## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 19-CV00285-CMA-NRN

 NICOLAS DONEZ,

      Plaintiff,

v.

LEPRINO FOODS, COMPANY, a Colorado
corporation,

      Defendant.

---

## DEFENDANT'S APPENDIX TO MOTION FOR SUMMARY JUDGMENT
## PURSUANT TO FED.R.CIV.P. 56

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 19-CV00285-CMA-NRN

NICOLAS DONEZ,

        Plaintiff,

v.

LEPRINO FOODS, COMPANY, a Colorado corporation

        Defendant.

---

### AFFIDAVIT OF STEVE SCHMIDT

---

Steve Schmidt, being first duly sworn, does hereby state for purposes of this Affidavit:

1.     I have personal knowledge of the facts contained herein, and if sworn at the time of trial could competently testify thereto.

2.     I currently hold the position of Senior Director, Production Division Human Resources and Safety for Leprino Foods Company ("Leprino Foods").

3.     Leprino Foods is a privately held corporation headquartered in Colorado, which manufactures cheese and dairy-related products.

4.     Leprino Foods has nine physically separate manufacturing facilities located across the United States.  Each of these nine facilities has its own internal Human Resources Department.

5.     The Fort Morgan facility is one of Leprino Foods' manufacturing plants.

6.     Leprino Foods employs over 300 individuals at its Fort Morgan facility of which, on average between 2012 to the present, approximately 40% have self-identified as Hispanic.

7.     Pursuant to Leprino Foods' Standards of Ethics and Business Practices, Leprino

Foods promotes equal opportunity and prohibits unlawful discrimination or harassment in the workplace based on any reason, including race.

8.     Leprino Foods also promotes a safe and respectful workplace for its employees, and believes it is extremely important to address incidents of workplace violence. With this goal in mind, Leprino Foods adopted a Workplace Security Policy *aka* its Workplace Violence Policy.

9.     Plaintiff Nicolas Donez was hired by Leprino Foods on November 3, 1998 for the position of bagger in the Whey Department.

10.     After approximately 10 years on the job, on or about 2008, Plaintiff was promoted by Leprino Foods to the position of Foreperson of the Whey Department at the Fort Morgan plant.

11.     Plaintiff worked as a Foreperson from 2008 until his termination on February 29, 2016.

12.     Based on 1) information received from the Fort Morgan Police Department, 2) Leprino Foods' own investigation, including Mr. Donez's and  Mr. Levar's written statements, and 3) the conversation between Risa Esterly- Wessbecker, the Human Resources Manager at Leprino Foods' Fort Morgan facility and Mr. Donez (wherein Mr. Donez confirmed that after being pushed by his co-worker Frank Levar he pushed him back), Leprino Foods determined that Mr. Donez had been an active participant in, and took actions which served to escalate, the altercation with Mr. Levar.

13.     Consequently, both Mr. Donez's and Mr. Levar's employment at Leprino Foods were terminated as a result of their respective violations of Leprino Foods' policy against violence at the workplace.

14.     Prior to their respective terminations, Mr. Donez and Mr. Levar were similarly

situated in that they a) dealt with the same supervisor; b) were subject to the same standards governing discipline, namely Leprino Foods' Workplace Violence Policy; and c) engaged in conduct of comparable seriousness by getting into a physical altercation at work.

15.     Additionally, I have determined based on a review of the relevant data that, of the over sixty-nine (69) Leprino Foods' employees at the Fort Morgan plant who filed for workers' compensation from 2012 to 2017, only two (2) were terminated within four months of submitting such a claim – Plaintiff and Sharonfae Abernathy.  Ms. Abernathy's employment was terminated for failure to follow safety rules relating to Leprino Foods' "lock out/tag out" policy.


FURTHER AFFIANT SAYETH NAUGHT.

Steve Schmidt


STATE OF COLORADO        )
                         ) ss.
CITY AND COUNTY OF DENVER)

SUBSCRIBED AND SWORN TO before me on December 9th, 2019 by Steve Schmidt.

Witness my hand and official seal.

My Commission Expires: 2/12/22

TRACY WELFRINGER DANIEL
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20144005082
MY COMMISSION EXPIRES FEB. 12, 2022

Notary Public

{00392151.DOCX / 1}                    3



Corporate
Operations
Manual

**HUMAN RESOURCES**
**WORKPLACE SECURITY POLICY**

Table of Contents

0.1    Workplace Security Policy
0.1.1  Policy ..............................................................................................................2
0.1.2  Responsibility for Administering Policy...........................................................2
0.1.3  Communcation ................................................................................................2
0.1.4  Incident Investigations ....................................................................................3
0.2    Appendix A .......................................................................................................4
0.3    Appendix B .......................................................................................................5
0.4    Appendix C .......................................................................................................7
0.5    Appendix D .......................................................................................................8

| Effective: | Approved By: | Policy #: | Page: |
|---|---|---|---|
| 02/01/2005 | KLUMP | HUM4950 | 1 |

This document contains Leprino's confidential information and it is intended for internal use only. Nothing contained in this document is intended to be a covenant, promise, or terms of an employment contract. Leprino reserves the right to modify or discontinue its policies, procedures, and guidelines at any time in its sole discretion, without notice. Access to this system will be monitored.

LF 00040

 Corporate
Operations
Manual

**Leprino Foods**

HUMAN RESOURCES
WORKPLACE SECURITY POLICY

0.1 <u>WORKPLACE SECURITY POLICY</u>

0.1.1 <u>Policy</u>

Leprino Foods believes employees should work in an environment without intimidation, threats or violence. Any action which, in management's opinion, is inappropriate to the workplace will not be tolerated. Such behaviors may include, but are not limited to, physical and/or verbal intimidation, threatening or violent conduct, vandalism, sabotage, arson, use of weapons, and/or carrying weapons onto Company property. This includes weapons within personal vehicles while parked on Company property; within Company vehicles while on Company property including tractor-trailers (at any time); and Company rental vehicles (at any time).

Employees are responsible for immediately reporting any such occurrence to their supervisor, human resources or any member of management. Supervisors notified of an incident will immediately contact the Human Resource Manager. The Human Resource Manager for the location will investigate complaints and take action management believes is appropriate when employees are found to have engaged in the above conduct.

Employees should directly contact law enforcement, security and/or emergency services if they believe there is an imminent bona fide threat to the safety and health of co-workers.

Leprino Foods reserves the right to conduct searches and inspections of any employee or Company owned property without notice based upon reasonable cause. Any employee who refuses to submit to a search will be subject to disciplinary action up to and including termination.

0.1.2 <u>Responsibility for Administering Policy</u>

Maintaining a safe workplace is the responsibility of every employee. Each employee is responsible for reporting incidences or potential problems.

The location Human Resource Manager will administer the Workplace Security Policy in conjunction with local management. This includes taking preventative measures, investigating incidents, responding to potential and actual violence and keeping related records.

The Human Resource Manager will work in conjunction with local management and outside resources including local law enforcement, mental health professionals, security companies, medical services and community services.

Information that may be useful in administering the policy and in developing an effective local program is included in the appendices at the end of the policy.

| Effective: | Approved By: | Policy #: | Page: |
|---|---|---|---|
| 02/01/2005 | KLUMP | HUM4950 | 2 |

This document contains Leprino's confidential information and it is intended for internal use only. Nothing contained in this document is intended to be a covenant, promise, or terms of an employment contract. Leprino reserves the right to modify or discontinue its policies, procedures, and guidelines at its discretion in its sole discretion, without notice. Access to this system will be monitored.

LF 000401



Corporate
Operations
Manual

HUMAN RESOURCES
WORKPLACE SECURITY POLICY

0.1.3    <u>Communication</u>

The policy is communicated to all employees on a periodic basis. New employees receive information on the Workplace Security Policy as part of their orientation.

The policy is available for viewing on the Public Policies and Procedures System. Employees are encouraged to ask any questions regarding the policy to their supervisor or a member of Human Resources.

0.1.4    <u>Incident Investigations</u>

Once an incident has been reported, the location's Human Resource Manager will investigate the incident with the assistance of local management or outside professionals as needed. Information obtained in the course of investigations will be provided only to those individuals who have a "need to know." Absolute confidentiality cannot be guaranteed. The company's first priority is to ensure the safety of employees and the general public.

If an incident involves an injury, a First Report of Injury may need to be completed. (See Safety Policy SAF1010 or a member of the Safety Department for guidance.)

Records of incident investigations and any injuries are maintained for a minimum of three years. Injuries reported under OSHA are subject to OSHA record keeping requirements.

| Effective: | Approved By: | Policy #: | Page: |
|---|---|---|---|
| 02/01/2005 | KLUMP | HUM4950 | 3 |

This document contains Leprino's confidential information and it is intended for internal use only. Nothing contained in this document is intended to be a covenant, promise, or terms of an employment contract. Leprino reserves the right to modify or discontinue its policies, procedures, and guidelines at its sole discretion, without notice. Access to this system will be monitored.



Corporate
Operations
Manual

**HUMAN RESOURCES**
**WORKPLACE SECURITY POLICY**

0.2    Appendix A

<u>Indicators of a Potentially Violent Individual</u>

The following are potential indicators of an employee with a problem or propensity toward violence.  A mental health professional should be relied upon in evaluating an individual's fitness for duty.

- The individual has a history of violence.

- The individual has problems controlling emotions and behavior in certain circumstances.

- The individual has an unsuccessful personal history.

- The individual does not accept responsibility for their own actions and believes factors outside themselves are responsible for their problems.

- Obsession with another person including stalking, spying, phone calls and general harassment.

- A person using alcohol or drugs is more likely to have violent tendencies or become highly aggressive.

- Extreme fascination with weapons, extensive gun collections and shooting skills.

- Unstable behavior and relationships such as irrational and demanding behavior and extreme mood swings.

- The individual is preoccupied with incidences of violence and frequently discusses the subject.

- A person who is experiencing negative personal circumstances (e.g., divorce, death) or who is having current psychological problems may be at risk.

| Effective: | Approved By: | Policy #: | Page: |
|---|---|---|---|
| 02/01/2005 | KLUMP | HUM4950 | 4 |

This document contains Leprino's confidential information and it is intended for internal use only. Nothing contained in this document is intended to be a covenant, promise, or terms of an employment contract.  Leprino reserves the right to modify or discontinue its policies, procedures, and guidelines in its sole discretion, without notice.  Access to this system will be monitored.

LEX 000430



Corporate
Operations
Manual

Leprino Foods

HUMAN RESOURCES
WORKPLACE SECURITY POLICY

0.3     Appendix B

Investigating Workplace Violence Incidents

The following steps are guidelines for investigating an incident.  In all cases, the first priority is to ensure the safety of employees and the general public.  Some situations may not warrant as comprehensive of an approach as outlined below.  Access to information from investigations is limited to those who have a "need to know."

1.     Plan the Investigation

Develop a list of witnesses or individuals affected by the incident.

Determine the sequence of interviews.

Determine the type of information needed from each person and develop specific questions.

Determine if any action is needed before beginning the investigation such as implementing security measures or suspending the accused employee.

2.     Conduct Interviews

First interview the individual who reported the occurrence, asking for specifics on who, what, why and when.  Obtain dates, times, witnesses and evidence to corroborate story.  Ask for a written statement summarizing the individual's view of the situation at the end of the interview.

Second, question the individual named as behaving in an intimidating, threatening or violent manner.  Ask for the same details as listed above and a written statement summarizing the alleged perpetrator's view of the situation at the end of the interview.

Question the witnesses, avoiding as much as possible identifying the involved parties at least at the beginning of the interview.  Ask general open-ended questions initially to see if the witness is aware of any incidents.  Obtain specific details.

Inform all parties interviewed that while their statements will be handled as discreetly as possible that they cannot be guaranteed confidentiality.  Witnesses should be informed that their statements may be reported to others and that they may have to testify in the future about the information they are providing.

3.     Document the Investigation

Prepare a confidential report of the investigation.  Stick to objective, verifiable data of the event.

-     Include all actual findings and their sources.

-     Keep the report as confidential as possible.  Only those with a legitimate need to know should have access to the report.  Do not give secretaries, supervisors, and other personnel not directly involved in the investigation access to any of the documents.

| Effective: | Approved By: | Policy #: | Page: |
|---|---|---|---|
| 02/01/2005 | KLUMP | HUM4950 | 5 |

This document contains Leprino's confidential information and it is intended for internal use only.  Nothing contained in this document is intended to be a covenant, promise, or terms of an employment contract.  Leprino reserves the right to modify or discontinue its policies, procedures, and guidelines at any time in its sole discretion, without notice.  Access to this system will be monitored.

LF 00044



Corporate
Operations
Manual

HUMAN RESOURCES
WORKPLACE SECURITY POLICY

4.    <u>Evaluate the Evidence</u>

Consult with an outside violence assessment professional if needed.

Consider the credibility of each party, the level of detail provided and corroborating evidence.

5.    <u>Take Appropriate Corrective Action</u>

Take appropriate correction action based on the severity of the incident and precedent.

| Effective: | Approved By: | Policy #: | Page: |
|---|---|---|---|
| 02/01/2005 | KLUMP | HUM4950 | 6 |

This document contains Leprino's confidential information and it is intended for internal use only. Nothing contained in this document is intended to be a covenant, promise, or terms of an employment contract. Leprino reserves the right to modify or discontinue its policies, procedures, and guidelines in its sole discretion, without notice. Access to this system will be monitored.

LE-4-00045

 Corporate
Operations
Manual

**Leprino Foods**

HUMAN RESOURCES
WORKPLACE SECURITY POLICY

0.4     Appendix C

**Emergency Response**
**Immediate Threat Exists**

In the event of a threat, the following actions may be taken as appropriate to the situation.

1.   Assess danger to employees, public, etc.  Contact resources such as security, law enforcement, mental health professionals as needed.

2.   Warn potential targets if needed.

3.   Determine security measures needed, such as restricting access to premises, adding security personnel, lighting, and alarm systems.

4.   Take appropriate action with employee that engaged in threatening behavior (investigation, suspension, collecting keys and access card).  If appropriate, take disciplinary action and/or file compliant with law enforcement.

5.   Conduct post-incident analysis and determine what changes can be made to prevent future occurrences and implement.

**Emergency Response**
**Violence Has Occurred**

In the event of violence, the following actions may be taken as appropriate to the situation.

1.   Contact law enforcement and/or location security personnel.

2.   Contact emergency services.

3.   Determine whether the facility needs to be evacuated.

4.   Determine whether there are potential victims that need to be warned.

5.   Provide victims and families with assistance.

6.   Determine who is responsible for communicating with the media.

7.   Conduct post-incident analysis and determine what changes can be made to prevent future occurrences and implement.

| Effective: | Approved By: | Policy #: | Page: |
|---|---|---|---|
| 02/01/2005 | KLUMP | HUM4950 | 7 |

This document contains Leprino's confidential information and it is intended for internal use only. Nothing contained in this document is intended to be a covenant, promise, or terms of an employment contract. Leprino reserves the right to modify or discontinue its policies, procedures, and guidelines in its sole discretion, without notice. Access to this system will be monitored.

LF 00046



Corporate
Operations
Manual

HUMAN RESOURCES
WORKPLACE SECURITY POLICY

0.5      Appendix D

<u>Preventative Measures</u>

The following measures, taken on a periodic basis, can avoid or minimize the impact of violent behavior.

1.      **Assess** the physical security of the building including:

-        Adequacy of security and communication systems.

-        System for particularly vulnerable staff such as the receptionist to notify others when there is a problem.

-        System that controls **access** by former employees and public to work **area**.

An outside security company or local law enforcement professional can assist with this effort.

2.      Establish contacts with the following outside resources.

-        Local law enforcement.

         Understand who to contact in the event of an emergency.  Have them visit to become familiar with the physical layout of the facility.

-        Mental health professionals with the ability to **assess** an individual's "fitness for duty."

-        Emergency medical services.

3.      Incorporate questions regarding applicants' previous history with respect to violence and emotional stability in the reference checking process.

4.      Ensure information on evacuating the building is incorporated in safety training.

5.      Incorporate information on Leprino Foods Workplace Security Policy into new employee orientation, emphasizing zero tolerance policy and who to contact.

| Effective: | Approved By: | Policy #: | Page: |
|---|---|---|---|
| 02/01/2005 | KLUMP | HUM4950 | 8 |

**This document contains Leprino's confidential information and it is intended for internal use only.  Nothing contained in this document is intended to be a covenant, promise, or terms of an employment contract.  Leprino reserves the right to modify or discontinue its policies, procedures, and guidelines at any time in its sole discretion, without notice.  Access to this system will be monitored.**

LF 0047

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2                FOR THE DISTRICT OF COLORADO

3      Civil Action No. 19-CV-00285-CMA

4      ----------------------------------------------------

5      NICOLAS DONEZ,

       Plaintiff,

6
       v.

7
       LEPRINO FOODS COMPANY,

8
       Defendant.

9      ----------------------------------------------------

10          DEPOSITION OF RISA ESTERLY-WESSBECKER
                       November 6, 2019

11     ----------------------------------------------------

12          PURSUANT TO NOTICE and the appropriate
       rules of civil procedure, the deposition of RISA

13     ESTERLY-WESSBECKER, called for examination by the
       Plaintiff, was taken on Wednesday, November 6, 2019,

14     commencing at 1:00 p.m. at the Burma Law Offices,
       1035 Pearl Street, Suite 325, Boulder, Colorado,

15     before Carmen Murphy, a Registered Professional
       Reporter and Notary Public in and for the State of

16     Colorado.

17

18
                       Dauster│Murphy
19                  www.daustermurphy.com
                       303.522.1604
20

21

22

23

24

25

**Page 25**

1    Q.   -- or were there separate training
2  sessions for -- one for harassment or one for
3  discrimination?
4    A.   They were all together.
5    Q.   Okay.  So what did the harassment and
6  discrimination training consist of?
7    A.   Separately?
8    Q.   Yes, let's start with discrimination.
9  That you provided to the employees when you were
10  there.
11    A.   Okay.  So it was a -- we did it multiple
12  times within a week.  Typically it was a 3-, 4-hour
13  session that we held across the road.  I don't recall
14  the place that we rented out.
15          We would go over videos, ask questions
16  of our audience, who were employees, go through
17  different scenarios, and everyone then signed off on
18  that policy and procedure.
19          Go to the next one?
20    Q.   Uh-huh.
21    A.   Okay.  Very similar to what I said in
22  the first one.
23    Q.   And these training sessions, they would
24  be done at the same time for harassment and
25  discrimination?

**Page 26**

1    A.   Correct.
2    Q.   And you said that you do multiple times.
3  Are you just referring that you would kind of have
4  different groups of employees?
5    A.   Multiple times during that week to hit
6  our early morning employees, our evening employees.
7  And because they worked on a different rotation, we
8  would have them different days during the week.
9    Q.   So it's not the employees attended
10  multiple times; it's you did multiple trainings?
11    A.   Correct.
12    Q.   Okay.  Did you ever receive any training
13  as to how to conduct investigations when you were at
14  Leprino?
15    A.   No.
16    Q.   In the discrimination and/or harassment
17  training that you provided, did any of that include
18  workplace violence as part of the training?
19    A.   Yes.
20    Q.   And what did the workplace violence
21  portion include?
22    A.   I don't remember the specific scenario,
23  but it was need to report it immediately to a manager
24  or supervisor and HR.
25    Q.   Did you discuss what constitutes

**Page 27**

1  workplace violence during these training sessions?
2    A.   Specifically, no.  More of a blanket
3  overall statement, and there were videos that gave
4  key scenarios.
5    Q.   Did the videos deal specifically with
6  workplace violence, or did it include harassment as
7  well?
8    A.   Both.
9    Q.   I mean, did you have separate videos for
10  workplace violence?
11    A.   Yes.
12    Q.   Can you give me an example of anything
13  you can recall from any of the videos?
14    A.   I cannot.
15    Q.   Was there any documentation provided or
16  handouts given at these trainings?
17    A.   Yes.
18    Q.   And do you recall what that was?
19    A.   We prepared all of the policies and
20  procedures on a back table wall, and every employee
21  had to -- they had an option of taking it with them,
22  reading it there, but everyone had to sign off on
23  reaffirmation of policies and procedures.
24          MS. BURMA:  Okay.  Bill, do you recall
25  what exhibit number we are on?  I think we are on 15.

**Page 28**

1          MR. BRITTAN:  I don't, but in an
2  abundance of caution, if you want to skip a few, we
3  can make sure there's no overlap.
4          MS. BURMA:  Let's go with 16 to be safe.
5          MR. BRITTAN:  Okay.
6          (Exhibit 16 marked for identification.)
7          (Discussion off the record.)
8    Q.   (BY MS. BURMA)  Do you recognize this
9  document?
10    A.   Yes.
11    Q.   Can you tell me what it is?
12    A.   It's the annual reaffirmation.
13    Q.   Are these the policies that would be
14  available to employees during the training?
15    A.   Correct.
16    Q.   Was there any other policies that you
17  can recall?
18    A.   There could have been.  I don't recall.
19    Q.   Do you know if the employee handbook was
20  provided during the training?
21    A.   I do not know.
22    Q.   Aside from the policies and procedures,
23  was there any other documentation handed out at these
24  trainings?
25    A.   I do not recall.

Page 33

1    Q.    Is there anyone else besides yourself
2  and Julia Lambert that were responsible for
3  conducting workplace violence investigations at the
4  Fort Morgan plant?
5    **A.    If needed, we would ask a manager to**
6  **help with collecting statements or anything like**
7  **that.**
8    Q.    Anyone else in the HR department?  How
9  about that.
10   **A.    Oh, no, sorry.**
11   Q.    Okay.  And was there anyone else in the
12 HR department involved with harassment and
13 discrimination investigations aside from yourself or
14 Julia Lambert?
15   **A.    No.**
16   Q.    When you -- did you take witness
17 statements, or did you conduct interviews?
18   **A.    Both.**
19   Q.    How did you decide which to do?
20   **A.    Based upon the scenario that was**
21 **presented to me.  Typically have a conversation with**
22 **the individual, and then they would give me a**
23 **statement afterwards.**
24   Q.    Did Leprino have any kind of corporate
25 policy for its HR professionals to use with respect

Page 34

1  to investigations?
2    **A.    Can you clarify?**
3    Q.    Like did you have kind of a separate
4  handbook or documents that said these are the steps
5  that you should use when conducting investigations?
6    **A.    No.**
7    Q.    Is there a difference between -- during
8  the time that you were at Leprino, was there a
9  difference between formal complaints and informal
10 complaints?
11   **A.    Not that I can recall.**
12   Q.    How would an employee make a complaint
13 about -- I'll just stick with workplace violence.
14   **A.    Okay.  They could either speak to a**
15 **supervisor, a manager, or come up to the HR**
16 **department and speak to either myself or Julia about**
17 **a concern that they might have on workplace violence.**
18   Q.    And were all complaints investigated?
19   **A.    Yes.**
20   Q.    Could they do this verbally, or did it
21 have to be in writing?
22   **A.    Either/or.**
23   Q.    I'm going to switch gears here.
24   **A.    Okay.**
25   Q.    And do you recall an employee named

Page 35

1  Nicolas Donez?
2    **A.    Yes.**
3    Q.    Was he an employee when you were at
4  Leprino?
5    **A.    Yes, he was.**
6    Q.    Before the incident involving his
7  termination, did you have any interaction with
8  Mr. Donez?
9    **A.    Limited.**
10   Q.    Can you recall any specifics?
11   **A.    Yes.  During the reaffirmation, I**
12 **actually took a picture of him and his wife, just**
13 **showing that -- how many people we had at a specific**
14 **training.**
15   Q.    I'm assuming you're not friends and
16 don't socialize with Mr. Donez?
17   **A.    No, I don't.**
18   Q.    Since the end of your employment, have
19 you seen or talked to him at all?
20   **A.    No, I have not.**
21   Q.    To your knowledge, was Mr. Donez ever
22 disciplined while you were working at Leprino?
23   **A.    Can I clarify?**
24   Q.    Uh-huh.
25   **A.    Before the termination?**

Page 36

1    Q.    Before the termination.
2    **A.    I do not recall.**
3    Q.    What was your impression of Mr. Donez as
4  an employee?
5    **A.    He seemed like a good employee.**
6    Q.    Any complaints or issues that stand out
7  to you as we sit here today?
8    **A.    Not that I can recall.**
9    Q.    I'm going to go to the incident that
10 happened on February 9, 2016.  Do you recall that?
11 Do you recall an incident on February 9, 2016?
12   **A.    Yes, yes, yes.**
13   Q.    When did you first learn that something
14 had happened?
15   **A.    An employee, Frank, came up to my office**
16 **and told me that he had just knocked Nick out.**
17   Q.    What did you think when he said that?
18   **A.    Shock.**
19   Q.    After he said that, what happened?
20   **A.    I asked him to come into my office to**
21 **sit down, take a few breaths, and tell me what was**
22 **going on.**
23   Q.    Was there anyone else around when --
24 when you say "Frank," are we talking about
25 Frank Levar?

Page 37

1    A.   Correct.
2    Q.   Was there anyone else around when
3  Frank Levar came up and said, "I just knocked Nick
4  out"?
5    A.   Yes.  Julia Lambert was.
6    Q.   Anyone else?
7    A.   I believe Sheryl Groves is the
8  individual who brought Frank to my office.
9    Q.   Okay.  So after you say, "Come in and
10  sit down," what happened next?
11    A.   I asked Frank if he was okay, what had
12  happened.  He said that he was calling for help in
13  the lactose room.  Nick came to the room, got in his
14  face, and Frank pushed him back.  And then Nick
15  double fisted Frank.  And during that time, his
16  glasses came flying off, and that he then knocked
17  Nick out and he was on the floor.  And he came up to
18  my office.
19    Q.   Did he have -- did Mr. Levar have
20  anything with him when he came up to your office?
21    A.   His glasses.
22    Q.   Okay.
23    A.   I remember his glasses.
24    Q.   Anything else?
25    A.   Not that I can recall.

Page 38

1    Q.   So he said that he was calling for help
2  in the lactose room.  Nick came in and got in his
3  face.  Mr. Levar pushed him back.  Nick double fisted
4  him, knocked off his glasses, and Frank punched him?
5    A.   Correct.
6    Q.   Do you recall him saying anything else?
7    A.   That he was sick and tired of people not
8  coming and helping him in the lactose room.
9    Q.   Was that an issue?
10    A.   I don't know.  He made it seem like it
11  was.
12    Q.   Do you know who either Mr. Levar or
13  Mr. Donez's supervisor was that day?
14    A.   I don't.  I don't know who was working
15  that day.
16    Q.   Do you recall if -- do you recall what
17  Mr. Donez's position was at that time?
18    A.   Mr. Donez?
19    Q.   Uh-huh.
20    A.   I believe he was a foreman.
21    Q.   Do you know if the supervisor was there
22  that day, the day of the incident?
23    A.   I don't recall.
24    Q.   Did Leprino have issues with being
25  short-staffed at times?

Page 39

1    A.   Occasionally.
2    Q.   Did that create issues with the
3  employees?
4    A.   Not typically.
5    Q.   Is there any incident that you can
6  remember when it did create an incident with
7  employees when they were short-staffed?
8    A.   Not off the top of my head, no.
9    Q.   How much interaction did you have on a
10  daily basis with the hourly employees?
11    A.   It varied.
12    Q.   What would be like the maximum amount of
13  time that you would spend with hourly employees on a
14  daily basis?  And I'll strike that.  Let me ask you a
15  better question.
16    A.   Okay.  Because I'm like, oh...
17    Q.   What percent of your time was spent
18  dealing with benefits versus what percent of your
19  time was dealing with investigations?  How about
20  that.
21    A.   I did more with investigations than I
22  did with benefits.
23    Q.   Okay.  Aside from investigation and
24  benefits, was there another area that you spent
25  significant time on during your time at Leprino?

Page 40

1    A.   More of a strategic piece from the HR.
2  Whether the plant was being either restructured, how
3  it would affect -- we have cheese and then we have
4  lactose.  Or we did -- or how do I say that?  Leprino
5  has cheese and lactose.  So the restructuring of it,
6  more of a strategic high level, that is where I spent
7  the majority of my time for Leprino.
8    Q.   Would that be like 50 percent of the
9  time or 70 percent?
10    A.   Again, every day was different.
11    Q.   Okay.
12    A.   Every day was -- sometimes it was
13  100 percent; other times it was 10 percent.
14    Q.   Okay.
15    A.   It's hard to gauge that.
16    Q.   Okay.  Let's go back to the day of the
17  incident.  So Frank is in your office and he says
18  this to you.  What happens after that?
19    A.   After Frank and I had our conversation,
20  I told him that I would need to do an investigation,
21  and he was suspended pending investigation.  Julia
22  then took Frank and got his statement.
23    I, at that time, was -- I don't know if
24  it was the radio or a text, but I got ahold of the
25  manager to make sure that Nick was okay down on the

Page 41

1  floor.  I was told at that time then the ambulance

2  was coming.

3          And it was just a little -- it was chaos

4  at that time because we needed to make sure that Nick

5  was okay, the ambulance was coming.  And then Frank

6  exited the building.  I believe Julia walked him out.

7          And then I believe I met with Ron and

8  Julia at that time.

9      Q.   Okay.  We'll get to that.

10     A.   Okay.

11     Q.   When Frank was in your office and he was

12  sitting down and telling you about this, do you

13  remember how long, approximately, that conversation

14  took place?

15     A.   Maybe 20 minutes.

16     Q.   Did you ask Frank to make a statement at

17  that time?

18     A.   I did.

19     Q.   And did you have him write it out?

20     A.   Yes, I did.  Well, to clarify, Julia

21  actually made -- had him write the statement.  I

22  requested it.

23     Q.   Do you recall asking him any other

24  questions during that meeting?

25     A.   What happened, what's going on, and

Page 42

1  that's when he told me the situation that happened

2  with Frank.

3      Q.   What was Frank's demeanor during that

4  meeting?

5      A.   He was visibly shakened.  He was

6  fidgeting with his hands.  He was trying to fix his

7  glasses.  Because he told me -- obviously when Nick

8  double fisted him, it must have came up and got in

9  his glasses.

10     Q.   I mean, you were not present during the

11  assault, correct?

12     A.   No, I was not.

13     Q.   To your knowledge, do you know if there

14  were any witnesses?

15     A.   Not that I'm aware of.

16     Q.   During your time at Leprino, have you

17  ever had a similar incident, meaning an assault that

18  you had to deal with?

19     A.   No.

20     Q.   Okay.  So at the end of the meeting, you

21  told Mr. Levar that he was going to be suspended

22  without pay?

