## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:19-cv-00285

NICOLAS DONEZ,

      Plaintiff,

v.

LEPRINO FOODS COMPANY,

      Defendant.

---

### PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

      Plaintiff Nicolas Donez, by and through his attorney, Amy Burma of Burma Law Offices, LLC, respectfully submits his Response in Opposition of Defendants' Motion for Summary Judgment. As grounds therefore, Plaintiff states as follows:

### <u>INTRODUCTION</u>

      Defendant, Leprino Foods Company ("Leprino") hired the Plaintiff, Nicolas Donez in 1998. During his 18 years of employment, Mr. Donez was a good, hardworking employee and worked his way up from a bagger to foreman of the Whey Department. On February 9, 2016, Frank Levar, one of Mr. Donez's subordinate employees, perpetrated an unprovoked and life-threatening assault on Mr. Donez. After leaving Mr. Donez unconscious and bleeding on the floor, Mr. Levar immediately admitted to the assault to multiple Leprino employees. Mr. Levar was later arrested, tried and convicted of felony assault. Leprino decided to fire both Mr. Levar and Mr. Donez shortly after the assault and notified Mr. Levar of his termination two days later. Leprino, however waited until February 29, 2016 to notify Mr. Donez of his termination.

Leprino's internal investigation did not justify terminating Mr. Donez, so Leprino needed to find a pretextual basis to rationalize its predetermined reason to fire Mr. Donez. As a result, Leprino requested the police report and cherry-picked two sentences that it could use as Leprino's pretextual basis to wrongfully terminate Mr. Donez. The fact that Mr. Donez was acting in self-defense did not matter to Leprino – Mr. Donez was terminated despite the fac the was acting out of fear and in self-defense.

In Mr. Donez's termination letter, Leprino stated that he was terminated for verbally admitting to "pushing" Mr. Levar, which, Leprino claimed, was in violation of its "zero tolerance" policy for workplace violence. Leprino, however, did not have a "zero-tolerance" policy for workplace violence. Leprino's "Workplace Safety Policy" states that managers will investigate incidents and issue discipline based on the severity of the conduct. Leprino did not apply this purely subjective standard in a consistent manner. Caucasian employees, including Mr. Levar, were either not disciplined or were given warnings for similar conduct – such as pushing employees or putting employees in chokeholds. Yet, Mr. Donez was terminated when he acted in self-defense and was the victim of a vicious and unproved attack.

Leprino now claims that Mr. Donez was terminated for "escalating the incident," something for which there is absolutely no evidence and was not claimed at the time of Mr. Donez's termination or at the EEOC proceeding. In all probability, Leprino realized that it did not have a "zero tolerance" policy and sought to find another pretextual justification for Mr. Donez's wrongful and illegal termination. Moreover, in Leprino's Motion For Summary Judgment, it told only part of the story – no doubt to put it in the best light possible. As a result, Mr. Donez is required to set forth a significant number of additional material facts. With these additional record facts, the full story is readily apparent, and it is clear that Mr. Donez's claims should be heard by

a jury of his peers and Leprino's Motion should be denied.

<strong><u>RESPONSE TO LEPRINO'S "UNDISPUTED FACTS"</u></strong>

Notwithstanding the mischaracterizations and immaterial statements contained in Leprino's Motion for Summary Judgment, Mr. Donez provides the following response to Leprino's "Undisputed Facts" as follows:

1.      Admit.

2.      Admit.

3.      Admit.

4.      Admit.  Deny the remained as an undocumented "fact."

5.      Admit that Leprino has a written policy regarding discrimination and harassment. Deny that Leprino promotes equal opportunity and unlawful discrimination or harassment in the workplace as an unsubstantial "fact."

6.      Admit that Leprino has a "Workplace Safety Policy." (LF Appx., p. 5-9 – Defendant's "Workplace Safety Policy").

7.      Deny.  Leprino provided no training to its employees other than allegedly giving employees a copy of the policy when hired.  (ND Appx., p. 28 – Lambert Depo., 27:24-28:13).

8.      Admit.

9.      Admit that Mr. Donez was told at the time of his termination that Leprino had a "zero tolerance" policy for workplace violence.[1]  (ND Appx., p. 23 – Donez Depo., 121:7-23).

10.     Admit that in 2003, Mr. Donez received a "performance warning" which did not involve a violation of the "Workplace Safety Policy," physical violence or threats.  Mr. Donez contests the factual allegations of the warning.  (ND Appx., p. 20 – Donez Depo., 62:12-63:14).

---

[1] Mr. Donez does not appear to have received a copy of the "Workplace Safety Policy." Employees sign affirmations when they receive a handbook and there is evidence or affirmation acknowledging that Mr. Donez received the policy.

