# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:19-cv-00285

NICOLAS DONEZ,

      Plaintiff,

v.

LEPRINO FOODS COMPANY,

      Defendant.

---

## PLAINTIFF'S APPENDIX TO MOTION RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

1.      Excerpts from 30(b)(6) Deposition of Stephen Schmidt ………………………1-15

2.      Excerpts from Nicolas Donez Deposition ……………………………………..16-25

3.      Excerpts from Julia Lambert Deposition ……………………………………16-32

4.      Excerpts from Rita Esterly Deposition ……………………………………33-40

5.      Excerpts from Heather Donez Deposition ……………………………………41-56

6.      *State v. Levar*, Morgan County, Case No. 16CR36, Trial Transcript for 10/4/2016 ("Crim. Trans. I") ……………………………………………………57-266

7.      *State v. Levar*, Morgan County, Case No. 16CR36, Trial Transcript for 10/5/2016 ("Crim. Trans. II") ……………………………………………………267-327

8.      Defendant's Responses to Plaintiff's First Set of Discovery …………………328-346

9.      Leprino Investigation File, Deposition Exhibit 25 ………………………347-359

10.     February 22, 2016 Police Report, Deposition Exhibit 28 ………………………..360-384

11.     Email Dated 2/22/2016 re: Police Report, Deposition Exhibit 27 ………………385-388

12.     Email dated 2/26/2015 re: Award, Deposition Exhibit 24 ………………………389

13.   Leprino's Employee Handbook, Deposition Ex. 22 ……………………………...390-428

14.   Jury Verdict from *State v. Levar*, Morgan County, Case No. 16CR36……………429

15.   Leprino Response to Charge of Discrimination ……………………………………..430-433

16.   Denver Business Journal Article…………………………………………………………..434

17.   Lara Termination Notice, LEP0372………………………………………………………435

18.   Morrison Termination, Deposition Ex. 32………………………………………………436

19.   Crystal Campos Statement for Leprino Investiation ………………………………437

20.   Crystal Campos Termination ………………………………………………………………438

21.   Dryer Warning, Deposition Ex. 32………………………………………………………439

22.   Jedidiah Camacho Termination Letter, Deposition Ex. 30. …………………………440

Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT

 2           FOR THE DISTRICT OF COLORADO

 3   Civil Action No. 19-CV-00285-CMA
     _____
 4
     NICOLAS DONEZ,
 5
     Plaintiff,
 6
     v.
 7
     LEPRINO FOODS COMPANY,
 8
     Defendant.
 9   _____

10       RULE 30(B)(6) DEPOSITION OF LEPRINO FOODS COMPANY
11           GIVEN BY STEVEN C. SCHMIDT
                 November 8, 2019
12   _____

13           PURSUANT TO NOTICE and the appropriate
     rules of civil procedure, the deposition of STEVEN C.
14   SCHMIDT, as representative of Leprino Foods Company,
     called for examination by the Plaintiff, was taken on
15   Friday, November 8, 2019, commencing at 11:13 a.m. at
     Campbell Killin Brittan & Ray, LLC, 270 St. Paul
16   Street, Suite 300, Denver, Colorado, before Carmen
     Murphy, a Registered Professional Reporter and Notary
17   Public in and for the State of Colorado.

18

19
                    Dauster|Murphy
20                  www.daustermurphy.com
                    303.522.1604
21

22

23

24

25
```

Page 2

```
 1   APPEARANCES:

 2   ON BEHALF OF THE PLAINTIFF:

 3        AMY BURMA, ESQ.
          Burma Law Offices, LLC
 4        1035 Pearl Street
          Suite 325
 5        Boulder, Colorado 80302
          720-464-5655
 6        amy@burmalawoffices.com

 7   ON BEHALF OF THE DEFENDANT:

 8        WILLIAM C. BRITTAN, ESQ.
          Campbell Killin Brittan & Ray, LLC
 9        270 St. Paul Street
          Suite 300
10        Denver, Colorado 80206
          303-322-3400
11        bbrittan@ckbrlaw.com

12   Also Present:

13        Susanne E. Jennings, Esq., Leprino Foods

14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1                     I N D E X
 2   EXAMINATION:                          PAGE
 3   By Ms. Burma                             5
 4
 5   EXHIBITS:                             PAGE
 6
     Exhibit 20     Plaintiff's Fifth Amended     6
 7                  Notice of Rule 30(b)(6)
                    Deposition
 8
     Exhibit 21     Fort Morgan                  24
 9                  Self-Identification Race
                    Data for 30(b)(6) Deposition
10
     Exhibit 22     Employee Handbook, LEP0060 - 37
11                  97
12   Exhibit 23     Standards of Ethical and     44
                    Business Conduct (Revised
13                  January 12, 2012), LEP0005 -
                    30
14
     Exhibit 24     Email from Ms. Groves to     74
15                  Multiple People, 2/26/2015,
                    re:  Go the Extra Mile award
16                  (Archived), CONFIDENTIAL
                    LEP0988
17
     Exhibit 25     Fort Morgan Altercation      77
18                  Documents, LEP0140 - 152
19   Exhibit 26     Evidence/Property,           90
                    CONFIDENTIAL LEP0211
20
     Exhibit 27     Email Chain, top one dated   98
21                  2/22/2016, re:  Turnover
                    number at FTM, CONFIDENTIAL
22                  LEP0939 - 942
23   Exhibit 28     Fort Morgan Police          100
                    Department Incident Report,
24                  CONFIDENTIAL LEP0212 - 236
25
```

Page 4

```
 1   EXHIBITS (continued):                 PAGE
 2   Exhibit 29     Letter to Mr. Gibson from    111
                    Mr. Schmidt, 2/18/2016, re:
 3                  OSHA Activity No. 1062178,
                    CONFIDENTIAL LEP0392 - 393
 4
     Exhibit 30     Letter to Mr. Camacho from   116
 5                  Mr. Cole, 9/17/2012,
                    CONFIDENTIAL LEP0370
 6
     Exhibit 31     Employee Job Performance     122
 7                  Disciplinary Notification,
                    re:  Shawn Morrison,
 8                  CONFIDENTIAL LEP0375
 9   Exhibit 32     Memo to Personnel File from  124
                    Mr. Cole, 11/7/2012, re:
10                  Chris Dreher,  CONFIDENTIAL
                    LEP1158
11
     Exhibit 33     Memo to Mr. Carrillo-Nunez   125
12                  from Mr. Frisbie,
                    11/29/2018, re:  Violation
13                  of Harassment Prevention
                    Policy - Termination of
14                  Employment, CONFIDENTIAL
                    LEP389
15
     Exhibit 34     Profit-Sharing Document      127
16
17
18   PREVIOUSLY MARKED EXHIBITS:          PAGE
19   Exhibit  5                             42
20   Exhibit 14                            121
21   Exhibit 18                             92
22   Exhibit 19                             91
23
24
25
```

Page 37

1     **Q.**   Would that be a decision that Kelly Soja
2 would be involved in?
3     **A.**   No.
4     **Q.**   Okay. Does Leprino Foods have written
5 policies regarding what factors should be determined
6 in deciding whether or not to promote an employee?
7     **A.**   Not that I'm aware of.
8     **Q.**   I want to switch topics a little bit
9 here and talk about Leprino's actual policies that
10 they had that are pertinent to this case.
11     Can you -- did Leprino have disciplinary
12 policies for its employees at the Fort Morgan plant?
13     **A.**   The Fort Morgan Employee Guidebook has
14 their disciplinary policy.
15     **Q.**   Okay. And the Employee Guidebook, is
16 that the Employee Handbook?
17     **A.**   Yes.
18     **Q.**   Okay. I'll hand you what we'll mark as
19 Exhibit 22.
20     (Exhibit 22 marked for identification.)
21     **Q.**   (BY MS. BURMA) And I'll give you time
22 to look through it. Let me know if you recognize
23 this document.
24     **A.**   I do.
25     **Q.**   Okay. Can you tell me what it is?

Page 38

1     **A.**   It is the Fort Morgan Employee Handbook.
2     **Q.**   And is this -- does the Employee
3 Handbook contain all of the disciplinary policies for
4 employees at the Fort Morgan plant, or are there
5 additional policy and procedure documents that have
6 other guidelines?
7     **A.**   Fort Morgan disciplinary guidelines are
8 in this book. They are supposed to be. Mine stops
9 at page 30.
10     MR. BRITTAN: I'm sorry, yours --
11     THE DEPONENT: Mine stops at page 30.
12     MR. BRITTAN: Oh. Here. Let me --
13     MS. BURMA: Oh.
14     THE DEPONENT: Disciplinary guidelines
15 are on page 33.
16     MS. BURMA: Take mine. I'm sorry.
17     MR. BRITTAN: So we need to probably
18 mark another one as an exhibit, because the one
19 that's been marked as Exhibit 22 is apparently short.
20 He can use mine.
21     MS. BURMA: Okay. I thought I had
22 checked all of them.
23     MR. BRITTAN: So at a break, we can
24 re-mark this one as Exhibit 22.
25     MS. BURMA: Here are the pages that

Page 39

1 aren't included.
2     **Q.**   (BY MS. BURMA) Okay. Now, have you
3 gotten to the section of disciplinary policies?
4     **A.**   Yes.
5     **Q.**   Is this the disciplinary policies for
6 the employees at the Fort Morgan plant?
7     **A.**   Yes.
8     **Q.**   Do different plants have different
9 employee handbooks?
10     **A.**   Yes.
11     **Q.**   Why is that?
12     **A.**   We -- they're different.
13     **Q.**   Okay. For the Fort Morgan plant, did
14 Leprino have any zero tolerance policies?
15     **A.**   Not that I'm aware of.
16     **Q.**   Do you know -- can you describe to me
17 what your understanding of a zero tolerance policy
18 is?
19     **A.**   My definition of a zero tolerance policy
20 means that you're not going to tolerate it, and
21 whatever the infraction is, is going to be thoroughly
22 investigated, and that disciplinary action is going
23 to be taken up to and including termination based on
24 what's learned in the investigation.
25     **Q.**   Well, how does that differ from just

Page 40

1 conducting an investigation and -- strike that.
2     Does zero tolerance always result in
3 termination if it's determined that there was a
4 violation of the policy?
5     **A.**   It depends. It depends on the degree of
6 the violation and what was learned in the
7 investigation.
8     **Q.**   Okay. Let's take, for example, like,
9 drugs. If an employee is determined that they had
10 drugs on them at the time that they were at work,
11 would that be something that they would be
12 immediately terminated for?
13     **A.**   That would be on a very high scale of
14 severity and would lead to termination, yes.
15     **Q.**   Is there any circumstance in which an
16 employee would have drugs on them -- illegal drugs on
17 them during the time that they are working where they
18 would not be terminated?
19     **A.**   I can't speculate on that.
20     **Q.**   Are you aware of any such situation?
21     **A.**   Of?
22     **Q.**   Of an employee who had illegal drugs on
23 them and was not terminated?
24     **A.**   The times that I have been involved or
25 been over human resources --

Page 41

1   Q.   Yes.
2   A.   -- when that has been found, there has
3   been termination.
4   Q.   Any other conduct that, in your
5   experience, has resulted in termination?
6   A.   Any other conduct?
7   Q.   Such as -- is there anything else that
8   you can think of similar to being found with illegal
9   drugs that would result in immediate termination?
10  A.   There is so -- again, everything is
11  viewed through the scale of severity.
12  Q.   Uh-huh.
13  A.   And things that reach the end of the
14  scale of severity as the most severe -- whether it's
15  harassment, whether it's workplace violence -- will
16  lead to termination.
17  Q.   Okay.
18  A.   After an investigation.
19  Q.   So in your mind, zero tolerance doesn't
20  mean, if you -- if it's determined that you violated
21  that policy, you're automatically fired?
22  A.   Correct.
23  Q.   Okay.  Did the Fort Morgan plant have a
24  progressive disciplinary policy?
25  A.   Yes.  It's in this section.

Page 42

1   Q.   And what is a progressive
2   disciplinary -- what was Leprino's progressive
3   disciplinary policy?
4   A.   Leprino's or Fort Morgan's?
5   Q.   Fort Morgan's.
6   A.   So it's outlined on this section on
7   page 33, which -- a 5-step process, with the
8   paragraph below it that says, "There are situations,
9   however, where discipline is warranted (up to and
10  including termination) without the use of
11  progressive" disciplinary -- "progressive discipline
12  or counseling.  Each situation is reviewed carefully
13  with action taken appropriate to the
14  specific...circumstances."
15  Q.   Is this policy in place in
16  February 2016?
17  A.   I believe so.
18  Q.   What was -- did Leprino have a separate
19  policy for workplace violence?
20  A.   We have a workplace security policy,
21  yes.
22  Q.   Okay.  And if you look at Exhibit 5.
23  MR. BRITTAN:  In here.
24  Q.   (BY MS. BURMA)  Can you tell me what
25  Exhibit 5 is?

Page 43

1   A.   It's the Human Resources Workplace
2   Security Policy.
3   Q.   Is that provided to employees?
4   A.   It would be available to employees.
5   Q.   Is it -- strike that.
6   Did hourly employees receive training on
7   policies and procedures at the Fort Morgan plant?
8   A.   Yes.
9   Q.   How often did that training take place?
10  A.   It depends what policy it was.
11  Q.   What about for harassment and
12  discrimination?
13  A.   Trying to recall back then whether it
14  was annual or biannual.
15  Q.   So either annually or biannually,
16  employees were provided training on harassment or
17  discrimination; is that fair?
18  A.   Yes.
19  Q.   What did that training consist of?
20  A.   Back then, I believe it was a leader-led
21  PowerPoint presentation on harassment.
22  Q.   Do you recall how long the training
23  would take for harassment/discrimination?
24  MR. BRITTAN:  Let me just object to the
25  extent that it's a compound question.  I don't know

Page 44

1   if harassment and discrimination are two different --
2   MS. BURMA:  Okay.
3   MR. BRITTAN:  But to the extent you can
4   answer, go ahead.
5   Q.   (BY MS. BURMA)  Let's clear that up,
6   then.
7   Did Leprino have a harassment policy at
8   the Fort Morgan plant?
9   A.   Yes.
10  Q.   Did Leprino have a discrimination
11  policy?
12  A.   Yes.
13  Q.   Were they the same policy?
14  A.   No.
15  Q.   Okay.  What's -- first of all, is the
16  harassment and discrimination policy in Exhibit 22?
17  A.   No.
18  Q.   Let's mark this as Exhibit 23.
19  (Exhibit 23 marked for identification.)
20  (Discussion off the record.)
21  Q.   (BY MS. BURMA)  Do you recognize
22  Exhibit 23?
23  A.   Yes.
24  Q.   Can you tell me what that document is?
25  A.   Standards of Ethical and Business

Page 61
1  indicating whether or not Rita Esterly received
2  training on this policy during her on-board training?
3      A.   I'm unsure.
4      Q.   Or any documentation that Rita Esterly
5  received training on this policy at any other time?
6      A.   I'm unsure.
7      Q.   Okay.  Should disciplinary issues be
8  documented in employees' personnel files?
9      A.   Can you say that again?
10     Q.   Should disciplinary issues --
11  disciplinary actions be documented in employees'
12  personnel files?
13         MR. BRITTAN:  Let me object.
14         Again, can you indicate in which
15  paragraph of Exhibit A on the fifth amended 30(b)(6)
16  notice of deposition this narrative falls within?
17         MS. BURMA:  17.
18         MR. BRITTAN:  That addresses factual
19  information.  This is not factual information.  This
20  is more of an opinion.
21     Q.   (BY MS. BURMA)  Okay.  I will rephrase.
22         Is it Leprino Foods' policy to include
23  disciplinary actions in an employee's personnel file?
24     A.   Formal disciplinary action, yes.
25     Q.   What about informal disciplinary action,

Page 62
1  are those included in employees' personnel files?
2      A.   Can you explain what "informal
3  disciplinary action" is?
4      Q.   You said, yes, formal disciplinary
5  actions would be included in a personnel file,
6  correct?
7      A.   Yes.
8      Q.   Are there informal disciplinary actions?
9      A.   There may be a coaching or counseling.
10     Q.   Would that be included in an employee's
11  personnel file?
12     A.   It depends.
13     Q.   What does it depend on?
14     A.   Whether it's put in the file or not.
15     Q.   Does Leprino Foods have a policy as to
16  whether or not informal disciplinary actions should
17  be documented?
18     A.   Coaching and counselings.  We don't call
19  them informal disciplinary actions.
20     Q.   Does Leprino Foods have a policy as to
21  whether coaching or counseling should be documented
22  in an employee's personnel file?
23     A.   No.
24     Q.   With respect to the workplace violence
25  policy, who are employees supposed to report

Page 63
1  complaints of workplace violence to?
2      A.   They can report them to their
3  supervisor, their managers, human resources, the
4  plant manager, corporate office, ethics point
5  hotline.
6      Q.   Are the complaints required to be
7  written?
8      A.   No.
9      Q.   And so oral complaints are investigated
10  to the same extent as written complaints?
11     A.   Yes.
12     Q.   Once a complaint has been made, what is
13  the investigative process for workplace violence
14  violations?
15     A.   It's the same as any investigation
16  process.
17     Q.   Okay.  So before we get to the process,
18  does the process for, say, a complaint of
19  discrimination differ just in the procedure from the
20  process for a violation of workplace violence?
21     A.   No.
22     Q.   Okay.  So with respect to investigations
23  for violations of Leprino policies, what is the
24  procedure?
25     A.   So generally speaking, the complaint

Page 64
1  would reach human resources.  Human resources would
2  initiate a formal investigation that would entail
3  gathering statements, talking to witnesses,
4  looking -- assessing the facts gathered.
5      Q.   And in this case, it would have been
6  Rita Esterly and Julia Lambert that would have been
7  responsible for that initial investigation?
8      A.   No.
9      Q.   Who would have been responsible?
10     A.   Risa Esterly.
11     Q.   Okay.  Did -- does Leprino Foods have
12  guidelines as to how these investigations are
13  supposed to be completed, other than what's in the
14  documents that -- the policies that we've already
15  seen?
16         MR. BRITTAN:  Let me object to the
17  question as vague.
18         Go ahead.
19     Q.   (BY MS. BURMA)  I'll state it
20  differently.
21         Does -- to your knowledge, did Rita
22  Esterly receive any policy that is separate from
23  employee policies regarding how to conduct
24  investigations?
25     A.   No.

Page 65

1    Q.   Does -- is there any written policy for
2    Leprino Foods as to how human resources are supposed
3    to conduct investigations that only applies to human
4    resources managers that's not to employees?
5    A.   No.
6    Q.   Is there any written training material
7    that's provided to human resources managers regarding
8    how to conduct investigations at Leprino Foods, other
9    than the policies and procedures?
10   A.   Yeah.  So what I'm unsure of is the
11   written procedure.
12   Q.   Uh-huh.
13       Or -- when I say "written procedure,"
14   that when you get a complaint, you need to document
15   it, you know, take statements and, you know, what --
16   what an HR manager should do once they receive a
17   complaint.
18   A.   So conducting investigations is a core
19   competency of a senior-level HR manager.
20   Q.   Okay.
21   A.   So when we hire a senior-level HR
22   manager, they come with that experience and
23   education.
24   Q.   Okay.  Leprino Foods doesn't have
25   anything separate to say, "This is how we do it here

Page 66

1    at our company"?
2    A.   Nothing other than what's in those
3    documents.
4    Q.   Okay.  Who's responsible for determining
5    whether an employee gets a warning or gets
6    terminated?
7    A.   Generally speaking?
8    Q.   In this case, who was responsible for
9    determining whether -- strike that.
10       At the Fort Morgan plant, prior to 2016,
11   who was responsible for determining whether an
12   employee was disciplined or terminated?
13       MR. BRITTAN:  Let me just object as
14   vague.
15       But go ahead and answer if you can.
16   A.   Yeah.  So it depends.  And it depends on
17   what the violation or the infraction is.  So if it's
18   a job performance around just conducting your job,
19   that would normally follow the progressive
20   disciplinary process that is in the handbook.
21       If it's something of this magnitude,
22   like workplace violence, then the regional HR manager
23   is involved with the plant.  And in this case --
24   cases of this magnitude are then escalated to me.
25       So there's a one-over-one review; and in

Page 67

1    this case, a two-over-one review.
2    Q.   (BY MS. BURMA)  Okay.  Does Leprino
3    Foods have any guidelines as to what the regional HR
4    manager can handle on her own or make that decision
5    on her own versus what needs to be escalated up?
6    A.   Yes.  We had general guidelines around
7    escalation procedures of what authority level was.
8    Q.   Okay.  And what did those guidelines
9    provide?  Did they provide specifics saying that, you
10   know, in instances of violations of these policies,
11   this needs to be brought to the attention of the
12   regional manager?
13   A.   Yes.  And what I don't know is, in that
14   time period of '16, whether those were in written
15   format or verbally conveyed.
16   Q.   Okay.  If they were written, would
17   Leprino Foods still have copies of those policies?
18   A.   It wasn't a policy.
19   Q.   Or procedures, guidelines.
20   A.   Possibly.
21   Q.   Does workplace violence have to include
22   touching?
23   A.   No.
24   Q.   Does it have to involve the police?
25   A.   No.

Page 68

1    Q.   Can it consist of something as putting
2    your hand on someone's shoulder?
3    A.   Well, it depends on putting your hand
4    someone's shoulder.
5    Q.   Okay.  If an employee walks up, puts
6    their hand on an employee's shoulder -- another
7    employee's shoulder, would that constitute a
8    violation of the workplace violence policy?
9        MR. BRITTAN:  Let me, again, object.
10   The request, Exhibit A, paragraph 17, talks about
11   factual information relating to the Leprino Foods
12   employee policies.  You're asking now hypothetical
13   questions --
14       MS. BURMA:  I'm trying to --
15       MR. BRITTAN:  -- and opinion questions.
16       MS. BURMA:  I'm trying to obtain the
17   definition of "workplace violence," and I believe
18   this is definitely within the realm of the 30(b)(6).
19       MR. BRITTAN:  Well, I think he's already
20   provided you with his definition and the definition
21   of the policy of workplace violence for Leprino, so
22   that, to me, is factual information.  So I'll make an
23   objection as to the scope of this, and I believe it's
24   outside the Rule 30(b)(6).
25       Now, if you want to answer in your

**Page 73**

1 accurate? Was that Leprino's policy in 2016 for the
2 Fort Morgan plant?
3     **A.** It's in the Fort Morgan handbook.
4     **Q.** So is that accurate?
5     **A.** Well, it's prohibited. It says it's
6 prohibited.
7     **Q.** Okay. So was it Leprino's policy to
8 prohibit horseplay at the Fort Morgan plant in 2016?
9     **A.** Yes.
10     **Q.** Okay.
11     **A.** And it depends on the degree of it.
12     **Q.** Well, here, it doesn't say it depends on
13 the degree, correct? Does this -- does this include
14 whether or not it's the degree of horseplay?
15     **A.** It does not.
16     **Q.** And does this policy define "horseplay"?
17     **A.** Not that I saw there.
18     **Q.** Okay. I'm going to switch to Mr. Donez
19 at this point.
20     Was Mr. Donez qualified for his position
21 at the time of his employment?
22     MR. BRITTAN: Object to the form.
23 Vague.
24     **A.** He had been acting in the capacity of a
25 foreperson for years.

**Page 74**

1     **Q.** (BY MS. BURMA) Were you aware of any
2 issues regarding Mr. Donez's employment prior to his
3 termination?
4     MR. BRITTAN: Objection. Outside the
5 scope of the Rule 30(b)(6) notice.
6     Go ahead and answer in your individual
7 capacity.
8     **A.** I personally was not aware of any.
9     **Q.** (BY MS. BURMA) I'm going to hand you
10 what we'll mark as 24.
11     (Exhibit 24 marked for identification.)
12     **Q.** (BY MS. BURMA) So first of all, who is
13 Kenny Duggan?
14     **A.** I believe he was a former supervisor.
15     **Q.** Does it sound right saying that he was
16 Mr. Donez's supervisor at the -- in the final years?
17     MR. BRITTAN: Objection. Outside the
18 scope of the Rule 30(b)(6) deposition notice.
19     Go ahead and answer if you can in your
20 individual capacity.
21     **A.** Yeah, I did not know if he was his
22 supervisor.
23     **Q.** (BY MS. BURMA) Okay. What's the Go the
24 Extra Mile Award?
25     MR. BRITTAN: Same objection.

**Page 75**

1     **A.** It's an award -- it's an employee
2 recognition award.
3     **Q.** (BY MS. BURMA) Do you know if -- I
4 mean, this email seems to indicate that Mr. Donez was
5 provided with that award; is that correct?
6     MR. BRITTAN: Same objection. Outside
7 the scope.
8     Go ahead and answer in your individual
9 capacity.
10     **A.** I would like to read it first.
11     **Q.** (BY MS. BURMA) Go ahead. Let me know
12 when you're finished.
13     **A.** It appears that he may have been awarded
14 one of these, yes.
15     **Q.** And that was in -- approximately a year
16 before he was terminated, correct?
17     MR. BRITTAN: Objection. Same
18 objection. Outside the scope.
19     Go ahead and answer.
20     **A.** It appears that way.
21     **Q.** (BY MS. BURMA) Okay. When did you
22 personally first become aware of the incident on
23 February 9, 2016, between Mr. Donez and Frank Levar?
24     **A.** That day. Probably no more than
25 30 minutes after it took place.

**Page 76**

1     **Q.** Were you physically in the Fort Morgan
2 plant, or were you in a different location?
3     **A.** I was actually en route to Fort Morgan
4 for a meeting.
5     **Q.** Okay. Did you -- where was your
6 day-to-day office?
7     **A.** The corporate headquarters in Denver.
8     **Q.** Okay. After the -- how did you learn
9 about the incident?
10     **A.** I received a phone call from Kelly Soja.
11 She knew I was on my way up to Fort Morgan, and she
12 had received a phone call alerting her of the
13 situation.
14     **Q.** What did Ms. Soja tell you?
15     **A.** She told me that there was an incident
16 in the Fort Morgan plant, and that was it.
17     **Q.** Did she say whether or not an employee
18 was -- was hurt?
19     **A.** She may have. I don't recall.
20     **Q.** Do you know if she named the employee?
21     **A.** I don't recall.
22     **Q.** Do you know if she said there was an
23 assault or a fight?
24     **A.** I believe she said there was a fight.
25     **Q.** Any other information that you can

**Page 77**

1 recall from that conversation with Kelly Soja?

2      A.    No. It was a short phone call alerting

3 me of the situation.

4      Q.    Did you -- what was your response to

5 Kelly Soja?

6      A.    "I'm about 40 minutes from Fort Morgan."

7      Q.    Did you give Ms. Soja any instructions

8 on -- regarding what action to take with respect to

9 this incident?

10      A.    I didn't need to.

11      Q.    Okay. And why didn't you need to?

12      A.    Because she's a seasoned human resources

13 professional.

14      Q.    Did Leprino Foods conduct an

15 investigation involving the incident on February 9,

16 2016?

17      A.    Yes.

18      Q.    And I'm going mark this as 25.

19      (Exhibit 25 marked for identification.)

20      Q.    (BY MS. BURMA) Can you tell me what

21 this document is?

22      A.    It appears to be a compilation of notes

23 and investigation reports --

24      Q.    To your knowledge, is this --

25      MR. BRITTAN: Hold on.

**Page 78**

1      Did you finish your answer?

2      A.    -- and statements.

3      Q.    (BY MS. BURMA) Oh. I apologize.

4      Is this Leprino Foods' investigation

5 file for the February 9, 2016, incident?

6      A.    It's a portion of it.

7      Q.    What else would have been included in

8 the investigation file?

9      A.    The Fort Morgan police report.

10      Q.    Okay. Anything other than the Fort

11 Morgan police report?

12      A.    Not that I recall.

13      There would also -- I don't know if it's

14 in here. There would also be Nick Donez's written

15 statement that was obtained.

16      Q.    I believe that is in here.

17      A.    Is that in here?

18      Q.    Yeah. It's at the bottom, if you look

19 at LEP0147.

20      A.    Yes.

21      Q.    Is there any additional statement from

22 Nick Donez that Leprino Foods took that you are aware

23 of?

24      MR. BRITTAN: Object to the form.

25      Go ahead and answer.

**Page 79**

1      THE DEPONENT: Oh, okay.

2      A.    The additional statement I'm aware of is

3 that he confirmed with Risa over the telephone after

4 Risa received the Fort Morgan police report that --

5 Nick did confirm with her that he told me police

6 that when Frank pushed him, he pushed Frank back.

7      Q.    (BY MS. BURMA) Okay. And that was a

8 police statement, not a statement obtained by Leprino

9 Foods?

10      MR. BRITTAN: Object to the form.

11      Go ahead.

12      A.    The statement was obtained by the Fort

13 Morgan police, and then, as I said, Nick confirmed

14 that with Risa over the telephone.

15      Q.    (BY MS. BURMA) Leprino Foods conducted

16 its own separate investigation regarding the incident

17 on February 9, 2016, correct?

18      A.    We conducted an investigation, and then

19 there came a point when the Fort Morgan Police

20 Department took over.

21      Q.    So Leprino Foods conducted an

22 investigation, and the Fort Morgan police conducted

23 an investigation, correct?

24      A.    Yes.

25      Q.    And in Leprino Foods' investigation, we

**Page 80**

1 only have the one statement from Mr. Donez, correct?

2      MR. BRITTAN: Object to the form.

3      Go ahead.

4      A.    There's one written statement from

5 Mr. Donez.

6      Q.    (BY MS. BURMA) Okay. Who was involved

7 with investigating the incident for Leprino Foods?

8      A.    Risa Esterly, Kelly Soja. I believe

9 those were the only two that were investigating.

10      Q.    Did Leprino Foods cooperate with the

11 police during the investigation?

12      A.    Yes.

13      Q.    Were there any restrictions placed on

14 Leprino Foods' cooperation with the police?

15      A.    No.

16      Q.    Did Leprino Foods provide the police

17 with all the documents that they asked for from

18 Leprino?

19      A.    Yeah. So the police requested

20 statements we had gathered. We provided those to the

21 police. We provided -- we gave them access to the

22 facility. We gave them access to the employees they

23 wanted to speak with.

24      Q.    Do you recall if the police ever asked

25 for a copy of Mr. Levar's employment file?

Page 81

1  **A.**  I'm not sure.

2  **Q.**  Were there any time limits placed on

3  Leprino Foods' investigation of this incident?

4  **A.**  No.

5  **Q.**  Was there any restrictions as to how

6  many interviews Leprino Foods could conduct with

7  regards to this incident?

8  **A.**  No.

9  **Q.**  Was there any restriction as to whether

10  or not they had to get statements or if they could do

11  interviews when investigating this incident?

12  **A.**  Who's "they"?

13  **Q.**  Rita -- the people involved with

14  investigating.

15  **A.**  Could you restate that, please?

16  **Q.**  So I asked who investigated.

17  Rita Esterly and Kelly Soja conducted

18  the investigation for Leprino Foods regarding this

19  incident, correct?

20  **A.**  Yes.

21  **Q.**  And in general, when conducting

22  investigations, do -- are employees -- are witnesses

23  interviewed, or do they get written statements or

24  both?

25  **A.**  Either/or or both.

Page 82

1  **Q.**  Was there any requirements in this case

2  as to what Rita Esterly or Kelly Soja did regarding

3  either interviews or written statements?

4  **A.**  No.

5  **Q.**  Do you know if -- what was the purpose

6  of Leprino Foods' investigation?

7  **A.**  To investigate the incident that

8  happened in the plant.

9  **Q.**  So -- and based on what I can see, the

10  statements are either dated the day of the incident,

11  which was the 9th, or the 10th.

12  **A.**  Correct.

13  **Q.**  And the typed notes, which I believe the

14  last page of is LEP1 -- 0145.  Flip to the page

15  before that.

16  The last note was indicated at

17  February 10, 2016, correct?

18  MR. BRITTAN:  Object to the form.

19  Go ahead.

20  **A.**  Yes.

21  **Q.**  (BY MS. BURMA)  Is there anything else

22  in the investigative file, excluding the police

23  report, that is dated after February 10th, 2016?

24  **A.**  In this investigative file, I don't see

25  anything past that, other than I know that when Risa

Page 83

1  received the Fort Morgan Police Department report

2  that confirmed what Nick had told them: that when he

3  pushed -- that when Frank pushed him, he pushed Frank

4  back, she had a telephone conversation with Nick, and

5  he confirmed that.

6  **Q.**  I understand that.

7  But there's no notes regarding that

8  telephone conversation in -- in either -- in the

9  investigative file of the work that Leprino Foods did

10  in its investigation?

11  **A.**  No.  But I know it was part of the

12  decision.

13  **Q.**  And I'm not asking you what you know.

14  I'm just asking you, are there any notes regarding

15  that conversation between Rita Esterly and the Fort

16  Morgan police officer regarding what Nick said to him

17  or didn't say to him?

18  **A.**  I don't see any in here.

19  **Q.**  Are you aware of any?

20  **A.**  No.

21  **Q.**  Did Leprino Foods interview Mr. Donez

22  with respect to this incident?

23  **A.**  Risa talked to him the day of the

24  incident.  The next day, Nick, through his wife,

25  Heather Donez, provided his written statement, and

Page 84

1  then she talked with him after receiving the police

2  report.

3  **Q.**  Okay.  So -- now, Ms. Esterly went to

4  the hospital the day of the incident, correct?

5  **A.**  Correct.

6  **Q.**  Do you know how long after the incident

7  did Ms. Esterly go to the hospital?

8  **A.**  Shortly thereafter.

9  **Q.**  Do you know what her purpose was in

10  going to the hospital?

11  **A.**  Her purpose was to check on Nick and

12  also to take him some paperwork and ask him what

13  happened.

14  **Q.**  Did Ms. Esterly ask Mr. Donez what

15  happened when she was at the hospital speaking with

16  Mr. Donez?

17  **A.**  I believe so.

18  **Q.**  What was Mr. Donez's response?

19  **A.**  Can I refer to this?

20  **Q.**  Yes.

21  MR. BRITTAN:  Just for the record, you

22  were pointing to Exhibit 25.

23  THE DEPONENT:  Yes.

24  **A.**  I believe that is included in the first

25  paragraph on page 143.

### Page 93

1        Based on Leprino Foods' investigation,
2 Mr. Levar said to Ms. Esterly, "Consider this my exit
3 interview," correct?
4        A.   I believe that's what he said at one
5 point.
6        Q.   Wouldn't that indicate that Mr. Levar
7 was quitting?
8        A.   I don't know why he said that.
9        Q.   I mean, if someone said, "This is my
10 exit interview," that would seem to indicate that
11 they were resigning their position?
12        MR. BRITTAN:  Objection.  Asked and
13 answered.
14        A.   Frank Levar was placed on investigative
15 suspension on the day of the incident.
16        Q.   (BY MS. BURMA) Uh-huh.
17        But, I mean, he was -- he said, "Please
18 consider this my exit interview," so was there any
19 indication that Mr. Levar intended on coming back to
20 work?
21        A.   I don't know.
22        Q.   So there's no statement that Mr. Levar
23 made saying that he was going to come back to work,
24 correct?
25        A.   Not that I'm aware of.

### Page 94

1        Q.   Okay.  Is this -- and this termination
2 letter for Frank Levar was done on February 11th?
3        A.   Yes, that is the date.
4        Q.   That's two days after the incident,
5 correct?
6        A.   Yes.
7        Q.   Which was the day after the last notes
8 and statements in the investigation that Leprino
9 Foods did, correct?
10        MR. BRITTAN:  Object to the form.
11        A.   It's dated the 11th.
12        Q.   (BY MS. BURMA) Yes.  Okay.
13        And that was after Leprino Foods had
14 gathered its statements from employees for the
15 investigation, correct?
16        A.   For that portion of it, yes.
17        Q.   Okay.  And this says:  "...you did admit
18 to us you punched him," correct?
19        A.   Yes.
20        Q.   It doesn't say "pushed," right?
21        MR. BRITTAN:  Objection.
22        Go ahead.
23        A.   Correct.  It says:  "...you punched
24 him."
25        Q.   (BY MS. BURMA) And then it says:

### Page 95

1 "Leprino Foods Company has zero tolerance for
2 workplace violence," correct?
3        A.   Yes.
4        Q.   Is that Leprino Foods' policy with
5 respect to workplace violence?
6        A.   As I answered earlier, zero tolerance
7 means that if there's an incident that is deemed to
8 be workplace violence, we are going to investigate
9 it, and we're going to take appropriate action up to
10 and including termination based on what's found in
11 the investigation.
12        Q.   Okay.  I understand that.
13        But I want to know, is this accurate --
14 is this an accurate statement of Leprino policies --
15 policy for workplace violence?
16        A.   It's your interpretation of the words
17 "zero tolerance."  We are not going to tolerate it.
18 We are going to investigate it.
19        Q.   Okay.  Do you agree with that statement?
20        MR. BRITTAN:  What's -- object to --
21        A.   The ones I just said?
22        MR. BRITTAN:  Object to form.  Vague.
23        Q.   (BY MS. BURMA) Is this letter correct?
24        A.   It's correct in the form that we didn't
25 tolerate it, we investigated it, and we took the

### Page 96

1 appropriate action.
2        Q.   Is Exhibit 18, the termination letter
3 for Frank Levar, accurate?
4        MR. BRITTAN:  Objection.  Asked and
5 answered.  You're badgering the witness now.
6        MS. BURMA:  He's not answering my
7 question.
8        Q.   (BY MS. BURMA) I'm asking whether or
9 not there's anything incorrect in this letter.
10        MR. BRITTAN:  Go ahead and answer it
11 again.
12        Objection.
13        A.   So your question, is there anything
14 inaccurate?
15        Q.   (BY MS. BURMA) Yes.
16        A.   No.
17        Q.   Okay.  Who was involved with the
18 decision to terminate Mr. Levar?
19        A.   Same thing, up to me.
20        Q.   Okay.  And when did you make that
21 decision?
22        A.   Probably the day of the incident, based
23 on his statement where he admitted -- he was very
24 forthcoming, what happened, and admitted all the way
25 up to that he punched Nick.

**Page 97**

1     Q.  Okay. During the police portion of the
2 investigation, Leprino Foods sat in on the interviews
3 that the police officer did with Leprino employees,
4 correct?
5     A.  I'm thinking. I believe they did.
6     Q.  And it's my understanding that at least
7 part of the decision to terminate Mr. Donez was based
8 on statements in the police report, correct?
9     A.  Yes.
10     Q.  Was the entire police report reviewed
11 before making the decision to terminate Mr. Donez?
12     A.  I'm not sure.
13     Q.  If Leprino never received the police
14 report, would it have terminated Mr. Donez?
15     MR. BRITTAN: Objection. Calls for
16 speculation. Outside the area of the 30(b)(6).
17     You can go ahead and answer in your
18 individual capacity.
19     A.  It's my understanding that the Fort
20 Morgan Police Department, over the telephone or
21 either in person, informed Risa on the --
22 February 10th that when they interviewed Nick, that
23 Nick stated that when Frank pushed him, he pushed
24 Frank back. So we had -- we had that information
25 verbally, and the police department -- or the police

**Page 98**

1 report confirmed it in written form.
2     Q.  (BY MS. BURMA) I'm going to mark this
3 as Exhibit 27.
4     (Exhibit 27 marked for identification.)
5     Q.  (BY MS. BURMA) And if you flip to the
6 second page.
7     A.  I have two them of.
8     Q.  Oh. The second email at the top from
9 Julia Lambert on February 22, 2016, at 2:45 p.m., at
10 the bottom, it says: "FYI - Nick Donez is out
11 another week due to being dizzy and headaches,"
12 correct?
13     A.  Where are you, again, on this?
14     MR. BRITTAN: If I can, I'll point it
15 out to him.
16     Right here, I think.
17     THE DEPONENT: Oh, yeah. There we go.
18     Q.  (BY MS. BURMA) And this is an email
19 between Kelly Soja and Julia Lambert, correct?
20     A.  Yes, that's what it looks like.
21     Q.  And so at least as of February 22, 2016,
22 Nick was going to need additional time to recover and
23 had not been able to return to work, correct?
24     A.  Yes.
25     Q.  And then Kelly Soja responds at 4:43:

**Page 99**

1 "This isn't surprising on Nic.
2     "Did we get the police reports,
3 detective's statements on his conversations with
4 Nic...? We need those ASAP if we have not," right?
5     A.  Yes.
6     Q.  So if you go up on the next page, in the
7 middle, Kelly Soja sends an email February 22, 2016,
8 at 4:50 p.m. that says, "We need to press them for
9 that info this week. We need it. The longer this
10 goes, the less likely they will give it to us.
11     "If we don't get that detective's
12 statement on what Nic said to him, we probably can't"
13 terminate him -- or "term him," correct?
14     A.  That's what it says.
15     Q.  So it sounds like at that point, the
16 decision was made to terminate him if you received
17 the police statement, correct?
18     A.  I can't speculate why Kelly wrote that.
19     Q.  Do you disagree with her statement that
20 if we don't get that detective's statement on what
21 Nick said to him, we probably can't term him?
22     MR. BRITTAN: Same objection before.
23 Outside the scope of the 30(b)(6).
24     You can answer in your individual
25 capacity.

**Page 100**

1     A.  Did you say do I disagree with it?
2     Q.  (BY MS. BURMA) Yes.
3     A.  Can you state it again?
4     Q.  Do you agree with her statement?
5     MR. BRITTAN: Same objection.
6     Same instruction.
7     A.  No, I don't necessarily agree with that.
8     Q.  (BY MS. BURMA) Why not?
9     A.  You asked me if I did agree, and I said,
10 no, I don't.
11     Q.  Why not?
12     MR. BRITTAN: Same objection.
13     Same instruction.
14     Do you understand the question?
15     THE DEPONENT: Not really.
16     Q.  (BY MS. BURMA) Okay. Well, I withdraw
17 my question.
18     I'm going to hand you Exhibit 28.
19     (Exhibit 28 marked for identification.)
20     Q.  (BY MS. BURMA) Just one more last
21 question about Exhibit 27.
22     Kelly Soja was involved in the
23 investigation for Mr. Donez, right?
24     A.  Yes.
25     Q.  She was involved in a decision to

Page 105

1  Mr. Donez on February 29, 2016, says the reason he is
2  being terminated was that he verbally admitted that
3  he pushed his operator?
4       MR. BRITTAN:  Object to the form of the
5  question.
6           Can you read it back, please.
7       Q.  (BY MS. BURMA)  I'll withdraw that
8  question.
9       MR. BRITTAN:  Okay.
10      Q.  (BY MS. BURMA)  What reason is put --
11  did Leprino Foods put in its termination letter for
12  the basis of Mr. Donez's termination?
13      A.  That he pushed Frank, which is a
14  violation of our policy.
15      Q.  Okay.  Mr. Donez did request workers'
16  compensation benefits, correct?
17      A.  Well, yes, he received those.
18      Q.  And he was terminated I think about
19  17 days after he requested workers' compensation
20  benefits?
21      A.  Yeah.  I'm just -- I'm struggling with
22  your term "request."
23      Q.  Well, he signed the form for workers'
24  compensation benefits at the hospital, right?
25      A.  Yes.  We took them to him.

Page 106

1       Q.  Okay.
2       MR. BRITTAN:  Is this a good time for
3  another break?
4       MS. BURMA:  Yeah.  I --
5       MR. BRITTAN:  We've been going about an
6  hour and a half, I think.
7       MS. BURMA:  And I really don't have that
8  much more.
9       MR. BRITTAN:  Okay.  Great.  Let's take
10  a quick break.
11      MS. BURMA:  Hopefully.  Maybe.
12      (Recess taken from 2:02 p.m. to 2:20 p.m.)
13      Q.  (BY MS. BURMA)  When did you learn of
14  that conversation that Risa had with the Fort Morgan
15  police officer about what Nick said in his statement
16  to them?
17      A.  I'm not sure of the exact date.
18      Q.  Was it within the week following the
19  incident?
20      A.  Probably within the second week.
21      Q.  How did you learn about that
22  conversation?
23      A.  I believe it was through Kelly Soja.
24      Q.  Okay.  And do you recall anything about
25  what she said to you, other than what you've already

Page 107

1  testified to?
2       A.  Nothing other than that the Fort Morgan
3  police had verbally told Risa what I stated earlier.
4       Q.  And what was your response to her when
5  you learned about it?
6       A.  I don't recall.
7       Q.  At that point, had you made a decision
8  as to whether or not to terminate Mr. Donez?
9       A.  No.  I believe we were waiting on a
10  written report from the Fort Morgan Police
11  Department.
12      Q.  Okay.  Do you know how the written
13  report from the Fort Morgan Police Department was
14  delivered to Leprino?
15      A.  I don't know.
16      Q.  Do you know if it was emailed or faxed?
17      A.  I don't know.
18      Q.  Do you know who would know?
19      A.  I believe it went to Risa Esterly.
20      Q.  Okay.  So we've been talking a lot about
21  workplace violence -- violations -- strike that.
22          We've been talking a lot about what
23  constitutes a violation of Leprino's workplace
24  violence policy.
25          Is it fair to say that this is an

Page 108

1  objective standard?
2       A.  Can you define "objective standard"?
3       Q.  Well, I would consider a subjective
4  standard as being -- well, do you believe that
5  there's a difference between objective standards and
6  subjective standards?
7       A.  I don't know if I know the difference
8  between the two.
9       Q.  So is there -- there is not a certain
10  action that automatically constitutes workplace
11  violence, it depends on the investigation?
12      A.  It depends on the facts gathered in the
13  investigation.
14      Q.  Okay.  So I guess that's what I mean
15  by -- that it's objective, that there's no set,
16  hardline rule saying, this is for sure 100 percent
17  workplace violence?
18      MR. BRITTAN:  Object to form.
19      Go ahead and answer.
20      A.  Yeah.  Well, the policy we looked at
21  before has examples.
22      Q.  (BY MS. BURMA)  Would all of those
23  examples constitute violations of the workplace
24  violence policy?
25      A.  To some degree.

## Page 113

1  MR. BRITTAN: Object to the form.
2 Outside the scope of the 30(b)(6) notice.
3  You can answer in your individual
4 capacity.
5  A.  Should be accurate to what we know at
6 that time.
7  Q.  (BY MS. BURMA)  Okay.  I want to go now
8 to talk about other employees with violations of the
9 workplace violence policy at Leprino.  And based on
10 my understanding, since January 1, 2012, through
11 January 1, 2017, employees that were either
12 disciplined or terminated for workplace violence were
13 Kyle Lara, Jedidiah Camacho, Frank Levar, Nick Donez,
14 and Krystal Campos; is that correct?
15  A.  Can you say the date range again,
16 please?
17  Q.  And I can give you your supplemental
18 answers to discovery responses if you want to refresh
19 your memory.
20  A.  Sure.
21  So, yes, for this date range.
22  Q.  Uh-huh.
23  A.  Kyle Lara, Jedidiah Camacho, Frank
24 Levar, Nick Donez -- yes.
25  Q.  Okay.

## Page 114

1  A.  And I'm referring to the date range on
2 the interrogatory.
3  Q.  Yes.
4  A.  Okay.
5  Q.  For those five years and the date range
6 in the interrogatories, those are the employees that
7 you're aware of that were disciplined or terminated
8 for workplace violence?
9  A.  Yes.
10  Q.  Okay.  Let's start -- can I actually see
11 those back?
12  A.  Uh-huh.
13  Q.  Let's start with Kyle Lara.
14  A.  Uh-huh.
15  Q.  Kyle Lara was Hispanic, correct?
16  A.  I believe so.
17  Q.  Do you recall why Kyle Lara was
18 terminated?
19  A.  Yes.  He had an altercation with an
20 employee by the name of Chase Macase (phonetic).  He
21 struck Chase, I believe, two times in the head while
22 they were in the redline room.
23  Q.  The first time, did Mr. Levar strike him
24 in the hat, and then later, did an open-hand slap to
25 his face?  Does that sound accurate?

## Page 115

1  A.  Did --
2  MR. BRITTAN: I think you said "Levar."
3  Q.  (BY MS. BURMA)  Oh, sorry.  Lara.
4  A.  I would have to review the documents,
5 but I know that there was contact with his head.
6  Q.  Do you know who else was involved in
7 this altercation with Mr. Lara?
8  A.  The employee he hit was an employee
9 named Chase Macase.
10  Q.  Do you know whether or not Chase Macase
11 was white or Hispanic?
12  A.  I don't believe he self-disclosed.
13  Q.  The next one listed on here is Jedidiah
14 Camacho, correct?
15  MR. BRITTAN: I think you took it back.
16  Q.  (BY MS. BURMA)  Oh, I did.
17  A.  I was going to say, I don't have it
18 anymore.
19  Yes.
20  Q.  Do you know if Mr. Camacho is Hispanic?
21  A.  I believe he was.
22  Q.  Do you know why he was terminated?
23  A.  Yes.  He was making threatening
24 statements of workplace violence to coworkers.
25  Q.  And Frank Levar, we've discussed him.

## Page 116

1  Mr. Levar is Caucasian, correct?
2  A.  I believe so.
3  Q.  And are you aware of any previous
4 incidents involving Frank Levar in which he pushed
5 another employee?
6  A.  I'm personally not aware of it.
7  Q.  Did Mr. Levar or Mr. Camacho's incident
8 involve any physical touching?
9  A.  I believe you have the investigation
10 report and the notes, but upon -- if I can recall
11 from my review of it, it was -- I believe it was
12 primarily all making threats of workplace violence to
13 coworkers.
14  Q.  All right.  I'll hand you Exhibit 30.
15  (Exhibit 30 marked for identification.)
16  Q.  (BY MS. BURMA)  I've just handed you
17 Exhibit 30, which is a letter dated September 17,
18 2012, to Jedidiah Camacho that is signed Shane Cole.
19  A.  Uh-huh.
20  Q.  Is this Mr. Camacho's termination
21 letter?
22  A.  Yes, it is.
23  Q.  And in the last sentence of the first
24 paragraph, it says, "Such behavior is a direct
25 violation of the Company's workplace security policy

Page 117

1 and will not be tolerated."
2          What's the distinction between a
3 workplace security policy and a workplace violence
4 policy?
5      A.   So our workplace -- our position on
6 workplace violence is included in our workplace
7 security policy.  So the two terms are used
8 interchangeably.
9      Q.   Okay.  So "workplace safety" here also
10 refers to the workplace violence policy that we
11 talked about that's Exhibit 5?
12          MR. BRITTAN:  Can you read the question
13 back for me, please.
14      (The last question was read back.)
15          MR. BRITTAN:  Object to the form.
16 Misstates prior testimony.
17          Go ahead.
18      A.   No.
19      Q.   (BY MS. BURMA)  Oh.  So where's the
20 workplace safety policy?
21      A.   Workplace safety or workplace security?
22      Q.   Workplace security.  I apologize.
23      A.   Okay.  So the workplace security is
24 Exhibit -- in your exhibit book.  And workplace
25 violence is contained in the workplace security

Page 118

1 policy.
2      Q.   Okay.  Why does a company draft up
3 termination letters?
4          MR. BRITTAN:  Object to the form.
5 Outside the scope of the 30(b)(6) notice.
6          You can answer if you can in your
7 individual capacity.
8      A.   In the case here?  To inform the
9 employee why they were terminated.
10      Q.   (BY MS. BURMA)  Is it -- is it Leprino's
11 policy to provide accurate reasons for the
12 termination in the termination letters?
13      A.   No.
14      Q.   It's not the company's policy to provide
15 accurate information in the termination letters?
16      A.   No, it's not the company's policy to
17 provide the termination letter.  It's the individual
18 plant decision whether they provide a termination
19 letter or not.
20      Q.   If a termination letter -- can we agree
21 that if a termination letter is provided, Leprino
22 employees are -- it's Leprino's policy for the
23 letters to be accurate based on their investigations?
24      A.   Policy -- if a termination letter is
25 done, it should be an accurate reflection.

Page 119

1      Q.   Okay.  Next person on there is Shawn
2 Morrison.
3          Do you recall when Shawn Morrison was
4 terminated?
5      A.   Shawn Morrison is not on this list.
6      Q.   Oh, no, he's not.  Oh, Nicolas Donez.
7 We don't need to talk about Mr. Donez.
8          Krystal Campos is the next one; is that
9 correct?
10      A.   Yes.
11      Q.   And Krystal Campos is Hispanic, correct?
12      A.   Yes.
13      Q.   Frank Levar was arrested following the
14 incident on February 22, 2016?
15          MR. BRITTAN:  February 9th?
16          MS. BURMA:  February 9, 2016.
17      A.   My personal knowledge of that, I don't
18 have, but I believe it might be in the police report.
19      Q.   (BY MS. BURMA)  Are you aware that
20 Mr. Levar was found guilty of assault in a criminal
21 trial?
22      A.   I was aware of it recently, yes.
23      Q.   Some of Leprino's employees were
24 subpoenaed and testified in the criminal trial,
25 correct?

Page 120

1      A.   Yes.
2      Q.   Krystal Campos.  Do you recall why
3 Krystal Campos was terminated?
4      A.   She kicked another employee in the
5 groin.
6      Q.   And are you certain that she kicked the
7 employee in the groin?
8      A.   That's what was in the investigation.
9      Q.   That's what the investigation concluded?
10      A.   Yes.  And that's what the employee
11 stated she kicked in the groin.
12      Q.   Who's Mandy Phillips?
13      A.   I know she's an employee of Fort Morgan,
14 but I'm not sure exactly what she did.
15      Q.   I want to go now and talk about a couple
16 of other employees.
17          Shawn Morrison.  If you look at
18 Exhibit 14 -- strike that.
19          Are you aware of any complaints that
20 Heather Donez made regarding Shawn Morrison in 2016?
21      A.   Yes.
22      Q.   What do you know about that complaint?
23      A.   I know that she wrote a letter that I
24 believe was submitted to the corporate office.
25      Q.   Do you know what her complaint

Page 121

1  specifically was?
2      A.   She had some complaints around Shawn
3  Morrison.  I'd need to see the document to be sure.
4      Q.   Can you go to Exhibit 14?
5      A.   Yeah.  I don't have a 14.
6      Q.   Oh.
7          MR. BRITTAN:  Here you go.
8          Is that still warm, Steve?
9          THE DEPONENT:  No, but that's okay.  Not
10 picky.
11         MR. BRITTAN:  Are you good?
12         THE DEPONENT:  Yeah.
13         MR. BRITTAN:  That's 14.  I think he's
14 reviewed it.
15     Q.   (BY MS. BURMA)  Oh, sorry.
16         Is this what you recall regarding the
17 complaint that Ms. Donez made in 2016 with respect to
18 Shawn Morrison?
19     A.   Yes, this is the letter she sent.
20     Q.   Was Mr. Morrison disciplined as a result
21 of -- strike that.
22         Did Leprino conduct an investigation
23 into Ms. Donez's complaints about Mr. Morrison?
24     A.   There already had been an investigation
25 into this, I believe.  I know there's -- I believe we

Page 122

1  produced some documents regarding an investigation
2  and a counseling with Mr. Morrison.
3      Q.   Mr. Morrison is Caucasian, correct?
4      A.   Yes.
5      Q.   I'm going to hand you what we'll mark as
6  31.
7          (Exhibit 31 marked for identification.)
8      Q.   (BY MS. BURMA)  Is this the written
9  warning --
10     A.   Yeah.
11     Q.   -- that Mr. Morrison was given?  "Yes"?
12     A.   Uh-huh.  Yes.
13     Q.   And if you look at Exhibit 14, the
14 second page, it's dated April 6, 2016?
15     A.   Yes.
16     Q.   And this warning is issued April 18,
17 2016?
18     A.   Yes.
19     Q.   And he was disciplined for unacceptable
20 behavior for "The other day you were seen picking up
21 another employee around the waist.  Engaging in this
22 type of behavior is not suited for the workplace."
23 At least that's what the warning says, correct?
24     A.   Yes.
25     Q.   Was -- is this warning issued for

Page 123

1  violations of the workplace violence policy or for a
2  different policy?
3      A.   It's a general warning around
4  unprofessional behavior in the workplace.
5      Q.   Did his behavior violate the workplace
6  violence policy for Leprino Foods?
7      A.   Based on what I saw of the
8  investigation?  No.
9      Q.   Okay.  And Mr. Morrison admitted to
10 picking up another employee, correct?
11     A.   I believe so.
12     Q.   Mr. Morrison was eventually terminated
13 from Leprino Foods, correct?
14     A.   Yes.
15     Q.   And he was terminated as a result of
16 threatening to bring in a gun and shoot employees at
17 the plant?
18     A.   Mr. Morrison was terminated for threats
19 of workplace violence.
20     Q.   Did Leprino actually have to take legal
21 action against Mr. Morrison?
22         MR. BRITTAN:  Object to the form.
23         Go ahead.
24     A.   We did take legal action against
25 Mr. Morrison.

Page 124

1      Q.   (BY MS. BURMA)  What did Leprino do?
2      A.   We got a restraining order.
3      Q.   I'm going to hand you what will be
4  marked as Exhibit 32.
5          (Exhibit 32 marked for identification.)
6      Q.   (BY MS. BURMA)  And can you tell me what
7  Exhibit 32 is.
8      A.   I'm going to read it first.
9      Q.   Let me know when you're finished.
10     A.   This is a counseling memo to file to --
11 regarding Chris Dreher.  Not sure if that's how you
12 pronounce his name.
13     Q.   Was this a memo about investigation into
14 possible workplace violence and bullying?
15     A.   That's what it says.
16     Q.   It's signed by Shane Cole, correct?
17     A.   Correct.
18     Q.   Who is Shane Cole?
19     A.   He is the former Fort Morgan human
20 resources manager.
21     Q.   So he previously held Risa Esterly's
22 position?
23     A.   Correct.
24     Q.   And Mr. Dreher is Caucasian, correct?
25     A.   I believe so.

Page 125

Q. And he was not terminated as a result of the investigations that Leprino conducted, correct?
A. Correct. Based on what was found during the investigation.
Q. He was issued a warning, correct?
A. Yes.
Q. Was there an issue in 2012 with Leprino consistently applying its policies with respect to bullying in the Fort Morgan plant?
A. Not that I'm aware of.
Q. One more. I'll hand you what's been marked as Exhibit 33.
(Exhibit 33 marked for identification.)
Q. (BY MS. BURMA) Let me know when you're done reviewing it.
A. Okay.
Q. Can you tell me what Exhibit 33 is?
A. It's a termination letter for employee Edgar Carrillo-Nunez.
Q. Why was Mr. Nunez -- is Mr. Edgar Carrillo-Nunez Hispanic?
A. Yes.
MR. BRITTAN: I'm going to object to any questions on this area in this memo. It's outside the scope of 30(b)(6).

Page 126

But you can obviously answer these in your individual capacity.
Q. (BY MS. BURMA) Okay. In the second paragraph, it says: "On Tuesday, November 20, 2018, you had been involved in a conversation with another employee, after the completion of the conversation, you took a company tool and inappropriately touched the backside of the co-worker," correct?
A. That's what it says.
Q. Is -- was that the basis for Mr. Carrillo-Nunez's termination?
A. This is a polite way to say where he put the wrench on that other employee.
Q. Where did he put the wrench?
A. In the employee's rectum. Not in, but through his pants.
Q. Through his --
A. Well, against his pants.
Q. Okay. Do you recall who the other employee was?
A. I don't know for sure.
Q. So that's a polite way for saying the basis for the termination was that he put a wrench into the butt crack of another employee?
A. Yes.

Page 127

Q. For lack of a politer term.
Okay.
A. And then, in the gestures, he would pull it out and smell it.
Q. Okay. Was Mr. Carrillo-Nunez terminated as a result of harassment, workplace violence, or both?
A. Violation of our harassment prevention policy. Sexual harassment.
Q. Are you aware of any other time in which the police were called to the Fort Morgan plant to deal with an assault between two employees within the last ten years?
MR. BRITTAN: Objection to the form.
Go ahead.
A. I'm not aware.
Q. (BY MS. BURMA) Are you aware of any other employee who was terminated between January 1, 2012, and January 1, 2017, at the Fort Morgan plant for workplace violence other than the ones that we have discussed?
A. I'm not aware of others.
Q. I'm going to hand you what we're going to mark as Exhibit 34.
(Exhibit 34 marked for identification.)

Page 128

Q. (BY MS. BURMA) Can you tell me what Exhibit --
MR. BRITTAN: 34.
MS. BURMA: 34. Can I?
MR. BRITTAN: Yeah. There you go.
Q. (BY MS. BURMA) Can you tell me what Exhibit 34 is?
A. It's the profit-sharing contribution percent from the years 2013 to 2018.
Q. And are those percentages that the employee -- how is the profit sharing calculated for Leprino?
A. It's based on the profitability of the company.
Q. Okay.
A. And then the money that is deemed to go into profit sharing is then broken out based on the number of people in the plan. That profit-sharing percent is a mix of the company contribution to the 401(k) and then the profit-sharing plan.
Q. Did all the employees at -- do all the employees at the Fort Morgan plant receive profit sharing?
A. If they are -- if they are over -- if they meet the criteria over one year of employment.

1          IN THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF COLORADO

3   Civil Action No. 19-CV00285-CMA

4   _____

    VIDEO DEPOSITION OF:  NICOLAS DONEZ - August 26, 2019

5   _____

6   NICOLAS DONEZ,

7   Plaintiff,

8   v.

9   LEPRINO FOODS, INC.,

10  Defendant.

11  _____

12          PURSUANT TO NOTICE, the video deposition
    of NICOLAS DONEZ was taken on behalf of the Defendant
13  at 1035 Pearl Street, Suite 325, Boulder, Colorado, on
    August 26, 2019, at 9:54 a.m., before Carmen Murphy,
14  Registered Professional Reporter and Notary Public
    within Colorado.

15

16

17

18

19

20          **H+G**

21

22  Hunter + Geist, Inc.

23  303.832.5966        1900 Grant Street, Suite 1025    ▪ www.huntergeist.com
    800.525.8490        Denver, CO 80203                 ▪ scheduling@huntergeist.com

24                      Your Partner in Making the Record

25

Court Reporting, Legal Videography, and Videoconferencing

Page 3

```
1          IN THE UNITED STATES DISTRICT COURT
2             FOR THE DISTRICT OF COLORADO
3    Civil Action No. 19-CV00285-CMA
     _____
4
     VIDEO DEPOSITION OF:  NICOLAS DONEZ - August 26, 2019
5
6    NICOLAS DONEZ,
7    Plaintiff,
8    v.
9    LEPRINO FOODS, INC.,
10   Defendant.
11   _____
12           PURSUANT TO NOTICE, the video deposition
     of NICOLAS DONEZ was taken on behalf of the Defendant
13   at 1035 Pearl Street, Suite 325, Boulder, Colorado, on
     August 26, 2019, at 9:54 a.m., before Carmen Murphy,
14   Registered Professional Reporter and Notary Public
     within Colorado.
15
16
17
18
19
20
21
22
23
24
25
```

```
1                     I N D E X
     EXAMINATION OF NICOLAS DONEZ:              PAGE
2    August 26, 2019
3    By Mr. Brittan                               5
4
5                                             INITIAL
     DEPOSITION EXHIBITS:                     REFERENCE
6
     Exhibit 1    Employee Warning Record,       56
7                 LEF0580
8    Exhibit 2    Memo from Julia Lambert,        58
                  5/11-12/2009, re:  Meeting
9                 with Howie & Nick
10   Exhibit 3    Photograph                      85
11   Exhibit 4    Photograph                      85
12   Exhibit 5    Leprino Foods Corporate         99
                  Operations Manual,
13                LEP0040 - 47
14   Exhibit 6    Document dated 2/10/2016,      102
                  LEP0147
15
     Exhibit 7    Equal Employment Opportunity   107
16                Commission Intake
                  Questionnaire
17
     Exhibit 8    Tax Documents, CONFIDENTIAL    171
18                DONEZ 0147 - 159
19   Exhibit 9    Plaintiff's Supplemental       198
                  Response to Defendant's
20                Interrogatories
21
22
23
24
25
```

Page 2

```
1              A P P E A R A N C E S
2
     For the Plaintiff:
3
                 AMY BURMA, ESQ.
4                Burma Law Offices, L.L.C.
                 1035 Pearl Street
5                Suite 325
                 Boulder, Colorado 80302
6                720-464-5655
                 amy@burmalawoffices.com
7
8
     For the Defendant:
9
                 WILLIAM C. BRITTAN, ESQ.
10               Campbell Killin Brittan & Ray, L.L.C.
                 270 St. Paul Street
11               Suite 300
                 Denver, Colorado 80206
12               303-322-3400
                 bbrittan@ckbrlaw.com
13
14
     Also Present:
15
                 Susanne E. Jennings, Esq., Leprino Foods
16               John Jensen, Videographer
17
18
19
20
21
22
23
24
25
```

Page 4

1   WHEREUPON, the following proceedings
2   were taken pursuant to the Federal Rules of Civil
3   Procedure.
4       *    *    *    *    *
5       THE VIDEOGRAPHER:  Good morning.  We are
6   on the record.  The time is 9:54 a.m. on August 26,
7   2019.  We are here for the videotaped deposition of
8   Nicolas Donez in the matter of Nicolas Donez v.
9   Leprino Foods Company in the United States District
10  Court For the District of Colorado, Civil Action
11  Number 19-CV00285-CMA.
12      The deposition is being held at
13  1035 Pearl Street, Suite 325, Boulder, Colorado.  The
14  videographer is John Jensen, and the court reporter is
15  Carmen Murphy with Hunter + Geist, Inc., a U.S. Legal
16  Company, of Denver, Colorado.
17      Please note that audio and video
18  recording will take place until all parties have
19  agreed to go off the record.  Microphones are
20  sensitive and may pick up whispers, private
21  conversations, and cellular interference.
22      Will counsel please state their
23  appearances beginning with plaintiff's counsel.
24      MS. BURMA:  Amy Burma on behalf of the
25  plaintiff, Nicolas Donez.

Page 9

1    Q.   Okay.  What is your age, sir?
2    A.   I am 55 years old.
3    Q.   What is your current home address?
4    A.   516 Custer Street, Brush, Colorado
5    80723.
6    Q.   Who do you live there with?
7    A.   I live with my wife, Heather Donez, and
8    my son Jeremiah Donez.
9    Q.   How long have you and Heather been
10   married?
11   A.   We have been married -- 2013.  We have
12   been married seven years.
13   Q.   Do you have any children from that
14   marriage?
15   A.   Jeremiah Donez.
16   Q.   And how old is Jeremiah?
17   A.   Jeremiah is 17.
18   Q.   How long were you and Heather a couple
19   before your marriage?
20   A.   Before our marriage, let's see -- ten
21   years.
22   Q.   Do you have any other children from any
23   other spouse or partner other than Jeremiah?
24   A.   Yes, sir, I do.
25   Q.   And can you tell me the names and ages

Page 10

1    of those children?
2    A.   Anthony Donez; he is 34.  Matthew; he is
3    33.  Judas; I'm not exactly sure how old he is.
4    Q.   Can you give me kind of a range?
5    A.   I'd say 25.  Then Jessica Donez, and she
6    is 22.
7    Q.   Did your wife, Heather, have any other
8    children before you two were married?
9    A.   Yes.  She has a daughter, Hannah, and
10   she is 19.
11   Q.   Anyone else?
12   A.   No, sir.
13   Q.   I'm aware that Judas Donez, your son,
14   worked for a period of time at the Leprino Foods plant
15   in Fort Morgan.  Did any of your other children --
16   specifically Anthony, Matthew, Jessica, or Jeremiah --
17   work at -- work for Leprino Foods at any time?
18   A.   No, sir.
19   Q.   And Hannah, is she still employed at
20   Leprino Foods?
21   A.   Yes, sir, she is.
22   Q.   At the Fort Morgan plant?
23   A.   Yes.
24   Q.   And Heather is still employed there as
25   well?

Page 11

1    A.   Yes, she is.
2    Q.   Where were you born, sir?
3    A.   I was born in Harlingen, Texas.
4    Q.   What year?
5    A.   1964.
6    Q.   And what is your national origin?
7    A.   Hispanic.
8    Q.   When did you move to the Colorado area?
9    A.   I believe that was in -- one, two,
10   '67 -- '67 or '68.
11   Q.   How old were you at that time?
12   A.   3 years old.
13   Q.   Okay.  I understand why you're not too
14   sure, but it was within that time frame?
15   A.   Yes, sir.
16   Q.   And have you lived in Colorado since the
17   time you moved here when you were approximately 3?
18   A.   Yes, sir.
19   Q.   And during that period of time, have you
20   always lived in the Fort Morgan/Brush area of
21   Colorado?
22   A.   Yes, sir.
23   Q.   Can you give me an understanding of your
24   educational background?
25   A.   High school graduate.

Page 12

1    Q.   Which high school was that, sir?
2    A.   Fort Morgan.
3    Q.   What did you do after graduation from
4    Fort Morgan High School?
5    A.   Right into construction, working.
6    Q.   And what year did you graduate from Fort
7    Morgan?
8    A.   1982.
9    Q.   What was the company that you went to
10   work for initially out of high school?
11   A.   Century Housing.
12   Q.   What were you doing for them?
13   A.   They were a modular home manufacturer.
14   Q.   Specifically can you give me an
15   understanding -- strike that.
16   Let me ask it this way:  How long did
17   you work for Century Housing?
18   A.   Five years.
19   Q.   During that period of time, can you give
20   me an understanding of maybe what your initial
21   position was with the company -- maybe like a laborer,
22   a carpenter -- and then the other positions that you
23   had over the course of those five years?
24   A.   I was a laborer.  I did framed
25   interior/exterior walls, laid carpet.  Shingled the

Page 41

1    responsibilities as a foreperson in the whey
2    department change if there's no supervisor?
3        A.  Yes, sir.
4        Q.  So you earlier told me what your
5    responsibilities were as a whey department foreperson,
6    and one of them was assist the supervisor if needed.
7            If the supervisor isn't present, how do
8    your duties and responsibilities change?
9        A.   Then there's paperwork that needs to be
10   filled out for the supervisors.  Any calls that are
11   made for the supervisor, I would have to respond.  And
12   if any work needed to be done maintenance-wise, I
13   would have -- I would -- I was responsible for that
14   also that day.
15       Q.  So it sounds like as a foreperson on
16   this shift at that time, since Mr. Duggan wasn't
17   there, you had additional responsibilities?
18       A.  Yes, sir.
19       Q.  How long had you known Mr. Levar before
20   the day of the incident?
21       A.  The entire time that he worked there in
22   the whey department.  So I would have to say -- I'm
23   not exactly sure about the time frame, but somewhere
24   between eight and ten years.
25       Q.  What was Mr. Lavar like during those

Page 42

1    eight to ten years that you were working with him?
2        A.  As far as?
3        Q.  Well, I guess, if I ask you what kind of
4    a guy is Frank Levar, right?  Knowing that you had
5    worked with him for at least eight to ten years in the
6    same department, you know, what could you tell me --
7    and I guess I'm wanting to know, before the day of the
8    incident that you had with him on February 9, 2016,
9    what would you have said to me about what kind of a
10   guy Frank Levar is?
11       A.  He was a good individual.  I mean, we
12   got along.  He had the tendency -- he was
13   hot-tempered.  He would -- I always thought that he
14   would -- phrasing it, make a mountain out of a
15   molehill.  He would over- -- he would just blow things
16   out of proportion at times.
17       Q.  Did you ever have any problems with him
18   before the date of your incident?
19       A.  Not to my recollection.
20       Q.  You earlier mentioned a situation where
21   Mr. Levar was involved with a situation I think you
22   said with a supervisor or someone of authority.  Let's
23   talk about that situation in a little more detail.
24   Okay?
25           First of all, this situation you're

Page 43

1    talking about, prior to the date of your incident with
2    Mr. Levar, when did that take place?
3        A.  I'm not exactly sure what day or time
4    that took place.
5        Q.  Can you give me a best estimate?  I
6    mean, are we talking about a week before?  A year
7    before?  Five years before?
8        A.  Five -- about five years before.
9        Q.  Okay.  So that would put it -- just to
10   be fair to you, it would somewhere around the 2011,
11   2012 time frame?
12       A.  Yes, sir.
13       Q.  Okay.  Now going back to what we talked
14   about beginning at the deposition, what you know
15   versus what you understand.
16       A.  Uh-huh.
17       Q.  Okay.  Do you have any personal
18   knowledge about what happened in that incident?
19       A.  No, sir.
20       Q.  Okay.  So what we're talking about is
21   your understanding of what happened in this incident
22   back in 2011 or 2012 with Frank Levar is something
23   you've heard from other people?
24       A.  Yes, sir.
25       Q.  First of all, let me ask you this question:

Page 44

1    Where did you get your understanding from?  In other
2    words, who did you talk to about this prior incident
3    with Mr. Levar?
4        A.  Shane Tucker, the foreman that he had
5    the issue with, told me about it.  Dave Ocanos at the
6    time was bagging in the bagging room and visually seen
7    this occur.  And Darin Weegan.
8        Q.  Keep going.
9        A.  Darin Weegan was a supervisor at the
10   time, and he was present in the office when it
11   occurred.
12       Q.  And did you talk with both -- strike
13   that.
14           Did you talk with Mr. Tucker,
15   Mr. Ocanos, and Mr. Weegan, all three of them, after
16   the incident at some point?
17       A.  Yes, sir.
18       Q.  All right.  What did Mr. Tucker tell you
19   occurred in this incident involving Frank Levar?
20       A.  He told me that Frank had walked into
21   the office, said that he was going to go on a break,
22   and Shane replied, "Is your relief operator aware of
23   this?  And if not, you need to get with your relief
24   operator."
25           Frank said that -- or excuse me.  Shane

Page 61

1   he is done answering a question before you respond.
2          THE DEPONENT:  Okay.
3      Q.  (BY MR. BRITTAN)  That was,
4   unfortunately, one of the things I forgot to mention,
5   is it's much easier for the court reporter to take
6   down one person speaking at the same time -- or one
7   person speaking.  So if you can give me the courtesy
8   of finishing my question before you begin your answer,
9   she'll get a cleaner record.
10     A.  I apologize.
11     Q.  No problem.
12         What was your belief with regards to why
13  Mr. Morrill was -- I think your term was harassing
14  your wife?  Why did you believe Mr. Morrill was
15  harassing your wife?
16     A.  We never saw eye to eye.  Once I
17  started -- Heather and him had a good working
18  relationship.  Once I started seeing my wife, then we
19  both noticed the change in his attitude towards my
20  wife.
21     Q.  So let me see if I understand that.
22         He had a good working relationship with
23  your wife, Heather?
24     A.  Uh-huh.
25     Q.  And then once you started working at

Page 62

1   Leprino Foods --
2      A.  Once I started seeing Heather.
3      Q.  I see.  Once you started seeing
4   Heather -- which was approximately when, sir?
5      A.  2000- -- let me think.  I believe it was
6   2000, in the year 2000.
7      Q.  So your belief was that once you started
8   seeing Heather, Mr. Morrill's relationship with
9   Heather changed, and he began to essentially give her
10  a hard time?
11     A.  That's -- that's correct.
12     Q.  And was Mr. Morrill somehow in a
13  position at the Fort Morgan plant to give Heather a
14  hard time?
15     A.  Yes.  He was, at that time, her
16  foreman -- foreperson.
17     Q.  And so you confronted Mr. Morrill in the
18  parking lot at the Fort Morgan plant and told him
19  what, again, sir?
20     A.  I asked him that if it was work-related,
21  there is not a thing that I can do about it.  But when
22  it becomes a personal issue, then it's harassment.  So
23  I asked him to stop.
24     Q.  Stop what?
25     A.  Stop harassing my wife.

Page 63

1      Q.  What did Mr. Morrill say?
2      A.  He didn't take it very well and said
3   that if we had a problem, then we needed to take it
4   upstairs.
5      Q.  And it got taken upstairs, didn't it?
6      A.  Yes, sir.
7      Q.  And that's one of the situations that
8   led to the memo which we have marked as Exhibit
9   Number 2, correct?
10     A.  That's correct.
11     Q.  Did you ever call -- strike that.
12         So you were upset by the way that
13  Mr. Morrill was harassing Heather, correct?
14     A.  When it came to personal issues.
15     Q.  What --
16     A.  Taking time off.  "Why do you need that
17  time off?  Can't you figure out something else?
18  Can't" -- that, for example.  It's absolutely none of
19  his business why she needs the time off.  His response
20  as a foreperson is to rely that "Yes, you can," "No,
21  you can't" but -- once he spoke with a supervisor.
22     Q.  You began dating Heather, as I
23  understand it, in approximately 2000?
24     A.  To the best of my knowledge, yes.
25     Q.  And after that is when you believe

Page 64

1   Mr. Morrill's relationship -- vis-a-vis Mr. Morrill
2   and Heather -- changed, correct?
3      A.  Yes.
4      Q.  Essentially are you saying that you
5   believe Mr. Morrill was jealous?
6      A.  No.  I believe that Mr. Morrill did not
7   like me.  So -- and he knew that I was extremely
8   protective of my wife.  So his way of getting under my
9   skin would be to react in that manner towards my wife.
10     Q.  What is your -- strike that.
11         What is your belief as to why
12  Mr. Morrill did not like you?
13     A.  I never gave it any thought.  It didn't
14  matter to me.
15     Q.  Had you ever worked with Mr. Morrill?
16     A.  I have had to -- yes.  As forepersons,
17  we had -- we had to interact.
18     Q.  You had to interact how?
19     A.  If he ever had any issues, he would get
20  ahold of me to correct or assist him with that -- with
21  whatever issue arose.
22     Q.  Just so I'm clear, Mr. Morrill was on
23  the cheese side?
24     A.  That's correct.
25     Q.  You were on the whey side?

Page 81

1   on that shift before your incident with him?
2       A.  I would say overseeing his equipment.
3       Q.  Do you remember if he had any issues
4   with his equipment?
5       A.  Yes, I do.
6       Q.  What was -- what were the issues that he
7   was having?
8       A.  He was having issues with the refiners.
9       Q.  What issues was he having, if you know?
10      A.  I can't remember.
11      Q.  Tell me about your -- setting aside for
12  the moment the incident that occurred between you and
13  Mr. Levar.  Prior to that on that shift, had you had
14  any communications with him?
15      A.  No, not to my knowledge.
16      Q.  Tell me what occurred, then, between you
17  and Mr. Levar at the time of the incident.  And if you
18  can, tell me also where it occurred at.
19      A.  It occurred in the refiner room near a
20  control panel.
21      Q.  All right.  That's where Mr. Levar was
22  working that morning -- is that right? -- in the
23  refiner room?
24      A.  In the refiner room, yes, sir.
25      Q.  You said he was working on the refiner,

Page 82

1   so I assume they were in the refiner room.
2       A.  Yes, sir.
3       Q.  All right.  So explain to me what
4   happened that led up to the incident between you and
5   Mr. Levar.
6       A.  I had to go into the refiner room to
7   retrieve a tool that I needed to tear down the
8   separator.  When I walked into that refiner room,
9   Frank had yelled out, "Send Tim into the room."
10  I replied, "What do you need" -- or no.
11  Excuse me.  I replied, "Tim's busy.  What do you
12  need?"
13          And he responded, "Never mind."
14          So I left.  Went back to tearing down
15  the separator.  And then a while -- time had passed
16  by.  I needed a mallet from the toolbox, so I went
17  back into the refiner room, retrieved the mallet from
18  the toolbox and walked around the control panel.  And
19  Frank was standing at the control panel.  And I asked
20  him how things was going.  He proceeded to tell me
21  that -- that he had taken care of the situation and
22  then proceeded to tell me that next time I -- "Next
23  time I tell you I need help, you need to send me
24  help."  Any time I have issues back here in the
25  lactose department, nobody's free to help him.

Page 83

1       Q.  Okay.  And then what happened?
2       A.  Then I got -- I got offended by that
3   because of the fact that I was always -- I was always
4   the first to help him out.  So I don't remember
5   exactly what was said after he had responded.  But
6   then he pushed me, and I went back a foot.  And then
7   he had made a motion with his hands coming up again --
8   coming up towards me.  And I proceeded to push him --
9   push him back to get space between us so that --
10  hoping that he would not proceed with what he did do.
11      Q.  Which was what?
12      A.  That's when he assaulted me.
13      Q.  So let me ask you a few questions.  I
14  appreciate the answer of what happened there.  But
15  before I start asking you specific questions, you
16  remember him pushing you.  You remember him making a
17  motion with his hands, that the hands were coming up.
18  Is that correct?
19      A.  That's correct.
20      Q.  And at that point is when you pushed him
21  back; is that correct?
22      A.  That's correct.
23      Q.  Okay.  And then do you remember anything
24  after you pushing him back?
25      A.  I remember him going back and him

Page 84

1   standing there.  We were standing there looking at
2   each other for a few seconds.  And that's -- that's
3   all I can remember.
4       Q.  You said some words were exchanged
5   between the two of you.  You just don't remember what
6   they were?
7       A.  That's correct.
8       Q.  Sir, I'm going show you a couple of
9   photographs.  And I don't know if they reflect where
10  the incident with Mr. Levar occurred, but I understand
11  they're in the refiner room.  I'm going to see if
12  maybe you can identify them for me, and they might --
13  you might be able to show us where this incident
14  occurred.  Doesn't really make a whole lot --
15          MR. BRITTAN:  Let's make this one with
16  the yellow hose as 3 and the other one as 4.
17          MS. BURMA:  Do these have Bates numbers?
18  Have they been produced?
19          MR. BRITTAN:  No.  These are part of
20  the -- trying to remember.  I don't know if they have
21  been produced or not.  They are a part of the police
22  records.
23          MS. BURMA:  Which --
24          MR. BRITTAN:  Yellow hose is 3.  The
25  other one is 4.

Page 113

1   open -- and they were open he thought."
2           Is that what it says?
3       A.  Yes.
4       Q.  And is that what you told Detective
5   Vosburg that day?
6       A.  Yes.
7       Q.  Okay.  And earlier when we read that --
8   when you were talking to Detective Vosburg on the day
9   of the incident, when he was talking to you in the
10  hospital, that what you remembered was Frank pushing
11  you, and you pushed him back.  That's what you told
12  Detective Vosburg that day as well, correct?
13      A.  I honestly can't remember.
14      Q.  Being the foreperson and the supervisor
15  on this shift, you were the person within -- in the
16  whey department that had the ultimate responsibility
17  for the workers on that shift.
18          Is that a fair statement?
19      A.  That's correct.
20      Q.  And your duties and responsibility as
21  the foreperson/supervisor on the shift meant that you
22  had responsibilities as to the safety of yourself and
23  the employees?
24      A.  That's correct.
25      Q.  Okay.  Did you also have

Page 114

1   responsibilities, as every other worker does, to try
2   and minimize conflict?
3       A.  I tried to minimize it to the best of my
4   knowledge, given the fact that I had not been given
5   any additional training, being a foreman, slash,
6   supervisor.
7       Q.  Did you believe you needed additional
8   training that when somebody pushes you, you should
9   just walk away?
10          MS. BURMA:  Objection, argumentative.
11          Go ahead.
12      A.  I believe so, yes.
13      Q.  (BY MR. BRITTAN)  Why do you believe
14  that you needed additional training in that situation
15  when you were pushed by another employee, that you
16  were not to retaliate?
17      A.  Could you repeat that?
18      Q.  Sure.  First of all, you'll agree with
19  me, as we've talked about with regards to the
20  workplace violence policy, that fighting on the job is
21  something that is not desirable to any employer,
22  including Leprino Foods.
23      A.  That's correct.
24      Q.  Okay.  And so when Mr. Levar pushed you,
25  did you believe that you needed additional training as

Page 115

1   a foreperson/supervisor to understand that you were
2   not to engage him by pushing him back?
3           MS. BURMA:  Objection, form.
4       A.  I didn't engage him to fight or to
5   conflict, but simply to defend myself.
6       Q.  (BY MR. BRITTAN)  What made you believe
7   that you could not just walk away?
8       A.  The look in his eyes and that motion
9   that he made.
10      Q.  His hands coming up?
11      A.  Yes, sir.
12      Q.  Did you -- strike that.
13          When you came back and made contact with
14  Mr. Levar, did you hit him with -- strike that.
15          When you made contact with Mr. Levar --
16  because you said you pushed him back -- describe or
17  show me, if you will, how you pushed him back.
18      A.  I honestly can't remember whether it was
19  closed first or open hands.  I cannot recall.
20      Q.  Do you remember what portion of his body
21  you came into contact with?
22      A.  His chest.
23      Q.  You showed me earlier that his hands
24  were up and a little bit out.  How were you able to
25  get access to his chest?

Page 116

1       A.  His hands were not directly in front of
2   him.  So they were up in this manner.  So when I
3   pushed him, I pushed him directly on his chest.
4       Q.  We've seen two reports, both the
5   statement that you gave to Leprino Foods and the
6   police report that we just looked at -- police reports
7   that we just looked at that indicate that Mr. Levar
8   pushed you, then you pushed him back, correct?
9       A.  That's correct.
10      Q.  Okay.  And you'll agree with me that in
11  neither the statement that you gave to Leprino Foods
12  nor the statements that you gave to the Fort Morgan
13  Police Department, is there any indication of
14  Mr. Levar bringing his fists up and acting further
15  aggressively after pushing you?
16      A.  That's correct.
17      Q.  Okay.  So let's just talk about the
18  statements as they are, the statement that you gave to
19  Leprino Foods, which is Exhibit 6, and the statements
20  in the police report, which are part of your
21  questionnaire to the EEOC.
22          Those reports indicate that you were
23  pushed, and instead of leaving the situation, you
24  pushed back, correct?
25          MS. BURMA:  Objection -- objection,



Page 121

1   department's -- I was called in by Risa Esterly and
2   was notified that day.
3        Q.  Before you went in to meet with Risa,
4   did you have any understanding of what was going to
5   happen at that meeting?
6        A.  No, I did not.
7        Q.  So tell me what happened at the meeting
8   between you and Risa Esterly that day.
9        A.  I remember walking into the -- into her
10  office.  She had me sit down.  And she said that --
11  that after the -- with that -- with the -- the results
12  of the investigation, they were going to terminate me
13  because I had testified that -- or I had said that I
14  pushed Frank back.  And I cannot remember the exact
15  statement that she made pertaining to the -- to the
16  policy.  Something like a no-touch policy.
17       Q.  Okay.  What happened after that?
18       A.  Then she gave me the -- that letter and
19  my tools.  And that's when I -- that's when I had
20  asked her if -- that I was acting in self-defense.
21  And she proceeded to tell me that it didn't matter;
22  that -- that they have -- I can't remember the exact
23  words, but a no-touch policy.
24       Q.  Anything else happen in that meeting?
25       A.  That's all I can remember.

Page 122

1        Q.  The policy that we marked earlier --
2   specifically, if you look at the first page -- it
3   doesn't indicate that it's a no-touch policy, correct?
4        A.  That's correct.  But that's what she
5   specifically told me that day.
6        Q.  Okay.  Do you believe it was reasonable
7   for Leprino Foods to rely on the statement that you
8   gave that we marked as Exhibit 6 in terminating your
9   employment?
10           MS. BURMA:  Objection, speculation.
11       A.  Like I stated earlier, I don't believe
12  they did a thorough investigation.
13       Q.  (BY MR. BRITTAN)  So --
14       A.  So if I would have had a second or third
15  discussion with them, I would have told them that;
16  that I acted in self-defense.
17       Q.  Do you believe it was reasonable for
18  Leprino Foods to rely on the statements that you
19  provided to the Fort Morgan Police Department --
20           MS. BURMA:  Objection, speculation.
21       Q.  (BY MR. BRITTAN) -- in deciding to
22  terminate your employment?
23       A.  I believe that it's reasonable that
24  they -- that they used that statement, but
25  unreasonable that the police department spoke to me

Page 123

1   twice but Leprino Foods only spoke to me one time that
2   I can clearly remember.
3        Q.  Well, do you believe these statements --
4   the ones you provided to the police department and the
5   one you provided to Leprino Foods -- do you believe
6   they are consistent?
7        A.  About as consistent as they could
8   possibly be, considering the condition that I was in.
9        Q.  Did you contact Leprino Foods at all
10  between the time you were released from the hospital
11  and the time you met with Risa Esterly to talk to them
12  about what had occurred?
13       A.  No, I did not.
14       Q.  Why --
15       A.  But I didn't think I was under the -- I
16  didn't think it was my responsibility to lead the
17  investigation.
18       Q.  I'm not talking about leading the
19  investigation.  I'm saying calling Leprino Foods and
20  talking to them if you had any question at all about
21  the accuracy of the statement which we have marked as
22  Exhibit Number 6.
23       A.  In the condition that I was in, I was
24  just thinking about my health and getting better so
25  that I could get -- hopefully get back to work.  So

Page 124

1   that I left entirely on Leprino Foods.  So they would
2   follow through with their policy and their procedures.
3        Q.  So you were released from the hospital
4   the day after the incident, correct?
5        A.  Uh-huh.
6        Q.  Correct?  That's a "yes"?
7        A.  Yes.
8        Q.  Thank you.
9            And you went home after that?
10       A.  Yes, sir.
11       Q.  Okay.  And you were on home rest care
12  after that, correct?
13       A.  That's correct.
14       Q.  And you weren't working between the date
15  of the incident and the date that you met with Risa
16  Esterly, correct?
17       A.  That's correct.
18       Q.  Okay.  I understand that immediately
19  after the incident, your voice was kind of raspy.
20  Might be a little harder to talk; is that right?
21       A.  That's correct.
22       Q.  How long did that condition last?
23       A.  I honestly can't -- I honestly can't
24  say.  I don't remember.
25       Q.  Was it days or weeks?

Page 125

1    A.  I honestly -- I honestly don't remember.
2    Q.  Was there anything that was preventing
3  you from contacting Leprino Foods in the weeks after
4  providing the statement, which we marked as Exhibit
5  Number 6, to indicate to them that you thought that
6  the statement wasn't completely accurate or didn't
7  include all the facts that they should consider?
8    A.  I can vaguely remember making the
9  statement.  So how -- I couldn't remember making the
10  statement, so how was I going to correct something
11  that I couldn't remember making?
12    Q.  Did you -- well, you told me earlier
13  that you were provided with a copy of the statement a
14  few days after you provided it, by Leprino Foods.
15    A.  Hmm.  I can't -- I can't remember that.
16    Q.  Well, did --
17    A.  Whether it was...
18      Yeah, I can't remember whether I had
19  received it or whether that was the 2nd was the day
20  that I made that statement.
21    Q.  The 2nd?
22    A.  The -- excuse me.  The 10th, the second
23  day after the incident.
24    Q.  In any event, we can agree that you did
25  not attempt to contact Leprino Foods at any point in

Page 126

1  time after your release from the hospital until you
2  met with Risa Esterly, talked to them about what
3  happened in the refining room -- or refiner room with
4  Frank Levar?
5    A.  I agree that, yes, and --
6    Q.  That's all.  You agree with me that you
7  did not attempt to contact them, correct?
8    A.  That's correct.
9    Q.  Okay.  I am correct also that through
10  your workers' compensation action, Leprino Foods paid
11  for the medical costs associated with your care and
12  treatment; is that correct?
13      MS. BURMA:  Objection, relevancy.
14    A.  That's correct.
15    Q.  (BY MR. BRITTAN)  Okay.  And I'll circle
16  back to this a little bit later, but you did receive
17  payments through your workers' compensation action for
18  the time that you missed on your job?
19      MS. BURMA:  Objection, relevancy.
20    A.  That's correct.
21    Q.  (BY MR. BRITTAN)  Okay.  And so whatever
22  payments you received from Leprino Foods through the
23  workers' compensation action, you're not asking for
24  lost wages for the payments that you actually -- that
25  you did receive, correct?

Page 127

1      MS. BURMA:  Objection, relevancy.
2    A.  That's correct.
3    Q.  (BY MR. BRITTAN)  Okay.  We talked about
4  this briefly earlier, sir, about the basis of your
5  claim of discrimination that constitutes at least part
6  of your lawsuit against Leprino Foods in this case.
7  And you've made some comments about how essentially
8  Hispanics are treated differently at the Fort Morgan
9  plant than white workers, generally speaking.  I just
10  want to get you oriented as to where I'm headed next.
11      Obviously you were Hispanic at the time
12  that Leprino Foods hired you, correct?
13    A.  That's correct.
14    Q.  You were a Hispanic in 2003 when you
15  moved up from being a laborer into your next position.
16  And what was that, sir?
17    A.  In 2003, from being a laborer to
18  break -- or, excuse me, relief operator.
19    Q.  Relief operator.
20      And then in 2008, you were promoted
21  again to foreperson, correct?
22    A.  That's correct.
23    Q.  In the whey department, correct?
24    A.  That's correct.
25    Q.  And that's a position that you held from

Page 128

1  2008 until the time of your employment termination in
2  February of 2016, correct?
3    A.  That's correct.
4    Q.  And of course during this 17, 18 years
5  or so that you were employed at Leprino Foods, you
6  continued to be a Hispanic, correct?
7    A.  That's correct.
8    Q.  And I know you didn't have a good sense
9  of it, but earlier you estimated that maybe 15,
10  20 percent, I think it was, of employees at the Fort
11  Morgan facility are Hispanic, correct?
12    A.  That's correct.
13    Q.  So why do you believe that if Leprino
14  Foods at its Fort Morgan plant discriminates against
15  Hispanics, it hires them, such as yourself --
16    A.  Uh-huh.
17    Q.  -- and promotes them and gives them
18  positions of authority, like foreperson?  Is that
19  consistent with your belief that Leprino Foods
20  discriminates against Hispanics?
21      MS. BURMA:  Objection, form.
22    A.  I believe that Leprino Foods
23  discriminates against Hispanics because of incidents
24  that have occurred.  A white foreperson smacks a
25  coworker in the butt, and he is also white, has

Page 145

1     A.  I do not remember.
2     Q.  Where did it occur?
3     A.  Leprino Foods' lunchroom.
4     Q.  Did that occur before or after your
5 termination from Leprino?
6     A.  Before.
7     Q.  Now we have talked already about the
8 fact that Mr. Morrison was fired from Leprino in 2018.
9         Have you talked with Mr. Morrison at
10 all?
11     A.  No.
12     Q.  Next one on your list is Marcus Vowell,
13 V-o-w-e-l-l.  And it references that he witnessed an
14 event in which Allen Burton, a Caucasian, violated the
15 company's workplace violence policy and was not
16 terminated.
17         What is your understanding about Marcus
18 Vowell's knowledge in that regard?
19     A.  Just that he witnessed Allen Burton
20 poking Richard Rodriguez in the chest.
21     Q.  And who -- strike that.
22         How did you come that information?
23     A.  My wife.
24     Q.  What else did she tell you about that
25 situation?

Page 146

1     A.  That was all.
2     Q.  When did that occur?
3     A.  I -- I don't know dates or time.
4     Q.  Do you have any understanding as to what
5 happened as a result of that situation you just talked
6 about; Mr. Burton supposedly poking Mr. Rodriguez in
7 the chest?
8     A.  No, I do not.
9     Q.  Is it your belief that if that was true
10 that Mr. Burton was to be fired?
11     A.  Is it my belief that if it were true?
12     Q.  Yes.
13         MS. BURMA:  Objection, speculation.
14     Q.  (BY MR. BRITTAN)  Let me rephrase it.
15 I'll withdraw the question.
16         Is it your understanding of Leprino's
17 workplace violence policy that if, in fact, Mr. Burton
18 did poke his finger into Mr. Rodriguez's chest that
19 Mr. Burton was to be fired?
20         MS. BURMA:  Again, objection,
21 speculation.
22     A.  According to the policy, yes.
23     Q.  (BY MR. BRITTAN)  Let's go back and take
24 a look at the policy.  You have it in front of you
25 there, which is Exhibit 5.

Page 147

1     Q.  Stay on that page, sir, which is the
2 second page.  Go to the second paragraph.  No, I'm
3 sorry, sir.  I think it was the --
4     A.  Okay.
5     Q.  Yeah.  Second page of the exhibit.
6         The second paragraph, the last sentence
7 of that paragraph says, "The human resource manager
8 for the location will investigate complaints and take
9 action management believes is appropriate when
10 employees are found to have engaged in the above
11 conduct."
12         Do you see that, sir?
13     A.  Yes.
14     Q.  Okay.  That doesn't indicate that in all
15 situations that a termination is required, does it?
16         MS. BURMA:  Objection, the document
17 speaks for itself.
18     A.  I don't know how to answer that.
19     Q.  (BY MR. BRITTAN)  Well, let's talk about
20 your situation.  You had a situation that went before
21 the plant manager and Julia Lambert when you had an
22 issue with Howie Morrill, correct?
23     A.  That's correct.
24     Q.  And there's allegations that you
25 confronted Mr. Morrill in the parking lot, correct?

Page 148

1     A.  That's correct.
2     Q.  And the workplace violence policy
3 addresses situations of intimidation, doesn't it?
4     A.  I wasn't intimidating him.
5     Q.  If Mr. Morrill disagrees with that,
6 would you be surprised?
7     A.  I wouldn't be surprised, no.
8     Q.  So in that situation, you weren't
9 terminated, were you?
10     A.  I wasn't intimidating nor did I threat
11 nor did I physically touch him.
12     Q.  If, in fact, you crossed over in the
13 aisleway and put your shoulder into him, that would be
14 physically touching him in an unwanted manner,
15 correct?
16         MS. BURMA:  Objection, speculation and
17 calls -- and misinterprets the testimony.
18     A.  That's not what occurred.
19     Q.  (BY MR. BRITTAN)  Well, where do you get
20 your understanding that whenever there is any touching
21 that occurs at Leprino's Fort Morgan plant, that
22 termination is required?
23     A.  Leprino management.
24     Q.  Who?
25     A.  Risa Esterly.

**Page 1**

```
 1          IN THE UNITED STATES DISTRICT COURT

 2            FOR THE DISTRICT OF COLORADO

 3   Civil Action No. 19-CV-00285-CMA

 4   _____

 5   NICOLAS DONEZ,

 6   Plaintiff,

 7   v.

 8   LEPRINO FOODS COMPANY,

 9   Defendant.
     _____

10          DEPOSITION OF JULIA LAMBERT
            November 21, 2019
11   _____

12         PURSUANT TO NOTICE and the appropriate
     rules of civil procedure, the deposition of JULIA
13   LAMBERT, called for examination by the Plaintiff, was
     taken on Thursday, November 21, 2019, commencing at
14   1:32 p.m. at the Logan County Courthouse, 110 North
     Riverview Road, Sterling, Colorado, before Jennifer
15   Bajwa Melius, a Registered Professional Reporter and
     Notary Public in and for the State of Colorado.

16

17

18                Dauster|Murphy
                  www.daustermurphy.com
19                  303.522.1604

20

21

22

23

24

25
```

**Page 2**

```
 1   APPEARANCES:

 2   ON BEHALF OF THE PLAINTIFF:

 3        AMY BURMA, ESQ.
          Burma Law Offices, LLC
 4        1035 Pearl Street
          Suite 325
 5        Boulder, Colorado 80302
          720-464-5655
 6        amy@burmalawoffices.com

 7   ON BEHALF OF THE DEFENDANT:

 8        WILLIAM C. BRITTAN, ESQ.
          Campbell Killin Brittan & Ray, LLC
 9        270 St. Paul Street
          Suite 300
10        Denver, Colorado 80206
          303-322-3400
11        bbrittan@ckbrlaw.com

12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1                    I N D E X

 2   EXAMINATION:                              PAGE

 3   By Ms. Burma                             5, 122

 4   By Mr. Brittan                             120

 5

 6   EXHIBITS:                                 PAGE

 7   Exhibit 44   E-mail                         44
                  Subject: Jaynie Tucker
 8                Discussion Thurs. Sept 20th
                  Dated: October 4, 2012
 9                CONFIDENTIAL LEP0836 to 0837

10   Exhibit 45   Investigation Notes dated      44
                  September 20, 2012, to
11                September 28, 2012
                  CONFIDENTIAL, miscellaneous
12                Bates Numbers

13   Exhibit 46   E-mail Subject: Dept           54
                  Items Dated: September 18,
14                2012
                  CONFIDENTIAL LEP0834
15
     Exhibit 47   September 13, 2012, Production 55
16                Staff Meeting, Meeting Minutes
                  CONFIDENTIAL LEP0832 to 0833
17
     Exhibit 48   Shawn Morrison Investigation   96
18                Documents
                  CONFIDENTIAL LEP0375 to 0388
19
     Exhibit 49   Text Message Printout         107
20                LEP1149 to 1150

21   Exhibit 50   Leprino Foods Company's Remarks111
                  RE: Termination, Kyle Lara,
22
                  August 17, 2015
22                CONFIDENTIAL LEP0372
23
23
24
24
25
25
```

**Page 4**

```
 1   Exhibit 51   E-mail                        112
                  Subject: Statement of Kyle
 2                Lara Incident
                  Date: August 27, 2015
 3                LEP1142 to 1143

 4   Exhibit 52   Leprino Foods Company's Remarks113
                  RE: Termination, Crystal
 5                Campos, June 16, 2017
                  CONFIDENTIAL LEP0371
 6

 7

 8   PREVIOUSLY MARKED EXHIBITS:               PAGE

 9   Exhibit 5                                   27

10   Exhibit 14                                 101

11   Exhibit 16                                  29

12   Exhibit 18                                  85

13   Exhibit 22                                  22

14   Exhibit 25                                  78

15   Exhibit 27                                  88

16
17
18
19
20
21
22
23
24
25
```

Page 5

1          P R O C E E D I N G S
2                JULIA LAMBERT,
3    having been first duly sworn/affirmed, was examined
4    and testified as follows:
5                EXAMINATION
6    BY MS. BURMA:
7         Q.    Can you please state and spell your name
8    for the record.
9         A.    Julia Lambert, J-u-l-i-a L-a-m-b-e-r-t.
10        Q.    And we just met.  My name is Amy Burma.
11   I'm the attorney for Nick Donez in this case.  Thank
12   you for agreeing to come and have your deposition
13   taken today.  We are here today because I was
14   instructed by opposing counsel that I couldn't just
15   call you without him present, so that's why we're
16   taking the deposition.
17             I'm going to go over a couple of ground
18   rules, and I'm sure Mr. Brittan went over these with
19   you.  As you see, we have a court reporter, so we
20   have to make sure to give verbal answers, yeses and
21   nos, not head nods or mm-hmms.  If I correct you, I'm
22   not trying to be rude.  I'm just trying to make sure
23   there's a clear record.
24             I will ask that you let me finish asking
25   my question before you answer, and I will do the same

Page 6

1    for you with respect to your answer, again,
2    because -- so that we can have a clear record.
3             And if you don't understand one of my
4    questions, please let me know.  If you answer my
5    question, I am going to assume that you understood
6    it; is that fair?
7         A.    Yes.
8             MS. BURMA:  Are you looking for lights,
9    Bill?
10            MR. BRITTAN:  No.  I'm just kind of
11   looking around to see what lights there were.  It's a
12   little dark, but. . .
13            MS. BURMA:  We can go off the record for
14   a second to see if we can turn on some overheads.
15            (Recess from 1:33 p.m. to 1:34 p.m.)
16            MS. BURMA:  We're back on.
17        Q.    (BY MS. BURMA)  If you need a break,
18   just let me know.  And I think I said if you don't
19   understand a question, let me know.  If you answer my
20   question, I'm going to assume you understood it; is
21   that fair?
22        A.    Yes.
23        Q.    You no longer work at Leprino, correct?
24        A.    Correct.
25        Q.    When you were at Leprino -- and let's

Page 7

1    just talk about 2016 through the time of your
2    termination -- did you have the authority to hire or
3    fire employees?
4         A.    I did.
5         Q.    Okay.  Did you generally have
6    communications with legal counsel, general counsel
7    for Leprino, or outside counsel?
8         A.    Yes.
9         Q.    Okay.  What did you do to prepare for
10   today?
11        A.    Nothing.
12        Q.    Did you talk to anyone, either
13   counsel -- and I don't want to know what you said,
14   just if you talked to him.
15        A.    Yes, I did talk to Bill.
16        Q.    Oh, and -- and Bill Brittan?
17        A.    Bill Brittan, yeah.
18        Q.    And how long did you speak with
19   Mr. Brittan?
20        A.    Probably around an hour.
21        Q.    And when was that?
22        A.    Last night.
23        Q.    Okay.  Have you spoken with him --
24        A.    Or Tuesday night.  What night was it?
25   Today is Thursday, so it would have been Tuesday

Page 8

1    night.
2         Q.    Have you spoken with him before?
3         A.    Yes.
4         Q.    How long ago?
5         A.    I can't recall.
6         Q.    And I'm -- have you spoken with him
7    before in reference to this case?
8         A.    Yes.
9         Q.    Okay.  Was it in the past month?
10        A.    Yes.
11        Q.    Do you recall how long that conversation
12   was?
13        A.    No.
14        Q.    And did you speak with anyone else at
15   Leprino in the past year regarding this case?
16        A.    Yes.
17        Q.    Who did you speak with?
18        A.    Steve Schmidt.
19        Q.    Okay.  Do you recall when you spoke with
20   Mr. Schmidt?
21        A.    No.
22        Q.    Do you recall how long you spoke with
23   Mr. Schmidt?
24        A.    An hour.  No, not even an hour.
25   30 minutes.

Page 25

1      MR. BRITTAN:  Okay.
2      A.   So I'm sorry.  Ask the question again.
3  Give you an example?
4      Q.   (BY MS. BURMA) So you said -- I asked
5  you if there's a difference between progressive and
6  zero tolerance policies.  You said yes.  I asked you
7  what.  You said "depend on the situation."  I guess I
8  don't understand what you mean by "depend on the
9  situation."
10      From -- I mean, for me I hear zero
11  tolerance and I think, if you violate this policy,
12  you're fired, where I hear progressive discipline and
13  I hear this takes warnings and steps.
14      MR. BRITTAN:  Object to the form, if
15  that is a question.
16      A.   From my background, I would say if -- so
17  you said give you an example of what that was.  So if
18  it was a violation of -- I can't think off the top of
19  my head here.
20      Q.   (BY MS. BURMA) I mean, I have two
21  examples and you can tell me if I'm wrong.
22      A.   Okay.
23      Q.   One I'm thinking of is attendance.  You
24  know, you violate the attendance policy, you know, X
25  times, you get a warning, you know, and then after

Page 26

1  two more times, you know, whatever, it progresses,
2  the disciplinary policy.
3      A.   Correct.
4      Q.   Whereas for a zero tolerance, as I
5  said -- I used the example of drugs before.  Someone
6  shows up with drugs at work, that -- they don't get
7  warnings, they just get fired.
8      A.   For showing up with drugs at work?
9      Q.   Illegal drugs.
10      A.   Correct.
11      Q.   Or a gun or something, you know --
12      A.   Correct.
13      Q.   -- like that.  So is that your
14  understanding in general as to the difference between
15  progressive disciplinary policies that have kind of
16  steps that lead to termination versus zero tolerance
17  that doesn't have those steps?
18      A.   Correct.
19      Q.   Okay.  Did Leprino have a progressive or
20  zero tolerance or both disciplinary policies?
21      MR. BRITTAN:  Object to the form.
22      A.   Both.
23      Q.   (BY MS. BURMA) Let's go and talk about
24  workplace violence.  Did Leprino have a policy
25  regarding workplace violence?

Page 27

1      A.   Yes.
2      Q.   What was Leprino's policy on workplace
3  violence?
4      A.   I couldn't tell you it verbatim.  It's
5  been a long time since I looked at their policies.
6      Q.   Okay.  And I have -- there's some
7  documents in here that may refresh your memory.  If
8  you look at -- I think it's Exhibit 5.
9      And before we get here, the handbook
10  that we were just looking at, was that -- did that
11  change during your time at Leprino?
12      A.   Yes.
13      Q.   Were there any significant changes made
14  with respect to the discipline policy during your
15  time at Leprino?
16      A.   Not that I recall.
17      Q.   Okay.  Now you can go to Exhibit 5.  Is
18  that what you're thinking of when -- as regards to
19  Leprino's workplace violence policy?
20      A.   Yes.
21      Q.   Okay.  And is workplace security -- is
22  there a difference between workplace security and
23  workplace violence?
24      A.   From what I recall, I would say yes.
25      Q.   Did you ever receive any training on the

Page 28

1  workplace security policy that's been marked as
2  Exhibit 5 during your time at Leprino?
3      A.   Formalized training?
4      Q.   Yes.
5      A.   No.
6      Q.   What about informal training?
7      A.   Yes.
8      Q.   What did your informal training consist
9  of?
10      A.   Review of the policy.
11      Q.   Anything else?
12      A.   Not that I remember.
13      Q.   All right.  And did that happen yearly
14  or just when you were hired or. . .
15      A.   I don't recall.
16      Q.   Do you know if it was more than ten
17  times that you reviewed it?
18      A.   I don't recall.
19      Q.   Was it more than once?
20      A.   Yes.
21      Q.   More than five times?
22      A.   No.
23      Q.   Okay.  Was this policy provided to all
24  employees at Leprino's, Exhibit 5?  And you can take
25  a second to review it just let me know when

Page 29

1  you're finished.
2      A.   Yes.
3      Q.   And was it something that was provided
4  each year to Leprino employees or just when they were
5  hired?
6      MR. BRITTAN:  Object to the form.
7      A.   I don't recall.
8      Q.   (BY MS. BURMA)  Sorry.  We're going to
9  be flipping a little bit.
10      If you can go to Exhibit 16.  Do you
11  recognize this document?
12      A.   Yes.
13      Q.   And what is it?
14      A.   Reaffirmation that's done annually.
15      Q.   What's a reaffirmation?
16      A.   That it's given to the employees to
17  review and to sign off on an annual basis.
18      Q.   So -- and it's saying that they have --
19  "All the policies are available on LeprinoNet or from
20  my local human resources manager," and acknowledging
21  those above policies.
22      If you flip back to Exhibit 5 but keep a
23  finger in Exhibit 16, at the bottom there's a little
24  table, and one of the things says "Policy Number" and
25  has "HUM4950."  If you flip back to Exhibit 16, I

Page 30

1  don't see that here.  If it was provided, would it
2  have been included in the reaffirmation?
3      A.   Not all policies were reaffirmed every
4  year.
5      Q.   Okay.  If it was reaffirmed that year,
6  it would have been referenced in the reaffirmation?
7      A.   Not necessarily.
8      Q.   Why not?
9      A.   There could have been other training
10  done --
11      Q.   Okay.
12      A.   -- outside of it.
13      Q.   So if -- it would have been mentioned in
14  an affirmation when the employee received either the
15  training or the material; is that fair to say?
16      A.   Say that again.
17      Q.   It's my -- there are other affirmations,
18  some that happen annually and some that were --
19  happened once.  If an employee received the material,
20  it would be referenced in an affirmation statement;
21  is that fair to say?
22      MR. BRITTAN:  Object to the form.
23      A.   Correct.
24      Q.   (BY MS. BURMA)  Okay.  And why is that?
25      A.   To ensure the employee read the policy

Page 31

1  and signed off stating they understood it.
2      Q.   Okay.  So if we go back to Exhibit 5 --
3  and you've had some time to look through it.  Can you
4  show me in here where the workplace violence policy
5  is for Leprino?
6      A.   Can I show you where the workplace
7  violence policy is?
8      Q.   Yeah.  Is it just in this first
9  paragraph?
10      A.   It would be the entire policy.
11      Q.   What is your understanding as to what
12  Leprino's policy was with respect to workplace
13  violence or workplace security?
14      A.   My understanding was if there was any
15  violence, acts of violence, they would be
16  investigated and appropriate action would be taken.
17      Q.   Is workplace violence defined as what
18  conduct constitutes workplace violence?
19      A.   Are you asking me my opinion or in the
20  policy?
21      Q.   Let's start within the policy.
22      A.   In the policy, yes.
23      Q.   Where?
24      A.   That first section.
25      Q.   Okay.  So it's that "Leprino Foods

Page 32

1  believes employees should" be -- "should work in an
2  environment without intimidation, threats, or
3  violence," and then it goes on.
4      Does it -- does workplace violence have
5  to include physical touching?
6      A.   Does workplace violence have to include
7  physical --
8      Q.   Let me strike that.
9      What is your opinion as to what
10  Leprino's workplace violence policy was?
11      MR. BRITTAN:  Objection.  Asked and
12  answered.
13      A.   What is my opinion --
14      Q.   (BY MS. BURMA)  Yes.
15      A.   -- of what their policy -- the workplace
16  policy was?  My opinion would be any acts of
17  violence, physical or verbal.
18      Q.   Okay.  So physical or verbal acts of
19  violence.  Would that include horseplay?
20      A.   No.
21      Q.   Would that include hitting someone's
22  hat?
23      A.   No.
24      Q.   Would it include acting in self-defense?
25      A.   Say that again.

Page 33

1   Q.   Would it include acting in self-defense?
2   A.   The workplace police -- the workplace
3   violence policy?
4   Q.   Yes.
5   A.   Yes.
6   Q.   So if an employee was assaulted and
7   tried to defend themselves, that would be a violation
8   of Leprino's workplace violence policy?
9   A.   Yes.
10  Q.   Is that stated anywhere in here?
11  A.   "Threatening or violent conduct."
12  Q.   Well, if they're acting in self-defense,
13  they're not the one threatening or being violent.
14  They're just trying to protect themselves.
15       MR. BRITTAN:  Object to the form, if
16  that's a question.
17  Q.   (BY MS. BURMA)  Okay.  Hypothetically,
18  in your opinion, if an employee was trying to protect
19  themselves from an assault, would that be a violation
20  of workplace violence policy for Leprino Foods?
21  A.   Yes.
22       MR. BRITTAN:  Object to the form.
23  Q.   (BY MS. BURMA)  And why is that?
24  A.   That they were acting in a violent,
25  threatening manner.

Page 34

1   Q.   If they're acting in self-defense, how
2   are they acting violent?
3   A.   So what is your question?
4   Q.   I'm saying if an employee is acting in
5   self-defense, they're not the aggressor.  They are
6   just trying to protect themselves.  How is that
7   acting violent or threatening?
8        MR. BRITTAN:  Object to the form.
9   A.   Because they're acting in physical or
10  verbal intimidation.
11  Q.   (BY MS. BURMA)  So would an employee
12  pushing another employee constitute a violation of
13  the workplace violence policy for Leprino Foods?
14       MR. BRITTAN:  Object to the form.
15  A.   It depends on the situation.
16  Q.   (BY MS. BURMA)  When would an employee
17  pushing another employee not constitute a violation
18  of Leprino's workplace violence policy in your
19  opinion?
20  A.   Say that again.
21  Q.   When would an employee pushing another
22  employee not constitute a violation of Leprino's
23  workplace violence policy, in your opinion?
24  A.   If it was maybe in the hallway and they
25  pushed them or tripped.

Page 35

1   Q.   So why do companies have policies for
2   employees, in your opinion?
3   A.   To protect their employees.
4   Q.   Is it also so that employees know what
5   conduct and behaviors are appropriate and
6   inappropriate?
7   A.   Correct.
8   Q.   Is it important for these policies to be
9   clear so employees can understand it and understand
10  what policy -- what behavior is appropriate and
11  inappropriate?
12       MR. BRITTAN:  Object to the form.
13  A.   Correct.
14  Q.   (BY MS. BURMA)  I'm struggling to
15  understand how -- can you define for me, as we sit
16  here today, what action constitutes workplace
17  violence under the Leprino Foods policy that's in
18  Exhibit 5?
19  A.   Physical or verbal intimidation.
20  Q.   Okay.  So if an employee puts another
21  employee in a chokehold, would that constitute a
22  violation of this policy?
23       MR. BRITTAN:  Object --
24  A.   No.
25  Q.   (BY MS. BURMA)  Why not?

Page 36

1   A.   It depends on what the situation -- it
2   would have been -- it could have been horseplay.
3   Q.   Okay.  How are employees supposed to
4   know what conduct violates the policy if the -- if
5   you can't determine if there's a violation until
6   after you do an investigation?  I guess -- you see
7   what I'm getting at?
8        MR. BRITTAN:  Object to the form.
9   Q.   (BY MS. BURMA)  How is an employee
10  supposed to know what conduct violates this policy if
11  it's not defined?
12       MR. BRITTAN:  Object to the form.
13  A.   By reading the policies.
14  Q.   (BY MS. BURMA)  Okay.  So under this
15  policy, putting someone in a chokehold can constitute
16  a violation of the policy and can also not constitute
17  a violation of the policy; is that accurate?
18  A.   Correct.
19  Q.   Okay.  So where in here does it say when
20  that is a violation of the policy and when it's not a
21  violation of the policy?
22  A.   I didn't read the whole policy, but I
23  don't know where that would be.
24  Q.   And if you want to look through it, you
25  can.

**Page 37**

1     **A.** The first section defines what the
2 policy is and what they -- "threats or violence." So
3 what is your question again?
4     **Q.** Well, how is -- I will come back to
5 that.
6     Are you aware of any other policy that
7 Leprino had dealing with workplace violence in 2016?
8     **A.** Not that I remember.
9     **Q.** And aside from being provided with a
10 copy of the policy, were employees provided with
11 training on this policy?
12     **A.** Yes.
13     **Q.** And what did that training consist of?
14     **A.** With the workplace policy, I believe it
15 was a -- either reading of the policy or
16 presentation. I don't remember 100 percent what that
17 was.
18     **Q.** And I'm only referring to this policy in
19 Exhibit 5. You don't recall if it was just reading
20 the policy or if it was a presentation?
21     **A.** I don't recall.
22     **Q.** Do you recall if it happened annually or
23 when the employee was hired?
24     MR. BRITTAN: Object to the form.
25     **A.** Definitely annually -- or definitely

**Page 38**

1 when someone was hired.
2     **Q.** (BY MS. BURMA) They would at least get
3 a copy of the policy, minimum?
4     **A.** Minimum, yes.
5     **Q.** Okay. Unaware of any additional
6 training with respect to the workplace violence
7 policy in Exhibit 5; is that fair?
8     **A.** I don't remember.
9     **Q.** Okay. Do you personally think
10 individuals have a right to self-defense?
11     **A.** Not at the workplace.
12     **Q.** So if you're assaulted at the workplace,
13 you don't have a right to defend yourself?
14     **A.** No.
15     **Q.** Do you think that creates a safe working
16 environment?
17     **A.** Do I think that creates a safe working
18 environment?
19     **Q.** Yes.
20     **A.** I would say yes.
21     **Q.** How so?
22     **A.** What are you asking me?
23     **Q.** I mean, so if an employee is walking
24 down the hallway and another employee comes up to
25 them and starts assaulting them, the victim employee

**Page 39**

1 does not have the right to take any action to defend
2 themselves against an unprovoked attack?
3     **A.** Correct.
4     **Q.** And that -- is that Leprino's policy
5 with regards to self-defense, to your knowledge?
6     **A.** Sorry. Can you ask me that again?
7     **Q.** To your knowledge, was it Leprino's
8 policy that employees did not have a right to
9 self-defense?
10     **A.** Was it stated in the policy?
11     **Q.** Did Leprino have any policy, written or
12 unwritten, that employees did not have a right to
13 self-defense while they were at work?
14     **A.** Not that I recall.
15     **Q.** Was it Leprino's policy that employees
16 did not have a right to self-defense?
17     MR. BRITTAN: Objection. Asked and
18 answered.
19     **A.** Not that I recall in the policy.
20     **Q.** (BY MS. BURMA) Okay. I'm getting --
21 because I thought you said it was Leprino's policy
22 that employees -- was it your opinion that employees
23 did not have a right to self-defense?
24     **A.** Correct.
25     **Q.** And that's different from Leprino's

**Page 40**

1 policy?
2     MR. BRITTAN: Object to the form.
3     **A.** Does the policy state that? Is that
4 what you're asking me?
5     **Q.** (BY MS. BURMA) I'm just asking,
6 Leprino's in general when you were there, did it at
7 any point have any policy, written or unwritten, as
8 to whether or not an employee can act in self-defense
9 at the workplace?
10     **A.** If the employee acted in self-defense,
11 it would be violating the workplace violence.
12     **Q.** And that was Leprino's policy?
13     **A.** Correct.
14     **Q.** Who told -- or where did you get that
15 information from?
16     **A.** Not that I -- I can't tell you who told
17 me that.
18     **Q.** I mean, we can agree it's not in
19 Exhibit 5; is that fair?
20     **A.** Correct.
21     **Q.** Did someone at Leprino tell you that
22 employees don't have a right to self-defense?
23     **A.** Not that I remember.
24     **Q.** Okay. Do you believe you have a right
25 to self-defense in your house?

Page 61

1    A.    It was -- they were having a discussion.
2    Q.    Anything else that you personally
3  observed Mr. Donez do that was threatening or
4  intimidating?
5    A.    To me personally?
6    Q.    Yes.
7    A.    No.
8    Q.    Anything else that you observed
9  Mr. Donez do that was threatening or intimidating to
10  anyone else that you personally observed?
11    A.    No.
12    Q.    Where does your opinion of him being
13  threatening and intimidating come from aside from
14  this incident with Heather Donez?
15    A.    My own personal feelings towards him.
16    Q.    Nothing that he said or did?  It was
17  just your personal opinion?
18    A.    Correct.
19    Q.    Did you think Mr. Donez was -- performed
20  his job adequately?
21    A.    Yes.
22    Q.    Did Mr. Donez receive a promotion during
23  his employment at Leprino?
24    A.    Yes.
25    Q.    Did you agree with the decision to

Page 62

1  promote Mr. Donez?
2    A.    I don't remember being a part of that
3  decision.
4    Q.    Who would have been a part of it?
5    A.    HR manager -- actually, the department
6  manager.
7    Q.    So -- and was that standard for all
8  promotions at Leprino, the HR manager was involved
9  with that?
10    A.    Yes.
11    Q.    Were you involved in any promotions at
12  Leprino?
13    A.    Yes, I believe.
14    Q.    Which ones?
15    A.    I don't remember.
16    Q.    Was the majority of promotions handled
17  by the HR manager?
18    A.    Yes.
19    Q.    Do you recall Mr. Donez's position at
20  the time of his termination?
21    A.    Whey department.
22         THE REPORTER:  Whey?
23         THE DEPONENT:  Whey --
24         MR. BRITTAN:  W-h-e-y.
25         THE DEPONENT:  -- department foreperson.

Page 63

1    Q.    (BY MS. BURMA)  Do you recall who had
2  this position before Mr. Donez?
3    A.    No.
4    Q.    Okay.  When did you first learn about
5  the incident -- or are you aware of an incident that
6  occurred on February 9, 2016, involving Nicolas Donez
7  and Frank Levar?
8    A.    Yes.
9    Q.    Tell me about the incident.
10    A.    Tell you about the incident from what I
11  know?
12    Q.    Yes.
13    A.    Frank Levar came up to Risa's office.
14  He told us that he had knocked out his foreperson.
15  At the time, I was in Risa's office.  And he said
16  that, and I did not know he meant he was knocked out.
17  So then he proceeded to say he knocked him out.  Risa
18  asked him, "What do you mean?"  He said, "I knocked
19  out my foreperson."  And I asked, "You mean he's on
20  the floor?"  And he said, "Yes."
21         So then I left the room to go find out
22  if Nick was okay.  So I made a call to the whey
23  department office, but at that time others were
24  already involved and an ambulance had been called.
25    Q.    Okay.  Do you recall approximately what

Page 64

1  time Mr. Levar came into the office?
2    A.    I do not.
3    Q.    Do you recall what you were doing in
4  Ms. Esterly's office at that time?
5    A.    No.
6    Q.    So Mr. Levar came in.  Do you recall if
7  he had anything in his hands?
8    A.    He did not.
9    Q.    And Mr. Levar said, "I knocked out my
10  supervisor"?
11    A.    My foreperson, correct.
12    Q.    My foreperson.  Do you recall anything
13  else that Mr. Levar said at that time?
14    A.    Yes.
15    Q.    What else?
16    A.    He said that -- he was visibly shaken.
17  He was upset.  And he said, "Look, my glasses are
18  messed up."  And we asked him to tell us what had
19  happened.
20    Q.    And what did Mr. Levar say?
21    A.    Mr. Levar said he was in the whey
22  department and he was needing some help, and he asked
23  Mr. Donez for some help.  And they began to yell at
24  each other, and Mr. Donez got close to him.  And
25  Frank said he put up his hands because he was getting

Page 1

```
 1          IN THE UNITED STATES DISTRICT COURT
 2             FOR THE DISTRICT OF COLORADO
 3    Civil Action No. 19-CV-00285-CMA
 4    _____
 5    NICOLAS DONEZ,
 6    Plaintiff,
 7    v.
 8    LEPRINO FOODS COMPANY,
 9    Defendant.
10    _____
11          DEPOSITION OF RISA ESTERLY-WESSBECKER
              November 6, 2019
12    _____
13          PURSUANT TO NOTICE and the appropriate
      rules of civil procedure, the deposition of RISA
14    ESTERLY-WESSBECKER, called for examination by the
      Plaintiff, was taken on Wednesday, November 6, 2019,
15    commencing at 1:00 p.m. at the Burma Law Offices,
      1035 Pearl Street, Suite 325, Boulder, Colorado,
16    before Carmen Murphy, a Registered Professional
      Reporter and Notary Public in and for the State of
17    Colorado.
18
19                    Dauster|Murphy
20                   www.daustermurphy.com
                       303.522.1604
21
22
23
24
25
```

Page 2

1 APPEARANCES:

2 ON BEHALF OF THE PLAINTIFF:

3        AMY BURMA, ESQ.
         Burma Law Offices, LLC
4        1035 Pearl Street
         Suite 325
5        Boulder, Colorado 80302
         720-464-5655
6        amy@burmalawoffices.com

7 ON BEHALF OF THE DEFENDANT:

8        WILLIAM C. BRITTAN, ESQ.
         Campbell Killin Brittan & Ray, LLC
9        270 St. Paul Street
         Suite 300
10       Denver, Colorado 80206
         303-322-3400
11       bbrittan@ckbrlaw.com

12 Also Present:

13       Susanne E. Jennings, Esq., Leprino Foods

14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1                    I N D E X
2 EXAMINATION:                          PAGE
3 By Ms. Burma                            4
4 By Mr. Brittan                         90
5
6
   EXHIBITS:                           PAGE
7
   Exhibit 16    Annual Re-affirmations 2015,    28
8                CONFIDENTIAL LEP0159
9  Exhibit 17    Fort Morgan Altercation         57
                 Document, CONFIDENTIAL
10               LEP0804 - 809
11 Exhibit 18    Letter to Mr. Levar from Ms.    64
                 Lambert, 2/11/2016, LEP0100
12
   Exhibit 19    Letter to Mr. Donez from Ms.    66
13               Esterly, 2/29/2016, LEP0131
14
15 PREVIOUSLY MARKED EXHIBITS:          PAGE
16
   Exhibit 5                             81
17
   Exhibit 6                             61
18
   Exhibit 14                            76
19
20
21
22
23
24
25

Page 4

1                P R O C E E D I N G S

2          RISA ESTERLY-WESSBECKER,

3 having been first duly sworn/affirmed, was examined

4 and testified as follows:

5                    EXAMINATION

6 BY MS. BURMA:

7       Q.   Can you please state and spell your name

8 for the record.

9       A.   Legal name?

10      Q.   Yes.

11      A.   Risa Esterly-Wessbecker.  R-i-s-a,

12 E-s-t-e-r-l-y, hyphen, W-e-s-s-b-e-c-k-e-r.

13      Q.   Do you prefer "Ms. Esterly"?

14      A.   Please.

15      Q.   Okay.  I'm sure you have heard kind of

16 the ground rules with talking to counsel before, but

17 I'm going to go over them now.

18           We have to make sure to give verbal

19 answers, yeses and noes, so that the court reporter

20 can have a clear record.  If I correct you, I'm not

21 trying to be rude.  I'm just trying to make sure that

22 the record's clear.

23           Please wait until I'm finished asking my

24 question before you answer.  I will give you the same

25 courtesy, hopefully, when you respond.  Again, just

Page 29

1    Q.    So what did the standards of ethical
2  business conduct policy include?
3          A.    I wouldn't be able to recite it
4  specifically.  Sorry.
5          Q.    Okay.  Do you recall what Leprino's
6  policy was for workplace violence during the time
7  that you were employed there?
8          A.    That it was workplace -- workplace
9  free -- I'm sorry.  Give me a second here.  I'm
10  saying this completely wrong.  That there was not
11  supposed to be any type of workplace violence within
12  Leprino Foods.
13          Q.    Is that a zero tolerance policy or...
14          A.    I don't believe it said "zero
15  tolerance."
16          Q.    Okay.  What is the distinction, then,
17  there's not supposed to be any workplace violence
18  versus a zero tolerance policy?
19          A.    Can you clarify?
20          Q.    Well, okay.  So you said your
21  understanding of Leprino's policy was there wasn't
22  supposed to be any workplace violence at Leprino.
23          Let's start with, how do you define
24  workplace violence, you personally?
25          A.    Me personally?

Page 30

1          Q.    Uh-huh.
2          A.    An act of aggression to physically harm
3  another individual.
4          Q.    Can you give me some examples?
5          A.    Personal examples?  I don't have --
6          Q.    How about, would an assault include
7  work --
8          A.    Yes.
9          Q.    What about horsing around?
10          A.    It would depend upon the situation.  If
11  someone was injured...
12          Q.    What if someone is not injured but feels
13  uncomfortable with horsing around?
14          A.    An investigation would have to be done.
15          Q.    When you did training regarding
16  workplace violence, did you tell employees what the
17  policy was?
18          A.    Did I read the policy?
19          Q.    Or just say, Leprino Foods' policy with
20  workplace violence is X, or something similar to
21  that.
22          A.    I don't recall specifically what I said.
23          Q.    Was Leprino's workplace violence policy
24  written down?
25          A.    Yes.

Page 31

1          Q.    Do you recall where?
2          A.    I don't recall if it's called "the hub,"
3  where their intranet is, but all policies and
4  procedures are in that intranet -- intranet -- not
5  inter-, but intranet.
6          Q.    Is that the LeprinoNet that is referred
7  to at the bottom of Exhibit 16?
8          A.    Yes.  Thank you.
9          Q.    Okay.
10          A.    Sorry.  Policies and procedures were
11  located there, and then we would always have them up
12  in the human resource area.
13          Q.    From what you recall, was the workplace
14  violence included in a separate section, or did it
15  have its own kind of brochure or section, portion?
16          A.    I believe it had its own section under
17  the handbook of Leprino Foods in general.
18          Q.    Okay.  And is that, like, the employee
19  handbook or a different handbook?
20          A.    It would have been the corporate
21  handbook.
22          Q.    Okay.
23          A.    And -- yeah.
24          Q.    What is the corporate handbook?
25          A.    Meaning it comes from headquarters, but

Page 32

1  it is overlying to all policies and procedures within
2  every single plant operation.
3          Q.    Okay.  How is the -- did, for example,
4  the corporate handbook have a different harassment
5  policy than what is listed on Exhibit 16?
6          A.    No.  It would be the same policy.
7          Q.    Okay.  Did you ever receive any training
8  as to how to conduct workplace violence
9  investigations at Leprino?
10          A.    Specific, no.
11          Q.    How did you go about conducting
12  workplace violence investigations at Leprino?
13          A.    Based upon previous experience, sit down
14  with the individuals, take their statements, conduct
15  additional interviewing if needed, take pictures.
16  Again, depending upon the situation, block off areas.
17  It really kind of depends.
18          Q.    Did your investigations for workplace
19  violence differ from your investigations for
20  discrimination or harassment?
21          A.    No.
22          Q.    In terms of the -- I'm saying like
23  interviewing witnesses and the steps that you would
24  take, they were consistent?
25          A.    Correct.

## Page 33

1     **Q.**   Is there anyone else besides yourself
2  and Julia Lambert that were responsible for
3  conducting workplace violence investigations at the
4  Fort Morgan plant?
5     **A.**   If needed, we would ask a manager to
6  help with collecting statements or anything like
7  that.
8     **Q.**   Anyone else in the HR department?  How
9  about that.
10    **A.**   Oh, no, sorry.
11    **Q.**   Okay.  And was there anyone else in the
12  HR department involved with harassment and
13  discrimination investigations aside from yourself or
14  Julia Lambert?
15    **A.**   No.
16    **Q.**   When you -- did you take witness
17  statements, or did you conduct interviews?
18    **A.**   Both.
19    **Q.**   How did you decide which to do?
20    **A.**   Based upon the scenario that was
21  presented to me.  Typically have a conversation with
22  the individual, and then they would give me a
23  statement afterwards.
24    **Q.**   Did Leprino have any kind of corporate
25  policy for its HR professionals to use with respect

## Page 34

1  to investigations?
2     **A.**   Can you clarify?
3     **Q.**   Like did you have kind of a separate
4  handbook or documents that said these are the steps
5  that you should use when conducting investigations?
6     **A.**   No.
7     **Q.**   Is there a difference between -- during
8  the time that you were at Leprino, was there a
9  difference between formal complaints and informal
10  complaints?
11    **A.**   Not that I can recall.
12    **Q.**   How would an employee make a complaint
13  about -- I'll just stick with workplace violence.
14    **A.**   Okay.  They could either speak to a
15  supervisor, a manager, or come up to the HR
16  department and speak to either myself or Julia about
17  a concern that they might have on workplace violence.
18    **Q.**   And were all complaints investigated?
19    **A.**   Yes.
20    **Q.**   Could they do this verbally, or did it
21  have to be in writing?
22    **A.**   Either/or.
23    **Q.**   I'm going to switch gears here.
24    **Q.**   Okay.
25    **Q.**   And do you recall an employee named

## Page 35

1  Nicolas Donez?
2     **A.**   Yes.
3     **Q.**   Was he an employee when you were at
4  Leprino?
5     **A.**   Yes, he was.
6     **Q.**   Before the incident involving his
7  termination, did you have any interaction with
8  Mr. Donez?
9     **A.**   Limited.
10    **Q.**   Can you recall any specifics?
11    **A.**   Yes.  During the reaffirmation, I
12  actually took a picture of him and his wife, just
13  showing that -- how many people we had at a specific
14  training.
15    **Q.**   I'm assuming you're not friends and
16  don't socialize with Mr. Donez?
17    **A.**   No, I don't.
18    **Q.**   Since the end of your employment, have
19  you seen or talked to him at all?
20    **A.**   No, I have not.
21    **Q.**   To your knowledge, was Mr. Donez ever
22  disciplined while you were working at Leprino?
23    **A.**   Can I clarify?
24    **Q.**   Uh-huh.
25    **A.**   Before the termination?

## Page 36

1     **Q.**   Before the termination.
2     **A.**   I do not recall.
3     **Q.**   What was your impression of Mr. Donez as
4  an employee?
5     **A.**   He seemed like a good employee.
6     **Q.**   Any complaints or issues that stand out
7  to you as we sit here today?
8     **A.**   Not that I can recall.
9     **Q.**   I'm going to go to the incident that
10  happened on February 9, 2016.  Do you recall that?
11  Do you recall an incident on February 9, 2016?
12    **A.**   Yes, yes, yes.
13    **Q.**   When did you first learn that something
14  had happened?
15    **A.**   An employee, Frank, came up to my office
16  and told me that he had just knocked Nick out.
17    **Q.**   What did you think when he said that?
18    **A.**   Shock.
19    **Q.**   After he said that, what happened?
20    **A.**   I asked him to come into my office to
21  sit down, take a few breaths, and tell me what was
22  going on.
23    **Q.**   Was there anyone else around when --
24  when you say "Frank," are we talking about
25  Frank Levar?

## Page 37

1    A.    Correct.

2    Q.    Was there anyone else around when
3 Frank Levar came up and said, "I just knocked Nick
4 out"?

5    A.    Yes.  Julia Lambert was.

6    Q.    Anyone else?

7    A.    I believe Sheryl Groves is the
8 individual who brought Frank to my office.

9    Q.    Okay.  So after you say, "Come in and
10 sit down," what happened next?

11    A.    I asked Frank if he was okay, what had
12 happened.  He said that he was calling for help in
13 the lactose room.  Nick came to the room, got in his
14 face, and Frank pushed him back.  And then Nick
15 double fisted Frank.  And during that time, his
16 glasses came flying off, and that he then knocked
17 Nick out and he was on the floor.  And he came up to
18 my office.

19    Q.    Did he have -- did Mr. Levar have
20 anything with him when he came up to your office?

21    A.    His glasses.

22    Q.    Okay.

23    A.    I remember his glasses.

24    Q.    Anything else?

25    A.    Not that I can recall.

## Page 38

1    Q.    So he said that he was calling for help
2 in the lactose room.  Nick came in and got in his
3 face.  Mr. Levar pushed him back.  Nick double fisted
4 him, knocked off his glasses, and Frank punched him?

5    A.    Correct.

6    Q.    Do you recall him saying anything else?

7    A.    That he was sick and tired of people not
8 coming and helping him in the lactose room.

9    Q.    Was that an issue?

10    A.    I don't know.  He made it seem like it
11 was.

12    Q.    Do you know who either Mr. Levar or
13 Mr. Donez's supervisor was that day?

14    A.    I don't.  I don't know who was working
15 that day.

16    Q.    Do you recall if -- do you recall what
17 Mr. Donez's position was at that time?

18    A.    Mr. Donez?

19    Q.    Uh-huh.

20    A.    I believe he was a foreman.

21    Q.    Do you know if the supervisor was there
22 that day, the day of the incident?

23    A.    I don't recall.

24    Q.    Did Leprino have issues with being
25 short-staffed at times?

## Page 39

1    A.    Occasionally.

2    Q.    Did that create issues with the
3 employees?

4    A.    Not typically.

5    Q.    Is there any incident that you can
6 remember when it did create an incident with
7 employees when they were short-staffed?

8    A.    Not off the top of my head, no.

9    Q.    How much interaction did you have on a
10 daily basis with the hourly employees?

11    A.    It varied.

12    Q.    What would be like the maximum amount of
13 time that you would spend with hourly employees on a
14 daily basis?  And I'll strike that.  Let me ask you a
15 better question.

16    A.    Okay.  Because I'm like, oh...

17    Q.    What percent of your time was spent
18 dealing with benefits versus what percent of your
19 time was dealing with investigations?  How about
20 that.

21    A.    I did more with investigations than I
22 did with benefits.

23    Q.    Okay.  Aside from investigation and
24 benefits, was there another area that you spent
25 significant time on during your time at Leprino?

## Page 40

1    A.    More of a strategic piece from the HR.
2 Whether the plant was being either restructured, how
3 it would affect -- we have cheese and then we have
4 lactose.  Or we did -- or how do I say that?  Leprino
5 has cheese and lactose.  So the restructuring of it,
6 more of a strategic high level, that is where I spent
7 the majority of my time for Leprino.

8    Q.    Would that be like 50 percent of the
9 time or 70 percent?

10    A.    Again, every day was different.

11    Q.    Okay.

12    A.    Every day was -- sometimes it was
13 100 percent; other times it was 10 percent.

14    Q.    Okay.

15    A.    It's hard to gauge that.

16    Q.    Okay.  Let's go back to the day of the
17 incident.  So Frank is in your office and he says
18 this to you.  What happens after that?

19    A.    After Frank and I had our conversation,
20 I told him that I would need to do an investigation,
21 and he was suspended pending investigation.  Julia
22 then took Frank and got his statement.

23    I, at that time, was -- I don't know if
24 it was the radio or a text, but I got ahold of the
25 manager to make sure that Nick was okay down on the

Page 41

1  floor.  I was told at that time then the ambulance
2  was coming.
3        And it was just a little -- it was chaos
4  at that time because we needed to make sure that Nick
5  was okay, the ambulance was coming.  And then Frank
6  exited the building.  I believe Julia walked him out.
7        And then I believe I met with Ron and
8  Julia at that time.
9        Q.    Okay.  We'll get to that.
10       A.    Okay.
11       Q.    When Frank was in your office and he was
12  sitting down and telling you about this, do you
13  remember how long, approximately, that conversation
14  took place?
15       A.    Maybe 20 minutes.
16       Q.    Did you ask Frank to make a statement at
17  that time?
18       A.    I did.
19       Q.    And did you have him write it out?
20       A.    Yes, I did.  Well, to clarify, Julia
21  actually made -- had him write the statement.  I
22  requested it.
23       Q.    Do you recall asking him any other
24  questions during that meeting?
25       A.    What happened, what's going on, and

Page 42

1  that's when he told me the situation that happened
2  with Frank.
3        Q.    What was Frank's demeanor during that
4  meeting?
5        A.    He was visibly shakened.  He was
6  fidgeting with his hands.  He was trying to fix his
7  glasses.  Because he told me -- obviously when Nick
8  double fisted him, it must have came up and got in
9  his glasses.
10       Q.    I mean, you were not present during the
11  assault, correct?
12       A.    No, I was not.
13       Q.    To your knowledge, do you know if there
14  were any witnesses?
15       A.    Not that I'm aware of.
16       Q.    During your time at Leprino, have you
17  ever had a similar incident, meaning an assault that
18  you had to deal with?
19       A.    No.
20       Q.    Okay.  So at the end of the meeting, you
21  told Mr. Levar that he was going to be suspended
22  without pay?
23       A.    Pending investigation.
24       Q.    Pending investigation.
25            And then did you ask Ms. Lambert to walk

Page 43

1  Mr. Levar out?
2        A.    To get his statement and then to walk
3  him out, correct.
4        Q.    Any other interaction you had with
5  Frank Levar that day?
6        A.    No.
7        Q.    Any other interaction you had with
8  Frank Levar after that day?
9        A.    Yes.
10       Q.    When was that?
11       A.    During the -- I think you called it
12  criminal trial?
13       Q.    Uh-huh.
14       A.    During the criminal trial, I was asked
15  questions, and Frank was present.
16       Q.    Okay.  That was just -- was that in a
17  courtroom?
18       A.    Yes.
19       Q.    Any other time that you have seen or
20  talked to Frank Levar since that meeting?
21       A.    Not to my knowledge.
22       Q.    So after that, you said you -- either
23  through a text or some -- some method, you got ahold
24  of -- who was it?
25       A.    The manager.  So it would have been

Page 44

1  either Mike Buckhout or Ron Cantwell.
2        Q.    Do you recall what was said when you got
3  ahold of the manager?
4        A.    I believe I was just asking someone to
5  please check on Nick, that he was in the lactose
6  area.  And at that time they told me that the
7  ambulance had been called.
8        Q.    Did the manager convey Nick's condition
9  to you at that time?
10       A.    No.
11       Q.    Did you go down to the lactose room and
12  ever see Nick there?
13       A.    I went down to the lactose room, but
14  Nick had already been moved at that point.
15       Q.    Okay.  So after you -- when you talked
16  to the manager, was that on the phone or in person or
17  on radio?
18       A.    Yeah.  It wasn't in person.
19       Q.    Okay.  After you talked to the manager,
20  what happened after that?
21       A.    At that point, then, Julia and I decided
22  we were going to the hospital to check on Nick.  So
23  we grabbed our workers' comp paperwork and -- I can't
24  remember the name, the FMLA -- NUMA (phonetic).
25       Q.    So --

Page 53

1     Q.   Do you recall in general what you
2  discussed with Ms. Soja?
3     A.   Told her basically what Frank had told
4  me; that Nick Donez was in the hospital, gave her the
5  information that he gave me. And then I believe at
6  that point, too, the Fort Morgan Police were asking
7  for additional information, so I needed to get
8  clarification on what kind of information that I
9  could release or turn over to them.
10    Q.   Did you believe Frank, his statement as
11  to what happened?
12    A.   I did.
13    Q.   Did you have any previous incidents
14  during your employment at Leprino involving
15  Frank Levar?
16    A.   Not that I can recall.
17    Q.   Do you recall any employees making
18  complaints about Frank Levar at any time during your
19  employment?
20    A.   Not that I can recall.
21    Q.   Why did you believe Frank?
22     MR. BRITTAN:  Can I get a time frame?
23     MS. BURMA:  During the conversation --
24    Q.   (BY MS. BURMA)  I think we have kind of
25  gone over that was the only time you spoke with him.

Page 54

1  So that day when you were speaking with
2  him, why did you believe him, Mr. Levar?
3    A.   Because he came up and he originally
4  wanted to -- he said it was going to be an exit
5  interview because he just knocked Nick out. At that
6  point he didn't have any reason to lie, and he was
7  very forthcoming when I asked the questions.
8    Q.   So Mr. Levar said this is his exit
9  interview?
10    A.   When he initially came into the office,
11  yes.
12    Q.   Okay. When you were talking with
13  Mr. Levar, did you take notes?
14    A.   I did.
15    Q.   What happened to those notes?
16    A.   Typically -- I shouldn't say
17  "typically." But if I write it, then I will type it
18  up. So they would have been in my recap.
19    Q.   And then what would happen to the
20  handwritten notes?
21    A.   Typically I would throw them away.
22    Q.   Okay.
23    A.   Yeah.
24    Q.   Was there any time limits put on how
25  long the investigation for Leprino would take?

Page 55

1    A.   Can you clarify?
2    Q.   Meaning, was -- did anyone tell you, "We
3  have to have this investigation completed in like two
4  weeks," or anything like that?
5    A.   No. No.
6    Q.   Were you in charge of the investigation
7  for Leprino Foods involving this incident?
8    A.   Yes.
9    Q.   I'm sure Julia Lambert was also
10  involved.
11    A.   Correct.
12    Q.   Was there anyone else from human
13  resources that was involved in the investigation of
14  the incident between Mr. Donez and Mr. Levar?
15    A.   Anyone else in human resources?
16    Q.   Correct.
17    A.   No.
18    Q.   Did you view Mr. Donez's personnel file
19  as part of your investigation?
20    A.   I don't recall.
21    Q.   Did you review Mr. Levar's personnel
22  file as part of your investigation?
23    A.   I don't recall.
24    Q.   When you spoke with witnesses, did you
25  take statements, or did you conduct interviews?

Page 56

1    A.   Both.
2    Q.   And when you conducted interviews, did
3  you keep notes?
4    A.   Yes.
5    Q.   How about this: Tell me what you can
6  recall from the process of the investigation for this
7  incident.
8    A.   The process of the investigation of
9  this. Would -- in general?
10    Q.   Let's start in general. Then we'll go
11  to specific.
12    A.   Okay. Ask the individual to come in.
13  Ask them a series of questions based upon the
14  circumstances. And when they were -- my questions
15  would be done, then I would ask them to write their
16  statement.
17    Q.   Do you recall approximately how many
18  employees you interviewed?
19    A.   Not off the top of my head.
20    Q.   Were these interviews done separate from
21  the police interviews?
22    A.   Some were; some weren't.
23    Q.   Were you involved in any of the police
24  interviews?
25    A.   Yes.

Page 57

1    Q.    Why?
2    A.    I was requested from legal, Leprino, to
3  sit in on all of the investigations.
4    Q.    Did you sit in on all the police
5  interviews?
6    A.    I believe so, yes.
7    Q.    Did you sit in on any of the interviews
8  between the police and Mr. Donez?
9    A.    No, I did not.
10    MS. BURMA:  We have been going for about
11  an hour and 15 minutes.  Can we take a brief break?
12    MR. BRITTAN:  That's fine.
13    (Recess taken from 2:14 p.m. to 2:26 p.m.)
14    Q.    (BY MS. BURMA)  I am going to hand you
15  what we are going to mark as Exhibit 17.  Let me hand
16  it to her first.
17    (Exhibit 17 marked for identification.)
18    Q.    (BY MS. BURMA)  And I'll give you a
19  second to review it.  Just let me know when you're
20  done.
21    Let me first ask you, do you recognize
22  this document?
23    A.    Some of them, yes.
24    Q.    Do you know who prepared it?  Kelly --
25    A.    By Kelly Soja's name on the top, this is

Page 58

1  her notes.
2    Q.    So this was not something that you
3  typed?
4    A.    Correct.
5    MR. BRITTAN:  Just for clarification --
6  go ahead and clarify.
7    A.    Well, the first part is not something
8  that I typed.  My piece is on -- starting on
9  number 3, page number 3.
10    Q.    (BY MS. BURMA)  Uh-huh.
11    A.    This is something that I typed, through
12  page 6.
13    Q.    Okay.  If you look -- can you look at
14  the bottom of page 3.
15    A.    Bottom of page 3, yes.
16    Q.    So you typed everything from 3 to 6?
17    A.    Correct.
18    Q.    Okay.  Aside from this document and the
19  handwritten statements, is there anything else that
20  you're aware of that was included in Leprino's
21  investigative file regarding this incident?
22    A.    The police report.
23    Q.    Okay.  During your time at Leprino, were
24  you involved in any other incidents that involved the
25  police in any way, shape, or form?

Page 59

1    A.    Yes.
2    Q.    In those incidents, did you include the
3  police investigative report as part of the incident
4  file?
5    A.    Not for one.
6    Q.    What was -- the one that you're thinking
7  of right now, what was that incident?
8    A.    Drugs were found on the plant floor.
9  Police were called.  Their dogs came into the plant,
10  swept it, could not find any additional drugs in the
11  plant.
12    Q.    Okay.  And any other incidents that you
13  recall during your time at Leprino besides that one
14  and the one at issue in this case?
15    A.    No.
16    Q.    Was it your decision to include the
17  police report as part of the investigative file, or
18  were you asked to do that?
19    A.    It was my decision, based upon a comment
20  that one of the police officers had made to me that
21  Nick told him that he had punched Frank.
22    Q.    Do you recall when this conversation
23  with the police officer occurred?
24    A.    It was after the incident, but I don't
25  have a specific date.

Page 60

1    Q.    Was it in person, or was it over the
2  phone?
3    A.    It was in person.
4    Q.    And did the conversation happen at
5  Leprino, at the Fort Morgan plant?
6    A.    Correct.
7    Q.    Do you recall who the officer was?
8    A.    Not off the top of my head, no.
9    Q.    Do you recall if it was a man or a
10  woman?
11    A.    It was a man.
12    Q.    Does Vosburg ring any -- refresh your
13  memory at all?
14    A.    There were three of them.  I apologize,
15  no, I don't recall which one.
16    Q.    Do you recall specifically what the
17  officer said to you about what Nick told him?
18    A.    That Nick had stated that he
19  pushed/punched Frank, which accelerated the -- sorry,
20  conversation -- or excuse me, the incident.
21    Q.    So the police officer said that Nick had
22  told him that he either pushed or punched Frank,
23  which accelerated the incident; is that correct?
24    A.    Correct.
25    Q.    Did you review the police report?

## Page 69

1      A.    That we were all in consensus that due
2  to the fact that he admitted that he, you know, was
3  part of the incident with Frank Donez --
4            MR. BRITTAN:  Frank Levar.
5            THE DEPONENT:  Oh, did I say the
6  wrong --
7            MR. BRITTAN:  You said Frank Donez.
8            THE DEPONENT:  I'm sorry.  I apologize.
9      A.    Okay.  Can you repeat the question?
10     Q.    (BY MS. BURMA)  Okay.  Let's back up and
11  try to go in order.
12     A.    Okay.
13     Q.    So we have the incident that happened,
14  and you have conducted an investigation and you've
15  interviewed witnesses.
16     A.    Correct.
17     Q.    How long did it take you to interview
18  witnesses?
19     A.    I would say probably within that
20  following week.
21     Q.    Okay.  Now, after you have interviewed
22  witnesses, what happened after that?
23     A.    After we interviewed all the witnesses,
24  gathered all of our information, we were waiting on
25  the police report in order for it to confirm what

## Page 70

1  Frank had said or what Nick had said.  And at that
2  point, it basically -- it lined up with what Frank
3  had stated initially.
4            And then that's when I placed a phone
5  call to Nick and asked him about it, and that's when
6  he admitted that, yes, he made that statement to the
7  police.
8      Q.    Okay.  And before we get to your phone
9  call with Nick, did you have conversations with
10  corporate -- after the interviews and before the
11  phone call with Nick -- regarding Mr. Donez's
12  termination?
13     A.    Yes, yes.
14     Q.    And those were those conversations we
15  just talked about, about you were on the same page
16  because of what the detective had told you?
17     A.    Correct.
18     Q.    Now, when you spoke with Nick, had
19  you -- had the decision already been made to
20  terminate Nick at that time --
21     A.    No.
22     Q.    -- when you made that phone call?
23            Had you received the police report at
24  the time that you called Mr. Donez?
25     A.    Yes.

## Page 71

1      Q.    So what did you say during that phone
2  call with Mr. Donez?
3      A.    That I received the police report, and
4  that based upon his statement he provided to me and
5  what the police report was stating, that it is
6  different, and whether or not his statement in the
7  police report was accurate or not.
8      Q.    And did you -- I mean, did you have the
9  police report in front of you, if you recall?
10     A.    I did.
11     Q.    Did you quote from the police report?
12     A.    I did.
13     Q.    Do you know if Mr. Donez had the police
14  report in front of him?
15     A.    I don't.
16     Q.    What did Mr. Donez say in response?
17     A.    I don't know his exact words, but that,
18  yes, he remembered when he spoke to the police
19  officer that he did state that he had shoved Frank as
20  well.
21     Q.    Okay.  And why was Nick shoving
22  Mr. Levar a violation of the workplace violence
23  policy for Leprino?
24     A.    It physically hurt, and/or in a
25  threatening manner, the well-being of an employee.

## Page 72

1      Q.    Did Mr. Donez say that he either pushed
2  or punched Mr. Levar in a threatening manner?
3      A.    State that again.
4      Q.    Did Mr. Donez make any statements as to
5  what his intent was when he pushed Mr. Levar?
6      A.    Not to me, no.
7      Q.    Did Mr. Donez convey to you that he was
8  fearful at that time, which is why he pushed
9  Mr. Levar?
10     A.    No, he did not.
11     Q.    Did you ask Mr. Donez that?
12     A.    I did not.
13     Q.    How long did your phone call with
14  Mr. Donez last?
15     A.    Maybe ten minutes.
16     Q.    Do you recall anything else that you
17  discussed during that phone call?
18     A.    That I would be back in touch with him.
19     Q.    That was it?
20     A.    Yeah, that I would be back in touch with
21  him.
22     Q.    Do you recall if during that phone call
23  you scheduled a meeting with Mr. Donez?
24     A.    I do not.
25     Q.    Did you ever speak with Mr. Donez again?

*DONEZ*

*VS.*

*LEPRINO FOODS COMPANY*

Deposition

*HEATHER L. DONEZ*

*10/28/2019*

_____

*AB Court Reporting & Video*
*216 16th Street, Suite 600*
*Denver Colorado, 80202*
*303-296-0017*

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 19-CV-00285-CMA

DEPOSITION OF HEATHER L. DONEZ     October 28, 2019

NICOLAS DONEZ,

Plaintiff,

vs.

LEPRINO FOODS COMPANY,

Defendant.

APPEARANCES:

BURMA LAW OFFICES, LLC
   By Amy K. Burma, Esq.
      1035 Pearl Street, Suite 325
      Boulder, Colorado 80302
         Appearing on behalf of Plaintiff

CAMPBELL KILLIN BRITTAN & RAY, LLC
   By William C. Brittan, Esq.
      270 St. Paul Street, Suite 300
      Denver, Colorado 80206
         Appearing on behalf of Defendant

Also Present: Nicolas Donez

## Page 2

1      Pursuant to Notice and the Federal
2  Rules of Civil Procedure, the deposition of
3  HEATHER L. DONEZ, called by Defendant, was taken
4  on Monday, October 28, 2019, commencing at 1:14
5  p.m., at 1035 Pearl Street, Suite 325, Boulder,
6  Colorado, before Tracy L. Harris, Certified
7  Realtime Reporter, Registered Merit Reporter, and
8  Notary Public within and for the State of
9  Colorado.
10
11
12          I N D E X
13  DEPOSITION OF HEATHER L. DONEZ
14  EXAMINATION BY:              PAGE
15   Ms. Burma                   --
16   Mr. Brittan                  3
17
18  EXHIBITS           INITIAL REFERENCE
   Exhibit 10 Photograph            30
19
   Exhibit 11 Photograph            32
20
21 Exhibit 12 Equal Employment Opportunity    42
          Commission Intake Questionnaire
22 Exhibit 13 Typewritten statement of Nicolas  59
          Donez dated 2-10-2016
23
24 Exhibit 14 Letter dated 4/6/2016 to Whom It  93
          May Concern
25

## Page 3

1       P R O C E E D I N G S
2           HEATHER L. DONEZ,
3  being first duly sworn in the above cause, was
4  examined and testified as follows:
5              EXAMINATION
6  BY MR. BRITTAN:
7      Q    Can you state your full name for the
8  record, please.
9      A    Heather Lynn Donez.
10     Q    Ms. Donez, have you ever given a
11 deposition before?
12     A    No.
13     Q    I know you've testified under oath at
14 least one time --
15     A    Yes.
16     Q    -- maybe twice, so this is -- is a
17 similar process.  Before we get going, though, I
18 want to make sure you understand kind of the
19 ground rules for the deposition this afternoon.
20         First of all, Tracy's our court
21 reporter, and she's going to be taking down
22 everything that's said.  You and I are sitting
23 across the table from one another and we're going
24 to have kind of a conversation, a one-way
25 conversation primarily.  I'll ask you questions

## Page 4

1  and you'll answer them, but it's very common in
2  this setting for people to answer with uh-huh or
3  huh-uh or with a nod or a shrug when a question is
4  asked.  I'll understand what you mean, but we need
5  to have a verbal response for Tracy to get it down
6  so that we have a proper transcript, okay?
7      A    Okay.
8      Q    All right.  If I get an uh-huh or
9  huh-uh or a shrug or a nod -- and it's very common
10 to do that -- I'm going to ask for a verbal
11 response.  And I mean no disrespect.  I just want
12 to make sure we have a clean transcript, okay?
13     A    Okay.
14     Q    Again, in normal conversation, it's --
15 it's not uncommon for you to jump in and maybe
16 begin your answer before I begin -- or before I
17 complete my question, but it makes it difficult
18 for Tracy to take down two people talking at the
19 same time.  So if you give me the courtesy of
20 waiting until I finish my question before you
21 begin your answer, I'm sure Tracy would appreciate
22 that.
23     A    Okay.
24     Q    All right.  I want to make sure that
25 you understand the question before you answer it.

Page 37

1    Q    Is your dad local?  Does he live local?
2    A    In Brush.
3    Q    Brush?
4    A    (Deponent nodded head.)
5    Q    Did --  Did anyone from Leprino Foods
6 come to the hospital?
7    A    Julia Lambert and Risa.
8    Q    Why did they come to the hospital, to
9 your understanding?
10    A    The first thing they did was have him
11 fill out workers' compensation paperwork.
12    Q    And did they --  So did that get filled
13 out while you were still at the hospital?
14    A    Yeah.  Nick signed it.  He was groggy,
15 but he signed it.
16    Q    Okay.  Was there something to fill out
17 other than just him signing it?
18    A    Just his signature.
19    Q    Okay.  So you're saying that for the
20 workers' comp paperwork, the only thing Nick had
21 to do was sign the paperwork?
22    A    Yes.
23    Q    And that's it.  I mean, there was
24 nothing else to fill out?
25    A    Right.

Page 38

1    Q    Did you review it before he signed it?
2    A    No.
3    Q    Okay.  Did they --  Did they bring
4 anything else with them, any other paperwork or
5 information?
6    A    Not that I know of.
7    Q    Was there a period of time when
8 Ms. Esterly and Ms. Lambert had to wait outside of
9 the room?
10    A    I don't know.
11    Q    Do you remember that?
12    A    I was in the room with him, so I don't
13 know.
14    Q    I'm sorry.  You were or were not?
15    A    I was in the room with Nick, so I don't
16 know where they were.
17    Q    So --  Okay.  So you don't remember
18 them having to leave and wait for a period of time
19 out in the general waiting area?
20    A    I don't remember that.
21    Q    Okay.  Other than the police officer or
22 officers, Ms. Esterly and Ms. Lambert, did anybody
23 else come to the hospital that day while you were
24 there?
25    A    In the emergency room?

Page 39

1    Q    So you're --  You had indicated that at
2 the time you got there, he already had a room.
3 Was that a room in the emergency room?
4    A    It was in the emergency room.
5    Q    Okay.  So that's not --  Because your
6 husband ended up staying overnight, correct?
7    A    Right.
8    Q    Okay.  He was put in a room outside of
9 the emergency room, correct?
10    A    Correct.
11    Q    Okay.  So for some period of time, he
12 was in the emergency room, and then for some
13 period of time after that he was in his actual
14 overnight room?
15    A    Yes.
16    Q    Okay.  When Ms. Esterly and Ms. Lambert
17 came, was that while your husband was in the
18 emergency room?
19    A    Yes.
20    Q    Okay.  Did they ever talk to him while
21 he was in his overnight room?
22    A    No.
23    Q    Did the police officer or officers talk
24 to your husband when he was in the emergency room,
25 in his room or both?

Page 40

1    A    In the emergency room.
2    Q    Okay.  Only in the emergency room?
3    A    At the hospital?
4    Q    Yes.
5    A    Yes, only in the emergency room.
6    Q    Okay.  At what point in time did you
7 come to understand what happened between your
8 husband and Mr. Levar?
9    A    When I got to the hospital, I believe,
10 I --  Well, it was after I got to the hospital.
11 The police came, and before I even got a chance to
12 speak to Nick --  I mean, the doctors were with
13 him and then the police were with him, so I was
14 kind of learning it all while he was having --
15 while the conversations were being had.
16        He was starting to remember, so --  But
17 I didn't hear the whole police interview, you
18 know, because I was trying to get ahold of my
19 family.  But after the police left, Nick --  Nick
20 told me what he --  what he remembered at that
21 time.
22    Q    So you did not hear from Nick what had
23 happened between him and Mr. Levar until after he
24 had spoken to the police officers?
25    A    Correct.

Page 49

1    A    Yes, Exhibit 12.  Whenever this took
2  place, about 35 minutes from the incident
3  happening, things were still pretty foggy.  And
4  then just that one other time.  And I think that
5  was at our house.
6    Q    Okay.  So let me repeat my question.
7  You've already told me that the conversations
8  that are recorded here in Report No. 2 from the
9  Fort Morgan Police Department reflected in
10  Exhibit 12, where it indicates that Frank pushed
11  Nick and Nick pushed Frank, that you were not
12  present at the emergency room when those
13  conversations were had, correct?
14    A    Correct.
15    Q    Okay.  So the only time that you would
16  have had a conversation involving your husband and
17  the Fort Morgan Police Department as to what
18  happened between himself and Frank Levar that
19  morning was the one time at your house in
20  preparation for the criminal trial, correct?
21    A    I spoke to the police detective a
22  little bit after -- or when he was getting
23  ready -- whenever he was getting ready to leave
24  the emergency room also, but that was -- I don't
25  think that was anything of substance.

Page 50

1        We spoke about -- You know, he asked
2  me about the hammer, because there was a hammer
3  present in the room.  But as far as me being
4  present for this statement, I was not present for
5  this statement.
6    Q    Okay.
7    A    But I did speak to the police officer
8  that day, and he did take my statement as far as
9  the hammer goes and as far as Frank and -- and
10  stuff like that.  I did speak to him in the
11  emergency room, but as far as me listening to all
12  of Nick's statements, I was not -- yeah, I was not
13  in the emergency room -- or I was not in the room
14  the whole time.
15    Q    Then let me make sure the record is
16  clear.  You did not overhear the conversation
17  between your husband and the officer or officers
18  with the Fort Morgan Police Department the morning
19  of the incident as to Nick pushing Frank and Frank
20  pushing Nick, correct?
21    A    Correct.
22    Q    Okay.  And so the only time that you
23  had a conversation about exactly what happened
24  between Nick and Frank that morning, including the
25  police officers, was at your home in preparation

Page 51

1  for the criminal trial.  And you've already
2  indicated to me as to what Nick said at that time,
3  correct?
4    A    I believe that the police officer may
5  have came to our house and re-interviewed Nick,
6  but I don't remember exactly.
7    Q    So is this a different time than what
8  you just mentioned with the district attorney
9  there, or is it the same time?
10    A    I believe it was a different time.
11    Q    And were you present for that interview
12  or conversation?
13    A    I believe so.  I'm trying to remember.
14  It was a long time ago.
15    Q    And what was said at that time by your
16  husband --
17    A    The same thing.
18    Q    Hold on.  Let me finish my question.
19        What was said at that time by your
20  husband as to what happened in the refiner room
21  that morning between he and Frank Levar?
22    A    The same thing.
23    Q    "The same thing," meaning what?
24    A    The same thing as I -- as with the
25  district attorney and the police detective.

Page 52

1    Q    That Frank shoved Nick and that Frank
2  was -- was proceeding forward, so Nick shoved him
3  back at that time, correct?
4    A    To stop the imminent attack, yes.
5    Q    Okay.  Were you involved at all in the
6  investigation by Leprino Foods into the incident?
7    A    So if anybody was involved, it was me.
8  They really didn't talk to Nick.  So, yeah.
9    Q    When you say they did not talk to Nick,
10  what do you mean?
11    A    They went to the hospital, Risa and
12  Julia, and they asked him a few questions.  Things
13  were still really foggy for him at that time.  I
14  don't remember what they asked him exactly, but I
15  know he was having a hard time remembering things
16  clearly.  And then it wasn't until February 29th
17  that Risa Esterly called him and told him -- or
18  set up a meeting for that afternoon and terminated
19  him.
20        So those were the only two times they
21  spoke to Nick.  Otherwise, any conversations that
22  were had about Nick's -- about how he was doing
23  went through me.
24    Q    And what conversations did you have
25  with representatives of Leprino Foods as to how he

**Page 53**

1  was doing?

2      A    Oh, I sent text messages back and forth

3  the Julia Lambert letting them know -- letting

4  them know that he was in ICU; letting them know

5  that I wouldn't be back to work that next day, I

6  believe.  And I don't know if I worked the next

7  day, but -- I mean, I went in the very next

8  day -- he was still in the hospital -- to Leprino

9  Foods, because he needed his keys and wallet and

10  stuff out of his locker.  I also went up and spoke

11  to Mike Buchout and told him that I needed a few

12  days off.

13           They wanted his stuff, his bump cap and

14  his stuff that was on the floor, because -- So in

15  the refiner room, Coral Mendez and -- They -- I

16  mean, they had picked everything up and they gave

17  it all to me.  It was a bump cap, a hair net, a

18  pen, keys and an apron, I believe.  They put it

19  all in -- His bump cap, they gave it to me, so I

20  put it in his locker -- in my locker before I

21  left.  They wanted that.

22      Q    "They" being who?

23      A    HR, Risa.

24      Q    Do you have any understanding as to why

25  they wanted that?

**Page 54**

1      A    The police wanted it, I believe.

2      Q    Okay.  So they were -- were requesting

3  for you to give it to the police?

4      A    Yeah, I think so.

5      Q    Okay.

6      A    And then, also, they had -- That day,

7  I was told that they needed a statement from Nick.

8  I explained to them that he wasn't really in a --

9  in a good place to write a statement, so I was

10  told to write it for him, to have him dictate it.

11  And so that's how that statement was written.  I

12  wrote it, but he dictated it to the best of his

13  ability at that time.  Everything was still pretty

14  foggy.

15      Q    You said that at the hospital when

16  Julia and -- Julia Lambert and Risa Esterly were

17  there, you said Nick was not remembering things

18  clearly?

19      A    Yeah.

20      Q    How do you know that?

21      A    I'm married to him.  He was not

22  himself.  He was remembering -- His memory was

23  coming back extremely slowly.  He was remembering

24  things, but he just wasn't -- wasn't remembering

25  everything that -- He -- He just had a major

**Page 55**

1  concussion.

2      Q    Was he ever diagnosed with a

3  concussion?

4      A    Yes.

5      Q    And who diagnosed him with a

6  concussion?

7      A    The doctors.

8      Q    What doctor?

9      A    I don't know.  The doctor.  He was

10  knocked unconscious.  That's a concussion.

11      Q    What examples can you give me, if any,

12  as to what he was remembering and what he was not

13  remembering clearly as he was in the hospital room

14  and at the ER at the hospital?

15           MS. BURMA:  I'm going to object to any

16  communications that are protected by spousal

17  privilege unless there was a third party present.

18           MR. BRITTAN:  If that's the case, then

19  I'll object to any such testimony at the time of

20  trial, because you won't be able to waive the

21  privilege and disadvantage the defendant.

22           So if you want to stand on the

23  privilege, then that's fine, but it won't be able

24  to be testified to at the time of trial.

25           MS. BURMA:  Give me a couple minutes to

**Page 56**

1  speak with my clients.

2           MR. BRITTAN:  Absolutely.  This is a

3  good time to take a break.

4           (Recess from 2:25 p.m. to 2:30 p.m.)

5           MS. BURMA:  I will withdraw my

6  objection.

7           MR. BRITTAN:  Tracy, will you read back

8  the last question, please.

9           (Last question read.)

10           THE DEPONENT:  Can I answer it?

11           MS. BURMA:  Yeah, I'm withdrawing my

12  objection.

13      Q    (By Mr. Brittan)  Yes, you can.

14      A    Okay.  I mean, the incident -- He

15  was -- He was trying really hard to remember

16  clearly the incident.  He was trying to remember

17  what led up to it and then especially during the

18  incident.  He wanted to remember that, but he

19  couldn't.  And so -- Yeah, just what led up to it

20  and the incident.

21      Q    Okay.  So in terms of what he wasn't

22  remembering clearly in the -- or I should say at

23  the hospital, that's the example you can give me

24  to indicate that you believe he had a concussion?

25      A    I know he had a head injury.

Page 57

1 **Q    Okay.  But you had said he wasn't**
2 **remembering things clearly, and that's the example**
3 **you can give me right now, is that he was trying**
4 **really hard to remember what happened between**
5 **himself and Mr. Levar, but he couldn't remember it**
6 **clearly?**
7 **A    He still has no memory of the actual**
8 **incident -- of the actual altercation.**
9     Q    Just answer my question.  At the
10 hospital, I asked you for examples -- if you had
11 any examples of what he wasn't remembering clearly
12 at the hospital.  The example that you gave me was
13 that he was he was trying to remember, but he was
14 having difficulty remembering what happened
15 between himself and Mr. Levar --
16     A    Yes.
17     Q    -- correct?
18         Okay.  Did he know who you were?
19     A    Yes.
20     Q    Did he know who Ms. Lambert was?
21     A    Yes.
22     Q    Did he know who Ms. Esterly was?
23     A    I think so.
24     Q    Okay.  When the police officer came in,
25 did he recognize that individual as a police

Page 58

1 officer?
2     A    You would have to ask him, but I think
3 so.
4     Q    Did you have --  Did you --  Strike
5 that.
6         Did you notice anything about your
7 husband's questioning or attitude towards the
8 police officer about wondering why he was there in
9 a hospital room?
10     A    No.
11     Q    Okay.  Or in the emergency room?
12     A    No.
13     Q    Okay.  He was aware that the police had
14 been called because of the incident with
15 Mr. Levar, correct?
16     A    Yes.  He knew something had happened
17 with Mr. Levar, and he was remembering bits and
18 pieces.
19     Q    **And you say he still cannot remember**
20 **what happened -- or to this day he still cannot**
21 **remember what happened?**
22     A    **As far as the altercation goes --  As**
23 **far as the physical altercation goes, that's**
24 **right.  Yeah, as far as what happened once he**
25 **was -- once he was attacked.  At --  He remembers**

Page 59

1 **up to the point of Frank shoving him and then**
2 **Frank proceeding forward, him shoving him back to**
3 **prevent the attack.  And then that's it.  Yeah,**
4 **that's all he remembers.**
5     Q    You indicated before we just took the
6 break that you assisted your husband Nick in
7 preparing his statement for Leprino Foods,
8 correct?
9     A    Yes.
10         MR. BRITTAN:  What are we on, Trace?
11         THE REPORTER:  13.
12         MR. BRITTAN:  Let's mark this as No.
13     13.
14         (Exhibit 13 marked.)
15     Q    (By Mr. Brittan)  Let me show you what
16 we have marked as Exhibit 13.  Please take a
17 moment to look at that.
18     A    Okay.
19     Q    Did you review this in preparation for
20 your deposition?
21     A    After I wrote it, no.
22     Q    After --  When was the last time that
23 you actually saw this statement?
24     A    When I wrote it.
25     Q    Okay.  So --  And that would have been,

Page 60

1 according to right up here in the right corner,
2 February 10, 2016?
3     A    Yes.
4     Q    And so that would be the day after this
5 incident?
6     A    Yes.
7     Q    Okay.  At that --  Strike that.
8         You talked to your husband, and he --
9 I think you said before that he dictated and you
10 basically typed this out, right?
11     A    Yes.
12     Q    Was this done at the hospital or
13 somewhere else?
14     A    It was at our house the night after
15 he --  So he was released at about 2:00 p.m.
16     Q    Okay.  And is that your husband's
17 signature there in the lower right-hand --
18     A    Yes.
19     Q    And you'll agree with me that this
20 statement does not include anything about your
21 husband pushing Frank back, correct?
22     A    Correct.
23     Q    Okay.  And you'll agree with me that
24 there's nothing in this statement that indicates
25 that Frank was advancing on your husband?

## Page 61

1    A    Correct.

2    Q    And you'll agree with me that there's
3 nothing in this statement that indicates that
4 Frank had raised his fists up after he pushed your
5 husband, correct?

6    A    Correct.

7    Q    And you provided this statement to
8 Leprino Foods, correct?

9    A    I did.

10    Q    And who -- who did you provide it to at
11 Leprino Foods?

12    A    Risa Esterly.

13    Q    Did you e-mail it to her or hand it to
14 her?  Do you --

15    A    I believe -- I don't know, honestly.

16    Q    Did you have any conversation with
17 Ms. Esterly when you provided her with this
18 statement?

19    A    I don't remember.

20    Q    Did you ever have any conversation with
21 anyone at Leprino Foods following your husband's
22 incident with Mr. Levar indicating that you
23 believed he was concussed and was not remembering
24 things accurately?

25    A    Yes, I did.  I told them that --  They

## Page 62

1 wanted his statement, and I said that he was in no
2 position to be writing this statement for them at
3 that time, because he was having a hard time
4 remembering; that he was groggy and foggy.  So
5 they told me to write -- Risa Esterly told me to
6 write this statement out and have him tell me what
7 happened.

8    Q    Okay.  After you provided the
9 statement, did you have any further communication
10 was Leprino Foods about the statement?

11    A    About the statement?  After they fired
12 Nick, I talked to Risa and told her that -- that I
13 didn't think it should be held against him that
14 the statement was different just because of how he
15 -- he was -- because he just had had a traumatic
16 head injury and was groggy and not remembering
17 well.

18    Q    And where -- where did you have this
19 conversation with Ms. Esterly?

20    A    In her office.

21    Q    You went to see her?

22    A    Yes.

23    Q    And what did she say to you and what
24 did you say to her, other than what you have
25 already told me, in this conversation?

## Page 63

1    A    I told her that --  Well, I don't
2 remember exactly what I -- what I said.  What I
3 told her is what I told her.  She told me that she
4 didn't think he was lying and she understood that
5 he had a traumatic head injury.  She --  But she
6 said the policy is the policy, basically.  And
7 that's not word-for-word.  It was a long time ago,
8 but that is basically what was said.

9    Q    The policy is the policy.  What do you
10 mean by that --  Or what did you understand she
11 meant by that?

12    A    What she wrote in his termination
13 letter was zero tolerance for workplace violence.
14 And because he admitted to pushing Frank back,
15 that's why he was terminated.

16    Q    Now, you indicated that it was
17 represented in this conversation that you had with
18 Ms. Esterly when you went in to talk to her after
19 your husband's termination that the statement was
20 different.  Different than what?

21    A    The police statement says that he
22 pushed him back, but this one does not.

23    Q    And who brought that up?

24    A    Well, she did during their termination
25 or --  Wait.  No.  She did during the phone call,

## Page 64

1 because she asked him --  This is what --  This is
2 what she said:  She asked him --  And she was on
3 speakerphone, so I heard it.

4        She said, "The police report does not
5 match your report" -- or "your statement you gave
6 us.  The police report says you pushed him back.
7 So they're different.  Why are they different?"

8    Q    And when was this conversation?

9    A    When did she have that conversation
10 with my husband?  It was the day she called him in
11 for a termination -- or she called him on the
12 phone and asked him that.  Then she said she
13 needed to have a meeting with him.

14        So I don't know the exact --  I don't
15 know if it was the day or the day before he was
16 terminated, but it was before he was terminated.

17    Q    And during this conversation that she
18 had with your husband when she was calling him in
19 for a meeting --

20    A    That was it, yeah.

21    Q    -- either the day before or the day
22 of --

23    A    Somewhere.

24    Q    -- the termination, was your husband at
25 home at that time?

Page 65

1    A    Yes.
2    Q    Okay.  And where were you?
3    A    At home.
4    Q    How much time from work did you take
5  off to care for your husband after this incident?
6    A    Three days.
7    Q    So this phone call with Ms. Esterly
8  would have been either presumably the --  We can
9  agree that your husband was terminated on the
10  29th?
11    A    Yes.  It was within a week of that.
12  I'm not sure exactly what day she called him,
13  whether it was --  She called him to set up a
14  meeting for his termination, basically --
15    Q    Okay.
16    A    -- and that's when this conversation
17  took place.
18    Q    Okay.  So she was just calling to set
19  up the meeting, correct?
20    A    To ask him about why the statements
21  were -- or why in the police report he had said
22  that he had pushed him back, but he didn't in this
23  statement (indicating).
24    Q    And what was his explanation?
25    A    He said that he was -- he had a

Page 66

1  traumatic head injury and was not fully
2  remembering everything the way that it was
3  supposed to be remembered -- or the way that it
4  went -- the way that it actually happened.
5    Q    So he remembered at the emergency room
6  after the incident, but he did not remember the
7  next day that he had pushed Frank Levar?
8    A    His memory was foggy and in and out,
9  yes.
10    Q    Okay.  What did you say during that
11  conversation?
12    A    I did not say anything during that
13  conversation.  It wasn't a conversation that I was
14  having.
15    Q    What was Ms. Esterly's response to
16  that?
17    A    To what he said?  To what Nick said?
18    Q    Yes.
19    A    That they needed to have a meeting at
20  4:00 p.m. on the 29th.
21    Q    Okay.  Did she say anything regarding
22  Nick's representation that he didn't remember, the
23  day after the incident, anything about pushing
24  Frank?
25    A    No.

Page 67

1    Q    When did he tell you that he remembered
2  Frank advancing on him?
3    A    It was after --  He was --  He was
4  pretty quiet, so it was a few days after.
5    Q    More or less than a week after the
6  incident?
7    A    Less.
8    Q    And was this while you were still off
9  work post-incident?
10    A    I don't remember.
11    Q    But it sounds like it was -- what? --
12  within three or four days or so after the
13  accident?
14    A    It was within a week, yeah.
15    Q    Okay.  So when your husband tells you a
16  few days after the incident that he now remembers
17  that Frank was advancing on him after Frank pushed
18  him, did you take another statement from him?
19    A    No.
20    Q    Did you go to anyone at Leprino and
21  advise them of that?
22    A    No, because I figured that Leprino
23  Foods would do their due diligence and investigate
24  the way that they're supposed to, as well as have
25  conversations with my husband.  And they did not.

Page 68

1    Q    So you didn't think that you should
2  advise them that he now remembered that Frank was
3  advancing on him after Frank pushed him?
4    A    I don't think I should do their job for
5  them, no.  I don't think I should be the
6  investigator.
7    Q    But you did take his statement for
8  them, correct?
9    A    I wrote this statement for Nick.  They
10  wanted it the day after, and this is what I gave
11  them.
12    Q    You weren't present at the meeting
13  between your husband and Ms. Esterly on the --
14    A    No.
15    Q    -- 29th?
16      How did you find out that your husband
17  had -- husband's employment had been terminated
18    A    Because I gave him a ride to
19  Leprino Foods that day.  He walked out with his
20  tool bag and told me -- toolbox and told me "I've
21  been fired."
22    Q    And what did you do at that time?
23    A    I drove him home.
24    Q    Were you not working that day?
25    A

## Page 69

1    Q    Okay.  When was this conversation,
2  then, in relation to that day, that you had with
3  Ms. Esterly?
4    A    I believe it was the day after.  I
5  believe so.
6    Q    Do you have any understanding as to
7  whether anybody else was in the meeting between
8  Ms. Esterly and your husband where he was
9  terminated, other than the two of them?
10    A    Jim Wilkins.
11    Q    What did your husband tell you that
12  Mr. Wilkins, if anything, at that meeting?
13    A    I don't remember.  I don't remember.  I
14  don't think he said anything.  I don't know.
15    Q    So you've told me about --  Strike
16  that.
17         After providing the statement that your
18  husband dictated to you on the 10th, and then
19  after providing that statement to Leprino Foods,
20  until the 29th, which was the date of the
21  termination, did you have a conversation with
22  anybody at Leprino Foods concerning this incident?
23    A    I don't believe so.  I believe that --
24  I thought it was under investigation and --  I
25  don't believe so.

## Page 70

1    Q    Okay.
2    A    I was just trying to not insert myself
3  into their investigation.
4    Q    After the 29th --  February 29th, you've
5  told us about one conversation that you had with
6  Risa Esterly.  Is there anything else about that
7  conversation other than what we've already
8  discussed?
9    A    No.  I did talk to her --  I did call
10  her on the phone and ask her, you know, if he
11  filed for unemployment, would --  would they fight
12  that?  And she said yes.  I believe that is it.
13    Q    Okay.  And so did you have --  Strike
14  that.
15         So you had a phone conversation with
16  Ms. Esterly, and you've now told me everything
17  that you remember about that phone conversation
18  post-termination, correct?
19    A    Uh-huh.  Yes.
20    Q    And then you had a meeting with her,
21  and you've told me everything about --  that you
22  remember about that meeting with Ms. Esterly?
23    A    Everything I remember, yes.
24    Q    Okay.  And did you have conversations
25  or communications of any type with anyone at

## Page 71

1  Leprino Foods post-termination other than
2  Ms. Esterly on these two occasions concerning your
3  husband's termination?
4    A    I don't --  I don't know.  I don't
5  think so.
6    Q    Are you familiar with the Leprino Foods
7  workplace violence policy?
8    A    I --  It's --  It's --  I don't know
9  if --  I am familiar with what Risa put as to zero
10  tolerance for workplace violence in Nick's
11  termination letter.  I don't know what their
12  actual policy is, I guess, because some people get
13  away with it and some people don't.
14    Q    Well, is there a written policy that
15  you're aware of?
16    A    I don't know.  I believe that it's a --
17  If I remember correctly, and I have read it.
18  There is a written policy, but --  Here, let me
19  just think this through.
20         I believe that it is --  that they will
21  conduct an investigation and, I guess, depending
22  on the severity of it, that's what will be the
23  discipline.  I don't know what the exact written
24  policy is.
25    Q    Do you think that it is a good idea for

## Page 72

1  an employer to have a policy that precludes
2  physical altercations on a workplace site?
3         MS. BURMA:  Objection, speculation.
4         THE DEPONENT:  Do I answer?
5         MS. BURMA:  You can answer.
6         THE DEPONENT:  Okay.
7    A    I believe that it is a basic human
8  right to defend yourself.
9    Q    (By Mr. Brittan)  That's not my
10  question, ma'am.
11    A    Do I believe --  I believe it depends
12  on the circumstances.
13    Q    Do you think it's a good idea for an
14  employer to have a policy to preclude workplace
15  altercations, physical altercations in the
16  workplace?
17         MS. BURMA:  Objection, speculation.
18         You can answer.
19    A    I believe that it is a good idea.
20  However, if one is defending themselves, they
21  should have that right.
22         MR. BRITTAN:  Move to strike everything
23  after the initial phrase.
24    Q    (By Mr. Brittan)  You, yourself, have
25  taken advantage of the Leprino Foods workplace

Page 73

1 violence policy with regards to Mr. Morrison,
2 correct?
3     A     He threatened to shoot the place up.
4     Q     Including yourself?
5     A     Including myself, yes.
6     Q     Right.
7     A     Uh-huh.
8     Q     And you ultimately reported that,
9 didn't you?
10     A     Yes, I did.
11     Q     What action was taken?
12     A     He was terminated and charges were
13 filed.
14     Q     And, ultimately, Leprino Foods went in
15 for a restraining order to prevent Mr. Morrison
16 from coming within a certain distance of the
17 plant, as well as you, correct?
18     A     Yes.
19     Q     Okay.  And then, ultimately, there was
20 a hearing to make that restraining order
21 permanent, correct?
22     A     Yes.
23     Q     And you testified at that hearing,
24 correct?
25     A     I did.

Page 74

1     Q     Do you think it was a good idea for
2 Leprino Foods to have a policy to prevent someone
3 from threatening to shoot the place up, including
4 its employees?
5     A     I do think that is a great policy.  I
6 think that if they were following their workplace
7 violence with Shawn Morrison years before, he
8 would have been terminated and never allowed to
9 threaten to shoot the place up.
10     Q     Who -- Strike that.
11         With regards to Mr. Morrison, who
12 complained about Mr. Morrison's antics before you?
13     A     Jay Marshall did.  There was a physical
14 alteration between Shawn Morrison and another
15 employee where they were throwing each other
16 around in processing.  There was a restraining
17 order filed against -- Shawn Morrison filed a
18 restraining order against the other employee.  The
19 supervisors saw it, so they knew it was happening.
20         People complained to the supervisors,
21 but nothing was done.  He was hitting people with
22 crescent wrenches, putting people in choke holds,
23 throwing people over his shoulder.  And there were
24 so many witnesses to it.
25     Q     Okay.  So let's go through these.  Jay

Page 75

1 Marshall  Did you ever talk to Mr. Marshall about
2 what complaints he made about Mr. Morrison?
3     A     Yes.
4     Q     What did Mr. Marshall tell you?
5     A     What did Mr. Morrison tell me.
6     Q     No.  What did Mr. Marshall tell you?
7     A     Mr. Marshall -- Oh, that he was sick
8 and tired of Mr. Morrison putting him in choke
9 holds and hitting him, so he complained.
10     Q     Have you ever seen the complaint
11 Mr. Marshall made to HR?
12     A     I don't think so.
13     Q     Do you have any understanding about
14 what HR at the Fort Morgan plant did regarding
15 Mr. Marshal's complaint?
16     A     They sat Shawn Morrison down and spoke
17 to him.  And --  And then Shawn Morrison cornered
18 Jay in the hallway and told him that -- and
19 basically said, "Yeah, I know you're the one who
20 told on me.  They told me that you told on me,"
21 so . . .
22     Q     Okay.  How do you know that?
23     A     Because Shawn Morrison told me.
24     Q     Okay.  So Mr. Marshall made a
25 complaint, correct?

Page 76

1     A     Yes.
2     Q     And human resources talked to him,
3 correct?
4     A     To Shawn Morrison, yes.
5     Q     Correct.  That's right?
6     A     Uh-huh.
7     Q     Is it your understanding that any
8 time a complaint is filed under any policy at
9 Leprino Foods, that the person is to be
10 terminated?
11     A     No.
12     Q     Okay.  Is it your understanding that
13 under the workplace violence policy or workplace
14 security policy, whatever you want to call it,
15 that any time a complaint is made, the person is
16 to be terminated?
17     A     No.
18     Q     Okay.  So Mr. -- Did you -- Is it
19 your understanding that Mr. Marshall wanted
20 Mr. Morrison terminated?
21     A     No.
22     Q     So you criticize Leprino because,
23 ultimately, you understand Mr. Morrison was told
24 that it was Mr. Marshall that complained about
25 him, correct?

**Page 77**

1     MS. BURMA:  Objection, mischaracterizes
2   testimony.
3         Go ahead and answer.
4     **Q    (By Mr. Brittan)  Is that correct?**
5     A    I criticize Leprino because Shawn
6   Morrison's behavior was obnoxious and violent and
7   they did not do anything about it.
8     **Q    Okay.**
9     A    They spoke to him.  They gave him
10  probation.
11    **Q    Okay.  So with regards to Mr. Marshall,**
12  **one of the criticisms you have is that Leprino --**
13  **somebody at Leprino told Mr. Morrison that it was**
14  **Mr. Marshall that complained about him, correct?**
15    A    Yes.
16    **Q    Okay.**
17    A    Well, I mean --  Yes.
18    **Q    Okay.  Now, is there a difference in**
19  **your mind between workplace violence and horsing**
20  **around?**
21    A    Yes.
22    **Q    Okay.  Is Leprino's workplace violence**
23  **policy, as you understand it, a no-touch policy,**
24  **such that if you touch another employee for any**
25  **reason, you will be terminated?**

**Page 78**

1     A    No.
2     **Q    Okay.  And you've never had that**
3   **understanding of that policy?**
4     A    No.
5     **Q    I'm correct, right?**
6     A    Correct.
7     **Q    Okay.  So have you ever heard that,**
8   **that at Leprino Foods' Fort Morgan plant, if you**
9   **touch another employee for any reason, you can and**
10  **should be terminated?**
11    **A    I've heard it.**
12    **Q    Okay.  Who's told you that?**
13    **A    I know Nick understood it that way, I**
14  **think -- I believe.  I -- I don't know.  It's**
15  **just other employees, I guess.**
16    **Q    Is there anybody you can identify as**
17  **you sit here right now, other than your husband?**
18    A    No.  I don't know.
19    **Q    In fact, because of the noise level at**
20  **the plant, sometimes you have to touch an employee**
21  **to get their attention, correct?**
22    A    Correct.
23    **Q    And you've done that, correct?**
24    A    Yeah.
25    **Q    Okay.  And some --  And other employees**

**Page 79**

1   have touched you, correct?
2     A    Yeah.
3     **Q    And you haven't reported them for**
4   **touching you, have you?**
5     A    No.
6     **Q    Okay.  So getting back to Mr. Morrison,**
7   **you talked about Mr. Marshal's complaint, and then**
8   **you indicated that there was a restraining order**
9   **issued between Mr. Morrison and another employee?**
10    A    Yes.
11    **Q    Who was the other employee?**
12    A    Alan Krob.
13    **Q    And what do you understand occurred**
14  **between Mr. Morrison and Mr. Krob?**
15    A    They were pushing each other around and
16  throwing each other around in the processing
17  department.
18    **Q    Now, what information --  Strike that.**
19        **Did you see that occur?**
20    A    No.
21    **Q    So this is a situation where you don't**
22  **have personal knowledge, but you have an**
23  **understanding --**
24    A    Right.
25    **Q    -- correct?**

**Page 80**

1     A    Yes.
2     **Q    Okay.  When did this occur -- this**
3   **situation occur between Mr. Morrison and Mr. Krob?**
4     A    Several years ago.
5     **Q    Can you be any more specific than that?**
6     A    I don't know.  Several years ago.
7     **Q    And what is "several years"?  Are we**
8   **talking two or seven?  What --**
9     A    It was pre- -- pre- -- pre-Nick's
10  termination.
11    **Q    Okay.  So that would be pre-2016?**
12    A    Yep.
13    **Q    Okay.  Can you be any more specific**
14  **than that?**
15    A    I would say probably --  I can't be
16  specific, but approximately five to 10 years
17  before that.
18    **Q    Okay.  So this is going back to maybe**
19  **2011, maybe even going back to 2006?**
20    A    Yeah.
21    **Q    Okay.  Is Mr. Krob still employed at**
22  **Leprino Foods?**
23    A    No.  He quit.
24    **Q    When did he quit?  Do you know?**
25    A    I don't know.

Page 81

1    Q    Now, you say that they were pushing
2 each other around.  Do you have any more
3 information other than that?
4    A    There was a physical altercation, and
5 Shawn Morrison called the cops.
6    Q    And this, of course, was at the plant?
7    A    Yes.
8    Q    Is it your understanding that the
9 police came to the plant?
10    A    I do not know.
11    Q    What action was taken --  Strike that.
12        You mentioned something about a
13 restraining order?  Who got a restraining order
14 against who?
15    A    Shawn Morrison against Alan Krob.
16    Q    Do you have an understanding of what --
17 what Leprino Foods did about that situation?
18    A    I do not know.  They both continued to
19 work there.
20    Q    Did you ever specifically inquire to
21 find out more information, particularly in light
22 of what happened with your husband, about this
23 Krob-Morrison situation?
24    A    No.
25    Q    Now, you indicated that there was a

Page 82

1 situation where Mr. Morrison was choking someone
2 else.  Is that the same situation with Mr. Krob or
3 a different one?
4    A    Different.
5    Q    Before I leave the Krob situation, do
6 you know anything more about that other than what
7 you've told me, which is essentially that they had
8 a -- were pushing each other around, a physical
9 altercation, and that Mr. Morrison called the
10 cops, obtained a restraining order against
11 Mr. Krob and that they both continued to work
12 there for some period of time after that?
13    A    Correct.
14    Q    That's what you know?
15    A    That's what I know.
16    Q    Okay.  The choking situation involving
17 Mr. Morrison, what was that about?
18    A    A guy was eating a pizza in the break
19 room, and he choked him while he had food in his
20 mouth.  He put him in a choke hold.
21    Q    Who?
22    A    Shawn Morrison choked Sean Kelly.
23    Q    And did you see this occur?
24    A    No.
25    Q    How did you hear about it?

Page 83

1    A    Jay Marshall, I believe, told me.
2    Q    Do you have any understanding of
3 whether Mr. Kelly ever complained to his
4 supervisor or to HR about that situation?
5    A    I do not know.
6    Q    Okay.  Do you know anything more about
7 that situation other than what you've just
8 indicated?
9    A    No.
10    Q    Okay.  Are there any other situations
11 involving Mr. Morrison that we haven't talked
12 about yet?
13    A    He picked a female up over his
14 shoulder.
15    Q    Who was the female?
16    A    Angela Sears.
17    Q    And did you witness this?
18    A    Yes.
19    Q    And where did this occur?
20    A    In the vat room.
21    Q    When did this occur?
22    A    It was after Nick's termination, maybe
23 six months after, maybe even a year after Nick's
24 termination.
25    Q    What was Ms. Sears' reaction to being

Page 84

1 picked up?
2    A    She just squealed.
3    Q    Did she seem upset?
4    A    No.
5    Q    Were Mr. Morrison and Ms. Sears
6 involved at that time?
7    A    Not that I know of.
8    Q    Do you know if Ms. Sears complained or
9 reported that incident to anyone?
10    A    I reported it.
11    Q    Who did you report it to?
12    A    To corporate.
13    Q    Who specifically?
14    A    To whoever --  I mean, to whom it may
15 concern (indicating).
16    Q    In your letter?
17    A    Yes.
18    Q    Okay.  Other than in your letter, had
19 you reported it?
20    A    Jim Volk, the maintenance manager --
21    Q    I'm asking you --
22    A    -- witnessed it.
23    Q    Did you report it to anybody other than
24 in your letter?
25    A    No.  That was me reporting it.

Page 85

1    Q    Okay.  So one of the purposes of your
2  letter, which we'll mark here in a second, was to
3  report this incident between Mr. Morrison and
4  Ms. Sears, correct?
5    A    Yes.
6    Q    Okay.  And you say Jim Volk saw it as
7  well, right?
8    A    Yes.  He's a maintenance manager.
9    Q    Okay.  Now, we talked earlier about
10  there being a distinction between horseplay and
11  workplace violence.  Do you believe that it was
12  workplace violence when Mr. Morrison picked up
13  Ms. Sears?
14    A    I believe it was horseplay plus sexual
15  harassment.  He cupped her rear end with his hand,
16  so . . .
17    Q    So did you report it as workplace
18  violence or as sexual harassment?
19    A    I reported it, and then I figured they
20  could go ahead and they could make that
21  determination based upon their investigation.
22    Q    Do you have any understanding of what
23  investigation, if any, was done regarding your
24  report?
25    A    The one thing I do know is that Kelly

Page 86

1  Soja came to the plant after they received my
2  corporate letter to talk to me about it.
3    Q    About "it"?
4    A    Shawn Morrison.
5    Q    Okay.
6    A    About everything that was in my
7  corporate letter.  Most of it was about Shawn
8  Morrison.
9    Q    Okay.  With regards to the situation
10  involving Mr. Morrison and Ms. Sears when he
11  picked her up, did Ms. Soja talk to you about
12  that?
13    A    She talked to me about Shawn Morrison
14  in general and about him -- about his behavior;
15  that they were investigating.  And she said
16  they decided that they were going to put him on a
17  year's probation -- a year -- where he couldn't
18  have -- get into any sort of trouble -- any
19  trouble for a year or he would be terminated.
20    Q    And did that occur?
21    A    Yes.
22    Q    And do you criticize Leprino for taking
23  that step?
24    A    I think that he -- that if he was
25  Hispanic, he would have been fired.

Page 87

1    Q    So you do criticize Leprino for not
2  firing Mr. Morrison?
3    A    For picking somebody up and cupping
4  their rear end, for throwing them over their
5  shoulder, for hitting people, for choking people,
6  yes.  I mean, I do criticize Leprino Foods for not
7  firing Shawn Morrison before he threatened to
8  shoot me.
9    Q    Do you have any criticisms of Leprino
10  Foods' actions in regards to Mr. Morrison's threat
11  against you?
12    A    I think that if they acted
13  appropriately to begin with, I would never have
14  been threatened in the first place.
15    Q    Do you believe that the threat to shoot
16  up the plant, including you, is on a completely
17  different order than picking someone up and
18  horseplaying around in the workplace?
19    A    I believe that he portrayed
20  inappropriate and violent behavior in the past,
21  and that if they would have acted appropriately in
22  the past, he wouldn't have had the opportunity to
23  threaten to shoot me and management.
24    Q    Do you have any criticisms of the
25  actions that Leprino Foods did take once he

Page 88

1  threatened to shoot you and, I believe, eight
2  other people --
3    A    Right.
4    Q    -- right?
5    A    Right.
6    Q    Do you have any criticisms of Leprino
7  Foods and the actions that Leprino Foods took in
8  that regard?
9    A    So I think Leprino Foods handled that
10  fairly well.  However, I will say again that if
11  they would have taken the appropriate actions with
12  this guy in the first place, he wouldn't have had
13  the opportunity and we wouldn't have been going
14  through that in the first place.
15        MR. BRITTAN:  Move to strike everything
16  after "well" as non-responsive.
17    Q    (By Mr. Brittan)  Has your husband Nick
18  ever been counseled at Leprino Foods' Fort Morgan
19  plant for any workplace violence issues prior to
20  his termination?
21    A    No.  Not for workplace violence, no.
22    Q    Okay.  Did your husband Nick have
23  issues when he confronted your supervisor?
24    A    My supervisor?  My -- My foreperson,
25  yes.

Page 89

1  **Q    Your foreperson, Howie Morrill?**
2  **A    Yes, sir.**
3  **Q    Okay.  Tell me about that.**
4  **A    Okay.  So Howie Morrill did not like**
5  **Nick, and he also did not like me being with Nick,**
6  **so he would harass.  He** would nitpick my work.
7  He would -- There was -- The day that he
8  actually -- that Nick confronted him, it was
9  because I -- So I knew that I didn't have a
10 babysitter in the afternoon.  At 5:00 a.m., I
11 called in and said -- My shift, at that time,
12 started from 7:00 a.m.
13        At 5:00 a.m., I call and said, "I'm
14 going to be able to come in from 7:00 a.m. to
15 noon, but after that, I do not have a babysitter.
16 My kids are young, so I have to" -- "so I'm going
17 to have to leave at noon," trying to give them a
18 heads-up, trying to allow them to find coverage.
19 I was actually doing what I was supposed to do,
20 because I could have just left at noon.
21        It was probably 11:55 whenever Howie
22 came in angry and aggressive.  He told me, "We
23 don't have coverage for you, so if you leave, you
24 will be fired for job abandonment."  I asked him,
25 "How is this job abandonment?  I am" -- "I gave

Page 90

1  you plenty of notice.  This is not job
2  abandonment.  If I'm following Leprino Foods'
3  policy, then this is not job abandonment."
4        But he did stuff like that to me a lot,
5  all the time, like harassing me and, like, just
6  yelling at me and --  So I talked to Nick, and
7  Nick just went and confronted him --
8      **Q    How did he confront him?**
9      A    He told him to --  I wasn't there, but
10 this is what Nick told me.  He told me --  Or he
11 told him, "Work-related stuff is fine; you can
12 talk to her about that.  You can" -- "You can go
13 ahead and have those conversations, but anything
14 personal, you need to stay out of it.  You need to
15 leave her alone whenever it comes to personal
16 business."
17        And then -- then I think that was
18 basically it.
19     **Q    Where did that confrontation take**
20 **place?**
21 A    I believe in the parking lot.
22     **Q    Were there any other confrontations**
23 **between your husband and Mr. Morrill other than**
24 **the one in the parking lot?**
25 A    Not that I know --  Not that I know of.

Page 91

1  I mean, Howie was always picking on me, and Nick
2  didn't like it very much.  But I don't think there
3  was any sort of confrontations.
4      **Q    The issue that you just mentioned about**
5  **having to leave at noon and Mr. Morrill not,**
6  **obviously, liking that, isn't that a work-related**
7  **issue?**
8  A    My daycare situation is a personal
9  issue.
10     **Q    And so is that your understanding of**
11 **how your husband was interpreting that situation,**
12 **as a non work-related issue?**
13 A    Yes.  I was leaving work.  I --
14 Because I didn't --  It was for my lack of
15 daycare, yes.
16     **Q    What is it that leads you to believe**
17 **that Mr. Morrill did not like you being with Nick?**
18 A    Because he --  I mean, we were friends.
19 Then right as soon as I -- me and Nick got
20 together, he was horrible towards me.  He was
21 constantly on my case, constantly nitpicking me.
22     **Q    Did you ever talk to him about that?**
23 A    Well, I reported that incident to my
24 manager.
25     **Q    I'm sorry.  "That incident" being . . .**

Page 92

1  A    That --  Him threatening to take my job
2  away from me, basically, because I didn't have a
3  babysitter.  And he didn't --  I don't think I
4  ever spoke to Howie personally about it, no.
5      **Q    Okay.  But your opinion is that**
6  **because --  Strike that.**
7        **Your opinion is that Mr. Morrill didn't**
8  **like you being with Nick and, therefore, his**
9  **treatment of you changed?**
10 A    Yes.  And then right as soon as he got
11 with his current wife, he started being nice to me
12 again.
13     **Q    So when was that?**
14 A    I don't know when they got together,
15 honestly.
16     **Q    Was it --  Give me an approximation, if**
17 **you can.**
18 A    Approximately five to 10 years ago --
19 Or 10 years ago, probably.
20     **Q    Did you ever hear any situation --**
21 **Strike that.**
22        **Did you ever hear of a situation where**
23 **your husband crossed the hallway to put**
24 **Mr. Morrill up against the wall?**
25 A    No.

1 **2016?**

2    A    Yes.

3    **Q    When was the second one?**

4    A    I think it was -- It wasn't very far

5 after that. It might have been six months after,

6 maybe a year after.

7    **Q    Let's just say 2017. Does that sound**

8 **right?**

9    A    Yes.

10    **Q    Were you out of work for the injuries**

11 **that you had in 2016?**

12    A    I was in the hospital for six days, and

13 then I was out of work, I believe, for one or two

14 weeks after that. Then I was on light duty for a

15 long time.

16    **Q    And then what about in 2017?**

17    A    In 2017, I was out of work for -- well,

18 I believe it might have been two weeks to a month.

19 I'm sorry. I was not out of work. It was light

20 duty.

21    **Q    Light duty?**

22    A    Light duty, yes.

23    **Q    Okay. Now, in your way of thinking,**

24 **did Leprino Foods take any action against you to**

25 **your detriment as a result of either of these**

1 **claims?**

2    A    No.

3    **Q    Do you know of anyone else who you**

4 **believes -- Strike that.**

5        **Do you know of anyone else who has**

6 **filed a workers' compensation claim and you**

7 **understand or believe that Leprino took some**

8 **detrimental action against them because of it?**

9    A    No. I mean, not as far as workers'

10 comp goes, no. Nick's injury was extensive. He

11 was going to be out for a really long period of

12 time, way longer than I was, so . . .

13    **Q    Well, I --**

14    A    And I'm not saying -- I don't -- I

15 don't know about that. I'm just saying that the

16 time -- that because he filed workers' comp and

17 then he was terminated -- I believe, actually, he

18 was terminated because he was Hispanic; that's

19 what I believe.

20        But just the timing is suspect, and the

21 fact that his injury was way worse than my injury,

22 and it was going to cost the company way more than

23 mine was going to, and so -- I don't know.

24    **Q    But from that standpoint, if his injury**

25 **was more extensive than yours --**

1    A    Uh-huh.

2    **Q    -- right? -- Leprino Foods still paid**

3 **the workers' compensation, correct?**

4    A    Yes.

5    **Q    Okay. So they were -- And they still**

6 **paid for all the medicals associated with your**

7 **husband?**

8    A    Yes.

9    **Q    So from that standpoint, if you're**

10 **assuming they're going to discriminate against**

11 **someone because of workers' compensation, doesn't**

12 **it make more sense for them to fight the workers'**

13 **compensation as opposed to paying it?**

14    A    I --

15        MS. BURMA:  Objection, calls for

16 speculation.

17    A    -- don't know.

18    **Q    (By Mr. Brittan)  Okay. Now, you've**

19 **indicated a couple of times here -- and,**

20 **obviously, I think that's why we're here -- that**

21 **you believe Leprino Foods terminated your**

22 **husband's employment because he's Hispanic.**

23    A    Yes.

24    **Q    What --  Can you --  Strike that.**

25        **Can you tell me the reasons why you**

1 **believe his -- his employment was terminated**

2 **because he's Hispanic?**

3    A    Because of past experience. Because

4 whenever a white person does -- If a white person

5 would have defended themselves, they would still

6 be working there.

7    **Q    Okay. Now, you'll agree with me that**

8 **your answer assumes that the person is defending**

9 **themselves, correct?**

10    A    Well, if it was the same scenario as

11 Nick's, they would still be working there. I

12 mean, I can go to Cory Gettman grabbing Leonard

13 Woodson's rear end or smacking him on the rear

14 end, and then years later, Edgar Carrillo touching

15 Leonard's rear end with a crescent wrench. Well,

16 Cory Gettman worked there for years and years and

17 years after that, but Leonard Woodson -- but Edgar

18 Carrillo was fired.

19    **Q    So let me back up. Let's assume for**

20 **moment that this was a situation where Frank**

21 **Levar pushed your husband and your husband pushed**

22 **him back.**

23    A    Okay.

24    **Q    Okay. Do you believe that in that**

25 **situation, even if both people involved were**

## Page 113

1   A   Yeah.
2   Q   What's the relationship between Cory
3 Gettman and --  Who was the Gettman that came to
4 the refiner room?
5   A   They're brothers.
6   Q   Okay.  What is your --  Strike that.
7       How do you know about the situation
8 between Leonard Woodson and Cory Gettman?
9   A   Nick told me.
10   Q   Okay.  Have you ever talked to Leonard
11 Woodson about that situation?
12   A   Not Leonard Woodson, no.
13   Q   Have you talked to Cory Gettman about
14 that situation?
15   A   No.
16   Q   Other than your husband, who have you
17 talked to about that situation?
18   A   Leonard Woodson's son.
19   Q   Okay.  What's his name?  He just got
20 hurt, right?
21   A   Yeah.  I've forgotten his name, though.
22   Q   Okay.  I think I know who it is.
23   A   Yeah.
24   Q   So the son --  What did the son tell
25 you?

## Page 114

1   A   Well, he spoke to me about it after --
2 after Edgar was actually fired for it.  You know,
3 actually, I have spoke to Leonard about that
4 incident --
5   Q   Okay.
6   A   -- in the grocery store.  I don't know
7 why, but Leonard -- Leonard talked -- Leonard did
8 speak to me about that grocery store -- or about
9 that in the grocery store.
10   Q   So what did Leonard tell you about that
11 incident?
12   A   He told me that --  So his words were
13 that he doesn't know, "but a white person hits me
14 in the rear end and gets away with it, but a
15 Hispanic gets fired right away."
16   Q   What did --  Strike that.
17       Did he give you any facts, other than
18 being hit in the rear end, other than --
19   A   Just the fact that he was hit in the
20 rear end by both individuals.
21   Q   What did Cory Gettman hit him with?
22   A   His hand.
23   Q   What did --
24   A   A crescent wrench.
25   Q   Okay.  So who hit him with a crescent

## Page 115

1 wrench?
2   A   Edgar Carrillo hit him with a crescent
3 wrench -- or touched him with a crescent wrench, I
4 guess.
5   Q   He brought the crescent wrench up
6 between his legs into his private parts, correct?
7   A   Yes.  Just like Shawn Morrison brought
8 his fingers up in between Angela Sears' rear end.
9   Q   Can I --  Will you just answer my
10 question, please.
11       MS. BURMA:  Can we take a break.  We've
12 been going for a while now.
13       MR. BRITTAN:  Let me just finish this
14 question, and then we'll go on a break.
15   Q   (By Mr. Brittan)  So you understand
16 that Cory Gettman slapped Leonard Woodson on his
17 butt --
18   A   Yep.
19   Q   -- with his hand?
20   A   Yes.
21   Q   And that Edgar Carrillo took a crescent
22 wrench and brought it up between his legs into his
23 private parts, correct?
24   A   I knew he brought a crescent wrench
25 between his butt cheeks.  Yes, I did know that.

## Page 116

1   Q   And that's what Leonard Woodson told
2 you?
3   A   No.  Leonard Woodson did not tell me
4 that.  I heard that.
5   Q   From who?
6   A   I don't remember.  It -- I don't
7 honestly remember.  Somebody at the plant.
8   Q   Okay.  Once again, you don't know that.
9 You just understand that?
10   A   That's what I was told, yes.
11       MS. BURMA:  We're going to take a break
12 now.
13       MR. BRITTAN:  Okay.
14       (Recess from 3:44 p.m. to 3:54 p.m.,
15        after which Mr. Donez was not
16        present.)
17       MR. BRITTAN:  Back on the record.
18   Q   (By Mr. Brittan)  Ms. Donez, did you
19 talk to Edgar Carrillo at all about the incident
20 with Leonard Woodson?
21   A   No.
22   Q   Did Mr. Woodson tell you anything more
23 about what occurred between he and Mr. Gettman or
24 he and Mr. Carrillo other than what you have
25 already told me?

```
DISTRICT COURT, MORGAN COUNTY, COLORADO |
400 Warner Street                       |
Fort Morgan, CO 80701                   |
(970)542-3435                           |
_____ |
                                        |
PEOPLE OF THE STATE OF COLORADO         |
v.                                      |
FRANK DONALD LEVAR, Defendant.          |*COURT USE ONLY*
_____ |_____
                                        |
For the People:                         |Case No. 16CR36
Rebecca R. Wiard, Esq.                   |
Deputy District Attorney                |
400 Warner Street                       |
Fort Morgan, CO 80701                   |
(970)542-3420                           |
                                        |
For the Defendant:                      |
Paul Wiese, Esq.                        |
The Law Firm of Paul Wiese, L.L.C.      |
109 East Railroad Avenue                |
Fort Morgan, CO 80701                   |
(970)370-2292                           |
_____ |_____
```

                Reporter's Transcript
                     Jury Trial
                  October 4, 2016
_____


        THIS MATTER comes on for Jury Trial on October 4,
2016, at 8:39 a.m., before HONORABLE MICHAEL K. SINGER,
District Court Judge.












                Ashton N. Goethe, RPR

1                          INDEX

2                                                        **Page**
   Opening Statements By Ms. Wiard........................ 3
3  Opening Statements By Mr. Wiese....................... 13

4  **WITNESS NAME**

5       Nicolas Donez, Jr.
            Direct Examination by Ms. Wiard............... 18
6           Cross-Examination by Mr. Wiese............... 52
            Redirect Examination by Ms. Wiard............ 63
7           Recross-Examination by Mr. Wiese............. 66
        Robert Davidson
8           Direct Examinatino by Ms. Wiard.............. 69
            Cross-Examination by Mr. Wiese............... 88
9           Redirect Examination by Ms. Wiard........... 90
        Charles Fisher
10          Direct Examination by Ms. Wiard.............. 91
        Timothy Martin
11          Direct Examination by Ms. Wiard............. 107
            Cross-Examination by Mr. Wiese.............. 119
12      James Wilkins
            Direct Examination by Ms. Wiard............. 120
13          Cross-Examination by Mr. Wiese.............. 129
        Jonathan Prell
14          Direct Examination by Ms. Wiard............. 131
            Cross-Examination by Mr. Wiese.............. 145
15      Heather Donez
            Direct Examination by Ms. Wiard............. 148
16          Cross-Examinatino by Mr. Wiese.............. 162
            Redirect Examination by Ms. Wiard........... 164
17      Sheryl Groves
            Direct Examination by Ms. Wiard............. 167
18      Risa Esterly
            Direct Examination by Ms. Wiard............. 174
19          Cross-Examination by Mr. Wiese.............. 184
            Redirect Examination by Ms. Wiard........... 192
20      Robert Davidson
            Direct Examination by Ms. Wiard............. 197
21          Cross-Examination by Mr. Wiese.............. 200
            Redirect Examination by Ms. Wiard........... 201
22      Cindy Brackett
            Direct Examination by Ms. Wiard............. 202
23 **EXHIBITS**

24 People's Exhibit No. 1 Entered into Evidence............ 29
   People's Exhibits No. 2, 3, 4, 5, 6, 7, and 8 Entered
25 into Evidence......................................... 38
   People's Exhibit No. 18 Entered into Evidence........... 184

1                P R O C E E D I N G S
2     (The following is a partial transcript.  All other
3     proceedings were reported, but are not part of this
4     transcript pursuant to instruction of the ordering party.)
5                         * * * * * * *
6               THE COURT:  At this time we will commence opening
7     statements, and we'll turn the floor over to Ms. Wiard.
8               MS. WIARD:  Your Honor, may I work in the well?
9               THE COURT:  Yes, you may.
10              MS. WIARD:  Thank you, Judge.
11          Good morning.
12              February 9, 2016, here in Fort Morgan at Leprino
13     Foods.  It started out pretty much like every other day at
14     Leprino.  It's a really high stress place to work, Leprino
15     is.  Employees, supervisors, foremen all working in a
16     tremendous amount of stress and tension primarily because
17     they have product that they have to get out.  Every day
18     they're under deadlines.
19              And also because lots of the equipment at Leprino
20     is not brand new and it is constantly breaking down and it
21     needs repair.  It needs maintenance.  And that puts a lot of
22     stress on everybody there.
23              So that morning things were running about normal
24     at Leprino except for what happens sometime between 9:00.
25     At about 10:00 the defendant, Frank Levar, came running out

1    of the refinery room.  And as he ran out he ran past a bunch
2    of guys standing at the control room, and he talked to
3    Charles Fisher and he said I just knocked Nick's ass out.
4    He's unconscious in the refinery room.  I'm going home.
5          Well, all the guys stood there and didn't believe
6    what they just heard.  But he kept running.  And he was very
7    agitated.  He had his toolbox under his arm.
8          He continued running and ran down the hall and saw
9    Bob Davidson.  And he said hey, I just knocked your
10   supervisor's ass out.  He's knocked out.  I'm going home.
11   And he kept going.  Bob turned around and ran right into the
12   refinery room.
13         Defendant keeps going, runs upstairs.  And on his
14   way upstairs he sees Sheryl Groves, who is HR.  And he tells
15   her you might as well consider this my exit interview.  I
16   knocked Nick's ass out.  I'm going home.
17         What happened?  Well, we have to go back in time.
18   That morning Nick Donez was working as supervisor.  Now,
19   Nick had been at Leprino for a little over ten years.  His
20   role was foreman.  But that morning the supervisor in his
21   department was out, and when that happens at Leprino foremen
22   take over supervisory roles.  So Nick was acting as
23   supervisor.
24         What that means is what I was saying before, he's
25   got to run around and make sure everything is operating

1    according to plan.  Which means if a machine breaks down, if
2    there's issues with equipment, he's got to be there to help.
3    And he's got a radio on and he's listening to people calling
4    him for help.
5            That morning sometime around 9:00 he was needing
6    to work on the clarifier.  He was going to help a couple of
7    guys who were brand new, didn't really know what they were
8    doing.  They were in the process of working with them, but
9    he needed a tool.  So he was on his way to get the tool when
10   he got a call over his radio.  And it was from the defendant
11   who was working in the lactose refinery room.
12           And so he ran in to get his tool, and while he was
13   in there he saw the defendant.  And the defendant was very
14   upset, was clearly agitated.  Something was going on with
15   him.
16           And he said hey.  The defendant told Nick I need
17   Jim Wilkins to get in here and help me.  And Nick said Tim's
18   busy, he can't come help you.  What do you need?  I'm here.
19   What do you need?
20           And the defendant said forget about it, I'm fine.
21   Never mind.  Nick said all right.
22           And then defendant said you know, I don't really
23   appreciate it.  When I call over the radio for help in
24   lactose nobody ever seems to want to help me, but when
25   somebody in another department calls everybody seems to go

1    rushing over there to help.  He was very upset.

2            And Nick said calm down.  You know, Frank, it's

3    not that big of a deal.  You need to just calm down, take a

4    breath, we can figure this out.  But complaining about it

5    and getting upset about it isn't going to fix anything.

6            The defendant was very mad and he's yelling.  And

7    Nick is yelling back.  But there's a reason for the yelling

8    aside from the defendant being angry, and that is it's super

9    loud at Leprino.  There's machinery running in that facility

10   all day long, and in specific in the refinery room that

11   machine is really loud.

12           In fact, it's so loud at Leprino that all

13   employees are required to wear ear protection.  They wear a

14   bump cap, which is kind of a hard hat.  And inside that cap

15   they also have to wear hairnets because, you know, they deal

16   with food products.  So they've got the bump cap, earplugs,

17   hairnet.  And on top of the earplugs, now they're standing

18   in a room right next to a very loud machine.  So it's not

19   uncommon that when there are conversations going on in any

20   of those rooms employees are yelling.  They have to.  They

21   have to be heard.

22           Not only that, they're about this close to each

23   other (indicated).  A couple feet.  Because they can't hear.

24   So it's not unusual to see two people talking like that

25   right up in each other's faces or mouth-to-ear.  That's the

1    way they can be heard.  So in addition to the defendant
2    being angry and yelling, they're yelling because they need
3    to be yelling to be heard.
4            So Nick tells the defendant it's not going to do
5    you any good to complain, you need to calm down.  And the
6    defendant says you need to get out of my face.  And then he
7    takes his hand, puts them on Nick's chest and shoves him,
8    and Nick takes a step back.
9            Well, Nick looks at Frank, takes his fist, puts
10   them in his chest, and pushes him back so that he can get
11   some space in between them to defend himself.  So now
12   they're about three to five feet apart, and they're standing
13   just staring at each other.  And that's all Nick remembers.
14   Because the next thing he knows he's on the refinery room
15   floor.  He was knocked out.  He doesn't remember anything
16   other than the initial confrontation and the pushing.
17           What's interesting, though, is that his head is
18   now near the lactose refiner and his feet are facing out the
19   front door in a complete opposite direction from where he
20   was originally standing.  Not only that, he's a couple of
21   feet, at least, away from where they were talking.  He
22   doesn't know how he got there.  His throat hurts.  His neck
23   hurts.  He's got a huge bump on the back of his head, and he
24   can't talk.  He's horse.
25           Well, Bob Davidson by now has run in and he sees

1   Nick laying there passed out and he's got EMT background so
2   he knows he's been unconscious.  He can tell by the look in
3   his eyes.  And he's worried because Nick is laying right
4   next to that refiner and it's starting to do a cleaning
5   cycle so water is spewing and chemicals are spewing out onto
6   the floor.  So he pulls him away from that a little bit.  At
7   the same time Heather Donez, who is Nick's wife who works at
8   Leprino, has heard about this and she's now in there.
9           Well, Nick starts to come to, and because of his
10  head injury he's agitated and they're worried he's going to
11  hurt himself so they're trying to be really careful with
12  him.  And while they're sitting there Heather and Bob notice
13  that Nick's bump cap is not on his head anymore and the
14  hairnet's not on his head anymore, and there's a rubber
15  mallet lying next to him.  And things that were in his
16  pockets were now on the floor.
17          Well, all the other employees who had heard the
18  defendant say he knocked Nick out had now come in at one
19  stage or another and had seen Nick laying there unconscious
20  or coming to, various stages.  And so it's crazy.
21          They call 9-1-1.  The ambulance comes.  Fort
22  Morgan Police dispatched Officer Brackett.  She comes to
23  Leprino, but by the time she gets there there's no Frank
24  Levar and Nick is being placed on the ambulance and taken
25  away.  So she heads off to Colorado Plains Medical Center

1  where Nick is taken.  And she's met there by Detective
2  Vosburg and Sergeant Sharp of the Fort Morgan Police
3  Department as well.
4          Detective Sharp -- or Detective Vosburg talks to
5  both the E.R. doctor, Dr. Elias Hernandez, and Nick.  And
6  when he talks to Nick, Nick's voice is really horse and he
7  can barely talk.  And he tells Detective Vosburg that he
8  doesn't know what happened.  Detective Vosburg notices that
9  the front of Nick's mouth is swollen and blue, and the
10  entire left side of his face is blue and very swollen.  He's
11  got a neck brace so you can't tell what's going on with his
12  nick.  And there's something on the back of his head right
13  here (indicated).
14          Dr. Hernandez talks to Detective Vosburg and
15  Dr. Hernandez explains that when he saw Nick and realized
16  that Nick couldn't talk and said that his throat hurt and
17  his neck hurt he was concerned so he immediately ordered a
18  CT scan.  And that CT scan showed that the larynx was
19  broken.  There was a fracture in the larynx.
20          And as a result of that break, the larynx itself,
21  the airway had a hematoma bleeding and it was filling up
22  with blood and the airway was filling up.  And he was
23  losing, he was not able to breathe.  He was breathing, but
24  his airway was compromised.  That's very serious, obviously.
25  They had to immediately figure out what are they going to do

1   to make sure Nick can breathe.

2            Well, Dr. Hernandez talked to Dr. Manchester, who

3   is the surgeon on call that morning, and they decide they

4   probably better intubate because they needed to get an

5   airway right away.  But they didn't want to operate.  That's

6   pretty dangerous when you're talking about larynx and the

7   blood in the larynx.

8            So they talked to Dr. Brad Runyan who was also

9   working that morning.  He's an ear, nose, and throat

10  specialist.  Well, Dr. Runyan knew what to do.  Dr.

11  Manchester and Dr. Hernandez had never seen -- in all of

12  their years in ER work had never seen a fracture of the

13  larynx.  Very unusual.  Dr. Runyan, however, had.

14           All three doctors said that it takes excessive

15  force and high velocity to break the larynx, usually seen in

16  motor vehicle accidents.  That's about it.

17           Dr. Runyan said we don't want to operate unless we

18  absolutely have to, but what we want to do is get the

19  swelling down so that the airway can open up and he can

20  breathe.  So they put him on steroids and watched and make

21  sure that the swelling would go down and his airway wouldn't

22  be compromised any longer, and the steroids worked.

23  Emergency was averted, Nick began to breathe normally again,

24  and he was okay.  They never had to do any surgery.

25           Dr. Hernandez told Steve Vosburg that this was

1   serious bodily injury because there was a substantial risk

2   of death due to the fact that his airway could have swollen.

3   And Dr. Hernandez said he could have died.

4         So Detective Vosburg then after talking to the

5   doctor, talking to Nick, also talked to Mrs. Donez, Heather

6   Donez.  And then in the next couple of days talked to all

7   the other people who were involved.

8         He also talked to the defendant.  And in the

9   defendant's interview he admitted that he hit Nick.  He said

10   that he worked in lactose that morning, he couldn't get it

11   working, he was upset.  He was calling over the radio and

12   nobody would come and help him.  And finally Nick showed up,

13   but Nick wasn't much help.

14         And he said Nick was yelling at him and Nick told

15   him to stop complaining, and he said I said get out of my

16   face.  And he said and then I pushed him.  And then he said

17   and then Nick took his fist and pushed me back.  He said

18   pushed him in the chest, pushed him back.  And he said then

19   I was ready for a fight.  And he said so I popped him in the

20   face and I gave him a right hook to the left side of his

21   face and then he stiffened up, crumpled, and fell over.  And

22   the defendant said I bent over him to make sure he was still

23   breathing and then I got out of there.

24         And the defendant told Detective Vosburg look, I

25   know I was in the wrong.  I started it.  He said, I was

1    ready for a fight, and I hit him.
2            The defendant was angry.  He was so angry because
3    things weren't going the way he wanted them to go that
4    morning.  He wasn't getting the help that he wanted that
5    morning.  And when Nick Donez came in to help him, well,
6    that wasn't the kind of help he wanted.  He didn't want to
7    be told to calm down.  He didn't want to be told just take a
8    breath, doesn't do any good to complain, we'll work this
9    out.  That's not what he wanted to hear.
10           And so not only is he angry that things aren't
11   working out, he's angry because Mr. Donez doesn't give him
12   the response he wants.  And so he pushes him.  And when Nick
13   pushed him back out of self-defense and to get some space so
14   that they could breathe, he didn't like that.  He got even
15   more angry.  And so he punched him.  He punched him at least
16   twice that we know of.  And he punched him so hard with such
17   excessive force that he broke his larynx and placed him in a
18   substantial risk of death.
19           No matter how the defendant tries to spin this or
20   tires to justify what happened that morning, the facts speak
21   for themselves.  The defendant took the first step.  He
22   pushed Nick Donez.  He was the initial aggressor.  And when
23   Nick responded in self-defense, the defendant didn't like
24   that and so he punched him.  He used excessive force and he
25   punched him and he broke his larynx.  And that break caused

1    that hematoma and caused the swelling in the larynx to the
2    degree that he almost lost his life, and would have had it
3    not been for EMT and the quick work of the doctors and the
4    steroids.
5           Ladies and gentlemen, after you've heard all the
6    evidence in this case and seen the evidence I'm going to ask
7    that you find the defendant guilty of second degree assault,
8    serious bodily injury, because you will know beyond a
9    reasonable doubt that he is guilty.  Thank you.
10          THE COURT:  Thank you.
11          Mr. Wiese, do you wish to have an opening
12   statement addressed to the jury at this time?
13          MR. WIESE:  Now, on February 9 Frank Levar was
14   working in the refinery of the weigh section of Leprino.
15   Frank had worked there for approximately 16 years and he was
16   very passionate about his job.  He liked things to go right
17   and would -- could get upset if they didn't go right.  And
18   that day things were not going right.
19          Things were not good with the lactose machine.
20   Frank didn't feel he was getting the support he needed, and
21   his foreman, Nick Donez, had been in a few minutes to check
22   on what was happening and Frank had asked for a specific
23   employee to come help him out.  Nick told Frank that that
24   employee was not available and he left.
25          A few minutes later Nick Donez came back in to

1    help out Frank, and at that point Frank being Frank started
2    to complain that he wasn't getting the help he needed.
3    Frank was saying that he never gets the help he needs and
4    that everybody else was off helping with another machine,
5    and he wasn't happy.
6              Now, when Nick Donez heard this Nick got angry.
7    And he got up in Frank's face, inches from his face.  Not a
8    foot, but inches from his face.  Nick was yelling.  But he
9    wasn't just yelling, he was being aggressive.  And this
10   wasn't yelling needed to be heard over the machinery, this
11   was angry, aggressive yelling.  And he told Frank well, it
12   ain't going to do no good to sit around and cry and whine
13   about it.
14             At that point Frank told Nick you better get out
15   of my face.  But he said that because he felt intimidated by
16   Nick Donez.  He believed that Nick was about to assault him
17   based on the yelling and the aggressive nature of Nick at
18   that point.  Frank then said I know it ain't going to do no
19   good to whine and cry, and again told him you better get out
20   of my face.
21             Now, because Nick -- or because Frank believed he
22   was about to be assaulted, he reached up, he placed his hand
23   on Nick's chest, and he pushed him away.  And when he pushed
24   him away he stepped back to put more distance between them.
25             At that point, Nick's response was to take his

1   fists and to come forward and to slam them into Frank's
2   chest and hit him with both of his hands in the chest.  And
3   when he did that at some point when his hands were either
4   going in or going out he knocked Frank's glasses off of his
5   face.
6           Now, in response to the escalation in violence by
7   Nick Donez, at that point Frank felt he had no choice but to
8   respond accordingly, and he did.  He punched Nick twice.  He
9   punched him in the mouth and he gave him a right hook that
10  landed on the left side of Nick's face.
11          Now, as soon as that happened Nick went down to
12  the ground, he landed on his back.  Frank didn't want to
13  wake him up because he thought well, Nick might come up
14  swinging.  So he checked on Nick to make sure he was still
15  breathing and it looked like he was.
16          Now, at that point Frank knew he was in trouble
17  for violating company policy because there is supposed to be
18  a strict no-fighting policy at Leprino, and he figured he
19  might as well leave because he figured that both him and
20  Nick were going be fired anyhow.  So he picked up his
21  glasses that were bent and he got on the radio and he
22  hollered for Jim Wilkins, who is a senior supervisor, to
23  come and check on Nick.
24          Frank went down to the control room and he saw a
25  friend of his named Charles Fisher.  He told Charles to get

1   on the radio and get somebody to the refinery room because
2   he just knocked out Nick.  Then Frank went and got his tools
3   and he headed to clean out his locker.  On the way to
4   cleaning out his locker he saw Robert Davidson, who is the
5   sanitation supervisor, and he told Robert to get somebody
6   down to the refinery room because he just knocked out Nick.
7   At that point Robert Davidson noticed Frank didn't have his
8   glasses on because he always wears his glasses and they
9   weren't on at that point, and that stood out to Robert
10  Davidson.
11          Then Frank cleaned out his locker and he headed up
12  to the human resources department to tell them why he was
13  leaving.  Because again, he figured that he might as well
14  let them know and he figured that he was going to be fired
15  because both him and Nick had violated the no fighting
16  policy.
17          This is a case of self-defense.  Frank does not
18  deny that he punched Nick Donez.  But he only did so when he
19  tried a lesser degree of force by pushing him away and that
20  didn't work.  Frank did not find out until he was
21  interviewed later by Detective Vosburg that Nick's throat
22  had been crushed or that he had any other injuries like the
23  lump on the back of his head and that he ended in the ER as
24  a result.  When Detective Vosburg told Frank Levar that Nick
25  Donez's throat had been crushed, Frank reacted with shock.

1    Absolute shock that this had happened.

2              Frank does not know how the injuries occurred.  He
3    did not intend to cause the injuries to Nick's throat or the
4    back of his head, and he only intended to defend himself
5    from Nick Donez and did not intend to seriously harm him.
6    Despite the serious nature of the injuries that Nick Donez
7    received, the bottom line is that the evidence in this case
8    will show that Frank Levar acted in a lawful, valid manner.
9    He acted in self-defense, and as a result of that he is not
10   guilty of second degree assault.

11             THE COURT:  All right.  Thank you.

12             The People may call their first witness.

13             MS. WIARD:  Judge, it's going to take me a minute
14   to get set up.  If I could just have a moment, Judge.  I'm
15   going to step out.

16             THE COURT:  Sure.  Understood.

17             If the jury would like to stand up and move around
18   and sit back down you're welcome to do that since we have a
19   short break for a moment.  Can't leave the room, but at
20   least you can stretch.

21             MS. WIARD:  Thanks, Judge.  The people call Nick
22   Donez to the stand.

23                       NICOLAS DONEZ, JR.
24   was called as a witness and, having been sworn, was examined
25   and testified as follows:

```
 1                    DIRECT EXAMINATION
 2   BY MS. WIARD:
 3              Q      Good morning.
 4              A      Good morning.
 5              Q      Why don't you pull that mic a little closer
 6   or you can sit a little closer so I can hear you.  Thank
 7   you.
 8              Could you please state your name and spell your
 9   last name.
10              A      Nicolas Donez, Jr.  It's D-o-n-e-z.
11              Q      What's your occupation?
12              A      At the present time I'm unemployed.
13              Q      Okay.  What was your occupation?
14              A      I was a foreman at Leprino Foods.
15              Q      For how long?
16              A      I'd say about 13 years.
17              Q      When did you start do you think?
18              A      When did I start?
19              Q      At Leprino.
20              A      At Leprino.  November 3, 1998.
21              Q      Okay.  When you started what was your
22   responsibilities or what was your role?
23              A      When I first started I was a bagger.
24              Q      I'm sorry?
25              A      A bagger.
```

```
 1                Q      How long were you a bagger?
 2                A      I would say about five years.
 3                Q      And then you went from that to being a
 4    foreman?
 5                A      Yes.
 6                Q      Where were you a foreman?  What department?
 7                A      In the weigh department.
 8                Q      Were you always working in the weigh
 9    department?
10                A      I worked a short brief time in processing.
11                Q      So were you still employed at Leprino as a
12    foreman in February of 2016?
13                A      Yes, I was.
14                Q      Where is Leprino located?
15                A      Here in Fort Morgan on Bijou, I believe.
16    Beaver.
17                Q      Here in Fort Morgan?
18                A      Here in Fort Morgan.
19                Q      Is that Morgan County?
20                A      Yes.
21                Q      Did you know Frank Levar?
22                A      Yes.  He was a co-worker.
23                Q      Okay.  How long have you known Frank?
24                A      You know, I'm not absolutely sure.  It's --
25    the whole time that I've been working there at Leprino.  I
```

```
 1   would say about 13, 14 years.
 2            Q      Did you work with him that entire time?
 3            A      He worked —— he first worked in processing.
 4   I didn't know him then.  But once he transferred over to the
 5   weigh department, yeah, I got to know him.
 6            Q      So ten years maybe?
 7            A      Yeah.
 8            Q      How closely would you say that you worked
 9   with the defendant?
10            A      We were close.  We worked close every day.
11            Q      Did you get along with him?
12            A      Yes.  I always thought we were good friends.
13            Q      Okay.  What was his title or
14   responsibilities?
15            A      He was a lactose operator.
16            Q      So were you over him?  Were you his
17   superior?
18            A      Yes.
19            Q      Do you remember if something happened
20   between you and the defendant on February 9 of 2016?
21            A      Yeah.  We were —— we were short-handed that
22   day.  A supervisor called in.  And it was a pretty hectic
23   day.  He was having issues with his equipment, and he had
24   asked if I could get him some help.  Send Tim over.  And I
25   had told him that Tim was busy.
```

```
 1              Q      I'm sorry, I don't want to interrupt.  I
 2    just want to back up a little bit.
 3              So because a supervisor was out what does that
 4    mean for you?
 5              A      It means that I had more responsibilities
 6    for that day.
 7              Q      Why is that?  Why did you have to have more
 8    responsibilities?
 9              A      Because of the supervisor not being there
10    that meant that I was in charge of that department as a
11    supervisor and as a foreman.
12              Q      Okay.  So you had double roles that morning.
13              A      Yes.
14              Q      So what does that mean if you have to become
15    supervisor and foreman?  What changes?  What did you have to
16    do?
17              A      I'm responsible for everything that's going
18    on in that department that day.  Usually it's both the
19    supervisor and the foreman's responsibility to make sure
20    that everything's taken care of and everything, you know,
21    works smoothly through the day.  But we were short-handed
22    that supervisor that day.
23              Q      Okay.  Now, as a result of you being
24    short-handed where were you working at that point in the
25    morning?
```

 1              A      I was everywhere.  We were having issues in
 2      the bagging room.  I was maintenance.  I was trying to get
 3      maintenance to fix the problems we were having in the
 4      bagging room.
 5              And then we were having issues with a clarifier
 6      that we needed to tear down because it was -- I'm not
 7      exact -- I can't remember exactly what was wrong with it.
 8      But I was having to oversee two individuals who had
 9      absolutely no experience tearing down a clarifier.  So they
10      were assisting me while I was trying take care of
11      everything.
12              Q      Now, did you need any specific tools to work
13      on that clarifier?
14              A      There's -- yes.  We have a toolbox,
15      toolboxes, that we keep in the refiner room.  And instead of
16      pulling that toolbox over to the actual piece of equipment
17      that I was tearing down I was having to go back and forth
18      from the piece of equipment to the toolboxes that are in the
19      refiner room to get the tools that I needed.
20              Q      So while you're going back and forth at some
21      point did you get a radio call or a request from the
22      defendant to help him?
23              A      I didn't hear anything.
24              Q      Okay.  Did you get a request from the
25      defendant in person, then, to help him?

1          A      Yes, I did.

2          Q      And where did that happen?

3          A      That happened in the refiner room.

4          Q      Is that when you had gone in to get one of

5    your tools?

6          A      Yes.

7          Q      So tell me when you went into the refiner

8    room what did the defendant say to you?

9          A      He told me that -- he asked me to send Tim

10   to the refiner room.

11         Q      Okay.  What was his demeanor at that time?

12   How was he acting?

13         A      Stressed.  Because of the equipment.

14         Q      Okay.  So when he asked for you to send Tim

15   in what was your response?

16         A      I told him that Tim was busy, what do you

17   need?

18         Q      Did he tell you what he needed?

19         A      And he responded never mind.  So then I went

20   ahead and I went back to tearing down the clarifier.  Or

21   helping them tear down the clarifier.

22         Q      Did you have another conversation with the

23   defendant after that?

24         A      I needed another -- I needed a mallet, so I

25   went into the refiner room a second time to retrieve that

```
1    mallet from the toolbox.  And once I retrieved that mallet I
2    went around a control panel and he was standing near a
3    control panel and I asked him how things were going.
4              Q    Okay.  And what did he say?
5              A    He said that he had gotten things under
6    control.  And then he proceeded to tell me that next time I
7    need -- next time I tell you I need help you need to send me
8    help.
9              Q    Okay.  Was he angry at that point?
10             A    He was upset.
11             Q    And how did you respond to that?
12             A    I can't remember my exact words.  But we
13   were all under stress.
14             Q    Okay.
15             A    So I simply responded that, you know, there
16   was -- you know, I'm honestly -- I honestly can't remember
17   how I responded.
18             Q    In a normal situation -- you have been a
19   foreman for ten years.  When somebody responds to you and
20   says that they need help and then they're angry with you,
21   how did you respond in those situations?
22             A    I tried to help before it got to that point.
23   Or if it was at that point I would help them out as much as
24   I could.
25             Q    Okay.  So when the defendant told you that
```

1    he was upset that things weren't going the way that he
2    wanted, that he wasn't getting the help that he needed, did
3    you continue to have a discussion with him about that?
4              A    Because of the -- yeah.  We were discussing
5    back and forth the fact that, you know, I'm always the first
6    one to help.  I always helped him out.  And a lot of the
7    times I was the one who would only help him.  Through CIPs
8    or whatever the problems were.
9              Q    So you're standing now in the refinery room
10   having this discussion.  Is he yelling or are you yelling?
11   What are your voices like at this point?
12             A    Well, you have to yell.  And we're both
13   upset.  But you have to yell in that.  And throughout 90
14   percent of Leprino Foods is loud.  And especially our
15   department because of the evaporator.  That is extremely
16   loud, so it adds to the other equipment that's around.  So
17   it's hard to hear.  It's hard to hear in there.  And we're
18   always standing close to one another because of the fact
19   that it's so loud.
20             Q    Okay.  Do you wear ear protection?
21             A    Yes.
22             Q    Is that required?
23             A    It's required, yes.
24             Q    Does that ear protection muffle sounds?
25   Does it make it harder for you to hear?

    1            A      It makes it even harder to hear.  Yes, it
    2    does.
    3            Q      So when you and the defendant were having
    4    this discussion and you said you were both upset, were your
    5    voices raised then?
    6            A      Yes, they were.
    7            Q      And how far apart would you say you were
    8    from the defendant when you were having this discussion?
    9            A      We were standing face-to-face with one
   10    another.
   11            Q      Feet?  Two feet?  One foot?
   12            A      I would have to say a foot apart.
   13            Q      Okay.  And is the defendant more upset than
   14    you or are you equally upset?  How would you measure that?
   15            A      I believe we were both equally upset.
   16            Q      Okay.  And at some point does the defendant
   17    say anything to you about how upset he is?
   18            A      We just -- we argued.  But as far as him
   19    expressing his level of anger, it was pretty obvious.
   20            Q      Mr. Donez, are you having difficulty
   21    remembering what happened?
   22            A      I have a lot of problems remembering.
   23            Q      And so let me just take you back.  From --
   24    can you tell me when your memory is clear and when you have
   25    no recollection of anything?  What point in time did that

    1    begin?

    2              A       I have -- from the point of when I pushed

    3    him away from me, from that point on I don't remember

    4    anything after that.

    5              Q       Okay.  But in terms of the discussion prior

    6    to the pushing, do you remember that discussion that you

    7    were having?

    8              A       I vaguely remember.

    9              Q       Do you remember him saying anything about

    10   you need to get out of my face?  Do you remember that?

    11             A       No.

    12             Q       Do you remember your response at all to any

    13   of the things that he was saying?

    14             A       No.

    15             Q       Do you remember ever telling him to stop

    16   complaining or calm down or anything like that?

    17             A       No.

    18             Q       Would that normally be how you would respond

    19   to somebody who was complaining and upset?

    20             A       To tell them to calm down?

    21             Q       Uh-huh.

    22             A       To tell them to calm down.  And you know

    23   what, not to make a big deal out of it because it doesn't

    24   help matters.

    25             Q       Okay.  So if that was a situation with

```
 1    another employee or another situation that might have been
 2    how you would have handled it?
 3              A    Yeah.
 4              Q    Okay.  Now, you said you were up against a
 5    control panel; is that right?
 6              A    We were standing there at a control panel.
 7              MS. WIARD:  If I could approach, Judge?
 8              THE COURT:  Yes, you may.
 9              MS. WIARD:  Judge, I need to bring in an easel if
10    that's okay?
11              THE COURT:  Sure.
12              MS. WIARD:  Judge, I'm going to just push this
13    over here if that's all right with you.
14              THE COURT:  Sure.
15              Q    (By Ms. Wiard) I'm handing you what's been
16    marked as People's Exhibit 1.  Do you recognize that?
17              A    That's the refinery room.
18              Q    Is that a blueprint of the refinery room?
19              A    Yes, it is.
20              Q    Is that a fair and accurate representation
21    of the blueprint of the lactose refinery room that you were
22    in that day?
23              A    This is bigger than what it actually is in
24    the refinery room.
25              Q    You mean -- by scale when there is 12 feet
```

     1     by 5 feet, does that scale look appropriate?

     2              A     Yes.

     3              Q     And on this blueprint are there pieces of

     4     equipment in there that -- or items, I guess I should say,

     5     on there that fairly and accurately represent maybe where

     6     you were standing or things you were sitting next to?

     7              A     Yes.

     8              MS. WIARD:  Your Honor, People ask to admit

     9     People's 1.

    10              THE COURT:  Any objection or voir dire?

    11              MR. WIESE:  We have no objection, Judge.

    12              THE COURT:  Exhibit 1 will be admitted.

    13              (People's Exhibit No. 1 was received into

    14     evidence.)

    15              MS. WIARD:  And may I publish it, Judge?

    16              THE COURT:  Yes, you may.

    17              (People's Exhibit No. 1 was published to the

    18     jury.)

    19              Q     (By Ms. Wiard) So Mr. Donez, I'm going to

    20     hand you some pens -- and I realize you have to bend over.

    21              THE COURT:  He can step out of the box, too, as

    22     long as he can be heard.  I don't have a problem with him

    23     doing that.

    24              Q     (By Ms. Wiard) And I'm just going to ask you

    25     if you could maybe -- if you want to stand to the side there

```
 1    so the jury can see what you're doing.  Can you use a pen
 2    and show with a pretty good size mark where you and the
 3    defendant were initially standing when you were talking
 4    about his needing help?
 5            A     We were standing -- I was standing closest
 6    to the control panel.  And then he was standing there
 7    (indicated).
 8            Q     Okay.  Why don't you put your initial and
 9    his initial so we know who you're talking about.
10            A     (Indicated).
11            Q     Okay.  And that's the control panel.  That
12    WP-11, is that the control panel?  Or where it says refiner,
13    is that the control panel?
14            A     This is the control panel (indicated).
15            Q     Which one?
16            A     WP-11.
17            Q     And you were standing having a discussion
18    right there?
19            A     Yes.
20            Q     That's when the defendant told he you he was
21    upset that nobody was helping him?
22            A     Yes.
23            Q     And again, you don't recall how you exactly
24    responded at that point?
25            A     No, I don't.
```

```
 1              Q      Now, you can go ahead and sit down again.
 2    We'll go back to that in a minute.
 3              So after the defendant told you that he was upset
 4    what did he do?
 5              A      He had pushed me.
 6              Q      Okay.  How did he push you?
 7              A      He pushed me with open hands.
 8              Q      Where did he place his hands?
 9              A      He placed his hands on my chest and pushed
10    me back.
11              Q      Okay.  About how far back would you say he
12    pushed you from himself?
13              A      I probably took a step back, so probably
14    about a foot.
15              Q      Okay.  So now about how many feet are
16    between the two of you?
17              A      So there's probably about two feet between
18    us.
19              Q      Now, did that happen in front of the refiner
20    or had you moved from that position when this occurred?
21              A      That --
22              Q      And you can get up again if you need to.
23              A      That actually occurred -- we were standing
24    closer to the refiner.  So that actually occurred -- we were
25    standing closer to the refiner, so that actually occurred
```

```
 1  right here (indicated).
 2            Q     Okay.  And who is who?
 3            A     This is -- and that was Frank (indicated).
 4            Q     So the first X closest -- where's the
 5  doorway to get into the refinery room?
 6            A     That doorway is over here (indicated).
 7            Q     So you're standing closest to the doorway.
 8            A     Yeah.  That doorway is over here
 9  (indicated).
10            Q     You're standing closest to the doorway?
11            A     Yes.
12            Q     And he's standing next to the refiner?
13            A     Yes.
14            Q     Is that correct?
15            A     That's correct.
16            Q     Okay.  Now, why did you move to where you
17  were, to those two positions?  Do remember that?
18            A     I'm not absolutely sure how we wound up over
19  there.
20            Q     Okay.  Do you have any tools in your hand at
21  that point?
22            A     I had gone in to grab a mallet, but I
23  honestly can't remember whether I actually had that in my
24  hand at that time.
25            Q     And what kind of mallet was it?
```

```
 1              A      It was an orange rubber mallet.
 2              Q      And you don't remember if you had it with
 3  you when you were standing there talking to him at that
 4  point?
 5              A      I can't honestly recall.
 6              Q      Okay.  Now, you guys had moved over to that
 7  position, and you said he pushed you.
 8              A      That's correct.
 9              Q      So when he pushed you did he push you toward
10  the doorway then?
11              A      When he pushed me, yes, he did.  He pushed
12  me back towards the doorway.
13              Q      How many feet were you -- were there between
14  the two of you at this point?
15              A      I'd say there was probably two feet between
16  us.
17              Q      Okay.  And what did you do in response?
18              A      After that happened then he motioned with
19  his hands up and took a step forward, so I was under the
20  assumption that he was going to attack me.  So that's when I
21  pushed him back.
22              Q      Where did you push him?
23              A      I pushed him in the same manner that he did
24  me, but harder.
25              Q      And were your fists -- were your palms open
```

```
 1   or closed?
 2            A     I believe my palms -- I believe my hand were
 3   closed.
 4            Q     And where did you place them?
 5            A     On his chest.
 6            Q     And you pushed him harder?
 7            A     Yes.  To create that distance.
 8            Q     How much distance do you think you created?
 9            A     I would say there was probably three or
10   four feet.
11            Q     Okay.  What happened after that?
12            A     We stood there and we looked at each other
13   for probably about three or four or five seconds.
14            Q     Okay.
15            A     And I don't recall after that.  I remember
16   waking up on the ground.
17            Q     Okay.  And when you woke up on the ground
18   where did you wake up?
19            A     I was laying in this direction (indicated)
20   with my head facing the refiners and my -- when I initially
21   came through I was actually in a seated position right here
22   (indicated) with my wife behind me.
23            Q     Okay.  So when you came to you had --
24   somebody had already set you up?
25            A     Yes.
```

```
 1              Q     But your head was toward the refiner?
 2              A     Yes.
 3              Q     Okay.  Thank you.
 4        Why did you push the defendant?
 5              A     I felt he was going to attack me.
 6              Q     Okay.
 7              A     So in defense I went ahead and had pushed
 8    him back.
 9              Q     Was there any other reason to push him away
10    from you?
11              A     That was my sole reason was just to create
12    that space between us.
13              Q     Okay.  And you did create some space?
14              A     I created that space and had made the
15    conscious decision that I wasn't going to fight that day.
16              Q     And when you pushed him back then you stood
17    and stared at one another.
18              A     That's correct.
19              Q     So you had obviously some time to both of
20    you get your wits about you.
21              A     That's correct.
22              Q     Was anybody else in the refinery room with
23    you?
24              A     No.  It was just the two of us.
25              Q     At any point when you guys were having your
```

1    discussion did anybody come in?

2            A      Not that I can recall.

3            Q      Okay.  Now, you said that your head was near

4    the refiner and your feet were facing the room; correct?

5            A      The door, yes.

6            Q      When you pushed the defendant, how far would

7    you say you pushed him from where that X is now?

8            A      I'd say he wound up about right there

9    (indicated).

10           Q      And you said there was now about how many

11   feet between the two of you?

12           A      I'd say about three to four feet.

13           Q      Between you and he at that point?

14           A      Between Frank and I, yes.

15           THE COURT:  Just for the record, the witness was

16   indicating with another X to the right of the diagram with

17   an initial where the defendant ended up after he was pushed.

18   And also there's a line with a little circle on it, and that

19   was indicated by the witness in terms of where he was

20   resting when he woke up.

21           Is that correct?

22           THE WITNESS:  That's correct.  Yes.

23           Q      (By Ms. Wiard) And maybe next to the X where

24   you said Mr. Levar ended up after you pushed him the second

25   time, maybe you could put a two next to that so we know

```
 1    that's the second position.
 2              A     (Witness complied.)
 3              MS. WIARD:  If I could approach, Judge?
 4              THE COURT:  Yes.
 5              Q     (By Ms. Wiard) I'm handing you what's been
 6    previously marked as People's Exhibits 2 through 8.  Would
 7    you just real quickly look through those and tell me if you
 8    recognize them?
 9              A     Yes.  They're all pictures of the refiner
10    room.
11              Q     Okay.  And various places in the refinery
12    room?
13              A     Yes.
14              Q     Are those fair and accurate photocopies --
15    or I'm sorry, fair and accurate photos of the refinery room
16    back from when you worked there in February 2016?
17              A     Yes.
18              Q     And do they fairly and accurately depict
19    parts of the refinery room?
20              A     Yes, they do.
21              Q     What's Exhibit No. 8 in specific?
22              A     That a photo of my toolbox.
23              Q     Is that a fair and accurate photograph of
24    your toolbox?
25              A     Yes, it is.
```

1          Q      I'd move to admit People's 2 through 8.

2          THE COURT:  Any objection?

3          MR. WIESE:  No objection.

4          THE COURT:  Exhibits 2 through 8 are admitted.

5          (People's Exhibits No. 2, 3, 4, 5, 6, 7, and 8

6   were received into evidence.)

7          MS. WIARD:  I'd move to publish.

8          THE COURT:  You may.

9          MS. WIARD:  Thank you, Judge.

10         (People's Exhibits No. 2, 3, 4, 5, 6, 7, and 8

11   were published to the jury.)

12         Q      (By Ms. Wiard) So this is People's Exhibit

13   2.  What are we looking at?

14         A      That's the refiner.  In the refiner room.

15         Q      Okay.  That is the refiner.  So if you could

16   look over your shoulder to the blueprint, can you point to

17   what we are looking at here with the yellow hose on it?

18         A      That's this corner of the refiner

19   (indicated).

20         Q      So this is that corner there (indicated)?

21         A      Is this corner there (indicated).

22         Q      And this piece of that, anyway, is that

23   entire -- that's the refiner itself but we're just seeing a

24   piece of it here; is that correct?

25         A      That's correct.  You're looking at from this

```
 1    section (indicated) to this end here (indicated) depicts
 2    that here.
 3                THE COURT:  He's pointing to the upper right side
 4    of the diagram of Exhibit 1.
 5                MS. WIARD:  Thank you, Judge.
 6                Q     (By Ms. Wiard) And then in Exhibit 2 under
 7    this exit sign, is that the entrance to the room?
 8                A     Yes, it is.
 9                Q     And is that the same as over here on the
10    left-hand side of Exhibit 1?  Is that the same entrance
11    there?
12                A     Yes, it is.
13                Q     Okay.  Thank you.
14                People's Exhibit 3.  What are we looking at in
15    this angle?
16                A     That the same -- that's the same -- the
17    refiner.
18                Q     Okay.  What is this kind of stairway looking
19    thing?  What is that?
20                A     That's a -- it's a staircase that we use to
21    access elbows and connections that are higher.
22                Q     Now, on People's Exhibit 1 you drew a circle
23    with a line to indicate where you -- roughly where you were
24    sitting up when you came to.
25                A     Yes.
```

```
 1              Q      On People's Exhibit 3, is that right about
 2      where I have my red dot here (indicated)?
 3              A      Yes.
 4              Q      And it's sort of an angle; is that correct?
 5              A      That's correct.
 6              Q      Now, does this photograph in Exhibit 3 show
 7      the part of the room where you and the defendant were
 8      standing when you pushed him -- he pushed you and you pushed
 9      him?
10              A      Yes.
11              Q      Where about on here were you?
12              A      This (indicated).
13              Q      That X there on People's Exhibit 1, where
14      would that be in this photograph?
15              A      It was just to the right of that staircase
16      about -- I'd have to say about two feet from that staircase.
17              Q      So more this way (indicated) or more this
18      way (indicated)?
19              A      Right here (indicated).
20              Q      That's about where you were standing?
21              A      Yes.
22              MS. WIARD:  If the record could reflect that the
23      witness has identified roughly the center of Exhibit 3 as
24      where he was standing.
25              THE COURT:  It will so reflect.
```

1            Q      (By Ms. Wiard) And then could you see on
2    this photograph roughly where the defendant was standing, or
3    would he be out of the photograph here?
4            A      No, he would still be in that photograph but
5    directly in front of me.
6            Q      So if you're standing about the center of
7    the room in Exhibit 3 he would be roughly at about the
8    beginning of the refiner?
9            A      About, yes.
10           Q      Also in the center of the room, though?
11           A      Yes.
12           MS. WIARD:  If the record could reflect the
13   witness has identified about even with Exhibit 3, this piece
14   of apparatus, the edge of this silver, I guess, elbow shaped
15   item.
16           THE COURT:  Toward the right of the diagram?
17           MS. WIARD:  Yes.
18           THE COURT:  And the record will so reflect.
19           MS. WIARD:  Thank you.
20           Q      (By Ms. Wiard) Exhibit 4.  What are we
21   looking at now?
22           A      That's the front of the refiner.
23           Q      So if I can go back to 3, is that right here
24   (indicated)?
25           A      Yes.

```
 1              Q     Okay.
 2              MS. WIARD:  So the witness is identifying that's
 3      the front of the refiner in Exhibit 4.
 4              Q     (By Ms. Wiard) And that has some sort of,
 5      like, milk-looking thing, milk container on it.
 6              A     Yes.
 7              Q     And then I'm not sure what this is.  And
 8      there's that yellow hose that we saw in this first -- in
 9      People's 2; correct?
10              A     That's correct.
11              Q     So now we've just got the front angle here;
12      is that right?
13              A     That's correct.
14              Q     Now, Mr. Donez, looking at the front angle
15      was your head in this area that I'm pointing to when you
16      came to (indicated)?
17              A     Yes.
18              Q     Were you further or closer to that piece of
19      equipment?
20              A     I would have to be about two feet from that.
21              Q     Toward me?
22              A     Yes.
23              Q     Toward my direction.  So further down in
24      this area here (indicated)?
25              A     Yes.
```

```
1              Q      Okay.  People's Exhibit 5 --
2              THE COURT:  So bottom center of Exhibit 4?
3              MS. WIARD:  Bottom center of Exhibit 4, yes,
4     Judge, is where the witness has identified where he
5     remembers sitting.
6              Q      (By Ms. Wiard) Is that correct?
7              A      That's correct.
8              Q      Exhibit 5.  What are we looking at in
9     Exhibit 5?
10             A      That's the control panel.
11             Q      Okay.  I'm sorry.  Because there's three
12    things here, which of these three items is the control
13    panel?
14             A      The chrome object that the individual is
15    standing directly in front of is the control panel.  That
16    right there (indicated).
17             Q      This right here (indicated)?
18             A      Yes.
19             Q      And in People's Exhibit 1 that is WP-11?
20             A      Yes.
21             MS. WIARD:  So witness has identified this taller
22    piece of chrome equipment as being the control panel.
23             Q      (By Ms. Wiard) And this is where you say you
24    and Mr. Levar were standing and having your discussion?
25             A      That's correct.  That's where it started.
```

```
 1              Q      What is this headgear that we're looking at
 2   on the individual in People's 5?
 3              A      That's a required hard hat.
 4              Q      And is that hairnet also required?
 5              A      Yes, it is.
 6              Q      And we can't see there's earplugs, but are
 7   there earplugs there inside the helmet?  Is that how it
 8   works?
 9              A      They're attached to the helmet.
10              Q      Now, behind this taller piece of equipment
11   in 5 there are two shorter pieces of equipment.  What are
12   they?
13              A      Those gray boxes are the toolboxes that
14   house the tools for the separators and the clarifiers.
15              Q      And is that where you went to get your
16   tools?
17              A      Yes.
18              Q      Okay.  So was your toolbox actually inside
19   one of these?
20              A      Yes.
21              Q      I see.  Okay.
22              MS. WIARD:  And the witness is identifying that
23   those shorter pieces of equipment in People's Exhibit 5 are
24   where he initially had gone in --
25              Q      (By Ms. Wiard) Am I right?  Went into the
```

1    refinery room?

2              A    That's correct.

3              Q    All right.  People's Exhibit 6.  Is this

4    just a different angle of how you get into the refinery

5    room?

6              A    Yes.

7              Q    Outside of the refinery room what do we

8    first run into?  When we walk out of that what do you first

9    go into?

10             A    A tank farm.

11             Q    And where's the control room in relation to

12   walking through this exit?

13             A    You would take -- you would step out of that

14   walkway and turn to your right.  And it is probably about

15   20 -- 20 feet to your right from there.

16             Q    Okay.  And then coming in underneath the

17   exit sign and back toward this stairway that you mentioned

18   earlier on, is this again kind of just a piece of that

19   control panel?

20             A    Yes, it is.

21             MS. WIARD:  So witness has identified that this

22   piece that's showing, this taller I guess chrome piece

23   that's showing in the left-hand side of the photograph, is

24   the control panel.

25             Q    (By Ms. Wiard) Okay.  This is People's

```
 1    Exhibit 6.  What is this?
 2                 A       That is the floor in the refiner room.
 3                 Q       Okay.  And do you -- why are we looking at
 4    those two legs?  What are those legs part of?
 5                 A       Those are the two legs that house -- that
 6    white container that holds the defoamer, those are the two
 7    legs that support that.  That are directly in front of the
 8    refiner.
 9                 Q       Okay.  I'm going to go back to People's I
10    think that's 4.  And that's what you're referring to that
11    these legs here are what we were looking at in People's 7, I
12    believe?  Is that right?
13                 A       Right.
14                 Q       And is that People's 7 that you're looking
15    at right here with the legs on it?
16                 A       Yes, it's 7.
17                 Q       Okay.  Now, when you came to and were
18    sitting up, how far would you say you were from these two
19    legs here?
20                 A       I was to the left of those about a foot --
21    now, I'd have to say about two feet from there.
22                 Q       So you were about over in here (indicating)?
23                 A       More to the left of it.
24                 Q       Am I going the wrong way?
25                 A       Excuse me.  I'm sorry.  More to the right of
```

1    it.

2                Q      So you were closer to the legs or further

3    away?

4                A      Further away from the -- further away.

5                Q      Okay.  And were you up in this area

6    (indicated)?

7                A      No, in the opposite direction.  In that

8    area.

9                Q      So again, about -- and I believe this is,

10   again, about the center of the area of the room, anyway.

11               A      That's correct.

12               Q      Is that correct?

13               And then People's Exhibit 8.  What is this?

14               A      That's my toolbox.

15               Q      Now, before you had said that in People's 5,

16   I believe, that your toolbox was in these.  So did you take

17   your toolbox out of these containers?

18               A      No.  That room that my toolbox is in is the

19   lab where they do testing for like sediment.  It's a room

20   that the lactose operator uses to do all of his testing for

21   the lactose.  And that's where both myself, other foremen,

22   and Frank store our toolboxes.  Personal toolboxes.

23               Q      I see.  So this is your personal toolbox

24   that you keep separate from the refinery room?

25               A      That's correct.

```
 1              Q       And these boxes in People's 5, I believe,
 2     that houses tools but not your personal toolbox?
 3              A       That's correct.
 4              Q       So when you went into the refinery room to
 5     get your tools where did you go?
 6              A       When I went into the refiner room I went to
 7     those gray toolboxes behind the control panel to retrieve
 8     the tools that I needed for the teardown of the clarifier.
 9              Q       And that's where you got the mallet.
10              A       Correct.
11              Q       So the mallet was not in People's 8?
12              A       No.
13              Q       Okay.  Thank you.
14              So Mr. Donez, when you came to you said you were
15     sitting up; is that correct?
16              A       That's correct.
17              Q       And who was in the room with you when you
18     came to, do you remember?
19              A       I only remember my wife.  And I don't
20     remember who else was there.
21              Q       Okay.  How were you feeling when you came
22     to?
23              A       Out of it.  I wasn't sure what happened
24     or -- and just unclear of what had happened.
25              Q       Okay.  Was your bump cap still on your head?
```

```
 1                A    No.
 2                Q    Was your hairnet still on your head?
 3                A    No.
 4                Q    Did you see anything near you when you came
 5  to?
 6                A    I don't recall anything.
 7                Q    Okay.  Do you feel any pain?  Did you have
 8  any injuries that you were aware of when you first came to?
 9                A    My head.  My head hurt a lot.  And I was
10  having troubles breathing.
11                Q    And were you able to speak?
12                A    Yeah.
13                Q    Okay.  Did you have a normal voice, do you
14  remember?
15                A    No, it wasn't normal.
16                Q    What was it like?
17                A    Sounded like it would if I had been choked.
18                Q    Okay.  That was back in February.
19                A    That's correct.
20                Q    Did you see physicians after that?
21                A    Yes.
22                Q    After you were released from the emergency
23  room?
24                A    I'm still seeing physicians.
25                Q    Okay.  What kind of physicians did you see?
```

```
 1    Or have you seen?
 2             A       Neurology.  My workman's comp doctor.  Nose,
 3    ears, and throat doctor.
 4             Q       Okay.  And why have you been seeing a
 5    neurologist?  Or why did you see a neurologist, I should
 6    say?
 7             A       I'm still seeing the neurologist because I
 8    still have dizziness, lightheadedness, and I pass out.
 9             Q       Okay.  Now, what about your neck and throat?
10             A       My neck and throat, how was it presently?
11             Q       Yes.  How is it presently?
12             A       I've recovered from the injury.
13             Q       How long did that take?
14             A       That took -- I think that took about three
15    months.
16             Q       Okay.  But today that's fine?
17             A       Yes.
18             Q       No issues with swallowing or breathing or
19    anything?
20             A       I haven't had any issues.
21             Q       Okay.  Great.
22             Now, previous to this, Mr. Donez, did you have any
23    other medical conditions?
24             A       Previous to this?
25             Q       Uh-huh.
```

```
1              A     I had -- in the past I had epilepsy, but it
2    had been -- since this incident it had been 15 years since I
3    had had an epileptic seizure.
4              Q     And today you haven't had any issues with
5    any more seizures?
6              A     No.
7              Q     And when you were admitted to the ER they
8    did not determine you had a seizure?
9              A     No.
10             Q     Do you see the defendant in court today?
11             A     Yes, I do.
12             Q     Can you please point him out for the jury.
13             A     The gentleman sitting in between -- in the
14   white shirt.
15             Q     The white shirt sitting in between where?
16   Could you identify clothing, please.
17             A     Between the gentleman in the suit.  The two
18   suits.
19             MS. WIARD:  If the record could reflect the
20   witness has identified the defendant subject to cross.
21             THE COURT:  It will so reflect.
22             MS. WIARD:  If I could have a moment, Judge?
23             THE COURT:  Certainly.
24             MS. WIARD:  I don't have anything further at this
25   time, Judge.
```

```
 1              THE COURT:  All right.  Cross-examination?
 2                      CROSS-EXAMINATION
 3    BY MR. WIESE:
 4              Q      Mr. Donez, on the morning of February 9 you
 5    were stressed because you were fulfilling dual roles that
 6    morning; correct?
 7              A      That's correct.
 8              Q      And you had actually previously had
 9    arguments like this with Frank Levar; correct?
10              A      Had previous arguments?  That day or
11    previous to that?
12              Q      Not that day.  Just previous to February 9
13    you had had arguments of this type with Frank Levar;
14    correct?
15              A      We had one disagreement.
16              Q      One disagreement?
17              A      Yes.
18              Q      Okay.  And as a matter of fact, you don't
19    remember anything after you -- let me reword that.
20              On that day, February 9, do you recall talking to
21    Detective Vosburg at the emergency room here in Fort Morgan?
22              A      Vaguely.
23              Q      Vaguely.  Okay.  And during that interview
24    do you recall telling him that you don't remember anything
25    after you pushed Frank back?
```

```
 1                  A     That's correct.
 2                  Q     Okay.  And you at least didn't remember
 3      anything after you pushed Frank back until you woke up later
 4      on; correct?  Between the time you were pushed and the time
 5      that you woke up when Robert Davidson was there you don't
 6      remember anything; correct?
 7                  A     That's correct.
 8                  Q     And you don't remember on February 9 when
 9      you -- exactly when you lost consciousness; correct?
10                  A     After the push we stood and we looked at
11      each other for, like I said, three or four or five seconds.
12      And I don't remember anything after that.
13                  Q     Okay.  And as a matter of fact, you don't
14      remember if Frank struck you in addition to pushing you;
15      correct?
16                  A     I don't recall.
17                  Q     Okay.  And you also told Detective Vosburg
18      that you were not sure where Frank hit you; correct?
19                  A     Yes, that's correct.
20                  Q     Okay.  And you're in fact -- but then you
21      also told Detective Vosburg that you assumed he had hit you
22      on the left cheek in your mouth because your left cheek and
23      your lips were swollen; correct?
24                  A     That's correct.
25                  Q     But you really are just assuming Frank hit
```

1    you on the cheek and in the lips because you don't remember
2    what happened after he pushed you; correct?
3              A    That's correct.
4              Q    And in that same interview -- and this is
5    going back to when you were in the emergency room on
6    February 9 -- you told Detective Vosburg that you pushed
7    Frank back and that that was all you could remember;
8    correct?  After you pushed him back.
9              A    That's correct.
10             Q    Okay.  You also told Detective Vosburg that
11   you couldn't recall if any threats were made to you in the
12   refinery room by Frank Levar.  Isn't that true?
13             A    That's correct.
14             Q    So you don't recall telling Frank Levar
15   to -- you don't recall responding to Frank Levar by saying,
16   Frank, why don't you make me get out of your face?
17             A    No.  I don't recall that.
18             Q    And when you were interviewed by Detective
19   Vosburg at the emergency room on February 9, in that
20   interview you did not tell him that you felt that Frank
21   Levar was about to assault you; correct?
22             A    I did not tell him that, no.
23             Q    Okay.  Now, referring to People's Exhibit 1.
24   And this is in the upper right-hand corner.
25             MR. WIESE:  Judge, if I could approach?

1              THE COURT:  Yes, you may.

2              You were talking about the diagram?

3              MR. WIESE:  Yeah.

4              Q     (By Mr. Wiese) So you had testified earlier

5     that after the push you were by the lactose refiner;

6     correct?

7              A     After the push?

8              Q     Yes, after the push.  These two Xes here

9     further up on the right indicate where you and Frank Levar

10    were after the push?

11             A     That's correct.  I was standing there

12    (indicated) and when I had pushed Frank I had pushed him to

13    that point there (indicated).

14             Q     Right.  Before the push happened, Frank

15    Levar was closer to the lactose refiner and you were further

16    away from the lactose refiner; correct?

17             A     That's correct.

18             Q     Right.  And you were in between Frank and

19    the door out of the room; correct?

20             A     That's correct.

21             Q     Now, do you recall doing an interview by

22    phone with Detective Vosburg on February 26 of this year?  A

23    follow-up interview?

24             A     Yes.

25             Q     Okay.  And in that interview on February 26,

```
 1    that was done over the phone; correct?
 2              A    That's correct.
 3              Q    And in that interview, early on one of the
 4    first statements you made to Detective Vosburg was I don't
 5    remember any of this, I only remember what I was told;
 6    correct?
 7              A    I can't remember whether I made that
 8    statement or not.
 9              Q    So you don't know if you made that statement
10    or not.  Okay.
11              And after that in that same interview you told
12    Detective Vosburg in response to another question, I can't
13    for the life of me remember what happened after the initial
14    push; correct?
15              A    That's correct.
16              Q    Now, you had testified that in the refinery
17    room and in much of the plant people have to be close to
18    each other to be heard because of all the equipment.
19              A    That's correct.  Because of the noise.
20              Q    And because they're also wearing hearing
21    protection.
22              A    That's correct.
23              Q    So you had indicated earlier that people
24    generally had to be approximately a foot from each other to
25    be heard?
```

```
 1              A      Depends.  Because there are times when we're
 2   actually mouth-to-ear because of the noise level or because
 3   of our own hearing, whether we have bad hearing or not.
 4   Because I know at times I would practically be in the
 5   individual's ear just so that they could hear what I was
 6   saying or vice versa.
 7              Q      Okay.  But most of the time, though, you can
 8   be within about a foot of somebody to be heard; correct?
 9              A      Depending on the piece of equipment that
10   you're working around.
11              Q      Do you also recall during this February 26
12   telephone interview telling Detective Vosburg that you don't
13   recall what you said to Frank right before he pushed you?
14              A      That's correct.
15              Q      Okay.  So you would have no idea if you, in
16   fact, told him, Frank, why don't you make me move away?
17              A      I don't recall any of that.  I can't say.
18              Q      And you don't recall what, if anything,
19   Frank told you right before he pushed you; correct?
20              A      That's correct.
21              Q      Okay.  In that same interview, the
22   February 26 interview, you told Detective Vosburg that when
23   Frank came at you you were not absolutely sure if you pushed
24   Frank away with your hands or with your fists; correct?
25              A      That's correct.
```

 1           Q     Okay.  So you could have pushed him away
 2    with your fists?
 3           A     No.  I clearly said earlier when I was asked
 4    whether I had pushed him away with my fists that I did push
 5    him with closed fists.
 6           Q     And that's despite the fact that during the
 7    February 26 telephone interview you told Detective Vosburg
 8    that you were not absolutely sure if you pushed Frank back
 9    with your hands or your fists.
10           A     This occurs with everyday things.  I have
11    troubles remembering from one day to the next what I said.
12    And it's not due to because I'm lying, it's due to the fact
13    that since this injury my memory has gotten worse.  There
14    are days that I have good days.  There are days that I have
15    bad days.  When I get nervous it's not because I'm lying,
16    it's because I'm having troubles remembering.
17           Q     Exactly.
18           And in that same interview on February 26 you told
19    Detective Vosburg that you had been trying and trying to
20    remember what happened but you just couldn't do it; correct?
21           A     That's correct.
22           Q     And you actually told him that twice in that
23    same interview, once at the beginning and once at the end;
24    correct?
25           A     That's correct.

```
 1              Q      And as a matter of fact, during this
 2    February 26 interview that we're talking about you told
 3    Detective Vosburg at least half a dozen times that you
 4    didn't remember what happened after the push; correct?
 5              A      That's correct.
 6              Q      Now, you and Frank had been pretty friendly
 7    for the most part before this incident; correct?
 8              A      That's correct.
 9              Q      And there had never been any violence
10    against you by Frank before this incident?
11              A      Disagreements.
12              Q      Disagreements.  Right.  But never anything
13    physical.
14              A      No violence.  Nothing physical.
15              Q      And before this February 9 incident you were
16    in pretty good shape; correct?
17              A      That's correct.
18              Q      And you had, in fact, at one point ridden
19    your bike from Brush to the Leprino plant on many occasions;
20    correct?
21              A      That's correct.
22              Q      And you had previously run in marathons?
23              A      No marathons, but races.
24              Q      Was the Boulder Boulder one of them?
25              A      Yes, sir.
```

      1              Q      And you had also been into some mixed
      2    martial arts?
      3              A      Not mixed martial arts, but like -- I would
      4    attend kung fu classes with my brother.
      5              Q      So you had had some training in actual
      6    martial arts.
      7              A      Not training.  I went there just for the --
      8    just to work out.  I didn't get -- I didn't get -- it was
      9    short stints.  It wasn't actually training in the art.  It
     10    would -- I just went there to work out.
     11              Q      Okay.  But when you worked out you were
     12    practicing this kung fu with your brother; correct?
     13              A      It was mostly exercising and stretching.
     14              Q      Okay.  Now, since this incident you have
     15    slowly worked back to where you're doing some running;
     16    correct?
     17              A      That's correct.
     18              MR. WIESE:  And Judge, if we can approach for a
     19    second?
     20              THE COURT:  Sure.
     21              (The following proceedings were conducted at the
     22    bench out of the hearing of the jury:)
     23              MR. WIESE:  Judge, at this point I want to ask
     24    Mr. Donez about the incident that my witness witnessed in
     25    person between Mr. Donez and Charles Fisher in which in my

```
1    offer of proof is that my client witnessed Mr. Donez really
2    berating Charles Fisher.  And this is in approximately 2014.
3    And my client was present in person for this to witness
4    this.
5                 THE COURT:  Is there argument?
6                 MR. WIESE:  Yes.
7                 THE COURT:  Why is that relevant?
8                 MR. WIESE:  Judge, it goes to my client's state of
9    mind on February 9 in regards to his determination that he
10   was about to get assaulted.  It's relevant to the
11   self-defense instruction if that is, in fact, granted.
12                THE COURT:  But did Mr. Donez do something to
13   Mr. Fisher, like push him or something?
14                MR. WIESE:  He did not, but it was an angry
15   argument that was similar to what has been described.
16                THE COURT:  It's irrelevant.  If there's no shove
17   it's irrelevant.  Overruled.
18                (The following proceedings were conducted in the
19   presence and hearing of the jury:)
20        Q      (By Mr. Wiese) Now, Mr. Donez, you are, in
21   fact, no longer employed at Leprino; correct?
22        A      That's correct.
23        Q      And you're no longer employed there because
24   after some recovery time you were, in fact, fired by Leprino
25   for violating their policy of not fighting with other
```

```
 1   employees; correct?
 2             A     Could you repeat that?
 3             Q     I said the reason you no longer work at
 4   Leprino is that you were fired for violating Leprino's
 5   policy of not fighting with other employees; correct?
 6             A     I was released -- yes, sir.  I was fired
 7   because of their no touch policy, and because I pushed Frank
 8   back in defense.  I touched Frank so I violated their
 9   policy.
10             MR. WIESE:  If I can have just a second, Judge?
11             THE COURT:  Certainly.
12             Q     (By Mr. Wiese) Now, as a matter of fact, in
13   May of this year, 2016, you remember being asked by
14   Detective Vosburg why you'd been terminated and your
15   response to him was because they told you, Leprino, that you
16   had went hands-on and that was the reason that you had been
17   terminated; correct?
18             A     That I had said that we had --
19             Q     Gone hands-on and that was the reason you
20   were terminated.
21             A     I don't remember making that comment.
22             Q     But if that is what's written in Detective
23   Vosburg's report would that have been accurate to what you
24   had told him?
25             A     That I had been released because --
```

```
1              Q     You had gone hands-on was the term you used.
2              A     I don't recall making that comment.
3              MR. WIESE:  If I could have one more minute,
4    Judge?
5              THE COURT:  Sure.
6              MR. WIESE:  Judge, I have nothing further at this
7    time.
8              THE COURT:  All right.  Redirect?
9              MS. WIARD:  Thank you, Judge.
10                      REDIRECT EXAMINATION
11   BY MS. WIARD:
12             Q     Mr. Donez, you said that previously you had
13   had a disagreement with the defendant; is that correct?
14             A     That's correct.
15             Q     Were you able to work that out?
16             A     Yes, we did.  We discussed it.
17             Q     Okay.  In fact, after that disagreement and
18   prior to this disagreement you guys had -- he's even been
19   over to your house; is that correct?
20             A     I had never been to his house?
21             Q     I'm sorry.  You went to his house.
22             A     Yes.
23             Q     And that's before this incident?
24             A     Yes.
25             Q     I just want to just be clear because defense
```

```
 1    counsel continues to talk about the initial push.  So do you
 2    recall -- and I'm sorry to make you repeat this.  The
 3    initial push means that the defendant pushed you and you
 4    pushed back; is that right?
 5            A    That's correct.
 6            Q    So you do recall pushing him?
 7            A    Yes, ma'am.
 8            Q    And the use of the fists, when Detective
 9    Vosburg talked to you about using your fists and you said
10    apparently on the 26 interview you didn't know if you used
11    your hands or your fists, but you didn't deny pushing the
12    defendant; is that correct?
13            A    That's correct.
14            Q    In your visits with the doctor, did you --
15    do you recall if at any time during -- in the past few
16    months your doctors have talked to you about sometimes
17    pieces of your memory can return, some won't return at all.
18            A    That's correct.
19            MR. WIESE:  Judge, I would object to this question
20    because it's essentially stating what the doctor told him.
21    So it's a form of hearsay, and I would object on that basis.
22    And also on the basis of not being -- of confrontation.
23    He's repeating what the doctor told him.
24            THE COURT:  I would agree as to hearsay.  Which
25    relates to confrontation, but not always.  So I'll sustain.
```

1             MS. WIARD:  Thanks, Judge.

2             Q     (By Ms. Wiard) So Mr. Donez, in the past few

3      months have you noticed yourself if you are able to

4      recollect some things, regardless of whether it had to do

5      with this incident or not?  But are you able to remember

6      some things better?  Do you recognize your memory coming and

7      going?

8             A     It comes and goes depending on if I'm

9      stressed it's worse.  It gets worse.

10            Q     Okay.  And that is in relation to anything?

11            A     To anything.

12            Q     Now, in terms of what happened between now

13     and the defendant that day, has your memory increased so

14     that you remember more today than you remembered back on

15     February 9?

16            A     No, it hasn't changed at all.

17            Q     Okay.  Thank you.

18            Now, this whole hands-on policy at Leprino, can

19     you explain that?

20            A     It's a no-touch policy.  So you can't place

21     your hands on anybody.  You're not supposed to place your

22     hands on anybody for anything, for that matter.

23            Q     Okay.  So no-touch, hands-on means the same

24     thing to you?

25            A     That's correct.

```
 1              Q      Okay.  Thank you.
 2              MS. WIARD:  Nothing further.
 3              THE COURT:  Mr. Wiese?
 4                       RECROSS-EXAMINATION
 5   BY MR. WIESE:
 6              Q      Now, Mr. Donez, to clarify here in regards
 7   to these questions about your memory, on February 9 in the
 8   emergency room you had told Detective Vosburg that you
 9   didn't remember anything after you pushed Frank back;
10   correct?
11              A      That's correct.
12              Q      But in the February 26 interview you told
13   him that you did not remember anything after the initial
14   push; correct?
15              A      That's correct.
16              Q      And of course in that same interview you had
17   told Detective Vosburg that you only remember what you were
18   told; correct?
19              A      I only remember what I was told according to
20   my own -- who was in the room taking care of me at the time.
21   But not related to what actually occurred with Frank and I.
22              Q      Okay.
23              MR. WIESE:  If I can have one more second, Judge?
24              THE COURT:  Certainly.
25              Q      (By Mr. Wiese) Now, this hands-on policy
```

1  says that if you touch anybody that you will be terminated;
2  correct?
3          A     That's correct.
4          Q     But you weren't -- you had not been
5  terminated for anything that happened before the February 9
6  incident?
7          A     Neither one of us were.
8          Q     Okay.
9          MR. WIESE:  Judge, can we approach again?
10         (The following proceedings were conducted at the
11  bench out of the hearing of the jury:)
12         MR. WIESE:  So Judge, I'm of the position because
13  there was testimony between myself and Ms. Wiard here that
14  if he touched anybody you would be fired.  Another incident
15  that we're aware of is this incident we talked about before
16  jury selection of Mr. Donez slamming an employee, Kory
17  Kaper, against a locker.  He was not fired for that
18  incident, so I believe that is not relevant
19  cross-examination.  Certainly in terms of attacking his
20  credibility for it.
21         But I also just for the fact that he's saying he'd
22  be fired for this but he wasn't.  So I think at a very
23  minimum it goes to his credibility.  I believe that's now --
24         MS. WIARD:  Well, first of all, as I stated
25  yesterday, the defendant does not.  If the Court wants to

1    listen to the entire interview that is not redacted, never
2    does he mention that he knows anything about this incident.
3    So in order for this specific to have -- there's no evidence
4    during any of the interview that he knew.  He very clearly
5    tells Detective Vosburg what he did, but he never mentioned
6    that.
7              But in addition, the fact that the defendant and
8    the victim just said that that's policy and he's never been
9    fired I don't believe opened the door to anything.
10             MR. WIESE:  And Judge, I'm not actually asking to
11   go into this incident in terms of the -- my client had
12   direct knowledge of it.  I'm asking to go into it at this
13   point in terms impeachment.
14             MS. WIARD:  You can't impeach --
15             THE COURT:  How does that impeach Leprino?
16   Leprino fired before.  So what?  What do we care?
17             I'm denying the request.
18             (The following proceedings were conducted in the
19   presence and hearing of the jury:)
20             MR. WIESE:  Judge, we have nothing further at this
21   point.
22             THE COURT:  Any jury questions?  Apparently not.
23             All right.  May this witness be excused?
24             MS. WIARD:  He may, Judge.
25             THE COURT:  Is he under subpoena?

     1              MR. WIESE:  He's not under a defense subpoena.
     2              THE COURT:  You're free to step down and free to
     3     go about your business.
     4              THE WITNESS:  Thank you.
     5              THE COURT:  This is time for morning recess.  Do
     6     not discuss the case.  Do not form or express an opinion
     7     about it.  And we'll see you back in the courtroom in about
     8     15 minutes or so.
     9              (A recess was taken from 10:36 a.m. to 10:58 a.m.)
    10              THE COURT:  We are back on the record with counsel
    11     present, defendant present, and the jury is in the
    12     courtroom.
    13              And People may call their next witness.
    14              MS. WIARD:  Thank you.  The People call Robert
    15     Davidson.
    16                        ROBERT DAVIDSON
    17     was called as a witness and, having been sworn, was examined
    18     and testified as follows:
    19                      DIRECT EXAMINATION
    20     BY MS. WIARD:
    21              Q    Good morning.
    22              A    Good morning.
    23              Q    Can you sate your name and spell it for the
    24     record.
    25              A    Robert Davidson, D-a-v-i-d-s-o-n.

     1                Q       Do you mind coming a little closer to that
     2    mic?  Thank you.
     3                        Mr. Davidson, what is your occupation?
     4                A       I'm the sanitation supervisor at Leprino
     5    Foods.
     6                Q       How long have you been with Leprino?
     7                A       Not quite six and a half years.
     8                Q       What does a sanitation supervisor do?
     9                A       I oversee the cleaning of the equipment,
    10    manufacturing of the product, and several other facets.
    11    Training and so on.
    12                Q       Okay.  Is sanitation a concern or important
    13    at Leprino?
    14                A       Absolutely.
    15                Q       Why is that?
    16                A       Because without it there are bacteria or
    17    pathogens that can make you sick or kill you.
    18                Q       Is that because of the type of product you
    19    deal with?
    20                A       Yes.
    21                Q       When you say sanitation what exactly does
    22    that mean?  How are things cleaned?
    23                A       A lot of our equipment is cleaned
    24    mechanically, what we call CIP, cleans in place.  They are
    25    manufactured with a spray system that's built in so that we

```
 1    can apply cleaning solutions internally.  Then there's
 2    manual cleaning that has to happen on different conveyors
 3    and things of that nature.
 4              Q      Is that a daily thing, hourly?  How does
 5    that work?
 6              A      Every day.  We clean the entire plant top to
 7    bottom every day.
 8              Q      Does it happen more than once a day?
 9              A      Not usually.  If we have to stop production
10    for a problem we usually don't start back up until the next
11    day.
12              Q      Okay.  So if something happened that the
13    place needed to be completely cleaned you wouldn't clean and
14    go back to work, you would just shut things down and get
15    everything situated?
16              A      It would depend on the time of day.  We call
17    it a clean break.  If we found a problem let's say 10:00 at
18    night, we're ready to shut down at 2:00 or 3:00 in the
19    morning, we're not going to restart.  We'll just shut down.
20              Q      So you said you have been there about six
21    and a half years?
22              A      Yes.
23              Q      And as sanitation supervisor who do you
24    supervise?
25              A      I oversee everything.  I have no direct
```

```
1    reports.  So if I were to go into a department and have to
2    address issues therein I would work with the operator and
3    supervisors and foremen to help resolve the issues.
4              Q      So no one directly reports to you?
5              A      No.
6              Q      Yet you have supervisory capacity over
7    basically everyone?
8              A      In sanitation.  During station, yes.
9              Q      Do you know Frank Levar?
10             A      Yes, I do.
11             Q      How long have you known him?
12             A      I probably met him shortly after I started
13   working at Leprino.
14             Q      So about six years?
15             A      Uh-huh.
16             Q      And do you work directly with Mr. Levar?
17             A      I have on occasion because I cover the whole
18   plant and no one department.  There's been things that have
19   been brought to my attention by Frank that I need to
20   address.
21             Q      Okay.  And do you know Nick Donez?
22             A      Yes, I do.
23             Q      And how long have you known Nick?
24             A      About the same length of time.
25             Q      And have you worked with Mr. Donez?
```

```
 1              A      Yes.  Same capacity.
 2              Q      Same capacity.  Okay.  So would you say that
 3    you have worked the same amount of -- the same amount with
 4    both the defendant and Mr. Donez?
 5              A      I would have to say yeah.  I mean, I
 6    couldn't break it down, so I'd have to say yes.
 7              Q      Were you working on February 9 of this year?
 8              A      I would have to say yes.  I assume that's
 9    why we're here.
10              Q      Yes.  And do you recall what happened or do
11    you recall an incident that occurred in the refinery room on
12    February 9?
13              A      Yes.
14              Q      Do you remember what time of day?
15              A      Fairly early.  I want to say it was 7:00 or
16    6:00 a.m., but fairly early in the day.  I don't really
17    recollect the exact time.
18              Q      Before noon?
19              A      Yes, I believe so.
20              Q      Now, that morning had you seen the
21    defendant, Frank Levar, prior to what happened in the
22    refinery room?
23              A      I don't recollect.
24              Q      Do you recall telling Detective Vosburg that
25    you remember seeing him?
```

```
 1              A      When I went into the department for that
 2    time that was the first time I'd seen Frank that day.
 3              Q      Okay.  And when -- where were you working
 4    that morning around 10:00?
 5              A      I was coming into the weigh department where
 6    both people work.
 7              Q      Okay.
 8              A      Probably to do something or discuss an issue
 9    of concern.  I also review all the microbiology hits as we
10    call them and the numbers for microbial issues, and we will
11    address them with the department so we can look at that
12    piece of equipment possibly a little closer to clean it a
13    little bit or whatever the case may be.  So I was coming
14    into the department to probably do that.
15              Q      Okay.  I'm sorry to ask you, could you move
16    just a little closer to the microphone?  You have such a
17    soft voice.
18              Do you have a tickle?
19              A      No, I lose my voice.
20              Q      We have some water behind you if you need
21    it.
22              A      No, I'm fine.  Thank you.
23              Q      Okay.  That morning did you see the
24    defendant?
25              A      Yes, I did.
```

```
 1                    Q       And where were you about when you saw him?
 2                    A       I was -- I came into the department and
 3       there's a hallway that cuts across east to -- north to
 4       south, excuse me, in front of the control room.  And as I
 5       entered that what I would call a walkway is when I first
 6       made contact with Frank.
 7                    Q       Was he walking?  What direction was he
 8       headed?
 9                    A       Out.  He was leaving the room.
10                    Q       Out of the refinery room?
11                    A       We were not in the refinery room at that
12       time.  It's a fair distance from there, actually.
13                    Q       And he was walking past you then I take it?
14                    A       He was coming out at this intersection.
15       There's also a main walkway.  I believe it's the east or
16       west.  I get turned around, excuse me.  And I came in that
17       way.  And as I turned that's when I came and met Frank.
18                    Q       And as you met with him did he say anything
19       to you?
20                    A       He said to me, he said I just knocked out
21       your supervisor.  He's on the floor in the refinery.
22                    Q       Is that exactly what he said?
23                    A       It's in my statement the exact words.  I
24       don't know.  He used the F word.  I just knocked your effing
25       supervisor out.  He's on the floor in the refinery.
```

1    Something.  I can't say that's an exact quote, but yes.

2                Q    Okay.  Roughly.

3                And what did you do after you heard that?

4                A    He left and I went across that walkway and I

5    came across Charles, Tim, and John, and I said what

6    happened?  And they're looking at each other kind of

7    stunned, we didn't really know what to understand.  And

8    someone said something, I don't remember what it was, and I

9    took off to the refinery room.

10               Q    So you actually went in the refinery room?

11               A    Yes, I did.

12               Q    And when you went in what did you see?

13               A    Just as I turned the corner Nick was on the

14   floor obviously unconscious and at that very moment he

15   simultaneously was starting to come around.

16               Q    Okay.  I'm going to direct your attention to

17   People's Exhibit 1, which is right behind you.  And do you

18   recognize that, Mr. Davidson?

19               A    Yes.  Okay.  Uh-huh.

20               Q    Does that look like a blueprint of the

21   refinery room?

22               A    Yes.  I would be somewhere in here

23   (indicated).

24               Q    I'm sorry, say that again.

25               A    I would have come in this door here

```
 1    (indicated).
 2              Q     Okay.  So when you came in that door where
 3    did you find Mr. Donez?
 4              A     Roughly laying on the floor in this area
 5    here (indicated).
 6              Q     Okay.  And you're pointing toward the -- I
 7    don't know what direction that end of the refiner is facing
 8    because I don't know what --
 9              A     This end is -- this should be north and
10    south.
11              Q     Okay.  So he was on the north end?
12              A     He was on the north end with his legs coming
13    this way (indicated).
14              Q     So where that circle and that line is, is
15    that roughly where his head was?
16              A     No, he was -- yes.  Where the circle is, not
17    the line.
18              Q     Okay.  Where were his legs?
19              A     His body was coming this way (indicated).
20              Q     At a diagonal?
21              A     Uh-huh.
22              Q     If you could look at People's Exhibit -- in
23    front of you you have got a whole bunch of exhibits there.
24    Look for People's Exhibit 2, if you would.
25              A     Yes.
```

```
 1              Q      Okay.  And it's also up here on the screen.
 2              So as you're looking at that photograph, People's
 3    Exhibit 2 and on the screen, can you show -- and I don't --
 4              MS. WIARD:  If I may approach, Judge?
 5              THE COURT:  Yes.
 6              Q      (By Ms. Wiard) If you want to use this, the
 7    yellow center is a red dot.  It should work from here.  If
 8    you could go use the red dot and show where you saw
 9    Mr. Donez laying.
10              A      His head was down here (indicated).  There's
11    a basket on here, and his feet then stretched out to
12    approximately there (indicated).
13              Q      Toward that stairway?
14              A      Yes.  More toward that little tank.  It was
15    at an angle.
16              Q      Okay.  Thank you.
17              So again, his head was roughly right about there
18    (indicated), and then his feet were toward the tank in
19    People's Exhibit 2; correct?
20              A      Correct.
21              Q      And you mentioned a basket.
22              A      That --
23              Q      Is that the basket you're referencing?
24              A      Where that device is sitting, yes.  Kind of
25    right below that.
```

1          Q       So his head was right in here (indicated)?

2          A       Yes.

3          THE COURT:  That's Exhibit 4; right?

4          MS. WIARD:  The witness is referencing the floor

5     directly beneath the basket in People's Exhibit 4.

6          THE COURT:  Thank you.

7          Q       (By Ms. Wiard) So now we're just in a

8     close-up.  And again, this is People's Exhibit I believe 3.

9     In People's Exhibit 3 his head would have been right

10    approximately between those two legs there (indicated); is

11    that correct?

12         A       Roughly speaking, yes.

13         Q       And then again legs stretched out at a

14    diagonal.

15         A       Yes.

16         Q       Now, Mr. Davidson, when you saw Mr. Donez

17    laying there what did you do?

18         A       I went up to him and I was afraid he may

19    have hit his head because of where he was at and I was

20    concerned of a neck injury so I tried to keep him still.

21         Q       Okay.  And did his body get moved at all?

22         A       I had to move his body.  That system was in

23    CIP as we call it, cleaning.  So all of the chemicals were

24    coming out, which could have been caustic or acid solutions,

25    so I don't want him to get that sort of an injury as well.

```
 1    So I moved him out of the way.
 2              Q     Okay.  When you moved him did you just keep
 3    him lying flat and kind of pull him?
 4              A     Tried to.  He was agitated and normal head
 5    injuries responses.  Not cooperative.
 6              Q     And how do you know that's a normal head
 7    injury response?
 8              A     I'm 15 years in EMT.
 9              MR. WIESE:  Judge, I'm going to object at this
10    point.  I think we're getting into expert testimony and this
11    witness has not been endorsed as an expert.  So I'm
12    objecting to any testimony that would be expert witness
13    testimony at this point.
14              THE COURT:  I'll sustain at this time.
15              MS. WIARD:  Thank you, Judge.
16              Q     (By Ms. Wiard) So Mr. Davidson, based on
17    just your observations you were concerned that he might be
18    agitated?
19              A     No, he was agitated.
20              Q     And how was he acting?
21              A     Just -- I don't know how to explain it.  He
22    wanted to get up, he wanted to do, but I knew under the
23    circumstances that he needed to be still.  As I said,
24    concerned with a possible neck injury, if he had hit his
25    head.  I didn't know what happened.  And that's how you're
```

1     trained, you assume the worst case scenario.

2              MR. WIESE:  And Judge, I think this is getting

3     into expert testimony.

4              THE COURT:  I overrule on that.  He's just talking

5     about his own experience.  He said he was 15 years EMT.

6     He's talking about why he was responding the way he was.

7     He's not talking about observations of this particular

8     defendant, he's talking about general comments in terms of

9     why he was acting the way he did to calm the alleged victim

10     down.

11              So I'm overruling.  I don't think it's expert

12     testimony as such.  I understand there's a limit there, but

13     so far it hasn't been crossed.

14              MR. WIESE:  I understand.  Thank you.

15              Q     (By Ms. Wiard) Now, after you moved him did

16     anybody -- was anybody else in the room at that time other

17     than you and Mr. Donez?

18              A     I think by this time Heather Donez arrived.

19     I explained to her my concerns, to try to keep him calmed

20     down and still.

21              Q     Did you notice anything?  Did you look at

22     his face?  Did you see any injuries?

23              A     I think possibly about this time when

24     Heather showed up when we moved him she noticed some blood

25     and she also noticed on the left side of his face.

```
 1              Q      And what did you notice about his eyes?
 2              A      His eyes were fully dilated.  Pupils were
 3    fully dilated.
 4              Q      Did he recognize you?
 5              A      He didn't seem to acknowledge where he was.
 6    I asked him directly Nick, what happened, and he didn't
 7    know.  And I don't believe he knew me nor his wife at first.
 8    I don't know if later he did, but at that point in time he
 9    didn't seem to acknowledge knowing us.  Not in my opinion.
10              Q      When you came into the room and saw
11    Mr. Donez, did you happen to notice if he had his bump cap
12    on?
13              A      No.
14              Q      You didn't notice or he did not?
15              A      I'm sorry.  He did not have it on.
16              Q      Did he have his hairnet on?
17              A      I don't know.
18              Q      Okay.  When Mrs. Donez was holding his head,
19    did you notice at that time if he had his hairnet on?
20              A      No, he did not.
21              Q      Did you notice anything laying next to him
22    or around him?
23              A      I recollect seeing a white rubber mallet.
24    It was not next to him, but it was some feet away.  And I
25    acknowledged it only because I'd never seen it before.
```

```
 1              Q      Okay.  Anything else on the floor that you
 2    noticed?
 3              A      I don't recollect.
 4              Q      Do you recall where you saw that rubber
 5    mallet?
 6              A      I was on his right.  It was over there
 7    (indicated) probably 5 feet.
 8              Q      So using the Exhibit 1, where about on
 9    that -- and if you could take the red pen there, and on that
10    exhibit if you could draw the position of Mr. Donez.
11              A      After I moved him?
12              Q      No, when you first saw him.
13              A      (Witness complied.)
14              Q      So head in the same direction, feet in the
15    opposite direction; is that correct?
16              A      Correct.
17              Q      And could you indicate that at the end of
18    that line that's his feet?
19              A      (Witness complied.)
20              Q      And now on that same picture or exhibit,
21    Exhibit 1 that you have just drawn a line more to the
22    diagonal to that blueprint, where did you see the mallet?
23              A      I want to say somewhere over -- when we
24    moved him roughly here (indicated), and it was across the
25    room somewhere.
```

1          Q     The mallet was maybe over there (indicated)?

2          A     Still further away.

3          Q     Okay.  Now, that looks like a huge amount of

4    expanse on that blueprint.  In fact, how many feet would you

5    say that mallet was from where Mr. Donez's body was?

6          A     Maybe another four or five feet.

7          THE COURT:  So the mallet was marked with a red

8    mark.  I can't see if that's an X or what.

9          Mr. Davidson, is that an X that you marked where

10   the mallet was?

11         THE WITNESS:  I'm sorry?

12         THE COURT:  Is that an X where you marked where

13   the mallet was?

14         THE WITNESS:  Well, yes, sort of.  It's kind of a

15   slopy X, yes.

16         THE COURT:  Where the better X is in red is where

17   the mallet was found on Exhibit 1.

18         Q     (By Ms. Wiard) Now, I want to take your --

19   just go back in time a minute.  When you saw the defendant,

20   Frank Levar, coming by you and telling you that he just

21   knocked the effing supervisor out, what was his demeanor at

22   that time?

23         A     He had no glasses and he was agitated.

24         Q     Did you notice if he had his toolbox with

25   him?

```
 1              A     I did not.
 2              Q     Now, if you could look at the photographs
 3    that are laying in front of you, People's 2 through 8, and
 4    specifically I think People's I want to say 4, it's the one
 5    with the -- it might be 5.  It's the one with the floor.
 6    Just a photograph of just the floor and some feet.
 7              That's the one, yes.  What number is that?
 8              A     Seven.
 9              Q     Oh, 7.  I was way off.  Sorry.
10              Do you recognize those legs?  Not those legs
11    (indicated), these legs (indicated).
12              A     From what I can tell in the picture the
13    individual standing in front of that tank and these are the
14    legs to the bracings of the equipment at the end of the
15    refiner tanks.
16              Q     And is that where the basket is then?
17              A     I believe it is, yes.
18              Q     Okay.  And this that's on the floor, what is
19    this?  That liquid looking stuff.
20              A     By now I don't know what was there.
21    Everything's been moved, so they could have rinsed it down.
22    It could have also been caustic solution or acid solution or
23    water.
24              Q     Okay.  So that could be what you were moving
25    Mr. Donez out of.
```

```
 1              A       Caustic or acid, yes.  Because we were
 2       getting splashed by the tank and I just wanted him out of
 3       that.
 4              Q       Okay.  Thank you.
 5              So when you were attending to Mr. Donez did you
 6       yourself observe anything other than a blue or I guess
 7       swollen -- is that what you said -- on his face?
 8              A       I don't recollect it being swollen yet.
 9       There was a brazen look to it, rough look like something
10       happened.  I couldn't tell what it was.
11              Q       Did you notice any other injuries on his
12       face, neck, head?
13              A       No.  At the time Heather -- when we went to
14       move him he had a little bit of blood that was on her shirt
15       or on her hand.
16              Q       How long did you stay with Mr. Donez?
17              A       All told it happened very quickly, maybe 10
18       or 15 minutes, because we called for help.  I called -- John
19       came into the room and I said get this person and this
20       person right away.  No questions, just tell them to get here
21       now.
22              Q       Okay.  And so that happened.  Did you stay
23       until the EMTs arrived?
24              A       No.  My manager showed up, the production
25       manager, Troy Gettman, who is an EMT and our safety person.
```

1    And at that point they took over and my manager said go to
2    your office and write a statement, and so I did.
3            Q       And did you write a statement?
4            A       I did.
5            Q       And in that statement did you say roughly
6    exactly what you're telling the Court today or was your
7    statement at all different, do you recall?
8            A       I believe it should be close to it.
9            MS. WIARD:  If I could approach, Judge?
10           THE COURT:  Yes.
11           THE WITNESS:  It's been a while.
12           Q       (By Ms. Wiard) Do you want to just look that
13   over and refresh your recollection, see if there's anything
14   different about your statement than what you've told the
15   Court today.
16           A       Just the fact that I apparently used his
17   radio to call the first person.  I don't remember that, but
18   that's in there so apparently it happened.
19           Q       So other than using someone else's radio or
20   Mr. Donez's radio what you just told the Court today is
21   essentially what you recollect and what you wrote in your
22   statement?
23           A       I believe so, yes.
24           Q       And do you see the defendant in court today?
25           A       Yes.

1              Q       Could you please point him out and identify
2      an article of clothing he's wearing?
3              A       Frank in the shirt.  The striped shirt.
4              Q       If you could describe it.
5              A       Striped shirt.  I can't quite make out the
6      colors.  It's gray or dark tones.
7              Q       And where is he sitting?
8              A       He is sitting next to I assume his attorney,
9      to your left.
10             MS. WIARD:  If the record could reflect that the
11     witness identified the defendant.
12             THE COURT:  Subject to cross-examination it will
13     so reflect.
14             MS. WIARD:  Thank you, Judge.
15             THE COURT:  Cross-examination?
16                          CROSS-EXAMINATION
17     BY MR. WIESE:
18             Q       Good morning, Mr. Davidson.
19             A       Good morning.
20             Q       Now, you had testified earlier that you knew
21     Frank on February 9, 2016.
22             A       Yes.
23             Q       And you would see him almost daily?
24             A       When I worked they were shifts, so yes.
25             Q       So you're aware that he wears glasses on a

1    regular basis?

2              A     Yes.

3              Q     And as you had just testified, when you saw

4    him on February 9 he was not wearing his glasses?

5              A     Correct.

6              Q     Okay.  And that stuck out enough to you that

7    you put that in the written statement that you made later

8    that morning.

9              A     (Non-verbal response.)

10             Q     Now, in the time that you've known Frank you

11   know that he's very passionate about his work; correct?

12             A     Yes.

13             Q     And that he wants immediate resolution to

14   problems that come up when he's working on anything?

15             A     Yes.

16             Q     And you're not aware of any previous

17   problems between Frank and Nick Donez, are you?

18             A     No, none at all.

19             Q     And you were shown this written statement

20   that you had made by Ms. Wiard just a minute ago; correct?

21             A     Correct.

22             Q     Now, in your testimony when Ms. Wiard was up

23   here you had testified to the effect that when you saw Frank

24   he's -- let me reword that.

25             When you testified earlier while being questioned

1   by Ms. Wiard, you testified that Frank said to the effect
2   something about his effing supervisor or something like
3   that.  Do you recall that?
4           A     Yes.
5           Q     Do you still have your written statement up
6   there with you?
7           A     I don't have it here.  But yes, I did not
8   use that phrase in it if that's what you're asking.
9           Q     That's what I'm asking.  You did not use
10  that phrase in your written statement.
11          A     No.
12          MR. WIESE:  And Judge, I have nothing further for
13  this witness.
14          THE COURT:  All right.  Redirect?
15          MS. WIARD:  Briefly.
16                    REDIRECT EXAMINATION
17  BY MS. WIARD:
18          Q     Is there any particular reason why you would
19  keep the effing word out of your statement?
20          A     I just didn't think it would be appropriate
21  to put it in.
22          Q     Okay.  Thank you.
23          MS. WIARD:  Nothing further.
24          THE COURT:  Jury questions?  All right.  I'm
25  seeing none.

```
 1                    May this witness be excused, also?
 2                    MS. WIARD:  He may, Judge.
 3                    THE COURT:  All right.  You're free to go about
 4       your business.
 5                    And the People may call their next witness.
 6                    MS. WIARD:  Thank you, Judge.
 7                    MR. WIESE:  And Judge, just to clarify,
 8       Mr. Davidson is under a defense subpoena, also.
 9                    THE COURT:  Okay.  So you may be called.
10                    MR. WIESE:  As long as he's on call, Judge, that's
11       fine.
12                    THE COURT:  All right.  You know how to reach each
13       other apparently.  That's fine then.  Thank you.
14                    And that's why I asked if there was any objection.
15       So you didn't state it right away before they leave the
16       room.
17                    MR. WIESE:  Yes.
18                    MS. WIARD:  Thank you, Judge.  People call Charles
19       Fisher.
20                              CHARLES FISHER
21       was called as a witness and, having been sworn, was examined
22       and testified as follows:
23                           DIRECT EXAMINATION
24       BY MS. WIARD:
25                    Q    Good morning.
```

```
 1              A     Good morning.
 2              Q     Can you state your name and spell your last
 3    name, please.
 4              A     Charles Fisher, F-i-s-h-e-r.
 5              Q     Mr. Fisher, what do you do for a living?
 6              A     I work at Leprino Foods.
 7              Q     What's your role?
 8              A     I'm a separator UF operator.
 9              Q     A UF operator?
10              A     Yes.
11              Q     What's that stand for?
12              A     Ultra filtration.
13              Q     How long have you worked at Leprino?
14              A     Over 21 years.
15              Q     Have you -- what department are you in?
16              A     Weigh department.
17              Q     Have you always been in the weigh
18    department?
19              A     No.  I was a year and a half in cheese
20    department when I first started.
21              Q     And then from there weigh?
22              A     Yes.
23              Q     Has your role always been separator?
24              A     No.  I was a lactose operator in the
25    beginning for five years.
```

```
 1              Q       Now, do you know Mr. Levar, Frank Levar?

 2              A       Yes.

 3              Q       How do you know him?

 4              A       We worked together.

 5              Q       Do you work in the same department?

 6              A       Yes.

 7              Q       Now, Mr. Levar is a lactose operator; is

 8    that correct?

 9              A       Yes.

10              Q       So do you -- in that lactose operation, does

11    that occur in the refinery room?

12              A       It's a part of the process.

13              Q       So it happens in multiple rooms?

14              A       Yes.

15              Q       So where does the lactose operator -- what

16    rooms does the lactose operator have to be in?

17              A       Could be throughout the whole department.

18    It's spread out.

19              Q       Okay.  Primarily is the there one area of

20    the weigh department where the lactose operator should focus

21    his or her attention?

22              A       It's in the back of the department, yes.

23              Q       And where is that?  Is that the refinery?

24              A       That's part of it, yeah.  That's one room.

25              Q       Now, when you were working as separator and
```

1  Mr. Levar was working as lactose operator how often did your
2  paths cross?  Did you work closely together?
3          A      No.  Some of my area is close to his.  The
4  control room is used by everybody.
5          Q      Oh, I see.  And how close is the control
6  room to the refinery room?
7          A      Over 50 feet away I'd say.
8          Q      And how big is the control room?
9          A      About as long as that wall over there
10 (indicated).
11         Q      Okay.  So you're pointing to the back of the
12 courtroom?
13         A      Yes.  And the back sitting, behind that wall
14 there.  Somewhere in there.
15         Q      And I'm really bad at dimensions,
16 Mr. Fisher.
17         A      Me too.
18         THE COURT:  Maybe about 26-foot across it looks
19 like.  Does that sound right?
20         THE WITNESS:  Yeah.  Like I say, without a tape
21 measure I ain't going to know.  Just by looking that's about
22 as long as it is.
23         Q      (By Ms. Wiard) So I guess where the gallery
24 is.  Where the people sit in the courtroom is roughly the
25 size of the control room?

```
 1              A      Yeah.
 2              Q      So multiple individuals can be in this
 3   control room.  Is that what you're telling me?
 4              A      Oh, yeah.
 5              Q      Who uses the control room and what is its
 6   purpose?
 7              A      It controls the equipment that everybody
 8   uses.
 9              Q      Okay.  So is there a control panel?
10              A      Yeah, there's a big control panel right in
11   the middle, right in the center of that room, almost the
12   full length of it.
13              Q      So somebody from the weigh department might
14   need to go in there and work on some controls.
15              A      Me and another person's in there almost all
16   day long.  Ours and that other person's controls are right
17   in that room.
18              Q      Okay.  So you work in there a lot.
19              A      Yeah.
20              Q      Now, how well would you say that you know
21   the defendant, Mr. Levar?
22              A      Pretty good.
23              Q      Are you friends?
24              A      Yes, we're friends.
25              Q      Do you socialize?
```

```
 1              A      Yes.
 2              Q      Does your wife and Mr. Levar's wife
 3     socialize?
 4              A      Yes.
 5              Q      So you're more than just work friends, you
 6     are outside of work friends?
 7              A      Yeah.
 8              Q      And what about Mr. Donez, do you know him?
 9              A      Yes.
10              Q      And how long have you known Mr. Donez?
11              A      Ever since he started working for the
12     department, I guess.  I don't --
13              Q      So maybe ten years?  Does that sound about
14     right?
15              A      Maybe more than that.
16              Q      And I'm sorry, I didn't ask you how long you
17     have known Mr. Levar.
18              A      Less than I knew Nick.
19              Q      Okay.  So maybe ten?
20              A      Yeah.
21              Q      And do you work with Mr. Donez?
22              A      Yes, I did.
23              Q      How closely did you work with Mr. Donez?
24              A      He was our foreman.
25              Q      Your foreman?
```

```
 1              A      Yes.
 2              Q      And what about Mr. Donez, are you friends
 3      with him?
 4              A      Not like I am with Frank, no.
 5              Q      So you don't socialize with Mr. Donez?
 6              A      No.
 7              Q      And your wives don't socialize?
 8              A      No.
 9              Q      Now, on February 9 of this year, which was a
10      Tuesday, were you working?
11              A      Yes.
12              Q      And do you remember an incident that took
13      place sometime between the hours of 9:00 and 10:00 in the
14      morning?
15              A      Are you referring to that situation?
16              Q      Yeah.
17              A      Yeah.
18              Q      Did you actually witness anything that
19      occurred that morning?
20              A      No.
21              Q      Where was the defendant that morning, do you
22      know?
23              A      He was back in the refiner room.
24              Q      Okay.  And at some point did he come out of
25      the refinery room?
```

```
 1                A     Only when he left that I know of.

 2                Q     And did he come past the control room?

 3                A     Yeah.  He stopped and talked to me.

 4                Q     He did.  Okay.  And when he stopped and

 5     talked to you what did he say to you?

 6                A     He told me he had knocked Nick out and he's

 7     laying on the refinery room floor.  Tell Jim Wilkins.

 8                Q     Did he have anything in his hands that you

 9     noticed?

10                A     He had his toolbox.

11                Q     How did he appear to you?  What was his

12     demeanor?

13                A     I don't know how you'd describe it.  I'm

14     having a hard time putting a name to it.

15                Q     Okay.  Well, was he -- did he seem upset?

16                A     Yeah, he was upset.  He was upset.

17     Distraught maybe would be the right word.

18                Q     Did he saying anything other than that to

19     you?

20                A     That was it.

21                Q     And then where did he go from there?

22                A     He left.

23                Q     What did you do?

24                A     I went to the refiner room to see what he

25     was talking about, and then I went and got Jim Wilkins.
```

```
 1              Q      When you went into the refinery room did you
 2       see anything?
 3              A      I didn't actually go in, I was at the huge
 4       doorway.  I seen Nick laying on the floor.
 5              Q      So I'm going to ask you to turn around and
 6       look at that exhibit.  It's Exhibit 1.  Do you recognize
 7       that?  What is that a blueprint of?
 8              A      It's a refinery room.
 9              Q      If you're looking at that refinery room in
10       that blueprint, how far did you get into the room?
11              A      I was right here (indicated).  Right at the
12       entrance.
13              Q      Are you pointing to the doorway there?
14              A      Yes, the double doors.
15              Q      And Mr. Fisher, if you want to look at the
16       photographs that are in front of you.  I think it's People's
17       Exhibit 3, possibly 4.  If you want to look at that.
18              Actually, let's start with 2.  People's Exhibit 2.
19       Do you see that one?  You have that in your hand?
20              A      Yeah.
21              Q      Okay.  And that's up here on the screen.
22              If you could go show -- explain where you were
23       when you came into the room.
24              A      Right there at the door there at the back of
25       the picture.
```

```
 1            Q     So right in here (indicated)?

 2            A     Yeah.  I stopped right there.

 3            Q     Okay.  And where did you see Mr. Donez when

 4   you walked in?

 5            A     His head was near this catwalk that's in the

 6   front and his feet was near that ladder.

 7            MS. WIARD:  If I may approach, Judge?

 8            THE COURT:  Yes.

 9            Q     (By Ms. Wiard) I'm going to bring the

10   pointer to you.  If you want to use the yellow button and so

11   just show with the pointer where.

12            A     His head was in there (indicated) and his

13   feet was there (indicated).

14            Q     And show again where you were standing?

15            A     Right there (indicated).

16            Q     Okay.  Thank you.

17            Now, also, if you wouldn't mind looking at I think

18   it's People's Exhibit 5, maybe.  Is that right?  Is that

19   People's Exhibit 5?

20            A     No, it's six.

21            Q     Okay.  I'm sorry.  Does that give you a

22   better angle in terms of where you came into the room?

23            A     That's the door I walked in at.

24            Q     And how far would you say you stepped in,

25   Mr. Fisher?
```

1          A     Right there (indicated).  I stood right
2     there.  When I seen him laying on the floor I left.
3          Q     Okay.  And again, you said his feet were in
4     this direction (indicated) pointing in this direction
5     (indicated)?
6          A     Yeah.
7          Q     And his head was in here somewhere
8     (indicated)?
9          A     Yes.
10          Q     Thank you.
11          MS. WIARD:  And Your Honor, the record should
12     reflect that the witness has said that the victim's head was
13     near the post, I guess, or one of the feet in People's
14     Exhibit --
15          What number is that?  I believe that's 3.
16          THE WITNESS:  That's 3 that you're looking at now.
17          MS. WIARD:  And that the victim's feet were in the
18     direction of what looks to be a ladder in People's Exhibit
19     3.
20          THE COURT:  The record will so reflect.
21          MS. WIARD:  Thank you.
22          Q     (By Ms. Wiard) Was he face up or face down?
23          A     Face up.
24          Q     And could you see anything other than how he
25     appeared on the floor?  In other words, did you get up close

```
 1   to him?
 2           A     No.
 3           Q     Did you see anything on his face?
 4           A     I don't remember.  I know in the -- I told
 5   the detective I seen a blue mark, but I don't remember.
 6           Q     Okay.  But if you told the detective that
 7   you saw a blue mark then that would be true?
 8           A     Yes.
 9           Q     All right.  Now, did you notice anything
10   laying near Mr. Donez?
11           A     There was a tool laying on the floor there.
12           Q     Okay.  Do you remember what kind of tool?
13           A     To me -- I only spent maybe five seconds
14   standing there.  Maybe a mallet.
15           Q     Okay.  Now, did you happen to notice if he
16   had his bump cap or his hairnet on?
17           A     Not really.
18           Q     Okay.  Don't remember?
19           A     No.  I just thought the situation was very
20   serious and I went and got --
21           Q     You got help?
22           A     Yeah.
23           Q     Tell me about being in the refinery room.
24   Do you work in the refinery room ever?
25           A     I used to.  You can walk through there, but
```

```
 1    I don't anymore.
 2              Q      What's the level of noise in there?
 3              A      It's loud.
 4              Q      How loud?
 5              A      You can't have a normal conversation.
 6              Q      What do you mean by that?
 7              A      Well, without microphones it would be hard
 8    to hear across the room.
 9              Q      So when you're having a conversation in
10    there what level of voice to you need?
11              A      Usually you scream in the other person's
12    ear.
13              Q      And are you wearing ear protection?
14              A      You have to wear ear protection.
15              Q      So does that make it even harder to hear?
16              A      Yeah.
17              Q      Do you wear ear protection all day long?
18              A      If you're in a department, yes.
19              Q      Okay.  So you can pull it out when you're
20    not --
21              A      If you are on break, restroom, you can pull
22    them out, yeah.
23              Q      But if not you're required to keep that ear
24    protection?
25              A      Yeah.
```

```
1              Q      So it's not unusual to be in the refinery
2    room and having a very loud conversation with somebody?
3              A      Yes.
4              Q      That is not unusual?
5              A      Yes.  Correct.
6              Q      Thank you.
7              Now, before all of this happened do you recall
8    hearing the defendant on the radio?
9              A      Yes.
10             Q      And do you recall what he was requesting?
11             A      Jim Wilkins.
12             Q      Did he say why he was requesting?
13             A      No.
14             Q      And did you notice if Mr. Donez went into
15   the refinery room to assist Mr. Levar?
16             A      No.  You can't see the refinery room from
17   the control room.
18             Q      Okay.  So were you anywhere near if you knew
19   that Mr. Donez was on his way to help out the defendant in
20   the refinery room?
21             A      Nick was working just outside my window in
22   the control room.
23             Q      Okay.  So did you -- were you aware that he
24   went in to help?
25             A      No.
```

 1          Q     But he was near you so he could hear -- or I
 2    don't know.
 3          A     It's over the radio.  I wear an earbud so I
 4    can hear everything real easy.
 5          Q     Oh, I see.  So you might not necessarily
 6    hear it if you didn't have an earbud on?
 7          A     Right.  Because most of them just wear the
 8    mics here and if -- with all the other noise you might not
 9    hear.
10          Q     Okay.  So prior to this whole incident where
11    Mr. Levar comes out and tells you that he knocked Nick out,
12    did you see Nick ever go into the refinery room?
13          A     No.
14          Q     And do you see the defendant, Frank Levar,
15    in court today?
16          A     Yes.
17          Q     And could you point him out for the Court,
18    please.
19          A     He's sitting right there (indicated).
20          Q     And could you point out a piece of clothing
21    he's wearing?
22          A     Striped shirt.
23          MS. WIARD:  If the record could reflect the
24    witness has identified the defendant.
25          THE COURT:  Subject to cross it will so reflect.

```
 1              Q       (By Ms. Wiard) And Mr. Fisher, did you write
 2      a statement about this, about what happened?  Do you recall?
 3              A       I think I had to.
 4              MS. WIARD:  If I could approach, Judge?
 5              THE COURT:  Yes.
 6              A       They gave me a piece of paper and I just had
 7      to write stuff down, yeah.
 8              Q       (By Ms. Wiard) Do you recognize that?
 9              A       Yep.
10              Q       Is that your statement?
11              A       Yep.
12              Q       And is there anything in that statement that
13      you did not tell us today?
14              A       No.  That's it.
15              Q       Okay.  Thank you.
16              MS. WIARD:  Nothing further, Judge.
17              THE COURT:  Cross-examination?
18              MR. WIESE:  May I have just a second, Judge?
19              Judge, we have no questions for Mr. Fisher.
20              THE COURT:  Any jury questions?  All right.
21      Apparently not.
22              And is he under subpoena to remain for any reason?
23              MR. WIESE:  Mr. Fisher is not under our subpoena,
24      Judge.
25              THE COURT:  Then you're free to go about your
```

```
 1   business then.  Thank you.
 2              People may call their next witness.
 3              MS. WIARD:  Thank you, Judge.  The people call Tim
 4   Martin to the stand.
 5                         TIMOTHY MARTIN
 6   was called as a witness and, having been sworn, was examined
 7   a testified as follows:
 8                      DIRECT EXAMINATION
 9   BY MS. WIARD:
10              Q    Hi.  Could you please state your name and
11   spell your last name.
12              A    Timothy Edward Martin, M-a-r-t-i-n.
13              Q    Mr. Martin, what do you do for a living?
14              A    I work for Leprino.  I am a relief operator.
15   A vacation relief operator.
16              Q    So you get to fill in when everybody is
17   gone.
18              A    Yep.  If somebody calls in sick or takes a
19   vacation day I run the equipment.
20              Q    Are you full time then?
21              A    Yes, ma'am.
22              Q    So somebody's gone every day?
23              A    Not every day.  I mean, if nobody calls in
24   I'm extra and I just do extra cleaning.
25              Q    So you're actually at work every day?
```

```
 1                A      Pretty much.

 2                Q      How long have you been with Leprino?

 3                A      Since February of 2014.

 4                Q      So Mr. Martin, does that mean you work in

 5      every department?

 6                A      No, ma'am, just the weigh department.

 7                Q      Just the weigh?

 8                A      Yep.

 9                Q      Okay.  Now, were you working at Leprino on

10      February 9, 2016?

11                A      Yes, I was.

12                Q      And what was your capacity that morning?

13                A      I was extra that day, and I was just moving

14      around helping other people clean up, get ready for the next

15      day of production.

16                Q      Okay.  And when you say working around,

17      where exactly?  You do you recall?

18                A      I was foaming I think the evaporator at

19      first, and then I was helping give breaks.  Then I think we

20      started having problems with clarifier number one.

21                Q      Who was helping you?

22                A      Jonathan Prell and Nick Donez.

23                Q      Okay.  And what was the issue?  What were

24      you trying to fix?

25                A      I'm not sure what the problem was.  I never
```

```
 1    tore one down.  I was just doing it to help take it down.
 2    It was more than likely cheese was stuck inside of it.
 3              Q      But that was a new experience for you?
 4              A      It was, yes.
 5              Q      And now you said that you were working with
 6    Nick.  Is that Nick Donez?
 7              A      Yes, ma'am.
 8              Q      How long had you worked with Mr. Donez prior
 9    to February 9?
10              A      Probably most of the time in the weigh
11    department.  I did nights in the bagging room and then I
12    moved to the day shift.
13              Q      So maybe two years?
14              A      About that.
15              Q      And was he your foreman?
16              A      On one rotation he was, yes.  Because you
17    have two rotations.  When they're off then we have another
18    foreman.
19              Q      How well did you know Mr. Donez?
20              A      Just on a professional level.  I'd never
21    seen him outside of work.
22              Q      Okay.  How about Mr. Levar?  Did you ever
23    work with Frank Levar?
24              A      Yes.  He trained me half of the time on the
25    lactose job and the other rotation was Greg Majors.
```

       1              Q      Okay.  And how long would you say that you
       2       worked with Mr. Levar?
       3              A      I worked directly with him probably a month
       4       and a half I think while he was training me, and then just
       5       off and on.  Again, if I'd help him clean something if he
       6       was having problems or tear down the machines for CIPs,
       7       clean it up, get it ready for the next production day.
       8              Q      What is your working relationship or what
       9       was your working relationship with the defendant, Mr. Lever?
      10              A      Just co-worker.
      11              Q      And what about your relationship with
      12       Mr. Donez?
      13              A      He was my foreman, so he'd give me a task to
      14       do and I'd have to go do it.
      15              Q      Did you get along with him?
      16              A      Yes.
      17              Q      And did you get along with Mr. Levar?
      18              A      Yes.
      19              Q      Do you recall what happened, or if something
      20       happened, on February 9 of 2016?
      21              A      I recall probably something happened.  I
      22       didn't witness it, though.
      23              Q      Okay.  Did you hear or -- let me back up.
      24              Where were you at about -- between 9:00 and 10:00
      25       in the morning?  Were you working on the clarifier at that

    1    point?

    2                A       Yeah.   The three of us, Nick Donez, Jonathan

    3    Prell, and myself.   We were tearing it down.

    4                Q       Where is that clarifier in relationship to

    5    the refinery room?

    6                A       It's quite a ways away.   The clarifiers are

    7    right outside of our control room.   I don't know if you have

    8    pictures of those.

    9                Q       Not of the control room.   But if you look

   10    behind you on item 1 there, on that blueprint, if you see

   11    where the doorway is to the left on the image, on that

   12    blueprint, and you walked out the door --

   13                A       On the left.

   14                Q       Right.   So where would you have been in

   15    relationship to that doorway?

   16                A       Oh, gosh.   Probably way up here or so

   17    (indicated).

   18                Q       Okay.   So if I could show you.   If you look

   19    through those photographs, I think there's a photograph of

   20    the entrance, or a pretty good shot of the entrance.

   21                A       This one's the entrance to the refinery

   22    room.

   23                Q       Right there?

   24                A       Yes, ma'am.

   25                Q       So Mr. Martin, in that you said if you came

1    out this doorway -- and there's some big vat or something
2    there, I guess -- you would go all the way this way
3    (indicated).
4              A    Yep.
5              Q    To the right of that photograph.
6              A    Yes.
7              Q    And somewhere in there on the other side of
8    that wall is where you were that morning?
9              A    Quite a ways away.  The room right nextdoor
10   to that room is a CIP room, then a lactose lab, supervisor's
11   office, and then the control room.  So it's a good probably
12   30 or 40 feet or further.
13             Q    When somebody leaves that department, this
14   department, and it says the exit arrow is going that way
15   (indicated), is that correct?
16             A    That's for like a fire exit kind of thing.
17   That's emergency exit.
18             Q    So if normal people -- not normal.  But if
19   people are leaving under normal circumstances how would they
20   exit?
21             A    They'd go to the right.
22             Q    Do you need to walk by the control room on
23   your way out?
24             A    Mostly, yeah.  I mean, there's a different
25   path you could take, but it's right there.

```
 1              Q      So mostly yes?

 2              A      Yes.

 3              Q      Okay.  Thank you.

 4                     While you were working did you ever hear the

 5     defendant make any sort of call for help over the radio?

 6              A      Yes, I did.

 7              Q      What did you hear?

 8              A      I heard Frank call for Nick.  He said he was

 9     having problems with the Tema (phonetic), a piece of

10     machinery on the lactose dryer.

11              Q      So you heard that.

12              A      Yep.

13              Q      And was Nick with you when you heard that?

14              A      Yes, he was.

15              Q      And did he leave and go to help?

16              A      He did after a couple of minutes.  We were

17     still working on the clarifier, trying to tear it down.  He

18     wanted to make some progress and then he took off.

19              Q      And you don't know where he went, though?

20              A      No.

21              Q      After a few minutes did you happen to see

22     the defendant?

23              A      I did.

24              Q      And where did you see him?

25              A      He was walking towards the control room.  He
```

1  then went inside the control room, he said something to
2  Charles Fisher, and then he proceeded to leave the control
3  room.
4          Q      Did you hear what he said to Charles?
5          A      No.  There's no way I could have.  The
6  control room's sealed with plexiglass windows.
7          Q      So you just saw him say something but you
8  don't have any idea.
9          A      Yes.
10         Q      What did you do after that?
11         A      Charles came out and he told Johnathan Prell
12 something, and I'm not sure what he said exactly.  It was
13 loud.  It's a noisy factory.  And I think he said something
14 like he hit Nick or knocked Nick down or something.  He so
15 then Johnathan and I both went back to the refinery room and
16 we saw Nick laying down on the ground.
17         Q      Okay.  So when you say that you went back to
18 the refinery room, did you go all the way into the refinery
19 room?
20         A      I think we just took a couple of steps in
21 and then we went back out right away because we knew we had
22 to get ahold of somebody.  We didn't know what happened.  We
23 thought maybe he could have fallen.
24         Q      Where on that blueprint there -- about how
25 far into the room did you get?

```
 1              A      Probably just about here (indicated).  This
 2    is our COP tank, I think.
 3              Q      If you want to look at one of those
 4    photographs.  Maybe back to the one we were just looking at.
 5    Does that show about how far you got in?  That's People's
 6    Exhibit 5, I believe.
 7              A      That first one, I believe.
 8              Q      Is that No. 5?
 9              A      It's 6.
10              Q      Sorry.  So at the bottom of No. 6 -- I mean
11    not the bottom.  In that photograph, you got in to about
12    where this -- what is this called again?
13              A      That's like a mini UF, I think.  It's a
14    filtration system.
15              Q      Is that the same thing you were referencing
16    on the blueprint here?
17              A      No.  On the right-hand side.  Right there.
18    That's our COP tank.  And that was probably right about
19    there where your laser pointer is.  Just a few steps, a few
20    feet in.
21              Q      Did you stop?
22              A      Yeah.
23              Q      And what did you see?
24              A      I saw Nick just laying on the floor.
25              Q      When you saw Nick laying on the floor where
```

```
1    about was he laying?
2              A      It'd be a little bit behind this a ladder,
3    probably by this tank.
4              Q      So if you were looking at -- that's People's
5    Exhibit 3?
6              A      Yep.  He was probably a little bit behind
7    the ladder.
8              Q      When you say behind, what do you mean?
9              A      Well, the rolling ladder there.
10             Q      I'm going to bring you the pointer.
11             A      Okay.
12             Q      If you could show where his head was and
13   where his feet were.
14             A      Just the yellow button?
15             Q      Uh-huh.
16             A      His head was probably right around there
17   (indicated), and his feet were about here (indicated).  So
18   he was pretty much right by the rolling ladder.
19             Q      And was he on his -- face up or face down?
20             A      Face up.  He was on his back.
21             Q      Could you see anything else?
22             A      No.
23             Q      Do you recall if there was anything on the
24   floor near Nick's body?
25             A      There was like an orangish hammer that we
```

1    use to help tear down the equipment.

2             Q      And could you see -- did he have his bump

3    cap on did you notice?

4             A      I think it was on.  It was like off a little

5    bit because it sits behind our head and if he's laying on

6    the floor it'll move it a little.

7             Q      Do you remember for sure if it was on or

8    off?

9             A      I don't know for sure.

10            Q      Did you see the hairnet?

11            A      I think so.  I'm sorry.

12            Q      That's okay.

13            Do you remember where the hairnet was?

14            A      I thought it was like halfway on his head

15    and maybe stuck to his bump cap a little bit.

16            Q      Okay.  But you don't know?

17            A      I don't.  I'm not sure exactly.

18            Q      Okay.  Did you see anything else near his

19    body at all?

20            A      No.

21            Q      No?

22            A      No.

23            Q      Okay.  Now, when you saw the defendant and

24    he was walking by the control room and you saw him talking

25    to Charles fisher, did he have any sort of angry, upset look

1    about his face?  Was he --

2              A    He looked upset.  He was carrying his

3    personal toolbox.

4              Q    Okay.  And Mr. Martin, I have to ask you

5    this.  Are you -- do you have a prior felony conviction?

6              A    Yes, I do.

7              Q    Okay.  And is that from 1996?

8              A    I believe that's probably the right year.

9              Q    Okay.  And was that in Weld County?

10             A    Yes, ma'am.

11             Q    And was that for second degree burglary?

12             A    Yes, it was.

13             Q    Thank you.

14             And do you see Mr. Levar, the defendant, in court

15   today?

16             A    Yes, I do.  He's sitting there (indicated).

17             Q    And could you point out a piece of clothing,

18   please.

19             A    He's wearing a white and blue striped shirt.

20             Q    Thank you.

21             MS. WIARD:  If the record could reflect the

22   witness has identified the defendant subject to

23   cross-examination.

24             THE COURT:  It will so reflect.

25             MS. WIARD:  Thank you, Judge.

```
 1              THE COURT:  Cross-examination?
 2                      CROSS-EXAMINATION
 3  BY MR. WIESE:
 4              Q     Mr. Martin, in the time you have worked at
 5  Leprino you are not aware of Frank having any argument or
 6  disagreements with anyone around the plant; correct?
 7              A     No.
 8              MR. WIESE:  And Judge, I have no further
 9  questions.
10              THE COURT:  Redirect?
11              MS. WIARD:  No, Judge.
12              THE COURT:  Any jury questions?  Does not appear
13  we have any.
14              And may this witness be excused?
15              MS. WIARD:  Yes, Judge.
16              THE COURT:  All right.  Thank you, sir.  You're
17  free to go about your business.
18              THE WITNESS:   Thank you.
19              THE COURT:  And we have time for another witness
20  of like length if you have somebody like that.
21              MS. WIARD:  I think I could probably get
22  Mr. Wilkins in, Judge.
23              THE COURT:  All right.  Jim Wilkins, I believe.
24              MS. WIARD:  Yes.  Jim Wilkins.
25
```

```
 1
 2                      JAMES WILKINS
 3   was called as a witness and, having been sworn, was examined
 4   and testified as follows:
 5                    DIRECT EXAMINATION
 6   BY MS. WIARD:
 7              Q    Good morning.
 8              A    Good morning.
 9              Q    Could you please state your name and spell
10   your last name.
11              A    James Wilkins, W-i-l-k-i-n-s.
12              Q    What's your occupation?
13              A    A senior supervisor, Leprino Foods.
14              Q    What does that mean, senior supervisor?
15              A    Means I'm in charge of the other
16   supervisors.
17              Q    Okay.  Is there any particular department
18   that you are senior supervisor of or is it all of Leprino?
19              A    It's mainly weigh now.
20              Q    Okay.  How long have you been a senior
21   supervisor?
22              A    Since October.
23              Q    Of this year?
24              A    Yes.
25              Q    Prior to that what was your role?
```

```
 1                    A     A cheese supervisor.
 2                    THE COURT:  So wait a minute.  Just to clarify.
 3         So since October 2016.
 4                    MS. WIARD:  '16.
 5                    THE COURT:  So he just started a couple days ago.
 6                    THE WITNESS:  No.  October 2015.
 7                    MS. WIARD:  Oh, I'm sorry.  Thank you.
 8                    Thanks, Judge.
 9                    Q     (By Ms. Wiard) And before that you were a
10         cheese supervisor?
11                    A     Yes.
12                    Q     And what department is that?
13                    A     The cheese department.
14                    Q     Okay.  Sorry.
15                    On -- back on February 9, 2016, were you the
16         supervisor for Nick Donez?  Were you his supervisor?
17                    A     Yeah.  I still hadn't fully assumed my
18         position in the weigh department.  That day I was still
19         completing duties in the cheese department.
20                    Q     So sort of a supervisor at that point?
21                    A     Yeah.
22                    Q     And were you Frank Levar's supervisor on
23         that day?
24                    A     Yeah.  Same.
25                    Q     Same?
```

```
 1              A      As Nick, yeah.

 2              Q      How long have you known Nick Donez?

 3              A      I would say over ten years, easy.

 4              Q      How closely have you worked with Mr. Donez

 5     over those ten years?

 6              A      I've worked with him as he's been a bagger

 7     and an operator and a foreman.

 8              Q      And did you work closely with him in all of

 9     those capacities?

10              A      Same as any of the other operators.

11              Q      And what does that mean?

12              A      Daily interaction with him.  Observations of

13     their work and stuff.

14              Q      Okay.  Did you get along with Mr. Donez?

15              A      Yeah.

16              Q      And what about Mr. Levar?  Did you work

17     closely with him?

18              A      Yeah.  Same.  I've known Frank for probably

19     over ten years also.

20              Q      And did you work with him in the same

21     capacity that you worked with Mr. Donez?

22              A      Yes.

23              Q      And did you get along with Mr. Levar?

24              A      Yes.

25              Q      So on February 9, 2016, at around somewhere
```

```
1    between 9:00 and 11:00 in the morning were you working?
2               A       Yes.
3               Q       Where were you working?
4               A       I was actually in the cheese department that
5    day.
6               Q       How far is the cheese department from the
7    refinery room?
8               A       Maybe 100 yards.
9               Q       Okay.  So if you look at that blueprint
10   behind you and the entrance is to the left on that blueprint
11   to the refinery room, which direction would the cheese
12   department be?
13              A       It would be up here (indicated).
14              Q       Okay.  And you said you were about 100 yards
15   away then at that point?
16              A       Yeah.
17              Q       Were you working with anybody else at that
18   point?
19              A       I'm not even sure who was in the cheese
20   office with me that morning.  But yeah, there was other
21   people in the cheese department I was working with.
22              Q       How far is the cheese office or department
23   from the control room?
24              A       About 75 yards.
25              Q       Does the control room come before the cheese
```

1    department or vice versa?

2         A    If you're going from the refiner room the

3    control room would be first and then the cheese department

4    would be after that.

5         THE COURT:  He's pointing to the upper end of the

6    diagram.  I guess if you'd like to look at things as far as

7    south, as the diagram the top end being north, he's pointing

8    to the north when he's addressing Exhibit 1.

9         MS. WIARD:  Thank you, Judge.

10        Q    (By Ms. Wiard) North on that document?

11        A    Yes.

12        Q    Sometime around between 9:00 and 11:00 did

13   you see the defendant walking out of the refinery room?

14        A    No.  I seen (sic) them both that morning,

15   but I don't recall either one of them.  They were both

16   performing their jobs and stuff like that.

17        Q    So you don't recall ever seeing the

18   defendant coming out of the refinery room and headed toward

19   the control room?

20        A    No.  I mean, I'm not -- no, I can't

21   remember.

22        Q    Are you -- do you recall something happening

23   that morning, February 9 of 2016?

24        A    Yeah.  I was over in the cheese office when

25   I heard there was an issue in the refiner room.

```
 1              Q      Okay.  And do you recall going into the
 2    refinery room that morning then?
 3              A      Yes, I do.
 4              Q      About what -- when you went into the
 5    refinery room did you see anything?
 6              A      Yes.  I seen (sic) Nick laying down and Bob
 7    holding his head.
 8              Q      So you did not see the defendant prior to
 9    going into the refinery room?
10              A      No.
11              Q      And do you recall talking to Detective
12    Vosburg about that?
13              A      Yes.
14              Q      Do you recall telling Detective Vosburg that
15    you saw the defendant that morning before you saw Mr. Donez
16    in the refinery room?
17              A      Yes.  I seen (sic) them both that morning.
18              Q      Okay.  And do you remember telling Detective
19    Vosburg that you'd seen Mr. Levar with his toolbox?
20              A      No.
21              Q      You don't recall saying that?
22              A      No.
23              Q      Okay.  If Detective Vosburg had written that
24    in his report after he'd interviewed you is that just
25    something maybe you forgot that you'd said?
```

1          A     Maybe.  As far as I know Frank's toolbox

2  would have been in the lab.  But I honestly don't recall him

3  having it that morning now.

4          Q     Okay.  Did you hear any news or did you hear

5  the defendant say anything prior to you going into the

6  refinery room?

7          A     I know running back and forth between the

8  weigh department that Nick was taking apart a piece of

9  equipment called a clarifier.  Frank was running the lactose

10  drier and he was having some problems with the lactose drier

11  operations.

12         Q     Did you hear that over the radio or did that

13  just get reported to you?

14         A     That was reported.

15         Q     And were you going to go into the refinery

16  room to assist or him or were you aware if Mr. Donez was

17  going to do that?

18         A     No.  I was taking care of duties over on the

19  cheese side.  I was comfortable with Nick taking care of the

20  clarifier and Frank taking care of the lactose issues.

21         Q     So you were not going to get involved in

22  that?

23         A     No.

24         Q     Now, you said you went into the refinery

25  room.

```
 1              A      Yes.

 2              Q      Why did you go into the refinery room?

 3              A      I was in the cheese office and somebody came

 4    in there and said that Nick was unconscious in the refinery

 5    room.  I can't remember who came in and told me that.

 6              Q      Okay.  Could it have been the defendant?

 7              A      No, it was not him.

 8              Q      Okay.  When you went into the refinery room

 9    what did you see?

10              A      I seen (sic) Nick laying on his back with

11    Bob kneeling behind him holding his head.

12              Q      Okay.  And where if you look at that

13    blueprint again that's behind you that's Exhibit No. 1, if

14    you could show with your finger, I guess, or point out where

15    you saw Nick lying.

16              A      Right there where the circle is.

17              Q      Okay.  And you're referencing the circle

18    that is next to the image called lactose refiner?

19              A      Yes.  Right by there.

20              Q      And you said he was sitting up at that

21    point?

22              A      No, he was laying down.  Bob was kneeling

23    behind him holding Nick's head.

24              Q      Behind him.  How close would you say that

25    Nick's head was to the actual refiner itself?
```

```
 1              A      I would say with Bob between them within a
 2     couple feet.
 3              Q      Where were Mr. Donez's legs?
 4              A      They were pointing toward the opening, the
 5     entrance to the room.
 6              Q      Okay.  If you see that red line there and
 7     then you see another line, would either of those lines
 8     depict where his legs were facing?
 9              A      I would say they were facing more toward the
10     red line.  That direction.
11              Q      So the red line on Exhibit 1 is about where
12     you remember seeing Nick's legs?
13              A      Yes.
14              Q      Was anybody else in the room when you went
15     in?
16              A      No, just Bob and Nick.
17              Q      Did you notice anything laying on the floor?
18              A      No, I didn't.  I was more concerned with the
19     issue that was -- I had an operator that was damaged, hurt.
20              Q      And what did you do at that point?
21              A      I went over and I asked what was going on.
22     Bob said that we needed an ambulance so I proceeded from the
23     refiner room into the control room.  I called the guard
24     shack and told them to get an ambulance here as soon as
25     possible.
```

```
 1              Q      Did you have any other contact with the
 2      defendant or Nick that morning?
 3              A      No.
 4              Q      And didn't have any conversations with them?
 5              A      Not that I recall.
 6              Q      Earlier in the morning before any of this
 7      happened did you have conversations with Mr. Levar at all?
 8              A      Probably.  Because my duties first thing in
 9      the morning, I come into my office and check my emails and
10      stuff and we probably talked.
11              Q      But it was not any conversation that
12      significantly sticks out with you?
13              A      No.
14              Q      And what about Mr. Donez?  Did you have
15      conversations with him that morning?
16              A      No, I don't believe so at all.
17              Q      Thank you.
18              MS. WIARD:  Nothing further.
19              THE COURT:  Cross-examination?
20                          CROSS-EXAMINATION
21      BY MR. WIESE:
22              Q      I guess at this point it's good afternoon,
23      Mr. Wilkins.
24              A      Good afternoon.
25              Q      So in your time as a supervisor at Leprino
```

1    is it, in fact, true that -- let me reword that.
2              Is it in fact true that you had been asked as part
3    of this investigation if Frank had a reputation as being a
4    hothead or if he would fly off the handle relatively easy
5    and your response to that was no more so than everybody
6    else?
7              A     Yeah.
8              Q     And are you aware of any circumstances of --
9              Let me ask you this then.  If an employee is
10   involved in a physical altercation with another employee,
11   that's required be reported to HR; correct?
12             A     Correct.
13             Q     So HR would have a record of that if that
14   happened?
15             A     Yes.
16             MR. WIESE:  I have no further questions, Judge.
17             THE COURT:  Redirect?
18             MS. WIARD:  No, Judge.
19             THE COURT:  Any jury questions?  All right.
20   Apparently there are none.
21             May this witness be excused?
22             MS. WIARD:  Yes, Judge.
23             THE COURT:  All right.  Thank you.  You're free to
24   go about your business.  Thanks.
25                             * * * * * * *

```
 1                    MS. WIARD:  Thank you.  People call Jonathan
 2  Prell.
 3                    THE COURT:  Thank you.
 4                         JONATHAN PRELL
 5  was called as a witness and, having been sworn, was examined
 6  and testified as follows:
 7                         DIRECT EXAMINATION
 8  BY MS. WIARD:
 9            Q    Good afternoon.  Please state your name and
10  spell your last name.
11            A    My name is Jonathan David Prell.  Last name
12  is P-r-e-l-l.
13            Q    What's your occupation?
14            A    I'm a relief operator at Leprino Foods.
15            Q    How long have you been at Leprino?
16            A    Sixteen years.
17            Q    What does a relief operator do?
18            A    My specific job is I give people breaks.  I
19  run their equipment while they're at break because the line
20  always runs, it doesn't stop.
21            Q    Is that on any piece of equipment?
22            A    In the weigh department.
23            Q    How many pieces of equipment are there?
24            A    There's like five different jobs.
25            Q    Okay.  So for each job there's some sort of
```

```
 1   piece of machinery or equipment that needs to be running at
 2   all times?
 3              A    Yes.
 4              Q    And you're trained to operate all of those?
 5              A    Yes.
 6              Q    Do you work full time, then, as a relief
 7   operator?
 8              A    Yes.
 9              Q    And in the weigh department, that is not
10   just the refinery room; is that correct?  That's all around?
11         A    Yeah, it's all around.  It's not just the
12   refinery room.
13              Q    Is the refinery room part of the weigh
14   department though?
15              A    Yes.
16              Q    Were you working at Leprino February 9,
17   2016?
18              A    Yes.
19              Q    And were you there sometime between 9:00 and
20   11:00 in the morning?
21              A    Yes, I was.
22              Q    Now, you said you worked there 16 years.  Do
23   you know Nicolas Donez?
24              A    Yes, I do.
25              Q    And how do you know him?
```

```
 1              A       I've worked with him for Leprino probably
 2     for that long.
 3              Q       In the same department with him?
 4              A       Yeah, actually.  Not on the same shift the
 5     whole time, but in the same department.
 6              Q       And what was his role as related to your
 7     role?
 8              A       At the time he was my foreman.
 9              Q       And you're speaking of in February?
10              A       Yeah.
11              Q       So was he your foreman the entire time
12     you've been there or just part of the time?
13              A       Just part of the time.
14              Q       And prior to that did you have another
15     foreman or were you in a different department?
16              A       I had a different foreman before that.
17              Q       And do you know Frank Levar?
18              A       Yes, I do.
19              Q       And how do you know him?
20              A       Same, work with him at Leprino Foods.
21              Q       Same department?
22              A       Same department.
23              Q       And for how long?
24              A       Maybe ten years.  I'm not really sure.
25              Q       Okay.  Now, when you say you work with the
```

```
1    defendant, did you work side by side or just in the same
2    department?
3              A      Just in the same department.
4              Q      So did you see him on a daily basis?
5              A      Yes.
6              Q      And how about Mr. Donez, did you see him on
7    daily basis?
8              A      Yes.
9              Q      Did you interact with both of them on a
10   daily basis?
11             A      Yes.
12             Q      And were you friends or are you friends with
13   either of them?
14             A      Co-worker friends.  I don't see them out of
15   work, no.
16             Q      Let's go back and talk about February 9.  Do
17   you recall an incident that occurred in the refinery room?
18             A      I wasn't actually in the refiner room.  But
19   yeah, I remember the incident.
20             Q      Where were you about the time that occurred,
21   do you know?
22             A      I was by our control room.
23             Q      Okay.  What were you doing?
24             A      We were working on a piece of machinery that
25   we were taking apart.
```

```
1              Q      And who is we?
2              A      At the time it was me and Tim Martin.  Nick
3    was with us right before that.
4              Q      So you and Tim Martin were working on a
5    piece of equipment?
6              A      Yeah.
7              Q      What was the equipment?
8              A      It was a clarifier.
9              Q      How far were you from the control room?
10             A      Just right outside the control room wall.
11             Q      So right nextdoor?
12             A      Yeah.
13             Q      Did you happen to see the defendant at all
14   while you were working on this clarifier or near the control
15   room?
16             A      No.
17             Q      Did you see Nick?
18             A      Yeah.  Nick was with me.
19             Q      At some point did Nick leave then?
20             A      Yeah.
21             Q      Do you recall when that happened?
22             A      Exact time no.  But Frank had called him on
23   the radio that he was having problems with the equipment he
24   was running.
25             Q      And after that radio call do you know how
```

```
 1    soon after that Nick left?
 2              A      I think Frank called about twice.
 3              Q      Okay.  And then sometime after that second
 4    time?
 5              A      Yeah.
 6              Q      So you said you didn't see anything; is that
 7    right?
 8              A      Yeah.
 9              Q      Did you end up going into the refinery room?
10              A      Yes.
11              Q      What did you see when you went in the
12    refinery room?
13              A      When I went in there Nick was on the floor,
14    appeared to be unconscious or --
15              Q      How far into the refinery room did you go?
16              A      I was up to where Nick was.
17              Q      Okay.  When you went into the refinery room
18    was Nick unconscious?
19              A      He was laying on the floor.  I don't know if
20    he was actually unconscious unconscious, but he was pretty
21    dazed.
22              Q      Okay.  So if you could refer to that
23    blueprint that's right behind you.  That's People's Exhibit
24    1.  Do you recognize that blueprint?
25              A      Yeah.
```

 1                Q       What is that?

 2                A       That is our refiner room.

 3                Q       Does that look about right to you in terms

 4    of blueprint?

 5                A       Yeah.

 6                Q       Can you see all those Xes and lines and

 7    things?

 8                A       Yeah.

 9                Q       So when you walked into the refinery room --

10    and you said you walked all the way up to where Nick was; is

11    that right?

12                A       Yeah.

13                Q       Can you show just by pointing where Nick

14    was?

15                A       Approximately right in between this refiner

16    and this tank.  This area right in here (indicated).

17                MS. WIARD:  And the witness is pointing to the

18    blueprint, and he was pointing between the -- what is

19    labeled the lactose refiner and the circle that is in the

20    north -- mid-north section of that blueprint.

21                Q       (By Ms. Wiard) So Mr. Prell, where was

22    Mr. Donez's head?

23                A       He was laying with feet towards this

24    (indicated) and his head towards the refiner.

25                Q       So that little circle there that you see and

```
1   that red line there, does that look about right in terms of
2   placement for where you saw Mr. Donez?
3            A     Yeah, that's pretty close.  Right in that
4   general.
5            Q     Okay.  And you said he was -- I don't know
6   if you said.  Was he on his back?
7            A     Yes, he was on his back.
8            Q     Was there anybody with him when you went in?
9            A     Yeah.  Bob was right in front of me.  And I
10  think Jim Wilkins might have been with him, but I can't
11  remember who the other person was at that time.
12           Q     How close did you get to Nick?
13           A     Probably within a few feet.  Yeah.  I mean,
14  it was --
15           Q     Were you able to see if he was injured?
16           A     I couldn't really tell.  I mean, except for
17  the fact he was laying down.
18           Q     Did you see any swelling?
19           A     Not really.  Not at the time, no.
20           Q     Okay.  Do you recall telling Detective
21  Vosburg that there was some swelling on his head?
22           A     I'm trying to remember if there was at that
23  time.  I was looking for his glasses.
24           Q     Okay.  But --
25           A     It looked maybe more like his face except
```

```
 1    maybe his head.  His face, the one side.  I think it would
 2    have been the left side.
 3              Q       And that looked how to you?
 4              A       Just kind of puffy.
 5              Q       And did you see any blood?
 6              A       No.  Not that I noticed anywhere massively,
 7    no.
 8              Q       Okay.  And you said that his head, that
 9    little circle on that blueprint, is that a pretty close
10    replica of where his head was?
11              A       Oh, the blue circle?
12              Q       Uh-huh.
13              A       Yeah, that's pretty close.
14              Q       Okay.  So how many feet or how many inches,
15    if that's the case, would you say he was from the refiner
16    when you saw him?
17              A       Maybe a foot.  Maybe a foot and a half.
18              Q       Okay.  Now, you said earlier you were
19    working with Nick.
20              A       Uh-huh.
21              Q       And you were working on the clarifier; is
22    that right?
23              A       On the clarifier, yeah.
24              Q       Were you using any tools on that clarifier?
25              A       We had wrenches, screwdriver, a hammer, a
```

1  pipe.  There's all kind of different tools that are used to
2  disassemble one of these.
3                Q      What about Mr. Donez?  Did he have any
4  tools?
5                A      When he walked away he had -- I can't
6  remember if it was the hammer or the pipe.  Because you put
7  a round wrench on and one person holds the bowl and another
8  person swings and hits the wrench to knock the pieces loose.
9                Q      Okay.  And when you say hammer is it a
10 regular nail and hammer?
11               A      No, like a dead-blow hammer.  It's more like
12 a mallet.
13               Q      What's it made out of?
14               A      It's plastic.
15               Q      And is it heavy, light?
16               A      It's not really heavy.  Maybe more 12
17 ounces, 16 ounces.  I don't know how heavy they are.
18               Q      And that's what you use to knock things into
19 place you said?
20               A      That's one of the tools we can use, yeah.
21               Q      And you believe that Mr. Donez had those two
22 items in his hands?
23               A      No.  He had the hammer in his hand because
24 he hadn't picked up the pipe yet.  It kind of depends on how
25 tight a piece is what you hit it with, I guess.

```
1              Q        So when you -- that was when you were
2    working on the clarifier; right?
3              A        Yeah.
4              Q        And when you went into the refinery room and
5    saw Mr. Donez on the floor did you see the tool that you'd
6    seen him with earlier?  Did you see that somewhere near him?
7              A        It wasn't near him, no.
8              Q        Okay.  Where was it?
9              A        Like I said, I was watching him.  I think it
10   was laying on the floor -- I kind of noticed it but I was
11   more paying attention to what was going on with Nick.  I
12   didn't even -- I really didn't have time or knew what
13   actually had happened.
14             Q        Okay.  But you remember seeing it, you just
15   don't remember exactly where it was?
16             A        Yeah.  I know he did not have it in his
17   possession.
18             Q        Now, you said you were right up next to
19   Nick.  Was he talking to you?
20             A        No, he didn't talk to me.
21             Q        Was he talking?
22             A        No.  I actually don't think he started
23   talking until Heather came in.
24             Q        So you were there when Heather came in?
25             A        Yeah.  Because she was, like, right behind
```

1   me.

2                Q       And Heather is?

3                A       His wife and another employee.

4                Q       Did you hear him talking to Heather?

5                A       No.  He was saying something but I didn't

6    really -- at that time I kind of backed up because the

7    people with more of the medical training, so to speak, were

8    trying to get him up.

9                Q       Do you recall telling Detective Vosburg that

10   you heard him talk but his voice was horse?

11               A       Yeah.  I can't remember if that was before

12   or after.

13               Q       Before or after?

14               A       When Heather was in there.  I honestly can't

15   remember.

16               Q       But you do recall he was speaking?

17               A       Yeah.  Because at that time when I heard his

18   voice they had to stand him up at that time.

19               Q       And you heard his voice at that time?

20               A       Yeah.

21               Q       Did it sound like his normal voice?

22               A       No.

23               Q       Now, earlier in the day did you have any

24   contact with the defendant at all?

25               A       Not anything that I recall that wasn't

 1    normal work-related.

 2              Q    Okay.  Do you remember hearing him talk

 3    about work that day or his job that day?

 4              A    He might have been.  But like I said, it was

 5    just normal work conversation.  Nothing really standing out.

 6              Q    Okay.  Do you remember telling Detective

 7    Vosburg that Frank was complaining and agitated that day?

 8              A    Probably, because I know it was a pretty

 9    stressful day.

10              Q    Okay.  Why it was stressful?

11              A    Just because the equipment that Frank was

12    running -- I mean, I wasn't actually back there with him --

13    but had been not operating properly.

14              Q    And do you remember Frank saying that this

15    place is really pissing him off?

16              A    Yeah.

17              Q    And that was obviously before this happened

18    in the refinery room?

19              A    Yeah.

20              Q    What alerted you or caused you to go into

21    the refinery room?

22              A    Charles Fisher had come out of the control

23    room and told me that Frank had walked through and said that

24    Nick was knocked out in the refinery room.

25              Q    So you went in there because of that?

```
 1              A      Yeah.
 2              Q      How long did you stay in the refinery room?
 3              A      I don't know, maybe 5, 10 minutes by the
 4    time everybody got in there at most.
 5              Q      Did you have anything to do with what was
 6    going on in terms of helping or anything like that?
 7              A      No.
 8              Q      Now, you said you noticed that the mallet or
 9    the hammer or whatever you call it was somewhere in the
10    refinery room and you don't recall where.
11              A      Yeah.  I remember I saw it, but I honestly
12    cannot remember.
13              Q      Do you remember seeing anything else laying
14    on the floor?
15              A      Besides Nick's glasses, no.
16              Q      Do you recall if Nick had his bump cap off
17    or on?
18              A      I think it was off.
19              Q      Okay.  What about his hairnet?
20              A      I honestly don't remember about the hairnet.
21              Q      But the bump cap was off?
22              A      Yeah.  I'm pretty sure the bump cap was off.
23              Q      Now, I want to back up again.  When you
24    first walked into the refinery room was Nick sitting up,
25    laying down?
```

```
1                A      Nick was laying down.
2                Q      So at that point he still -- was Bob
3   assisting him at that point?
4                A      Yeah.  Bob had got in there before I did.
5                Q      And when you saw him laying down did you
6   notice at that point if he had his bump cap off or on?
7                A      Pretty sure he was laying down it was off.
8                Q      And you don't recall the hairnet, though?
9                A      I honestly don't recall the hairnet.
10               Q      Thank you.
11               MS. WIARD:  I don't have anything further.
12               THE COURT:  Cross-examination?
13                       CROSS-EXAMINATION
14  BY MR. WIESE:
15               Q      Mr. Prell, do you recall being interviewed
16  by a detective later on that same day?
17               A      Yes.
18               Q      And you were asked some questions by him
19  about what had occurred and what knowledge you had; correct?
20               A      Yes.
21               Q      And at one point you had been asked if he,
22  referring to Nick, could have hit his head on something.  Do
23  you recall that?
24               A      Kind of, yeah.
25               Q      And your response to that was that he could
```

1   have, but it looked to you more like he may have fallen
2   directly to the floor; correct?
3           A    Yeah.
4           Q    And at the time you were in there did you
5   see any bent or broken machinery?
6           A    No.
7           Q    And earlier when you were working on the
8   clarifier with Nick you heard Frank call and ask and speak
9   to Nick; is that correct?
10          A    Yeah.
11          Q    But you told the detective you couldn't
12  remember specifically what it is was that Frank said to
13  Nick.
14          A    Yeah.  Because it's pretty noisy and you
15  really can't -- you know, unless you're the one right by the
16  radio I really couldn't understand what was said.
17          Q    But you also told the detective that when he
18  called to talk to Nick that Frank did not sound -- let me
19  reword that.
20          You told the detective quote, Frank did not sound
21  mad when he called Nick over the radio; correct?
22          A    Yeah.  From what I could hear it didn't
23  sound like there was yelling or anything.
24          Q    And you have -- how long have you known
25  Frank Levar specifically?

```
 1              A      I'm honestly trying to remember when he
 2    started working in the department and I can't.  Several
 3    years.
 4              Q      So you have worked with him a lot during
 5    that time?
 6              A      Yeah.
 7              Q      And you have never seen Frank violent during
 8    that time; correct?
 9              A      I've seen him agitated and mad.
10              Q      But never physically violent with anybody?
11              A      No.
12              Q      Okay.
13              MR. WIESE:  Judge, I have nothing further for this
14    witness.
15              THE COURT:  All right.  Thank you.
16              Redirect?
17              MS. WIARD:  No, Judge.
18              THE COURT:  Jury questions?  All right.  I'm not
19    seeing any.
20              So thank you, Mr. Prell.  You may step down.
21              May this witness be excused?
22              MS. WIARD:  Yes, Judge.
23              MR. WIESE:  Yes, Judge.
24              THE COURT:  You're free to go about your business.
25              People may call their next witness.
```

```
 1                  MS. WIARD:  People call Heather Donez.
 2                          HEATHER DONEZ
 3    was called as a witness and, having been sworn, was examined
 4    and testified as follows:
 5                          DIRECT EXAMINATION
 6    BY MS. WIARD:
 7                  Q    Good afternoon.
 8                  A    Hi.
 9                  Q    Can you state your name and spell your last
10    name.
11                  A    Heather Donez, D-o-n-e-z.
12                  Q    What is your occupation?
13                  A    I'm a cheese foreman at Leprino Foods.
14                  Q    How long have you been with Leprino?
15                  A    Nineteen years.
16                  Q    And how long have you been a cheese foreman?
17                  A    Three years.
18                  Q    What department -- I'm sorry.  I should know
19    that.  You're in the cheese department then.
20                  A    I'm in the cheese department, yes.
21                  Q    Have you always been in the cheese
22    department?
23                  A    I've bounced around, but I've spent probably
24    18 of the 19 years in the cheese department.
25                  Q    Okay.  How close in proximity to the weigh
```

```
 1    department is the cheese department?
 2              A     It's just through a double door.  So
 3    probably from the refiner room to the cheese department is
 4    probably -- I don't know.  I don't know how far.  It's
 5    probably a football field away probably.
 6              Q     Okay.  Do you know Nick Donez?
 7              A     I do.
 8              Q     And how do you know him?
 9              A     He's my husband.
10              Q     How long have you been married to Mr. Donez?
11              A     We've been married 11 years, together 15.
12              Q     Did you meet at Leprino?
13              A     Yes.
14              Q     When you first met Mr. Donez were you in the
15    same department?
16              A     I was just leaving the weigh department.  I
17    was only in the weigh department for four months.
18              Q     And is that where Mr. Donez was as well?
19              A     Yes.
20              Q     And do you know Frank Levar?
21              A     Yes.
22              Q     How do you know Frank?
23              A     He works in the weigh department.  I know
24    him mostly from my husband.  We didn't work directly
25    together.
```

```
 1              Q      Were you working at Leprino on February 9,
 2       2016?
 3              A      Yes.
 4              Q      And where were you working that day?
 5              A      I was in the vat room in the cheese
 6       department.
 7              Q      The vat room?
 8              A      Yeah.
 9              Q      Okay.  And is that again a football field
10       away from the weigh department?
11              A      Yes.
12              Q      What time of day were you at work?  Or do
13       you work the same shift as your husband?
14              A      Yeah.  6:00 to 6:00 at that time.
15              Q      6:00 a.m. to --
16              A      6:00 a.m. to 6:00 p.m.  Same time.
17              Q      And that's the shift you were working at
18       that time?
19              A      Yes.
20              Q      Did you and your husband go to work together
21       that day?
22              A      Yes.
23              Q      Do you recall something happening sometime
24       between 9:00 and 11:00 that morning?
25              A      Yes.
```

```
1              Q      And how did you find out about that?
2              A      Charles Fisher came and got me in the vat
3    room and told me that Nick was on the floor.
4              Q      And so what happened when you got that news?
5              A      I took off.
6              Q      Okay.
7              A      And I went to him.
8              Q      Okay.  When you got -- did you go into the
9    refinery room then?
10             A      Yes.
11             Q      And what happened when you got in there?
12             A      I replaced Bob.  Bob was sitting behind him.
13             Q      Okay.  And do you need a second?  There's
14   some Kleenex behind you if you need that.
15             So when you got in and you saw -- you took over
16   where Bob was?
17             A      Yeah.  Behind him.
18             Q      Okay.  And what did you do?
19             A      I just talked to him, tried to wake him up.
20   He wasn't responding.
21             Q      Okay.  You sure -- we've got some Kleenex
22   for you.
23             A      Thank you.
24             Q      So if you could turn around and look at that
25   blueprint right there.  Does that look familiar to you?
```

```
 1              A       Yes.
 2              Q       And since you have been in the weigh
 3   department, is that a pretty accurate blueprint of where you
 4   used to work?  Or at least part of where you used to work?
 5              A       It's accurate.  The size is off.  It looks a
 6   lot bigger in the picture.  But it's accurate as far as the
 7   placement of the equipment.
 8              Q       Okay.  And when you say it looks a lot
 9   bigger, the room itself is not as big as it appears on that
10   piece of paper?
11              A       No.
12              Q       Okay.  Now, when you when into the refinery
13   room where was your husband?
14              A       He was right here (indicated).
15              Q       Okay.  So you're pointing to -- there's a
16   circle there.  It looks like it might be blue.
17              A       Yeah.  His head was right there where the
18   circle is.
19              Q       So his head was what you're pointing to
20   close to the actual lactose refiner?
21              A       Yes.
22              Q       How close would you say his head was to the
23   machine?
24              A       Bob had him kind of propped up, but if he
25   had him laying down it probably would have been about this
```

```
 1    far from the machine (indicated).
 2              Q    So Bob had him propped up at that point?
 3              A    Uh-huh.
 4              THE COURT:  She was indicating about a foot?
 5              THE WITNESS:  Yeah.  Sorry.
 6              Q    (By Ms. Wiard) And what direction were his
 7    legs pointing at that point?
 8              A    Down.  Toward this direction (indicated).
 9              Q    Okay.  And where was Bob in relationship to
10    your husband?
11              A    Bob was behind him.  He actually was
12    kneeling behind him and had him propped up.
13              Q    Now, when you went in did you notice if his
14    bump cap -- his being your husband's -- was his bump cap on
15    his head?
16              A    No, it was off.
17              Q    What about his hairnet?
18              A    His hairnet was off as well.
19              Q    And did you remove that?
20              A    No.
21              Q    And did Bob remove that?
22              A    I'm not sure.
23              Q    Now, did you notice anything else around
24    near your husband?
25              A    There was his pen from his front pocket, his
```

1    keys from his front pocket, his glasses.  There was a
2    hammer, a rubber mallet.  There was an apron.  And the room
3    was just littered with weird items, like the stuff out of
4    his front pocket was -- the room was littered.
5              Q    Now, when you say the stuff from his front
6    pocket, where in are relationship to where you had just
7    shown on the drawing where his body was, where were those
8    items?
9              A    I would say like right all around here
10   (indicated) and right around here (indicated).
11             Q    Okay.  So you're pointing now to -- there's
12   two blue Xes down there and you're pointing in that
13   direction?
14             A    Yes.
15             Q    Okay.  So I'm going to show you -- and
16   actually, in front of you there's some photographs.  So
17   let's go to this People's Exhibit 2.
18             A    Okay.
19             Q    Okay.  And so in People's Exhibit 2 -- and
20   if you compare that to the blueprint, so where on this
21   photograph did you see -- or where were you holding your
22   husband's head up in that photograph?
23             A    I was sitting right here (indicated).
24             Q    So would that be right there (indicated)?
25             A    Yes.

```
 1              Q     Right at the edge?

 2              A     Yeah.

 3              Q     Was your back more toward this -- whatever

 4    this white container is?

 5              A     Yes.

 6              Q     So if you look at People's Exhibit 5.

 7              A     Okay.

 8              Q     And that's a close-up, obviously.  Where

 9    were you in relationship to that photograph?

10              A     I would be right in front of that white jug.

11              Q     Right here (indicated)?

12              A     Yeah.

13              Q     And were you sitting, standing, kneeling?

14              A     Kneeling behind him.

15              Q     Was your back right up against that?

16              A     No.  I was probably a foot away from that.

17              Q     All right.  And if we go back to then No. 3,

18    where on this photograph did you see Nick's bump cap, if you

19    remember?

20              A     It was off to the side of him, just off --

21    just thrown off on the side.

22              Q     Somewhere right there (indicated)?

23              A     Yep.

24              Q     And where was his hairnet?

25              A     Scattered.  It was behind him.
```

1           Q      Behind him?

2           A      Yeah.  So the bump cap was off to the side

3    and the hairnet was behind him.

4           Q      So bump cap here (indicated) and hairnet

5    maybe right there (indicated)?

6           A      Yep.

7           MS. WIARD:  So the witness has indicated that on

8    People's Exhibit 3 the bump cap was about perpendicular to

9    the end of the refiner, and the hairnet was just about maybe

10   a third of the way to the right of that.

11          Q      (By Ms. Wiard) Would that be right?

12          A      Uh-huh.

13          Q      And then what about -- you said there was

14   keys and what else?

15          A      His pen and just an apron that was not used,

16   which was strange.

17          Q      Where was the apron?

18          A      It was in the middle of the floor.  I'm

19   wondering if Bob brought it in, but I don't know.

20          Q      What about the pen and the keys?

21          A      They were more towards the ladder, which

22   is --

23          Q      More toward the ladder?

24          A      Yep.  Which is up here (indicated).  So they

25   were more toward where his feet were.

1           Q      Right in there.  Now, where were those
2     items?  Were those items from -- you know your husband.
3     Were those items he kept in his front pocket or his back
4     pocket?
5           A      Front pocket.  Everything that was in his
6     back pocket was in tact in his back pocket.  I pulled it out
7     and put it in his bump cap.  And then I gathered up his bump
8     cap and took it to my locker.
9           Q      So the items in his back pockets were still
10    there?
11          A      Yes.
12          Q      The items in his front pocket were removed?
13          A      Yes.
14          Q      Are you aware of who may have removed them?
15          A      No.  But I thought it was weird because I
16    thought that if there was a scuffle of any sort that the big
17    items in the back pocket would have fallen out, not the
18    stuff in the front pocket.
19          Q      Okay.  So thank you.
20          THE COURT:  By front pocket are you talking about
21    on a shirt or pants?
22          THE WITNESS:  Yes.  Pants.
23          THE COURT:  Thank you.
24          Q      (By Ms. Wiard) What type of pants was he
25    wearing that day?

 1          A      They're just blue khakis.  They're the
 2    Leprino uniform.
 3          Q      So you all have to wear the same pants?
 4          A      Yes.
 5          MS. WIARD:  So before you do that, Judge, I think
 6    we might have -- sorry.
 7          THE COURT:  Okay.
 8          Q      (By Ms. Wiard) You can't really see right
 9    there (indicated).
10          A      That's actually an overcoat.  So like
11    visitors wear those.  We just wear a button-up shirt with
12    blue pants, khakis.
13          Q      So like those pants in that photograph there
14    maybe?
15          A      Yeah.
16          Q      And are those booties?
17          A      Those are another thing that visitors bring
18    in so that way -- we wear steel toe boots.
19          Q      Thank you.
20          Was your -- did you notice any injuries on your
21    husband?
22          A      Yeah.  He had a big -- the first one I
23    noticed was a big knot on his head.  I believe it was the
24    right side of his head.  And then he had what looked like
25    started to be swelling and bruising whenever I initially got

```
 1    there around his cheek and a little bit on his lip.  And
 2    that was all I noticed initially.
 3              Q       Where's the bruising, on the left side or
 4    the right side?
 5              A       I don't exactly remember.
 6              Q       Okay.
 7              A       I'm not sure.  I don't remember.
 8              Q       Was there any bleeding?
 9              A       On the lump on his head was bleeding.  I had
10    it all over my shirt, my unform shirt.
11              Q       How big of a lump on the back of his head
12    would you say there was?
13              A       It probably stood out this far (indicated),
14    two inches probably.  It was a big bump.
15              Q       Okay.  Was he able to talk to you?
16              A       His voice was really raspy.  And whenever I
17    initially got there he was unresponsive.  I talked to him
18    and I talked to him.  And then whenever he did become
19    responsive he turned to me and he said what happened, and I
20    said I don't know.  And then he just kept asking me what
21    happened, what happened.
22              Q       Did you eventually tell me him how he was
23    found and what Bob did and what you did?
24              A       Yeah.  I figured out 'cause John Prell and
25    Tim Martin actually came in and told me that they thought
```

1   Frank was involved.  And so I told him I think it has
2   something to do with Frank, do you know anything?  And he
3   said no, what happened.
4           MR. WIESE:  Judge, I'm going to object to this
5   response as -- at least the first half of it as hearsay.
6           THE COURT:  It was.
7           MR. WIESE:  And then I think what she gave to
8   Mr. Donez was her basically repeating hearsay.  So I would
9   object to both of those.
10          THE COURT:  What we'll allow is the fact that she
11  was told those things and then related something to her
12  husband, but beyond that the rest of it is stricken.
13          Q    (By Ms. Wiard) So let me just rephrase the
14  question.  Did you end up relating to your husband the
15  things that were told to you in terms of how he was found,
16  where he was found, that kind of thing?
17          A    Yeah.
18          Q    And who else might have been involved?
19          A    Right.
20          Q    Those were not things that he volunteered to
21  you.
22          A    No.  He did not have any idea.
23          And then he turned to me again even after I told
24  him --
25          THE COURT:  Hang on just a second.  That kind of

```
 1   goes beyond the question, and we don't want you volunteering
 2   at this point, so if you could just wait.
 3            Q    (By Ms. Wiard) So he had no knowledge of
 4   anything as far as you knew?
 5            A    No.
 6            Q    Okay.  In terms of the items that were
 7   removed from his head and around on the floor, et cetera,
 8   did everybody ever give you any explanation as to how those
 9   things appeared where they did on the floor?
10            A    No.
11            Q    Now, you said he appeared to be dazed.
12            A    He was out of it.
13            Q    And voice was raspy?
14            A    Yes.
15            Q    Did you notice if he was having difficulty
16   breathing or wheezing or anything like that?
17            A    Yes.  He was having difficulty, yes.
18            Q    Now, you said that your husband and
19   Mr. Levar worked together previously?
20            A    Yes.
21            Q    And were you aware if they were friends?
22            A    I think they were, yeah.  You know, me and
23   Nick would be talking in the hallway and Frank would come by
24   and joke around with him.
25            Q    So as far as you knew they were on a
```

```
 1   friendly basis?
 2            A     Yes, they were.
 3            Q     Thank you.
 4            MS. WIARD:  I don't have anything further.
 5            THE COURT:  Cross-examination?
 6            MR. WIESE:  Thank you.
 7                      CROSS-EXAMINATION
 8   BY MR. WIESE:
 9            Q     Ms. Donez, these items that you were asked
10   about, the hammer, cap, and the other items, you collected
11   those on that day; correct?
12            A     I collected everything but the hammer, yeah.
13            Q     You collected everything but you said?
14            A     But the rubber mallet.
15            Q     Right.  And you collected those and then you
16   eventually gave those items to somebody in HR; correct?
17            A     Yes.  Yes, I did.
18            Okay so we -- I think we're --
19            Q     Hold on.  So you gave the items to somebody
20   in HR.  And was that -- I believe it was Risa Esterly in HR?
21            A     Yes.  Risa Esterly.
22            Q     And you gave the items to her on that day?
23            A     No.  I took the items to my personal locker,
24   got dressed out of my uniform, jumped in my truck, and
25   followed the ambulance to the hospital.
```

```
1              Q       And it was several weeks later that you gave
2     those items to HR?
3              A       Well, the very following day I had Kevin
4     George, who is a senior supervisor, take all the items.  And
5     I gave him Nick's locker combination and I had him put them
6     in Nick's locker.  His personal locker.  And then Risa
7     collected them once the police officer asked for them.
8              Q       And who collected the hammer?
9              A       I have no idea.
10             Q       Okay.  But you were not the person who
11    collected the hammer?
12             A       I was not the person who collected the
13    hammer.
14             Q       Okay.  And do you know how long the items
15    were in Nick's locker before they were collected by Risa
16    Esterly?
17             A       No, I do not.  Risa called me up to her
18    office asking me for the items.  I told her where they were
19    and she collected them.  I do not know.
20             MR. WIESE:  If I can have just a second, Judge?
21             THE COURT:  Certainly.
22             Q       (By Mr. Wiese) So essentially when you got
23    there this incident was over because when you got there your
24    husband was on the floor; correct?
25             A       Yeah.
```

 1              Q      So you don't know where these items you said
 2      had been in his front pocket, you don't know where those
 3      were before -- I mean, you don't know where they were before
 4      Nick had gone into that room?
 5              A      I know for the last 15 years that I've been
 6      with him he's carried those items in his front pocket.
 7              Q      Right.  But you don't know specifically on
 8      that day where they were?
 9              A      (Non-verbal response.)
10              Q      Thank you.
11              MR. WIESE:  I have nothing further.
12              THE COURT:  Redirect?
13              MS. WIARD:  Thank you, Judge.
14                          REDIRECT EXAMINATION
15      BY MS. WIARD:
16              Q      Ms. Donez, when you went into the refinery
17      room and saw your husband, was there anybody other than Bob
18      Davidson there?
19              A      Just Bob.  Bob was the only one.  Bob and
20      Nick, that's it.
21              Q      And while you were holding your husband did
22      you see Bob Davidson take anything out of your husband's
23      pockets?
24              A      No.
25              Q      Did you see him move any of the items that

```
 1    were on the floor?
 2              A      No.
 3              Q      Are you aware of if Mr. Davidson was even
 4    paying attention to the items on the floor?
 5              A      Probably not.  He was -- I'm not aware that
 6    he was.
 7              Q      And again, the items, specifically keys and
 8    the pen, were not anywhere near your husband's head; is that
 9    right?
10              A      Yes, they were down by his feet.
11              Q      Now, I don't think I heard you correctly
12    maybe the first time, or when defense counsel was
13    questioning you.  Did you pick up the mallet or did you
14    leave it where it was?
15              A      I left the mallet where it was.
16              Q      So you never had anything to do with that?
17              A      No.  The only thing I had to do with the
18    mallet was that was the first thing I said, there's a rubber
19    mallet, somebody hit him with the hammer.  That was the only
20    thing I had to do with the hammer, the rubber mallet.  That
21    was it.
22              Q      Do you remember what the mallet looked like?
23              A      It has -- I'm thinking it was a black head
24    and an orange handle.  All our rubber mallets kind of look
25    the same.  And they're common use.
```

```
 1                Q      So handles are all similar colors?
 2                A      They'll be bright colored.  Yellow, orange.
 3                Q      So it was a bright colored handle that you
 4     recall?
 5                A      Uh-huh.
 6                Q      And then you don't recall necessarily the
 7     color of the mallet itself?
 8                A      No, I don't.  Black, I think.
 9                Q      Were you paying particular attention to
10     that, the color?
11                A      I was not paying attention to the color.
12                Q      Now, the other thing I wanted to ask you.
13     Those items, it was just the keys and the pen; right?
14                A      Right.  Out of his front pocket.
15                Q      There was nothing other than that that you
16     recall?
17                A      No.
18                Q      And those items you were told to give to
19     Ms. Esterly?
20                A      Everything that I put into his bump cap
21     actually the QE manager would help me pick everything up
22     from the floor and we put it in his bump cap and I was told
23     to put it in my personal locker.
24                Q      And who is the QE manager?
25                A      Her name is Coral Mendez.
```

```
 1              Q     So when Ms. Mendez came into the room were
 2   those items still laying on the floor?
 3              A     Yes.
 4              Q     So she and you picked those up together?
 5              A     Yes.
 6              Q     Thank you.
 7              MS. WIARD:  I don't have anything further.
 8              THE COURT:  Jury questions?  Apparently there's
 9   not.
10              You may step down.
11              May this witness be excused?
12              MS. WIARD:  Yes, Judge.
13              MR. WIESE:  Yes.
14              THE COURT:  You're free to go about your business.
15              THE WITNESS:  Thank you.
16              MS. WIARD:  If I could have just a moment, Judge?
17              THE COURT:  Sure.
18              MS. WIARD:  Thank you, Your Honor.  The People
19   call Sheryl Groves.
20              THE COURT:  Very well.
21                        SHERYL GROVES
22   was called as a witness and, having been sworn, was examined
23   and testified as follows:
24                    DIRECT EXAMINATION
25
```

```
 1    BY MS. WIARD:
 2              Q      Good afternoon.
 3              A      Good afternoon.
 4              Q      Can you state your name and spell your last
 5    name.
 6              A      Sheryl Groves.  It's G-r-o-v-e-s.
 7              Q      What is your occupation?
 8              A      HR assistant.
 9              Q      That's human resources?
10              A      Yes.
11              Q      And are you the HR assistant at Leprino
12    Foods?
13              A      Yes.
14              Q      How long have you been with Leprino?
15              A      Almost seven years.
16              Q      Have you been in that same capacity as HR
17    since the whole time you've been there?
18              A      Yes.
19              Q      What are your duties?
20              A      Multitude of duties.  Most of them are
21    dealing with the employees, getting them benefits, uniforms,
22    pay, everything.  Attendance.  All kinds of duties.
23              Q      Can you scoot up just a little bit?  You
24    have us such a soft voice it's hard to hear you.
25              A      Yes.
```

```
 1              Q        So you deal with all the employees on some
 2      level?
 3              A        Yes.
 4              Q        Were you working at Leprino on February 9,
 5      2016?
 6              A        Yes.
 7              Q        And what are your normal hours for you?
 8              A        8:00 to 5:00 with an hour lunch break in
 9      there somewhere.
10              Q        So if anybody ever has an HR issue and
11      they're working a late shift they have to come back during
12      normal 8:00 to 5:00 hours to talk to you or talk to someone
13      in HR?
14              A        It does unless they deem it more of an
15      emergency and then they could call the generalist or the
16      manager.
17              Q        Okay.  On February 9, 2016, were you
18      familiar with Frank Levar?
19              A        Yes.
20              Q        And were you also familiar with Nicolas
21      Donez?
22              A        Yes.
23              Q        Did you know either of them well?
24              A        Just from work.
25              Q        Okay.  So how often would you say you had
```

1    contact with the defendant?

2              A    I would see him in the break room or -- not

3    very often.  I mean --

4              Q    And how about your contact with Nick Donez?

5              A    Same thing.  I'd see him in the break room.

6    Neither one of them were problem employees so they didn't

7    need to come see me.

8              Q    Okay.  Do you recall something happening on

9    February 9 between the defendant and Nick Donez?

10             A    I only -- I spoke to Frank that day.  I

11   didn't speak to Nick.

12             Q    About what time would you say you spoke to

13   Frank?

14             A    I would say mid to late morning.

15             Q    And where were you when you first spoke to

16   him?

17             A    I was coming down the stairs from our

18   offices that are upstairs.

19             Q    And where was he?

20             A    He was at the bottom of the stairs by the

21   receptionist desk.

22             Q    And did he stop and tell you something?

23             A    He stopped and he said -- he asked if Mike

24   Buckhout was upstairs.  He is our -- Mike is our production

25   manager.  And I told him no, he wasn't, but he was in a

```
 1   meeting.  He was upstairs but he was in a meeting.
 2            Q    Okay.  And then what did he say to you?
 3            A    He said he might as well leave.  And I asked
 4   him why, and he said he was -- he and Nick had got into an
 5   altercation and he pushed Nick and that Nick was in the
 6   refinery room.
 7            Q    Okay.  Now, after he told you that what did
 8   you do?
 9            A    I asked if he would come upstairs and talk
10   to either our HR generalist or the manager, whichever one of
11   them I could find.
12            Q    And did he come upstairs with you?
13            A    Yes, he did.
14            Q    And did you stay with him while he talked to
15   whoever else he talked to?
16            A    No.  That was my last contact with him that
17   day.
18            Q    Okay.  Now, when you talked to Frank, the
19   whole time were you at the bottom of the stairs did you
20   continue talking with him as you walked upstairs?
21            A    I think I walked up the stairs with him.
22            Q    Okay.  And when he told you that he pushed
23   Nick, did he show you how he had pushed Nick?
24            A    I think he might have said he just shoved
25   him with his hands open like that (indicated).
```

```
 1                Q       So when you were interviewed by Detective
 2     Vosburg if you told him that he made a motion with both
 3     hands that would be accurate?  That's what you said?
 4                A       Yes.
 5                Q       Did he -- when he made that motion with both
 6     hands was he standing?  Where was he when he told you that?
 7     Do you remember?
 8                A       Where was Frank when he told me that?
 9                Q       Yeah.
10                A       He was at the bottom of the stairs.
11                Q       So he volunteered that he pushed Nick and
12     showed you with both hands?
13                A       Yes.
14                Q       Did he say where he placed his hands?
15                A       I'm not sure if he said.  I'm not sure if he
16     said specifically where he placed his hands.
17                Q       Okay.  And did he tell you the condition of
18     Nick in the refinery room?
19                A       I think he said Nick was out cold.
20                Q       Did he say anything about this being his
21     last day?
22                A       He had said that he might as well leave.
23                Q       What was his demeanor?
24                A       He was calm.  He was not agitated.  He was
25     not angry.
```

```
 1                  Q      Do you recall telling the detective that it
 2      was clear to you that Frank thought this was his last day?
 3                  A      He had all the contents of his locker in his
 4      hands.
 5                  Q      Okay.  Why would he want to speak to Mike
 6      Buckhout?  What would Mike Buckhout have do with anything?
 7                  A      Mike Buckhout would be the production
 8      manager and that's probably who he thought he should speak
 9      to.
10                  Q      Is he over kind of everybody at Leprino?
11                  A      He's I guess one below the plant manager.
12                  Q      Okay.  Now, you said that you had him talk
13      to other folks in HR; is that right?
14                  A      Yes.
15                  Q      Who all did you have him speak to?
16                  A      I asked him if he would like to speak to
17      Julia Lambert, who is our generalist, or Risa Esterly, who
18      is our HR manager.
19                  Q      And who did he say?  Or did he speak to both
20      of them, if you know?
21                  A      I handed him off to Julia and I'm not sure
22      what happened after that.
23                  Q      Okay.  And do you see the defendant, Frank
24      Levar, in the courtroom today?
25                  A      Yes.
```

```
 1            Q      Could you point him out by describing an
 2     article of clothing?
 3            A      He's in a like blue and green striped shirt.
 4            Q      Thank you.
 5            MS. WIARD:  If the record would reflect the
 6     witness has identified the defendant subject to cross.
 7            THE COURT:  It will so reflect.
 8            MS. WIARD:  Thank you, Judge.
 9            THE COURT:  Cross-examination?
10            MR. WIESE:  Judge, I have no questions for this
11     witness.
12            THE COURT:  Jury questions?  I'm not seeing
13     anything.
14            May this witness be excused?
15            MS. WIARD:  Yes, Judge.
16            MR. WIESE:  Yes.
17            THE COURT:  All right.  Thank you.  You're free to
18     go about your business.
19            And the People may call their next witness.
20            MS. WIARD:  People call Risa Esterly, Judge.
21            THE COURT:  Thank you.
22                         RISA ESTERLY
23     was called as a witness and, having been sworn, was examined
24     and testified as follows:
25                         DIRECT EXAMINATION
```

```
 1   BY MS. WIARD:
 2              Q      Good afternoon.
 3              A      Hello.
 4              Q      Please state your name and spell your last
 5   name.
 6              A      Risa Esterly-Wessbecker.
 7   E-s-t-e-r-l-y-W-e-s-s-b-e-c-k-e-r.
 8              Q      What's your occupation?
 9              A      I am the human resource manager at Leprino
10   Foods.
11              Q      And how long have you been the human
12   resource manager at Leprino?
13              A      Since January 19, 2015.
14              Q      Previous to January 9, 2015, where were you?
15              A      At Schlumberger at my Spot Co. company.
16              Q      And what was your role there?
17              A      I was a regional HR as well.
18              Q      How long were you in that position?
19              A      Again, a little over a year and a half.
20              Q      And is that here?  Where is that located?
21              A      Corporate or?
22              Q      Where you worked.
23              A      Denver.
24              Q      As HR manager at Leprino what are some of
25   your duties?
```

```
 1                A      I'm in charge of basically a wide variety of
 2      duties when it comes to hiring, discipline, benefits,
 3      employee relations, community relations.  Those are just
 4      some off the top of my head.
 5                Q      Do you have regular -- I don't want to say
 6      meetings.  But do you have regular contact with all the
 7      employees at Leprino?
 8                A      Can you specify quality of time or contact?
 9                Q      Well, I guess -- do you have reason to have
10      a meeting or a sitdown with all the employees at one point
11      or another at Leprino?
12                A      I do yearly harassment training where I meet
13      with all the employees.  Other than that it would be random.
14                Q      Okay.  So would it be unusual for you not to
15      know any of the employees on a really deep level?
16                A      No, that would not be unusual.
17                Q      Do you know Nicolas Donez?
18                A      I do.
19                Q      And how do you know him?
20                A      From working at Leprino.
21                Q      Okay.  And what kind of contact did you ever
22      have with Nick?
23                A      Very limited.
24                Q      So did you pass him in the hallway or that
25      kind of thing or in the lunch room?
```

```
 1            A      Not in the lunch room.  Hallway is a
 2   possibility.  I know that he has attended some of our
 3   mandatory meetings.
 4            Q      And what about Frank Levar?  Do you know
 5   him?
 6            A      Very limited, again.
 7            Q      Also as an employee at Leprino?
 8            A      Correct.
 9            Q      And somebody that you would maybe just pass
10   by in the hallway?
11            A      Correct.
12            Q      So other than knowing Mr. Donez and
13   Mr. Levar kind of in that limited capacity did you know them
14   on any other level other than that?
15            A      No, I did not.
16            Q      Were you working February 9, 2016?
17            A      I was.
18            Q      And were you working in the morning?
19            A      Yes.
20            Q      Did you speak to the defendant on the
21   morning of February 9 regarding an assault?
22            A      Yes.
23            Q      How did you come about talking to him?
24            A      Frank came up to the human resource office.
25            Q      Okay.  And did he ask to speak to you?
```

```
 1              A       He did.
 2              Q       And were you alone or were you with someone
 3     else when he asked to speak to you?
 4              A       I was with my generalist, Julia Lambert.
 5              Q       What is Julia's role?  When you say
 6     generalist what does that mean?
 7              A       Human resource generalist.
 8              Q       Okay.  What is she, a step below you?  Is
 9     that it?
10              A       Correct.
11              Q       So she deals roughly with the same things
12     that you do?
13              A       Correct.
14              Q       So when he asked to speak to you were you in
15     an office, were you in an open room?  What happened?
16              A       I was in my office.  Frank came in.  Julia
17     just happened to be in my office at the time.  And I asked
18     him to have a seat and kind of tell me what was going on.
19              Q       Okay.  And what did he tell you?
20              A       He said I guess this is my exit interview.
21     And that he knocked Nick out.
22              Q       Did he describe how he did that?  Did he use
23     that same verbiage?
24              A       The verbiage is he knocked Nick out is
25     accurate.  I told him kind of to calm down, take a few deep
```

```
 1    breaths, have a seat, and explain to me the situation, what
 2    happened.
 3               Q      And did he do that?
 4               A      He did.
 5               Q      What did he tell you?
 6               A      He said he was sick and tired of no one
 7    coming to help when he requested help.  I believe he was
 8    working in the lactose room at that time.  He had paged or
 9    over the radio asked for help.  He said Nick came in and got
10    into his face, and that he demonstrated.  So he put his hand
11    up and said he pushed him back.  At that point Nick double
12    fisted him in the chest.  And during that time it sounded
13    like one of his fists went up and knocked his glasses off
14    and then he hit him.
15               Q      He being who?
16               A      Frank.
17               Q      And he described that in the process of Nick
18    fist bumping him somehow his glasses came off?
19               A      Correct.
20               Q      What -- other than you telling him to calm
21    down, how else did the defendant appear when he was talking
22    to you?
23               A      He seemed upset.  He kept on rubbing his
24    hands.  And yeah.
25               Q      Did he demonstrate for you how he put his
```

```
 1    hands on Nick when he pushed Nick?
 2           A      He didn't demonstrate on me, but I did ask
 3    him to do a demonstration on Julia, my HR generalist.  And
 4    without touching her he demonstrated it.
 5           Q      And how did he -- can you show me how he
 6    demonstrated that?  Or do you recall?
 7           A      Yeah, I recall.  Do you want me to stand up
 8    and show?
 9           Q      From sitting I think you can.
10           A      So the first it was basically he put his
11    hand like this (indicated) to tell Nick to get out of his
12    face.  Then he had his fist like this (indicated) and kind
13    of went up like that (indicated).
14           Q      So did he tell you that he actually put his
15    hands on Nick?
16           A      Yes.
17           Q      So he said he actually pushed Nick back?
18           A      Correct.
19           Q      Okay.  But in his version to you he just
20    used one hand?
21           A      Correct.
22           Q      Did you see any marks on him?
23           A      No, I did not.
24           Q      Did you ever end up seeing Nick Donez?
25           A      Yes, I did.
```

```
 1              Q      And did you see his injuries?

 2              A      I did.

 3              Q      What injuries did you see on Mr. Donez?

 4              A      Nick had a red splotch on his cheek.  He had

 5      a fat lip.  The rest of it he was in a neck brace so I

 6      couldn't see any other injuries.

 7              Q      Do you recall what side of his face was

 8      injured?

 9              A      Left.

10              Q      And where did you see him?

11              A      I saw him at the hospital.

12              Q      How soon after the incident did you see him?

13              A      I don't recall the exact timing.

14              Q      Was it on that day, though?

15              A      It was on that day.

16              Q      Was it that morning?

17              A      It was.

18              Q      Okay.  Were you able to speak to Nick?

19              A      I did.

20              Q      And did you notice what the quality of his

21      voice was?

22              A      It was kind of scratchy.

23              Q      Did you talk to him for very long?

24              A      No.

25              Q      Had the doctor treated him by then, do you
```

```
 1    know?

 2              A     I don't.

 3              Q     And when you were visiting him or seeing him

 4    in the hospital who else was with him, if anyone?

 5              A     His wife, Heather Donez.  And Julia Lambert

 6    was with me as well.

 7              Q     Had law enforcement arrived by then, do you

 8    know?

 9              A     Not at the time I was in the room with him.

10              Q     After your conversation with Frank Levar

11    what did you do?  Other than going to the hospital.  What

12    did you do with Mr. Levar?

13              A     I asked Mr. Levar to write a statement and I

14    told him he was suspended pending investigation.  Julia at

15    that point took him into a room to write the statement and

16    then escorted him out.  I don't know if that's accurate or

17    not.  And then at that time I contacted Mike Buckhout, who

18    is my production manager, Ron Cantwell, who is my plant

19    manager, and I went down to the floor.

20              Q     Okay.  And did he provide you a written

21    statement?

22              A     He did.

23              Q     And did that become part of his file?

24              A     I guess clarify file.

25              Q     Well, I mean, did you put that in his
```

1 personal file?  Or what did you end up doing with that
2 statement?
3         A     I basically created a known file for myself.
4 It's not in his quote unquote personal file.
5         Q     And did you read that statement?
6         A     I did.
7         MS. WIARD:  If I could approach?
8         THE COURT:  Yes, you may.
9         MS. WIARD:  If I could have just a moment, Judge?
10        THE COURT:  Sure.
11        Q     (By Ms. Wiard) I'm handing you what's been
12 marked as People's 18.  Do you recognize that?
13        A     Yes, I do.
14        Q     And is that a copy of the defendant's
15 statement that he provided to you on the date of the
16 assault?
17        A     Yes, it is.
18        Q     Is that a fair and accurate copy of the
19 statement that he provided to you?
20        A     Yes.
21        MS. WIARD:  At this time the People would ask to
22 admit People's Exhibit No. 18.
23        THE COURT:  Any objection or voir dire?
24        MR. WIESE:  No objection.
25        THE COURT:  No objection.

```
 1                    (People's Exhibit No. 18 was received into
 2      evidence.)
 3                    MS. WIARD:  Thank you.  And the People would ask
 4      to orally publish.
 5                    THE COURT:  The exhibit is admitted and may be
 6      published.
 7                    Q      (By Ms. Wiard) Would you read that statement
 8      for us, please.
 9                    A      On 2-9-16 had problem with lactose and Nick
10      came into the refinery room around 10:50 and I told him I
11      was a little tired of every time the lactose operator needed
12      help everyone is too busy.  He got in my face and I moved
13      him back a little, and he double fisted me in the chest so I
14      hit him.  Frank.
15                    Q      Okay.  Thank you.
16                    MS. WIARD:  I don't have anything further, Judge.
17      Thank you.
18                    THE COURT:  Cross-examination?
19                            CROSS-EXAMINATION
20      BY MR. WIESE:
21                    Q      Good afternoon, Ms. Esterly.
22                    A      Yes.
23                    Q      Now, this written statement that Frank Levar
24      did, he was given some paper and just told to write this
25      out; correct?
```

1              A      Correct.

2              Q      And this was not -- this was not dictated as

3     the result of a formal interview?

4              A      Can you clarify?

5              Q      In other words, he wasn't being asked

6     questions and writing down?  This was his own written

7     statement?

8              A      Correct.

9              Q      Okay.  And this was done for HR purposes at

10    Leprino; correct?

11             A      Correct.

12             Q      Okay.  And while he was up in human

13    resources on February 9 around the time he wrote this

14    statement you were able to notice his hands?

15             A      Correct.

16             Q      And he was, in fact, grabbing his hands?

17             A      Grabbing, rubbing.  Correct.

18             Q      And you also noticed that Frank's glasses

19    were bent?

20             A      Correct.

21             Q      He was playing with them and trying to fix

22    them while he was up there.

23             A      Correct.

24             Q      Now, after Frank had come up to HR that's

25    when you went to the hospital to check on Mr. Donez;

```
 1    correct?
 2              A      Can you clarify?
 3              Q      So Mr. Levar came up to HR and he gave his
 4    statement, he did his written statement, and then he was
 5    escorted out.
 6              A      Correct.
 7              Q      And then after that you went to the
 8    hospital?
 9              A      Not immediately after.  I went down to the
10    floor first.
11              Q      But you did go that morning.
12              A      Correct.
13              Q      And then in the afternoon of that same day,
14    February 9, you came back to Leprino to meet with law
15    enforcement?
16              A      Correct.
17              Q      Okay.  And law enforcement had to be
18    escorted around the plant; correct?
19              A      Correct.
20              Q      And that's because of the proprietary nature
21    of some of the equipment at Leprino.
22              A      Correct.
23              Q      And are you the person who actually escorted
24    them?
25              A      Correct.
```

```
 1              Q      And there were three officers; correct?  At
 2      least for part of the time there were three officers.
 3              A      Initially when they first came there were
 4      three officers.  I only escorted two of the officers out to
 5      the floor.
 6              Q      And when you escorted them down to the floor
 7      that's when some photographs were taken; correct?
 8              A      Correct.
 9              Q      Now, some of the photographs that were taken
10      had to end up being cropped because, again, of the
11      proprietary nature of Leprino's equipment.
12              A      Correct.
13              Q      And you made sure that anything that Leprino
14      believed was proprietary was cropped out of those
15      photographs.
16              A      Correct.
17              Q      And on that same day, February 9, you were
18      present in human resources when Jim Wilkins was interviewed
19      by law enforcement; correct?
20              A      Correct.
21              Q      Were you actually present or somebody else
22      from HR present when he was interviewed?
23              A      I was present.
24              Q      Okay.  And then Charles Fisher was called in
25      to be interviewed.  And were you present for that?
```

```
 1              A     I was.
 2              Q     Okay.  And on that day you also had provided
 3    written statements, like Frank's, to law enforcement;
 4    correct?
 5              A     Correct.
 6              Q     And then Jonathan Prell was called into HR
 7    and he was interviewed?
 8              A     Correct.
 9              Q     And you were present the whole time he was
10    interviewed.
11              A     Correct.
12              Q     Now, Robert Davidson was not present to be
13    interviewed on the 9 so he had to be interviewed later.
14              A     That following day, correct.
15              Q     One of the cropped photographs that you
16    provided -- I'll withdraw that question.
17              So then the law enforcement came back on the next
18    day, on the 10, and did some more interviews; correct?
19              A     Correct.
20              Q     And on that day they interviewed Robert
21    Davidson?
22              A     I believe so.
23              Q     Okay.  And Tim Martin?
24              A     Correct.
25              Q     And those were both done in the HR
```

1    department.  And were you present for those interviews?

2              A    Yes.

3              Q    Now, shifting your frame of reference to

4    February 24 of this year, on that date Detective Vosburg,

5    who is seated here in the courtroom, he came out to Leprino

6    to do even more interviews; correct?

7              A    I don't recall.

8              Q    Okay.  And on that same day he also had a

9    court order for production of records with him asking for

10   information from certain personnel files?

11             A    I do recall that, yes.

12             Q    And that court order was actually requesting

13   reports of any incidents of verbal or physical altercations

14   with certain employees of Leprino Foods; correct?

15             A    With certain employees?  I'm sorry.  Can you

16   clarify?

17             Q    The court order was requesting any records

18   or reports that Leprino had relating to verbal or physical

19   altercations of certain employees who were employed by

20   Leprino Foods; is that correct?

21             A    No.

22             Q    No.  Okay.  I guess let me -- when I say

23   certain, that means it named specific individuals.

24             MS. WIARD:  Your Honor, may we approach?

25             THE COURT:  Yes.

     1              (The following proceedings were conducted at the
     2     bench out of the hearing of the jury:)
     3              MS. WIARD:  Judge, I believe Mr. Wiese is going to
     4     try to -- I believe Mr. Wiese is going to attempt to
     5     introduce records given to -- I believe he's going to try to
     6     introduce personal records of Mr. Donez and any writeups
     7     that he has.  And there was a writeup for Mr. Donez using
     8     inappropriate language with another employee, which I do not
     9     think is relevant in this case at all.  Inappropriate
    10     language has no bearing on an assault in the second degree.
    11     So I would object to presenting that information.  I object
    12     to that.
    13              MR. WIESE:  Judge, what I'm attempting to
    14     introduce is the lack of records of Frank Levar, that
    15     there's nothing in the -- no writeups meeting the criteria
    16     of the production of records order for Frank Levar.
    17              MS. WIARD:  I was not aware that there was a court
    18     order for production of records to Frank Levar.  But okay.
    19              MR. WIESE:  It requested three individuals, Shane
    20     Tucker, Nick Donez, and Frank Levar.  But the only one that
    21     was produced was the one for Nick Donez.  But I'm not going
    22     to ask for the Donez one.  But what I'm trying to introduce
    23     is the absence of reports and that nothing was given to
    24     Detective Vosburg that had any kind of writeup, physical or
    25     verbal writeups.  I think that's fair.

 1              MS. WIARD:  I do, too.

 2              (The following proceedings were conducted in the

 3      presence and hearing of the jury:)

 4              MR. WIESE:  Thank you.

 5              Q     (By Mr. Wiese) So Ms. Esterly, we had

 6      established that there was a request for records of certain

 7      individuals, and one of the records that was requested was

 8      any record that met that criteria, that is verbal or

 9      physical altercations, of Frank Levar; correct?

10              A     I don't recall it being Frank.

11              MR. WIESE:  If I can approach, Judge?

12              THE COURT:  Yes, you may.

13              Q     (By Mr. Wiese) Ms. Esterly, I'm showing you

14      a document that is titled court order for production of

15      records.  Now, I'll ask you specifically is one of the

16      records that's requested in there for Frank Levar?  In the

17      body of the --

18              A     Correct.

19              Q     Okay.  So one of the records requested was,

20      in fact, for Frank Levar?

21              A     Correct.

22              Q     Now, and ultimately, though, of records that

23      were turned over, none of those records related to Frank

24      Levar; correct?

25              A     Correct.

```
1              Q       So that means that Leprino had nothing in
2   Frank Levar's personnel file relating to incidents of verbal
3   or physical altercations between himself and other employees
4   of Leprino Foods; correct?
5              A       Correct.
6              Q       Also on that same day, February 23, you gave
7   Detective Vosburg some items that had been collected in the
8   refinery room on February 9, 2016, by Nick Donez's wife;
9   correct?
10             A       Correct.
11             Q       And amongst the items that you gave him were
12  a hammer and a hard hat; correct?
13             A       There was more as well.
14             Q       Okay.  But I guess -- you know what, let me
15  ask a more focused question.
16             One of the items that you gave to Detective
17  Vosburg on February 23 was a hammer that had been collected
18  by Nick Donez's wife; correct?
19             A       Correct.
20             Q       Thank you.
21             MR. WIESE:  Judge, I have no further questions at
22  this time.
23             THE COURT:  Redirect?
24                          REDIRECT EXAMINATION
25
```