23     A.   Pending investigation.

24     Q.   Pending investigation.

25          And then did you ask Ms. Lambert to walk

Page 43

1  Mr. Levar out?

2      A.   To get his statement and then to walk

3  him out, correct.

4      Q.   Any other interaction you had with

5  Frank Levar that day?

6      A.   No.

7      Q.   Any other interaction you had with

8  Frank Levar after that day?

9      A.   Yes.

10     Q.   When was that?

11     A.   During the -- I think you called it

12  criminal trial?

13     Q.   Uh-huh.

14     A.   During the criminal trial, I was asked

15  questions, and Frank was present.

16     Q.   Okay.  That was just -- was that in a

17  courtroom?

18     A.   Yes.

19     Q.   Any other time that you have seen or

20  talked to Frank Levar since that meeting?

21     A.   Not to my knowledge.

22     Q.   So after that, you said you -- either

23  through a text or some -- some method, you got ahold

24  of -- who was it?

25     A.   The manager.  So it would have been

Page 44

1  either Mike Buckhout or Ron Cantwell.

2      Q.   Do you recall what was said when you got

3  ahold of the manager?

4      A.   I believe I was just asking someone to

5  please check on Nick, that he was in the lactose

6  area.  And at that time they told me that the

7  ambulance had been called.

8      Q.   Did the manager convey Nick's condition

9  to you at that time?

10     A.   No.

11     Q.   Did you go down to the lactose room and

12  ever see Nick there?

13     A.   I went down to the lactose room, but

14  Nick had already been moved at that point.

15     Q.   Okay.  So after you -- when you talked

16  to the manager, was that on the phone or in person or

17  on radio?

18     A.   Yeah.  It wasn't in person.

19     Q.   Okay.  After you talked to the manager,

20  what happened after that?

21     A.   At that point, then, Julia and I decided

22  we were going to the hospital to check on Nick.  So

23  we grabbed our workers' comp paperwork and -- I can't

24  remember the name, the FMLA -- NUMA (phonetic).

25     Q.   So --

Page 45

1    **A.    Don't quote me on that, but it was**
2    **basically like FMLA-type, FTD-type paperwork and**
3    **stuff like that that was separate from the workers'**
4    **comp.  And we went to the hospital.**
5    **Q.    Do you recall how long after the time**
6    **that Nick appeared -- or not Nick -- Frank appeared**
7    **to the time that you left to go to the hospital, do**
8    **you recall how much time that was?**
9    **A.    I don't.**
10   **Q.    Why did you bring the workers' comp**
11   **and -- we'll just call it FMLA paperwork?**
12   **A.    Because he was injured at work.**
13        Q.    Did you eventually go to the hospital?
14        A.    I did.
15        Q.    Did you see Mr. Donez at the hospital?
16        A.    I did.
17        Q.    Tell me what happened.
18        A.    Julia and I were in the waiting room of
19   the hospital, then we were released to go back and
20   see Nick.  Heather, his wife, was there as well.  I
21   asked him if he was okay.  He had a neck brace on.
22   His voice was very scratchy.
23        I asked him, you know, what happened.
24   He couldn't recall really at that time; that Frank
25   and him got into an altercation.  Those aren't his

Page 46

1    words.  He couldn't remember anything after that.
2        Q.    Did you talk to Heather when you were at
3    the hospital?
4        A.    I did.
5        Q.    And by "Heather," I mean Heather Donez,
6    Nick's wife.
7        A.    Yes.
8        Q.    And so do you actually recall Nick
9    answering your questions when you were at the
10   hospital?
11       A.    I do.
12       Q.    And you asked if he knew what happened,
13   something to that extent?
14       A.    Correct.
15       Q.    Do you recall what his response was?
16       A.    His actual response, no.
17       Q.    In general, do you recall what his
18   response was?
19       A.    That Frank pushed him, punched him.  And
20   he could not recall anything else.
21       Q.    Was Heather in the room the entire time
22   that you were there?
23       A.    Yes.
24       Q.    I have met Heather, obviously.
25   Sometimes she can talk a little bit.  Did she talk

Page 47

1    during the -- while you were at the hospital?
2        A.    Yes, she did.
3        Q.    Do you recall anything that Heather
4    said?
5        A.    Yes.  Heather was shaken, upset.  Made a
6    comment that it looked like Nick had been, like,
7    strangled or something -- something was wrong with
8    his throat and/or larynx.  That's the majority of
9    what she said.
10       Q.    Did that seem to be the case to you,
11   just based on what you observed?
12       A.    I couldn't -- I didn't observe the
13   incident, so...
14       Q.    You did notice that Nick had a scratchy
15   throat?
16       A.    I did.
17       Q.    Did you see any other injuries?  Did you
18   see any physical injuries on Nick?
19       A.    Yes.  His eyes were kind of bloodshot,
20   and he did have a mark on his left cheek.  And he had
21   a neck brace on.
22       Q.    Do you recall approximately how long you
23   were at the hospital?
24       A.    The whole time at the hospital, roughly
25   an hour.

Page 48

1        Q.    And about how much of that time were you
2    actually talking with Nick or in the room?
3        A.    Yeah, maybe 20 minutes or so.
4        Q.    I'm assuming there's doctors and people
5    coming in and out.
6        A.    I don't recall that.
7        Q.    Oh, do you recall seeing any doctors?
8        A.    No.
9        Q.    Do you recall anyone else aside from
10   Heather in the -- aside from Julia Lambert and
11   Heather in the emergency room while you were in the
12   hospital?
13       A.    No.
14       Q.    Were the -- did the police arrive any
15   time that you were at the hospital?
16       A.    Not when I was there.
17       Q.    Okay.  So aside from Julia Lambert;
18   maybe Sheryl Groves, the manager; and Mr. Levar; as
19   well as Nick Donez and Heather, is there anyone else
20   at that time that you had talked to?
21       A.    Ron Cantwell.
22       Q.    Okay.
23       A.    Yeah.
24       Q.    Did you make any calls to either
25   Kelly Soja or to corporate before you went to the

Page 49

1  hospital?
2      A.    I believe I texted Kelly Soja with -- we
3  had an incident at the hospital -- not at the
4  hospital, sorry -- we had an incident at the plant,
5  and I would update her when I got more information.
6      Q.    Do you recall anyone else that you
7  talked to?
8      A.    Before?
9      Q.    Uh-huh.
10     A.    I do not.
11     Q.    What about what happened after you
12  left -- let me back up a second here.
13     A.    Okay.
14     Q.    Aside from what we have already spoken
15  about, anything else that you can remember Mr. Donez
16  saying at the hospital?
17     A.    No.
18     Q.    Anything else that you can recall
19  Heather Donez saying at the hospital?
20     A.    The only other thing I can recall
21  Heather saying, that we talked to her about if she
22  needed additional time off, she would need to apply
23  for the FMLA.  That's it.
24     Q.    Okay.  Did Mr. Donez sign any forms when
25  he was at the hospital?

Page 50

1      A.    I believe he signed the workers' comp
2  information --
3      Q.    Uh-huh.
4      A.    -- because we recapped that with him.
5      Q.    Okay.
6      A.    And Heather, as well, was there.
7      Q.    When you say "recap," what do you mean?
8      A.    So basically taking his information,
9  telling them that he would be subject to a drug test
10  per policy.  And then there's a signature page, I
11  believe, at the very end where he just has to sign
12  his name.
13     Q.    Is the drug testing, is that a policy
14  for workers' comp, or is that a policy in incidents
15  like this?
16     A.    Anytime anyone is injured at work, they
17  are subject to a drug test.
18     Q.    Is that only the injured party, or is
19  it -- in a situation like this, is it both parties?
20     A.    In this case, it was just for Nick.
21     Q.    Did you see any injuries on Mr. Levar?
22     A.    His hands were red, and his face, which
23  would have been his left -- left side was red.
24     Q.    Did Mr. Levar report any injuries to you
25  during that conversation?

Page 51

1      A.    No.
2      Q.    After leaving the hospital and before
3  Mr. Donez was terminated --
4      A.    Okay.
5      Q.    -- did you have any other conversations
6  with Nick Donez?
7      A.    Personal conversation with Nick would
8  have happened prior to his termination, to clear up
9  the information he gave me from his written statement
10  versus the information that the police report came
11  out on.  There was a conversation that I had with --
12  telephone conversation that I had with him.
13     Q.    Okay.  And I believe Mr. Donez was
14  terminated on February 29th?
15     A.    I'm sorry.  I don't recall.
16     Q.    Let me see if that's right.  Yeah.
17     A.    Okay.
18     Q.    Does that sound about right?
19     A.    Correct.
20     Q.    How close to Mr. Donez's termination did
21  that conversation that you just mentioned occur?  Was
22  it a few days or couple of weeks or --
23     A.    No.  It was probably a few days.
24     Q.    Okay.  What was Mr. Donez's demeanor
25  when you saw him in the hospital?

Page 52

1      A.    He just looked like he was in pain.  He
2  was just laying on the bed.
3      Q.    So you leave the hospital.  What happens
4  next?
5      A.    So I leave the hospital and we went back
6  to the plant.  Continue?
7      Q.    Uh-huh.
8      A.    At that point, it was gathering
9  statements, talking to the individuals who had -- not
10  necessarily witnessed the situation, but were --
11  happened to be there right after the situation had
12  happened.  And then I believe later in the day, the
13  Fort Morgan Police Department came to the facility,
14  the plant.
15     Q.    Before working at Leprino, had you ever
16  handled an incident similar to this involving an
17  assault?
18     A.    Not similar to this, no.
19     Q.    Did you talk to anyone from corporate
20  that day regarding the incident?
21     A.    I believe I spoke to Kelly Soja, and I
22  followed up with her on what had happened.
23     Q.    Do you recall what you said to
24  Kelly Soja?
25     A.    Specifically, no.

Page 53

1    Q.   Do you recall in general what you
2  discussed with Ms. Soja?
3    A.   Told her basically what Frank had told
4  me; that Nick Donez was in the hospital, gave her the
5  information that he gave me.  And then I believe at
6  that point, too, the Fort Morgan Police were asking
7  for additional information, so I needed to get
8  clarification on what kind of information that I
9  could release or turn over to them.
10   Q.   Did you believe Frank, his statement as
11  to what happened?
12   A.   I did.
13   Q.   Did you have any previous incidents
14  during your employment at Leprino involving
15  Frank Levar?
16   A.   Not that I can recall.
17   Q.   Do you recall any employees making
18  complaints about Frank Levar at any time during your
19  employment?
20   A.   Not that I can recall.
21   Q.   Why did you believe Frank?
22        MR. BRITTAN:  Can I get a time frame?
23        MS. BURMA:  During the conversation --
24   Q.   (BY MS. BURMA)  I think we have kind of
25  gone over that was the only time you spoke with him.

Page 54

1        So that day when you were speaking with
2  him, why did you believe him, Mr. Levar?
3    A.   Because he came up and he originally
4  wanted to -- he said it was going to be an exit
5  interview because he just knocked Nick out.  At that
6  point he didn't have any reason to lie, and he was
7  very forthcoming when I asked the questions.
8    Q.   So Mr. Levar said this is his exit
9  interview?
10   A.   When he initially came into the office,
11  yes.
12   Q.   Okay.  When you were talking with
13  Mr. Levar, did you take notes?
14   A.   I did.
15   Q.   What happened to those notes?
16   A.   Typically -- I shouldn't say
17  "typically."  But if I write it, then I will type it
18  up.  So they would have been in my recap.
19   Q.   And then what would happen to the
20  handwritten notes?
21   A.   Typically I would throw them away.
22   Q.   Okay.
23   A.   Yeah.
24   Q.   Was there any time limits put on how
25  long the investigation for Leprino would take?

Page 55

1    A.   Can you clarify?
2    Q.   Meaning, was -- did anyone tell you, "We
3  have to have this investigation completed in like two
4  weeks," or anything like that?
5    A.   No.  No.
6    Q.   Were you in charge of the investigation
7  for Leprino Foods involving this incident?
8    A.   Yes.
9    Q.   I'm sure Julia Lambert was also
10  involved.
11   A.   Correct.
12   Q.   Was there anyone else from human
13  resources that was involved in the investigation of
14  the incident between Mr. Donez and Mr. Levar?
15   A.   Anyone else in human resources?
16   Q.   Correct.
17   A.   No.
18   Q.   Did you view Mr. Donez's personnel file
19  as part of your investigation?
20   A.   I don't recall.
21   Q.   Did you review Mr. Levar's personnel
22  file as part of your investigation?
23   A.   I don't recall.
24   Q.   When you spoke with witnesses, did you
25  take statements, or did you conduct interviews?

Page 56

1    A.   Both.
2    Q.   And when you conducted interviews, did
3  you keep notes?
4    A.   Yes.
5    Q.   How about this:  Tell me what you can
6  recall from the process of the investigation for this
7  incident.
8    A.   The process of the investigation of
9  this.  Would -- in general?
10   Q.   Let's start in general.  Then we'll go
11  to specific.
12   A.   Okay.  Ask the individual to come in.
13  Ask them a series of questions based upon the
14  circumstances.  And when they were -- my questions
15  would be done, then I would ask them to write their
16  statement.
17   Q.   Do you recall approximately how many
18  employees you interviewed?
19   A.   Not off the top of my head.
20   Q.   Were these interviews done separate from
21  the police interviews?
22   A.   Some were; some weren't.
23   Q.   Were you involved in any of the police
24  interviews?
25   A.   Yes.

Page 57

1    Q.   Why?

2    A.   I was requested from legal, Leprino, to

3  sit in on all of the investigations.

4    Q.   Did you sit in on all the police

5  interviews?

6    A.   I believe so, yes.

7    Q.   Did you sit in on any of the interviews

8  between the police and Mr. Donez?

9    A.   No, I did not.

10      MS. BURMA:  We have been going for about

11  an hour and 15 minutes.  Can we take a brief break?

12      MR. BRITTAN:  That's fine.

13      (Recess taken from 2:14 p.m. to 2:26 p.m.)

14    Q.   (BY MS. BURMA)  I am going to hand you

15  what we are going to mark as Exhibit 17.  Let me hand

16  it to her first.

17      (Exhibit 17 marked for identification.)

18    Q.   (BY MS. BURMA)  And I'll give you a

19  second to review it.  Just let me know when you're

20  done.

21      Let me first ask you, do you recognize

22  this document?

23    A.   Some of them, yes.

24    Q.   Do you know who prepared it?  Kelly --

25    A.   By Kelly Soja's name on the top, this is

Page 58

1  her notes.

2    Q.   So this was not something that you

3  typed?

4    A.   Correct.

5      MR. BRITTAN:  Just for clarification --

6  go ahead and clarify.

7    A.   Well, the first part is not something

8  that I typed.  My piece is on -- starting on

9  number 3, page number 3.

10    Q.   (BY MS. BURMA)  Uh-huh.

11    A.   This is something that I typed, through

12  page 6.

13    Q.   Okay.  If you look -- can you look at

14  the bottom of page 3.

15    A.   Bottom of page 3, yes.

16    Q.   So you typed everything from 3 to 6?

17    A.   Correct.

18    Q.   Okay.  Aside from this document and the

19  handwritten statements, is there anything else that

20  you're aware of that was included in Leprino's

21  investigative file regarding this incident?

22    A.   The police report.

23    Q.   Okay.  During your time at Leprino, were

24  you involved in any other incidents that involved the

25  police in any way, shape, or form?

Page 59

1    A.   Yes.

2    Q.   In those incidents, did you include the

3  police investigative report as part of the incident

4  file?

5    A.   Not for one.

6    Q.   What was -- the one that you're thinking

7  of right now, what was that incident?

8    A.   Drugs were found on the plant floor.

9  Police were called.  Their dogs came into the plant,

10  swept it, could not find any additional drugs in the

11  plant.

12    Q.   Okay.  And any other incidents that you

13  recall during your time at Leprino besides that one

14  and the one at issue in this case?

15    A.   No.

16    Q.   Was it your decision to include the

17  police report as part of the investigative file, or

18  were you asked to do that?

19    A.   It was my decision, based upon a comment

20  that one of the police officers had made to me that

21  Nick told him that he had punched Frank.

22    Q.   Do you recall when this conversation

23  with the police officer occurred?

24    A.   It was after the incident, but I don't

25  have a specific date.

Page 60

1    Q.   Was it in person, or was it over the

2  phone?

3    A.   It was in person.

4    Q.   And did the conversation happen at

5  Leprino, at the Fort Morgan plant?

6    A.   Correct.

7    Q.   Do you recall who the officer was?

8    A.   Not off the top of my head, no.

9    Q.   Do you recall if it was a man or a

10  woman?

11    A.   It was a man.

12    Q.   Does Vosburg ring any -- refresh your

13  memory at all?

14    A.   There were three of them.  I apologize,

15  no, I don't recall which one.

16    Q.   Do you recall specifically what the

17  officer said to you about what Nick told him?

18    A.   That Nick had stated that he

19  pushed/punched Frank, which accelerated the -- sorry,

20  conversation -- or excuse me, the incident.

21    Q.   So the police officer said that Nick had

22  told him that he either pushed or punched Frank,

23  which accelerated the incident; is that correct?

24    A.   Correct.

25    Q.   Did you review the police report?

Page 61

1     A.   I did.
2     Q.   And did you find that statement in
3  there?
4     A.   There was a statement in there that had
5  stated that Nick -- I don't know the word, but that
6  he did have physical contact with Frank.
7     Q.   Did you ask the police officer any
8  questions after they made that statement to you?
9     A.   I don't recall.
10    Q.   Do you recall anything else from that
11 conversation with the police officer where they said
12 that Nick pushed/punched Frank, which accelerated the
13 incident?
14    A.   Not at the moment, no.
15    Q.   Okay.  I'm going to have you -- if you
16 go in there and look at Exhibit 6.
17         MS. BURMA:  I just had it.  There's a
18 copy for you --
19         MR. BRITTAN:  Thank you.
20         MS. BURMA:  -- Bill, but it has been
21 previously marked as Exhibit 6.
22    Q.   (BY MS. BURMA)  And I'll give you a
23 second to review it, and just let me know when you're
24 done.
25    A.   Okay.

Page 62

1     Okay.
2     Q.   Have you seen this document before?
3     A.   I have.
4     Q.   Can you tell me what it is?
5     A.   It is a typed statement by Nick Donez.
6     Q.   Do you know who typed this statement?
7     A.   My understanding, it was his wife,
8  Heather.
9     Q.   Did you do any follow-up interviews with
10 Mr. Donez after he made that statement?
11    A.   Yes.  Before his termination, I had a
12 phone conversation with him.
13    Q.   And that was a phone conversation that
14 we previously mentioned that happened a few days
15 before his termination?
16    A.   Correct.
17    Q.   Do you recall, did Heather give you this
18 statement?
19    A.   Yes, she did.
20    Q.   Do you recall when she did that?
21    A.   It was after the incident.
22    Q.   Was it shortly after, or was it --
23    A.   I would say shortly after.
24    Q.   Do you have any reason to doubt that
25 Mr. Donez had memory issues after the incident?

Page 63

1         MR. BRITTAN:  Objection.  Calls for
2  speculation.
3         Go ahead and answer if you can.
4     A.   Can you repeat that again?
5     Q.   (BY MS. BURMA)  Do you have any reason
6  to -- okay.  Strike that.
7         Did Heather or anyone else mention to
8  you that Nick had issues with his memory after this
9  incident?
10    A.   I do not recall.
11    Q.   When Nick was in the hospital, did he
12 say something -- I thought he said something to you
13 like he couldn't remember what happened after a
14 certain point.
15    A.   Correct.
16    Q.   Do you have any reason to doubt that
17 Mr. Donez had memory issues after the incident?
18    A.   After the incident, I couldn't comment
19 on that.
20    Q.   Did either a doctor or a detective or
21 anyone else say anything to you that would make you
22 question whether or not Nick had memory issues after
23 the incident?
24         MR. BRITTAN:  Object to the form.
25         Go ahead.

Page 64

1     A.   Sorry.  No.
2     Q.   (BY MS. BURMA)  Did you think Mr. Donez
3  was being truthful when he made this statement?
4     A.   I did.
5     Q.   Do you recall when the decision to
6  terminate Mr. Levar was?
7     A.   Decision to -- off the top of my head,
8  no.
9         MS. BURMA:  Mark this as Exhibit 18.
10        (Exhibit 18 marked for identification.)
11    A.   Okay.
12    Q.   (BY MS. BURMA) Do you recognize this
13 document?
14    A.   I do.
15    Q.   Can you tell me what it is?
16    A.   It's a termination letter.
17    Q.   And Julia Lambert signed it?
18    A.   Correct.
19    Q.   Did you review it before it was sent to
20 Mr. Levar?
21    A.   I believe so.
22    Q.   Do you agree with what was included in
23 the letter?
24    A.   Yes.
25    Q.   And who decided to terminate Mr. Levar?

Page 65

1  Whose ultimate decision was it?
2       A.   That would have been myself and
3  Ron Cantwell.
4       Q.   So I'm assuming you agree with the
5  decision?
6       A.   Yes.
7       Q.   Okay.  Do you know if Mr. Levar was
8  arrested following this incident?
9       A.   I heard he was.
10      Q.   Do you have any idea as to when
11 Mr. Levar was arrested?
12      A.   I do not.
13      Q.   We briefly referenced the criminal
14 trial, and you testified.  Did you agree -- did you
15 think Mr. Levar should have been convicted of
16 assault?
17           MR. BRITTAN:  Objection.  Calls for a
18 legal conclusion.
19           But go ahead and answer if you can.
20      A.   I'm not an expert when it comes to...
21      Q.   (BY MS. BURMA)  Did you think Mr. Levar
22 should have been prosecuted?
23           MR. BRITTAN:  Same objection.
24           Go ahead.
25           THE DEPONENT:  Go ahead?

Page 66

1       A.   Personally?
2       Q.   (BY MS. BURMA)  Yes.
3       A.   Yes.
4       Q.   We may come back to that, but right now
5  we are going to go to 19.
6       A.   Keep this out?
7       Q.   You can just leave it.
8        (Exhibit 19 marked for identification.)
9       Q.   (BY MS. BURMA)  Hand you what we have
10 marked as Exhibit 19.
11           MR. BRITTAN:  Thank you.
12      Q.   (BY MS. BURMA)  Let me know when you're
13 done reviewing.
14      A.   Okay.
15      Q.   Do you recognize this document?
16      A.   Yes.
17      Q.   And can you tell me what it is?
18      A.   It is a termination letter.
19      Q.   Did you draft this letter?
20      A.   I did.
21      Q.   And Mr. Levar -- in Mr. Levar's letter,
22 which is 18 --
23      A.   Uh-huh.
24      Q.   -- in the third sentence it says,
25 "Leprino Foods has zero tolerance for workplace

Page 67

1  violence."
2           Is that your understanding of Leprino
3  Foods' policy at the time?
4       A.   For Mr. Levar's?
5       Q.   Yeah.
6       A.   Yes.
7       Q.   And in Mr. Donez's, it says something --
8  I don't think it's the exact same language, but it's
9  similar.
10      A.   Correct.
11      Q.   "Leprino Foods has no tolerance for
12 workplace violence."
13           So that was your understanding as to
14 Leprino Foods' policy at that time?
15      A.   Correct.
16      Q.   Why did it take longer to terminate
17 Mr. Donez than Mr. Levar?
18      A.   For Mr. Donez, we were waiting for
19 confirmation from the police report after the -- I
20 spoke to the officer, and he told me that Nick's
21 statement to him was different than to myself.
22           And in Frank's termination letter, he
23 admitted to me that he did punch Nick.
24      Q.   Okay.  Had you not received the police
25 report, would you have terminated Mr. Donez?

Page 68

1       A.   I -- I don't know.  I can't respond to
2  that.
3       Q.   Who all -- who was involved in the
4  decision to terminate Mr. Donez?
5       A.   It would have been myself, Ron Cantwell,
6  Kelly Soja, Steve Schmidt, and typically we also
7  speak to legal.
8       Q.   Do you recall having conversations about
9  whether or not to terminate Mr. Donez with anyone
10 from Leprino, excluding legal?
11      A.   Excluding -- can you clarify?
12      Q.   I don't want to ask about anything that
13 you talked to with legal.
14      A.   Okay.
15      Q.   I don't want you to answer any of that.
16      A.   Okay.
17      Q.   I'm asking about conversations with
18 either Ron Cantwell, Kelly Soja, Steve Schmidt, or
19 any of those other individuals.
20      A.   Yeah.
21      Q.   Do you recall having conversations with
22 them about whether or not to terminate Mr. Donez?
23      A.   Yes.
24      Q.   What can you recall from those
25 conversations?

Page 69

1  A.  That we were all in consensus that due
2  to the fact that he admitted that he, you know, was
3  part of the incident with Frank Donez --
4  MR. BRITTAN:  Frank Levar.
5  THE DEPONENT:  Oh, did I say the
6  wrong --
7  MR. BRITTAN:  You said Frank Donez.
8  THE DEPONENT:  I'm sorry.  I apologize.
9  A.  Okay.  Can you repeat the question?
10  Q.  (BY MS. BURMA)  Okay.  Let's back up and
11  try to go in order.
12  A.  Okay.
13  Q.  So we have the incident that happened,
14  and you have conducted an investigation and you've
15  interviewed witnesses.
16  A.  Correct.
17  Q.  How long did it take you to interview
18  witnesses?
19  A.  I would say probably within that
20  following week.
21  Q.  Okay.  Now, after you have interviewed
22  witnesses, what happened after that?
23  A.  After we interviewed all the witnesses,
24  gathered all of our information, we were waiting on
25  the police report in order for it to confirm what

Page 70

1  Frank had said or what Nick had said.  And at that
2  point, it basically -- it lined up with what Frank
3  had stated initially.
4  And then that's when I placed a phone
5  call to Nick and asked him about it, and that's when
6  he admitted that, yes, he made that statement to the
7  police.
8  Q.  Okay.  And before we get to your phone
9  call with Nick, did you have conversations with
10  corporate -- after the interviews and before the
11  phone call with Nick -- regarding Mr. Donez's
12  termination?
13  A.  Yes, yes.
14  Q.  And those were those conversations we
15  just talked about, about you were on the same page
16  because of what the detective had told you?
17  A.  Correct.
18  Q.  Now, when you spoke with Nick, had
19  you -- had the decision already been made to
20  terminate Nick at that time --
21  A.  No.
22  Q.  -- when you made that phone call?
23  Had you received the police report at
24  the time that you called Mr. Donez?
25  A.  Yes.

Page 71

1  Q.  So what did you say during that phone
2  call with Mr. Donez?
3  A.  That I received the police report, and
4  that based upon his statement he provided to me and
5  what the police report was stating, that it is
6  different, and whether or not his statement in the
7  police report was accurate or not.
8  Q.  And did you -- I mean, did you have the
9  police report in front of you, if you recall?
10  A.  I did.
11  Q.  Did you quote from the police report?
12  A.  I did.
13  Q.  Do you know if Mr. Donez had the police
14  report in front of him?
15  A.  I don't.
16  Q.  What did Mr. Donez say in response?
17  A.  I don't know his exact words, but that,
18  yes, he remembered when he spoke to the police
19  officer that he did state that he had shoved Frank as
20  well.
21  Q.  Okay.  And why was Nick shoving
22  Mr. Levar a violation of the workplace violence
23  policy for Leprino?
24  A.  It physically hurt, and/or in a
25  threatening manner, the well-being of an employee.

Page 72

1  Q.  Did Mr. Donez say that he either pushed
2  or punched Mr. Levar in a threatening manner?
3  A.  State that again.
4  Q.  Did Mr. Donez make any statements as to
5  what his intent was when he pushed Mr. Levar?
6  A.  Not to me, no.
7  Q.  Did Mr. Donez convey to you that he was
8  fearful at that time, which is why he pushed
9  Mr. Levar?
10  A.  No, he did not.
11  Q.  Did you ask Mr. Donez that?
12  A.  I did not.
13  Q.  How long did your phone call with
14  Mr. Donez last?
15  A.  Maybe ten minutes.
16  Q.  Do you recall anything else that you
17  discussed during that phone call?
18  A.  That I would be back in touch with him.
19  Q.  That was it?
20  A.  Yeah, that I would be back in touch with
21  him.
22  Q.  Do you recall if during that phone call
23  you scheduled a meeting with Mr. Donez?
24  A.  I do not.
25  Q.  Did you ever speak with Mr. Donez again?

1          IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF COLORADO

3   Civil Action No. 19-CV00285-CMA

4   _____

    VIDEO DEPOSITION OF:  NICOLAS DONEZ - August 26, 2019

5   _____

6   NICOLAS DONEZ,

7   Plaintiff,

8   v.

9   LEPRINO FOODS, INC.,

10  Defendant.

11  _____

12          PURSUANT TO NOTICE, the video deposition
    of NICOLAS DONEZ was taken on behalf of the Defendant
13  at 1035 Pearl Street, Suite 325, Boulder, Colorado, on
    August 26, 2019, at 9:54 a.m., before Carmen Murphy,
14  Registered Professional Reporter and Notary Public
    within Colorado.

15

16

17

18

19

20  **H+G**

21

22  Hunter + Geist, Inc.

23  303.832.5966        1900 Grant Street, Suite 1025      ▪ www.huntergeist.com
    800.525.8490        Denver, CO 80203                   ▪ scheduling@huntergeist.com

24                      Your Partner in Making the Record

25

Page 29

1  that burn to her hand?
2       A.  I'm not absolutely sure.
3       Q.  But she was off for some period of time?
4       A.  Yes, sir.
5       Q.  And your wife, Heather, filed a workers'
6  compensation claim as a result of that burn to her
7  hand, correct?
8       A.  Yes, sir.
9       Q.  Was Heather fired from Leprino Foods as
10  a result of filing that workers' compensation claim?
11      A.  No, she was not.
12      Q.  Do you know of any adverse employment
13  action that was taken against her as a result of her
14  filing that workers' compensation claim?
15      A.  No, sir.
16      Q.  Do you know others at Leprino Foods who
17  have filed workers' compensation claims and continued
18  to be employed at Leprino Foods?
19      A.  No, I do not.
20      Q.  Let me see if I can repeat that
21  question.
22          Do you know other people who have filed
23  workers' compensation claims at Leprino Foods other
24  than yourself and your wife?
25      A.  Not to my knowledge.