11.     Admit.

12.     Admit.

13.     Admit.

14.     Deny.  Mr. Donez did not get into an "altercation." Mr. Levar viciously assaulted Mr. Donez with a mallet in an unprovoked attack.  (LF Appx., p. 33 – Donez Stmt.; ND Appx., p. 21 – Donez Depo., 82:3-84:3; LF Appx., p. 79, 83, 106, 115 – Police Report).

15.     Admit there were no eyewitnesses to the assault.  Deny the remainder.  The "snippets" of the audio recordings are incomplete and edited in a misleading manner.[2]  Neither Leprino's investigation nor the Fort Morgan Police Department ("FMPD") concluded there was a "shoving match."  Leprino's "investigation" was based on the report of the FMPD.  Mr. Levar was arrested for second degree assault as a result of the FMPD investigation.  Mr. Donez was never investigated by the police or charged.  (ND Appx., p. 347-359 –Invest. File; LF Appx., 72-118 – Police Report).

16.     Deny.  Mr. Donez did not escalate the altercation.  Mr. Donez pushed Mr. Levar away because he was fearful of an imminent life-threatening assault. (ND Appx., p. 21 – Donez Depo., 83:1-10; ND Appx., p. 89, 90 – Crim. Trans. I, 33:18-21, 35:3-15).

17.     Admit.

18.     Admit in part.  Leprino asked employees to write statements, did not interview Mr. Donez after the incident and did not conduct any further investigation after February 10, 2016. (ND Appx., p. 347-359 – Leprino Invest. File; ND Appx., p. 7 – Schmidt Depo., 78:4-12, 82:21-20; ND Appx., p. 47 – H. Donez Depo., 61:20-62:7).

---

[2] Leprino received the full recordings of the police interviews.  Instead of relying on unedited recordings, Leprino provided "snippets," which are highly edited versions that are incomplete, misleading and do not accurately reflect the original audio record.  These "snippets" should not be considered in support of Leprino's Motion. *See* F.R.E. 901.

19. Admit.

20. Deny. The audio "snippets" are incomplete and inaccurate and should be excluded.

21. Deny. The audio "snippets" are incomplete and inaccurate and should be excluded.

22. Admit that Leprino requested the police report to justify its predetermined and pretextual decision to terminate Mr. Donez. (ND Appx., p. 385 – Feb. 22, 2016 Email).

23. Deny. Mr. Donez's was terminated because he admitted to "pushing" Mr. Levar. The is absolutely no evidence, either in Leprino's "investigation" or in the FMPD report, to support any conclusion that Mr. Donez escalated the incident or to contradict the fact Mr. Donez was acting in self-defense. (LF Appx., p. 60 – Donez Term. Ltr.; ND Appx., p. 347-359 –Invest. File; ND Appx., p. 360-384 – 2/22/2016 Police Report; ND Appx., p. 40 – Esterly Depo., 72:4-12).

24. Admit that Leprino sent Mr. Levar a termination letter on February 11, 2016 and gave Mr. Donez a termination letter February 29, 2016. (LF Appx., p. 59 – Levar Term. Ltr.; LF Appx., p. 60 – Donez Term. Ltr.).

25. Deny. Mr. Donez testified in his deposition that he did not believe he could walk away because of the look in Mr. Levar's eyes and that motion he made when he raised his hands. (ND Appx., p. 22 – Donez Depo., 115:6-11).

26. Deny. Plaintiff and Mr. Levar were not similarly situated because they were not subjected to the same standards governing discipline and they did not engage in conduct of comparable seriousness. *See* Plaintiff's Additional Facts, *surpa*.

27. Admit.

28. Admit that Mr. Donez stated he was acting in self-defense in his EEOC Charge of Discrimination. Deny it was the first time that Mr. Donez made that claim. (ND Appx., p. 89, 91, – Crim. Trans. I, 33:17-21, 35:3-15; (ND Appx., p. 23 – Donez Depo., 121:7-23).

29.     Admit.

30.     Admit.

31.     Whether or not Plaintiff received workers' compensation is irrelevant with respect to the claims asserted in this case and is a collateral source.

32.     Admit.

33.     Admit that Mr. Donez was termination 20 days after requesting workers' compensation.

## PLAINTIFF'S ADDITIONAL UNDISPUTED FACTS

34.     Plaintiff is Hispanic.  (ND Appx., p. 18 – Donez, Depo., 11:6).

35.     Plaintiff was qualified for his position.  (ND Appx., p. 35 – Esterly Depo, 36:5; ND Appx., p. 32 – Lambert Depo., 61:19).

36.     On February 26, 2015, Mr. Donez received the "Go the Extra Mile Award," because he was "an inspiration to other about hard work."  (ND Appx., p. 389 – Email Re: Award; ND Appx., p. 6 – Schmidt Depo., 74:23-75:20).

37.     Plaintiff was replaced with a Caucasian employee.  (ND Appx., p. 343 – Defendant's Responses to Plaintiff's Discovery).