Page 30

1       Q.  Okay.  So the only -- just to be clear,
2  the only two people you're aware of who have filed
3  filed workers' compensation claims while working for
4  Leprino Foods at the Fort Morgan plant were yourself
5  and your wife, correct?
6       A.  Yes, sir.
7       Q.  Okay.  And of course in your wife's
8  case, she continued to be employed at Leprino Foods
9  after filing her workers' compensation claim --
10      A.  Yes, sir.
11      Q.  -- correct?
12          And in your case, your employment was
13  terminated several weeks after the filing of the
14  workers' compensation claim, correct?
15      A.  Yes, sir.
16      Q.  Okay.  And other than the fact that your
17  employment was terminated several weeks after filing
18  the workers' compensation claim, you don't have any
19  other facts to support your claim that your
20  termination was in any way related to the filing of
21  that claim, do you?
22      A.  No.
23      Q.  I want to start talking a little bit
24  about your employment at Leprino Foods.  Because we
25  had gone through a period of time up when you were

Page 31

1  working at Leprino Foods for the staffing company, and
2  then I believe in approximately 1998 you were employed
3  by Leprino Foods directly, correct?
4       A.  That's correct.
5       Q.  Okay.  And then you were employed at
6  Leprino Foods' Fort Morgan plant from 1998 until
7  February 29, 2016, correct?
8       A.  That's correct.
9       Q.  All right.  When you first started at
10  Leprino Foods as an employee -- not for the
11  labor/staffing company but as an employee, what were
12  your job duties and responsibilities?  In other words,
13  what was your title?
14      A.  Laborer in the whey department, and I
15  worked as a bagger in that department.
16      Q.  And that was essentially the same things
17  that you were doing for the staffing company --
18      A.  Yes, sir.
19      Q.  -- right?
20          Okay.  So how long did you work as a
21  bagger in the whey department at the Fort Morgan
22  plant?
23      A.  I believe it was five years.
24      Q.  Have you always been on the whey side of
25  the building?

Page 32

1       A.  No, sir.  I was in processing for a few
2  months.
3       Q.  Just a few months?
4       A.  Yes, sir.
5       Q.  Otherwise, have you always been on the
6  whey side?
7       A.  Yes, sir.
8       Q.  Okay.  So let's pick it up where we left
9  off.  If you started in approximately 1998 for Leprino
10  Foods as a laborer in the whey department as a bagger
11  and you stayed there for about five years, that would
12  take us to approximately 2003.
13          Does that sound about right?
14      A.  Yes.
15      Q.  Okay.  What happened in 2003 with your
16  employment at Leprino Foods?
17      A.  I put in for a whey department relief
18  operator's position.
19      Q.  Did you get that position?
20      A.  Yes, sir.
21      Q.  Was there a raise that went with that?
22      A.  Yes, sir.
23      Q.  Do you remember how much of a raise you
24  got?
25      A.  I can't remember.

Page 37

1    Q.   Okay.  Were you ever a lead foreperson?
2    A.   No, sir.
3    Q.   Back in 2016 time frame, who was the
4  lead foreperson in the whey department?
5    A.   I do not -- I do not recall.
6    Q.   Were you ever offered the position of
7  lead foreperson?
8    A.   No.
9    Q.   And can you explain to me how the lead
10  foreperson oversees all the other foremen -- or, I'm
11  sorry, forepersons in the whey department?
12    A.   So they basically -- basically look --
13  check to make sure that all the forepersons are doing
14  their positions, and that's basically what -- what
15  their -- what their responsibilities were.
16    Q.   And how many forepersons were there in
17  the whey department at that time?
18    A.   On -- on day shift, there were two
19  forepersons, and on nights, there were two also.
20    Q.   Would one of the two forepersons be also
21  a lead foreperson, or is that a separate individual?
22    A.   That's a separate individual.
23    Q.   Okay.  Are you familiar with an
24  individual by the name of Ryan Henry?
25    A.   Yes, sir.

Page 38

1    Q.   Who is -- back when you were employed --
2  strike that.
3        And I take it you know Mr. Henry from
4  your employment at Leprino Foods?
5    A.   Yes, sir.
6    Q.   Did you know Mr. Henry outside of your
7  employment at Leprino Foods?
8    A.   No.
9    Q.   Who -- who was Mr. Henry while you were
10  employed at Leprino Foods?
11    A.   He was a co-foreperson.
12    Q.   A co-foreperson?
13    A.   Yes.
14    Q.   So he was equal with you?
15    A.   Yes, sir.
16    Q.   Okay.  In the whey department?
17    A.   Yes, sir.
18    Q.   How did you get along with Mr. Henry?
19    A.   We were good friends.
20    Q.   Do you think Mr. Henry was a qualified
21  foreperson in the whey department?
22    A.   Yes, sir.
23    Q.   Was -- is Mr. Henry a Caucasian, a white
24  person -- a white man?
25    A.   Yes, sir, he is.

Page 39

1    Q.   At the time of -- of the incident with
2  Frank Levar, was Mr. Henry working as a foreperson in
3  the whey department?
4    A.   Yes, sir.
5    Q.   You said there was two forepersons in
6  the day shift and two forepersons in the night shift.
7        Were you working days at that time?
8    A.   Yes, sir.
9    Q.   Was Mr. Henry the other foreperson on
10  the day shift?
11    A.   Yes, sir.  I believe so.
12    Q.   And who was the lead foreperson on the
13  day shift in the whey department?
14    A.   I cannot remember.
15    Q.   Do you remember who the forepersons were
16  on the night shift in this period of time in February
17  of 2016?
18    A.   Donovan.  I don't remember his last
19  name.  And the other -- I can't remember -- I can't
20  remember the other foreperson's name.
21    Q.   What were your duties and
22  responsibilities as a foreperson in the whey
23  department back in January and February of 2016?
24    A.   To oversee the floor, make sure that the
25  operators were running the equipment properly, to make

Page 40

1  sure that the paperwork was being documented.  If the
2  operators needed assistance, I was always the first to
3  help them, and do -- assist the supervisor as
4  needed -- if needed.
5    Q.   How many -- how many supervisors were
6  there in the whey department back in January and
7  February of 2016 for the -- for the day shift?
8    A.   There was two for the day shift.
9    Q.   Who were they?
10    A.   Kenny Duggan and Mark Doman.
11    Q.   Is that Doman?
12    A.   Doman.  D-o-m-a-n.
13    Q.   Thank you.
14        And I'll come back to this in a little
15  bit, but on the date of your incident with Mr. Levar,
16  which -- strike that.
17        On the date your incident with
18  Mr. Levar, was Mr. Duggan or Mr. Doman on that
19  shift -- working on that shift?
20    A.   It was supposed to be Kenny Duggan, but
21  he had called in sick that day.
22    Q.   Okay.  Does that mean there was no
23  supervisor on your shift at that time?
24    A.   That's correct.
25    Q.   Okay.  Do your duties and

Page 41

1 responsibilities as a foreperson in the whey
2 department change if there's no supervisor?
3      A.  Yes, sir.
4      Q.  So you earlier told me what your
5 responsibilities were as a whey department foreperson,
6 and one of them was assist the supervisor if needed.
7      If the supervisor isn't present, how do
8 your duties and responsibilities change?
9      A.  Then there's paperwork that needs to be
10 filled out for the supervisors.  Any calls that are
11 made for the supervisor, I would have to respond.  And
12 if any work needed to be done maintenance-wise, I
13 would have -- I would -- I was responsible for that
14 also that day.
15      Q.  So it sounds like as a foreperson on
16 this shift at that time, since Mr. Duggan wasn't
17 there, you had additional responsibilities?
18      A.  Yes, sir.
19      Q.  How long had you known Mr. Levar before
20 the day of the incident?
21      A.  The entire time that he worked there in
22 the whey department.  So I would have to say -- I'm
23 not exactly sure about the time frame, but somewhere
24 between eight and ten years.
25      Q.  What was Mr. Lavar like during those

Page 42

1 eight to ten years that you were working with him?
2      A.  As far as?
3      Q.  Well, I guess, if I ask you what kind of
4 a guy is Frank Levar, right?  Knowing that you had
5 worked with him for at least eight to ten years in the
6 same department, you know, what could you tell me --
7 and I guess I'm wanting to know, before the day of the
8 incident that you had with him on February 9, 2016,
9 what would you have said to me about what kind of a
10 guy Frank Levar is?
11      A.  He was a good individual.  I mean, we
12 got along.  He had the tendency -- he was
13 hot-tempered.  He would -- I always thought that he
14 would -- phrasing it, make a mountain out of a
15 molehill.  He would over- -- he would just blow things
16 out of proportion at times.
17      Q.  Did you ever have any problems with him
18 before the date of your incident?
19      A.  Not to my recollection.
20      Q.  You earlier mentioned a situation where
21 Mr. Levar was involved with a situation I think you
22 said with a supervisor or someone of authority.  Let's
23 talk about that situation in a little more detail.
24 Okay?
25      First of all, this situation you're

Page 43

1 talking about, prior to the date of your incident with
2 Mr. Levar, when did that take place?
3      A.  I'm not exactly sure what day or time
4 that took place.
5      Q.  Can you give me a best estimate?  I
6 mean, are we talking about a week before?  A year
7 before?  Five years before?
8      A.  Five -- about five years before.
9      Q.  Okay.  So that would put it -- just to
10 be fair to you, it would somewhere around the 2011,
11 2012 time frame?
12      A.  Yes, sir.
13      Q.  Okay.  Now going back to what we talked
14 about beginning at the deposition, what you know
15 versus what you understand.
16      A.  Uh-huh.
17      Q.  Okay.  Do you have any personal
18 knowledge about what happened in that incident?
19      A.  No, sir.
20      Q.  Okay.  So what we're talking about is
21 your understanding of what happened in this incident
22 back in 2011 or 2012 with Frank Levar is something
23 you've heard from other people?
24      A.  Yes, sir.
25      Q.  First of all, let me ask you this question:

Page 44

1 Where did you get your understanding from?  In other
2 words, who did you talk to about this prior incident
3 with Mr. Levar?
4      A.  Shane Tucker, the foreman that he had
5 the issue with, told me about it.  Dave Ocanos at the
6 time was bagging in the bagging room and visually seen
7 this occur.  And Darin Weegan.
8      Q.  Keep going.
9      A.  Darin Weegan was a supervisor at the
10 time, and he was present in the office when it
11 occurred.
12      Q.  And did you talk with both -- strike
13 that.
14      Did you talk with Mr. Tucker,
15 Mr. Ocanos, and Mr. Weegan, all three of them, after
16 the incident at some point?
17      A.  Yes, sir.
18      Q.  All right.  What did Mr. Tucker tell you
19 occurred in this incident involving Frank Levar?
20      A.  He told me that Frank had walked into
21 the office, said that he was going to go on a break,
22 and Shane replied, "Is your relief operator aware of
23 this?  And if not, you need to get with your relief
24 operator."
25      Frank said that -- or excuse me.  Shane

Page 73

1      A.  No.  I always thought we got along
2  really well.
3      Q.  Other than the situations we have talked
4  about so far, and excluding also the altercation with
5  Mr. Levar, have you ever been in any fights?
6          MS. BURMA:  Objection, vague.
7      A.  Yes.
8      Q.  (BY MR. BRITTAN)  How many are we
9  talking about?
10     A.  I can't recall.
11     Q.  And I just need to clarify, is it --
12  strike that.
13         Is it more or less than ten?
14         MS. BURMA:  Again, objection to form.
15     A.  I would say less than five.
16     Q.  (BY MR. BRITTAN)  And I need to talk to
17  you a little bit about these.  We can take them in
18  whichever order you want to do; chronologically or
19  whatever the first one that comes to your mind.  So
20  let's maybe start off chronologically.
21         What's the first fight you remember
22  being in?
23         MS. BURMA:  And I'm going to say
24  objection.  The term "fight" is vague.
25     Q.  (BY MR. BRITTAN)  I'm talking about a

Page 74

1  physical fight.
2      A.  In -- in grade school.
3      Q.  About how old were you?
4      A.  I was probably 12.
5      Q.  Do you remember what set it off?
6      A.  Somebody was knocking down my sister.
7      Q.  Physically knocking her down?
8      A.  Yes, sir.
9      Q.  And what did you do?
10     A.  I remember when I seen that, I ran,
11  pushed him, pushed him up against the school bus, and
12  hit him once.
13     Q.  Was that the end of that fight?
14     A.  That was the end of that fight.
15     Q.  What's the next one you remember?
16     A.  It was also in grade school.  I was
17  getting bullied by a heavier schoolmate.
18     Q.  What was he doing?
19     A.  Pushing me.
20     Q.  What happened there?
21     A.  He pushed me.  I pushed him back.  He
22  was much heavier than I am.  He proceeded to wrestle
23  me to the ground and basically beat me up.
24     Q.  And was that the sum and substance of
25  that fight?

Page 75

1      A.  Yes, sir.
2      Q.  Okay.  What about the next one?
3      A.  There was one when I was much older.  Me
4  and friends were -- were drinking, and this gentleman
5  walked up to the -- up to the vehicle that we were in
6  and proceeded to -- proceeded to make racial remarks.
7         And I stepped out of the -- I stepped
8  out of the vehicle.  He came around the vehicle and
9  proceeded to -- proceeded with the racial remarks.
10  And he pushed me.  And after he pushed me, I -- I hit
11  him.
12     Q.  Hit him with your fist?
13     A.  Yes, sir.
14     Q.  And where did you hit him at?
15     A.  In the face.
16     Q.  What happened after that?
17     A.  He went to the ground.  I got on top of
18  him and proceeded to punch him in the face.  Then was
19  pulled off of him.  And that's where -- that's where
20  that ended.
21     Q.  Were the police involved at all
22  afterwards?
23     A.  No.
24     Q.  Is that where it was left pretty much?
25     A.  We -- me and that individual had run

Page 76

1  into each other I believe it was about a month later
2  and basically shook hands and walked our separate
3  ways.
4      Q.  What's the next one?
5      A.  That's all I can recall.
6      Q.  I want to talk to you a little bit about
7  the situation with Frank Levar that day of February 9,
8  2016, okay?
9         So as I understand it, you were
10  operating as the foreperson on the day shift in the
11  whey department, correct?
12     A.  That day, I was foreperson, slash,
13  supervisor that day.
14     Q.  That's right.  Supervisor Kenny Duggan
15  wasn't there that day.  The other supervisor was
16  there.
17         So you were the foreperson and the
18  supervisor --
19     A.  Yes, sir.
20     Q.  -- for that shift?
21     A.  Yes, sir.
22     Q.  In the whey department?
23     A.  That's correct.
24     Q.  Okay.  And as we talked about before,
25  Mr. Levar was employed as what?  A lactose operator?

Nicolas Donez   08/26/2019
NICOLAS DONEZ v. LEPRINO FOODS

Pages 77..80

Page 77

1    A.  That's correct.
2    Q.  In the whey department?
3    A.  That's correct.
4    Q.  Okay.  So on that shift, how many people
5  were you supervising?
6    A.  There are five -- five operators; four
7  operators and one break relief.
8    Q.  And Mr. Levar was the lactose operator?
9  What are the other four operators on that shift?
10    A.  You have the bagger, separator operator,
11  the whey protein operator.  Then there's Frank's
12  lactose operator and the bagger -- or, excuse me, the
13  break relief.
14    Q.  Okay.  I have got bagger, separator,
15  whey protein, lactose.  That's four.  And I thought
16  you said there was five operators and one break relief
17  operator.
18    A.  Four operators and one break relief
19  operator.
20    Q.  I apologize.
21    A.  Excuse me.  Break relief.
22    Q.  Okay.  Do you remember who the bagger
23  operator was on that shift?
24    A.  No, I do not.
25    Q.  What about the separator operator?

Page 78

1    A.  I cannot recall his name.
2    Q.  All right.  How about the whey protein
3  operator?
4    A.  That would have been Bobby Rhinebarger.
5    Q.  Bobby?
6    A.  Rhinebarger.
7    Q.  Rhinebarger.  All right.  Thank you.
8        And the relief operator?
9    A.  John Prell.
10    Q.  Is it P-r-e-l-l?
11    A.  That's correct.
12    Q.  Thank you.
13        What time would your shift -- strike
14  that.
15        What time did your shift start that day?
16    A.  6:00 a.m.
17    Q.  And that was the normal start time?
18    A.  Yes, sir.
19    Q.  How long was your shift scheduled to
20  last that day?
21    A.  12 hours.
22    Q.  And, again, that's normal?  We've got
23  12-hour shifts, 6:00 to 6:00 -- 6:00 a.m. to
24  6:00 p.m., and then the night shift would be 6:00 to
25  6:00?

Page 79

1    A.  The hours would be from 6:00 to 6:30.
2    Q.  To 6:30.  There would be some overlap?
3    A.  Because of the lunch.
4    Q.  Yes.  Okay.
5    A.  Right.
6    Q.  So 12-hour shift.  What was going on, if
7  anything, out of the ordinary on that shift that day
8  before your incident with Mr. Levar?
9    A.  We were having issues in the bagging
10  room.
11    Q.  Do you remember what the issues were?
12    A.  I cannot recall the problem.  And we
13  were also tearing down a clarifier.
14    Q.  Approximately what time was it that your
15  incident with Mr. Levar occurred?
16    A.  Not absolutely sure the exact time.  I'd
17  say 10:00, 10:50, 10:53, somewhere about that time.
18    Q.  Obviously in the morning?
19    A.  Yes, sir.
20    Q.  So there was -- you were having issues
21  with -- in the bagging room, and you were tearing down
22  a clarifier.
23        Can you just give an understanding of
24  what tearing down a clarifier means?
25    A.  So this clarifier, we were having to

Page 80

1  dismantle it so that the maintenance department could
2  come and check and see what problems the clarifier was
3  having.
4    Q.  Was this routine maintenance, or was the
5  clarifier having problems and that's why you had to
6  tear it down?
7    A.  I cannot recall whether it was a routine
8  maintenance or whether it was mechanical issues.
9    Q.  So can you tell -- strike that.
10        What area of the plant was the clarifier
11  in?  Is there a particular room or some place that you
12  can designate?
13    A.  Yes, sir.  That's in a separator area.
14    Q.  And Mr. Levar was working the lac -- on
15  something with regards to the lactose; is that
16  correct?
17    A.  That's correct.
18    Q.  What was Mr. Levar doing that day --
19  that morning?
20    A.  At the time that --
21    Q.  I guess so the shift would have started
22  around 6:00 a.m. and the incident occurred somewhere
23  around approximately 10:00 a.m. in the morning or so.
24  So we've got a few hours there.
25        Do you remember what Mr. Levar was doing

Nicolas Donez  08/26/2019
NICOLAS DONEZ v. LEPRINO FOODS
Pages 93..96

Page 93

1    Q.  (BY MR. BRITTAN)  Sir, we are back from
2  lunch.  And just before we broke for lunch, we talked
3  about the situation between you and Mr. Levar in the
4  refiner room.  And I want to go back and ask you a
5  little more detail on your description of what
6  happened.
7         What is the noise like in the -- let me
8  rephrase that.
9         What was the noise like in the refiner
10  room that morning when you were having your
11  conversation with Mr. Levar?
12    A.  The noise level is extremely loud.  So
13  loud, we're having to use ear protection which makes
14  it even more difficult to hear what your coworkers are
15  saying.
16    Q.  So how were you communicating with
17  Mr. Levar when you're having this conversation with
18  him just before he pushed you?
19    A.  We were yelling at one another.
20    Q.  And why were you yelling at one another?
21    A.  One, because of the noise level and
22  because of us both being upset.
23    Q.  When you were talking to him, and I
24  think you said -- you know you exchanged words with
25  Mr. Levar; you don't remember exactly what was said.

Page 94

1         Do you remember generally what was said
2  as you're talking to him?
3         MS. BURMA:  Objection, asked and
4  answered.
5    A.  No.
6    Q.  (BY MR. BRITTAN)  When he pushed you,
7  how close to you -- strike that.
8         When he pushed you, how close were you
9  to him at that time?
10    A.  We were about a foot away.
11    Q.  And how -- can you demonstrate how he
12  pushed you?
13    A.  He used both his hands and pushed out,
14  push me -- hitting me in the chest and pushing me
15  back.
16    Q.  Okay.  When he did that, did you lose
17  your balance?
18    A.  I went back about a foot.  I stepped
19  back.
20    Q.  Okay.  But you didn't fall down from
21  that?
22    A.  No, sir.
23    Q.  And you didn't lose your balance?
24    A.  No, sir.
25    Q.  Now, you said that when he pushed you

Page 95

1  and you went back, you said something about his hands
2  coming up.
3    A.  That's correct.
4    Q.  What did he -- can you demonstrate what
5  you saw?
6    A.  Yes, sir.  He came up -- his hands came
7  up in the upward position, like so.
8    Q.  Okay.  So you're holding -- because
9  while we do have a video, we'll also have a
10  transcript.  So you're saying that his hands came up
11  to the side of his body on the outside?
12    A.  Directly -- directly in front of him.
13    Q.  Directly in front of him?
14    A.  Yes.
15    Q.  Like what you're showing us?
16    A.  Right.
17    Q.  What did you interpret that mean?
18    A.  I didn't know whether he was going to
19  push me again or what it was that he was going to do.
20    Q.  Why didn't you leave?
21    A.  I don't know why I didn't leave.
22    Q.  Was it because you were upset?
23    A.  Upset and shocked.
24    Q.  You -- now, we earlier talked about what
25  you understand happened with Mr. Levar and Shane

Page 96

1  Tucker, correct?
2    A.  Correct.
3    Q.  You understand that Mr. Levar pushed
4  Shane Tucker.  What you understand happened with Shane
5  Tucker is similar to what happened with you; he pushed
6  Shane Tucker, correct?
7    A.  That's correct.
8    Q.  Mr. Tucker didn't push Mr. Levar back,
9  did he?
10    A.  No, he did not.
11    Q.  That's your understanding; Mr. Tucker
12  did not do that, correct?
13    A.  That's correct.
14    Q.  But you pushed Mr. Levar back, correct?
15    A.  I pushed Mr. Levar back in self-defense.
16    Q.  Okay.  So you earlier told me in
17  relation to the photographs, if you can pull out the
18  photographs again.  On Exhibit 4, you would have been
19  facing the photographer, correct?
20    A.  That's correct.
21    Q.  And the exit to that room would have
22  been to your left and behind you, correct?
23    A.  That's correct.
24    Q.  You could have simply left the room and
25  gone and reported this to human resources, couldn't

Page 97

1  you?
2        MS. BURMA:  Objection, speculation.
3        A.  Yes, I could have.
4        Q.  (BY MR. BRITTAN)  But instead, you
5  decided to push Mr. Levar after he had pushed you,
6  correct?
7        A.  Because of his actions.
8        Q.  Well, you showed us he brought his hands
9  up, but you didn't know what that meant, correct?
10        A.  That's correct.
11        Q.  And he didn't block your way outside of
12  the -- strike that.
13          He didn't block your exit from the room,
14  did he?
15        A.  No, sir, he didn't.
16        Q.  And he didn't say anything after he
17  pushed you, did he?
18        A.  Not to my knowledge.
19        Q.  So he pushed you back, I think you
20  said -- well, strike that.
21          You said the two of you were
22  approximately a foot apart, and then he pushed you
23  back so that you took another step back, correct?
24        A.  That's correct.
25        Q.  So you are now -- what? -- two, three

Page 98

1  feet away from Mr. Levar?
2        A.  About two feet, yes.
3        Q.  Okay.  Do you remember telling Mr. Levar
4  that you were going to -- strike that.
5          Do you remember telling Mr. Levar that
6  he was going to have to make you get out of his face
7  before he pushed you?
8        A.  I do not recall that.
9        Q.  Do you remember one way or the other as
10  to whether you said that?
11        A.  No.
12        Q.  Now, you're familiar with the fact that
13  Leprino Foods, like a lot of companies, have a policy
14  against workplace violence?
15        A.  Yes, sir.
16        Q.  Okay.  Generally speaking, companies,
17  including Leprino Foods, don't want employees fighting
18  on the job, right?
19        A.  That's correct.
20        Q.  Okay.  And you've seen that workplace
21  security, workplace violence policy during the course
22  of your employment at Leprino Foods?
23        A.  If that is in the handbook, I have seen
24  it.  Otherwise, I have not seen the policy.
25        Q.  Let me show you what we'll mark as

Page 99

1  Exhibit 5.
2        (Exhibit 5 marked for identification.)
3        Q.  (BY MR. BRITTAN)  Sir, take a minute to
4  take a look -- and you don't need to read all of this,
5  but glance through this and let me know if you have
6  seen what we've marked as Exhibit Number 5.
7          Have you had a chance to look at that
8  document, sir?
9        A.  Yes.
10        Q.  Have you seen this document before?
11        A.  I honestly can't remember.
12        Q.  Okay.  If you'll go to the second page
13  of this document, there's a section entitled Workplace
14  Security Policy, and then underneath that there's a
15  section that just says Policy.  And I'm going to read
16  from the first portion of this document.  And follow
17  along with me, if you will.
18          "Leprino Foods believes employees should
19  work in an environment without intimidation, threats,
20  or violence.  Any action which, in management's
21  opinion, is inappropriate to the workplace will not be
22  tolerated.  Such behaviors may include, but are not
23  limited to, physical and/or verbal intimidation,
24  threatening or violent conduct, vandalism, sabotage,
25  arson, use of weapons and/or carrying weapons onto

Page 100

1  company property."
2          Do you see that, sir?
3        A.  Yes.  Yes.
4        Q.  Okay.  And, again, generally speaking,
5  you were aware -- even if you hadn't studied this
6  policy, you were aware that it was inappropriate to
7  intimidate or harass or fight on company property,
8  correct?
9        A.  That's correct.
10        Q.  Okay.  You are aware that Mr. Levar was
11  terminated as a result of his involvement in the
12  altercation that occurred on February 9, 2016?
13        A.  Yes.
14        Q.  Okay.  And is it your understanding that
15  he was terminated based on this policy of Leprino
16  Foods?
17        MS. BURMA:  Objection, calls for
18  speculation.
19        A.  Yes.
20        Q.  (BY MR. BRITTAN)  Have you ever talked
21  to Mr. Levar after that day?
22        A.  No, I have not.
23        Q.  But you have talked to other people
24  about what happened in the refiner room that day,
25  correct?


Leprino Foods

## EMPLOYEE WARNING RECORD

Employee Name: Nick Donez          DOH: 11/3/98          DEPT: Whey

Date Warning Issued by H.R. 12/22/03          DEPT MGR: Kevin Cobian

# WARNING

On December 13, 2003, you had a verbal altercation with a warehouse employee. During this conversation, you used inappropriate language directed at the other employee. This performance warning is to inform and impress upon you the importance of professionaly addresssing others in frustrating situations. This is your first performance warning in a one-year period.

## EMPLOYEE'S REMARKS RE: VIOLATION

The absence of any statement on the part of the **employee** indicates his/her agreement with this report as stated, write on back of the white copy if necessary.

## ACTION TO BE TAKEN TO CORRECT VIOLATION

Future occurrences may result in further disciplinary action up to and including suspensions and/or termination.

I have read the "warning" and understand it.

_____  12-22-03
Manager's Signature                     Date

_____  12-22-03          _____  12/22/03
Employee's Signature         Date                        Human Resources Manager Signature    Date

SUPERVISOR/MGR SIGNATURE ISSUING WARNING: _____

DATE ISSUED TO EMPLOYEE: 12/22/03          TIME: 19:30

### H.R. COPY

CONFIDENTIAL                                    LEP0580

2-10-2016

On Tuesday 2-8-2016 I walked into the refiner room to grab a wrench from the separator tool box so I could tear down the clarifier that maintenance was waiting to work on. Frank Lavar was standing on the refiner catwalk and yelled to me "You need to send Tim over here." I responded he's busy. What do you need?" Tim was helping me with the clarifier. He replied "Never mind." So I left. I resumed the tear down of the clarifier and ten minutes later I needed a rubber mallet so I walked back into the refiner room to get the rubber mallet from the separator tool box. He was standing in front of the control panel. I walked up to him and asked "What's going on?" He said he was having problems with the decanters and the Tema not running. He was clearly upset. Then he yelled aggressively "The next time I tell you that I need help you better send help. Anytime they ask for help up front they immediately get help but I never do." I remember filling slightly offended by this comment because I am always the first one to help him. We just had a lot going on at this time. We were standing fairly close because it was so loud. I told him "Getting mad and yelling doesn't resolve anything." He then became aggressive, pushed me in my chest. Then everything went black. The next thing I remember was seeing Troy Gettman and my wife and I was trying to figure out what happened.

on 2-8-16 had problems with Luctose
and Nick came into refiner room
around 10:50 and I told him I was
a little tired of every time the Luctose
operator needs help everyone is to busy.
he got in my face and I moved him
back a little and he double fisted
me in the chest so I hit
him.

Fred C.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:19-cv-00285

NICHOLAS DONEZ,

      Plaintiff,

v.

LEPRINO FOODS COMPANY

      Defendant.

---

**AFFIDAVIT OF COMMANDER LOREN SHARP**

---

    I, Loren Sharp, being of lawful age and being first duly sworn, upon oath, deposes and says the following:

    1.    I am over the age of eighteen, of sound mind, and have personal knowledge to testify as to the matters set forth in this Affidavit.

    2.    I am currently employed with the Fort Morgan Police Department ("Fort Morgan PD") as a Commander. I have been employed in this capacity since approximately January 1, 2019.

    3.    On or around February 9, 2016, representatives of the Fort Morgan PD were dispatched to, and otherwise involved in reporting on, an incident between Nicolas Donez and Frank Levar at Leprino Foods Company, 2400 East Beaver Avenue, Fort Morgan, Colorado (the "Incident"). The investigation of the Incident continued thereafter for several months.

    4.    It is a regular business practice for representatives of the Fort Morgan PD to prepare and review police reports and conduct interviews of witnesses relating to an incident they were involved in.

    5.    Further, reports, audio recordings, and photographs pertaining to the investigation of an incident are kept in the course of a regularly conducted activity of business by the Fort Morgan PD.

6.      I have reviewed all databases that contain records to include the police report (the "Police Report"), audio recordings (the "Recordings"), and photographs taken (the "Photos") by Fort Morgan PD representatives relating to the Incident. A certified copy of the Police Report is attached hereto as **Exhibit A** and a certified copy of the Recordings and Photos are attached hereto as **Exhibit B** as a compact disc (CD).

7.      The Police Report, Recordings, and Photos were made at or near the time of the activity reflected therein and from information transmitted by someone with knowledge.

8.      I affirm the attached Police Report, Recordings, and Photos are complete and accurate copies of the records held by the Fort Morgan PD and can be so testified to by a representative of the Fort Morgan PD at trial if necessary.

Dated this _13th_ day of November, 2019.

FURTHER AFFIANT SAYETH NAUGHT.

_[signature]_

**LOREN SHARP**

STATE OF COLORADO            )
                             ) ss.
COUNTY OF _Morgan_           )

The foregoing instrument was acknowledged before me on November _13_, 2019 by Loren Sharp.