### Leprino's Policies

38.     The Employee Handbook contained Leprino's disciplinary policies, which was a progressive disciplinary policy. (ND Appx., p. 423 –Handbook; ND Appx., p. 2 – Schmidt Depo., 37:8-17, 41:23-42:17).

39.     Leprino's "Workplace Safety Policy" was not a "zero tolerance" policy.  The policy provided that managers would investigate workplace violence and discipline if necessary, based on the severity of the employee's conduct.  (ND Appx., p. 9 – Schmidt Depo., 95:4-11; ND Appx.,

p. 31 – Lambert Depo., 31:11-16; LF Appx., p. 5-9 –Workplace Safety Policy).

40.     Leprino's "Workplace Safety Policy" does not define what conduct violates the policy and the criteria used to find a violation and/or discipline was purely subjective.  The same conduct, such as horseplay or putting another employee in a chokehold, could at times constitute a violation of "Workplace Safety Policy," and other times not be a violation of the same policy. (ND Appx., p. 6 – Schmidt Depo., 73:7-11; Donez Appx., p. 30 – Lambert Depo., 35:20-36:18).

41.     Leprino's policies did not allow employees to act in self-defense.  (ND Appx., p. 31 – Lambert Depo., 40:5-13).

42.     Leprino did not provide training regarding its "Workplace Safety Policy" or training as to how to conduct investigations for violations of that policy. (ND Appx., pp. 4-5 – Schmidt Depo., 64:21-66:3; ND Appx., p. 28 – Lambert Depo., 27:25-28:12).

43.     It was Leprino's "Workplace Safety Policy" has written guidelines as to how management should investigate allegations of workplace violence. The investigations included personally interviewing the employees involved, taking statements, conducting additional interviews if necessary, blocking off areas and taking photographs.  Aside from this case, Leprino did not include police reports as part of their internal investigation. (LF Appx., p. 8-9 – Workplace Safety Policy; ND Appx., pp. 34, 39 – Esterly Depo., 32:11-17; 58:23-59:5).

**February 9, 2016 Assault**

44.     On February 9, 2016, Mr. Donez was acting as both the foreman and supervisor. At approximately 10:00 a.m., Mr. Donez was dismantling a machine.  Mr. Levar was acting as the lactose operator and was in the refiner room.  At some point, Mr. Donez was in the refiner room and Mr. Levar asked him to send in another employee to the refiner room.  Mr. Donez responded that the employee was busy and asked what Mr. Levar needed, to which Mr. Levar responded,

"never mind." A little later, Mr. Donez went back into the refiner room to get a mallet from the toolbox. At that time, Mr. Donez asked Mr. Levar how things were going. Mr. Levar proceeded to get visibly angry and yell at Mr. Donez that "Next time I tell you I need help, you need to send me help," and that any time he had issues in the refiner room, no one was able to help him. Then Mr. Levar pushed Mr. Donez. (ND Appx., pp. 19, 21 – Donez Depo., 40:13-41:18, 82:3-84:3).

45.     After he pushed Mr. Donez, Mr. Levar made a motion with his hands coming up towards Mr. Donez. Mr. Donez was fearful of an imminently serious assault and, as a result, pushed Mr. Levar back to get space and prevent an attack. (ND Appx., p. 21 – Donez Depo., 83:1-10; ND Appx., pp. 89, 90 – Crim. Trans. I, 33:17-21, 35:3-15).

46.     Mr. Levar then left the refiner room and told Charles Fisher and Richard Davidson that he "knocked Nick out." (ND Appx., pp. 353, 358 – Leprino Invest. File; LF Appx., 79, 90 – Police Report; ND Appx., pp., 131, 154 – Crim. Trans. I, 75:18-25, 98:4-7).

47.     Mr. Davidson immediately went to the refiner room and found Mr. Donez unconscious on the floor. Mr. Donez was dazed, could not remember anything bleeding and had trouble breathing.  (ND Appx., pp. 81-82 – Crim Trans. I, 81:15-82:9; LF Appx., p. 90 – Police Report).

48.     As a result of the assault, Mr. Donez had life threatening injuries, including a fractured trachea and a concussion. (ND Appx., pp. 105, 132, 136-138 – Crim. Trans. I, 49:7-17, 76:12-15, 80:20-82:9; ND Appx., p. 281 – Crim. Trans. II, 15:9-11; LF Appx., p. 81, 83, 90, 107, 115-116 – Police Report).

49.     Mr. Donez does not remember many details of the assault and continues to have memory issues to this day as a result of the injuries he suffered in the assault. (ND Appx., p. 21, - Donez Depo., 83:23:84:3; ND Appx., p. 109 – Crim. Trans I, 53:2-16).