Witness my hand and official seal.

MICHELLE J MILLER
Notary Public
State of Colorado
Notary ID # 19954010474
My Commission Expires 04-27-2022

_[signature]_
Notary Public

{00389621.DOCX / 4}                    2

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 19-CV00285-CMA-NRN

NICHOLAS DONEZ,

     Plaintiff,

v.

LEPRINO FOODS COMPANY

     Defendant.

---

**AFFIDAVIT OF KENSI M. MAYS**

---

     I, Kensi M. Mays, being of lawful age and being first duly sworn, upon oath, deposes and says the following:

     1.     I am over the age of eighteen, of sound mind, and have personal knowledge to testify as to the matters set forth in this Affidavit.

     2.     I am an attorney at Campbell Killin Brittan & Ray, LLC ("CKBR") representing Defendant Leprino Foods Company ("Defendant") in the above-captioned matter.

     3.     Pursuant to CKBR's request, the Fort Morgan Police Department ("Fort Morgan PD") provided a certified copy of the police report (the "Police Report"), audio recordings (the "Recordings"), and photographs (the "Photographs") relating to the incident which occurred on or around February 9, 2016 between Plaintiff Nicolas Donez and Frank Levar at Leprino Foods Company, 2400 East Beaver Avenue, Fort Morgan, Colorado (collectively, the "Records").

4.      I received and reviewed the certified hard copy of the Police Report and the certified compact disc (CD) containing the Recordings and Photographs provided by the Fort Morgan PD.

5.      Using audio editing software, I trimmed and amplified the relevant Recordings identified in Defendant's Motion for Summary Judgment (the "Recording Snippets").

6.      Further, I created a Workshare[1] folder, and prepared the universal serial bus (USB) hand delivered to this Court on December 10, 2019, containing the Recording Snippets. A copy of the Recording Snippets is also accessible via the hyperlinks listed on **Exhibit A** attached hereto and within Defendant's Motion for Summary Judgment (the "Hyperlinks").

7.      I affirm the contents of the Hyperlinks are accurate snippets of the relevant Recordings received from the Fort Morgan PD and can testify thereto at trial if necessary.

FURTHER AFFIANT SAYETH NAUGHT.

*Kensi M. Mays*

Kensi M. Mays

STATE OF COLORADO                    )
                                     ) ss.
CITY AND COUNTY OF DENVER            )

SUBSCRIBED AND SWORN TO before me on December 10, 2019 by Kensi M. Mays.

Witness my hand and official seal.

My Commission Expires:   01·04·2021

> SAMANTHA KAYE MERRICK
> Notary Public
> State of Colorado
> Notary ID # 20174000417
> My Commission Expires 01-04-2021

*Samantha Merrick*

Notary Public

---

[1] Workshare is an internet-based file sharing application.

{00392115.DOCX / 3}

# EXHIBIT A
## Hyperlinks to Audio Recording Snippets

Recording Snippet 1

Recording Snippet 2

Recording Snippet 3

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 19-CV00285-CMA

NICOLAS DONEZ,

        Plaintiff,

v.

LEPRINO FOODS, INC.

        Defendant.

---

## DEFENDANT LEPRINO FOODS COMPANY'S RESPONSES TO PLAINTIFF'S INITIAL DISCOVERY REQUESTS

Defendant Leprino Foods Company, ("Leprino") or ("Defendant") incorrectly sued herein as Leprino Foods, Inc., through its undersigned counsel, herein provides its Responses and Objections to Plaintiff's Initial Discovery Requests as follows:

### A. GENERAL STATEMENT AND OBJECTIONS

The following statements and objections apply to every Discovery Request and Leprino's Responses thereto:

1.     The Responses provided are solely for the purpose of this action, and not for the purpose of any other action. Each Response is subject to all obligations of confidence, relevancy, materiality, privilege and admissibility, and any and all other objections and grounds which would

1

require the exclusion of any response given in Court, all objections and grounds of which are reserved and may be interposed at the time of trial.

2.      Leprino has not completed its investigation of the facts relating to this case, has not completed its discovery in this action, and has not completed preparation for trial.  Leprino reserves the right to supplement if further information is later discovered.

3.      Leprino generally objects to each Interrogatory below to the extent it seeks information that is protected by the attorney-client privilege, attorney work product doctrine, F.R.C.P. Rule 26(b), accountant-client privilege, self-evaluative privilege, or any other applicable privilege and to the extent such information will disclose a trade secret or otherwise will violate Leprino's constitutional right to privacy.

4.      Leprino also generally objects to each Request below to the extent any Request seeks information in violation of any constitutional, statutory, or common law privacy interest of any current or former Leprino employee.

5.      Leprino objects to the Instructions and Definitions contained in the Requests to the extent that they request more than reasonably required or contemplated by the Federal Rules of Civil Procedure or by Order of the court.

## ANSWERS TO INTERROGATORIES

1.      Identify the individual(s) by name, address and job title, and relationship to Defendant, who participated in or prepared the answers to these Interrogatories, other than in a purely clerical capacity.

**RESPONSE:**        Information and documents responsive to Plaintiff's Requests were provided by many individuals at Leprino, which includes Kelly Durham, Plant HR Manager, Fort Morgan and Steve Schmidt, Senior Director Production HR and Safety.  The Responses were completed with the assistance of counsel.

2.        Identify each individual who you believe has knowledge of the facts and circumstances surrounding Defendant's employment of Plaintiff and Plaintiff's termination. In your response, describe in detail and with particularity each person's knowledge.

**OBJECTION**:        Defendant objects to this Interrogatory as overbroad, unduly burdensome and vague.  The Interrogatory requests the identity of each individual who has any knowledge regarding "Defendant's employment of Plaintiff".  Since Plaintiff was employed at Leprino for over 17 years, numerous individuals would have knowledge regarding his employment, and this information is equally accessible to Plaintiff.  In addition, identification of such individuals is irrelevant except as it relates to Plaintiff's termination from Leprino.  The same Objection applies to the Request for the identification of each individual who has knowledge of "facts and circumstances surrounding Plaintiff's termination".  Many individuals (including the Fort Morgan Police) mostly identified through documents previously produced, have knowledge concerning the circumstances of the altercation between Plaintiff and Frank Levar.

**RESPONSE:**        Without waiving said Objection and answering subject thereto, and assuming that the Interrogatory requests the identity of individuals who have knowledge of the reasons for Plaintiff's termination, those individuals include Kelly Soja (HR), Risa Esterly (HR),

3

Ron Cantwell (Plant Manager), Karen McTavish (Leprino Corporate counsel) and Steve Schmidt (Corporate HR). In addition, Julia Lambert (HR) was involved in the investigation of the incident. See also documents produced by Leprino in its Initial Disclosures or in Response to Plaintiff's Initial Discovery Requests.

3.     Did Plaintiff possess the qualifications for Plaintiff's position(s) during his employment? If your answer is "no," state in detail and with particularity the qualifications that Plaintiff did not possess.

**OBJECTION**:     Defendant objects to this Interrogatory as vague and overbroad. The term "qualifications" is undefined and Plaintiff was employed by Leprino for over 17 years in various positions.

**RESPONSE**:     Without waiving said Objection and answering subject thereto, prior to the altercation with Mr. Levar, yes.

4.     Prior to his termination, did Plaintiff perform his duties satisfactorily? If not, describe in full and in what manner Plaintiff was deficient in the performance of his duties.

**OBJECTION**:     Defendant objects to this Interrogatory as overbroad and unduly burdensome. Plaintiff was employed at Leprino for over 17 years, and it is not possible to address any and all deficiencies of Plaintiff during that period of time.

**RESPONSE**:     Without waiving said Objection and answering subject thereto, generally, Plaintiff performed his duties as an employee of Leprino Foods satisfactorily during his tenure, except as reflected in the documents produced by Leprino in its Initial Disclosures (or to

4

be produced upon entry of a mutually agreeable Protective Order) or in Response to Plaintiff's Initial Discovery Requests.

5.      Identify by name and job title all persons who played any role whatsoever in the decision to terminate Plaintiff.

**RESPONSE:**        See Response to Interrogatory Number 2.

6.      Describe completely the reason(s) for terminating Plaintiff.

**OBJECTION**:       Defendant objects to this Interrogatory as overbroad and argumentative in requesting a "complete description" for the reasons underlying Plaintiff's termination.

**RESPONSE:**        Without waiving said Objection and answering subject thereto, based on the reports received from Detective Vossberg and the Fort Morgan Police Department, which were consistent with the version of events provided by Frank Levar, the Plaintiff retaliated when Mr. Levar pushed Plaintiff/moved him back.  Based on this information, Plaintiff, who was the Foreperson on the shift with no Supervisor present, was an active participant in the altercation and escalated the situation. His actions were in violation of Leprino's policies.

**7.**      Identify Defendant's employee benefits and state the percentage of an employee's salary which reflects Defendant's cost for such benefits. In lieu of a salary percentage, provide the annual cost to Defendant to cover all such benefits.

**OBJECTION**:       Defendant objects to this Interrogatory as overbroad and requesting information not relevant to any claim or defense and not proportional to the needs of the case.

Defendant further objects in that the information regarding benefits is equally accessible to Plaintiff.

**RESPONSE:**     Without waiving said Objection and answering subject thereto, documents reflecting the employee benefits available to the Plaintiff will be provided upon entry of a mutually agreeable Protective Order.

8.     Identify the name, gender and date of birth and race of all person(s) who have performed any of Plaintiff's job duties since his termination.

**OBJECTION**:     Defendant objects to this Interrogatory insofar as it requests the gender and date of birth of individuals.  Plaintiff's' claims in this matter are not based on either gender or age and that information has no relevance to any of Plaintiff's claims.  In addition, the Interrogatory is overbroad.  The Interrogatory is not limited to an identification of persons which have moved into Plaintiff's position as Whey Foreperson, but rather anyone who has performed any of Plaintiff's "job duties", which are numerous, and may be performed by any number of individuals.

**RESPONSE:**     Without waiving said Objection and answering subject thereto, there have been numerous changes in the Whey Department in the last 3½ years.  However, after Plaintiff's termination, Ryan Henry, Caucasian, who had previously worked as a Whey Foreperson, returned to the Department from a special project.

9.     Identify the name, job title, date of birth, and gender and race of each employee terminated from Defendant from January 1, 2012 to January 1, 2017.

6

**OBJECTION**:        Defendant objects to this Interrogatory as overbroad, unduly burdensome, requesting information not relevant and not proportional to any claim or defense raised in this matter, and not proportional to the needs of the case. Plaintiff's claim is limited to the Fort Morgan, Colorado Leprino plant, but this Interrogatory requests information relating to all of Leprino. In addition, since Plaintiff's claim is premised on race, the dates of birth and gender of any terminated employee are irrelevant. The Interrogatory is overbroad because Plaintiff's' claim is premised on Defendant's alleged unfair application of one of its policies, and this Interrogatory encompass termination for any reason. Finally, this Interrogatory violates the privacy rights of employees that may have been terminated from the Fort Morgan, Colorado plant.

10.      Identify the name, job title, date of birth, gender and date of hire of each person hired by Defendant from January 1, 2012 to January 1, 2017.

**OBJECTION**:        Defendant objects to this Interrogatory as overbroad, unduly burdensome, requesting information not relevant to any claim or defense raised in this matter, and not proportional to the needs of the case. Plaintiff's claim is limited to the Fort Morgan, Colorado Leprino plant, but this Interrogatory requests information relating to all of Leprino. In addition, since Plaintiff's claim is premised on race, the dates of birth and gender of any terminated employee are irrelevant. Finally, this Interrogatory violates the privacy rights of employees at the Fort Morgan, Colorado plant.

11.      Identify all pay adjustments made by Defendant from January 1, 2012 to the present.

7

**OBJECTION**:      Defendant objects to this Interrogatory as overbroad, unduly burdensome, requesting information not relevant to any claim or defense in the matter, and not proportional to the needs of the case.  The Interrogatory is not limited to the position Plaintiff held at the time of his termination at the Fort Morgan, Colorado plant.

**RESPONSE:**      Without waiving said Objection and answering subject thereto, compensation increases vary for each job based on company performance and budget, local and national economic trends, and the Plant's talent needs and strategy. An individual in a situation similar to Plaintiff's may have received a pay increase in the range of two to four percent on an annual basis in the years since 2016.

12.      Other than this lawsuit, please describe with specificity all civil and criminal cases (including administrative and judicial proceedings) in which you have been a party from 2014 to the present. In your description of each case, please identify the court or agency, caption, and case number of the case, indicate whether you were the plaintiff or defendant in such case, describe  the claims  made by or against you and the outcome of such case.

**OBJECTION**:      Defendant objects to this Interrogatory as incredibly overbroad, unduly burdensome, vague, not relevant to any claim or defense raised in this matter, not proportional to the needs of the case, and is designed solely to harass the Defendant.

13.      Please identify any and all employees of Defendant(s) disciplined and/or terminated based on allegations of work place violence from January 1, 2012 through January 1, 2017.

8

**OBJECTION**:        Defendant objects to this Interrogatory as overbroad and unduly burdensome insofar as it requests identification of employees not associated with Leprino's Fort Morgan, Colorado facility.

**RESPONSE:**        Without waiving said Objection and answering subject thereto, at Leprino's Fort Morgan facility Jedidiah Camacho, Frank Levar and Nick Donez were terminated for violation of the workplace violence policy.  See also documents to be produced upon the entry of a mutually agreeable Protective Order.

## RESPONSES TO REQUEST FOR PRODUCTION

1.        Produce copies of all documents identified in your Rule 26(a) Disclosures.

**RESPONSE:**        As indicated in the Initial Disclosures of Defendant Leprino Foods Company Pursuant to Fed.R.Civ.P. 26(a)(1), any and all documents not produced therewith will be produced upon the entry of a mutually agreeable Protective Order.

2.        Produce all document (sic) referenced or used in answering the Interrogatories and Request for Admissions served upon Defendant in this action.

**RESPONSE:**        Any and all such documents not previously produced and not equally accessible to Plaintiff will be produced upon the entry of a mutually agreeable Protective Order.

3.        Produce copies of all documents that you have provided to any state or federal agency.

**OBJECTION**:        Defendant objects to this Request as overbroad and vague.  As worded, it is not limited to the claim brought by Plaintiff related to his termination from Leprino. Defendant further objects to this Request insofar as it requests pleadings and other documents

9

related to Plaintiff's workers' compensation claim.  As admitted by Plaintiff, Defendant did not

contest Plaintiff's workers' compensation claim with the Board, and any such records filed with

the State of Colorado or federal agency are equally  accessible to Plaintiff through the State or his

prior counsel.

**RESPONSE:**        Without waiving said Objection and answering subject thereto, and

limiting the Response to documents related to Plaintiff's claim, all such documents provided to

the EEOC in Response to Plaintiff's Charge were previously produced.  Defendant has also

previously produced certain documents relating to Plaintiff's workers' compensation claim filed

with the State of Colorado in order to demonstrate that Defendant did not seek dismissal of that

claim.  No additional responsive documents relating to the Workers' Compensation claim are

being produced. Any additional documents will be produced in Response to these Requests upon

entry of a mutually agreeable Protective Order.

4.      Produce copies of all memorandums, personal notes, emails, tape recordings or

other documents setting forth or memorializing in whole or in part, any communications that you

have had, including but not limited to, with any current or former employee, officer or agent of

Defendant, related to any complaints of race discrimination at Leprino Foods.

**OBJECTION**:        Defendant objects to this Request as overbroad, unduly burdensome

and requesting information that is not relevant to any claim or defense raised in this matter, and

not proportional to the needs of the case.  Plaintiff's claim is premised on allegations that Leprino's

Fort Morgan facility discriminated against him as a Hispanic in the enforcement of its workplace

violence policy.  This Request is not limited to the Fort Morgan facility or the enforcement of

10

Leprino's workplace violence policy.  In addition, the Request is overbroad and unduly burdensome since it appears to be unlimited in  time.

5.      Produce all documents, including but not limited to, all personnel files concerning anyone who was terminated and/or disciplined based on allegations of workplace violence and/or for violating Defendant's workplace violence policy from January 1, 2012 to January 1, 2017.

**OBJECTION**:        Defendant objects to this Request as overbroad, unduly burdensome and requesting information that is not relevant to any claim or defense raised in this matter, and not proportional to the needs of the case.  Plaintiff's claim is premised on allegations that Leprino's Fort Morgan facility discriminated again him as a Hispanic in the enforcement of its workplace violence policy.  Leprino further objects to this Request in seeking "all documents…concerning anyone who was terminated and/or disciplined" under the workplace violence policy as it is overbroad, vague and unduly burdensome.  The Request further violates the privacy concerns of Defendant's current and former employees.

**RESPONSE:**        Without waiving said Objection and answering subject thereto, documents relating to investigations of or statements concerning alleged violations of the workplace violence policy will be produced  upon entry of a mutually agreeable Protective Order.  Defendant reserves the right to confer with Plaintiff what additional documentation will be produced.

6.      All documents in your possession, including, but not limited to all personnel files, resumes, desk files, data files, and performance-related documents concerning:

    a)      Plaintiff;

    b)      Plaintiff's replacement(s)

11

c)      Any person identified in your response to any of Plaintiff's Interrogatories.

**OBJECTION**:      Defendant objects to this Request as overbroad and requesting information that is not relevant to any claim or defense raised in this matter, and not proportional to the needs of the case.  In addition, Defendant objects to the production of information relating to its employees other than Plaintiff as violative of those employees' privacy concerns.

**RESPONSE:**      Without waiving said Objection and answering subject thereto, as previously indicated, a copy of Plaintiff's personnel file and related documents will be produced upon the entry of a mutually agreeable Protective Order.  Based on its Objection, Defendant is not producing any other documents requested at this time.

7.      Produce all documents relating to Defendant's employment policies and procedures, including but not limited to handbooks, rules, policy statements, and benefit policies.

**OBJECTION**:      Defendant objects to this Request as overbroad and vague.  As presently stated, the Request includes all of Leprino's employment policies and procedures for all time, and not those relevant to Plaintiff's claim, Defendant's defenses or Plaintiff's employment.

**RESPONSE:**      Without waiving said Objection and answering subject thereto, Defendant has previously produced portions of its relevant policies, procedures and standards.

8.      Produce copies of all documents, including all correspondence between Defendant and its representatives, including, without limitation, its attorneys, referring to or relating to Plaintiff and Plaintiff's termination.

**OBJECTION**:      Defendant objects to this Request as overbroad, unduly burdensome, requesting information subject to the attorney-client privilege and the work product doctrine.  The

12

Request specifically includes communications between Defendant and its attorneys in clear violation of the attorney-client privilege and work product doctrine. In addition, the Request is overbroad to the extent it requests all correspondence related to Plaintiff, who was an employee of Leprino for over 17 years.

**RESPONSE:**        Without waiving said Objection and answering subject thereto, any non-privileged correspondence between Defendant and its representatives relating to Plaintiff's termination will be produced upon entry of a mutually agreeable Protective Order.

9.      Produce all copies of the job description for Plaintiff's position(s), including copies from the time period preceding the Plaintiff's termination and following the Plaintiff's termination.

**RESPONSE:**        A copy of the job description for Whey Foreman will be produced upon entry of a mutually agreeable Protective Order.

10.      Produce copies of Defendant's annual financial reports for 2014 to present. If Defendant does not generate annual reports, produce documents reflecting Defendant's revenue, expenses, profit, and loss for those years.

**OBJECTION:**        Defendant objects to this Request as premature, overbroad, unduly burdensome, and requesting confidential and proprietary information. Plaintiff has not demonstrated facts sufficient to support a claim for punitive damages, and in fact, Defendant has substantial basis for its defenses. Defendant is a privately owned company, and production of the financial information requested will violate its right to privacy. Further, Defendant concedes that if punitive damages are ultimately awarded against it, it has the financial capacity to pay the award.

11.    Produce copies of the documents for the period which indicates the name, date of birth, job title, wage and salary category, and place of employment of all of Defendant's employees.

**OBJECTION**:        Defendant objects to this Request as vague, incredibly overbroad, unduly burdensome, requesting documents that are not relevant to any claim or defense raised in this matter, and not proportional to the needs of the case.  The Request asks for <u>all</u> documents for <u>all</u> employees for some unstated period of time (presumably years and maybe decades) for thousands of employees who have nothing to do with either Plaintiff's claims or Defendant's defenses.  The Request appears to be a fishing expedition for Plaintiff and/or his counsel.

12.    Produce copies of any and all documents reflecting and/or relating to pay adjustments made by Defendants from January 1, 2012, to the present.

**OBJECTION**:        Defendant objects to this Request as overbroad, unduly burdensome, failing to request information relevant to any claim or defense raised in this matter, and not proportional to the needs of the case.  The Request is not limited to Leprino's Fort Morgan plant or to Plaintiff's position.

**RESPONSE:**        Without waiving said Objection and answering subject thereto, see Response to Interrogatory Number 11 for potential pay increases for the position of Whey Department Foreperson since the time of Plaintiff' termination.

## RESPONSES TO REQUEST FOR ADMISSION

1.    Admit that Plaintiff was employed with Defendant from November 3, 1998 to February 29, 2016.

**RESPONSE:**        Admit.

14

2.      Admit that Plaintiff was involved in a physical altercation with Frank Levar, an employee of Defendant, on February 9, 2016.

**RESPONSE:**          Admit.

3.      Admit that Plaintiff did not initiate the physical altercation at Leprino Foods on February 9, 2016.

**OBJECTION**:          Defendant objects to the phrase "initiate the physical altercation" as vague.

**RESPONSE:**          Without waiving said Objection and answering subject thereto, Defendant admits that, to its understanding, Mr. Levar pushed/physically moved Plaintiff back before Plaintiff retaliated.

4.      Admit that Frank Levar had been involved in workplace violence before February 9, 2016.

**OBJECTION**:          Defendant objects to this Request as the phrase "workplace violence" is not defined.

**RESPONSE:**          Without waiving said Objection and answering subject thereto, Defendant lacks knowledge to admit this Request, and therefore denies the same.

5.      Admit that before February 9, 2016, Plaintiff had not been involved in any incidents of workplace violence.

**OBJECTION**:          Defendant objects to this Request as the phrase "workplace violence" is not defined.

**RESPONSE:**          Without waiving said Objection and answering subject thereto, denied.

15

6.      Admit that on February 9, 2016, Plaintiff was acting in self-defense with the action he took.

**RESPONSE:**          Based on the reports which Defendant received, denied.

7.      Admit that a Caucasian replaced Plaintiff as the Whey Department Foreman.

**RESPONSE:**          Defendant admits that following Plaintiff's termination, Ryan Henry, a Caucasian and former Whey Department Foreperson, who had been assigned to a special project, returned to the Whey Department in his previous role.

8.      Admit that Plaintiff did not violate Defendant's workplace violence policy during his employment.

**RESPONSE:**          Denied.

16

**VERIFICATION**

STATE OF COLORADO )
                              )    ss
COUNTY OF DENVER )

Steve Schmidt states that he is authorized to make this Verification regarding the Responses made on behalf of Leprino Foods Company, in Leprino Foods Company's Response to Plaintiff's Interrogatories. They have been answered either by me or by authorized employees and counsel for Leprino Foods Company in this matter, and that to the extent the information came from a source other than me; I have been informed that the facts stated in this document are true and correct to the best of our knowledge.

Steve Schmidt
Leprino Foods Company

Subscribed and sworn to before me this ____ day of August, 2019 by Steve Schmidt, Leprino Foods Company

My Commission expires: 2|12|22

Witness my hand and official seal.

[SEAL]

TRACY WELFRINGER-DANIEL
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20144005082
MY COMMISSION EXPIRES FEB. 12, 2022

Notary Public

17

Dated this 5th day of August, 2019.

As to Responses to Request for Production and Request to Admit.

CAMPBELL KILLIN BRITTAN & RAY, LLC

By: *s/ William C. Brittan*
William C. Brittan, #17643
Margaret R. Pflueger, #39780
270 St. Paul Street, Suite 300
Denver, CO 80206
Phone: (303) 322-3400
Fax: (303) 322-5800
Email: bbrittan@ckbrlaw.com
mpflueger@ckbrlaw.com

*Counsel for Defendant Leprino Foods Company*

## CERTIFICATE OF SERVICE

I, the undersigned, certify that on this 5th day of August, 2019, a true and correct copy of the foregoing **DEFENDANT LEPRINO FOODS COMPANY'S RESPONSES TO PLAINTIFF'S INITIAL DISCOVERY REQUESTS** were served via email to the following:

Amy Burma
Burma Law Offices, LLC
1035 Pearl Street, Suite 325
Boulder, CO 80302
amy@Burmalawoffices.com

*Attorneys for Plaintiff*

*s/Andrea Davis*
Andrea Davis



**Leprino Foods**
2400 East Beaver Avenue
Fort Morgan, CO 80701
970 867-9351

February 11, 2016

Mr. Frank Levar
616 West 6th Avenue
Fort Morgan, CO 80701

Dear Mr. Levar:

We have concluded our investigation pertaining to the incident between you and your foreperson on Tuesday, February 9th, as you did admit to us you punched him Leprino Foods Company has zero tolerance for workplace violence.

Your employment is terminated effective today, February 11, 2016. Due to the grounds of your termination, you are not allowed on Leprino property, nor are you allowed to attend any Leprino sponsored events.

Sincerely,

Julia Lambert
Human Resources Generalist



CONFIDENTIAL

LEP0778



**Leprino Foods**

2400 East Beaver Avenue
Fort Morgan, CO 80701
970 867-9351

February 29, 2016

Mr. Nick Donez
Fort Morgan, CO 80701

Dear Mr. Donez:

We have concluded our investigation pertaining to the incident between you and your operator on Tuesday, February 9th 2016  During our investigation you verbally admitted to us you pushed your operator. Leprino Foods Company has no tolerance for workplace violence.

Your employment is terminated effective today, February 29, 2016. Due to the grounds of your termination, you are not allowed on Leprino property, nor are you allowed to attend any Leprino sponsored events

Sincerely,

Risa Esterly
Human Resources Manager

EEOC Form 5 (11/09)

RECEIVED

MAY 1 2 2017

## CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act
Statement and other information before completing this form

| Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|
| EEOC - DENVER FIELD OFFICE | |
| X  EEOC | 541-2017-00477 |

| Colorado Civil Rights Division | and EEOC |
|---|---|
| State or local Agency, if any | |

| Name (indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| Mr. Nicolas Donez | | 1964 |

| Street Address | City, State and ZIP Code |
|---|---|
| 516 Custer Street, Brush, CO 80723 | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| LEPRINO FOODS COMPANY | Unknown | (970) 867-9351 |

| Street Address | City, State and ZIP Code |
|---|---|
| 2400 E Beaver Ave, Fort Morgan, CO 80701 | |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

DISCRIMINATION BASED ON (Check appropriate box(es).)

[ ] RACE  [ ] COLOR  [ ] SEX  [ ] RELIGION  [X] NATIONAL ORIGIN

[ ] RETALIATION  [ ] AGE  [ ] DISABILITY  [ ] GENETIC INFORMATION

[ ] OTHER (Specify)

| DATE(S) DISCRIMINATION TOOK PLACE | |
|---|---|
| Earliest | Latest |
| 02-29-2016 | 02-29-2016 |

[ ] CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I worked for the above named employer from 1998 until February 29, 2016 when I was discharged from my position of Whey Department Foreman. I was violently attacked at work by a white/non-Hispanic co-worker on February 9, 2016 and defended myself. I was then discharged for violating the company's "no tolerance for workplace violence" policy. Other white/non-Hispanic employees have violated this policy, including my attacker previously and on February 29th, but were not discharged.

I believe I have been discriminated against because of my national origin (Mexican) in violation of Title VII of the Civil Rights Act of 1964, as amended.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| X 5-5-2017    X Nicolas Donez | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |
| Date           Charging Party Signature | |



LF App. Page 62
RECEIVED
DEC 15 2016
EEOC - DENVER
FIELD OFFICE

## EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
## INTAKE QUESTIONNAIRE

Please immediately complete the entire form and return it to the U.S. Equal Employment Opportunity Commission ("EEOC"). **REMEMBER**, a charge of employment discrimination must be filed within the time limits imposed by law, generally within 180 days or in some places 300 days of the alleged discrimination. Upon receipt, this form will be reviewed to determine EEOC coverage. **Answer all questions as completely as possible, and attach additional pages if needed to complete your response(s). If you do not know the answer to a question, answer by stating "not known."** If a question is not applicable, write "n/a." **Please Print.**

**1.    Personal Information**

1 line redacted this page. Reason: party personally identifiable information; DOB. FOIA code (b)(6) ; (b)(7)(C)

Last Name: Donez        First Name: Nicolas        MI:

Street or Mailing Address: 516 Custer Street        Apt Or Unit #:

City: Brush        County: Morgan        State: Co        ZIP: 80723

Phone Numbers: Home: (____)_____        Work: (____)_____

Cell: ( 970 ) 380-8574        Email Address: h.donez@bresnan.net

Date of B (b)(6);(b) 64 (7)(C)        Sex: Male ☒    Female ☐    Do You Have a Disability?   ☐ Yes   ☒ No

Please answer each of the next three questions.    i. Are you Hispanic or Latino?   ☒ Yes   ☐ No

ii. What is your Race?  Please choose all that apply.   ☐ American Indian or Alaska Native   ☐ Asian   ☐ White

☐ Black or African American   ☐ Native Hawaiian or Other Pacific Islander

iii. What is your National Origin (country of origin or ancestry)?  Mexico

Please Provide The Name Of A Person We Can Contact If We Are Unable To Reach You:

Name:        3 lines redacted this page. Reason: 3rd party personally identifiable information. FOIA code (b)(6) ; (b)(7)(C)

Addres (b)(6);(b)(7)(C)

Home

**2. I believe that I was discriminated against by the following organization(s):** (Check those that apply)

☒ Employer   ☐ Union   ☐ Employment Agency   ☐ Other (Please Specify)_____

**Organization Contact Information** (If the organization is an employer, provide the address where you actually worked. If you work from home, check here ☐ and provide the address of the office to which you reported.) **If more than one employer is involved, attach additional sheets.**

Organization Name: Leprino Foods

Address: 2400 East Beaver Avenue        County: Morgan

City: Fort Morgan        State: Co   Zip:  80701        Phone: ( 970 ) 867-9351

Type of Business: Food Industry        Job Location if different from Org. Address:

Human Resources Director or Owner Name: Risa Esterly, Human Resources Manager        Phone:

Number of Employees in the Organization at All Locations: Please Check (√) One

☐ Fewer Than 15   ☐ 15 - 100   ☐ 101 - 200   ☒ 201 - 500   ☐ More than 500

**3.  Your Employment Data** (Complete as many items as you can)   **Are you a Federal Employee?**  ☐ Yes  ☒ No

Date Hired: 11/03/1998        Job Title At Hire: Palletizer Operator

Pay Rate When Hired: $12.53        Last or Current Pay Rate: $24.98

Job Title at Time of Alleged Discrimination:  Whey Dept Foreman        Date Quit/Discharged:  02-29-2016

Name and Title of Immediate Supervisor:  Jim Wilkens, Kenny Duggan

**If Job Applicant**, Date You Applied for Job _____   Job Title Applied For _____

**4.  What is the reason (basis) for your claim of employment discrimination?**

*FOR EXAMPLE, if you feel that you were treated worse than someone else because of race, you should check the box next to Race. If you feel you were treated worse for several reasons, such as your sex, religion and national origin, you should check all that apply. If you complained about discrimination, participated in someone else's complaint, or filed a charge of discrimination, and a negative action was threatened or taken, you should check the box next to Retaliation.*

☒ Race    ☐ Sex   ☐ Age  ☐ Disability    ☐ National Origin ☐ Religion ☐  Retaliation    ☐ Pregnancy ☐ Color (typically a

difference in skin shade within the same race) ☐ Genetic Information; choose which type(s) of genetic information is involved:

☐ i. genetic testing    ☐ ii. family medical history    ☐ iii. genetic services (genetic services means counseling, education or testing)

If you checked color, religion or national origin, please specify: _____

If you checked genetic information, how did the employer obtain the genetic information? _____

Other reason (basis) for discrimination (Explain). _____

**5.  What happened to you that you believe was discriminatory?**  Include the date(s) of harm, the action(s), and the name(s) and title(s) of the person(s) who you believe discriminated against you.  **Please attach additional pages if needed.**
*(Example: 10/02/06 - Discharged by Mr. John Soto, Production Supervisor)*

A) Date:  02/29/2016          Action:  Termination

Name and Title of Person(s) Responsible: Risa Esterly

B) Date:                            Action:

Name and Title of Person(s) Responsible: _____

**6.  Why do you believe these actions were discriminatory? Please attach additional pages if needed.**

See Exhibit 1.