50.    There was a mallet next to Mr. Donez, which Mr. Levar used during his assault on Mr. Donez. (ND Appx., pp. 158, 172-3, 200, 209-210 – Crim Trans. I, 102:9-14, 116:23-117:1, 144:8-12, 153:23-154:4; LF Appx., p. 79, – Police Report).

51.    After the assault, Mr. Levar collected his tools, cleaned out his locker and spoke to Human Resources.  Mr. Levar told three HR employees that he assaulted Mr. Donez and told Ms. Esterly their conversation was "his exit interview."  (ND Appx., p., 38 – Esterly Depo., 53:24-54:11; ND Appx., p. 134 – Crim. Trans., I, 78:19-21).

52.    Ms. Esterly asked Mr. Levar to write out a statement, told him he would be on unpaid administrate leave and escorted Mr. Levar out of the building.  (ND Appx., p. 37 – Esterly Depo., 42:20 – 43:3).

53.    Leprino's "investigation" consisted of asking six employees for statements and was completed on February 10, 2016. (ND Appx., p., 277 – Crim. Trans. II, 11:4-13; ND Appx., p. 37 – Esterly Depo., 44:20-45:3).

54.    Leprino did not interview or obtain a statement from Mr. Donez after the incident. Ms. Esterly asked Mr. Donez's wife, Heather Donez, to get a statement from Mr. Donez, which Ms. Donez typed on February 10, 2016 after Mr. Donez was discharged from the hospital.  (ND Appx., p. 47 – H. Donez Depo., 61:20-61:7).

55.    Leprino was uncooperative with the police during the FMPD investigation.  (ND Appx., pp., 277, 287-8, 298 – Crim. Trans. II, 11:4-13; 21:21-22:7; 32:14-21; LF Appx., p. 79 – Police Report).

### Leprino's Decision to Terminate Mr. Levar and Mr. Donez

56.    Leprino decided to terminate Mr. Levar the day of the incident.  On February 11, 2016, Leprino sent Mr. Levar a letter, which stated in pertinent part:

> We have concluded our investigation pertaining to the incident between you and
> your foreperson on Tuesday, February 9th as you did admit to us you punched him
> Leprino Foods Company has zero tolerance for workplace violence

(ND Appx., p. 9 – Schmidt Depo., 96:20-25; LF Appx., p. 59 – Levar Term. Ltr.).

57.     Leprino decided to terminate Mr. Donez shortly after the assault, despite the fact Mr. Donez was the victim.  On February 22, 2016, requested the FMPD police report because it needed it justify its predetermined decision to terminate Mr. Donez.  Leprino needed the report or else it could not terminate Mr. Donez.  (ND Appx., p. 385 – Feb. 22, 2016 Email).

58.     After getting the police report, Leprino did not review the entire document, but only verified one of Mr. Donez's statements. (ND Appx., p. 10 – Schmidt Depo., 97:6-12).

59.     The police report was not complete as FMPD's investigation was not complete.  *Cf* ND Appx., pp. 360-386 – 2/22/16 Police Report with LF Appx., p. 72-114.

60.     Leprino terminated Mr. Donez on February 29, 2016, and provided him with a letter, which stated in pertinent part

> We have concluded our investigation pertaining to the incident between you and
> your operator on Tuesday, February 9th 2016 During our investigation you verbally
> admitted to us you pushed your operator. Leprino Foods Company has no tolerance
> for workplace violence.

(LF Appx., p. 60 – Donez Term. Ltr).

61.     On February 29, 2016, Mr. Donez told Ms. Esterly that he was acting in self-defense and she stated that it did not matter - Leprino still would have terminated Mr. Donez, even if he said he was acting in self-defense because of Leprino's "zero tolerance" policy.  (ND Appx., p. 23 – Donez Depo., 121:7-23).

62.     Leprino did not claim that Mr. Donez escalated the assault until after this case was filed.  (ND. Appx., pp. 430-1 –Response to Charge of Discrimination).

63.     In October 2016, Mr. Levar was convicted by a jury of second-degree assault.  Mr.

Donez was never investigated or charged by the FMPD.    (ND Appx., p. 429 – Jury Verdict).

**Leprino's Discriminatory Application of Its "Workplace Violence Policy"**

64.      In 2010 or 2011, Mr. Levar got angry with his foreman at the time, Richard "Shane" Tucker, a Caucasian employee, after Mr. Tucker told Mr. Levar that he had to wait to go to lunch and shoved Mr. Tucker. Despite engaging in a physical altercation, Mr. Levar was not disciplined. Mr. Tucker's supervisor, who was present at the time, refused to take any action regarding the incident.  Once the supervisor stated he was going to do anything about it, Mr. Tucker went to human resources and "[t]hey just said Frank was being Frank" and did not investigate or discipline Mr. Levar. (ND Appx., pp. 309-11, 321 – Crim. Trans. II, 43:7- 44:3, 44:21-45:5, 55:6-9).