**7.  What reason(s) were given to you for the acts you consider discriminatory?  By whom?  His or Her Job Title?**

See Exhibit 1.

**8. Describe who was in the same or similar situation as you and how they were treated.  For example, who else applied for the same job you did, who else had the same attendance record, or who else had the same performance?  Provide the race, sex, age, national origin, religion, or disability of these individuals, if known, and if it relates to your claim of discrimination.  For example, if your complaint alleges race discrimination, provide the race of each person; if it alleges sex discrimination, provide the sex of each person; and so on.  Use additional sheets if needed.**

Of the persons in the same or similar situation as you, who was treated *better* than you?

| A. Full Name | Race, sex, age, national origin, religion or disability | Job Title |
|---|---|---|
| See Exhibit 3 | | |
| Description of Treatment | | |

| B. Full Name | Race, sex, age, national origin, religion or disability | Job Title |
|---|---|---|
| | | |
| Description of Treatment | | |

**Of the persons in the same or similar situation as you, who was treated *worse* than you?**

| A. Full Name | Race, sex, age, national origin, religion or disability | Job Title |
|---|---|---|
| | | |
| Description of Treatment | | |

| B. Full Name | Race, sex, age, national origin, religion or disability | Job Title |
|---|---|---|
| | | |
| Description of Treatment | | |

**Of the persons in the same or similar situation as you, who was treated the *same* as you?**

| A. Full Name | Race, sex, age, national origin, religion or disability | Job Title |
|---|---|---|
| Judas J. Donez | Hispanic | Relief Operator |
| Description of Treatment | was terminated for workplace violence. | |

| B. Full Name | Race, sex, age, national origin, religion or disability | Job Title |
|---|---|---|
| | | |
| Description of Treatment | | |

Answer questions 9-12 only if you are claiming discrimination based on disability. If not, skip to question 13. Please tell us if you have more than one disability. Please add additional pages if needed.

9.   Please check all that apply:

☐   Yes, I have a disability

☐   I do not have a disability now but I did have one

☐   No disability but the organization treats me as if I am disabled

10. What is the disability that you believe is the reason for the adverse action taken against you?  Does this disability prevent or limit you from doing anything? (e.g., lifting, sleeping, breathing, walking, caring for yourself, working, etc.).

11. Do you use medications, medical equipment or anything else to lessen or eliminate the symptoms of your disability?

Yes ☐    No ☐

If "Yes," what medication, medical equipment or other assistance do you use?

12. Did you ask your employer for any changes or assistance to do your job because of your disability?

Yes ☐    No ☐

If "YES", when did you ask? _____    How did you ask (verbally or in writing)? _____

Who did you ask? (Provide full name and job title of person)

Describe the changes or assistance that you asked for:

How did your employer respond to your request?

**13. Are there any witnesses to the alleged discriminatory incidents? If yes, please identify them below and tell us what they will say. (Please attach additional pages if needed to complete your response)**

| A. Full Name | Job Title | Address & Phone Number |
|---|---|---|
| See Exhibit 2 | | |

What do you believe this person will tell us?

| B. Full Name | Job Title | Address & Phone Number |
|---|---|---|
| | | |

What do you believe this person will tell us?

**14. Have you filed a charge previously in this matter with EEOC or another agency?**   Yes ☐   No ☒

**15. If you have filed a complaint with another agency, provide name of agency and date of filing:**

**16. Have you sought help about this situation from a union, an attorney, or any other source?**   Yes ☒   No ☐
Provide name of organization, name of person you spoke with and date of contact. Results, if any?

Amy Burma, Burma Law Offices, LLC, 4450 Arapahoe Ave, Suite 100, Boulder, CO 80301. 720-464-5655. Currently representing.

**Please check one of the boxes below to tell us what you would like us to do with the information you are providing on this questionnaire.** If you would like to file a charge of job discrimination, you must do so either within 180 days from the day you knew about the discrimination, or within 300 days from the day you knew about the discrimination if the employer is located in a place where a state or local government agency enforces laws similar to the EEOC's laws. **If you do not file a charge of discrimination within the time limits, you will lose your rights.** If you would like more information before filing a charge or you have concerns about EEOC's notifying the employer, union, or employment agency about your charge, you may wish to check Box 1. If you want to file a charge, you should check Box 2.

Box 1 ☐ I want to talk to an EEOC employee before deciding whether to file a charge. I understand that by checking this box, I have not filed a charge with the EEOC. **I also understand that I could lose my rights if I do not file a charge in time.**

Box 2 ☒ I want to file a charge of discrimination, and I authorize the EEOC to look into the discrimination I described above. I understand that **the EEOC must give the employer, union, or employment agency that I accuse of discrimination information about the charge, including my name.** I also understand that the EEOC can only accept charges of job discrimination based on race, color, religion, sex, national origin, disability, age, genetic information, or retaliation for opposing discrimination.

_(signature)_ Signature                              12-15-16   Today's Date

PRIVACY ACT STATEMENT: This form is covered by the Privacy Act of 1974. Public Law 93-579. Authority for requesting personal data and the uses thereof are
1. FORM NUMBER/TITLE/DATE. EEOC Intake Questionnaire (9/20/08).
2. AUTHORITY. 42 U.S.C. § 2000e-5(b), 29 U.S.C. § 211, 29 U.S.C. § 626. 42 U.S.C. 12117(a), 42 USC §2000ff-6.
3. PRINCIPAL PURPOSE. The purpose of this questionnaire is to solicit information about claims of employment discrimination, determine whether the EEOC has jurisdiction over those claims, and provide charge filing counseling, as appropriate. Consistent with 29 CFR 1601.12(b) and 29 CFR 1626.8(c), this questionnaire may serve as a charge if it meets the elements of a charge.
4. ROUTINE USES. EEOC may disclose information from this form to other state, local and federal agencies as appropriate or necessary to carry out the Commission's functions, or if EEOC becomes aware of a civil or criminal law violation. EEOC may also disclose information to respondents in litigation, to congressional offices in response to inquiries from parties to the charge, to disciplinary committees investigating complaints against attorneys representing the parties to the charge, or to federal agencies inquiring about hiring or security clearance matters
5. WHETHER DISCLOSURE IS MANDATORY OR VOLUNTARY AND EFFECT ON INDIVIDUAL FOR NOT PROVIDING INFORMATION. Providing of this information is voluntary but the failure to do so may hamper the Commission's investigation of a charge. It is not mandatory that this form be used to provide the requested information.

Print Form

## EXHIBIT 1- QUESTIONS 6 AND 7

On February 9, 2016, I was violently and viciously attacked while performing my duties at Leprino Foods. Frank Levar, another Leprino employee, who is Caucasian, attacked me. I received serious injuries, including a left laryngeal fracture, thyroid cartilage and cricoid ring fractures as well as right temporal and left parietal scalp hematomas. Mr. Levar, who was not injured, was arrested and charged with assault. A jury later convicted Mr. Levar of assault.

On February 29, 2016, I received a letter from Risa Esterly, the Human Resources Manager at Leprino Foods, stating that I was being terminated for violating Leprino's "no tolerance for workplace violence" policy. Ms. Esterly claimed that I violated that policy by exercising my right to self-defense.

Mr. Levar was previously involved in an incident involving workplace violence in which he assaulted Shane Tucker, another employee. Other non-Hispanic employees have violated the "no tolerance for workplace violence" policy without being terminated, including Chris Dryer, Allen Burton, Shawn Morrison, and Cory Gettman.

I did not violate Leprino's workplace violence policy. I was not the aggressor and any action I took was in self-defense. I believe Leprino used its "workplace violence" policy as a pre-textual reason for its intentional discrimination.

## EXHIBIT 2- QUESTION 13

Dave Ocanas (970) 768-2609. Witnessed event in which Frank Levar violated the company's "workplace violence" policy and was not terminated.

Shane Tucker (970) 867-4601. Witnessed event in which Frank Levar violated the company's "workplace violence" policy and was not terminated.

Heather Donez (970) 380-8573. Witnessed discrimination at Leprino Foods.

Shane Cole (970) 842-3974. H.R manager at the time that Frank Levar shoved Shane Tucker. Did not terminate Frank, but did document incident. Documentation on Frank and Shane incident disappeared after Frank assaulted me.

Leonard Woodson (970) 842-2400. Was a victim in which Cory Gettman, a Caucasian, violated the company's "workplace violence" policy and was not terminated.

**Jay Marshall (970)-867-2803. Was a victim in which Shawn Morrison, a Caucasian, violated the company's "workplace violence" and was not terminated.**

## EXHIBIT 2- QUESTION 13 CONT

Sean Kelly.  Was another victim in which Shawn Morrison, a Caucasian, violated the company's "workplace violence" policy and was not terminated.

Marcus Vowell.  Witnessed event in which Allen Burton, a Caucasian, violated the company's "workplace violence" policy and was not terminated.

Richard Rodriquez.  Was a victim in which Allen Burton, a Caucasian,  violated the company's "workplace violence" policy and was not terminated.

Maryanne Zupancic (970)-842-2340. Was a victim in which Brian Kelly a Caucasian, violated the company's "workplace violence" policy and was not terminated.

Maria Beltran (970) 380-7716. Was a victim in which Chris Dreyer a Caucasian,  violated the company's "workplace violence" policy and was not terminated.

Amy Reyez.  Was a victim in which Chris Dreyer, a Caucasian,  violated the company's "workplace violence" policy and was not terminated.

Hannah Abrego (970)-380-1473. Was a victim in which Chris Dreyer, a Caucasian, violated the company's "workplace violence" policy and was not terminated.

Judas Donez (970)-380-8354. Mr. Donez, a Hispanic, was terminated for workplace violence, just for placing his hand on a foreman's shoulder.

## EXHIBIT 3- QUESTION 8

OF THE PERSONS IN THE SAME OR SIMILAR SITUATIONS AS YOU, WHO WAS TREATED BETTER THAN YOU.


Frank Lavar        Caucasian        Lactose Operator

Not terminated for violating "workplace violence" policy.


Shawn Morrison        Caucasian        CIP 2 Operator

Not terminated for violating "workplace violence" policy


Allen Burton        Caucasian        Maintenance Foreman

Not terminated for violating "workplace violence" policy.


Brian Kelly        Caucasian        Warehouse Forklift Operator

Not terminated for violating "workplace violence" policy.


Chris Dreyer        Caucasian        Eagle Operator

Not terminated for violating "workplace violence" policy.


Cory Gettman        Caucasian        Processing Foreman

Not terminated for violating "workplace violence" policy.



**Leprino Foods**

2400 East Beaver Avenue
Fort Morgan, CO 80701
970 867-9351

February 29, 2016

Mr. Nick Donez
Fort Morgan, CO 80701

Dear Mr. Donez:

We have concluded our investigation pertaining to the incident between you and your
operator on Tuesday, February 9th, 2016. During our investigation you verbally admitted
to us you pushed your operator. Leprino Foods Company has no tolerance for
workplace violence.

Your employment is terminated effective today, February 29, 2016. Due to the grounds
of your termination, you are not allowed on Leprino property, nor are you allowed to
attend any Leprino sponsored events.

Sincerely

Risa Esterly
Human Resources Manager

To Whom It May Concern:

My husband (Nicolas Donez) was violently attacked on Feb. 9th by Frank Lavar at The Ft. Morgan Leprino foods Whey Dept. Frank pushed Nick and then proceeded forward with his attack. Nick pushed him back to try to stop the imminent attack, but he failed, because he was knocked unconscious. The next thing he remembers was a bunch of people surrounding him and the paramedics coming in. Nick suffered severe injuries because he consciously chose not to fight back. All he did was push Frank back to get him away, to try to stop the attack.

The police investigated the incident and decided to charge Frank Lavar with second degree felony assault and Nick was not charged because he did nothing wrong. Leprino Foods however terminated Nick's employment because he pushed Frank away trying to stop the violent assault that he knew was coming. To protect himself using as little force as possible. Which seems like a basic human right, right? Not according to Reesa Esterly. She didn't even take his side of the story into consideration.

Frank Lavar shoved another foreman (Shane Tucker) in The Ft. Morgan Leprino Food Whey Dept. a few years ago with NO punishment. In my opinion you as a corporation had an opportunity; no, a responsibility to protect my husband and save him from all the pain and suffering he has gone through for the last two months by following your policy (zero tolerance for work place violence). Frank Lavar should have been fired for shoving Shane Tucker in The Leprino Foods Whey Dept. Reesa acknowledged that there is documentation proving that Frank shoved Shane, but her only response was that she wasn't there at the time. When she took the job as the Ft. Morgan Leprino Foods HR Manager she inherited all that comes with it, so I don't think she or Leprino Foods can wipe their hands of it so easily.

I have worked for this company for over 18 years and have seen the inconsistencies with who gets punished and how they get punished. It is no better now than it was 10 years ago. Most recently, on March 21st Shawn Morrison told me that he was taken upstairs because Jay Marshall reported him for putting multiple people in choke holds, grabbing people inappropriately etc. He then told me "You know how I am. I like to mess around." Shawn said that Julia Lambert and Jim Wilkins asked him what was going on, and told him to stop. NO other punishment. Shawn also told me that Jim Wilkins (Senior Supervisor) told him that Jay was the person who reported him. Which is completely unethical because of the chance that Shawn will retaliate.

After talking to Shawn I went and asked Jay Marshall what happened. He said that he complained to Pete after being grabbed inappropriately by Shawn yet another time, because he was sick of Shawn's behavior. Pete had him write out a statement and that was the last that Jay had heard about it until Shawn approached him in the hallway two weeks later angry and making threatening remarks because Jim Wilkins told Shawn that Jay was the one who reported it.

If HR would have done their job and conducted anything that resembled an investigation such as talking with Shawn's fellow employees or looking at the cameras in the breakroom they would have found validity in Jay's complaints because everybody including myself sees Shawn bullying people and acting inappropriately. But instead they just let this workplace violence continue. No tolerance for workplace violence?

On March 22nd I was walking through the Vat Room and saw Shawn pick up Angela Sears over his shoulder with his hand cupped around her buttock. Jim Volk (Maintenance Manager) also witnessed this disgusting act. Jim walked up to Shawn and told him to stop and then left. Again NO punishment?? Shawn Morrison continues to demonstrate violent and disgusting behavior on a daily basis toward his fellow employees. I have seen him hit several male employees in the genitals with a crescent wrench, but honestly why should he stop. There has been NO punishment, and he considers this behavior a "Good Time".

Reesa told my husband (Nicolas Donez) on Feb. 29th as she was handing him his termination letter that there was a zero tolerance for workplace violence, but putting people in choke holds whether it is a joke or not seems extremely violent. Yet Reesa chose not to investigate something that everybody on the floor sees happening.

I am writing this letter because the Ft. Morgan plant claims to have a zero tolerance policy for workplace violence yet the HR Dept. is willing to turn a blind eye to violent behavior depending on who is involved. The incidents with Shawn Morrison and Frank Lavar are proof. Nick Donez tried to protect himself against a known aggressor using as little force as possible to try to keep his job and was terminated. His son Judas Donez was terminated for putting his hand on Raul Sanchez's shoulder. Reesa decided that this was also considered to be workplace violence.

What are the criteria that need to be met for you as a corporation to consider violent behavior? Putting your hand on someone's shoulder, or trying to push someone away to protect yourself and prevent a violent assault? Because both of those seem way less violent than pushing your foreperson in the Whey Dept. (Shane Tucker) because you are mad, or choking people, or picking people up over your shoulder, or grabbing people inappropriately, or hitting people in the genitals with a crescent wrench because you like to have a "Good Time". All of these incidents have been investigated by the HR Dept. and they chose to fire two people with the same last name (Donez) for workplace violence when the acts of violence seem a lot less violent than the Morrison and Lavar acts. So my question to you is does it depend on who you are, or is Ft. Morgan HR on a different page than Leprino Foods as a corporation?

Our focus as a family is to get Nick to a place of good health. He still suffers from several lasting symptoms from the attack that took place on Leprino Foods property. But I am still an employee at The Ft. Morgan Plant and it is your responsibility to ensure a safe work environment. If there is a complaint then the HR Dept. needs to do their job and preform a proper investigation. If this would have happened when Frank Lavar shoved Shane Tucker then Frank would've been fired and my husband would've been safe. Reesa can try to wipe her hands of that incident because "she wasn't there at the time", but how is she going to explain allowing the violent and disgusting acts that Shawn Morrison is getting away with on a daily basis, with NO punishment. It was reported...

Sincerely,

4/6/2016

10/26/2016



## Fort Morgan Police Dept.

## INCIDENT REPORT
Incident: 201600002915 - Case: 201600000179

### INCIDENT DATES/TIMES:

| | | |
|---|---|---|
| **Reported Date/Time:** | 02/09/2016 | 10:59:05 |
| **Dispatched Date/Time:** | 02/09/2016 | 10:59:04 |
| **Enroute Date/Time:** | 02/09/2016 | 10:59:04 |
| **Arrival Date/Time:** | 02/09/2016 | 11:06:14 |

| | | |
|---|---|---|
| **Completed Date/Time:** | 02/09/2016 | 12:36:29 |
| **Earliest Date/Time:** | | |
| **Latest Date/Time:** | | |

### INCIDENT LOCATION:

2400  E Beaver Av          Fort Morgan          CO    80701      Morgan County

### OFFICERS ASSIGNED:

00000234          00000234          Cindy Brackett

### COMPLAINANT:

**Name:**

**Address:**

**City/State:**

### OFFENSES:

| IBR | Offense - Description | Statute - Description | Degree | Class | Level |
|---|---|---|---|---|---|
| 13A | 0000001306 - Aggrav Asslt- Nonfam | | | | Misdemeanor |

### SUBJECT(S) INVOLVED:

| Type | Name | DOB | Address | City/State/Zip | Phone |
|---|---|---|---|---|---|
| Arrest | Levar, Frank D | 12/11/1965 | 616 W 6Th Av | Fort Morgan, CO 80701 | 8673159 |
| Calls For Service | Levar, Frank | 12/11/1965 | | Fort Morgan, CO 80701 | 9708676123 |
| Contact | Fisher, Charles | 09/23/1957 | 818  Warner | Brush, CO 80723 | |
| Contact | Donez, Heather L | 01/13/1977 | 516  Curtis | Erie, CO 80516 | 9704410583 |
| Contact | Esterly, Risa | 02/14/1972 | 856  Mircos | Weldona, CO 80653 | 9707689226 |
| Contact | Wilkins, James C | 06/26/1970 | 703.5  Warren | Fort Morgan, CO 80701 | 9703700570 |
| Contact | Prell, Jonathan David | 03/30/1971 | 1000  Simpson | Fort Morgan, CO 80701 | 8459780553 |
| Contact | Davidson, Robert | 07/30/1952 | 424 E Riverview Ave | Brush, CO 80723 | |
| Contact | Martin, Timothy | 02/03/1977 | 715  Custer | Fort Morgan, CO 80701 | 9708672049 |
| Contact | Duggan, Kenny | 03/22/1966 | 427 S Sherman | Fort Morgan, CO 80701 | 9707680634 |
| Contact | Groves, Sheryl Leigh | 06/30/1964 | 621  Warner | Fort Morgan, CO 80701 | 9708674601 |
| Contact | Tucker, Richard Shane | 07/30/1967 | 12763  Morgan County Rd 19 | Fort Morgan, CO 80701 | 9707682609 |
| Contact | Ocanas, David Elias | 03/15/1976 | 936  Carol | Fort Morgan, CO 80701 | 8676336 |
| Contact | Kaper, Kory John | 07/09/1989 | 903  Michael Av | Wiggins, CO 80654 | 9704836580 |
| Contact | Abelson, Rick Andrew | 11/26/1970 | 312  Sally | Fort Morgan, CO 80701 | 8673159 |
| Offender | Levar, Frank D | 12/11/1965 | 616 W 6Th Av | Brush, CO 80723 | 9708427465 |
| Victim | Donez, Nicolas | 02/02/1964 | 516  Custer | Fort Morgan, CO 80701 | |
| Witness | Hernandez, Elias | 05/10/1970 | Lakeview  Lakeview Cir | | |

10/26/2016

**Fort Morgan Police Dept.**

### INCIDENT REPORT
Incident: 201600002915 - Case: 201600000179

NO IMAGE
AVAILABLE

NO IMAGE
AVAILABLE

**Arrest**
Levar, Frank D
**DOB:** 12/11/1965

**Offender**
Levar, Frank D
**DOB:** 12/11/1965



10/26/2016

**Fort Morgan Police Dept.**

## INCIDENT REPORT
Incident: 201600002915 - Case: 201600000179

**VICTIM/SUBJECT:**

Victim # 001

| | | | | | | |
|---|---|---|---|---|---|---|
| **Name:** | Donez, Nicolas | **DOB:** | 02/02/1964 | **Ethn:** | H | |
| **Addr:** | 516 Custer | **Race** | W | **Hair:** | BLK | |
| **City/St:** | Brush, CO 80723 | **Sex:** | M | **Eyes:** | BRO | |
| **Phone:** | 9708427465 | **Age:** | 52 | **Skin:** | LBR | |
| | 380-8574 | **Height:** 509 | | **Face:** | GTE | |
| **SSN:** | | **Weight:** 160 | | **Resident:** R | | |
| **OLN:** | 942622252 | **ST:** | CO | | | |
| **Type:** | Individual | | | | | |

Relationship to Offender 001:   VICTIM WAS ACQUAINTANCE

Offender # 001

| | | | | | | |
|---|---|---|---|---|---|---|
| **Name:** | Levar, Frank D | **DOB:** | 12/11/1965 | **Ethn:** | N | |
| **Addr:** | 616 W 6th Av | **Race:** | W | **Hair:** | BRO | |
| **City/St:** | Fort Morgan, CO 80701 | **Sex:** | M | **Eyes:** | BRO | |
| **Phone:** | 8673159 | **Age:** | 50 | **Skin:** | | |
| | | **Height:** 600 | | **Face:** | | |
| **SSN:** | | **Weight:** 160 | | **DANGEROUS:** | | N |
| **OLN:** | 921333484 | **ST:** | CO | **Resident:** R | | |

Witness # 001

| | | | | | | |
|---|---|---|---|---|---|---|
| **Name:** | Hernandez, Elias | **DOB:** | 05/10/1970 | **Ethn:** | H | |
| **Addr:** | Lakeview  Lakeview Cir | **Race:** | W | **Hair:** | BRO | |
| **City/St:** | Fort Morgan, CO 80701 | **Sex:** | | **Eyes:** | BRO | |
| **Phone:** | | **Age:** | 45 | **Skin:** | | |
| | | **Height:** 504 | | **Face:** | | |
| **SSN:** | | **Weight:** 143 | | **Resident:** | N | |
| **OLN:** | 032941214 | **ST:** | CO | | | |

Contact # 001

| | | | | | | |
|---|---|---|---|---|---|---|
| **Name:** | Fisher, Charles | **DOB:** | 09/23/1957 | **Ethn:** | N | |
| **Addr:** | 818 Warner | **Race:** | W | **Hair:** | | |
| **City/St:** | Fort Morgan, CO 80701 | **Sex:** | M | **Eyes:** | | |
| **Phone:** | 9708676123 | **Age:** | 58 | **Skin:** | | |
| | | **Height:** | | **Face:** | | |
| **SSN:** | | **Weight:** | | **Resident:** | R | |
| **OLN:** | | **ST:** | | | | |

Contact # 002

| | | | | | | |
|---|---|---|---|---|---|---|
| **Name:** | Donez, Heather L | **DOB:** | 01/13/1977 | **Ethn:** | | |
| **Addr:** | 516 Curtis | **Race:** | W | **Hair:** | BLN | |
| **City/St:** | Brush, CO 80723 | **Sex:** | F | **Eyes:** | BLU | |
| **Phone:** | | **Age:** | 39 | **Skin:** | | |
| | | **Height:** 509 | | **Face:** | | |
| **SSN:** | | **Weight:** 170 | | **Resident:** | | |
| **OLN:** | 950452567 | **ST:** | CO | | | |

10/26/2016



## Fort Morgan Police Dept.

### INCIDENT REPORT
Incident: 201600002915 - Case: 201600000179

---

**Contact # 003**

| | | | | | | |
|---|---|---|---|---|---|---|
| **Name:** | Esterly, Risa | **DOB:** | 02/14/1972 | **Ethn:** | N | |
| **Addr:** | 856 Mircos | **Race:** | W | **Hair:** | BLN | |
| **City/St:** | Erie, CO 80516 | **Sex:** | F | **Eyes:** | BLU | |
| **Phone:** | 9704410583 | **Age:** | | **Skin:** | | |
| | | **Height:** 509 | | **Face:** | | |
| **SSN:** | | **Weight:** 180 | | **Resident:** | N | |
| **OLN:** | 063330054 | **ST:** | CO | | | |

---

**Contact # 004**

| | | | | | | |
|---|---|---|---|---|---|---|
| **Name:** | Wilkins, James C | **DOB:** | 06/26/1970 | **Ethn:** | N | |
| **Addr:** | 703.5 Warren | **Race:** | W | **Hair:** | RED | |
| **City/St:** | Weldona, CO 80653 | **Sex:** | M | **Eyes:** | HAZ | |
| **Phone:** | 9707689226 | **Age:** | 45 | **Skin:** | | |
| | | **Height:** 604 | | **Face:** | | |
| **SSN:** | | **Weight:** 275 | | **Resident:** | N | |
| **OLN:** | 950192234 | **ST:** | CO | | | |

---

**Contact # 005**

| | | | | | | |
|---|---|---|---|---|---|---|
| **Name:** | Prell, Jonathan David | **DOB:** | 03/30/1971 | **Ethn:** | N | |
| **Addr:** | 1000 Simpson | **Race:** | W | **Hair:** | BLN | |
| **City/St:** | Fort Morgan, CO 80701 | **Sex:** | M | **Eyes:** | BLU | |
| **Phone:** | 9703700570 | **Age:** | 44 | **Skin:** | | |
| | | **Height:** 509 | | **Face:** | | |
| **SSN:** | | **Weight:** 160 | | **Resident:** | R | |
| **OLN:** | 921853868 | **ST:** | CO | | | |

---

**Contact # 006**

| | | | | | | |
|---|---|---|---|---|---|---|
| **Name:** | Davidson, Robert | **DOB:** | 07/30/1952 | **Ethn:** | N | |
| **Addr:** | 424 E Riverview Ave | **Race:** | W | **Hair:** | BRO | |
| **City/St:** | Fort Morgan, CO 80701 | **Sex:** | M | **Eyes:** | HAZ | |
| **Phone:** | 8459780553 | **Age:** | 63 | **Skin:** | | |
| | | **Height:** 602 | | **Face:** | | |
| **SSN:** | | **Weight:** 270 | | **Resident:** | R | |
| **OLN:** | 102041064 | **ST:** | CO | | | |

---

**Contact # 007**

| | | | | | | |
|---|---|---|---|---|---|---|
| **Name:** | Martin, Timothy | **DOB:** | 02/03/1977 | **Ethn:** | N | |
| **Addr:** | 715 Custer | **Race:** | W | **Hair:** | BLN | |
| **City/St:** | Brush, CO 80723 | **Sex:** | | **Eyes:** | HAZ | |
| **Phone:** | | **Age:** | 39 | **Skin:** | | |
| | | **Height:** 600 | | **Face:** | | |
| **SSN:** | | **Weight:** 210 | | **Resident:** | N | |
| **OLN:** | 942553142 | **ST:** | CO | | | |

---

**Contact # 008**

| | | | | | | |
|---|---|---|---|---|---|---|
| **Name:** | Duggan, Kenny | **DOB:** | 03/22/1966 | **Ethn:** | N | |
| **Addr:** | 427 S Sherman | **Race:** | W | **Hair:** | | |
| **City/St:** | Fort Morgan, CO 80701 | **Sex:** | M | **Eyes:** | | |
| **Phone:** | 9708672049 | **Age:** | | **Skin:** | | |
| | | **Height:** | | **Face:** | | |
| **SSN:** | | **Weight:** | | **Resident:** | R | |
| **OLN:** | | **ST:** | | | | |

10/26/2016



**Fort Morgan Police Dept.**

LF App Page 76
Page 5 of 6

## INCIDENT REPORT
### Incident: 201600002915 - Case: 201600000179

---

**Contact # 009**

| | | | | | |
|---|---|---|---|---|---|
| **Name:** | Groves, Sheryl Leigh | **DOB:** | 06/30/1964 | **Ethn:** | N |
| **Addr:** | 621  Warner | **Race:** | W | **Hair:** | BRO |
| **City/St:** | Fort Morgan, CO 80701 | **Sex:** | F | **Eyes:** | GRN |
| **Phone:** | 9707680634 | **Age:** | 51 | **Skin:** | |
| | | **Height:** 600 | | **Face:** | NAP |
| **SSN:** | | **Weight:** 180 | | **Resident:** | R |
| **OLN:** | 920895432 | **ST:** | CO | | |