65.      In 2015, a Hispanic employee, Kyle Lara, was involved in an "altercation" with Chase Nicaise, Caucasian employee.  Mr. Lara, the Hispanic employee was terminated but Mr. Nicaise, the Caucasian employee was not.  (ND Appx., p. 12 – Schmidt Depo., 114:13-115:5; ND Appx., p. 435 – Lara Term. Ltr.).

66.      Shawn Morrison, a Caucasian employee, was given a warning for "horseplay" after at least two employees complained about his behavior, which included, but was not limited to, putting employees in chokeholds and lifting one female employee up onto his shoulder and placing his hand on her buttock.[3] Crystal Campos, a Hispanic employee, was immediately terminated for touching when joking around with another employee.  (ND Appx., p. 50 – H. Donez Depo., 74:11-76:9; LF Appx., pp. 70-71 – H. Donez Ltr; ND Appx., p. 436 – Morrison Warning; ND Appx., p. 14 – Schmidt Depo., 121:16-122:4; ND Appx., p. 437 –  Campos Stmt.; ND Appx., p.  438 – Campos Termination).

---

[3] Mr. Morrison was terminated in 2019 after he threatened bring a gun to Leprino and "shoot up the place," including Ms. Donez. (ND Appex., p. 49 - H. Donez Depo., 72:24-73:5).   Leprino had to go to court to get a temporary, then permanent, restraining order against him.  ND Appx., p. 14 - Schmidt Depo., 123:24-124:2).

67.     In October 2012, Chris Dryer, a Caucasian employee, was given a warning for inappropriate touching that was discovered during a "bulling investigation" and terminated Jedidiah Camacho, a Hispanic employee, as a result of the same investigation. (ND Appx., pp. 14-15 – Schmidt Depo., 124:10-125:6; ND Appx., p. 439 – Dryer Warning; ND Appx., p. 440 – Camacho Term. Ltr.).

68.     Frank Levar, Kyle Lara, Chase Nicaise, Shawn Morrison, Crystal Campos, Chris Dryer, and Jedidiah Camacho were all employees at the Fort Morgan Plant, and all had similar positions and supervisors to Mr. Donez.[4]

69.     Leprino had issues with applying its policies in a fair and consistent manner. (ND Appx., p. 441 – 9/18/2018 Email re: Dept Items; ND Appx., p. 434 – Article).

## LAW AND ARGUMENT

Summary judgment is appropriate if the moving party demonstrates there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(a). At summary judgment a court should examine the record as a whole, just as a jury would, to determine whether a jury could reasonably find an invidious discriminatory purpose on the part of an employer. In discrimination cases, where there are intent and credibility issues, summary judgment standards should be applied strenuously. *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 149-151 (2000).

## I.     SUMMARY JUDGMENT IS INAPPROPRIATE OF PLAINTIFF'S CLAIM OF RACE DISCRIMINATION

### A.     Elements

To establish discriminatory dismissal based on race or national origin under Title VII, a

---

[4] In discovery, Leprino agreed only to produce documents relating to similarly situated employees at the Fort Morgan Plant.

plaintiff must show: he is a member of a protected class; he was discharged; he was qualified for the position at issue; and he was treated less favorably than others not in the protected class. *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002).

**B.    Burden**

The burden on an employee at this stage is "not onerous," and has been described as "de minimis." *EEOC v. Horizon/CMS Healthcare Corp.,* 220 F.3d 1184, 1193 (10th Cir.2000) ("a defendant cannot defeat a plaintiff's prima facie case by articulating the reasons for the adverse employment action because the plaintiff in such a situation would be denied the opportunity to show that the reasons advanced by the defendant were pretextual").  Ultimately, the goal of the prima facie case is for the plaintiff to show "actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were based on a discriminatory criterion." *Hysten v. Burlington Northern & Santa Fe. Ry. Co.*, 296 F.3d 1177, 1181 (10th Cir. 2002).

C.    <u>Mr. Donez Has Established a Prima Facie Case</u>

Contrary to Leprino's claims, Mr. Donez has sufficient evidence of a prima facie case because Plaintiff was treated less favorably than others not in the protected class.[5]  Evidence of an employer's more favorable treatment of employees who are not members of a plaintiff's protected class can provide an inference of discrimination if the employees are similarly situated.  *N'Gouan v. AB Car Rentals, Inc.,* Case No. 17-cv-1912, 2018 WL 6172351, *7 (Dist. Colo., November 26,

---

[5] The remaining elements are undisputed: Plaintiff was a member of a protected class, Hispanic, and that he suffered an adverse employment action when he was terminated.  (Def. Mot., p. 11).   It is also undisputed that Plaintiff was qualified for his position.  (Donez, Appx., p. 35 – Esterly Depo., 36:5; ND Appx., p. 32 – Lambert Depo., 61:19). *See Perry v. Woodward*, 199 F.3d 1126, 1138 (10th Cir. 1999) ("The firing of a qualified minority employee raises the inference of discrimination because it is facially illogical for an employer to randomly fire an otherwise qualified employee and thereby incur the considerable expense and loss of productivity associated with hiring and training a replacement."). Finally, it is undisputed that Plaintiff was replaced by a Caucasian employee.  (ND Appx., p. 343 – Leprino's Responses to Discovery Requests).