**Contact # 010**

| | | | | | |
|---|---|---|---|---|---|
| **Name:** | Tucker, Richard Shane | **DOB:** | 07/30/1967 | **Ethn:** | N |
| **Addr:** | 12763  Morgan County Rd 19 | **Race:** | W | **Hair:** | BRO |
| **City/St:** | Fort Morgan, CO 80701 | **Sex:** | | **Eyes:** | GRN |
| **Phone:** | 9708674601 | **Age:** | 48 | **Skin:** | FAR |
| | 9703803326 | **Height:** 601 | | **Face:** | GTE |
| **SSN:** | | **Weight:** 245 | | **Resident:** | R |
| **OLN:** | 941050962 | **ST:** | CO | | |

**Contact # 011**

| | | | | | |
|---|---|---|---|---|---|
| **Name:** | Ocanas, David Elias | **DOB:** | 03/15/1976 | **Ethn:** | H |
| **Addr:** | 936  Carol | **Race:** | W | **Hair:** | BLK |
| **City/St:** | Fort Morgan, CO 80701 | **Sex:** | M | **Eyes:** | BRO |
| **Phone:** | 9707682609 | **Age:** | 40 | **Skin:** | |
| | | **Height:** 505 | | **Face:** | |
| **SSN:** | | **Weight:** 120 | | **Resident:** | R |
| **OLN:** | 940811297 | **ST:** | CO | | |

**Contact # 012**

| | | | | | |
|---|---|---|---|---|---|
| **Name:** | Kaper, Kory John | **DOB:** | 07/09/1989 | **Ethn:** | N |
| **Addr:** | 903  Michael Av | **Race:** | W | **Hair:** | BRO |
| **City/St:** | Fort Morgan, CO 80701 | **Sex:** | M | **Eyes:** | GRN |
| **Phone:** | 8676336 | **Age:** | 27 | **Skin:** | |
| | 9703805362 | **Height:** 510 | | **Face:** | |
| **SSN:** | | **Weight:** 155 | | **Resident:** | R |
| **OLN:** | 041910094 | **ST:** | CO | | |

**Contact # 013**

| | | | | | |
|---|---|---|---|---|---|
| **Name:** | Abelson, Rick Andrew | **DOB:** | 11/26/1970 | **Ethn:** | N |
| **Addr:** | 312  Sally | **Race:** | W | **Hair:** | BLN |
| **City/St:** | Wiggins, CO 80654 | **Sex:** | M | **Eyes:** | BLU |
| **Phone:** | 9704836580 | **Age:** | 45 | **Skin:** | |
| | | **Height:** 510 | | **Face:** | |
| **SSN:** | | **Weight:** 140 | | **Resident:** | R |
| **OLN:** | 920012315 | **ST:** | CO | | |

10/26/2016  **Fort Morgan Police Dept.**

## INCIDENT REPORT
### Incident: 201600002915 - Case: 201600000179

---

### VEHICLE:

| Plate # | State | Type | VIN | | Yr | Make | Model | Color | Value |
|---------|-------|------|-----|--|----|----- |-------|-------|-------|
| | | | | | | | | | |

### PROPERTY:

| No. | Loss Type | Qty. | Make/Model/Style | Description | Serial # | Value | Evd. | RecDate | Rec Val |
|-----|-----------|------|------------------|-------------|----------|-------|------|---------|---------|
| 1 | | | | | | | | | |

### SYNOPSIS:

Case Number/201600000179 Offense/Assault. Location/2400 East Beaver Avenue. Date/020916. Time/1059 hours. Victim/Donez, Jr., Nicolas. Age/52. Address/Brush. Disposition/Open. 234CB/sh ***UPDATE*** Arrestee/Levar, Frank Age/

### APPROVALS:

| Function | ID | Name | Date | Status |
|----------|----|------|------|--------|
| Entered Investigated Reviewed | 00000264 | Stephanie Harman | 02/09/2016 | 1 - Approved |

10/26/2016        ◯ **Fort Morgan Police Dept.** ◯    

**ARREST REPORT**
**Incident: 201600002915 - Case: 201600000179 - Arrest: 000000016217**

**Frank D Levar**

**DOB:** 12/11/1965        **Arrested:**      02/17/2016
**Age:** 50        **Arresting Officer:** A Gagliano

**Sex:**     MALE        **Height:**    600
**Race:**    White        **Weight:**   160
**Eth. Ori.:** Non Hispanic      **Facial:**
**Hair:**    Brown        **Build:**
**Eye:**     Brown

**IDENTIFIERS:**

           **Misc. ID:**
**SSN:**            **Misc. ID #:**
**State ID:** 291668     **Drv. Lic. #:**   921333484
**FBI:**       829192KA8     **Drv. Lic. St:** COLORADO

**ADDRESS(ES):**

616 W 6th Av            Fort Morgan      CO   80701      8673159

**SCARS/MARKS/TATTOOS:**

**ARREST LOCATION:**

**CHARGE(S):**

| IBR | Offense - Description | Statute - Description | Degree | Class | Level |
|-----|----------------------|----------------------|--------|-------|-------|
| 13A | 0000001306 - Aggrav Asslt- Nonfam | | | | Misdemeanor |

**AGENCY DATA:**

| | Agency | Number |
|---|--------|--------|
| **Arrest:** | FMPD | 000000016217 |
| **Case:** | Fort Morgan Police Dept. | 201600000179 |
| **Citation:** | | |
| **Incident:** | Fort Morgan Police Dept. | 201600002915 |
| **Warrant:** | | |

**RIGHTS:**

**Date:**       **Time:**       **By:**

Administrative   Agency: Fort Morgan Police Dept.   Incident #: 201600002915    Case_Nr: 201600000179

Report No. 1   Entered: 02/09/2016 16:44   By Officer: 00000234  Cindy Brackett

Report #1

Statement of Officer Cindy Brackett

On 02/09/16 at approximately 1059 hours, I was dispatched to 2400 East Beaver Avenue at the front entrance for a medical issue.  I had very little information as dispatch was not given much information regarding a person that was conscious and breathing.  I arrived on scene and the ambulance was already inside.  One of the employees outside let me in as the doors are secure. I had a hard time finding where this occurred as there was not a lot of assistance. I finally was escorted to the back where the medical was at. The ambulance crew already had the person on a back board and was lifting him off the ground. I did not see anything in the work area on the floor.

While following the ambulance crew I was informed by a passer by that this call was actually an assault call.  He told me that he thought the victim had been knocked unconscious with a rubber hammer. I was escorted back in and talked to Charles Fisher, date of birth 09/23/57. Charles told me that he was working down in that area when Frank Levar walked up to him. Frank told him he needed to go into the other room as he just knocked someone out. He also told Charles that he was going home and picked up his tools and left.  Charles said that he went in the room and found an employee unconscious on the ground.

I was then taken upstairs to Human Resources to get further information on Frank Levar.  I asked Human Resources, for Frank's information such as his date of birth, address and a phone number and they refused to give me anything but his name "Frank." I then told them if I couldn't find his information I would be back with a search warrant. I was able to find out who this party was through the assistance of dispatch and the victims wife.

I responded over to Colorado Plains Medical Center reference this assault case and contacted the detectives. The victim, Nicolas Donez, date of birth 02/02/64 was conscious when I arrived at the hospital.    I talked to Human Resource employee Risa Esterly, date of birth 02/14/72, who told me at the hospital that Frank had not gone straight home and had filled out a statement regarding this incident. Frank was then suspended.  I drove by an address I was given by dispatch of 616 West 6th Avenue where I ran a plate, 990HTE, which came back to Frank Levar at that same location.

At this time I have nothing further. End of report.

1

**Administrative Agency: Fort Morgan Police Dept. Incident #: 201600002915 Case_Nr: 201600000179**

**Report No. 1 Entered: 02/09/2016 16:44 By Officer: 00000234 Cindy Brackett**

234CB/sh
Approved by Officer Brackett on 021216
Approved by Sgt. James A. Parks
02/14/2016

**Administrative Agency: Fort Morgan Police Dept.   Incident #: 201600002915   Case_Nr: 201600000179**

**Report No. 2   Entered: 02/11/2016 15:45   By Officer: 00000298 Steve Vosburg**

Report #2

Supplemental Statement of Detective Steve Vosburg

In the State of Colorado, County of Morgan, City of Fort Morgan on 02/09/16 at approximately 1059 hours, Officer Brackett of the Fort Morgan Police Department responded to a medical assist at the Leprino cheese factory at 2400 East Beaver Avenue in Fort Morgan. Upon her arrival she was informed that this call was in regard to a possible assault that took place at that location and the victim was transported to the Colorado Plains Medical Center in Fort Morgan. Officer Brackett requested assistance from Investigations through Sergeant Loren Sharp.

Sergeant Sharp and I both responded to Colorado Plains Medical Center into the emergency room where we met with Officer Brackett for a preliminary briefing of what she could tell us. Initially she told us that the suspect's name was Frank Levar. Officer Brackett identified a witness as Charles Fisher, date of birth 09/23/57, where this witness reported that the suspect went up to him and said "You might want to go into that room because I just knocked him out," picked up his tool box and said, "I'm going home," and then left. Officer Brackett also reported that someone came up, unknown who, reporting that there was a rubber mallet lying by the victim.

Preliminary information from the attending physician, Dr. Elias Hernandez, was that there was an injury around the neck area and the back of the head. The nurse attending to the victim was identified as Tara Schadegg. Sergeant Sharp and I went to the exam room and we contacted the victim's wife identified as Heather Donez, date of birth 01/31/77, maiden name of Doane. She informed us that she also works at Leprino and understood that there was a request from the suspect, Frank, for some assistance and wanting some immediate assistance of which they were busy at the time and the victim ultimately made it back to Frank and Heather was informed that all her husband remembered was Frank pushing him and Heather didn't believe that there was anyone else working in that particular section of the plant. When asked about cameras, Heather informed that there weren't any cameras in that particular portion of the plant. Heather said that when they came and got her, her husband was on the floor and there was a hammer next to him. She described the hammer as a rubber mallet.

Heather further stated that either Frank or her husband, Nicolas, could have had a hammer. Heather said Frank was extremely hotheaded and that others that work at the plant are well aware of that fact. She further stated that usually her husband and Frank

1

Administrative   Agency: Fort Morgan Police Dept.   Incident #:
201600002915     Case_Nr: 201600000179

Report No.  2   Entered: 02/11/2016 15:45   By Officer:  00000298 Steve Vosburg

get along and described just selling Frank some furniture approximately a month ago. Heather identified her husband as Nicolas Donez, Jr., date of birth 02/02/64. Heather further stated that they are going through a transition there at work and everybody is really tense, getting their butts kicked. Heather Donez also informed us that she also worked at Leprino, but worked in a different department than her husband. She said they came and got her right after the incident happened. I asked what his title was out at the workplace and she said that he is a whey department foreman and today he was acting as a supervisor.

I asked if he had any medical conditions and she said that he had epilepsy, but he hasn't had a seizure in ten years. I asked her if Nick had told her anything about the incident or if he knew what happened. She told me that he said that they were arguing about Frank not getting help, that they didn't have any extra people, that all the people were busy, but that he would get to him whenever he could help him. That's when Frank got mad and shoved him. Heather said at the time that she got there, Nick didn't know anything, that he couldn't remember. I asked if she had any idea how long he was unconscious and she said no. She said that he was awake whenever she got there. She said Bob Davidson, who is the sanitation supervisor, was there with him. Heather said she thought that Bob had told her that he didn't know anything, that they had found him that way.

I asked Heather if there was any past history between Nicolas and Frank. She said Frank is extremely hotheaded and everybody knows it, but Frank and Nick were friends. She said that they had just sold Frank some curio cabinets and they delivered them to him and set them up and Frank loved them. This happened just last month. Heather said Frank is so hotheaded anything can set him off and he'll just start screaming, but he is a decent operator and everybody just kind of deals with him until now. Heather told me that the doctor felt that he was strangled as well or hit in the throat, one of the two. I asked Heather who the HR person was and she told me Risa, but that Julia Lambert is her supervisor.

Officer Brackett provided me with the full name of the Human Resources person. She was identified as Risa Esterly, date of birth 02/14/72. Heather said that Nicolas was having a little bit of trouble breathing and the doctor had ordered some additional tests. I requested and obtained a written release for medical records from Nicolas Donez. I spoke to Nick Donez and asked him if he recalled what may have happened. Nick spoke to me with some difficulty and it was apparent from his voice that he was having some trouble speaking. His voice was very high pitched and squeaky. He said that they were

2

Administrative   Agency: Fort Morgan Police Dept.   Incident #: 201600002915   Case_Nr: 201600000179

Report No. 2   Entered: 02/11/2016 15:45   By Officer: 00000298 Steve Vosburg

arguing and he remembered Frank pushing and when he pushed him, Nick pushed him back. He said he didn't remember anything after that. He confirmed for me that it was in the refinery room in the whey department at the Leprino cheese factory. I asked him if he recalled whether he may have had a hammer or Frank may have had a hammer. He said he actually pulled the hammer out of the separator tool box that they have and he pulled that out to use it, working on the clarifier. He had pulled that hammer out because he needed. He walked over to the control panel in the refinery room and that's when Frank approached him. He was upset because he wasn't getting any help in the refinery room.

Frank had asked Nick for some assistance earlier and Nick asked him what his problem was. Frank told him there was nothing, he was fine. Nick walked away, but when he came back, that's when Nick had grabbed the hammer out of the toolbox and he was standing there at the control panel. That's when Frank and Nick started arguing. I asked Nick if he remembered when he lost consciousness. He said no that he didn't. I asked him if he remembered if Frank had struck him in addition to pushing him and he said he didn't remember it. I asked if there were any other possible witnesses there and he said not that he recalled. I asked if he'd ever had any past history with this individual and he said arguments like this one time before. I asked if they became physical and he said no they never became physical, just arguments. I asked if he recalled whether any threats were made towards him and he said no. I asked him about the previous dealings that he'd had involving furniture with him and asked him if he knew where Frank lived. He said he couldn't think of the address right now, but confirmed that it is in Fort Morgan.

I asked Nick to identify the individual by name and he said Frank Levar. I asked him about how old he is and he said he thought he was in his 50's. I asked him if he had any visible injuries at this time that we needed to document. He said he had a lump on the back of his head. He said, "I'm not sure where he hit me, but my left cheek and upper lip are swollen" and he had some pain in his neck. I asked him about any scratches, bruising, black eyes, anything at all like that and I took pictures of his upper lip and left side of his face with and without a scale. I asked him if he had any idea what he may have hit his head on and he said no. I asked Nick when Frank pushed him if he lost his balance or fell backwards and he said no. I asked him if he knew how long that he had struggled with Frank and he said he remembered Frank pushing him and he pushed him back and that's all he could remember. I also had Nick open his eyes as wide as he could to be able to take a photograph of what appeared to be possible petechiae in the whites of his eyes. I asked Nick if he recalled any choking of any kind and he said no. I asked him

3

**Administrative   Agency: Fort Morgan Police Dept.   Incident #: 201600002915     Case_Nr: 201600000179**

**Report No.  2   Entered: 02/11/2016 15:45   By Officer: 00000298  Steve Vosburg**

if he had any trouble breathing as a result of this.  He said he did at first, but he didn't now.

I left a business card with Heather in case they needed to follow-up with me reference this case.  I will download photographs and audio files into the DIMS system under this case number.  I left a Serious Bodily Injury form with Dr. Elias Hernandez in reference to this case.  He told me that he was running some additional tests to determine the extent of damage.  He was concerned about a crushed thyroid artery and cartilage in his throat and larynx as well as a hematoma of his scalp.  Once he had those extra tests run, then he would make a determination on the serious bodily injury form.  I left my business card to be contacted when that decision was made.  At that time, Officer Brackett and I left the ER at the Colorado Plains Medical Center.  No further information at this time.  End of supplemental report.

298SV/sh
Approved 02/12/16 Detective Vosburg
Approved by Sergeant Loren Sharp on 02/16/16

4

Administrative   Agency: Fort Morgan Police Dept.   Incident #:
201600002915     Case_Nr: 201600000179

Report No.  3   Entered: 02/11/2016 16:26   By Officer: 00000298  Steve
Vosburg

Report #3

Supplemental Statement of Detective Steve Vosburg

In the State of Colorado, County of Morgan, City of Fort Morgan on 02/09/16 at approximately 2:19 p.m., Chief Sagel, Sergeant Sharp and I went to the Leprino cheese factory at 2400 East Beaver Avenue in Fort Morgan where we met with Risa Esterly, the Human Resources Manager. We were allowed to go into the plant. We dressed in protective gear and were taken back to the approximate location of where the assault took place. We were allowed to take some limited photographs. Some photographs were not allowed to be taken because of proprietary equipment in the processing area of the plant. We also inspected the male locker area where employees keep things like clothes and tools. Locker number 53 had been assigned to Frank Levar and it was empty. The photos we took will be downloaded into the DIMS system under this case number.

Following that, in the conference room in the presence of the Human Resources Manager Risa Esterly we then interviewed some employees that had contact with the individuals shortly before and after this incident occurred. The first person that we spoke to was James C. Wilkins, date of birth 06/26/70, who is the Senior Supervisor at Leprino. We recorded these interviews which will also be downloaded into the DIMS system under this case number.

Mr. Wilkins knew both Frank and Nicolas since the time they started working there at the plant and he has been at the plant for 24 years. I asked James if Frank had a reputation as being a hothead or would fly off the handle relatively easy and he said no more so than anyone else, that everybody has their bad days and get worked up. He said he didn't think that Frank was the type that would let anything like this happen. He does however like to voice his opinion, but no past known altercations with anyone that he was aware of. James said as far as he knew in the 24 years that he'd been there, there had been no previous problems with Frank during that time. We asked how long Frank had worked there and were told that it was approximately 16 years, hire date was 01/24/00. I asked James about the hammers that were in the toolboxes and he said rubber mallets were common tools that they used on the floor and either Frank or Nicolas would have access to those.

I asked James about whether Frank had a toolbox with him while he walked back out of the area where this occurred and he said yes they normally were kept in that area where they keep the other toolboxes. I asked if they were company tools or individual

1

**Administrative Agency: Fort Morgan Police Dept.   Incident #: 201600002915   Case_Nr: 201600000179**

**Report No. 3   Entered: 02/11/2016 16:26   By Officer: 00000298 Steve Vosburg**

tools and he said individual tools. I asked if Frank took his tools home with him today and was informed that he had and generally he does leave these tools on site. I clarified with James that Nick was conscious and sitting up when he went into the refinery room but that was with the help of Bob Davidson who was supporting him from behind. I asked if Bob had said anything to him when he arrived there and he said Bob called his attention to the lump on the back of his head and that they needed an ambulance. I asked where the lump was and how big it was. James said it was on the back left side of his head and he said it would be a little bit smaller than a pop can and it stuck out two and a half inches.

I asked if there was any place in that room that he felt could have produced that bump on his head. He said there were many areas in the room and he would just be speculating if he tried to establish that. I asked James when the last time he saw Frank was in relationship to this incident and he wanted to know what time the call came in. I told him it came in at 1059 hours for the medical assist and he said it was probably 7:00 or 8:00 a.m. on this morning was the last time that he recalled seeing Frank. I asked about Nick and he said probably around the same time frame, but he had later talked to Nick on the radio. James said that there were five possible operators that worked in that area around where this incident happened, but they work in other specific areas as well. I asked James if he was aware of any argument between Frank and Nick and he said no. He said most of his involvement was just after it happened.

We next talked to Charles Fisher, date of birth 09/23/57, who is a Separator/UF Operator at the plant. Charles said that Frank came into the control room where he was working and said, "Get a hold of Jim Wilkins. Tell him that I knocked out Nick, that he's laying on the refinery room floor. I got my toolbox and I'm going home." Charles said that he was shocked he tried to get a hold of Jim on the radio and he couldn't get a hold of him. He walked out of the control room and looked at another co-worker. They went back to the refinery room and Nick was lying on the floor. The other co-worker was identified as Jonathan Prell. Jon stayed with Nick and Charles went looking for Jim. Sharp asked Charles when he saw Nick how was he and he said, "Lying on the floor on his back by himself with no one else in the room" and he described the area where Nick was found based on cell phone photos that were taken during an inspection of the area.

I asked Charles if he saw any visible injuries on Nick and he said it looked like there was a blue mark on his face on the left side somewhere around the cheekbone area. I asked if he heard Nick say anything and he said, "You can't hear nothing down there." I asked Charles if he noticed any tools around when he walked into the room where Nick

**2**

Administrative   Agency: Fort Morgan Police Dept.   Incident #: 201600002915      Case_Nr: 201600000179

Report No.  3   Entered: 02/11/2016 16:26   By Officer: 00000298  Steve Vosburg

was at and he said he thought that there was a hammer lying there.  He said that he thought Nick was working on a clarifier and they were getting ready to beat off a ring to disassemble it somewhat like a sledgehammer.  Charles said that he'd worked at the plant for almost 21 years and had worked with both Frank and Nick for a long time.  When asked if he was aware of any problems between the two and he said, "On a daily basis" and he was not aware of any problems with them more than anyone else in the plant. Charles said that he'd had problems with Nick himself.  Charles said a few years ago that Nick got into his face and he reported it to HR at the time that he didn't think it was appropriate for a foreman to do that.  Nothing physical, but Charles just thought Nick tried to intimidate him.  Charles said, "You almost have to work here to understand what's going on.  Sometimes the equipment can be very finicky and Frank gets very frustrated because of that.  He likes his equipment to work or run and when he turns in a work order to get something done, he likes to get it fixed and sometimes it's delayed in getting fixed."

Sharp asked him how he knew that Frank gets frustrated, to describe what he does that indicates that he's frustrated.  Charles said that he "drops the F-bomb a lot" and it's kind of a joke in their department.  Charles did say that Nick has authority over Frank. Charles said that he's an operator like Frank and Charles said that their supervisor was off today and that Nick was filling in as the supervisor in kind of a foreman/supervisor role and their lead supervisor was over there in the cheese department helping them with a problem on a different radio frequency and that was Jim Wilkins.

Risa provided us with  a written statement from Charles Fisher, a written statement from Frank Levar and a written statement from Robert Davidson.  Those statements will become part of this case file.  We next interviewed Jonathan David Prell, date of birth 03/30/71, who is a relief operator at the plant.  Jonathan told us that he arrived right after Bob Davidson in the refinery room.  I asked him to tell me what he saw when he walked in.  He said he couldn't tell whether Nick was conscious or unconscious and he was just lying on the floor all sprawled out.  He said he didn't know whether he had just woken up or what.  He said that his eyes were open and that Bob started talking to him and was assisting him to sit up.  Jonathan was trying to contact people in HR and in the meantime somebody had gotten a hold of them and they came down.  I asked if he noticed any injuries on Nick.  He said it looked like he might have been a little bit swollen and maybe bleeding a little bit on the left side of his face.  He said maybe coming from his nose or his lip.  He couldn't tell.  He said where Nick had landed there was water spraying from up above, but Nick did have some blood on his face.

3

Administrative   Agency: Fort Morgan Police Dept.   Incident #: 201600002915   Case_Nr: 201600000179

Report No.  3   Entered: 02/11/2016 16:26   By Officer: 00000298  Steve Vosburg

I asked if he was aware of any knots on his head and he said no, that he wasn't.  I asked if there anything in close proximity to where he fell that he might have hit his head on.  He said he could have hit his head on something, but it looked more to him that he might have fallen directly to the floor.  He was shown photographs taken on the cell phone and indicated the approximate location of where he found Nick lying on the floor.  I asked Jonathan if he noticed any tools in the room and he said he didn't know where it went because he was working with Nick when he got called back there.  He said they were working on a clarifier, him and Nick, when Frank had called and Nick had a ratchet and a hammer with him at that time.  He described the hammer as a dead blow mallet and he said he didn't know what went.  He said it was orange in color and a dead blow hammer, it doesn't recoil when you strike something with it.  He said kind of like a rubber mallet, but plastic coated.  I asked if Nick said anything in his presence and he said, "No, Bob was asking him what happened and Nick kept saying that he didn't know and you could tell that Nick was not really sure of anything at that point."

I asked if he had any trouble speaking and Jon said yes that he did.  I asked him to describe that for me and he said he sounded like somebody with a really sore throat, like he was more whispering, like he was trying to talk but it was really hard for him.  I asked if he noticed anything unusual about his eyes and he said no, not right away.  I asked if he was aware of any problems between Nick and Frank.  He said earlier in the day Frank was upset.  He was in the bagging room giving the bagger a break and he heard Frank on the radio call Nick out to help him because he has to go out there to get a sample and he knew where Nick was.  Frank was complaining, but not at Nick.  Just complaining about the equipment, cussing and dropping the F-bomb on it and all upset.  He went in about a half an hour later to see if Frank needed a break and Frank mentioned about "this place is really pissing him off."  Then after that he didn't see or hear any specifics about anything and Frank didn't sound mad when he called Nick on the radio.  Jonathan thought that he'd called him twice on the radio and Jon said that "Nick is our foreman" and it's common for anybody if they need help to call the foreman.

Charles had contacted Jonathan and told him that Frank had just come through the control room and advised that he had knocked Nick out and he was taking his toolbox and going home and Jon went back to the refinery room to see what was going on.  We asked Jon if he was aware of any problems in the past between Nick and Frank and he said that Frank has problems with almost everybody.  We asked if he had a reputation around the plant as being a hothead and he said yes.  When asked to describe what that meant to him then he said, "He just gets very mad" but he's never seen him violent.  He gets mad and cusses and is irate over stuff.  Jon said he's actually had altercations with

Administrative  Agency: Fort Morgan Police Dept.    Incident #: 201600002915    Case_Nr: 201600000179

Report No.  3   Entered: 02/11/2016 16:26   By Officer: 00000298  Steve Vosburg

---

him before where he's had to go to a supervisor and break them up because it was getting pretty heated.  I asked if anyone mentioned in any detail about how Frank knocked Nick out or explained it in more detail in any fashion and he said no.  All he'd heard from that was the secondhand information from Charles.

After concluding the interview with Jonathan Prell we were informed that Robert Davidson had left for the day and that we would have to set up an interview time to speak to him on the following day.  After the interviews, we were informed by Risa Esterly that Jim had mentioned that there was a section in the refinery room where we took photos stating that there was a bent piece of metal in the room that wasn't previously that way. We requested from Risa to have her send a copy of a cropped photo that she took that could show the bent piece of metal.  She said that after she was able to check with her corporate office, then she would try to comply with that request.  Risa went on to say that when Frank came up and wrote out his statement for her that he had never mentioned the hammer or the choking or anything, but he was grabbing his hands when they were talking.  She said she didn't know whether it was just a nervous thing or what, but she didn't notice any redness or anything, but Frank did state in his written statement that he had pushed Nick with his hands the first time when Nick got into his face and he demonstrated that with Julia, how close he was and he said, "Back up."  Frank said that Nick went towards his chest with both hands and one of his hands slid up and moved Frank's personal glasses.  Frank's glasses were bent but Risa did not see any visual marks on Frank's face.  Frank said that's when he "clocked" him.

We confirmed through the picture what we were specifically talking about, what was bent in the refinery room.  Risa indicated that it was the tray and Sergeant Sharp asked Risa to save that photograph in case there was any inquiry from the court and she said she was fully aware.  She'd been to court multiple times.  No further information at this time.  End of supplemental report.

298SV/sh
Approved  02/12/16 Detective Vosburg
Approved by Sergeant Loren Sharp on 02/16/16

**Administrative   Agency: Fort Morgan Police Dept.**   **Incident #:**
**201600002915     Case_Nr: 201600000179**

**Report No.  4   Entered: 02/12/2016 08:28   By Officer: 00000298  Steve
Vosburg**

---

Report #4

Supplemental Statement of Detective Steve Vosburg

In the State of Colorado, County of Morgan, City of Fort Morgan on 02/10/16 at approximately 11:04 a.m., I once again went to the Leprino cheese factory at 2400 East Beaver Avenue in Fort Morgan, CO where I went to Risa Esterly's office and conducted some follow-up interviews with some additional employees at Leprino.

I started with Robert A. Davidson, date of birth 07/30/52, who is the Sanitation Supervisor for Leprino. Mr. Davidson said that he was walking through the plant in the Whey Department and saw Frank. He waved at him and he heard Frank say something, but he didn't catch what it was right away. All he heard from the comment was "Supervisor's unconscious on the floor." Then Robert asked "What," but Frank kept going so Robert took off and passed three operators just outside of the control room, Charles, Jon and Tim. They asked what was going on. He said when he entered the refinery room Nick was on the floor unconscious. Robert said as he approached him, he noticed that Nick was starting to come to. He said based on his experience as a previous EMT, he was going to try to keep Nick on the floor and it didn't work well, stating that Nick was rather resistant. He said that Nick was wet and cold when he was coming out of unconsciousness. He said that's not an uncommon event and he said Nick had definitely been unconscious. His eyes were extremely dilated and he wasn't aware of what was going on around him. To one of the guys following Robert in, Robert told him to get an ambulance and to get Jim Wilkins and get Troy Gettman who is a paramedic or EMT that also works at Leprino.

Robert said he stayed there with Nick and his wife showed up. They thought that they could keep Nick calm at that location, but he was still quite disoriented and was not aware of his surroundings. Robert stated that it was necessary to have to try to move Nick a little bit because of one of the pieces of machinery that he was next to was starting to begin the cleaning process and to expel contents on the floor. It looked like Nick had been hit with something in the fact and when Nick put his head against his wife's chest then Robert noticed a large lump on the back of his head. His tools were scattered on the floor and Robert said he just waited for people to show up. I asked if he recalled when he saw Frank if Frank had his toolbox or was carrying some tools in a box with him. He said he didn't recollect that. I asked him when he first found Nick if he was still lying down or if he was trying to get up and he said no that he was lying supine on the floor unconscious and as he was approaching, Nick started to blink.