2018).  Individuals are considered similarly-situated when they: (1) have dealt with the same supervisor; (2) were subjected to the same work standards; and (3) had engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.  *Id.*

Mr. Levar and Mr. Donez were not similarly situated because they did not engage in the same conduct.  Mr. Levar assaulted a co-worker with a mallet and caused serious bodily injury. (ND Appx., pp. 105, 132, 136-138 – Crim. Trans. I, 49:7-17, 76:12-15, 80:20-82:9; ND Appx., p. 281 – Crim. Trans. II, 15:9-11; LF Appx., p. 81, 83, 90, 107, 115-116 – Police Report; ND Appx., p. 45 – H. Donez Depo., 55:2-7). Leprino interviewed Mr. Levar.  (ND Appx., p. 37 – Esterly Depo., 42:20 – 43:3).   Mr. Levar admitted to the assault immediately after - first to five employees at Leprino, then to the police.  (ND Appx., pp. 349, 353, 358 –Invest. File). Mr. Levar was arrested, tried and convicted of felony assault. (ND Appx., p. 429 – Jury Verdict).  In contrast, Mr. Donez was the victim of that unprovoked assault and acted in self-defense. (ND Appx., p. 21 – Donez Depo., 83:1-10; ND Appx., pp. 89, 90 – Crim. Trans. I, 33:17-21, 35:3-15).  Leprino did not interview Mr. Donez and Mr. Donez was not investigated, arrested or charged with any crime. (ND Appx., p. 47 – H. Donez Depo., 61:20-62:7).

Additionally, Mr. Donez and Mr. Levar were not subject to the same work standards.  Mr. Levar previously physically assaulted a co-worker, yet was not disciplined, let alone terminated. (ND Appx., pp. 309-11, 321 – Crim. Trans. II, 43:7- 44:3, 44:21-45:5, 55:6-9).  Mr. Donez, who was acting in self-defense, was terminated something that Mr. Levar was previously not disciplined for doing.   Thus, Mr. Donez has met the de minimums burden of establishing a prima facie case.

     D.     <u>A Rational Fact Finder Could Find that Defendant's Alternative Justifications for Plaintiff's Termination are False</u>

Pretext exists when an employer does not honestly represent its reasons for terminating an employee. *Miller v. Eby Realty Grp LLC*, 396 F.3d 1105, 1111 (10th Cir. 2005). In determining whether a plaintiff has shown pretext, the Court must consider the plaintiff's evidence in its totality. *Brown v. Parker-Hannifin Corp*., 746 F.2d 1407, 1411 (10th Cir. 1984) ("where different ultimate inferences may be drawn from the evidence presented by the parties, the case is not one for summary judgment."); *Randle v. City of Aurora*, 69 F.3d 441, 453 (10th Cir. 1995) ("So long as the plaintiff has presented evidence of pretext … upon which a jury could infer discriminatory motive, the case should go to trial. Judgments about intent are best left for trial and are within the province of the jury."); *Romero v. Union P. R.R*., 615 F.2d 1303, 1309 (10th Cir. 1980) (noting that questions of motive and intent are "particularly inappropriate for summary judgment disposition"). In this case, there is a genuine issue of material fact regarding pretext.

i.   <u>Leprino's Justification for Termination was False</u>

Leprino allegedly terminated Plaintiff for violating its "zero tolerance" policy for workplace violence when he "pushed" Mr. Levar. (LF Appx., p. 60 – Donez Term. Ltr). Leprino's written "Workplace Security Policy," however, was not "zero tolerance." A "zero tolerance" policy is defined as "one that 'mandates predetermined consequences or punishments for specific offenses." Tonya M. Boyd, *Confronting Racial Disparity: Legislative Response to the School-to-Prison Pipeline*, 44 HARV. C.R.-C.L. L. REV. 571, 573 (2009); Cherry Henault, *Zero Tolerance in Schools*, 30 J.L. & Educ. 547 (2001) ("The term 'zero tolerance' refers to those policies which deal out severe punishment for all offenses, no matter how minor, ostensibly in an effort to treat all offenders equally in the spirit of fairness and intolerance of rule–breaking").

In contrast, Leprino has progressive disciplinary policy and it's "Workplace Security Policy" states that managers will investigate claims and issue discipline based on the severity of

the conduct. (LF Appx., pp. 5-6 – "Workplace Safety Policy"; ND Appx., p. 423 – Leprino Foods Handbook; ND Appx., p. 2 – Schmidt Depo., 37:8-17, 41:23-42:17). These are not "zero tolerance" policies.