1

Administrative   Agency: Fort Morgan Police Dept.   Incident #: 201600002915   Case_Nr: 201600000179

Report No. 4   Entered: 02/12/2016 08:28   By Officer: 00000298 Steve Vosburg

I said, "According to your statement, you mentioned that Frank had no glasses on and he was very agitated" and Robert said he wears glasses. I confirmed that they were vision glasses and not safety goggles. He said Frank was in a state of high anxiety. I asked him if he saw any torn clothing, any blood or any marks on him and he said no, that he only literally saw him somewhere between three to five seconds and he kept walking away and Robert kept walking towards the refinery room. Robert said as they were waiting he kept asking Nick if he knew what was going on and Nick said no. He was having a hard time maintaining his balance sitting up. I asked him in reference to his statement where he mentioned something about Nick may have had a concussion. I asked him how he knew that and he said, "By his eyes." Based upon his experience and the type of injury that he had and his facial expressions and the fact he was lying on the floor and being unstable. I asked what he recalled about Nick's facial features. He said that there was swelling on the left side of the lip and petechiae of the little vessels that pop through. I asked if he noticed any petechiae in the eyes and he said no that he wasn't trying to assess him. He said it's been a long time since he held those certificates, but he knew he had to keep him calm and keep him down. I asked if he noticed any injuries around Nick's neck at all and he said no, that he did not. I asked if he complained about any injuries around his neck and he said no. I asked if he had any trouble talking or breathing and he said he didn't know whether he spoke or not. Most of the time he just moved his head.

I asked if he knew anything about Frank having any history of being a hothead or any reputation or anything around the company. Robert said that Frank was very "passionate" about his work. As far as any problems would go, then Frank wanted there to be an immediate resolution to whatever problems were currently bothering him. I asked him if he was aware of any problems between Nick and Frank. He said actually looking back; he was unaware of it if there was. He never saw anything of that type of an interchange. I asked Robert how Frank was dressed as he was leaving. He said he was in uniform and he looked normal.

I next spoke to Timothy Martin, date of birth 02/03/77, who is a relief operator at the plant. I asked him what he could tell me about this incident and he said that Jon, Charles and he had been working on one of the clarifiers in the control room and he heard Frank call over the radio that he was having trouble with one of his pieces of equipment and Nick helped them for a couple more minutes and then "just disappeared" and went to help Frank. A few minutes went by and all of a sudden he saw Frank coming by the control room and he was walking in a hurry carrying his personal toolbox. He came into

2

Administrative   Agency: Fort Morgan Police Dept.   Incident #: 201600002915   Case_Nr: 201600000179

Report No.  4   Entered: 02/12/2016 08:28   By Officer: 00000298 Steve Vosburg

the control room and said something to Charles and then took off.  He didn't quite hear what was said.  Something about Nick was unconscious or Nick was knocked out or something like that so all three of them went over by the refinery room.  Tim saw Nick lying down.  Bob showed up and Tim and Jon were trying to figure out how to get a hold of somebody.  After he had taken lunch, then he asked Charles what Frank had said to him.  Charles said Frank told him to tell Jim that he had knocked Nick out and then took off.

Tim said he tried to do damage control on the equipment that Frank was running and shut it down.  I asked Tim to describe for me how Frank was walking indicating that he was agitated and he said based on the way that he was walking, that he was almost at a slant he was walking so fast.  Power walking and holding his toolbox like "don't get in my way or I'll run you over."  He was "one grouchy dude."  I asked if he had some sort of a reputation around the plant to that effect and he said that he did.  I asked him what he knew about that and he said, "Not a lot, mainly that he was just grumpy."  I asked if he knew him ever to have any arguments or disagreements with anybody out at the plant there and he said not really, that he's only been here about two years.  Tim did tell me that there was a hammer lying next to Nick on the floor.  I asked him to describe it and he said it was just a plastic mallet that they use.

Following the interview with Timothy Martin, I also stopped by the Colorado Plains Medical Center in Fort Morgan and took along the Authorization for Disclosure of Protected Health Information signed release form and requested a copy of Nicolas Donez Jr.'s medical records; however, I was informed by the records department that those records were incomplete at this time.  He was still in the hospital in the ICU unit and those records would not be available until later.  I did request that they check his chart to see if the doctor had actually signed a Serious Bodily Injury form.  They went to the ICU unit and retrieved a copy of the physician's statement on a Serious Bodily Injury form where there was a check box for "a substantial risk of death" that had been checked on that box and signed by Dr. Elias Hernandez along with some notes in there to please describe the injuries and reasons for the above opinion.  It states, "Fracture to the left thyroid cartilage and some other type of cartilage along the thyroid gland in the larynx and a scalp hematoma."

The complete medical record from Colorado Plains Medical Center will be obtained when they are available and they will become part of this case file.  No further information at this time.  End of supplemental report.

3

**Administrative   Agency: Fort Morgan Police Dept.   Incident #: 201600002915   Case_Nr: 201600000179**

**Report No.  4   Entered: 02/12/2016 08:28   By Officer: 00000298  Steve Vosburg**

298SV/sh
Approved 02/12/16 Detective Vosburg
Approved by Sergeant Loren Sharp on 02/16/16

Administrative   Agency: Fort Morgan Police Dept.   Incident #:
201600002915     Case_Nr: 201600000179

Report No.  5   Entered: 02/12/2016 09:10   By Officer:  00000298  Steve
Vosburg

Report #5

Supplemental Statement of Detective Steve Vosburg

        In the State of Colorado, County of Morgan, City of Fort Morgan on 02/10/16 at
approximately 1310 hours, I went to a location of 616 West 6th Avenue in Fort Morgan,
CO to contact Frank Levar.  I told him that I understood that there was a little
disagreement between him and a guy by the name of Nick Donez out at Leprino and he
said yes.  He said, "Dude, I can take somebody's mouth, but when he punched me with a
hammer punch."  Frank said what started it was everything started going bad on lactose
and it kept diverting and he was running back and forth.  Frank said he called him and
Nick came in there.  Frank asked if he could send Tim, or another worker, over and Nick
said, "Tim's busy right now.  What do you need?"  Frank said, "That's alright, never
mind."  Frank was running back and forth trying to figure out what was going wrong with
the lactose and Nick came back in there and he was standing there.  Frank said, "I don't
know if you went in that room or not."  I told him I did and Frank said that there was a
panel view right there and Frank said he was trying to figure out what was going on.  He
was turning them on and shutting them off.  One time he had too many solids in it and
Frank said he opened up his mouth and he said, "If I would have just shut my mouth none
of this would have happened."

        Frank said, "I don't have a problem telling people what's on my mind."  Frank
said he made the comment he really didn't appreciate it.  Every time something's wrong
with lactose over here everybody is too busy to come and help, but if there's problems up
there on that end, you guys have got six guys up there working on it.  Nick jumped up in
my face and got in my face and he started screaming "Well it ain't gonna do any good to
sit and cry about it."  He was screaming at me "it ain't gonna do no good to sit and cry
and whine about it."  Frank said he told Nick that he better get out of my face.  I know it
ain't gonna do any good to whine and cry, but you better get out of my face.  Nick said,
"Frank why don't you make me get out of your face."  He said, "The only thing I did was
I reached up and placed my hand on his chest and pushed him back like that and I kind of
stepped back a little bit at the same time and then Nick went like that, he doubled up and
came at me.  Nick went boom and he hammer chested me with both fists right in the
chest and when he did that, I lost it.  I popped him in the mouth and I had a right hook to
the left side of his face."  Frank said he was expecting a good old fight, but he'd just had
enough.

1

Administrative   Agency: Fort Morgan Police Dept.   Incident #:
201600002915   Case_Nr: 201600000179

Report No. 5   Entered: 02/12/2016 09:10   By Officer: 00000298 Steve
Vosburg

Frank said he knew at that point he had lost his job and Nick folded right there. He went down kind of in a circular motion, he went down and landed on the ground on his back. Frank said at first he didn't believe it and he said, "Honestly I didn't want to wake the guy up myself because he was going to come up swinging again." Frank went over the top of him and looked at him to make sure that he was breathing and it looked like he was breathing. Frank said he bent down and picked his glasses up off of the floor. They were all bent up and he got on the radio and started hollering for Jim Wilkins, but nobody would answer him. He went down into a control room. "This guy Charlie, a friend of mine, was the first one I seen" and he told Charlie, "Get on the radio and get somebody in the refinery room. I just knocked Nick's ass out in there. At that point in time I went into the lab and grabbed my toolbox and I started walking out and right there by the wall there was a sanitation supervisor named Bob Davidson and he was standing there and I said Bob you need to get somebody to the refinery room now. I just knocked Nick's ass out and Bob took off." Frank said he was expecting a lot of people to come escort him out of the building because usually that's what happens, "so I went up in the locker room and was sitting there on the bench, straightening out my glasses. I put my glasses on, cleaned out my locker and started to walk out the door" and he said, "You know what, I think I'm just going to go up and let the office know why I'm leaving. I went up in the double doors right there and Sheryl Groves was coming down from upstairs. I told Sheryl I guess you can consider this my exit interview. I'm going home." Sheryl asked what the matter was and he said, "I just knocked Nick's ass out in the refinery room." She said "Frank, I think you need to come upstairs."

He then went upstairs and laid his stuff up there. He talked to Julia Lambert and Risa Esterly. They asked him what happened and they had him fill out a statement. He just wrote out a brief statement of what happened. He started yelling and then we both started yelling, but when I told him to get out of my face, he said, "Frank out of my face" so I kind of moved him and stepped back too just to get some space in between us and when I did that, that's when all hell broke loose. It wasn't a very good day." At that point in time Frank demonstrated physically on me as to what he did. Frank said when Nick hit him in the chest, that's when one of Nick's hands slid up and hit his glasses and knocked them off. His glasses went to the ground. Frank said "If you dig deep in the records at work you'll find that Nick has a habit of getting in people's faces." Frank said he went to one of his supervisors four, five or six months ago because he got in another guy's face and that supervisor's name was Kenny Doogan.

Frank said he didn't feel like he should take the whole brunt of this whole situation. If they're going to fire people then we should both be fired. Frank said, "To

2

Administrative  Agency: Fort Morgan Police Dept.   Incident #: 201600002915    Case_Nr: 201600000179

Report No.  5   Entered: 02/12/2016 09:10   By Officer: 00000298  Steve Vosburg

me, I was defending myself." He said he didn't think he should have to put up with it at work when somebody comes up and gets in your face. Frank said technically he was wrong, he realizes that because he put his hands on Nick first to get space between them and this had also happened with another foreman that no longer works there. This happened about a year ago and his name was Shane Tucker and he said we both kind of got into trouble on that deal and there happened to be a supervisor sitting right there when Frank got into that incident with Tucker and the supervisor didn't do his job and his name was Darron Weegan and he no longer works there.

I asked Frank when he hit Nick in the face if that was right handed and he said yes and his knuckle still kind of hurts. Frank then came around with another right hook and he said, "He just kind of wadded up and went down." I asked him after he had been hit two times if he, as he was falling, hit something on the way down and he said he didn't think so. It was kind of in slow motion. He said he didn't think he even hit the floor. He didn't go straight down and he rolled over and landed on his back. Frank thought maybe he was playing a trick on him, but he looked at him and he could tell that he was breathing and kind of stiffened up. His eyes were rolling around and that's when he started calling for Jim Wilkins on the radio and he grabbed his glasses off the floor. I asked if there was anything at all like a wrestling move or any contact between either one of them of any kind and he said no. I asked if there was any strangulation or choking by either one of them and he said no. When I told Frank that Nick had a bump on his head and that his throat was crushed, Frank seemed to be genuinely surprised and said "that he did not hit nothin." I asked Frank if either one of them had any weapons of any kind and he said no. Frank said he swears to me that he only hit him two times and he was pretty sure that he never hit him in the throat. It was on his side. I said he did have injuries consistent with what he had explained to me, but the only things that aren't explained are the knot on his head and the damage to his throat.

I asked Frank if he had his tools out of his toolbox and he said no, he had his tools in his toolbox except for a small crescent that he had in his back pocket and he didn't know what kind of tools that Nick had. He thought that he had a ratchet. Frank said when Nick hit him, he didn't have anything and Frank said he didn't have anything. I took a photograph of Frank's right hand, both with and without a scale and also a small mark that he had on his chest with and without a scale. I asked Frank if there were any other injuries that he wanted me to document and he said no. Frank said that the disagreement didn't even go on that long, that he was expecting to have a battle on his hands when he tagged him. I asked him to estimate for me time wise how long this entire

3

**Administrative   Agency: Fort Morgan Police Dept.   Incident #: 201600002915     Case_Nr: 201600000179**

**Report No.  5   Entered: 02/12/2016 09:10   By Officer:  00000298  Steve Vosburg**

process took and he said beginning to end with the argument, probably two to two and a half minutes and the contact portion of it took between 30 and 45 seconds.

I asked Frank if he'd ever had any problems with him in the past and he said no. No further information at this time.  End of supplemental report.

298SV/sh
Approved 02/12/16 Detective Vosburg
Approved by Sergeant Loren Sharp on 02/16/16

Administrative  Agency: Fort Morgan Police Dept.   Incident #: 201600002915     Case_Nr: 201600000179

Report No.  6   Entered: 02/17/2016 13:07   By Officer: 00000211  Loren Sharp

---

Report #6

Supplemental Statement of Detective Sergeant Loren Sharp

On 02/09/16 I did assist Detective Vosburg in responding to the Leprino Foods plant in order to look at the crime scene and conduct interviews.  See Detective Vosburg's report for the interviews.

When we were taken into the cheese plant I was allowed to bring a phone for the sole purpose of taking photographs.  I was informed prior to taking the photographs that I was not allowed to take any photographs that may show something that would be proprietary for the company.  I asked them to show me what may be proprietary as I would attempt to comply with that request.

We then went to the area where we were told the assault occurred.  I took several photographs of the little room where this happened from the angles that I was allowed. There was one machine that they stated was proprietary that I was to avoid and I did not take pictures of that machine.  I later provided these photographs to Detective Vosburg for the case file.  It should be noted that when we went back upstairs, it was reported to us that where the proprietary machine was there was a shelf that had been bent and that they noticed.  They did take a photograph of this area and showed us the bent shelf and indicated that they would crop out the proprietary piece and provide the photograph of the shelf.  She also indicated that one of the employees was already down there trying to straighten the shelf as we were speaking.

That's all the information I have at this time.  End of narrative.

211LS/sh
Approved by Sergeant Loren Sharp on 02/17/16

1

**Administrative  Agency: Fort Morgan Police Dept.  Incident #: 201600002915    Case_Nr: 201600000179**

**Report No. 7   Entered: 02/19/2016 08:52   By Officer: 00000235 Anthony Gagliano**

Report #7

Statement of Officer Tony Gagliano:

On 02/17/16 at 1221 hours Officer Brackett and I responded to 616 West 6th Avenue on a warrant attempt. We were attempting to locate Frank Donald Levar, date of birth 12/11/65. We were able to locate Mr. Levar at his residence. When asked, he stepped outside to speak with us at which time we contacted dispatch and had them run Mr. Levar through CCIC/NCIC. Mr. Levar did come back with a felony warrant out of the Morgan County Courts. This was a no bond warrant that did need confirmation on docket number 2016CR000036.

Prior to being placed into handcuffs Mr. Levar made a statement on his own as we were standing outside his home. The statement he made was; "I only acted in self defense and I never would have hit him if he hadn't hit me first." Mr. Levar was very friendly; he was polite and cooperative during his arrest. Mr. Levar was handcuffed behind his back and the handcuffs were double locked. He was placed in the back seat of my patrol car and transported to the Morgan County Detention Center where he is being held on no bond.

This case is cleared with one adult arrest. End of narrative

235AG/mh
Approved by Officer Gagliano on 02/27/2016
Approved by Sgt. James A. Parks
02/27/2016

1

Administrative  Agency: Fort Morgan Police Dept.   Incident #: 201600002915      Case_Nr: 201600000179

Report No.  8   Entered: 02/25/2016 08:00   By Officer: 00000298  Steve Vosburg

Report #8

Supplemental Statement of Detective Steve Vosburg

In the State of Colorado, County of Morgan, City of Fort Morgan on 02/23/16 at approximately 11:00 a.m., I went out to the Leprino Foods processing plant at 2400 East Beaver Avenue in Fort Morgan for the purposes of conducting some additional employee interviews along with the execution and delivery of a court order for production of records. I served a copy of that order on Risa Esterly who is the Human Resources manager for Leprino Foods at that address, asking for any and all work force information or personnel files involving reports or incidents of verbal or physical altercations involving Frank Levar, Nicholas Donez, Jr. and Shane Tucker, along with previous supervisors Kenny Duggan or Daren Weegan.

I first met with Kenny Duggan, date of birth 03/22/66, in the Human Resources conference room at Leprino Foods. He advised me that he was the Whey Supervisor for Leprino Foods. You pronounce his last name Duggan, D-U-G-G-A-N. The interviews were tape recorded and copies of them will be provided under this case file number in the DIMS system. I told Kenny that the reason that I was talking to him was because during an interview with Frank Levar, Frank told me that Nick has a history of getting into people's faces and that Frank had gone to one of his supervisors four, five or six months ago because Nicholas got into another guy's face and the supervisor's name was Kenny Duggan. I asked if he had any recollection of what Frank was talking about and he said he did not.

Kenny went on to tell me that he'd worked with both Frank and Nick during their entire career out at Leprino Foods. He said that he has never seen Nick get into somebody's face or get hostile towards a person. He said maybe it's just timing, but he didn't know, he'd never seen it and he never remembered Frank ever telling him that he'd seen it. I asked Kenny about any other thing in Nick's reputation and he did mention that Nicholas was very protective of his wife who also works out there at Leprino Foods. If people were to look at her the wrong way, then Nicholas would give them heck, but he has not seen that with his own eyes. Kenny did say years ago Nick's wife's sister, who was married to another employee out at Leprino and they got into some sort of an altercation. He said he didn't know whether it came to blows or if it was just words. He said he thought that this was six, seven, eight years ago and he said he knew that Nick was supposed to be suspended, but he didn't know. He had come to work early and

1

Administrative   Agency: Fort Morgan Police Dept.   Incident #: 201600002915   Case_Nr: 201600000179

Report No. 8   Entered: 02/25/2016 08:00   By Officer: 00000298  Steve Vosburg

wasn't caught at the door and it turned out he wasn't suspended. Kenny said he didn't know anything other than it was something involving his wife and his sister's husband.

I asked him if he was aware of anything at all that Frank was talking about that happened four, five or six months ago. He said he wasn't sure what it was. I asked if there was any other thing that he might be able to tell me about any potential problems between Frank and Nicholas. He said no, the whole situation really surprised him because they worked together for 12 years and he always thought that they were good friends. They were always laughing and joking with each other and it struck him odd that the altercation even happened. Kenny said that Frank has always been stressful and worries about everything and everything is his fault and that it's up to him to fix everything. Kenny said he'd never known either one of them to act like that, especially towards each other. He thought that they were good friends. He said he knew that Nick always told Frank that he needed to calm down, he was going to give himself a heart attack because Frank was always worried about this and that, but not in a violent way, but if I don't do this job, then nobody's going to do it.

Kenny did tell me that both Frank and Nick would be his subordinates in the Whey Department. I asked if he was aware of any problem or an ongoing problem that Frank felt that he didn't get the support that he needed for his position, that all the resources seemed to be redirected in some other place in the plant. Kenny said he thought it was more job related like cleaning or job responsibilities. Frank seems to be a person that wants help five minutes before he asks for it. Kenny said normally he would be there on that day, but he had taken a day's vacation and Nick would have been the acting foreman on that time during the time Kenny was gone.

I asked Kenny if he was aware of any potential damage to a shelf in the refinery room and Risa showed him a picture of the damage that we were talking about, a metal tray that holds an electrical unit up that appeared to be bent. He said that he was not aware of any damage being done at that location. Kenny said, "Now that you mention it, it does look like that tray is bent" and he said that he had never noticed that it was level or bent before. He is not aware of anything that might have happened to it. Risa Esterly did provide me a copy of the photo that she had taken of this unit because at the time that Sergeant Sharp and I were out there taking photographs, we were not allowed to take a photograph of this particular area because of proprietary information for Leprino until she was able to get a copy released by her superiors. A copy of that photo will be included in this case file.

2

**Administrative Agency: Fort Morgan Police Dept. Incident #: 201600002915 Case_Nr: 201600000179**

**Report No. 8 Entered: 02/25/2016 08:00 By Officer: 00000298 Steve Vosburg**

Following that, I did an interview with Sheryl Groves, date of birth 06/30/64, who has a title of HR Assistant at Leprino Foods. I told Sheryl the reason that I was speaking to her was because she was probably the first employee that had any extensive conversation with the suspect in this case, Frank Levar, after the incident happened. I told Sheryl when I talked to Frank, in his statement, he said that he "went up in the double doors right there and Sheryl Groves was coming down from upstairs. I told Sheryl I guess you can consider this my exit interview. I'm going home. Sheryl asked what the matter was and Frank said I just knocked Nick's ass out in the refinery room and she said, 'Frank, I think you need to come upstairs.'" I asked Sheryl if that was accurate and she said, "That's pretty close." He had asked for a request to see Mike Buckhout, who is the Production Manager. Sheryl told him that he was upstairs, but that he was in a meeting and not available right then.

I asked Sheryl if Frank had told her anything else about what he actually did or what led up to it. She said he didn't say anything about what provoked him. Sheryl said that Frank said "that he pushed Nick" and made a motion like this. Sheryl said that he demonstrated both hands just taking a flat palm and pushing on his chest with both hands. Frank told her that Nick was "out cold" in the refinery room. Sheryl said that Frank acted like he had something to say, but he wasn't nervous and he didn't act like he was angry or display anything other than normal characteristics. Sheryl said he obviously believed that this was his last day. Sheryl said once they got upstairs, she had him sit in the corner by her desk and she went and got Julia. Frank proceeded to talk to Julia and Sheryl wasn't involved in any of that. Sheryl was unsure when Frank was done if anyone had escorted him downstairs and out of the building, unknown to her. Sheryl said that she had worked there since November of '09 and had known of both Frank and Nick since that time. Both of them had been employed previous to her start date there.

I asked Sheryl what Frank was carrying when he came upstairs. She said she thought he had his lunchbox, his boots and a coat and maybe the stuff out of his locker. I asked if Frank complained of any injuries and she said he didn't say anything about any injuries that he might have had. I asked Sheryl if she was aware of any of the records that we had requested or what she knew about them. She said that she had to go to storage to find information about Shane Tucker. She said that she was not able to find Darren Weegan because he was an employee before her time there. I asked Sheryl if she was aware of any problems involving Nick or Frank in her position as HR Assistant, with either one of them being verbally or physically combative toward any other employee or any of the three supervisors named. She said no, that she hadn't heard of any incidents involving any of them. Sheryl did say that she has heard other employees talk about

3

Administrative   Agency: Fort Morgan Police Dept.   Incident #: 201600002915   Case_Nr: 201600000179

Report No. 8   Entered: 02/25/2016 08:00   By Officer: 00000298 Steve Vosburg

there has been bullying before, but she knew of nothing first hand. I asked for any specifics as to who was doing what and Sheryl said "just that Nick had been a bully," but she did not know any specifics. I asked about Frank. Sheryl said that she had never witnessed it, but she had heard people talk about that Frank was on a "short fuse," but she has never seen him act out on anything like that.

Following the interview, I was provided with the mallet that had been spoken about by other employees that was supposed to be in the refinery room in close proximity to where Nick and Frank had had their altercation and the item I was provided was one white rubber mallet with a yellow fiberglass handle and a black grip that Risa Esterly advised me had been picked up, along with a hard hat and some other miscellaneous tools, that had been in Nicholas' possession. When his wife was called to the location where this happened, she had collected those items and stored them away in a locker and later wound up giving them to Risa Esterly from Human Resources who in turn provided them to me at approximately 11:30 a.m. along with a written statement of Sheryl Groves and from the employee's personnel files about an employee warning that had been issued to Nick Donez on 12/22/03 where it states that "on 12/13/03 you had a verbal altercation with a warehouse employee. During this conversation you used inappropriate language directed at the other employee. This performance warning is to inform you and impress upon you the importance of professionally addressing others in frustrating situations. This is your first performance warning in a one year period."

Also, I was given a written statement from Kenny Duggan, the Whey Department supervisor and Risa Esterly did fill out the Attestation of Accuracy and Completeness that was attached to the Production of Records court order. I briefly looked through the other personnel records that were complete records for personnel for the people that were mentioned in the court order and found nothing of any particular comments that we were seeking information on other than just their ordinary personnel files. No further information at this time. End of supplemental report.

298SV/sh
Approved 02/25/16 Detective Vosburg
Approved by Sergeant Loren Sharp on 02/26/16

**Administrative Agency: Fort Morgan Police Dept.   Incident #: 201600002915   Case_Nr: 201600000179**

**Report No. 9   Entered: 02/29/2016 11:37   By Officer: 00000298 Steve Vosburg**

Report #9

Supplemental Statement of Detective Steve Vosburg

In the State of Colorado, County of Morgan, City of Fort Morgan on 02/26/16 at approximately 1615 hours, I made telephone contact with Nicolas Donez, Jr., date of birth 02/02/64. I asked him if he had any further recollection of anything that happened during his incident involving Frank Levar out at the Leprino Foods plant. He told me that he hadn't really remembered anything additional other than what he had already told me. Nick did tell me that he recalled when they set him up in the refinery room at the Leprino Foods plant that he was facing west about one foot away from the catwalk to the machine that sits in the northeast quadrant of the refinery room. He said he didn't recall whether they had moved him and he didn't remember any of this. He said that Bob Davidson was in the room and he said that his wife happened to walk in. She mentioned that he was trying to get up.

Nick said that from where he was lying, he was assuming what had happened. He said that he had a pretty good sized lump on the back of his head and he said he still couldn't remember anything that happened after the initial push. I asked if he recalled how he was pushed, if it was with both hands or one hand, a fist or an open hand. He said he thought that Frank had pushed him with both hands and they were open he thought. Nick said that they were "in each other's face" and that's usually because of the situation they are in because of the noise level in the room. He said normally they are very close, either face to face or mouth to ear because you can't hear very well in that room. I told him that Frank had mentioned that he told him to get out of his face and said that Nick told him to make him get out of his face. Nick said he didn't have any recollection as to what they said to each other.

Nick told me that he wasn't sure as to how he pushed Frank back. Nick said basically that he didn't have a clue after the push. Nick told me in regard to the mallet he stated he was working on a clarifier and had needed that to tear down that machinery prior to the argument with Frank. I asked Nick if he'd had any further problems with his throat in reference to any speaking or breathing. He said that he was still healing and that he was still not 100% and has a little bit of trouble swallowing when he eats or when he drinks. He said if he tries to extend his neck and swallow at the same time, that is painful. No further information on the interview with Nick Donez. End of supplemental report.

1

**Administrative   Agency: Fort Morgan Police Dept.   Incident #: 201600002915     Case_Nr: 201600000179**

**Report No.  9   Entered: 02/29/2016 11:37   By Officer: 00000298  Steve Vosburg**

298SV/sh
Approved 02/29/16 Detective Vosburg
Approved by Sergeant Loren Sharp on 02/29/16

Administrative  Agency: Fort Morgan Police Dept.   Incident #:
201600002915    Case_Nr: 201600000179

Report No. 10   Entered: 03/01/2016 14:23   By Officer: 00000298 Steve
Vosburg

Report #10

Statement of Detective Steve Vosburg:

In the State of Colorado, County of Morgan, City of Fort Morgan on 02/29/16 at
approximately 1600 hours I went to the Salud Clinic located at 729 East Railroad Avenue
where I spoke to Dr. Elias Hernandez who was the treating ER physician on duty at
Colorado Plains Medical Center when Nicolas Donez Jr. was transported by ambulance
to that location.

I showed Dr. Hernandez a photograph of the room where the assault took place at
Leprino Foods in the refinery room. Hernandez indicated that Donez's injuries originally
appeared to be some sort of circular motion injury and he thought perhaps there may have
been a strangulation but upon further examination it was noted the injury was primarily
confined to the left side of the neck with more accumulated blood and bruising on the left
side that looked more like Donez had direct trauma to that location. He said it was a
direct blow and there was no doubt about that.

I asked him specifically if this injury could have happened with the hands.
Hernandez said it could have happened with a fist or in the web portion of the thumb and
forefinger or side of the hand with high velocity force. I also asked him if it could have
happened while the victim was lying down on the ground and he said most definitely. It
could have come from a kick, but most likely if the suspect was wearing shoes then there
would probably be more of a pattern to the injured area. I asked if a knee could have
caused that injury and he said most definitely. I asked if a mallet or hammer could have
caused the injury and he said yes, but the injury was very high velocity. I asked if he
could make any determination whether the victim was standing upright or was laying on
the floor. He said it could be either one. It would be difficult to tell.

I told the doctor I didn't see Mr. Donez without his cervical collar on and asked if
there was any apparent injuries on the outside of the neck under the collar and he said oh
yes with bruising on the left side.  Some of the injuries were very faint, and almost round,
kind of bruising on the left side. I asked him based on the photograph if there was
anything in there that looked like the victim may have fell and struck on the way down.
Hernandez said it would be very hard to tell, but again more of a pattern injury if that
were the case.

1

**Administrative  Agency: Fort Morgan Police Dept.   Incident #: 201600002915   Case_Nr: 201600000179**

**Report No.  10    Entered:  03/01/2016 14:23    By Officer:  00000298  Steve Vosburg**

I asked him about the strangulation, if it would be consistent with being more around the neck and not concentrated in one spot and he said correct and the injury was more indicative of a blow by the fist, an open hand, a foot or a knee or another object. The doctor also told me that the assailant could have easily killed the victim. This was a deadly injury. He said someone that may have been trained in karate with a hard direct blow which collapsed the trachea and fractured the trachea like that, the person could choke to death.

No further information at this time. End of supplemental interview with Dr. Hernandez.

298SV/mh
Approved 3/01/16 Detective Vosburg
Approved by Sergeant Loren Sharp on 03/02/16

2

Administrative   Agency: Fort Morgan Police Dept.   Incident #: 201600002915     Case_Nr: 201600000179

Report No.  11    Entered: 04/11/2016 13:16    By Officer: 00000298  Steve Vosburg

Report #11

Supplemental Statement of Detective Steve Vosburg

In the State of Colorado, County of Morgan, City of Fort Morgan, at the request of Deputy District Attorney Rebecca Wiard from the 13th Judicial District Attorney's office, I contacted the victim in this case, Nicolas Donez, Jr., date of birth 02/02/64, and asked him about his previous relationship with Frank Levar.

Nick said that he always thought that they were friends. He said that they had always gotten along and they had never, ever had any major issues. He said, "You are at work and people get frustrated and have disagreements, but never anything to this extent." He said, "As far as our history together, I have known him probably well over 10 years that we've worked together and we've never, ever had any issues. We've had disagreements and he's a little hot headed and he would jump off the handle and get a little bit upset about minor things. We'd get upset and it always gets squashed."