Not only did Leprino fail falsely claim its policy was "zero tolerance," but it did not follow its policy with respect to conducting workplace violence investigations. (LF Appx., p. 8-9 – Workplace Safety Policy; ND Appx., pp. 34, 39 – Esterly Depo., 32:11-17; 58:23-59:5). Leprino conducted no interviews, and most importantly, never interviewed Mr. Donez, the victim of the assault. (ND Appx., p. 37 – Esterly Depo., 44:20-45:3l Donez Appx., p. 47 – H. Donez Depo., 61:20-61:7). Leprino terminated Mr. Levar exclusively on its internal investigation and stated in Mr. Levar's February 11, 2016 termination letter that its investigation was complete. (LF Appx., p. 59 – Levar Term. Ltr; ND Appx., p. 9 – Schmidt Depo., 96:20-25). Leprino waited until February 29, 2016, to terminate Mr. Donez and relied on a police report, and not its investigation, to justify its predetermined decision to fire Mr. Donez. (ND Appx., p. 385 – Feb. 22, 2016 Email). *See Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000) (stating that that pretext can be shown by "evidence that the defendant acted contrary to a written company policy prescribing the action to be taken by the defendant under the circumstances").

ii.    <u>Leprino Treated Similarly Situated Employees Differently Based on A Purely Subjective Standard</u>

A plaintiff may show pretext by providing evidence that he was treated differently from other similarly situated, nonprotected employees who violated work rules of comparable seriousness. *Smothers v. Solvay Chems., Inc.,* 740 F.3d 530, 540 (10th Cir. 2014). Leprino has treated other similarly situated employees differently from Mr. Donez. When two Caucasian employees were involved in an alteration, like the alternation with Mr. Levar and Mr. Tucker, Leprino did not discipline either employee. (ND Appx., pp. 309-11 – Crim. Trans. II, 43:7- 44:3,

44:21-45:5). When a Hispanic employee initiated an incident with a Caucasian employee, like Mr. Lara and Mr. Nicaise, Leprino only fired the Hispanic employee and the Caucasian employee, despite being involved, was not terminated. (ND Appx., p. 12 – Schmidt Depo., 114:13-115:5; ND Appx., p. 435 – Lara Term. Ltr.). Yet when a Caucasian employee assaulted a Hispanic employee, as is the case here, Leprino fired both employees. Leprino, it appears, does have a "zero tolerance" policy, but only with respect to Hispanic employees.

Leprino is able to apply discipline in an inconsistent manner because violations of the "Workplace Safety Policy" are based on a purely subjective standard. Similarly conduct, such as horseplay or pushing an employee, could or could not violate the policy, based on what the manager decided at the time. (ND Appx., p. 6 – Schmidt Depo., 73:7-11; Donez Appx., p. 30 – Lambert Depo., 35:20-36:18).

Given all of the evidence discussed above and the general rule that "the inference of discrimination permitted by evidence of pretext must be resolved in favor of the plaintiff," *Bryant v. Farmers Ins. Exch*., 432 F.3d 1114, 1125 (10th Cir. 2005), Plaintiff has made a sufficient showing of pretext. Thus, Defendant's Motion for Summary Judgment should be denied.

## II.  DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON THE PUBLIC POLICY CLAIMS SHOULD BE DENIED

### A.  Elements

An at-will employee, therefore, will establish a prima facie case for wrongful discharge under the public-policy exception if the employee presents evidence on the following elements: 1) that Leprino directed Mr. Donez to perform an illegal act or prohibited Mr. Donez from performing a public duty or exercising an important job-related right or privilege; 2) that the action directed by Leprino would violate a specific statute relating to the public health, safety, or welfare, or would undermine a clearly expressed public policy relating to Mr. Donez's basic responsibility as a

citizen or the employee's right or privilege as a worker; and 3) that Mr. Donez was terminated as the result of refusing to perform the act directed by Leprino. *Martin Marietta Corp. v. Lorenz*, 823 P.2d 100, 104–05 (Colo. 1992).

**B.** **There is a Causal Link Precluding Summary Judgment on the Claim for Wrongful Termination In Violation Of Public Policy For Requesting Workers' Compensation**

Causation is the only element in dispute with respect to Mr. Donez's claim for wrongful termination for exercising his rights to workers' compensation. Viewing evidence in the light most favorable to him as the non-moving party, he has. Mr. Donez requested workers' compensation benefits on February 9, 2016 and was terminated 20 days later. *See* Undisputed Facts, ¶¶29-30. A retaliatory motive may be inferred when an adverse action closely follows protected activity. *Metzler v. Federal Home Loan Bank of Topeka*, 464 F.3d 1164 (10th Cir. 2006) (termination occurring, at most, six weeks after employer knew plaintiff intended to engage in protected activity and even as little as four weeks after her request for FMLA-protected leave was sufficient to establish causal connection). Because of the temporal proximity between Mr. Donez's acceptance of workers' compensation benefits and his termination, a retaliatory motive can be inferred.