I asked if they hung out after work or anything and he said no. He said, "I did go over to his house one day but then that was only to sell him some cabinets that he had for sale that Frank wanted to look at." Nick showed him pictures of those on the phone and took the cabinets over to his house and delivered them. They spoke a little bit about his dogs and that was pretty much the extent of it. There has been no socializing outside of the work. I told Nick the last time I spoke to him that he had mentioned something about Frank having an issue with a foreman by the name of Shane Tucker. Nick gave me Tucker's phone number but I told Nick that I was not able to get a hold of Shane Tucker. I had left several messages with him to call me back, but he had never called me back and I was not able to talk to him personally on the phone, only to leave messages. I told Nick that I had also requested personnel files for both him and Frank at Leprino and found nothing in those files. Nick said it was Shane Tucker and Dave Ocanas that were witnesses to Frank pushing Shane in the office in front of the supervisor. He said it got taken upstairs and nothing ever got done about it. He said he wasn't sure why Shane wasn't answering.

Nick said that he would try to find some way to get a hold of Dave Ocanas and find out if he would be willing to speak with me. He said that he was in a completely separate room from Shane and Frank when this happened, but there were windows where he could see through them where he witnessed the pushing incident, but he didn't hear any conversation between the two. He did see Frank push Shane. Nick later contacted

1

Administrative  Agency: Fort Morgan Police Dept.    Incident #:
201600002915      Case_Nr: 201600000179

Report No. 11    Entered: 04/11/2016 13:16    By Officer: 00000298  Steve Vosburg

me with a telephone number where I could speak with Dave Ocanas at 380-6286. I asked Nick how he was coming along physically. He said that he was still having issues with his throat. It's healed up but not 100%. He said its closer to about 80% better than it was the day of the incident. Nick said he was still having issues with dizziness and loss of balance. Other than that, it's progressively getting better. End of interview with Nicolas Donez.

Later in the morning on the 8th of April, I was able to make telephone contact with Dave Ocanas, date of birth 03/15/76. I asked him if he recalled a pushing/shoving incident between Frank Levar and Shane Tucker and he said that he did. I asked him if he could recall approximately when that incident took place. He said it happened at work at Leprino in the supervisor's office. He said that he wasn't in the supervisor's office and didn't hear what was said between the two of them. He said that he was in an adjoining room with windows in it and he could see what was happening in the supervisor's office through the glass. He said he saw them talking to each other and he saw Shane stood up. At that time Frank kind of pushed him back a little bit and then Shane put his hands in his pockets and backed up a little bit, but he was pretty upset.

I asked if Shane was Frank's supervisor at the time and he said Shane would have been his foreman. Dave said that the supervisor was actually sitting in the office also and I asked who that was. Dave said that his name was Kenny Duggan. He said he didn't stand up or get in the way or anything. He just said, "You guys need to calm down." I asked if there was any formal reprimand or anything at the time and he said not that he knew of, no and he thought that Tucker was a little bit upset about that because nothing happened to him. Later on, when he saw Tucker, he asked him about it and Tucker told him Frank just came in there and told him that he was going to lunch and he wanted a break. Tucker told him, "You might want to let your break relief know" and that's when Frank yelled at him and told him "That's what I'm telling you. I'm telling you and I'm going to break." Tucker told him again that he needed to tell his break relief. That's when Tucker stood up and Frank shoved him.

I asked Ocanas for his best guess approximately when that was and he said he would say probably five years ago. I confirmed with him the location where this happened and he said it was in the Whey Department in the supervisor's office at Leprino. Ocanas said he just knew what was said based on what Tucker told him. He didn't hear the conversations. I asked if there was anything else that he was aware of that might have happened between the two of them and he said just that Frank was known to

2

**Administrative   Agency: Fort Morgan Police Dept.**   **Incident #:**
**201600002915     Case_Nr: 201600000179**

**Report No. 11   Entered: 04/11/2016 13:16   By Officer: 00000298 Steve Vosburg**

have quite a temper, any little thing would kind of set him off. It was always "f this and f that" right away. No further information. End of supplemental report.

298SV/sh
Approved 04/11/16 Detective Vosburg
Approved by Sergeant Loren Sharp on 04/12/16

**Administrative  Agency: Fort Morgan Police Dept.   Incident #: 201600002915    Case_Nr: 201600000179**

**Report No.  12   Entered: 05/12/2016 10:33   By Officer: 00000298  Steve Vosburg**

Report #12

Statement of Detective Steve Vosburg:

In the State of Colorado, County of Morgan, City of Fort Morgan on 05/06/16 at approximately noon I received an email from Deputy District Attorney Rebecca Wiard asking if I could follow-up with this case and get a medical record from the Salud Clinic where the patient first went and was seen by Elias Hernandez to see if we could get a medical release from Nick Donez for his records from Salud for the date of 02/09/16 to completion and get those records to the District Attorney's Office.

On 05/09/16 at approximately 0940 hours I was able to make telephone contact with Shane Tucker in reference to this case. I asked him what, if anything, he could tell me about an incident that happened out at Leprino some time ago between him and Frank Levar. He told me that the way it had started was that he was in the whey department in the office with a supervisor and Frank Levar walked in and said "I'm going to lunch." Shane said "Hey wait a minute, where is your break relief" and Frank said "fuck my break relief, I'm telling you I'm going to lunch". Shane said "Frank you can't just walk off your job and say you're going to lunch, you have to have your break relief". Frank said "fuck you Shane, I'm going to lunch". Shane told Frank he didn't need to talk to him like that. Shane told him he wasn't going to lunch without a break relief. Frank pointed his finger at Shane and said, "Fuck you motherfucker, I'm going to lunch". Shane jumped up and told Frank he wasn't going to lunch without a proper break relief. Shane said the supervisor was sitting about 2' away and Frank walked up and shoved Shane in the chest and said, "Fuck you motherfucker, I'm going to lunch." Shane looked at the supervisor and asked if he was going to let this happen and the supervisor told Frank to calm down. Shane said "That's it, I'm going up to the office to the HR department". When he got up there Frank was already there telling them what was going on. The response from the HR department was "Ah that's just how Frank is, Frank just gets a little excited". Shane said Frank put his hands on him and should have been fired. The matter was just left at that. Later on that same day Frank came and apologized to Shane. Frank said it was just a stupid thing that he did and he was surprised Shane didn't beat the shit out of him for it. After that they were pretty good friends.

I asked Shane if somebody from the defense team had contacted him and he said somebody came over to his house, but he couldn't remember what his name was. Shane said he told him pretty much the same thing that he just told me. Shane said he had a few other questions about how Frank was, "his demeanor and all that kind of shit". I asked

1

Administrative  Agency: Fort Morgan Police Dept.   Incident #:
201600002915      Case_Nr: 201600000179

Report No.  12   Entered: 05/12/2016 10:33   By Officer:  00000298  Steve
Vosburg

Shane if he had any idea why Human Resources didn't have a very good documented report about this incident and he said that was just their attitude saying that's just the way Frank is. Shane said he thought it was" a crock of shit". Shane said the other supervisor that was in the room no longer works for Leprino and his name is Darin Wiegand. Shane said from what he could remember there were some employees in the control room at the time and he thought that David Ocanas had seen the whole thing. Shane said David didn't hear anything, but he saw Frank push him.

I asked Shane if he knew approximately when this happened and he said no, he couldn't tell me. Shane said there really wasn't a lot to it. It was a quick little incident and then it was over.

After a few minutes I was also able to make telephone contact with Nicholas Donez Jr. in reference to a release for the medical records. Nick told me that he never went to the Salud. He said he was treated by Dr. Elias Hernandez at the Colorado Plains Medical Center and that he also saw Dr. Jacques LeBlanc at the Fort Morgan Medical Center, which has an office at the Colorado Plains Medical Center. Nick agreed to come into the Fort Morgan Police Department and sign a medical release for those medical records at the Colorado Plains Medical Center and Dr. Jacques LeBlanc.

Nick Donez also stated that they were doing further testing on his neck and on his brain, as far as the arteries and the nerves that they are going to do some scanning on the 16th of May and there will be additional information available with Dr. Alexander Feldman who comes to the specialty clinic at the Colorado Plains Medical Center but actually has an office in Denver. Later in the afternoon Nick came in and signed a medical release for Dr. Feldman's office, Dr. LeBlanc's office and for Colorado Plains Medical Center.

I was able to go to the Colorado Plains Medical Center to Dr. LeBlanc's receptionist and was able to get a copy of Nicolas's medical records from Dr. LeBlanc. There should be already in the case file a copy of the medical records from the Colorado Plains Medical Center and I faxed off a copy of the medical records release form to Dr. Feldman's office on 05/09/16 and have not received as of yet any medical records from Dr. Feldman's office.

When Nick Donez came to the Fort Morgan Police Department he also told me that he had been terminated from his job at Leprino. I asked him why and he stated

2

**Administrative   Agency: Fort Morgan Police Dept.    Incident #: 201600002915      Case_Nr: 201600000179**

**Report No.  12    Entered:  05/12/2016 10:33    By Officer:  00000298  Steve Vosburg**

because they told him that he had went hands on and that was the reason they had terminated him.

No further information at this time. End of supplemental report

298SV/mh
Approved 05/12/16 Detective Vosburg
Approved by Sergeant Loren Sharp on 05/12/16

3

Administrative   Agency: Fort Morgan Police Dept.   Incident #:
201600002915   Case_Nr: 201600000179

Report No.  13   Entered:  08/25/2016 08:11   By Officer:  00000298  Steve
Vosburg

Report #13

Supplemental Statement of Detective Steve Vosburg

In the State of Colorado, County of Morgan, City of Fort Morgan on Friday, 08/19/16 at approximately 1522 hours, I received an e-mail from Deputy District Attorney Rebecca Wiard in reference to this case requesting medical records from Dr. Feldman's office in Denver at 1721 East 19th Avenue, Denver, CO 80218.  I later sent a fax on 08/22/16 to fax number 303-863-0497.  On the same day, I received back by return fax 19 pages of medical records for Nicolas Donez, Jr., date of birth 02/02/64, from Dr. Feldman's office.  A copy of those records will be placed into the case file under this case number.  No further information at this time.  End of supplemental report.

298SV/sh
Approved 04/25/16 Detective Vosburg
Approved by Sergeant Loren Sharp on 08/25/16

1

**Administrative   Agency: Fort Morgan Police Dept.    Incident #: 201600002915      Case_Nr: 201600000179**

**Report No.  14   Entered: 08/30/2016 13:26   By Officer: 00000298  Steve Vosburg**

Report #14

Supplemental Statement of Detective Steve Vosburg

In the State of Colorado, County of Morgan, City of Fort Morgan on 08/29/16 at approximately 1500 hours, I accompanied Deputy District Attorney Rebecca Wiard to the Colorado Plains Medical Center to the offices of Dr. Thomas Manchester.  We asked him the following questions to include if he could read the CT scan.  He said that he could read them.  He said that he wasn't a board certified radiologist and that he can't read the actual films, but he could summarize the report of Dr. Jeremy McQue.  He stated that he probably couldn't see the hairline fractures in the images and didn't believe the jury could see them as well.  He said it was actually thyroid cartilage that sits behind the thyroid proper and houses the vocal chords, what people commonly call the windpipe.

Dr. Manchester was asked about Dr. Runyan, if he would be able to do that and he said maybe, depending upon how much trauma experience that he had.  He said the only reason that this is a life-threatening situation is because its where the air is taken in and out of your body and if there was swelling there, you could die.  He said it's about six inches long from the back of your mouth to your bronchi where it splits and goes to both of your lungs and that is the process for you to exchange air.  The main thoroughfare, or entrance to the parking lot, and if it gets jammed up and nothing comes or goes, then you die.  The doctors were concerned about having to intubate the patient because there was a hematoma or blood trapped inside the airway.  Manchester stated that they gave him steroids (Decadron) to keep from any swelling in the windpipe.  Manchester said that he was prepared to cut into his neck and open the airway if he had a situation where he stopped breathing or was gasping for air.  Manchester stated that the cause of the injury was blunt force trauma and he was asked if that would knock you out and he said no he didn't think so.  Manchester said, in general, like a clothes line injury such as a snowmobile accident or a seat belt where there is a rotational head movement it could cause unconsciousness, but this particular case was not long term enough and they did not notice any finger marks or strangulation marks on the neck.  Manchester didn't believe it to be caused by air deprivation.  He said it is possible that Donez could have been knocked unconscious by a prior force.

Manchester stated that there were external signs of injury to the head.  Manchester was asked how someone could sustain an injury such as this and Manchester replied that you had to be struck with something or struck something, an energy which compresses the cartilage.  He said it's not a bone that you are talking about, but a cartilage like your

1

Administrative  Agency: Fort Morgan Police Dept.   Incident #: 201600002915    Case_Nr: 201600000179

**Report No.  14   Entered: 08/30/2016 13:26   By Officer: 00000298  Steve Vosburg**

---

nose.  When asked if a fist could do that, Manchester said it's possible if it's attached to a long body or a long bone of the body.  He said that he'd never been involved in a case where he could definitively say that there had been a punch thrown that could cause unconsciousness.  He stated that this was the first time that he had treated someone with this type of an injury.  Manchester stated that he had talked to Dr. Hernandez and Dr. Runyan and they collaborated in reference to what the best policy was for him or what the worst possible outcome was and they chose the pharmacological way of reducing the swelling in a hospital setting so that they could deal with it if the problem got worse.

Manchester stated that he had worked at Denver General as a resident for approximately a year in the trauma/ICU unit and he never saw any cases with this type of a fracture, not one.  He stated that this is a pretty strong piece of cartilage.  When asked if an injury that was caused this way where the person might have been up against a wall or something where there was not much "give" to the movement of the body and then being struck.  Manchester said it could possibly cause additional trauma because it would be in a compressed manner, that it might have a better chance to crack if there is no option to pull back from it such as the difference of a parked car going at a parked car or a parked car going at a moving car or a moving car going at another moving car.  During the discussion about this, it became obvious that the prosecution did not have all of the Colorado Plains Medical Center records to include the CT scan and to include the 11:45 on February 9th narrative about the CT soft tissue with contrast and the CT brain with no contrast medical records.

On 8/30/16 I went to the Colorado Plains Medical Center and requested a copy of all of the medical records for Nicolas Donez Jr. concerning this incident as well as a DVD of the CT scan.

No further information at this time.  End of supplemental report.

298SV/sh
Approved 8/31/16 Detective Vosburg
Approved by Sergeant Loren Sharp on 08/31/16

2

**Administrative   Agency: Fort Morgan Police Dept.   Incident #:
201600002915   Case_Nr: 201600000179**

**Report No.  15   Entered: 09/20/2016 09:20   By Officer: 00000298  Steve
Vosburg**

Report #15

Supplemental Statement of Detective Steve Vosburg

In the State of Colorado, County of Morgan, City of Fort Morgan on 09/16/16 at
9:04 a.m., I was contacted by Deputy District Attorney Rebecca Wiard and requested to
talk to a couple of people that were endorsed as defense witnesses in this case. The first
one was identified as Kory Kaper of 108 Cherry Street in Fort Morgan. On 09/16/16, I
made telephone contact with Kory John Kaper, date of birth 07/09/89 and told him that
he was endorsed as a defense witness and I wanted to talk to him about what he could
testify to. I asked if he knew anything about the situation between Frank Levar and
Nicolas Donez and he said, "A little bit."

I asked him to tell me what he could about that. He said, "Everything that I know
about it is just second hand stuff" at the place where he worked and he said that there was
an accident that happened. I asked him if he knew the reason why they called him as a
witness. He said he had no idea. He said one of them went after the other one at work
and that might be it. I asked if he had ever seen any anger management issues with Frank
at work. He said he's never seen him violent, but he was always "hot headed." I asked
about Nicolas Donez and he said, "Yes, sir." He said there was an incident where he
threw him up against the wall at work. I asked if there was a report of that made or on
file with the company and he said, "No sir." I asked him if he knew why that was the
case and he said he just never wanted to do anything about it. Kory said Nicolas was also
"hot headed." He got around pretty good and sometimes he would be pissed off. I asked
him if he knew anything more about Mr. Donez and he said no, just what he had told me
that he was hot headed.

I was also able to make telephone contact with Rick Andrew Abelson, date of
birth 11/26/70, on 09/16/16. I told him that he was endorsed as a defense witness for
Frank Levar in an upcoming trial and he said, "I am?" I asked him if he could tell me
what he was going to testify to and he said that he's never actually received a summons.
I asked if he knew why he was listed as a witness and he said, "Yeah, because I used to
work with him." He said that he knew a lot of his friends who also worked with him are
just now getting them. I asked him when he worked with Mr. Levar how he got along
with him. He said he got along with him just fine. I asked him if he'd ever had any
problems with him and he said they'd had a few arguments, but nothing terrible. Just
everyday stuff. I asked him if he'd ever seen Frank have any outbursts of anger or

1

**Administrative   Agency: Fort Morgan Police Dept.   Incident #: 201600002915   Case_Nr: 201600000179**

**Report No.  15   Entered: 09/20/2016 09:20   By Officer: 00000298  Steve Vosburg**

anything and he said nothing violent.  I asked him if he'd ever seen him fighting with anybody or getting into pushing or shoving matches, anything like that and he said no.

I asked about Nicolas Donez and he said, "Yeah, he was my foreman for seven years."  I asked him how he got along with him and he said, "Just fine."  I said, "No problems with him" and he said just normal stuff.  When we get stressed out, we yell at each other.  I said, "You have no idea why you're being called as a defense witness" and he said, "No not really."  He said maybe it was because he was friends with him at work. No further information at this time.  End of supplemental report.

298SV/sh
Approved 9/20/16 Detective Vosburg
Approved by Lieutenant Loren Sharp on 09/20/16

2

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 19-CV00285-CMA

NICOLAS DONEZ,

        Plaintiff,

v.

LEPRINO FOODS, COMPANY,

        Defendant.

---

**DEFENDANT LEPRINO FOODS COMPANY'S RESPONSES TO PLAINTIFF'S
SECOND SET OF DISCOVERY REQUESTS**

      Defendant Leprino Foods Company, ("Leprino") or ("Defendant"), through its undersigned counsel, herein provides its Responses and Objections to Plaintiff's Second Set of Discovery Requests as follows:

**A.  GENERAL STATEMENT AND OBJECTIONS**

      The following statements and objections apply to every Discovery Request and Leprino's Responses thereto:

      1.      The Responses provided are solely for the purpose of this action, and not for the purpose of any other action. Each Response is subject to all obligations of confidence, relevancy, materiality, privilege and admissibility, and any and all other objections and grounds which would require the exclusion of any response given in Court, all objections and grounds of which are reserved and may be interposed at the time of trial.

2.      Leprino has not completed its investigation of the facts relating to this case, has not completed its discovery in this action, and has not completed preparation for trial.  Leprino reserves the right to supplement if further information is later discovered.

3.      Leprino generally objects to each Interrogatory below to the extent it seeks information that is protected by the attorney-client privilege, attorney work product doctrine, F.R.C.P. Rule 26(b), accountant-client privilege, self-evaluative privilege, or any other applicable privilege and to the extent such information will disclose a trade secret or otherwise will violate Leprino's constitutional right to privacy.

4.      Leprino also generally objects to each Request below to the extent any Request seeks information in violation of any constitutional, statutory, or common law privacy interest of any current or former Leprino employee.

5.      Leprino objects to the Instructions and Definitions contained in the Requests to the extent that they request more than reasonably required or contemplated by the Federal Rules of Civil Procedure or by Order of the court.

## ANSWERS TO INTERROGATORIES

14.      Please identify any and all employees of Defendant terminated within four months of filing for workers' compensation benefits from January 1, 2012 through January 1, 2017.

**OBJECTION:**   Defendant objects to this Interrogatory as overbroad and requesting information not relevant to any claim or defense raised in this matter, since it is not limited to the Fort Morgan plant.

 **RESPONSE:**   Without waiving said Objection, and answering subject thereto, at the Fort Morgan plant only Plaintiff and Sharonfae Abernathy.

2

15.     Did Defendant conduct an investigation of the incident that occurred on February 9, 2016? If so, identify all individuals that participated in the investigation and set forth their role in the investigation.

**RESPONSE:** Defendant has produced its documents relating to the investigation of the altercation between Frank Levar and Plaintiff.  Defendant's investigation documents reflect the individuals who conducted and participated in the investigation of the altercation.   These individuals include Risa Esterly (plant HR Manager), Julie Lambert (HR Generalist), and Kelly Soja, (Regional HR Manager).

16.     State any and all defenses upon which the defendant employer intends to rely or otherwise adopt in this action.

**RESPONSE:** See Defendant's Amended Answer.  Defendant reserves the right to amend its defenses depending on the results of discovery and in accordance with the applicable rules.

17.     State whether Defendant or its agents have obtained any statements from any potential witness in this matter or from any other agency, including the Fort Morgan Police, and, if so, set forth for each statement: who made the statement, when it was made and the substance of the statement.

**RESPONSE:** Yes.  See documents produced and Disclosures made by Defendant in this matter.   The statements were provided in connection with Defendant's investigation of the altercation and by the Fort Morgan Police Department in its investigation.

18.     State whether any EEOC claim and/or state claim with the Division on Civil Rights and/or any complaint in the courts of the State of bas (sic) been filed against the defendant employer company, and/or any charges, claims, or allegations made to any other government

agency or any employee of the defendant employer company, specifically including any personnel department employees alleging race discrimination since the plaintiff's date of hire, and, if so, state the date when the complaint was filed; the name, address and race of the person who filed the complaint; a summary of the complaint filed; a description of all actions taken as a result of the complaint filed; and the identity of any and all documents which reflect, refer to, or discuss any complaint.

**OBJECTION:**   Defendant objects to this Interrogatory as vague, overbroad, unduly burdensome, and requesting information not relevant to any claim or defense raised in this matter and not proportional to the needs of the case.  Plaintiff's claim is premised on the allegation that Leprino's Fort Morgan facility discriminated against him as a Hispanic in the enforcement if its workplace violence policy.  This Interrogatory is not limited to the Fort Morgan facility or the enforcement of Leprino's workplace violence policy.  In addition, this Interrogatory is overbroad and unduly burdensome since it encompasses over 21 years.

19.    Identify any witnesses you intend to call at trial in this matter and state in summary form the content of their expected testimony. This Interrogatory is specifically deemed to be continuing to date of trial.

**RESPONSE:** All such witnesses will be identified in accordance with  the Court's procedures.

## REQUEST FOR PRODUCTION

13.    Produce all documents relating or referring to any investigation either conducted by Defendant or in Defendant's possession relating to the incident that occurred on February 9, 2016, including any photographs, recordings, statements or other documents.

4

**RESPONSE:** Defendant has previously disclosed documents responsive to this Request, and produced the documents relating to Leprino's investigation of the February 9, 2016 incident. All other such documents are equally accessible to Plaintiff.

14.     Produce any and all statements Defendant or its agents have obtained in this matter including statements relating to the February 9, 2016 incident.

**OBJECTION:** Defendant objects to this Request insofar as it may encompass information subject to the attorney/client privilege or work product doctrine.

**RESPONSE:** Without waiving said Objection and answering subject thereto, see Response to Request for Production Number 13.

15.     All documents in your possession, including, but not limited to all personnel files, resumes, desk files, data files, and performance-related documents concerning: Jedidiah Camacho, Shawn Morrison, Allen Burton, Brian Kelley, Chris Dreyer, Frank Levar, Judas Donez, Edgar Carrillo, Alan Krob, Raul Sanchez and Cory Gettman.

**OBJECTION**:   Defendant objects to this Request as vague, overbroad, requesting information not relevant to any claim or defense raised in this matter and not proportional to the needs of the case.   The Request is not limited to any documents which may relate to Plaintiff's claim of discrimination raised in this matter.  In addition, Defendant objects to the production of information related to its employees as violative of those employees' privacy concerns.

**RESPONSE:** Without waiving said Objection and answering subject thereto, the personnel file for Frank Levar has been previously produced.  Defendant has also produced documents relating to the investigation of the matter involving Shawn Morrison, as well as the case number for Leprino's request for a Protective Order against Mr. Morrison.  Defendant has

also produced any notes, statements or other documents relating to any complaint or investigation of workplace violence at the Fort Morgan plant.  No additional documentation is being produced with this Response.

16.     Produce all documents relating or referring to any criminal investigation and/or proceeding relating to the incident that occurred on February 9, 2016, including any photographs, recordings, statements or other documents.

**RESPONSE:**  See Response to Request for Production Number 13.

17.     All minutes and agenda(s) of Defendant, from January 1, 2012 through the present date which addressed issues, complaints, investigations, and/or policies relating to race harassment/discrimination affecting employees of Defendant.

**OBJECTION:**  Defendant objects to this Request as overbroad, unduly burdensome, and requesting information not relevant to any claim or defense raised in this matter and not proportional to the needs of the case.  Plaintiff's claim is premised on the allegation that Leprino's Fort Morgan facility discriminated against him as a Hispanic in the enforcement if its workplace violence policy.  This Request is not limited to the Fort Morgan facility or the enforcement of Leprino's workplace violence policy.

18.     Any and all documents relating to actions taken by Defendant against employees regarding a complaint of workplace violence or race discrimination from January 1, 2012 to the present.

**OBJECTION:**  Defendant objects to this Request as overbroad, unduly burdensome, and requesting information not relevant to any claim or defense raised in this matter and not proportional to the needs of the case.  Plaintiff's claim is premised on the allegation that Leprino's

Fort Morgan facility discriminated against him as a Hispanic in the enforcement if its workplace violence policy.  This Request is not limited to the Fort Morgan facility or the enforcement of Leprino's workplace violence policy.

**RESPONSE:** Without waiving said Objection and responding only as to documents relating to actions taken by Defendant against employees regarding a complaint from January 1, 2012 to the present at the Fort Morgan plant, see documents previously produced by Defendant or produced in conjunction with this Response.

## REQUEST FOR ADMISSIONS

9.      Admit Plaintiff applied for workers' compensation on or about February 9, 2016.

**RESPONSE:**  Defendant admits that Plaintiff applied for workers' compensation benefits sometime between February 9-12, 2016.

Dated this 11th day of September, 2019.

As to Responses to Request for Production and Request to Admit.

**CAMPBELL KILLIN BRITTAN & RAY, LLC**

By: *s/ William C. Brittan*
William C. Brittan, #17643
Margaret R. Pflueger, #39780
270 St. Paul Street, Suite 300
Denver, CO 80206
Phone: (303) 322-3400
Fax: (303) 322-5800
Email: bbrittan@ckbrlaw.com
mpflueger@ckbrlaw.com

*Counsel for Defendant Leprino Foods Company*

7

## VERIFICATION

STATE OF COLORADO          )
                           )          ss
COUNTY OF DENVER           )

     Steve Schmidt states that he is authorized to make this Verification regarding the Responses to Interrogatories made on behalf of Leprino Foods Company in Leprino Foods Company's Response to Plaintiff's Second Set of Discovery Requests. The Responses to Interrogatories have been answered either by me or by authorized employees and counsel for Leprino Foods Company in this matter, and that to the extent the information came from a source other than me, I have been informed that the facts stated in this document are true and correct to the best of our knowledge.

                                      Steve Schmidt
                                      Leprino Foods Company

Subscribed and sworn to before me this 16th day of September, 2019 by Steve Schmidt, Leprino Foods Company

     My Commission expires:   2/12/22

     Witness my hand and official seal.

[SEAL]

TRACY WELFRINGER DANIEL
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20144005082
MY COMMISSION EXPIRES FEB. 12, 2022

                                Notary Public

8

## <u>CERTIFICATE OF SERVICE</u>

I, the undersigned, certify that on this 11th day of September, 2019, a true and correct copy of the foregoing **DEFENDANT LEPRINO FOODS COMPANY'S RESPONSES TO PLAINTIFF'S SECOND SET OF DISCOVERY REQUESTS** were served via email to the following:

Amy Burma
Burma Law Offices, LLC
1035 Pearl Street, Suite 325
Boulder, CO 80302
amy@Burmalawoffices.com

*Attorneys for Plaintiff*

<u>s/Andrea Davis</u>
Andrea Davis

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:19-cv-00285

NICHOLAS DONEZ,

      Plaintiff,

v.

LEPRINO FOODS, INC.,

      Defendant.

---

### PLAINTIFF'S RESPONSE TO DEFENDANT'S REQUEST FOR ADMISSIONS

---

      Plaintiff, Nicholas Donez, by and through its counsel, Amy Burma of Burma Law Offices, LLC,  serves the following Responses to Plaintiff's Request for Admissions:

**Request for Admission No. 1.**  Admit that Leprino Foods did not seek to dismiss YOUR Workers' Compensation claim after it was filed.

      **RESPONSE**: Admitted.

**Request for Admission No. 2.**  Admit that YOU received Workers' Compensation benefits from Leprino Foods after February 29, 2016.

      **RESPONSE**: Admitted.

**Request for Admission No. 3.** Admit that YOU have no knowledge of any other Leprino Foods employee whose employment status was adversely affected as a result of that PERSON filing a Workers' Compensation claim.

      **RESPONSE**: Denied.

**Request for Admission No. 4.** Admit that YOU have no knowledge of any other Leprino Foods employee whose employment was terminated as a result of that PERSON filing a Workers' Compensation claim.

**RESPONSE**:  Admitted.

**Request for Admission No. 5**.  Admit that on or about February 9, 2016, YOU told Officers of the Fort Morgan Police Department that during the INCIDENT YOU pushed Frank Levar.

    **RESPONSE**:  Denied.

**Request for Admission No. 6.**  Admit that during the INCIDENT YOU pushed Frank Levar.

    **RESPONSE**:  Denied.

**Request for Admission No. 7.** Admit that during the INCIDENT YOU came into contact with Frank Levar.

    **RESPONSE**: Admitted.

DATED this 10th day of June, 2019.

                Respectfully submitted,

                **BURMA LAW OFFICES, LLC**
                *The original signature is on file at Burma Law Offices, LLC*

      By:    /s/ Amy K. Burma
                Amy K. Burma

                ATTORNEY FOR PLAINTIFF
                Amy K. Burma (#43261)
                Burma Law Offices, LLC
                1035 Pearl Street, Suite 325
                Boulder, Co 80302
                Ph/Fax (720) 464-5655
                amy@burmalawoffices.com

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that a copy of the foregoing **PLAINTIFF'S RESPONSES TO**

**DEFENDANT'S REQUEST FOR ADMISSIONS** was served via electronic mail this 10th day

of June, 2019, upon the following Attorney for Defendant:


William C. Brittan, #17643
270 St. Paul Street, Suite 300
Denver, CO 80206
Phone: (303) 322-3400
Fax: (303) 322-5800
Email: bbrittan@ckbrlaw.com