**B.** **Public Policy Includes an Employees Right To Self-Defense**

The essence of the public policy exception is that an employee may state a claim for wrongful discharge if the discharge of the employee contravenes a clear mandate of public policy. *Lorenz*, 823 P.2d at 104-05 (Colo. 1992). First, two constitutional provisions support Plaintiff's position. Article II, Section 3 of the Colorado Constitution states:

> All persons have certain natural, essential and inalienable rights, among which may be reckoned the right of enjoying and defending their lives and liberties; of acquiring, possessing and protecting property; **and of seeking and obtaining their *safety* and happiness.**

C.R.S.A. Const. Art 2, §3 (emphasis added).   The section's drafters did not place any temporal or geographic restrictions on the scope of the right to safety, and there is simply no way to read the text as establishing a right of self-defense at an individual's home or in public, but not at his or her place of business.   Second, Article 3, Section 13 supports recognition of a clear and substantial public policy favoring the right of self-defense. That section provides,

> The right of no person to keep and bear arms in **defense of his home, person and property,** or in aid of the civil power when thereto legally summoned, shall be called in question…
> .

C.R.S.A. Const. Art. 2, §13 (emphasis added).  Like Article 2, Section 3, this provision recognizes a person's right for defense of his home, person and property.   These Constitutional provisions establish a clear mandate for self-defense as a public policy.

Colorado's statutory and common law decisions also reflect a public policy favoring the right of self-defense.   At common law, one had a duty to retreat before resorting to force to defend against an aggressor. *See People v. Watson*, 671 P.2d 973, 974 (Colo. App. 1983). The common-law doctrine was modified in this jurisdiction just prior to the turn of the century. *Boykin v. People*, 45 P. 419 (Colo. 1896).   The General Assembly in essence codified the principles developed by the court.  *Beckett v. People,* 800 P.2d 74, 78 (Colo. 1990).  In C.R.S. §18-1-704(2), the General Assembly has expressly authorized the use of deadly physical force by a non-aggressor when the non-aggressor believes, on reasonable grounds, that he, she or another person is in imminent danger of receiving great bodily harm.  Thus, there is a clear public policy favoring self-defense.

Other courts have concluded that right to self-defense constitutes a substantial public policy exception to the at-will employment.  *Ray v. Wal-Mart Stores, Inc*., 359 P.3d 614 (Utah 2015) (employees may bring common law wrongful discharge in violation of public policy claim alleging termination for exercising their right to self-defense in altercation with shoplifters where

employees' actions violated company policy); *Cocchi v. Circuit City Stores*, 2006 WL 870736 (N.D.Cal. Apr. 3, 2006) (The United States District Court of the Northern District of California recognized a right not to be fired based upon California Constitution's self-defense provision as a public policy exception to the at-will employee doctrine). Leprino's policies, which did not allow an exception for self-defense, is in clear violation of Colorado public policy and Mr. Donez's constitutional right to protect himself from unlawful violence.

Leprino, relying on *Feliciano v. 7-Eleven, Inc.*, 210 W. Va. 740, 559 S.E.2d 713 (2001), claims that Mr. Donez is only entitled to act in self-defense in response to a lethal imminent danger. Even if this standard apply, Leprino would still not be entitled to summary judgment. Mr. Donez pushed Mr. Levar because he was fearful of a lethal and imminent assault. Mr. Donez's fear was justified because he was assaulted, with a mallet, and choked and suffered significant bodily injury that could have resulted in death. Thus, even under Leprino's standard, its Motion for Summary Judgment should be denied.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff respectfully requests that Defendant's Motion for Summary Judgment be denied.


DATED this 4th day of January, 2020.

Respectfully submitted,

**BURMA LAW OFFICES, LLC**
*The original signature is on file at Burma Law Offices, LLC*

By:   /s/ Amy K. Burma
      Amy K. Burma (#43261)
      ATTORNEY FOR PLAINTIFF
      Burma Law Offices, LLC
      1035 Pearl Street, Suite 325
      Boulder, Co 80302
      Ph/Fax (720) 464-5655
      amy@burmalawoffices.com

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing **PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** was served via electronic mail this 4th day of January, 2020, upon the following Attorney for Defendant:

William C. Brittan, #17643
Margaret R. Pflueger, #39780
270 St. Paul Street, Suite 300
Denver, CO 80206
Phone: (303) 322-3400
Fax: (303) 322-5800
Email: bbrittan@ckbrlaw.com
mpflueger@ckbrlaw.com