1    BY MS. WIARD:

2             Q    Ms. Esterly, regarding these items, do you

3    remember what all the items were?

4             A    Some of them, yes.

5             Q    Okay.  Go ahead.

6             A    Okay.  It was a bump cap.  There was a

7    hairnet.  There was like a black little day planner kind of

8    pocket thing that they use.  There was a silver tool.  I'm

9    not going to state which one it is because I don't want to

10   give you the wrong information.  And then there was a

11   mallet.

12            Q    Okay.  And now, all of those items were

13   given to you by Ms. Donez?

14            A    No.

15            Q    What items were given to you by Ms. Donez?

16            A    None of them were given by Ms. Donez.

17            Should I continue?

18            Q    Yes, please.

19            A    Coral Mendez, my quality manager, actually

20   handed those to me.

21            Q    And was she the one who collected them?

22            A    I believe so.

23            Q    All right.  So nothing was actually provided

24   to you by Ms. Donez, the quality manager provided you all

25   that evidence.

```
 1              A     Correct.
 2              Q     And then did you turn that subsequently over
 3    to law enforcement?  All of it, some of it?
 4              A     I don't believe I turned all of it over, no.
 5              Q     Okay.
 6              A     I don't recall exactly what was taken at
 7    that point.
 8              Q     Okay.  Do you recall if you gave the mallet
 9    to law enforcement?
10              A     I do remember showing them it.  I know we
11    had a chain of custody.  I'd have to look back at my notes,
12    to be honest.
13              Q     So at least today you recall that you gave
14    some of that to Detective Vosburg?
15              A     Correct.
16              Q     Thank you.
17              MS. WIARD:  I don't have anything further.
18              THE COURT:  Jury questions?  We do have one.
19              (The following proceedings were conducted at the
20    bench out of the hearing of the jury:)
21              MS. WIARD:  I'm not sure.
22              MR. WIESE:  I probably didn't make it clear,
23    Judge, because I asked about she gave written statements to
24    Detective Vosburg, but I guess I didn't make it clear.  I
25    don't care if we clarify that.
```

1           THE COURT:  That could be.

2           And this one, that's an exhibit; correct?

3           MS. WIARD:  They can read it themselves.

4           MR. WIESE:  I believe it was February 9.

5           MS. WIARD:  Are they asking when she gave the

6   statement to law enforcement or when he wrote it?

7           THE COURT:  To HR.  It was to HR.

8           MR. WIESE:  My understanding from the reports is

9   Vosburg collected them that day.  But maybe we should

10  clarify what day he collected that.

11          MS. WIARD:  We can't assume -- we can question,

12  ask the question.  I suppose it's recorded there.  That may

13  not answer their question.

14          THE COURT:  I think it's referring to the

15  statement that he wrote out and she actually gave it to the

16  police.  I think that was what they were saying.

17          MR. WIESE:  Was that saying -- I guess okay.  I

18  probably didn't make it clear, but maybe we can ask her

19  again.

20          THE COURT:  I think it could be.  I can see that

21  point.  So I'll ask number one and I'll tell them the

22  statement.

23          (The following proceedings were conducted in the

24  presence and hearing of the jury:)

25          THE COURT:  As to one of the questions asking

1   about the statement written out by Mr. Levar, you will have
2   that in the jury room.  So you will have a chance to read
3   it.
4           Another question, though, was there was a
5   statement given, the statement given by Mr. Levar to you.
6   Was it given to the police department, also?  A copy given
7   to the police department?
8           THE WITNESS:  This statement?
9           THE COURT:  Yes.
10         THE WITNESS:  Yes.
11         THE COURT:  Exhibit 18, I believe, is what that
12   is.
13         THE WITNESS:  Correct.
14         THE COURT:  Do you recall when Exhibit 18 was
15   given to investigators?
16         THE WITNESS:  That day.
17         THE COURT:  Meaning the day it was written?
18         THE WITNESS:  Correct.  The 9.
19         THE COURT:  Of February?
20         THE WITNESS:  Of February.
21         THE COURT:  Any follow-up by counsel?
22         MS. WIARD:  No, Judge.
23         MR. WIESE:  No.
24         THE COURT:  All right.  Other jury questions?  All
25   right.  Looks like we're good.

1    And may this witness be excused?

2    MS. WIARD:  Yes, Judge.

3    THE COURT:  Mr. Wiese, do you have this witness

4  under subpoena?

5    MR. WIESE:  This witness?  Yes, we do.  But at

6  this point we can release her.

7    THE COURT:  All right.  You're free to go about

8  your business then.

9    THE WITNESS:  Thank you.

10                    *******

11    MS. WIARD:  Thank you.  The People recall Bob

12  Davidson.

13    THE COURT:  All right.  Mr. Davidson can be

14  brought back in.  He's still under oath.

15                  ROBERT DAVIDSON

16  was called as a witness and, having been previously sworn,

17  was examined and testified as follows:

18    THE COURT:  Good afternoon.  You're still under

19  oath.

20    THE WITNESS:  Yes, sir.

21              DIRECT EXAMINATION

22  BY MS. WIARD:

23    Q    Mr. Davidson, a couple things came up that I

24  wanted to direct your attention to that I did not get a

25  chance to ask you about.  When you were on the stand earlier

1    we talked about when you came into the refinery room and
2    found Mr. Donez.  Obviously your first concern was his state
3    of injury and what you were going to do with that.  And I
4    believe that you stated, and please correct me if I'm wrong,
5    that his bump cap was off his head?
6              A    I would have to say so just because of
7    falling.  They don't have chin straps, they're not fastened
8    to your head, so it would have come off probably.
9              Q    Okay.  Did you take that bump cap off?
10             A    No.
11             Q    And the hairnet, do you recall if the
12   hairnet was on or off?
13             A    I don't fully recollect, but as things
14   transpired it was gone.
15             Q    It was on or off?
16             A    I would have to say it was off.  Only
17   because when Heather came into the room we moved him and I
18   don't know if it was her or I that found the blood, but at
19   that point there was no hairnet.
20             Q    Okay.  Did you take that hairnet off?
21             A    No, I didn't.
22             Q    There was an apron somewhere in between the
23   entry and where Mr. Donez's body was.  Was that apron
24   something that you brought into the room?
25             A    No.

 1              Q      Did you see an apron?

 2              A      I did not.  I was focused on Nick's position

 3      on the floor and went directly to him.

 4              Q      Did you remove anything out of Mr. Donez's

 5      pockets, either front or back pockets?

 6              A      No.

 7              Q      Did you move anything around his body at

 8      all, say any of his clothing, other than assisting him in

 9      sitting up?

10              A      No.

11              Q      When Mr. Donez -- when you were sitting him

12      up did you try to explain to him where he was and what his

13      condition was, how you had found him?

14              A      I just recollect asking him a question.  It

15      may have been Nick, what happened, and he did not seem to

16      acknowledge me.  He was looking around like he didn't know

17      where he was.  Just not aware of what was going on.

18              Q      And at some point then did you try to

19      explain to him where you are and how -- your condition and

20      that kind of thing?

21              A      Honestly I can't make an affirmative

22      statement to that so I'd have to say no.  I don't recollect

23      enough to say.

24              Q      I'm sorry to interrupt.  Do you know if

25      anyone else in the room, at least while you were there --

1  and you may not know this -- tried to explain to Mr. Donez
2  what was going on?
3          A    Not to my recollection.
4          Q    Okay.  Thank you.
5          MS. WIARD:  Nothing further.
6          THE COURT:  Cross-examination?
7                        CROSS-EXAMINATION
8  BY MR. WIESE:
9          Q    Mr. Davidson, do you recall doing an
10  interview with Detective Vosburg, who is seated at the table
11  with Ms. Wiard?
12         A    Yes.
13         Q    That was on February 10 of this year.
14         A    Yes.
15         Q    And that was in the HR department at
16  Leprino?
17         A    Correct.
18         Q    And in that interview you told Detective
19  Vosburg that his, being Nick, his tools were scattered on
20  the floor and you were just waiting for people to show up;
21  correct?
22         A    I may have said that.  I don't recollect the
23  tools.  But my memory was fresh the day after versus today.
24         Q    Okay.  And also the written statement that
25  you did and that you provided to HR in this case relating to

1    the incident on February 9.  And in that written statement

2    you don't mention anything about finding any items on the

3    floor when you went into the refinery room; correct?

4               A    Correct.

5               MR. WIESE:  I have nothing further, Judge.

6               THE COURT:  Redirect?

7                      REDIRECT EXAMINATION

8    BY MS. WIARD:

9               Q    In your statement when you were interviewed

10   by Detective Vosburg, how many days after the incident would

11   you think that interview occurred?

12             A    A few days.

13             Q    So you had some time to kind of think about

14   and process what you'd seen?

15             A    Probably.  I mean, it was an incident I've

16   not experienced before.

17             Q    Right.  And so if you told Detective Vosburg

18   that you saw items on the floor there would be no reason for

19   you to say that other than that was what you recollected?

20             A    Correct.

21             Q    But again, you didn't have anything to do --

22   didn't move those items that were on the floor from one

23   position to another, just noticed that they were --

24             A    Not to my recollection, no.

25             Q    And do you recall -- I think you had earlier

1  said maybe a mallet.

2         A    Yes.  Somewhere.

3         Q    The red X?

4         A    Yes.

5         Q    But other than that mallet to you recall any

6  other tools?

7         A    No.

8         Q    So you, in fact, did recollect seeing the

9  mallet but that was about it?

10        A    I recall it because it was so different.

11  I'd never seen it before.

12        Q    Thank you.

13        MS. WIARD:  Nothing further.

14        THE COURT:  Jury questions.  All right.  Don't

15  believe are there are any.

16        So thank you.  You may step down.

17        The People may call their next witness.

18        MS. WIARD:  People call Officer Brackett.

19                    CINDY BRACKETT

20  was called as a witness and, having been sworn, was examined

21  and testified as follows:

22                  DIRECT EXAMINATION

23  BY MS. WIARD:

24        Q    Good afternoon.  Could you state your name

25  and spell your last name.

```
 1              A     Cindy Brackett, B-r-a-c-k-e-t-t.
 2              Q     What is your occupation?
 3              A     I'm a police officer for the City of Fort
 4    Morgan.
 5              Q     And how long have you been a police officer?
 6              A     Seventeen years.
 7              Q     And have all of those years been with Fort
 8    Morgan?
 9              A     Yes.
10              Q     What are your duties?
11              A     Patrol the city, investigate criminal
12    activity, community policing.
13              Q     Do you also end up doing interviews?
14              A     Yes.  Interviews.  Medicals.
15              Q     Okay.  And are you dispatched to assaults,
16    domestic violence, any sort of crime?
17              A     Yes.
18              Q     Do you recall being dispatched to Leprino
19    Foods back on February 9 of this year?
20              A     I do.
21              Q     And about what time in the morning were you
22    dispatched?
23              A     At 1059 hours.
24              Q     And where is Leprino located?
25              A     2400 East Beaver in Fort Morgan.
```

1           Q       And that's in Morgan County?

2           A       Yes, Morgan County.

3           Q       When you got dispatched do you know what you

4    were dispatched for?  Did they give you an idea what you

5    were --

6           A       All they said was a party was conscious and

7    breathing.

8           Q       Unconscious or conscious?

9           A       Conscious.

10          Q       Where in Leprino did you end up going?

11          A       Well, Leprino's kind of in a closed area, so

12   I went to the front because they don't really allow you to

13   go anywhere.  One of the employees was nice enough to let me

14   in, and there was a group of people standing inside that

15   eventually escorted me back to where this occurred.

16          Q       So once you got back there do you know where

17   you ended up?

18          A       Well, not exactly because I zigged and

19   zagged and there's metal things everywhere and I was just

20   following where they were going.

21          Q       Do you know the name of the room that you

22   ended up in?

23          A       No, I do not.

24          Q       I'm going to draw your attention to the

25   blueprint behind you.  Does anything about that blueprint

1   look familiar to you?
2            A    May I just borrow it for one second?  Let's
3   see.
4            Q    According to Judge Singer north is at the
5   top of the --
6            THE COURT:  Probably better not go very far with
7   that.
8            A    I can't say off that.  I can tell you that
9   when I went in there was a lot of metal containers on one
10  side and then to the left there was a dinky little room off
11  to the side that I had to go in to where the victim was.
12           Q    (By Ms. Wiard) Okay.  So I'm going to direct
13  your attention to the photographs laying in front of you,
14  and they are marked No. 2 through 8.  So if you want to
15  start with 2 and see if that looks like the room that you
16  were in.  And if it would help you I can also put them up on
17  the screen.
18           A    Oh, no.  I'm just trying to find 2.
19           What were you asking about 2?  I already forgot.
20           Q    If you look at the photograph in People's
21  Exhibit 2, does that look familiar to you?
22           A    Yes.  I mean, all the equipment, you know.
23  I didn't look that close at the equipment.  They had foam
24  all over the floor that I was walking over and people were
25  giving me things to put over my hair.  And so I recall

1    seeing bigger machines than that.

2            Q    So as you were walking through.  But when
3    you got back to where the victim was.

4            A    Oh, where the victim was.

5            Q    Yeah.  Did you actually see the victim once
6    you got back into that room?

7            A    For about two seconds.  All I did was come
8    into the entrance of that room.  They already had him on a
9    backboard thrown up onto the stretcher and they were moving
10   him out.  I didn't look around much.  I started to follow
11   them out.

12           Q    Did you see anything on the floor when you
13   went into that room?

14           A    No, not that I can recall.

15           Q    About how many people would you say were in
16   the room when you got there?

17           A    At least six.  There was quite a few.

18           Q    Okay.  And were they standing around the
19   victim or were they placed in different areas in the room?

20           A    Most were standing around the victim.  You
21   had the ambulance crew and then a couple people helping the
22   ambulance crew and escorting them out and somebody following
23   behind.

24           Q    If I can direct your attention to I believe
25   that's People's Exhibit 6.  Is that the same that is on the

```
 1    screen up here?
 2              A     Yep.
 3              Q     Is this where there's an exit sign, is that
 4    where you went into the room there?
 5              A     I believe so.  Like I said, I was zig-zagged
 6    and escorted.  I didn't really look around.
 7              Q     When you saw the victim being placed on the
 8    backboard, was the ambulance crew in the doorway?  Where
 9    were they?
10              A     They were inside the room probably about
11    three or four feet in.  Just like when you come in the
12    corner. They were down there and they were just putting him
13    on the stretcher.
14              Q     So they were about three or four feet in the
15    room.  So if you look at that blueprint behind you and if
16    you see that one red line --
17              A     Okay.
18              Q     Right.  And that -- would that be about
19    three to four feet -- by scale, obviously -- three to
20    four feet within the room where they were loading him onto
21    the backboard?
22              A     I believe so.
23              Q     Okay.  Did you learn the name of the victim?
24              A     Not 'till the hospital.
25              Q     Okay.  How about did you learn the name of
```

1    the individual who assaulted him?

2              A      I was told that his first --

3              MR. WIESE:  Judge, I'm going to object to hearsay.

4              THE COURT:  Sustained.

5              Q      (By Ms. Wiard) So you personally did not

6    discover the name of the defendant other than what somebody

7    told you?

8              A      Yes.  His first name.

9              Q      Okay.  Did you speak to anyone at Leprino?

10             A      Well, yes.  I went to human resources

11   because I needed information regarding the other person, and

12   they refused to give me anything.

13             Q      Okay.  So at some point, though, you did

14   learn the name of the defendant?

15             A      I did.  When I was at the hospital and the

16   victim came to, his wife in --

17             Q      Wait 'till she's -- I'm just asking if you

18   did subsequently learn.

19             A      Yes.

20             Q      You said you did go to the hospital?

21             A      I did.

22             Q      And did you interview anyone at the

23   hospital?

24             A      I guess you would say it was an interview.

25   I asked the victim Donez, Mr. Donez, if he knew Frank's last

```
 1   name.
 2            Q      Okay.  And did you subsequently get an
 3   address for the defendant?
 4            A      I did through dispatch.
 5            Q      Did you go to that address?
 6            A      I did.
 7            Q      And when you got to that address did you see
 8   a vehicle there?
 9            A      I did.
10            Q      Did you note the license plate on that
11   vehicle?
12            A      I did.  I ran the plate with dispatch and it
13   came back to --
14            Q      And who did the plate come back to?
15            A      Frank Levar.
16            Q      Thank you.
17            MS. WIARD:  I don't have anything further.
18            THE COURT:  Cross-examination?
19            MR. WIESE:  If I can have one second, Judge?
20            Judge, I have no questions.
21            THE COURT:  All right.  Appears not.
22            May this witness be excused?
23            MS. WIARD:  She may, Judge.
24            THE COURT:  People may call their next witness.
25            (End of requested proceedings.)
```

1              <u>REPORTER'S CERTIFICATE</u>

2

3    STATE OF COLORADO    )
                          )
4    COUNTY OF MORGAN     )

5

6              I, ASHTON N. GOETHE, Official Court Reporter in

7    and for the Thirteenth Judicial District, do hereby certify:

8              That the foregoing proceedings were had at the

9    time and place aforesaid; that the same was duly recorded by

10   me in machine shorthand and later reduced to typewriting;

11   that the foregoing is a true and correct transcript of my

12   shorthand notes thereof;

13             Done this 27th day of October, 2019.

14

15                       <u>/s/ Ashton N. Goethe</u>
                             Ashton N. Goethe, RPR
16

17

18

19

20

21

22

23

24

25

```
DISTRICT COURT, MORGAN COUNTY, COLORADO |
400 Warner Street                       |
Fort Morgan, CO 80701                   |
(970)542-3435                           |
_____ |
                                        |
PEOPLE OF THE STATE OF COLORADO         |
v.                                      |
FRANK DONALD LEVAR, Defendant.          | *COURT USE ONLY*
_____ |_____
                                        |
For the People:                         |Case No. 16CR36
Rebecca R. Wiard, Esq.                   |
Deputy District Attorney                 |
400 Warner Street                       |
Fort Morgan, CO 80701                   |
(970)542-3420                           |
                                        |
For the Defendant:                       |
Paul Wiese, Esq.                         |
The Law Firm of Paul Wiese, L.L.C.       |
109 East Railroad Avenue                 |
Fort Morgan, CO 80701                    |
(970)370-2292                           |
_____ |_____
```

Reporter's Transcript
Jury Trial
October 5, 2016
_____

      THIS MATTER comes on for Jury Trial on October 5, 2016, at 8:35 a.m., before HONORABLE MICHAEL K. SINGER, District Court Judge.

Ashton N. Goethe, RPR

1                                INDEX

2    **WITNESS NAME**                                          **Page**

3         Steve Vosburg
              Direct Examination by Ms. Wiard............... 3
4             Cross-Examination by Mr. Wiese............... 21
              Redirect Examination by Ms. Wiard............ 32
5         Thomas Lopez
              Direct Examination by Ms. Wiard.............. 35
6             Cross-Examination by Mr. Wiese............... 40
          Richard Tucker
7             Direct Examination by Ms. Wiard.............. 41
              Cross-Examination by Mr. Wiese............... 47
8             Redirect Examination by Ms. Wiard............ 50
          David Ocanas
9             Direct Examination by Ms. Wiard.............. 52
              Cross-Examination by Mr. Wiese............... 57
10            Redirect Examination by Ms. Wiard............ 59

11

12

13

14

15

16    **EXHIBITS**

17
18    People's Exhibits No. 9 and 10 Entered into
      Evidence.......................................... 8
19    People's Exhibit No. 17 Entered into Evidence.......... 14
      People's Exhibit No. 11 Entered into Evidence.......... 17
      People's Exhibits No. 12 and 13 Entered into
20    Evidence.......................................... 19

21

22

23

24

25



                    Ashton N. Goethe, RPR

```
 1                    P R O C E E D I N G S
 2   (The following is a partial transcript.  All other
 3   proceedings were reported, but are not part of this
 4   transcript pursuant to instruction of the ordering party.)
 5                        * * * * * * *
 6            (Jury entered the courtroom, and the following
 7   proceedings were had in the presence and hearing of the
 8   jury:)
 9            THE COURT:  We will let the record reflect the
10   jury is now present in the courtroom.  Thank you again for
11   your patience.
12            But we are ready to go, so the People may call
13   their next witness.
14            MS. WIARD:  Thank you.  The People call Detective
15   Vosburg.
16                      STEVE VOSBURG
17   was called as a witness and, having been sworn, was examined
18   and testified as follows:
19                   DIRECT EXAMINATION
20   BY MS. WIARD:
21            Q     Good morning.
22            A     Good morning.
23            Q     Could you state your name and spell your
24   last name.
25            A     Steve Vosburg, V-o-s-b-u-r-g.
```

Ashton N. Goethe, RPR

```
 1              Q      What is your occupation?
 2              A      I'm a detective with the Fort Morgan Police
 3      Department.
 4              Q      How long have you been with the Fort Morgan
 5      Police Department as a detective?
 6              A      As a detective, six years.
 7              Q      Prior to becoming a detective were you with
 8      Fort Morgan as a patrol officer?
 9              A      Yes.
10              Q      How long?
11              A      I'm starting my 16th year now.  So if you
12      want to credit the time it's 15 years and a couple months.
13              Q      And then prior to that were you with other
14      law enforcement agencies?
15              A      Yes.  Prior to coming to Fort Morgan Police
16      Department I was with the Colorado Department of Corrections
17      in Sterling for two years.  Prior to that I was with the
18      Brush Police Department for ten years.  And prior to that I
19      was with the Washington County Sheriff's Office for 18
20      years.
21              Q      As a detective what are your duties?
22              A      Primarily major cases.  Crimes against
23      persons, felony cases.  Sexual assaults.  Assist the patrol
24      division in more complicated cases.  A lot of frauds and
25      things that are time consuming cases that needed to be
```

Ashton N. Goethe, RPR

1  chased down that they don't have time to work on.  So the
2  more complicated cases and the more major cases, basically.
3          Q       Okay.  So something in the nature of a
4  second degree assault would be something you would follow up
5  on and do investigation?
6          A       Yes.
7          Q       And in this case were you asked to do a
8  follow-up on a second degree assault or a possible second
9  degree assault at Leprino back on February 9 of 2016?
10          A       Yes, I was.
11          Q       And how did that case come to you?
12          A       We heard the dispatch call for an
13  unconscious male medical assist out at the Leprino cheese
14  factory, and later we were requested by patrol to help
15  Officer Brackett responding with additional follow-up that
16  she might need any help.
17          Q       Did you initially respond at Leprino?
18          A       Initially we did not respond to Leprino
19  because the victim had already been transported to the
20  Colorado Plains Medical Center in Fort Morgan.  So that's
21  the location we went to.  We knew that Officer Brackett was
22  already there so we went to that location.
23          Q       And when you arrived at Colorado Plains
24  where did you go?
25          A       To the emergency room.


                    Ashton N. Goethe, RPR

1          Q      And when you got to the emergency room did
2     you contact the victim or did you look for the doctor?
3          A      Initially I was briefed by Officer Brackett,
4     who pointed out what room the victim was being treated in
5     and she had advised me that his wife was there.  And I did
6     speak to his wife and subsequently spoke to the victim.  And
7     also to the treating emergency room doctor.
8          Q      Did you -- when you talked to the victim
9     were you able to see his injuries?
10         A      Yes.  Well, somewhat because he had a
11    cervical collar on his neck and I could not see his neck at
12    that point in time.  But I did observe the injuries to his
13    facial area.
14         Q      Were you able to see any injuries to the
15    back of his head?
16         A      I could tell that there was a bump on the
17    back of his head, but I didn't try to move him around too
18    much because he was laying down face up and didn't want to
19    move him because of the fact that he had that cervical
20    collar on.  I didn't want to cause any additional injury to
21    him by moving him around.
22              MS. WIARD:  If I may approach, Judge?
23              THE COURT:  Yes, you may.
24         Q      (By Ms. Wiard) I'm handing you what's been
25    marked as People's Exhibit -- People's Exhibits 9 and 10.



              Ashton N. Goethe, RPR

1    Do you recognize those?

2              A     Yes, I do.  These are photos that I took at

3    the Colorado Plains Medical Center of the victim laying in

4    his hospital bed, one with a scale and one without a scale.

5              Q     And those are photos that you say you took?

6              A     I'm sorry?

7              Q     You took those photos?

8              A     Yes, I did.

9              Q     Are those fair and accurate copies, I guess,

10   of the photographs that you took?

11             A     Yes.

12             Q     Do they fairly and accurately depict the

13   injuries that you saw on February 9?

14             A     Yes.

15             MS. WIARD:  Move to admit 9 and 10.

16             THE COURT:  Objection or voir dire?

17             MR. WIESE:  Judge, we just wanted to confirm which

18   one is 9 and which is 10.

19             MS. WIARD:  Exhibit 9 is the one without the --

20             THE WITNESS:  People's Exhibit 9 is the picture of

21   the victim's face, and People's Exhibit 10 is the picture of

22   his face with the scale.

23             MR. WIESE:  With that clarified, Judge, I have no

24   objection.

25             THE COURT:  Thank you very much.  The People's

Ashton N. Goethe, RPR

1    Exhibits 9 and 10 are admitted.
2              (People's Exhibits No. 9 and 10 were received into
3    evidence.)
4              MS. WIARD:  Move to publish, Judge.
5              THE COURT:  And you may publish them.
6              MS. WIARD:  Thank you.  I will do that on the
7    screen.
8              Q      (By Ms.Wiard) So that's People's Exhibit 9;
9    is that correct?
10             A      Yes.
11             Q      And as you said, you noticed a bump on which
12   side of his head?
13             A      I believe it was on the right side top
14   portion of his head.
15             Q      Okay.  And this is obviously the left side
16   here?
17             A      Yes.
18             Q      And then People's 10, that's with the scale.
19   Why do you do that?
20             A      It's important to be able -- if there is an
21   injury to anyone it's important to document the size, the
22   proper size of the injury, and by placing a scale -- by
23   taking one without a scale it shows what the face looked
24   like and you weren't trying to hide or cover up anything.
25   Then we'd take and place a scale in there, try to take


                    Ashton N. Goethe, RPR

1    essentially the same picture with the scale in there to

2    indicate a proportion of any injuries that may be noted in

3    the photograph.

4           Q     Now, it's difficult to see in these

5    photographs, but could you tell if the bruising here or the

6    puffiness extended down into the neck region?  Were you able

7    to tell that?

8           A     I could not tell that because of the

9    cervical collar.

10          Q     Okay.  Thank you.

11          So after you talked to -- you said you talked to

12   Dr. Hernandez; is that correct?

13          A     That's correct.

14          Q     And did you end up -- did you talk to

15   Dr. Hernandez that morning or did you go back and talk to

16   him later in the day?

17          A     We talked to him initially at the hospital

18   when I tried to get him to sign the serious bodily injury

19   form, and he said he wanted to consult a little bit with

20   some other doctors and do some further tests before he made

21   that determination.  And I spoke to him later in the day

22   where he did sign the form and we spoke in more detail later

23   on.

24          Q     Okay.  Now, did you go back to Leprino?

25          A     Yes.  Later in the afternoon Sergeant Sharp,


                    Ashton N. Goethe, RPR

1    myself, and Chief Sagel went to Leprino.

2            Q       And did you begin an investigation at that
3    point?

4            A       Yes, we did.

5            Q       And interviewed the various witness at
6    Leprino?

7            A       Initially we took a tour of the area where
8    this incident happened and then returned to the human
9    resources offices in the conference room and spoke to some
10   of the witnesses that were available on shift that day at
11   the plant.

12           Q       So when you took the tour were you able to
13   take photographs of the area where the assault took place?

14           A       Sergeant Sharp was able to take some with
15   his cell phone.  We were restricted.  Leprino is kind of a
16   closed business that you have to sign in with the security
17   detail outside, announce what your intention is, go to the
18   building.  Have to have someone meet you at the building to
19   let you in the building.  And then when we met with that
20   person then we were provided with an overcoat, booties for
21   our shoes, a hairnet, and a hard hat.  We had to take off
22   any weapons that we had and secure them in the office.  We
23   then took a tour of the particular area where this incident
24   happened.  That was referred to as the refinery room in the
25   weigh department at Leprino Foods.


                    Ashton N. Goethe, RPR

```
 1                Q       Okay.  And if you turn around and look at
 2      Exhibit 1 is that the room you were in?
 3                A       Yes, it is.
 4                Q       Now, when you went in that room was there
 5      any evidence at all left in the room as far as you were made
 6      aware of or as far as you could see?
 7                A       No.  The room was vacant of any remnants of
 8      any struggle or anything that had happened had already been
 9      washed down.  The floor was wet.  It was sanitized and it
10      was pretty clean, and there was just the normal equipment
11      that's found in that room at the time when we were in there.
12      So it was difficult to determine exactly the location where
13      the incident had occurred.
14                Q       Okay.  Now, in front of you are People's
15      Exhibits 2 through 8.  If you could look through those and
16      tell me if those are the photos that you took.  Or that I
17      guess Sergeant Sharp took.
18                A       Yes, those are photos that Sergeant Sharp
19      took when we took our tour of the refinery room.
20                Q       And in any of those photos were there any --
21      you saw yesterday that Mr. Davidson with a red X made a mark
22      where he believed he had found a mallet.  Or had seen a
23      mallet, not found a mallet.  You did not see that mallet on
24      the floor when you were there?
25                A       It was not there.
```

                        Ashton N. Goethe, RPR

1          Q        Was that later provided to you?

2          A        Yes, it was.

3          Q        And how was it provided to you?

4          A        On February 23 when we returned to the human

5    resources offices of Leprino Foods the human resources

6    manager, Risa Esterly, provided the mallet to us at the

7    conclusion of our interviews with some additional employees

8    that we had followed up with that weren't previously

9    available.

10         Q        And were you aware of where this mallet came

11   from when she provided that to you?

12         A        She told me that it was the mallet that

13   Nicolas Donez had with him when he was in the refinery room

14   and had been picked up by their personnel along with his

15   hard had, his hairnet, and some other personal items.

16         Q        Did you take anything other than the mallet

17   into evidence?

18         A        We did not.  Only took the mallet.

19         MS. WIARD:  If I could approach, Judge?

20         THE COURT:  Yes, you may.

21         Q        (By Ms. Wiard) I'm handing you what's been

22   marked as People's Exhibit 17.  Do you recognize that?

23         A        Yes, I do.

24         Q        What is that?

25         A        It's a rubber mallet with a yellow

Ashton N. Goethe, RPR

1    fiberglass handle with a black grip on it.  Kind of a hard
2    rubber plastic head commonly referred to as a dead-blow
3    hammer.
4            Q    Is there any initials, evidence tape,
5    anything on that?
6            A    Nothing on the item itself.  However, on the
7    packaging for the item it's enclosed in is the packaging
8    that I processed it on the following day on February 24 of
9    2016 at 9:30 in the morning.
10           Q    Okay.
11           A    And initialed both ends of the seal and
12    placed the evidence sticker on there for this case.
13           Q    Okay.  And did anybody -- once you got that
14    mallet did you hand that off to anybody or did you place it
15    in there?
16           A    I took it into possession out at the Leprino
17    Foods factory, placed it into evidence myself where it's
18    been since that time.
19           Q    So is that mallet you're holding in People's
20    17 the same exact mallet that you received from Leprino?
21           A    Yes, it is.
22           Q    Has it been previous opened, that bag?
23           A    It has not.
24           Q    And how do you know that?
25           A    The integrity seals with my initials and the

Ashton N. Goethe, RPR

1    date are still in tact on the plastic tubing, and that
2    indicates to me that the seal has not been broken and it
3    hasn't been opened.
4              Q     Is that the first time since you took that
5    into evidence that you have retrieved it from evidence?
6              A     Yes.
7              Q     And to your knowledge no one else has taken
8    that out of evidence?
9              A     That's correct.
10             Q     And if they had would there be notification
11   or some indication on there that it had been taken out of
12   evidence?
13             A     Yes.
14             MS. WIARD:  Move to admit People's 17.
15             THE COURT:  Any objection or voir dire?
16             MR. WIESE:  Give me one second, Judge.
17             Judge, for purposes of admitting it I don't have
18   any an objection, but I will have cross-examination about
19   the circumstances under which it was found and all that.
20   But for purposes of yes, it's in an evidence bag and all --
21   I don't have an objection to that.
22             THE COURT:  Very well.  Exhibit 17 is admitted.
23             (People's Exhibit No. 17 was received into
24   evidence.)
25             MS. WIARD:  Thank you.



                    Ashton N. Goethe, RPR

1          Q      (By Ms. Wiard) Now, you said that then later
2     on -- and I don't know if it was that day or how many days
3     later -- you went back and spoke to Dr. Hernandez and picked
4     up the serious bodily injury form.
5          A      I believe it was that day that we picked up
6     the serious bodily injury form.
7          Q      On the 10 or the 9?
8          A      On the 9.
9          Q      And did Dr. Hernandez find serious bodily
10    injury?
11         A      He did.
12              MR. WIESE:  And Judge, I would object to the
13    detective testifying to what somebody else found, especially
14    since that's essentially a verbal statement.  It can be
15    testified to by Dr. Hernandez.
16              THE COURT:  I would agree, so I'll sustain.
17              MS. WIARD:  That's fine.  Thank you, Judge.
18         Q      (By Ms. Wiard) Now, did you also follow up
19    and interview the defendant?
20         A      Yes, I did.
21         Q      And when did you do that?
22         A      February 10, 2016.  Approximately 1:00 p.m.
23         Q      And in that interview did the defendant
24    admit to assaulting Nick Donez?
25         A      Yes, he did.



                    Ashton N. Goethe, RPR

```
 1              Q      And did you record that interview?
 2              A      Yes, I did.
 3              Q      And have you listened to the interview since
 4     that recording took place?
 5              A      Yes.
 6              MS. WIARD:  If I could approach, Judge?
 7              THE COURT:  Yes, you may.
 8              Q      (By Ms. Wiard) I'm handing you what's been
 9     previously marked as People's Exhibit 11.  Do you recognize
10     that?
11              A      Yes.  It's the interview that I listened to
12     today just a little while ago in reference to this case that
13     concerns the interview that I had with Frank Levar.
14              Q      And how do you know that that is the same
15     interview that you listened to?
16              A      It has my initials on there, today's date,
17     the case number, and Mr. Levar's name.
18              Q      Is that a fair and accurate copy of the
19     recorded interview that you conducted with the defendant?
20              A      It's a copy of a redacted interview.
21              Q      Okay.  Is it a fair and accurate --
22              A      It is the same interview that I conducted
23     with Mr. Levar minus what was required to be taken out.
24              Q      Okay.
25              MS. WIARD:  Move to admit People's 11.
```

                    Ashton N. Goethe, RPR

```
 1              THE COURT:  Any objection?
 2              MR. WIESE:  No objection, Judge.
 3              THE COURT:  Exhibit 11 is admitted.
 4              (People's Exhibit No. 11 was received into
 5    evidence.)
 6              MS. WIARD:  And move to publish?
 7              THE COURT:  You may do so.
 8              MS. WIARD:  Thank you, Judge.
 9              THE COURT:  Ladies and gentlemen, this will be
10    about 20 minutes in length.
11              (People's Exhibit No. 11 was published to the
12    jury.)
13              THE COURT:  The record will reflect that Exhibit
14    11 has been published.
15              MS. WIARD:  If I may approach, Judge?
16              THE COURT:  Yes, you may.
17              Q     (By Ms. Wiard) Now, Detective Vosburg,
18    during the interview it sounds like the defendant showed you
19    how he pushed Nick Donez and then what Nick did back to him;
20    is that correct?
21              A     That's correct.
22              Q     So can you show the jury how Mr. Levar
23    showed you what he did to Nick?
24              A     As I was standing next to Mr. Levar, we were
25    a foot and a half or so apart, he took his left hand and
```

                    Ashton N. Goethe, RPR

1  pushed it against my chest and pushed me back approximately
2  a step or so.  And then he said that Nick came back towards
3  him with both fists like you would do a fist bump and hit
4  him in the chest.
5          Q    And was that straight forward that he showed
6  you, like this (indicated)?
7          A    Yes.
8          Q    And did you ever see him make any motion
9  where he took both his fists and lifted them up this way
10 (indicated)?
11         A    He did not.
12         Q    Or the other direction?
13         A    He did not.
14         Q    Or toward his face?
15         A    He did mention when I spoke to him -- and
16 it's in the interview -- that one of his hands -- and I
17 believe it was the left hand -- slipped up when he did that.
18 Could have happened by a defensive move by Frank where he
19 threw his hands up and caused Mr. Donez's hands to go up and
20 knock his glasses off.  But that's speculation on my part.
21         Q    But in the interview, as you just heard, at
22 no time did he ever say that Mr. Donez hit him or
23 intentionally knocked his glasses off?
24         A    No.
25         Q    Now, you took photos of his knuckles and he

                    Ashton N. Goethe, RPR

1  said that he was injured in his chest as well; is that
2  correct?
3           A    Yes.
4           MS. WIARD:  If I may approach, Judge?
5           THE COURT:  You may.
6           Q    (By Ms. Wiard) I'm handing you what's been
7  marked as People's Exhibits 12 and 13.  Do you recognize
8  those?
9           A    Yes.  Exhibit 12 is a closeup picture of the
10  right fist or right knuckles of Mr. Levar.  And the Exhibit
11  No. 13 is a close-up picture of a red mark on what I believe
12  is Mr. Levar's left pectoral muscle.
13           Q    Okay.  And do those photos accurately and
14  fairly depict the injuries that you saw on the 10 of
15  February?
16           A    Correct.
17           MS. WIARD:  Move to admit People's 12 and 13.
18           MR. WIESE:  No objection.
19           THE COURT:  Exhibits 12 and 13 are admitted.
20           (People's Exhibits No. 12 and 13 were received
21  into evidence.)
22           MS. WIARD:  Move to publish.
23           THE COURT:  You may do so.
24           Q    So this is People's 12 (indicated), and this
25  was the focus right here was that part of the knuckle?


                    Ashton N. Goethe, RPR

1          A     Yes.

2          Q     And did you note -- it's hard to tell in

3    this photograph.  Did it appear that it was swollen?

4          A     It did not appear to be swollen to me.

5          Q     And then this is the injury to the chest,

6    that red mark there (indicated)?

7          A     Yes.

8          Q     And you believe that was on the left did you

9    say, or the right?

10         A     I don't know positively, but I believe it

11   was on the left.

12         Q     Right maybe in between the breastbone there,

13   or near the breastbone?

14         A     Yes.

15         Q     Thank you.

16         THE COURT:  Exhibit 13, how large is that bruise

17   you're seeing there?

18         THE WITNESS:  Approximately the size of a pencil

19   eraser in diameter.

20         THE COURT:  Thank you.

21         Q     (By Ms. Wiard) Now, did you also receive a

22   written statement that the defendant wrote?

23         A     Yes.

24         Q     Regarding what happened.

25         A     Yes, I did.




                 Ashton N. Goethe, RPR

```
 1              Q      And how did you receive that statement?
 2              A      I received that in our follow-up interview
 3      with Risa Esterly, the manager from human services at
 4      Leprino, on February 9 of 2016 when we went out to talk to
 5      the witnesses involved.
 6              Q      Thank you.  And do you see the defendant,
 7      Frank Levar, in court today?
 8              A      Yes.  He's seated at the defense table next
 9      to Mr. Wiese and Mr. Wiese's investigator.  He's wearing a
10      turquoise shirt.  He has glasses and very short cut hair.
11              Q      Thank you.
12              MS. WIARD:  If the record could reflect that this
13      witness has identified the defendant subject to cross.
14              THE COURT:  The record will so reflect.
15              MS. WIARD:  Thank you.  I have nothing further.
16              THE COURT:  Cross-examination?
17                          CROSS-EXAMINATION
18      BY MR. WIESE:
19              Q      Good morning, Detective Vosburg.
20              A      Good morning.
21              Q      Now, when you had gone back to Leprino --
22      well, not gone back to, but went there the first time on
23      February 9 and you testified you were escorted back into the
24      refinery section; is that correct?
25              A      Yes.
```

                        Ashton N. Goethe, RPR

1          Q      And while you were down there Sergeant Sharp
2   was allowed to take some pictures.
3          A      Yes.
4          Q      But there was some limitations on the
5   pictures based on machinery that Leprino claims is
6   proprietary in nature; correct?
7          A      That's correct.
8          Q      Now, you were also asked about did you see
9   any evidence there by Ms. Wiard.  Do you recall that?
10         A      I do.
11         Q      So but you saw actually no loose evidence
12  there.
13         A      No loose evidence.  That's correct.
14         Q      Right.  Because the things that Sergeant
15  Sharp took photos of that are in these exhibits that the
16  jury have seen, that's also evidence in this case; correct?
17         A      Well, that is evidence in this case.  And
18  that's like the room, the dimensions of the room and how
19  that was laid out.
20         Q      Sure.  But that's not the kind of evidence
21  you can pick up and put in an evidence bag.
22         A      No.  That's correct.
23         Q      Now, if you'd seen any evidence, loose
24  evidence you could pick up and put in an evidence bag or
25  collect, you would have collected that; correct?




                    Ashton N. Goethe, RPR

```
 1                A      Correct.
 2                Q      Because that is what you were trained to do.
 3                A      That's correct.
 4                Q      And you have also as part of your law
 5      enforcement training you have been trained over the years
 6      that there are certain evidence collection techniques;
 7      correct?
 8                A      That's correct.
 9                Q      And those techniques include such things as
10      noting the location where an item is found?
11                A      Yes, sir.
12                Q      Right.  And that can be done, like, either
13      noting it in a report or maybe putting a marker down and
14      taking a photo of the marker next to the item; correct?
15                A      Correct.
16                Q      Okay.  And that can also be done in other
17      ways, again, by packaging the item and marking on the
18      outside out of the packaging where the item was found;
19      correct?
20                A      Correct.
21                Q      It can also include photographing the item
22      in place before it's moved; correct?
23                A      Correct.
24                Q      And the purpose of doing those things, such
25      as photographing or noting the location of potential pieces
```

Ashton N. Goethe, RPR

1    of evidence, is so that in the future if a case came to

2    court or there was a hearing there wouldn't be any questions

3    about where those items were at or where they were located

4    like there has been during this trial; correct?

5            A    Correct.

6            Q    Now, shifting your focus to February 24.

7    You had gone back to the Leprino plant to do some follow-up

8    interviews, and you also met with Risa Esterly; correct?

9            A    Correct.

10           Q    And at the end of those interviews you

11   collected the hammer that you identified earlier from

12   Ms. Esterly; correct?

13           A    Correct.

14           Q    And you wrote a report about that follow-up

15   visit to Leprino on the 23?

16           A    Yes, I did.

17           Q    And you routinely write reports about the

18   different steps that you take in an investigation; correct?

19           A    Correct.

20           Q    And that's very standard for you to do?

21           A    Most of the time, yes.

22           Q    Yes.  And that is, again, so that you can

23   document what people -- and it's a summary, but it's a

24   summary that documents important things, like what people

25   said; correct?


                    Ashton N. Goethe, RPR

```
 1                A      Correct.

 2                Q      What items you collected?

 3                A      Also correct.

 4                Q      Okay.  And you try to get the information in

 5     those reports as accurate as possible; correct?

 6                A      Correct.

 7                Q      And you did, in fact, write a follow-up

 8     report about the -- about the 2-23 follow-up investigation

 9     at Leprino Foods; correct?

10                A      Yes, I did.

11                Q      And amongst the information in that report

12     you noted that you collected a rubber mallet from Risa

13     Esterly; correct?

14                A      Correct.

15                Q      In that same report --

16                MR. WIESE:  Just a second, Judge.

17                Q      (By Mr. Wiese) In that same report you state

18     that Risa Esterly told you that the rubber mallet was among

19     the items collected by Heather Donez in the refinery room on

20     February 9; correct?

21                A      Correct.

22                Q      And you further note that Risa Esterly

23     informs you that after the items were collected they were

24     stowed away in a locker and later given to Ms. Esterly?

25                A      I recall the items being stowed away in a
```

Ashton N. Goethe, RPR

1  storage locker, but I'm not positive about who they were
2  given to.
3          Q    I'll reword that question slightly.  You
4  note -- Ms. Esterly told you that quote, When his wife was
5  called to the location where this happened she collected
6  those items and stored them away in a locker and later wound
7  up giving them to Risa Esterly from human resources, who in
8  turn provided them to me at approximately 11:30 a.m.;
9  correct?
10         A    If that's what's written in my report then
11 that's probably the best recollection of it.  I don't recall
12 it right now specifically, but if I wrote that in my report
13 that's probably what was said.
14         Q    And so of course that report contains
15 nothing about other members of Leprino Food's staff being
16 involved in the collection of that mallet; correct?
17         A    Correct.
18         Q    And it's your understanding from that report
19 that the mallet was collected in the refinery room on
20 February 9; correct?
21         A    Yes.
22         Q    So on February 24 it would have been 14 days
23 later that you received that mallet?
24         A    Also correct.
25         Q    Okay.  And so your only knowledge that that

                    Ashton N. Goethe, RPR

1    mallet is, in fact, the one that was collected in the
2    refinery room on February 9 is what you were told by Risa
3    Esterly?
4            A    Correct.
5            Q    And where it was or who handled it in
6    between you have no clue; correct?
7            A    I do not.  I understand that according to
8    Ms. Esterly they had some sort of a chain of custody
9    documentation, but I did not physically see that.
10           Q    So you didn't see any kind of chain of
11   custody documentation?
12           A    No.
13           Q    And it's your understanding that some other
14   items were collected along with the mallet on February 9?
15           A    Yes.
16           Q    But you don't know what those items were?
17           A    Other than what I was basically told and
18   what I had heard was that --
19           Q    Hold on.  You don't personally -- you did
20   not see the list of the items that were collected; correct?
21           A    Correct.
22           Q    And in fact you have no way of knowing --
23   I'll withdraw that question.
24           Now, I want to go back to earlier when you were
25   testifying about being in the refinery room and some

Ashton N. Goethe, RPR

1   photographs being taken.  There was one photograph that had
2   to be cropped or altered somewhat by Leprino to take out
3   some proprietary information that was in it; correct?
4              A     Correct.
5              MR. WIESE:  Are the exhibits from yesterday up
6   there, Judge?
7              THE COURT:  I believe they're all there.  Yes,
8   sir.
9              MR. WIESE:  Can I approach?
10             THE COURT:  Yes.
11             Q     (By Mr. Wiese) So Detective Vosburg,
12  directing your attention to People's Exhibit 4.  Is that the
13  photograph that was cropped by Leprino Foods?
14             A     Yes, it was.
15             Q     And so you got this photograph a few days
16  after the others were taken?  Or did they crop it the same
17  day?
18             A     Well, this particular photograph is the
19  whole photograph.  The cropped version that we got we did
20  receive a few days later.  But this appears to be a
21  photograph of the whole area that you're talking about.
22             And the reason that we got this at a later point
23  in time, one of the employees noticed that there was a bent
24  portion of a bracket that holds up some sort of electronic
25  device that's sitting on this shelf that they said was not

                    Ashton N. Goethe, RPR

1  normally like that.

2          Q    Okay.  So that was important to your

3  investigation that that shelf was bent?

4          A    Yes.

5          Q    Now, can you just point out to the jury what

6  part -- I don't know if you can see it in the photograph or

7  not -- what shelf you're talking about being bent?

8          A    In this photograph this is the proprietary

9  device here (indicated), but is sits on a metal shelf that's

10 right here (indicted).  But on this corner of the shelf

11 that's there it appears to be bent down a little ways.  It

12 doesn't lay perfectly horizontal or level across.  It's

13 actually out of joint or out of what appears to be a level

14 shelf.  And we thought perhaps that may be an important

15 factor in this case, but we didn't know.

16         Q    So it was your understanding that that had

17 not been that way at least before the investigation?

18         A    That's correct.

19         Q    Now, People's 4, can you show the jury on

20 People's Exhibit 1 what that is depicting as compared to

21 People's Exhibit 1?

22         A    This is People's Exhibit 1 (indicated)?

23         Q    Yes.

24         A    Okay.  This is the area where that shelf

25 would have been is right here (indicated), which is just



                     Ashton N. Goethe, RPR

1    above where Mr. Donez was laying on the floor on either one

2    of these two diagrams here.  So the proprietary device set

3    on that shelf on those two legs that came up about three,

4    three and a half feet up above the floor level.

5          Q     Thank you.

6          Now, I'd like you to shift your focus to the

7    February 10 interview with Mr. Levar that we had just heard.

8          A     Okay.

9          Q     And this took place -- you were actually

10   outside of his home when this happened?

11         A     That's correct.  616 West 6th Avenue, City

12   of Fort Morgan, County of Morgan, State of Colorado.

13         Q     And in the interview -- first off I would

14   ask so even though this is a recorded interview obviously

15   you were there in person so you were able to see him in

16   person; correct?

17         A     Correct.

18         Q     And when you told him about the injuries to

19   Mr. Donez's throat he was genuinely surprised; correct?

20         A     He appeared to be; yes.

21         Q     And fair to say he was even shocked?

22          A     Yes.

23         Q     And at one point you were asking -- at one

24   point you asked Mr. Donez to describe -- you used the term

25   scuffle, but that was your term to explain the physical

Ashton N. Goethe, RPR

1    altercation between them; correct?

2              A      Correct.

3              Q      And you also at one point asked him to the

4    effect if he -- referring to Nick Donez -- got in your face

5    and invaded your space.  But that, again, was your term?

6              A      That was my term.

7              Q      Right.  And then Mr. Donez -- or I'm sorry,

8    Mr. Levar answered that question.

9              A      Yes.

10             Q      Now, the injuries that are shown in People's

11   Exhibit 9 that show the injuries to Mr. Donez's face, you

12   noted to Mr. Levar on February 10 that those injuries were

13   consistent with Mr. Donez being punched twice?

14             A      I don't know about being punched twice, but

15   I said that they were consistent with how it had been

16   reported to me that it had happened, or how he had been

17   struck.

18             Q      Let me reword that.  Mr. Levar had told you

19   that he struck Mr. Donez twice; correct?

20             A      Right.

21             Q      And then your response was -- and not an

22   exact quote -- but to the effect of that the injuries to Mr.

23   Donez were consistent with being struck twice?

24             A      Correct.

25             MR. WIESE:  If I can have just a second, Judge?




                    Ashton N. Goethe, RPR

```
 1              THE COURT:  Sure.
 2              MR. WIESE:  Judge, I have nothing further at this
 3    time.
 4              THE COURT:  Redirect?
 5                     REDIRECT EXAMINATION
 6    BY MS. WIARD:
 7         Q      Detective Vosburg, you interviewed a number
 8    of individuals in this case; correct?
 9         A      Correct.
10         Q      And there were a number -- were there a
11    number of individuals that confirmed that they saw a mallet
12    on the floor in the refinery room near Mr. Donez?
13         A      Yes.
14         Q      As far as other items to collect, did you
15    ever ask to collect any other items?
16         A      We asked for a lot of things, but the lack
17    of cooperation from personnel at Leprino Foods was extremely
18    out of the ordinary.  It wasn't anything customary like we
19    would normally conduct an investigation, and we felt quite
20    hampered by their cooperation.  We asked for a lot of
21    things, but we were denied almost everything.
22         Q      In terms of these other items that were
23    supposed to have been collected, the keys and the pen and
24    those sorts of things, were those items that you wanted to
25    collect?
```

Ashton N. Goethe, RPR

```
 1                A     No.  The only thing I was extremely
 2    interested in was the mallet.
 3                Q     So the other things you didn't feel were
 4    necessary to the investigation?
 5                A     I did not at the time.
 6                Q     Now, you have been in law enforcement for
 7    over 30 years, 35 years.
 8                A     It'll be 45 years the 1 of December.
 9                Q     And in your 45 years you have interviewed
10    numbers of defendants, I would assume.
11                A     Yes.
12                Q     And in those interviews at least a few of
13    them have been assaults.
14                A     Yes.
15                Q     And is it unusual for a defendant after an
16    assault to appear to be shocked or surprised by the injuries
17    to the victim?
18                A     Yeah.
19                MR. WIESE:  Judge, I would object because that's
20    just a general question.  It's not relating specifically to
21    the interview with Mr. Levar, and I don't know -- so I would
22    just object on those grounds.  Certainly that it's too
23    broad.
24                THE COURT:  Well, it's related to his experience,
25    that's why it's broad.  I believe the door was opened to
```

Ashton N. Goethe, RPR

1    that, so I'll permit him to answer that question.

2              A     Yes.

3              Q     (By Ms. Wiard) So it is unusual to appear to

4    be shocked or surprised?

5              A     Well, it happens.  A lot of times people

6    will talk about or try to minimize what they did and they

7    might act shocked when they find out actually how much

8    injury would be caused to someone.  So that's not all that

9    uncommon.

10             Q     Is it unusual for defendants who have --

11   that you're interviewing regarding an assault to place blame

12   on the victim?

13             A     Oh, yes.  Most of the time they try to shift

14   blame onto the victim.

15             Q     Thank you.

16             MS. WIARD:  I don't have anything further.

17             THE COURT:  Recross?

18             MR. WIESE:  Judge, I have no further questions.

19             THE COURT:  All right.  Jury questions for this

20   witness?  Not seeing any.

21             So thank you.  You may step down.

22                        *******

23             THE COURT:  Thank you once again for your

24   patience.  The jury is now present in the courtroom.

25             MS. WIARD:  Thank you.  The People call Tom Lopez.



                    Ashton N. Goethe, RPR

1              THE COURT:  Thank you.
2              MR. WIESE:  I would ask for the limiting
3     instruction, Judge.
4                    THOMAS LOPEZ
5     was called as a witness and, having been sworn, was examined
6     and testified as follows:
7              THE COURT:  And ladies and gentlemen, there is
8     certain evidence that may be admitted in a trial for a
9     particular purpose only.  The witness testimony regarding
10    allegations of prior assaults by the defendant is such
11    evidence.  The evidence you're about to hear is such
12    evidence.  It may be used as evidence for the purpose of
13    showing the defendant's mental state and motive at the time
14    of the incident before us today as related to self-defense.
15    And you should consider it for no other purpose.
16             You may proceed.
17             MS. WIARD:  Thank you.
18                   DIRECT EXAMINATION
19    BY MS. WIARD:
20             Q      Could you please state your name and spell
21    your last name.
22             A      Thomas Lopez, L-o-p-e-z.
23             Q      Mr. Lopez, what is your occupation?
24             A      I work for a cement company.
25             Q      And where is that cement company?

                    Ashton N. Goethe, RPR

```
 1              A     Pueblo, Colorado.
 2              Q     And do you live in Pueblo currently?
 3              A     Yes, I do.
 4              Q     Have you ever lived in Fort Morgan?
 5              A     Well, I lived in Brush.
 6              Q     So you lived in the Fort Morgan area?
 7              A     Yes.
 8              Q     When did you live in the Fort Morgan area?
 9              A     I moved out of here in 1999.  I think I got
10    here in '80.  Somewhere around there.
11              Q     So about ten years maybe?
12              A     Yeah.
13              Q     Did you work in Fort Morgan?
14              A     Yes, I did.
15              Q     Where did you work?
16              A     At the beef plant.  Excel beef.
17              Q     How long did you work there?
18              A     I was there for 25 years.
19              Q     And what was your position or title?
20              A     I was a shipping supervisor.
21              Q     Was one of your employees when you were
22    shipping supervisor Frank Levar?
23              A     Yes, he was.
24              Q     How long was he your employee?
25              A     I want to say eight years.  Somewhere around
```

                    Ashton N. Goethe, RPR

1   there.

2           Q       Eight years?

3           A       Yeah, somewhere in there.  I'm not sure to

4   tell you the truth.  It's been a long time.

5           Q       Do you see Frank Levar, that employee, in

6   court today?

7           A       Yes, I do.

8           Q       Could you please point him out for the

9   Court?

10          A       He's right there (indicated).

11          Q       What is he wearing?

12          A       Blue shirt.

13          MS. WIARD:  If the record could reflect that the

14  witness has identified the defendant.

15          THE COURT:  Subject to cross-examination it will

16  so reflect.

17          MS. WIARD:  Thank you.

18          Q       (By Ms. Wiard) What was your working

19  relationship like with Mr. Levar?

20          A       Just a working relationship.

21          Q       And you were his superior; correct?

22          A       Yes.

23          Q       Did he ever complain to you about

24  work-related issues?

25          A       Just that he didn't have enough time.


                    Ashton N. Goethe, RPR

1          MR. WIESE:  I guess, Judge, I would object to the

2     relevance of that question.  I don't understand if this was

3     admitted about what his working conditions were or his

4     working relations.

5          THE COURT:  Well, I think it's foundational.  So

6     I'm going to overrule the objection.  I don't want a lot

7     about that.  But I think the answer was not given or was

8     interrupted.

9          Q     (By Ms. Wiard) So I'll reask the question.

10    Did he ever complain to you about works issues?

11         A     Just that he didn't have enough time off

12    work.

13         Q     And did he blame you for that lack of time

14    off, or how did that happen?

15         MR. WIESE:  And again, Judge, I'll object.  Blame.

16    That's completely speculative as to what is in Mr. Levar's

17    head at that point or what caused that.

18         THE COURT:  I'll agree.  You can rephrase that

19    perhaps.  I sustain.

20         MS. WIARD:  Thank you.

21         Q     (By Ms. Wiard) So what was his issue with

22    not having enough time off?

23         A     Just that he needed more time with his

24    family.

25         Q     And was that your determination that he

Ashton N. Goethe, RPR

```
 1    could not have the time off?  Or what was the reason?
 2              A     It was the policy that they had to go
 3    through protocol and ask for the time.
 4              Q     And so was he just not asking for the time
 5    properly.  Was that the issue?
 6              A     Yes.
 7              Q     And that was something that he was
 8    frustrated with?
 9              A     Yes.
10              Q     As a result of his dissatisfaction with that
11    not enough time off did something happen back in 1993?
12              A     Yes, it did.
13              Q     Was there an incident that happened with
14    Mr. Levar and you?
15              A     Yes, there was.
16              Q     And where did that incident occur?
17              A     At his home.
18              Q     And how did you come to be at his home?
19              A     He called me and asked me to come over.
20              Q     And what happened when you got there?
21              A     He pulled out a weapon on me.
22              Q     Thank you.
23              MS. WIARD:  Nothing further.
24              THE COURT:  Cross-examination?
25              MR. WIESE:  Thank you.
```

                    Ashton N. Goethe, RPR

```
 1                    CROSS-EXAMINATION
 2   BY MR. WIESE:
 3           Q       So Mr. Lopez, to be clear, this happened 23
 4   years ago?
 5           A       Yeah.
 6           Q       So at that time Mr. Levar was very young at
 7   that time?
 8           A       Yes, he was.
 9           Q       And you don't know who he is today, do you?
10           A       No.
11           Q       Or what kind of person he is today?
12           A       Not since the last time I saw him.
13           Q       Not since 23 years ago?
14           A       Yes.
15           Q       Okay.
16           MR. WIESE:  I have nothing further, Judge.
17           THE COURT:  Redirect?
18           MS. WIARD:  No, Judge.
19           THE COURT:  Any jury questions?  All right.
20   Apparently none.
21           And may this witness be excused from his subpoena?
22           MS. WIARD:  He may, Judge.
23           THE COURT:  All right.  Thank you.  You're free to
24   go about your business.
25           THE WITNESS:  Thank you.
```

Ashton N. Goethe, RPR

```
 1              THE COURT:  People may call their next witness.
 2              MS. WIARD:  Thank you, Judge.  People call Shane
 3    Tucker.
 4              THE COURT:  Once again, ladies and gentlemen,
 5    certain evidence may be admitted for a particular purpose
 6    only and for no other.  Witness testimony regarding
 7    allegations of prior assaults by the defendant is such
 8    evidence.  You are about to hear such evidence.  It may be
 9    used for the purpose of showing the defendant's mental state
10    and motive at the time of the incident as related to
11    self-defense, and you should consider it for no other
12    purpose.
13                        RICHARD TUCKER
14    was called as a witness and, having been sworn, was examined
15    and testified as follows:
16                      DIRECT EXAMINATION
17    BY MS. WIARD:
18              Q     Good afternoon.
19              A     Good afternoon.
20              Q     Could you state your name and spell your
21    last name.
22              A     Richard Shane Tucker, T-u-c-k-e-r.
23              Q     What's your occupation?
24              A     I work in the oil field.
25              Q     How long have you been in the oil field?
```

Ashton N. Goethe, RPR

```
 1              A      Two years now.
 2              Q      Prior to the oil field did you work at
 3    Leprino Foods?
 4              A      Prior to the oil field I worked at Wolf
 5    Waste Removal.
 6              Q      Oh, Wolf?  Okay.
 7              A      Yes.  And then before Wolf it was Leprino.
 8              Q      When was your I guess last day, or the last
 9    time that you were working at Leprino?
10              A      It was in July of 2013.
11              Q      When you worked at Leprino did you also work
12    with Frank Levar?
13              A      Yes, I did.
14              Q      How long did you work with him?
15              A      It was a good 10, 12 years at least.
16              Q      What department were you in?
17              A      We were both in the weigh department.
18              Q      And how often did you interact with the
19    defendant?
20              A      Every day.
21              Q      Now, when you worked with the defendant in
22    2013 I'm assuming; is that correct?
23              A      Yes.
24              Q      What was your position?
25              A      It was a weigh department foreman.
```

Ashton N. Goethe, RPR

```
 1                Q       And as a foreman was the defendant beneath
 2    you, or did he have to report to you?
 3                A       Beneath me.  Yes, he did report to me.
 4                Q       So you had to supervise him to some degree;
 5    is that correct?
 6                A       Yes.
 7                Q       Now, was there an incident that occurred
 8    between you and Frank Levar back I believe somewhere in the
 9    neighborhood of 2013 or prior to that?
10                A       It was before that.  It was 2010 or '11.
11                Q       Okay.  But there was an incident?
12                A       There was an incident, yes.
13                Q       Where did that happen?
14                A       That happened in the weigh department
15    supervisor's office.
16                Q       And what happened?
17                A       I was in the office with a supervisor and
18    Frank walked in and said I'm going to lunch, watch my stuff.
19    And I stopped him and told him that -- asked him if his
20    break relief was watching his equipment.  He's like no, you
21    guys watch it, I'm going to lunch.  And I stopped him again
22    and said Frank, you can't go to lunch without the proper
23    relief.  And he was like fuck you, man, I'm going to lunch.
24                I got out of my seat and walked over to Frank and
25    was like dude, don't ever talk to me like that.  You are not
```

                    Ashton N. Goethe, RPR

1  going to lunch until you've got proper relief.  He's like
2  fuck you, man, I'm going to lunch.  He pushed me like that
3  (indicated) and then left.
4          Q    Now, when you got up and approached him --
5  and again, you were in the supervisor's office?
6          A    In the supervisor's office, yes.
7          Q    When you got up and approached him where
8  were your hands?
9          A    When I walked up to Frank I put my hands in
10 my pocket.
11         Q    Okay.  How close did you get to him when you
12 went up to him?
13         A    It was within a foot or two.
14         Q    And you used a motion with your hands.  Did
15 he actually put hands on you?
16         A    Yeah, he did.  When I said don't you ever
17 talk to me like that he said fuck you, motherfucker, I'm
18 going to lunch.  He put his hands and pushed me in the
19 chest.  I went backward.  I'm pretty sure my hands came out
20 of my pocket and I shoved them back in and he left.
21         Q    Now, what happened after that?
22         A    After that I looked down at the supervisor
23 and said aren't you going to do anything about that, and we
24 talked about that for a minute.  And he wasn't going to do
25 anything, so I waited a few minutes and went up to HR to

                    Ashton N. Goethe, RPR

1    discuss it with the HR manager.  And they had told me that
2    Frank was already up there and discussed that with them,
3    too.  And I asked them what they were going to do about it
4    and they didn't seem like they were going to do anything.
5    They just said Frank was being Frank.
6              Q    Now, are you -- you said your supervisor was
7    present.  Was anyone else present who witnessed this?
8              A    No one was in the supervisor's office, but
9    there was somebody that witnessed it in the bagging room.
10    And that's just right directly adjacent with the office.
11    There's a big window and you see right in there.
12              Q    The bagging room was adjacent to where you
13    were?
14              A    Yes.
15              Q    And there's a window from the bagging room
16    into the office where you work?
17              A    Yes.
18              Q    Who was the person who witnessed this?
19              A    David Ocanas.
20              Q    Did the defendant confront you -- or not
21    confront you, but come up to you later in the day?
22              A    Yes, he did.
23              Q    And what did he say when he came up to you
24    later in the day?
25              MR. WIESE:  And Judge, I would object.  I think

Ashton N. Goethe, RPR

1   that's beyond the scope of what this has been admitted for.

2           THE COURT:  Could you please approach, both of

3   you.  I'd appreciate that.

4           (The following proceedings were conducted at the

5   bench and outside the presence and hearing of the jury:)

6           THE COURT:  So didn't hear this before Judge has

7   made the ruling, and I don't have what it is that you're

8   trying to get out of this.

9           MS. WIARD:  He just came up later and apologized,

10  the defendant did.  That's how it ended.

11          THE COURT:  Okay.  Mr. Wiese, any further record

12  you want me to make on that?

13          MR. WIESE:  I guess my concern is, Judge, that I

14  can look through the transcript, but my understanding is the

15  statement from Mr. Tucker is Frank said I fucked up and I'm

16  sorry.  If it's only that he apologized that's fine.

17          MS. WIARD:  I can rephrase it and just ask if he

18  apologized.

19          THE COURT:  With a leading question.

20          MR. WIESE:  I will allow a leading question of did

21  he apologize.

22          MS. WIARD:  That's fine.

23          THE COURT:  Okay.

24          (The following proceedings were conducted in the

25  presence and hearing of the jury:)



                Ashton N. Goethe, RPR

1          THE COURT:  You may rephrase it.

2          Q     (By Ms. Wiard) So later in the day did the

3    defendant come up to you and apologize?

4          A     Yes, he did.

5          Q     And do you see Frank Levar in court today?

6          A     Yes, I do.

7          Q     Would you please point him out by an article

8    of clothing that he's wearing.

9          A     He's wearing a baby blue long sleeve shirt.

10         Q     Thank you.

11         MS. WIARD:  If the record could reflect the

12    witness has identified the defendant.

13         THE COURT:  Subject to cross-examination it will

14    so reflect.

15         MS. WIARD:  Thank you.  I have nothing further.

16         THE COURT:  Thank you.  Cross-examination?

17                      CROSS-EXAMINATION

18    BY MR. WIESE:

19         Q     Now, Mr. Tucker, just to clarify a couple of

20    things.  So you had been sitting down when Mr. Levar came

21    into the office?

22         A     Yes.

23         Q     And then after he made these statements you

24    got up and you stepped up to him, and that was a distance of

25    approximately one foot you said?

Ashton N. Goethe, RPR

```
 1              A     It was pretty close.
 2              Q     Okay.  And of course he was being
 3    disrespectful to you so you, in fact, weren't happy that
 4    he'd come into the office and demanded to go on break;
 5    correct?
 6              A     Yes.
 7              Q     Okay.  Because you didn't believe he was
 8    following proper procedure; correct?
 9              A     That's true.
10              Q     Okay.  And you were upset with him at that
11    point for the way he was handling this; correct?
12              A     To a certain extent, yes.
13              Q     And you just testified that when you stood
14    up your hand were in your pockets; correct?
15              A     They ended up in my pockets.
16              Q     When you first got up?
17              A     When I first got up I'm not sure if they
18    were in my pocket right then or not.  But I know that as I
19    got to Frank they were in my pocket.
20              Q     Okay.  And then if I understand your
21    testimony it's that when you were pushed back your hands
22    came out of your pocket and you put them back in; correct?
23              A     Yes.
24              Q     Okay.  Now, you in fact have been asked this
25    similar line of questions in some previous court hearings;
```

Ashton N. Goethe, RPR

```
 1    correct?
 2              A     That's correct.
 3              Q     And in that previous court hearing in August
 4    you were under oath at that time?
 5              A     Yes.
 6              Q     Okay.  And at that time you didn't say
 7    anything about your hands leaving your pocket for a minute
 8    and then going back in, did you?
 9              A     No, I didn't.
10              Q     And you also remember talking to the
11    gentleman seated at my table, Mr. Bill Evans?
12              A     Yes.
13              Q     And that was back in April of 2016; correct?
14              A     That's correct.
15              Q     And when you were talking to Mr. Evans you
16    told him that you kept your hands in your pockets the entire
17    time so as not to be accused of being physical with Frank;
18    correct?
19              A     That is correct.
20              Q     And ultimately -- ultimately -- well, also
21    when you were talking to Mr. Evans back in August you told
22    him honestly I got too close and he pushed me; correct?
23              A     Yeah, I think so.
24              Q     And when you went up to HR not only -- when
25    you went up to HR it was ultimately found that you had been
```

                    Ashton N. Goethe, RPR

```
 1   aggressive and that's why they did not do anything to
 2   Mr. Levar; correct?
 3             A    I'm not sure if that's the proper term for
 4   it or not.  What they told me is that I probably instigated
 5   by walking up to him.
 6             Q    But that was their term was that you had
 7   instigated it?
 8             A    That's their term.
 9             MR. WIESE:  If I can have just a second, Judge?
10             THE COURT:  Sure.
11             MR. WIESE:  Judge, I have nothing further.
12             THE COURT:  Thank you.
13             Any redirect?
14             MS. WIARD:  Yes, Judge.
15                        REDIRECT EXAMINATION
16   BY MS. WIARD:
17             Q    Regarding the statement that you instigated
18   it, as an employee or as a foreman are you required to make
19   sure your employees understand the rules and observe those
20   rules?
21             A    Absolutely.
22             Q    In your years as a foreman did you ever have
23   an employee use that type of language at you before?
24             A    No.
25             Q    Have you ever had an employee lay his hands
```

Ashton N. Goethe, RPR

1    on you before?

2              A      Never.

3              THE COURT:  All right.  Any jury questions?

4              All right.  Thank you very much.  You may step

5    down.

6              May this witness be released from his subpoena?

7              MS. WIARD:  Yes, Judge.

8              THE COURT:  Mr. Wiese, any objection to that?

9              MR. WIESE:  No, Judge.

10             THE COURT:  Very well.  You're free to go about

11   your business.

12             And free to call your next witness.

13             MS. WIARD:  People call Dave Ocanas.

14                       DAVID OCANAS

15   was called as a witness and, having been sworn, was examined

16   and testified as follows:

17             THE COURT:  Ladies and gentlemen, once again

18   certain evidence may be admitted for particular purposes

19   only and no other.  The testimony you're about to hear

20   regarding an allegation of a prior assault by the defendant

21   is such evidence.  It may be used as evidence for the

22   purpose of showing the defendant's mental state and motive

23   at the time of the incident before us as related to

24   self-defense and you should consider it for no other

25   purpose.

                    Ashton N. Goethe, RPR

```
 1                  You may proceed.
 2                  MS. WIARD:  Thank you.
 3                       DIRECT EXAMINATION
 4    BY MS. WIARD:
 5                  Q      Good afternoon.  Could you state your name
 6    and spell your last name.
 7                  A      My name is David Ocanas, O-c-a-n-a-s.
 8                  Q      What is your occupation?
 9                  A      I work at Leprino Foods.
10                  Q      What do you do at Leprino?
11                  A      I'm a separator operator in the weigh
12    department.
13                  Q      Say that again?
14                  A      I'm a separator operator in the weigh
15    department.
16                  Q      How long have you been at Leprino?
17                  A      Sixteen years.
18                  Q      Did you work with Frank Levar?
19                  A      I did, yes.
20                  Q      And was he also in the same department as
21    you?
22                  A      Yes, he was.
23                  Q      How closely did you work with him?
24                  A      I didn't do the same job as him but we
25    worked in the same department.  So he would come and go out
```

Ashton N. Goethe, RPR

 1    of the same control room that we were in.

 2            Q     How many years did you work with him?

 3            A     Eight.

 4            Q     Did you also work with Shane Tucker?

 5            A     I did, yes.

 6            Q     And how long did you work with Mr. Tucker?

 7            A     About the same.

 8            Q     Was Mr. Tucker your foreman?

 9            A     Yes, he was.

10            Q     And he was Mr. Levar's foreman as well?

11            A     Yes, he was.

12            Q     Do you recall if there was an incident

13    between Shane Tucker and Frank Levar back sometime between

14    2010 and 2011?

15            A     Yes.

16            Q     And do you recall where that incident

17    happened?

18            A     It happened in the supervisor's office in

19    the weigh department.

20            Q     In the weigh department.  Where were you?

21            A     I was in the bagging room.

22            Q     Okay.  Can you explain to the jury bagging

23    room and supervisor's office and how they --

24            A     Yeah.  They're right next to each other and

25    there's just a window kind of dividing the two.



                    Ashton N. Goethe, RPR

```
 1            Q     Okay.  So how big is the supervisor's
 2   office?
 3            A     I'd say ten by ten area.
 4            Q     And is the bagging room directly adjacent to
 5   that or next to the supervisor's office?
 6            A     Yes, it is.
 7            Q     Is there a door or window separating them?
 8            A     Just a window.  Or a wall and a window.
 9            Q     How big is that window?
10            A     There's two windows that are like four by
11   five.
12            Q     And how high up into the wall or off the
13   ground are those windows?
14            A     I'd say probably three feet.
15            Q     Three feet?
16            A     Yeah.
17            Q     And again, how large are the windows?
18            A     Probably like four by five.  Two of them.
19            Q     So about this high up and then yay
20   (indicated)?
21            A     Yeah.
22            MS. WIARD:  So I'm motioning from somewhere about
23   near my waist or my hip and then starting there and going up
24   about four feet and then 5 feet wide.
25            Q     (By Ms. Wiard) Or am I --
```

Ashton N. Goethe, RPR

```
 1              A     I'd say four feet wide.

 2              Q     Four feet wide and five feet high.  Okay.

 3              So in the bagging room were you able to see inside

 4    the supervisor's office?

 5              A     Yes.

 6              Q     What did you see, if anything?

 7              A     Just seen (sic) Shane and Frank having words

 8    with each other, and then Shane got kind of in his face and

 9    Frank shoved him back.

10              Q     It's hard to hear you because you have such

11    a soft voice, so if you could -- I'll back you up a little

12    bit.  You said you saw them having words?

13              A     Yes.

14              Q     What do you mean by that?

15              A     You could tell they were arguing about

16    something.

17              Q     And at that point when you saw them arguing

18    where were they in relationship to each other?

19              A     Frank was more by the doorway that he had

20    just kind of walked in and Tucker was sitting down in the

21    office.

22              Q     Sitting down in the office?

23              A     Yeah.

24              Q     You could tell they were having words while

25    Mr. Tucker was sitting down?
```

                    Ashton N. Goethe, RPR

```
 1              A     Yes.
 2              Q     And then what did you see?
 3              A     Shane stood up and kind of got closer to him
 4    while they were still talking to each other.
 5              Q     And was it clear to you that they were still
 6    having words when Shane got up?
 7              A     Yes.
 8              Q     Okay.  And what did Shane do then?
 9              A     Well, he said he had his hands in his pocket
10    and then I seen Frank shove him.  He kind of just went back
11    and had his hands in his pocket.
12              Q     And you saw Frank, the defendant, physically
13    shoving Shane tucker?
14              A     Yes.
15              Q     How did he shove him?  Can you show us the
16    motion of shoving?
17              A     I'd say more like kind of chest shoving.
18              Q     With one hand or two hands?
19              A     Two hands.
20              Q     And you said where was Mr. Tucker's hands?
21              A     In his pocket.
22              Q     And after you saw that what did you see?
23              A     Frank just walked out of the office.
24              Q     Okay.  And what did Mr. Tucker do?
25              A     He was talking to the supervisor that was in
```

Ashton N. Goethe, RPR

```
 1    the office.
 2              Q      When you saw this happening about how far
 3    would you say you were from the window?
 4              A      I'd say like 25, 30 feet.
 5              Q      Did you have a pretty clear shot then?
 6              A      Yeah.
 7              Q      There's no doubt in your mind what you were
 8    seeing?
 9              A      No.
10              Q      Did you report that you had seen that later
11    to someone?
12              A      No, I didn't.
13              Q      Did you tell Mr. Tucker that you had seen
14    that?
15              A      Yeah.
16              Q      Thank you.
17              MS. WIARD:  I don't have anything further.
18              THE COURT:  Cross-examination?
19                      CROSS-EXAMINATION
20    BY MR. WIESE:
21              Q      So Mr. Ocanas, when you first saw Mr. Tucker
22    get up they were approximately three feet apart?
23              A      I'd say, yeah.
24              Q      Okay.  And then as this argument went on
25    Mr. Tucker actually got closer to Mr. Levar; correct?
```

Ashton N. Goethe, RPR

```
 1              A     Yes, he did.
 2              Q     And he got like within a foot of him?
 3              A     Yeah.
 4              Q     Okay.  And it wasn't until Mr. Tucker walked
 5     up and got within a foot of Mr. Levar that's when Mr. Levar
 6     shoved him; correct?
 7              A     Yes.
 8              Q     And then after he was shoved back at that
 9     point -- well, let me reword that.
10              As a matter of fact, you did not see Mr. Tucker
11     put his hands in his pockets until after he was shoved and
12     took a step back from Mr. Levar; correct?
13              A     Yes.
14              Q     Okay.  And so you had actually testified
15     back in August in a matter related to this case and that was
16     your testimony at that time?
17              A     Yes.
18              Q     But your testimony today is that he had his
19     hands in his pockets the entire time; correct?
20              A     Yes.
21              Q     Okay.  And you know Mr. Tucker, don't you,
22     from working at Leprino?
23              A     Yeah.
24              Q     And you don't actually know what was said
25     between the two of them; correct?
```

Ashton N. Goethe, RPR

    1              A      I didn't hear anything, no.  What I know
    2    what was said was what Mr. Tucker told me.
    3              Q      What Mr. Tucker told you is what you know.
    4    But Mr. Tucker was, in fact, angry with Mr. Levar when he
    5    stood up; correct?
    6              A      I think they were both angry with each
    7    other.
    8              Q      But Mr. Tucker was a foreman; correct?
    9              A      Yes, he was.
   10              Q      Okay.  And he got up and was three feet away
   11    and then he moved up closer to Mr. Levar?
   12              A      Yes.
   13              Q      Thank you.
   14              MR. WIESE:  I have nothing further.
   15              THE COURT:  Redirect?
   16              MS. WIARD:  Thank you.
   17                      REDIRECT EXAMINATION
   18    BY MS. WIARD:
   19              Q      Did you ever see Mr. Tucker put his hands on
   20    Mr. Levar?
   21              A      I did not, no.
   22              Q      Thank you.
   23              THE COURT:  Jury questions?  All right.  It
   24    doesn't appear that we have any.
   25              May this witness be excused?




                     Ashton N. Goethe, RPR

```
 1              MS. WIARD:  He may, Judge.
 2              MR. WIESE:  Yes, Judge.
 3              THE COURT:  All right.  Thank you.  You are free
 4     to go about your business.
 5              And the People may call their next witness.
 6              MS. WIARD:  The People rest subject to rebuttal,
 7     Judge.
 8              (End of requested proceedings.)
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Ashton N. Goethe, RPR

```
 1                    REPORTER'S CERTIFICATE

 2

 3   STATE OF COLORADO    )
                          )
 4   COUNTY OF MORGAN     )

 5

 6          I, ASHTON N. GOETHE, Official Court Reporter in

 7   and for the Thirteenth Judicial District, do hereby certify:

 8          That the foregoing proceedings were had at the

 9   time and place aforesaid; that the same was duly recorded by

10   me in machine shorthand and later reduced to typewriting;

11   that the foregoing is a true and correct transcript of my

12   shorthand notes thereof;

13          Done this 27th day of October, 2019.

14

15                       /s/ Ashton N. Goethe
                          Ashton N. Goethe, RPR
16

17

18

19

20

21

22

23

24

25
```

Ashton N. Goethe, RPR

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 19-CV00285-CMA

NICOLAS DONEZ,

      Plaintiff,

v.

LEPRINO FOODS, INC.

      Defendant.

---

## DEFENDANT LEPRINO FOODS COMPANY'S RESPONSES TO PLAINTIFF'S INITIAL DISCOVERY REQUESTS

Defendant Leprino Foods Company, ("Leprino") or ("Defendant") incorrectly sued herein as Leprino Foods, Inc., through its undersigned counsel, herein provides its Responses and Objections to Plaintiff's Initial Discovery Requests as follows:

### A. GENERAL STATEMENT AND OBJECTIONS

The following statements and objections apply to every Discovery Request and Leprino's Responses thereto:

1.    The Responses provided are solely for the purpose of this action, and not for the purpose of any other action. Each Response is subject to all obligations of confidence, relevancy, materiality, privilege and admissibility, and any and all other objections and grounds which would

1

require the exclusion of any response given in Court, all objections and grounds of which are reserved and may be interposed at the time of trial.

2.      Leprino has not completed its investigation of the facts relating to this case, has not completed its discovery in this action, and has not completed preparation for trial.  Leprino reserves the right to supplement if further information is later discovered.

3.      Leprino generally objects to each Interrogatory below to the extent it seeks information that is protected by the attorney-client privilege, attorney work product doctrine, F.R.C.P. Rule 26(b), accountant-client privilege, self-evaluative privilege, or any other applicable privilege and to the extent such information will disclose a trade secret or otherwise will violate Leprino's constitutional right to privacy.

4.      Leprino also generally objects to each Request below to the extent any Request seeks information in violation of any constitutional, statutory, or common law privacy interest of any current or former Leprino employee.

5.      Leprino objects to the Instructions and Definitions contained in the Requests to the extent that they request more than reasonably required or contemplated by the Federal Rules of Civil Procedure or by Order of the court.

## ANSWERS TO INTERROGATORIES

1.      Identify the individual(s) by name, address and job title, and relationship to Defendant, who participated in or prepared the answers to these Interrogatories, other than in a purely clerical capacity.

2

**RESPONSE:**      Information and documents responsive to Plaintiff's Requests were provided by many individuals at Leprino, which includes Kelly Durham, Plant HR Manager, Fort Morgan and Steve Schmidt, Senior Director Production HR and Safety.  The Responses were completed with the assistance of counsel.

2.      Identify each individual who you believe has knowledge of the facts and circumstances surrounding Defendant's employment of Plaintiff and Plaintiff's termination. In your response, describe in detail and with particularity each person's knowledge.

**OBJECTION**:      Defendant objects to this Interrogatory as overbroad, unduly burdensome and vague.  The Interrogatory requests the identity of each individual who has any knowledge regarding "Defendant's employment of Plaintiff".  Since Plaintiff was employed at Leprino for over 17 years, numerous individuals would have knowledge regarding his employment, and this information is equally accessible to Plaintiff.  In addition, identification of such individuals is irrelevant except as it relates to Plaintiff's termination from Leprino.  The same Objection applies to the Request for the identification of each individual who has knowledge of "facts and circumstances surrounding Plaintiff's termination".  Many individuals (including the Fort Morgan Police) mostly identified through documents previously produced, have knowledge concerning the circumstances of the altercation between Plaintiff and Frank Levar.

**RESPONSE:**      Without waiving said Objection and answering subject thereto, and assuming that the Interrogatory requests the identity of individuals who have knowledge of the reasons for Plaintiff's termination, those individuals include Kelly Soja (HR), Risa Esterly (HR),

3

Ron Cantwell (Plant Manager), Karen McTavish (Leprino Corporate counsel) and Steve Schmidt (Corporate HR). In addition, Julia Lambert (HR) was involved in the investigation of the incident. See also documents produced by Leprino in its Initial Disclosures or in Response to Plaintiff's Initial Discovery Requests.

      3.      Did Plaintiff possess the qualifications for Plaintiff's position(s) during his employment? If your answer is "no," state in detail and with particularity the qualifications that Plaintiff did not possess.

      **OBJECTION**:      Defendant objects to this Interrogatory as vague and overbroad. The term "qualifications" is undefined and Plaintiff was employed by Leprino for over 17 years in various positions.

      **RESPONSE**:      Without waiving said Objection and answering subject thereto, prior to the altercation with Mr. Levar, yes.

      4.      Prior to his termination, did Plaintiff perform his duties satisfactorily? If not, describe in full and in what manner Plaintiff was deficient in the performance of his duties.

      **OBJECTION**:      Defendant objects to this Interrogatory as overbroad and unduly burdensome. Plaintiff was employed at Leprino for over 17 years, and it is not possible to address any and all deficiencies of Plaintiff during that period of time.

      **RESPONSE**:      Without waiving said Objection and answering subject thereto, generally, Plaintiff performed his duties as an employee of Leprino Foods satisfactorily during his tenure, except as reflected in the documents produced by Leprino in its Initial Disclosures (or to

4

be produced upon entry of a mutually agreeable Protective Order) or in Response to Plaintiff's Initial Discovery Requests.

5.      Identify by name and job title all persons who played any role whatsoever in the decision to terminate Plaintiff.

**RESPONSE:**      See Response to Interrogatory Number 2.

6.      Describe completely the reason(s) for terminating Plaintiff.

**OBJECTION**:      Defendant objects to this Interrogatory as overbroad and argumentative in requesting a "complete description" for the reasons underlying Plaintiff's termination.

**RESPONSE:**      Without waiving said Objection and answering subject thereto, based on the reports received from Detective Vossberg and the Fort Morgan Police Department, which were consistent with the version of events provided by Frank Levar, the Plaintiff retaliated when Mr. Levar pushed Plaintiff/moved him back. Based on this information, Plaintiff, who was the Foreperson on the shift with no Supervisor present, was an active participant in the altercation and escalated the situation. His actions were in violation of Leprino's policies.

7.      Identify Defendant's employee benefits and state the percentage of an employee's salary which reflects Defendant's cost for such benefits. In lieu of a salary percentage, provide the annual cost to Defendant to cover all such benefits.

**OBJECTION**:      Defendant objects to this Interrogatory as overbroad and requesting information not relevant to any claim or defense and not proportional to the needs of the case.

5

Defendant further objects in that the information regarding benefits is equally accessible to Plaintiff.

**RESPONSE:** Without waiving said Objection and answering subject thereto, documents reflecting the employee benefits available to the Plaintiff will be provided upon entry of a mutually agreeable Protective Order.

8. Identify the name, gender and date of birth and race of all person(s) who have performed any of Plaintiff's job duties since his termination.

**OBJECTION**: Defendant objects to this Interrogatory insofar as it requests the gender and date of birth of individuals. Plaintiff's' claims in this matter are not based on either gender or age and that information has no relevance to any of Plaintiff's claims. In addition, the Interrogatory is overbroad. The Interrogatory is not limited to an identification of persons which have moved into Plaintiff's position as Whey Foreperson, but rather anyone who has performed any of Plaintiff's "job duties", which are numerous, and may be performed by any number of individuals.

**RESPONSE:** Without waiving said Objection and answering subject thereto, there have been numerous changes in the Whey Department in the last 3½ years. However, after Plaintiff's termination, Ryan Henry, Caucasian, who had previously worked as a Whey Foreperson, returned to the Department from a special project.

9. Identify the name, job title, date of birth, and gender and race of each employee terminated from Defendant from January 1, 2012 to January 1, 2017.

6

**OBJECTION**: Defendant objects to this Interrogatory as overbroad, unduly burdensome, requesting information not relevant and not proportional to any claim or defense raised in this matter, and not proportional to the needs of the case. Plaintiff's claim is limited to the Fort Morgan, Colorado Leprino plant, but this Interrogatory requests information relating to <u>all</u> of Leprino. In addition, since Plaintiff's claim is premised on race, the dates of birth and gender of any terminated employee are irrelevant. The Interrogatory is overbroad because Plaintiff's' claim is premised on Defendant's alleged unfair application of one of its policies, and this Interrogatory encompass termination for any reason. Finally, this Interrogatory violates the privacy rights of employees that may have been terminated from the Fort Morgan, Colorado plant.

10. Identify the name, job title, date of birth, gender and date of hire of each person hired by Defendant from January 1, 2012 to January 1, 2017.

**OBJECTION**: Defendant objects to this Interrogatory as overbroad, unduly burdensome, requesting information not relevant to any claim or defense raised in this matter, and not proportional to the needs of the case. Plaintiff's claim is limited to the Fort Morgan, Colorado Leprino plant, but this Interrogatory requests information relating to <u>all</u> of Leprino. In addition, since Plaintiff's claim is premised on race, the dates of birth and gender of any terminated employee are irrelevant. Finally, this Interrogatory violates the privacy rights of employees at the Fort Morgan, Colorado plant.

11. Identify all pay adjustments made by Defendant from January 1, 2012 to the present.

7

**OBJECTION**:        Defendant objects to this Interrogatory as overbroad, unduly burdensome, requesting information not relevant to any claim or defense in the matter, and not proportional to the needs of the case.  The Interrogatory is not limited to the position Plaintiff held at the time of his termination at the Fort Morgan, Colorado plant.

**RESPONSE:**        Without waiving said Objection and answering subject thereto, compensation increases vary for each job based on company performance and budget, local and national economic trends, and the Plant's talent needs and strategy. An individual in a situation similar to Plaintiff's may have received a pay increase in the range of two to four percent on an annual basis in the years since 2016.

12.        Other than this lawsuit, please describe with specificity all civil and criminal cases (including administrative and judicial proceedings) in which you have been a party from 2014 to the present. In your description of each case, please identify the court or agency, caption, and case number of the case, indicate whether you were the plaintiff or defendant in such case, describe  the claims  made by or against you and the outcome of such case.

**OBJECTION**:        Defendant objects to this Interrogatory as incredibly overbroad, unduly burdensome, vague, not relevant to any claim or defense raised in this matter, not proportional to the needs of the case, and is designed solely to harass the Defendant.

13.        Please identify any and all employees of Defendant(s) disciplined and/or terminated based on allegations of work place violence from January 1, 2012 through January 1, 2017.

8

**OBJECTION**:        Defendant objects to this Interrogatory as overbroad and unduly burdensome insofar as it requests identification of employees not associated with Leprino's Fort Morgan, Colorado facility.

**RESPONSE**:        Without waiving said Objection and answering subject thereto, at Leprino's Fort Morgan facility Jedidiah Camacho, Frank Levar and Nick Donez were terminated for violation of the workplace violence policy.  See also documents to be produced upon the entry of a mutually agreeable Protective Order.

<u>**RESPONSES TO REQUEST FOR PRODUCTION**</u>

1.        Produce copies of all documents identified in your Rule 26(a) Disclosures.

**RESPONSE**:        As indicated in the Initial Disclosures of Defendant Leprino Foods Company Pursuant to Fed.R.Civ.P. 26(a)(1), any and all documents not produced therewith will be produced upon the entry of a mutually agreeable Protective Order.

2.        Produce all document (sic) referenced or used in answering the Interrogatories and Request for Admissions served upon Defendant in this action.

**RESPONSE**:        Any and all such documents not previously produced and not equally accessible to Plaintiff will be produced upon the entry of a mutually agreeable Protective Order.

3.        Produce copies of all documents that you have provided to any state or federal agency.

**OBJECTION**:        Defendant objects to this Request as overbroad and vague.  As worded, it is not limited to the claim brought by Plaintiff related to his termination from Leprino.  Defendant further objects to this Request insofar as it requests pleadings and other documents

9

related to Plaintiff's workers' compensation claim. As admitted by Plaintiff, Defendant did not

contest Plaintiff's workers' compensation claim with the Board, and any such records filed with

the State of Colorado or federal agency are equally accessible to Plaintiff through the State or his

prior counsel.

**RESPONSE:** Without waiving said Objection and answering subject thereto, and

limiting the Response to documents related to Plaintiff's claim, all such documents provided to

the EEOC in Response to Plaintiff's Charge were previously produced. Defendant has also

previously produced certain documents relating to Plaintiff's workers' compensation claim filed

with the State of Colorado in order to demonstrate that Defendant did not seek dismissal of that

claim. No additional responsive documents relating to the Workers' Compensation claim are

being produced. Any additional documents will be produced in Response to these Requests upon

entry of a mutually agreeable Protective Order.

4. Produce copies of all memorandums, personal notes, emails, tape recordings or

other documents setting forth or memorializing in whole or in part, any communications that you

have had, including but not limited to, with any current or former employee, officer or agent of

Defendant, related to any complaints of race discrimination at Leprino Foods.

**OBJECTION**: Defendant objects to this Request as overbroad, unduly burdensome

and requesting information that is not relevant to any claim or defense raised in this matter, and

not proportional to the needs of the case. Plaintiff's claim is premised on allegations that Leprino's

Fort Morgan facility discriminated against him as a Hispanic in the enforcement of its workplace

violence policy. This Request is not limited to the Fort Morgan facility or the enforcement of

10

Leprino's workplace violence policy. In addition, the Request is overbroad and unduly burdensome since it appears to be unlimited in time.

5. Produce all documents, including but not limited to, all personnel files concerning anyone who was terminated and/or disciplined based on allegations of workplace violence and/or for violating Defendant's workplace violence policy from January 1, 2012 to January 1, 2017.

**OBJECTION**: Defendant objects to this Request as overbroad, unduly burdensome and requesting information that is not relevant to any claim or defense raised in this matter, and not proportional to the needs of the case. Plaintiff's claim is premised on allegations that Leprino's Fort Morgan facility discriminated again him as a Hispanic in the enforcement of its workplace violence policy. Leprino further objects to this Request in seeking "all documents...concerning anyone who was terminated and/or disciplined" under the workplace violence policy as it is overbroad, vague and unduly burdensome. The Request further violates the privacy concerns of Defendant's current and former employees.

**RESPONSE:** Without waiving said Objection and answering subject thereto, documents relating to investigations of or statements concerning alleged violations of the workplace violence policy will be produced upon entry of a mutually agreeable Protective Order. Defendant reserves the right to confer with Plaintiff what additional documentation will be produced.

6. All documents in your possession, including, but not limited to all personnel files, resumes, desk files, data files, and performance-related documents concerning:

a) Plaintiff;

b) Plaintiff's replacement(s)

11

c)      Any person identified in your response to any of Plaintiff's
Interrogatories.

**OBJECTION**:        Defendant objects to this Request as overbroad and requesting
information that is not relevant to any claim or defense raised in this matter, and not proportional
to the needs of the case.  In addition, Defendant objects to the production of information relating
to its employees other than Plaintiff as violative of those employees' privacy concerns.

**RESPONSE**:        Without waiving said Objection and answering subject thereto, as
previously indicated, a copy of Plaintiff's personnel file and related documents will be produced
upon the entry of a mutually agreeable Protective Order.  Based on its Objection, Defendant is not
producing any other documents requested at this time.

7.      Produce all documents relating to Defendant's employment policies and
procedures, including but not limited to handbooks, rules, policy statements, and benefit policies.

**OBJECTION**:        Defendant objects to this Request as overbroad and vague.  As
presently stated, the Request includes all of Leprino's employment policies and procedures for all
time, and not those relevant to Plaintiff's claim, Defendant's defenses or Plaintiff's employment.

**RESPONSE**:        Without waiving said Objection and answering subject thereto,
Defendant has previously produced portions of its relevant policies, procedures and standards.

8.      Produce copies of all documents, including all correspondence between Defendant
and its representatives, including, without limitation, its attorneys, referring to or relating to
Plaintiff and Plaintiff's termination.

**OBJECTION**:        Defendant objects to this Request as overbroad, unduly burdensome,
requesting information subject to the attorney-client privilege and the work product doctrine.  The

12

Request specifically includes communications between Defendant and its attorneys in clear violation of the attorney-client privilege and work product doctrine. In addition, the Request is overbroad to the extent it requests all correspondence related to Plaintiff, who was an employee of Leprino for over 17 years.

**RESPONSE:** Without waiving said Objection and answering subject thereto, any non-privileged correspondence between Defendant and its representatives relating to Plaintiff's termination will be produced upon entry of a mutually agreeable Protective Order.

9. Produce all copies of the job description for Plaintiff's position(s), including copies from the time period preceding the Plaintiff's termination and following the Plaintiff's termination.

**RESPONSE:** A copy of the job description for Whey Foreman will be produced upon entry of a mutually agreeable Protective Order.

10. Produce copies of Defendant's annual financial reports for 2014 to present. If Defendant does not generate annual reports, produce documents reflecting Defendant's revenue, expenses, profit, and loss for those years.

**OBJECTION**: Defendant objects to this Request as premature, overbroad, unduly burdensome, and requesting confidential and proprietary information. Plaintiff has not demonstrated facts sufficient to support a claim for punitive damages, and in fact, Defendant has substantial basis for its defenses. Defendant is a privately owned company, and production of the financial information requested will violate its right to privacy. Further, Defendant concedes that if punitive damages are ultimately awarded against it, it has the financial capacity to pay the award.

13

11. Produce copies of the documents for the period which indicates the name, date of birth, job title, wage and salary category, and place of employment of all of Defendant's employees.

**OBJECTION**: Defendant objects to this Request as vague, incredibly overbroad, unduly burdensome, requesting documents that are not relevant to any claim or defense raised in this matter, and not proportional to the needs of the case. The Request asks for <u>all</u> documents for <u>all</u> employees for some unstated period of time (presumably years and maybe decades) for thousands of employees who have nothing to do with either Plaintiff's claims or Defendant's defenses. The Request appears to be a fishing expedition for Plaintiff and/or his counsel.

12. Produce copies of any and all documents reflecting and/or relating to pay adjustments made by Defendants from January 1, 2012, to the present.

**OBJECTION**: Defendant objects to this Request as overbroad, unduly burdensome, failing to request information relevant to any claim or defense raised in this matter, and not proportional to the needs of the case. The Request is not limited to Leprino's Fort Morgan plant or to Plaintiff's position.

**RESPONSE:** Without waiving said Objection and answering subject thereto, see Response to Interrogatory Number 11 for potential pay increases for the position of Whey Department Foreperson since the time of Plaintiff' termination.

## RESPONSES TO REQUEST FOR ADMISSION

1. Admit that Plaintiff was employed with Defendant from November 3, 1998 to February 29, 2016.

**RESPONSE:** Admit.

14

2.      Admit that Plaintiff was involved in a physical altercation with Frank Levar, an employee of Defendant, on February 9, 2016.

**RESPONSE:**          Admit.

3.      Admit that Plaintiff did not initiate the physical altercation at Leprino Foods on February 9, 2016.

**OBJECTION**:          Defendant objects to the phrase "initiate the physical altercation" as vague.

**RESPONSE:**          Without waiving said Objection and answering subject thereto, Defendant admits that, to its understanding, Mr. Levar pushed/physically moved Plaintiff back before Plaintiff retaliated.

4.      Admit that Frank Levar had been involved in workplace violence before February 9, 2016.

**OBJECTION**:          Defendant objects to this Request as the phrase "workplace violence" is not defined.

**RESPONSE:**          Without waiving said Objection and answering subject thereto, Defendant lacks knowledge to admit this Request, and therefore denies the same.

5.      Admit that before February 9, 2016, Plaintiff had not been involved in any incidents of workplace violence.

**OBJECTION**:          Defendant objects to this Request as the phrase "workplace violence" is not defined.

**RESPONSE:**          Without waiving said Objection and answering subject thereto, denied.

15

6.     Admit that on February 9, 2016, Plaintiff was acting in self-defense with the action he took.

**RESPONSE:**     Based on the reports which Defendant received, denied.

7.     Admit that a Caucasian replaced Plaintiff as the Whey Department Foreman.

**RESPONSE:**     Defendant admits that following Plaintiff's termination, Ryan Henry, a Caucasian and former Whey Department Foreperson, who had been assigned to a special project, returned to the Whey Department in his previous role.

8.     Admit that Plaintiff did not violate Defendant's workplace violence policy during his employment.

**RESPONSE:**     Denied.

16

## VERIFICATION

STATE OF COLORADO      )
                       )      ss
COUNTY OF DENVER       )

Steve Schmidt states that he is authorized to make this Verification regarding the Responses made on behalf of Leprino Foods Company, in Leprino Foods Company's Response to Plaintiff's Interrogatories. They have been answered either by me or by authorized employees and counsel for Leprino Foods Company in this matter, and that to the extent the information came from a source other than me; I have been informed that the facts stated in this document are true and correct to the best of our knowledge.

_____
Steve Schmidt
Leprino Foods Company

Subscribed and sworn to before me this 5th day of August, 2019 by Steve Schmidt, Leprino Foods Company

My Commission expires: 2/12/22

Witness my hand and official seal.

[SEAL]

TRACY WELFRINGER DANIEL
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20144005082
MY COMMISSION EXPIRES FEB. 12, 2022

_____
Notary Public

17

Dated this 5th day of August, 2019.

    As to Responses to Request for Production and Request to Admit.

          **CAMPBELL KILLIN BRITTAN & RAY, LLC**

          By: *s/ William C. Brittan*
          William C. Brittan, #17643
          Margaret R. Pflueger, #39780
          270 St. Paul Street, Suite 300
          Denver, CO 80206
          Phone: (303) 322-3400
          Fax: (303) 322-5800
          Email: bbrittan@ckbrlaw.com
          mpflueger@ckbrlaw.com

          *Counsel for Defendant Leprino Foods Company*

## CERTIFICATE OF SERVICE

I, the undersigned, certify that on this 5th day of August, 2019, a true and correct copy of the foregoing **DEFENDANT LEPRINO FOODS COMPANY'S RESPONSES TO PLAINTIFF'S INITIAL DISCOVERY REQUESTS** were served via email to the following:

Amy Burma
Burma Law Offices, LLC
1035 Pearl Street, Suite 325
Boulder, CO 80302
amy@Burmalawoffices.com

*Attorneys for Plaintiff*

<u>s/Andrea Davis</u>
Andrea Davis

19

Fort Morgan Altercation
February 9, 2016
K. Soja Notes

**Persons involved In Altercation**: Nicolas Donez & Frank Levar

**Location of Altercation**: Whey department floor – by Refiners (Crystallizers). No witnesses to the actual event and there is no video coverage.

| Nicolas Donez | Frank Levar |
| --- | --- |
| Whey Foreperson | Whey Dryer Operator |
| DOB: 02/02/1964 (52) | DOH: 12/11/1965 (50) |
| DOH: 11/03/1998 | DOH: 01/24/2000 |

**Conversation with Ron Cantwell @ 12:30pm**: Ron stated that he heard that there was an altercation on the Whey department floor by the Refiners (by Crystallizers) that involved Nicolas Donez and Frank Levar. Per Ron, no one witnessed the altercation that one took place that Frank went into the locker room to change after the altercation and made some comments to a fellow employee named Charles Fisher, came upstairs to HR and said, "I guess I'm done." Frank then talked with Risa Esterly and Julia Lambert, wrote out his statement, and Risa sent the employee home on Suspension – pending investigation. Ron does not know who called the police/911/etc. on this matter but did attest that the police and ambulance did show up.

*The plant cannot confirm who from the facility who called 911. What we were told by Detectives was that a call was made at 10:59am from the plant and said, "Man down and unconscious" and hung up. The police and ambulance arrived at the plant due to the vagueness of the call that was received and concern (per the Detective). They arrived at the plant and the ambulance took Nic Donez to the hospital; Frank Levar was already off of the premises.

**Frank Levar's statement**:
Frank Levar came up to HR around 11:05am and wrote a hand written statement of his account of what happened between him and Nicolas Donez. Per Frank, "02/09/16 at 10:50 am I had problems with Lactose and Nic came into Refiner room around 10:50am and I told him. I was a little tired of every time the Lactose Operator needs help everyone is too busy. He got in my face and I moved him back a little and he double fisted me in the chest so I hit him." His hand written statement is attached.

Risa Esterly and Julia Lambert both went to the hospital and spoke with Nicolas Donez. Risa has Nic's statement on this matter, took photos of Nic, advised that drug/alcohol screen needs to take place since this is a work related injury. Risa is writing up her statement on all of this.



EXHIBIT
25

Julia Lambert received a text update from Nic's wife Heather Donez at 1:35pm (also an employee of LFC/Cheese Line 2 Foreperson) that stated Nic would be kept overnight in the hospital due to a possible crushed esophagus that may be due to being choked.   *We have a copy of this text.

**Fort Morgan Police at Plant – 2:45pm**:
Fort Morgan Police detectives came to the plant at 2:45pm. The detectives stated that they did not have warrants with them but that they were asking if we would let them:
1.  Go out onto the production floor and see where the altercation took place and take photos
2.  Talk with any witnesses to this situation
3.  Get a copy of any statements HR has on this matter

*Called Darcy Levy to see what we should do from a legal stance on this matter. Darcy Levy and Karen McTavish called us back at 2:52pm. They both spoke to Richard Russeth and Richard has advised us to fully cooperate with the Fort Morgan police but to ask them:
1. Not take any photos of highly confidential or propriety information, equipment, etc.
2. Be escorted to the floor by a member of management so they can see the area, take photos, etc.
3. HR to be present when the police talks with any employees on this matter
4. To ask the police for copies of any employee statements that they take, investigation notes, etc.
5. Get a copy of each Detectives business card so we have those on record

*Risa Esterly regrouped with the Detectives (waiting in the FTM plant lobby) at 3:07pm and let them know that we would fully cooperate with the investigation and what we would like. The detectives were escorted to the floor and did take photos of the area. They then came up and spoke with Jim Wilkins, Jonathan Prell, Charles Fischer, and Risa Esterly.

*Julia Lambert received another text from Heather Donez at 3:13pm stating that Nic is in his room in the ICU.  *We have a copy of this text.

*Detectives left at 4:20pm. They will be calling Risa Esterly tomorrow because they need to come back tomorrow to talk with Bob Davidson (Bob Davidson was not here at the time the detectives were).  Risa will be typing up her statement and also the statement she took from Nicolas Donez at the hospital.

*The Plant notified their security guards that we need to have extra security walks. The Detectives also said they would do extra patrol around the plant and to contact them if we need anything.

*John Forrester is putting all of the information together the OSHA and will submit the report tomorrow to them.

*Julia Lambert has contacted Matrix to start the Workers Compensation process in regards to Nicolas Donez.

### Risa Esterly's Statement:

On Tuesday, February 9th, 2016 around 11:02am Frank Levar came into my office. Julia Lambert was also present at this time. Frank stated that this was his exit interview. I asked him to sit down so we could talk. Frank was visibly upset and I asked him to calm down and take some deep breathes. Frank stated that he "Knocked Nic Donez out". I asked him what happened. He stated that he was sick and tired of no one helping lactose out. He explained that he called Nic over the radio for some help with the lactose. Nic said he was busy right now. Frank asked to send Tim over to help him. Nic said he was working on something else. Nic came into the refiner room to see Frank. Frank stated that Nic yelled what did Frank want, Frank yelled back that he was sick and tried that everyone was always too busy to help lactose out when he was asking for help. Frank stated that Nic stepped into his face and Frank stepped back. Frank then put his right hand on Nic's chest to push him back and said "get out of my face". Franks then stated that Nic punched Franks chest with both hands and one hand came up to his face and knocked his glasses off. Frank said he punched Nic in the face and he was out on the refiner floor. Frank then yelled out to Bob that Nic was lying on the refiner floor. Frank grabbed his tool box went to the men's room changed his clothes and came up to HR's office.

Franks glasses were bent and he was trying to fix them. He said that Nic knocked them off when he punched him. Frank was rubbing his hands but could not see any visible injuries.

I asked Frank to demonstrate with Julia what he meant. Frank stood within 3 inches of Julia and then raised his right hand open to push forward on Julia's check. (Didn't touch her). He then made fists with both his hands to show what Nic did to him. I asked if there was anything else, he send no. I explained that I would need a statement from him and that he is suspended pending investigation. I asked for his phone numbers, he told me 970-867-3159 and Cell 970-441-0550. I told him I would call him later this week.

Julia took Frank into conference room B to write is statement. I contacted Mike Buckhout at 11:06am to notify him of the situation. Mike was already on the plant floor help with Nic. I was told that the ambulance was on its way. I then found Ron Cantwell to tell him of the situation. During this conversation a female officer came into my office asking for information. I explained that I could not give out any information at this time. The Officer stated that she would get a warrant then and left.

Ron, Julia, Mike and Coral Mendez were all in my office talking about the situation. I asked Coral to get Bob Davidson's statement, as I heard that he was first to see Nic. I asked Mike if Nic was conscious, he stated that the ambulance team took his out on a stretcher but his eyes were open. Heather, Nic's wife was going with the ambulance to the hospital. Julia asked if she should go to the hospital and I said I would go with her. We grabbed the workers comp paperwork and then we proceeded to leave for the hospital.

At 11:36am I texted Kelly Sojo the following:
Had a situation here at work
Julia and I are heading to the hospital will update you later.

Around 12:15pm Julia and I were able to visit with Nic Donez. Nic was lying on the hospital bed with a neck brace on. I asked how he was doing and explained that I would need to get a statement from him on the altercation. Nic stated that he work breaking down a piece of equipment in the whey department. He heard Frank Levar over the radio asking for help with the lactose. He radioed back that he was busy at the moment. Nic then went to the refiner room to check on Frank. Frank was upset and started yelling at him. Nic said that Frank was mad about not getting help when he needed some. He stated that Frank pushed him in the chest and that is all he could remember. I asked what is the first thing he could remember. He stated that he thinks he saw Troy's face but not sure.

Heather made a comment that the doctor thinks Nic might have been chocked. He is having pain in this throat and cannot talk well, his eyes were also bloodshot.

I explained that I had paperwork for him since this would be considered a workers comp case. I asked him to sign the paperwork and that he would need to have a UA and Hair Foil done because of the WC status. Julia explained that this is normal in any WC case. Heather help Nic sign the paperwork by holding it up over his head.

I explained to Heather and Nic that she would need to call Unum and start FMLA paperwork. If she needs additional time off.

Julia and Heather exchanged phone numbers and we asked to keep us updated on Nic's health.

Julia and I got back to the plant around 1:05pm.

#### Fort Morgan Police at Plant – 2:45pm:

Darin Sagel (Chief of Police), Loren Sharp (Detective Sergeant) and Steve Vosburg (Detective) came to the Fort Morgan Plant. Mr. Sagel requested information about the incident with Frank Levar and Nic Donez. He said he did not have a warrant and was asking that Leprino Foods Company would cooperate with this investigation. I explained that I would need to contact my legal team in Denver for advice/approval.

See above notes.

After receiving legal approval, around 3:10pm I escorted Loren Sharp (Detective Sergeant) and Steve Vosburg (Detective) with correct PPE on to the production floor with Jim Wilkins. Jim Wilkins showed the detectives the refiner room where Nic was found. The detectives could pictures of the floor from 3 different angles. We then proceeded to the lab room. In the lab room the detectives could pictures of where the tool boxes were sitting. Asked if Frank's tool box was there and it was not. We went on to the controls room. Jim showed that detectives where he went to call for help. No pictures were taken in the controls room. We walked by thru the red line room into the men's locker room. Franks' locker was

#53 in the center of the men's locker room. I opened his locker and it was empty. The detectives took a picture of the locker. We all went up stair to my office so the detectives could talk to our employees.

Detectives Sharp and Vosburg spoke with Jim Wilkins first. They asked for his name, date of birth, address, phone number and title at Leprino Foods. Asked how long Jim knows Frank and Nic? Was Frank a "hothead"? Are you aware of any situation with Frank and Nic? How did you find Nic? Were Nic's eyes open? Was there blood? Was a hammer on the floor? What were they doing? Is there a Crisis plan here? Any additional information you can think of?

Detectives Sharp and Vosburg spoke with Charles Fisher. They asked for his name, date of birth, address, phone number and title at Leprino Foods. Asked how long Jim knows Frank and Nic? Was Frank a "hothead"? Are you aware of any situation with Frank and Nic? How did you find Nic? Were Nic's eyes open? Was there blood? Was a hammer on the floor? What were they doing? What is Frank Like? Any additional information you can think of?

Detectives Sharp and Vosburg spoke with Jonathan Prell. They asked for his name, date of birth, address, phone number and title at Leprino Foods. Asked how long Jim knows Frank and Nic? Was Frank a "hothead"? Are you aware of any situation with Frank and Nic? How did you find Nic? Were Nic's eyes open? Was there blood? Was a hammer on the floor? What were they doing? What is Frank Like? Any additional information you can think of?

I made copies of all statement and gave them to the detectives. I explained to the detectives that Bob Davidson had left for the day already but they could call me tomorrow and I could set up an interview with him then. They agreed they would call me on my cell around 10:00am.

The detectives left the plant around 4:20pm.

### 2/10/2016 Fort Morgan Police at Plant – 11:05am:

10:13am Detective Steve Vosburg called me to set up a time to come in and interview Bob Davidson. We agreed on 11:00am 2/10/2016.

Only Detective Vosburg was present on 2/10/2016. He spoke with Bob Davidson and asked the following questions: his name, date of birth, address, phone number and title at Leprino Foods. Asked how long Jim knows Frank and Nic? Was Frank a "hothead"? Are you aware of any situation with Frank and Nic? How did you find Nic? Were Nic's eyes open? Was there blood? Was a hammer on the floor? Any additional information you can think of?

During Bob's interview Tim Martin's name came up. I asked that Tim come and talk to detective Vosburg.
Detectives Vosburg spoke with Tim Martin and asked for his name, date of birth, address, phone number and title at Leprino Foods. Asked how long Jim knows Frank and Nic? Was Frank a "hothead"?

Are you aware of any situation with Frank and Nic? How did you find Nic? Were Nic's eyes open? Was there blood? Was a hammer on the floor? Any additional information you can think of?

I had Tim go see Sheryl Groves after this interview to write a statement. (Included)

I asked Detective Vosburg how to get copies of their documentation. He explained to me either online or came into the police station and fill out a form. There might be cost related.

*Side note, I believe that today's (2/10/16) conversation was tape recorded. The detective didn't mention that is was. I would assume that yesterdays were too.

February 9, 2016
Approximately 10:50 A.M.

I was walking through the Whey department near the pathway to the control room around the evaporators when I saw Frank. He called out to me and said something about his supervisor is un conscious on the floor in the Re Finer room and he left the area. He had no glasses on and was very agitated. I took off running and ran into Charles, John and Tim and went on to the refiner room. John followed into the Re finer room. I immediately saw Nike Donez on the floor just coming too from being unconscious. I ran to him to stop him from getting up. He was obviously un aware with glassed over eyes. I talking with him he stated he didn't know what happened. I knew then he may have a concussion. I tried to keep him still and keep his neck immobilized but he was not cooperating. I used his radio to call Jim Wilkins, I also asked John to get help and call for an ambulance. I believe at this time I also asked for Troy Gettman as he is an EMT. The CIP was running on the Refiners and had to move Nick approximately 5 feet to the west to get him away from the water and or chemicals in the CIP. I then waited for help.

Robert A. Davidson
Sanitation Supervisor

2-10-2016

On Tuesday 2-8-2016 I walked into the refiner room to grab a wrench from the separator tool box so I could tear down the clarifier that maintenance was waiting to work on. Frank Lavar was standing on the refiner catwalk and yelled to me "You need to send Tim over here." I responded he's busy. What do you need?" Tim was helping me with the clarifier. He replied "Never mind." So I left. I resumed the tear down of the clarifier and ten minutes later I needed a rubber mallet so I walked back into the refiner room to get the rubber mallet from the separator tool box. He was standing in front of the control panel. I walked up to him and asked "What's going on?" He said he was having problems with the decanters and the Tema not running. He was clearly upset. Then he yelled aggressively "The next time I tell you that I need help you better send help. Anytime they ask for help up front they immediately get help but I never do." I remember filling slightly offended by this comment because I am always the first one to help him. We just had a lot going on at this time. We were standing fairly close because it was so loud. I told him "Getting mad and yelling doesn't resolve anything." He then became aggressive, pushed me in my chest. Then everything went black. The next thing I remember was seeing Troy Gettman and my wife and I was trying to figure out what happened.

I was working on a clarifier with John Perell and Nick when I heard Frank call over the radio that he was having problems with the Tema, Nick continued to help us for a few minutes, then he left to help Frank, Another few minutes passed and I saw Frank walk by the control room. He looked very upset, He went into the control room, said a few things to Charles and left. Charles came out of the control room said to John that Nick was unconsious or something like that, John ~~Charles~~ and I went to the refiner room and saw Nick on the floor. John and I then tried to get ahold of a manager then I tried to get the Lactose dryer under control, Later I saw Charles on lunch and asked him what Frank said to him. Charles said that Frank told him to tell Jim Wilking that he knocked out Nick,

Timothy
Martin

Timothy
Martin

2-10-16

On 2-8-16 had problems with Luctor
and Nick came into refiner room
around 10:50 and I told him I was
a little tired of every time the Lacke
operator needs help everyone is to busy.
he got in my face and I moved him
back a little and he double fisted
me in the chest so I hit
him.

Fred C.

LEP0149

ND Appx, p.357

Nick and I was working on cluster #1. I heard Frank call Nick on the Radio. I didn't hear it all clearly, something about the TEMA not running. I stayed working on the clarifier and Nick Went to go see what Frank needed. A few minutes later Charles came out of the control room and told me. Frank said he knocked Nick out and that Nick was laying in the refiner room, Frank also said that he was fucking his tool box and going home. After this I went to the refiner room, I was behind Bob Davison, I seen Nick laying on the floor, flat on his back. Nick seemed to be just waking up. Bob helped him get up a little. Bob sent me to call some help. When I got back to the refiner room, Nick was having trouble speaking and didn't seem to know what happened, other workers started showing up. I was asked a few questions and then got out of the way and started packing, cuz of the lockout dryer. I was asked how Frank seemed to be doing. I told Mike that Frank was upset and complaining about some new stumpity shit most of the morning.

Jonathan Brell

2-9-16

FRANK Entered Control Room and told me
to get a hold of Jim wilkens and tell
him that he Knocked Nick out
AND He was Laying on the refiner Room
Floor AND that he was going home

2-9-16    Philip Teter

On 2/9/16 at around 10:50 Charles Fisher came into the Milk HTST Room for line #1 and asked me why I did not answer my radio. I explained that I was on channel #2 vs. channel #7 which is normal. Charles then said Nick was unconscious in the refiner room on the floor. I proceeded to the Refiner Room where I seen Nick Donez sitting up on the floor with the assistance of Bob Davisson. Bob said Nick had a large bump on his head and we needed ambulance. I then tried calling guard shack on the radio to request ambulance. After two tries I went to the control room and called out to guard shack on the phone and requested the ambulance. Returning to the Refiner Room I asked Charles Fisher what had happened. He stated that Frank Levar said he knocked Nick out and he was leaving and grabbed his toolbox and left. I then went up front and waited for the ambulance to arrive and escorted then back to the Refiner Room were Nick was.

*[signature]*
2/9/16

## Fort Morgan Police Dept.

### INCIDENT REPORT
Incident: 201600002915 - Case: 201600000179

### INCIDENT DATES/TIMES:

| | | | | |
|---|---|---|---|---|
| **Reported Date/Time:** | 02/09/2016 | 10:59:05 | | |
| **Dispatched Date/Time:** | 02/09/2016 | 10:59:04 | **Completed Date/Time:** | 02/09/2016   12:36:29 |
| **Enroute Date/Time:** | 02/09/2016 | 10:59:04 | **Earliest Date/Time:** | |
| **Arrival Date/Time:** | 02/09/2016 | 11:06:14 | **Latest Date/Time:** | |

### INCIDENT LOCATION:

2400 E Beaver Av      Fort Morgan      CO    80701      Morgan County

### OFFICERS ASSIGNED:

00000234      00000234      Cindy Brackett

### COMPLAINANT:

**Name:**
**Address:**
**City/State:**

### OFFENSES:

| IBR | Offense - Description | Statute - Description | Degree | Class | Level |
|---|---|---|---|---|---|
| 13A | 0000001306 - Aggrav Asslt- Nonfam | | | | Misdemeanor |

### SUBJECT(S) INVOLVED:

| Type | Name | DOB | Address | City/State/Zip | Phone |
|---|---|---|---|---|---|
| Arrest | Levar, Frank D | 12/11/1965 | 616 W 6Th Av | Fort Morgan, CO 80701 | 8673159 |
| Calls For Service | Levar, Frank | 12/11/1965 | | | |
| Contact | Fisher, Charles | 09/23/1957 | 818 Warner | Fort Morgan, CO 80701 | 9708676123 |
| Contact | Donez, Heather L | 01/13/1977 | 516 Curtis | Brush, CO 80723 | |
| Contact | Esterly, Risa | 02/14/1972 | 856 Mircos | Erie, CO 80516 | 9704410583 |
| Contact | Wilkins, James C | 06/26/1970 | 703.5 Warren | Weldona, CO 80653 | 9707689226 |
| Contact | Prell, Jonathan David | 03/30/1971 | 1000 Simpson | Fort Morgan, CO 80701 | 9703700570 |
| Contact | Davidson, Robert | 07/30/1952 | 424 E Riverview Ave | Fort Morgan, CO 80701 | 8459780553 |
| Contact | Martin, Timothy | 02/03/1977 | 715 Custer | Brush, CO 80723 | |
| Offender | Levar, Frank D | 12/11/1965 | 616 W 6Th Av | Fort Morgan, CO 80701 | 8673159 |
| Victim | Donez, Nicolas | 02/02/1964 | 516 Custer | Brush, CO 80723 | 9708427465 |

NO IMAGE      NO IMAGE
AVAILABLE      AVAILABLE

**Arrest**          **Offender**
Levar, Frank D      Levar, Frank D
**DOB:** 12/11/1965    **DOB:** 12/11/1965



EXHIBIT
28
Schmidt   cm

# Fort Morgan Police Dept.

## INCIDENT REPORT
### Incident: 201600002915 - Case: 201600000179

**VICTIM/SUBJECT:**

| | | Victim # 001 | | |
|---|---|---|---|---|

| | | | | |
|---|---|---|---|---|
| Name: | Donez, Nicolas | DOB: | 02/02/1964 | |
| Addr: | 516 Custer | Race | W | Ethn: H |
| City/St: | Brush, CO 80723 | Sex: | M | Hair: BLK |
| Phone: | 9708427465 | Age: | 52 | Eyes: BRO |
| | 380-8574 | Height: | 509 | Skin: LBR |
| SSN: | | Weight: | 160 | Face: GTE |
| OLN: | 942622252 | ST: | CO | Resident: R |
| Type: | Individual | | | |

**Relationship to Offender 001:** VICTIM WAS ACQUAINTANCE

| | | Offender # 001 | | |
|---|---|---|---|---|

| | | | | |
|---|---|---|---|---|
| Name: | Levar, Frank D | DOB: | 12/11/1965 | Ethn: N |
| Addr: | 616 W 6th Av | Race: | W | Hair: BRO |
| City/St: | Fort Morgan, CO 80701 | Sex: | M | Eyes: BRO |
| Phone: | 8673159 | Age: | 50 | Skin: |
| | | Height: | 600 | Face: |
| SSN: | | Weight: | 160 | DANGEROUS: N |
| OLN: | 921333484 | ST: | CO | Resident: R |

| | | Witness # | | |
|---|---|---|---|---|

| | | | | |
|---|---|---|---|---|
| Name: | | DOB: | | Ethn: |
| Addr: | | Race: | | Hair: |
| City/St: | | Sex: | | Eyes: |
| Phone: | | Age: | | Skin: |
| | | Height: | | Face: |
| SSN: | | Weight: | | Resident: |
| OLN: | | ST: | | |

| | | Contact # 001 | | |
|---|---|---|---|---|

| | | | | |
|---|---|---|---|---|
| Name: | Fisher, Charles | DOB: | 09/23/1957 | Ethn: N |
| Addr: | 818 Warner | Race: | W | Hair: |
| City/St: | Fort Morgan, CO 80701 | Sex: | M | Eyes: |
| Phone: | 9708676123 | Age: | 58 | Skin: |
| | | Height: | | Face: |
| SSN: | | Weight: | | Resident: R |
| OLN: | | ST: | | |

| | | Contact # 002 | | |
|---|---|---|---|---|

| | | | | |
|---|---|---|---|---|
| Name: | Donez, Heather L | DOB: | 01/13/1977 | Ethn: |
| Addr: | 516 Curtis | Race: | W | Hair: BLN |
| City/St: | Brush, CO 80723 | Sex: | F | Eyes: BLU |
| Phone: | | Age: | 39 | Skin: |
| | | Height: | 509 | Face: |
| SSN: | | Weight: | 170 | Resident: |
| OLN: | 950452567 | ST: | CO | |

CONFIDENTIAL

LEP0213

# Fort Morgan Police Dept.
## INCIDENT REPORT
### Incident: 201600002915 - Case: 201600000179

---

**Contact # 003**

| | | | |
|---|---|---|---|
| **Name:** | Esterly, Risa | **DOB:** 02/14/1972 | **Ethn:** N |
| **Addr:** | 856 Mircos | **Race:** W | **Hair:** BLN |
| **City/St:** | Erie, CO 80516 | **Sex:** F | **Eyes:** BLU |
| **Phone:** | 9704410583 | **Age:** | **Skin:** |
| | | **Height:** 509 | **Face:** |
| **SSN:** | | **Weight:** 180 | **Resident:** N |
| **OLN:** | 063330054 | **ST:** CO | |

---

**Contact # 004**

| | | | |
|---|---|---|---|
| **Name:** | Wilkins, James C | **DOB:** 06/26/1970 | **Ethn:** N |
| **Addr:** | 703.5 Warren | **Race:** W | **Hair:** RED |
| **City/St:** | Weldona, CO 80653 | **Sex:** M | **Eyes:** HAZ |
| **Phone:** | 9707689226 | **Age:** 45 | **Skin:** |
| | | **Height:** 604 | **Face:** |
| **SSN:** | | **Weight:** 275 | **Resident:** N |
| **OLN:** | 950192234 | **ST:** CO | |

---

**Contact # 005**

| | | | |
|---|---|---|---|
| **Name:** | Prell, Jonathan David | **DOB:** 03/30/1971 | **Ethn:** N |
| **Addr:** | 1000 Simpson | **Race:** W | **Hair:** BLN |
| **City/St:** | Fort Morgan, CO 80701 | **Sex:** M | **Eyes:** BLU |
| **Phone:** | 9703700570 | **Age:** 44 | **Skin:** |
| | | **Height:** 509 | **Face:** |
| **SSN:** | | **Weight:** 160 | **Resident:** R |
| **OLN:** | 921853868 | **ST:** CO | |

---

**Contact # 006**

| | | | |
|---|---|---|---|
| **Name:** | Davidson, Robert | **DOB:** 07/30/1952 | **Ethn:** N |
| **Addr:** | 424 E Riverview Ave | **Race:** W | **Hair:** BRO |
| **City/St:** | Fort Morgan, CO 80701 | **Sex:** M | **Eyes:** HAZ |
| **Phone:** | 8459780553 | **Age:** 63 | **Skin:** |
| | | **Height:** 602 | **Face:** |
| **SSN:** | | **Weight:** 270 | **Resident:** R |
| **OLN:** | 102041064 | **ST:** CO | |

---

**Contact # 007**

| | | | |
|---|---|---|---|
| **Name:** | Martin, Timothy | **DOB:** 02/03/1977 | **Ethn:** N |
| **Addr:** | 715 Custer | **Race:** W | **Hair:** BLN |
| **City/St:** | Brush, CO 80723 | **Sex:** | **Eyes:** HAZ |
| **Phone:** | | **Age:** 39 | **Skin:** |
| | | **Height:** 600 | **Face:** |
| **SSN:** | | **Weight:** 210 | **Resident:** N |
| **OLN:** | 942553142 | **ST:** CO | |

# Fort Morgan Police Dept.
## INCIDENT REPORT
### Incident: 201600002915 - Case: 201600000179

**VEHICLE:**

| Plate # | State | Type | VIN | Yr | Make | Model | Color | Value |
|---------|-------|------|-----|----|----|-------|-------|-------|
|  |  |  |  |  |  |  |  |  |

**PROPERTY:**

| No. | Loss Type | Qty. | Make/Model/Style | Description | Serial # | Value | Evd. | RecDate | Rec Val |
|-----|-----------|------|------------------|-------------|----------|-------|------|---------|---------|
| 1 |  |  |  |  |  |  |  |  |  |

**SYNOPSIS:**

Case Number/201600000179  Offense/Assault.  Location/2400 East Beaver Avenue.  Date/020916.  Time/1059 hours.  Victim/Donez, Jr., Nicolas.  Age/52.  Address/Brush.  Disposition/Open.  234CB/sh  ***UPDATE***  Arrestee/Levar, Frank  Age/

**APPROVALS:**

| Function | ID | Name | Date | Status |
|----------|-----|------|------|--------|
| Entered Investigated Reviewed | 00000264 | Stephanie Harman | 02/09/2016 | 1 - Approved |

# Fort Morgan Police Dept.

## ARREST REPORT
### Incident: 201600002915 - Case: 201600000179 - Arrest: 000000016217

## Frank D Levar

| | | | |
|---|---|---|---|
| **DOB:** | 12/11/1965 | **Arrested:** | 02/17/2016 |
| **Age:** | 50 | **Arresting Officer:** | A Gagliano |

| | | | |
|---|---|---|---|
| **Sex:** | MALE | **Height:** | 600 |
| **Race:** | White | **Weight:** | 160 |
| **Eth. Ori.:** | Non Hispanic | **Facial:** | |
| **Hair:** | Brown | **Build:** | |
| **Eye:** | Brown | | |

### IDENTIFIERS:

**Misc. ID:**

| | | | |
|---|---|---|---|
| **SSN:** | | **Misc. ID #:** | |
| **State ID:** | 291668 | **Drv. Lic. #:** | 921333484 |
| **FBI:** | 829192KA8 | **Drv. Lic. St:** | COLORADO |

### ADDRESS(ES):

616 W 6th Av      Fort Morgan    CO   80701     8673159

### SCARS/MARKS/TATTOOS:

### ARREST LOCATION:

### CHARGE(S):

| IBR | Offense - Description | Statute - Description | Degree | Class | Level |
|---|---|---|---|---|---|
| 13A | 0000001306 - Aggrav Asslt- Nonfam | | | | Misdemeanor |

### AGENCY DATA:

| | Agency | Number |
|---|---|---|
| **Arrest:** | FMPD | 000000016217 |
| **Case:** | Fort Morgan Police Dept. | 201600000179 |
| **Citation:** | | |
| **Incident:** | Fort Morgan Police Dept. | 201600002915 |
| **Warrant:** | | |

### RIGHTS:

**Date:**      **Time:**      **By:**

**Administrative   Agency: Fort Morgan Police Dept.     Incident #:
201600002915     Case_Nr: 201600000179**

**Report No. 1   Entered: 02/09/2016 16:44   By Officer: 00000234  Cindy
Brackett**

---

Report #1

Statement of Officer Cindy Brackett

On 02/09/16 at approximately 1059 hours, I was dispatched to 2400 East Beaver
Avenue at the front entrance for a medical issue. I had very little information as dispatch
was not given much information regarding a person that was conscious and breathing. I
arrived on scene and the ambulance was already inside. One of the employees outside let
me in as the doors are secure. I had a hard time finding where this occurred as there was
not a lot of assistance. I finally was escorted to the back where the medical was at. The
ambulance crew already had the person on a back board and was lifting him off the
ground. I did not see anything in the work area on the floor.

While following the ambulance crew I was informed by a passer by that this call was
actually an assault call. He told me that he thought the victim had been knocked
unconscious with a rubber hammer. I was escorted back in and talked to Charles Fisher,
date of birth 09/23/57. Charles told me that he was working down in that area when
Frank Levar walked up to him. Frank told him he needed to go into the other room as he
just knocked someone out. He also told Charles that he was going home and picked up
his tools and left. Charles said that he went in the room and found an employee
unconscious on the ground.

I was then taken upstairs to Human Resources to get further information on Frank
Levar. I asked Human Resources, for Frank's information such as his date of birth,
address and a phone number and they refused to give me anything but his name "Frank."
I then told them if I couldn't find his information I would be back with a search warrant.
I was able to find out who this party was through the assistance of dispatch and the
victims wife.

I responded over to Colorado Plains Medical Center reference this assault case
and contacted the detectives. The victim, Nicolas Donez, date of birth 02/02/64 was
conscious when I arrived at the hospital.   I talked to Human Resource employee Risa
Esterly, date of birth 02/14/72, who told me at the hospital that Frank had not gone
straight home and had filled out a statement regarding this incident. Frank was then
suspended. I drove by an address I was given by dispatch of 616 West 6th Avenue where
I ran a plate, 990HTE, which came back to Frank Levar at that same location.

At this time I have nothing further. End of report.

1

Administrative   Agency: Fort Morgan Police Dept.      Incident #:
201600002915      Case_Nr: 201600000179

Report No.  1    Entered:  02/09/2016 16:44    By Officer:  00000234  Cindy
Brackett

234CB/sh
Approved by Officer Brackett on 021216
Approved by Sgt. James A. Parks
02/14/2016

**2**

**Administrative  Agency: Fort Morgan Police Dept.    Incident #:**
**201600002915     Case_Nr: 201600000179**

**Report No. 2   Entered: 02/11/2016 15:45   By Officer: 00000298 Steve**
**Vosburg**

---

Report #2

Supplemental Statement of Detective Steve Vosburg

In the State of Colorado, County of Morgan, City of Fort Morgan on 02/09/16 at approximately 1059 hours, Officer Brackett of the Fort Morgan Police Department responded to a medical assist at the Leprino cheese factory at 2400 East Beaver Avenue in Fort Morgan. Upon her arrival she was informed that this call was in regard to a possible assault that took place at that location and the victim was transported to the Colorado Plains Medical Center in Fort Morgan. Officer Brackett requested assistance from Investigations through Sergeant Loren Sharp.

Sergeant Sharp and I both responded to Colorado Plains Medical Center into the emergency room where we met with Officer Brackett for a preliminary briefing of what she could tell us. Initially she told us that the suspect's name was Frank Levar. Officer Brackett identified a witness as Charles Fisher, date of birth 09/23/57, where this witness reported that the suspect went up to him and said "You might want to go into that room because I just knocked him out," picked up his tool box and said, "I'm going home," and then left. Officer Brackett also reported that someone came up, unknown who, reporting that there was a rubber mallet lying by the victim.

Preliminary information from the attending physician, Dr. Elias Hernandez, was that there was an injury around the neck area and the back of the head. The nurse attending to the victim was identified as Tara Schadegg. Sergeant Sharp and I went to the exam room and we contacted the victim's wife identified as Heather Donez, date of birth 01/31/77, maiden name of Doane. She informed us that she also works at Leprino and understood that there was a request from the suspect, Frank, for some assistance and wanting some immediate assistance of which they were busy at the time and the victim ultimately made it back to Frank and Heather was informed that all her husband remembered was Frank pushing him and Heather didn't believe that there was anyone else working in that particular section of the plant. When asked about cameras, Heather informed that there weren't any cameras in that particular portion of the plant. Heather said that when they came and got her, her husband was on the floor and there was a hammer next to him. She described the hammer as a rubber mallet.

Heather further stated that either Frank or her husband, Nicolas, could have had a hammer. Heather said Frank was extremely hotheaded and that others that work at the plant are well aware of that fact. She further stated that usually her husband and Frank

1

Administrative Agency: Fort Morgan Police Dept.    Incident #:
201600002915    Case_Nr: 201600000179

Report No. 2  Entered: 02/11/2016 15:45  By Officer: 00000298 Steve
Vosburg

get along and described just selling Frank some furniture approximately a month ago. Heather identified her husband as Nicolas Donez, Jr., date of birth 02/02/64. Heather further stated that they are going through a transition there at work and everybody is really tense, getting their butts kicked. Heather Donez also informed us that she also worked at Leprino, but worked in a different department than her husband. She said they came and got her right after the incident happened. I asked what his title was out at the workplace and she said that he is a whey department foreman and today he was acting as a supervisor.

I asked if he had any medical conditions and she said that he had epilepsy, but he hasn't had a seizure in ten years. I asked her if Nick had told her anything about the incident or if he knew what happened. She told me that he said that they were arguing about Frank not getting help, that they didn't have any extra people, that all the people were busy, but that he would get to him whenever he could help him. That's when Frank got mad and shoved him. Heather said at the time that she got there, Nick didn't know anything, that he couldn't remember. I asked if she had any idea how long he was unconscious and she said no. She said that he was awake whenever she got there. She said Bob Davidson, who is the sanitation supervisor, was there with him. Heather said she thought that Bob had told her that he didn't know anything, that they had found him that way.

I asked Heather if there was any past history between Nicolas and Frank. She said Frank is extremely hotheaded and everybody knows it, but Frank and Nick were friends. She said that they had just sold Frank some curio cabinets and they delivered them to him and set them up and Frank loved them. This happened just last month. Heather said Frank is so hotheaded anything can set him off and he'll just start screaming, but he is a decent operator and everybody just kind of deals with him until now. Heather told me that the doctor felt that he was strangled as well or hit in the throat, one of the two. I asked Heather who the HR person was and she told me Risa, but that Julia Lambert is her supervisor.

Officer Brackett provided me with the full name of the Human Resources person. She was identified as Risa Esterly, date of birth 02/14/72. Heather said that Nicolas was having a little bit of trouble breathing and the doctor had ordered some additional tests. I requested and obtained a written release for medical records from Nicolas Donez. I spoke to Nick Donez and asked him if he recalled what may have happened. Nick spoke to me with some difficulty and it was apparent from his voice that he was having some trouble speaking. His voice was very high pitched and squeaky. He said that they were

2

ND Appx., p.369

**Administrative Agency: Fort Morgan Police Dept.    Incident #:**
**201600002915     Case_Nr: 201600000179**

**Report No. 2    Entered: 02/11/2016 15:45    By Officer: 00000298 Steve**
**Vosburg**

arguing and he remembered Frank pushing and when he pushed him, Nick pushed him back. He said he didn't remember anything after that. He confirmed for me that it was in the refinery room in the whey department at the Leprino cheese factory. I asked him if he recalled whether he may have had a hammer or Frank may have had a hammer. He said he actually pulled the hammer out of the separator tool box that they have and he pulled that out to use it, working on the clarifier. He had pulled that hammer out because he needed. He walked over to the control panel in the refinery room and that's when Frank approached him. He was upset because he wasn't getting any help in the refinery room.

Frank had asked Nick for some assistance earlier and Nick asked him what his problem was. Frank told him there was nothing, he was fine. Nick walked away, but when he came back, that's when Nick had grabbed the hammer out of the toolbox and he was standing there at the control panel. That's when Frank and Nick started arguing. I asked Nick if he remembered when he lost consciousness. He said no that he didn't. I asked him if he remembered if Frank had struck him in addition to pushing him and he said he didn't remember it. I asked if there were any other possible witnesses there and he said not that he recalled. I asked if he'd ever had any past history with this individual and he said arguments like this one time before. I asked if they became physical and he said no they never became physical, just arguments. I asked if he recalled whether any threats were made towards him and he said no. I asked him about the previous dealings that he'd had involving furniture with him and asked him if he knew where Frank lived. He said he couldn't think of the address right now, but confirmed that it is in Fort Morgan.

I asked Nick to identify the individual by name and he said Frank Levar. I asked him about how old he is and he said he thought he was in his 50's. I asked him if he had any visible injuries at this time that we needed to document. He said he had a lump on the back of his head. He said, "I'm not sure where he hit me, but my left cheek and upper lip are swollen" and he had some pain in his neck. I asked him about any scratches, bruising, black eyes, anything at all like that and I took pictures of his upper lip and left side of his face with and without a scale. I asked him if he had any idea what he may have hit his head on and he said no. I asked Nick when Frank pushed him if he lost his balance or fell backwards and he said no. I asked him if he knew how long that he had struggled with Frank and he said he remembered Frank pushing him and he pushed him back and that's all he could remember. I also had Nick open his eyes as wide as he could to be able to take a photograph of what appeared to be possible petechiae in the whites of his eyes. I asked Nick if he recalled any choking of any kind and he said no. I asked him

3

Administrative Agency: Fort Morgan Police Dept.   Incident #:
201600002915    Case_Nr: 201600000179

Report No. 2   Entered: 02/11/2016 15:45   By Officer: 00000298 Steve
Vosburg

---

if he had any trouble breathing as a result of this.  He said he did at first, but he didn't now.

I left a business card with Heather in case they needed to follow-up with me reference this case.  I will download photographs and audio files into the DIMS system under this case number.  I left a Serious Bodily Injury form with Dr. Elias Hernandez in reference to this case.  He told me that he was running some additional tests to determine the extent of damage.  He was concerned about a crushed thyroid artery and cartilage in his throat and larynx as well as a hematoma of his scalp.  Once he had those extra tests run, then he would make a determination on the serious bodily injury form.  I left my business card to be contacted when that decision was made.  At that time, Officer Brackett and I left the ER at the Colorado Plains Medical Center.  No further information at this time.  End of supplemental report.

298SV/sh
Approved  02/12/16 Detective Vosburg
Approved by Sergeant Loren Sharp on 02/16/16

4

**Administrative Agency: Fort Morgan Police Dept.     Incident #:**
**201600002915     Case_Nr: 201600000179**

**Report No. 3     Entered: 02/11/2016 16:26     By Officer: 00000298 Steve Vosburg**

Report #3

Supplemental Statement of Detective Steve Vosburg

In the State of Colorado, County of Morgan, City of Fort Morgan on 02/09/16 at approximately 2:19 p.m., Chief Sagel, Sergeant Sharp and I went to the Leprino cheese factory at 2400 East Beaver Avenue in Fort Morgan where we met with Risa Esterly, the Human Resources Manager. We were allowed to go into the plant. We dressed in protective gear and were taken back to the approximate location of where the assault took place. We were allowed to take some limited photographs. Some photographs were not allowed to be taken because of proprietary equipment in the processing area of the plant. We also inspected the male locker area where employees keep things like clothes and tools. Locker number 53 had been assigned to Frank Levar and it was empty. The photos we took will be downloaded into the DIMS system under this case number.

Following that, in the conference room in the presence of the Human Resources Manager Risa Esterly we then interviewed some employees that had contact with the individuals shortly before and after this incident occurred. The first person that we spoke to was James C. Wilkins, date of birth 06/26/70, who is the Senior Supervisor at Leprino. We recorded these interviews which will also be downloaded into the DIMS system under this case number.

Mr. Wilkins knew both Frank and Nicolas since the time they started working there at the plant and he has been at the plant for 24 years. I asked James if Frank had a reputation as being a hothead or would fly off the handle relatively easy and he said no more so than anyone else, that everybody has their bad days and get worked up. He said he didn't think that Frank was the type that would let anything like this happen. He does however like to voice his opinion, but no past known altercations with anyone that he was aware of. James said as far as he knew in the 24 years that he'd been there, there had been no previous problems with Frank during that time. We asked how long Frank had worked there and were told that it was approximately 16 years, hire date was 01/24/00. I asked James about the hammers that were in the toolboxes and he said rubber mallets were common tools that they used on the floor and either Frank or Nicolas would have access to those.

I asked James about whether Frank had a toolbox with him while he walked back out of the area where this occurred and he said yes they normally were kept in that area where they keep the other toolboxes. I asked if they were company tools or individual

**1**

**Administrative   Agency: Fort Morgan Police Dept.      Incident #:**
**201600002915      Case_Nr: 201600000179**

**Report No. 3   Entered: 02/11/2016 16:26   By Officer: 00000298 Steve**
**Vosburg**

---

tools and he said individual tools. I asked if Frank took his tools home with him today and was informed that he had and generally he does leave these tools on site. I clarified with James that Nick was conscious and sitting up when he went into the refinery room but that was with the help of Bob Davidson who was supporting him from behind. I asked if Bob had said anything to him when he arrived there and he said Bob called his attention to the lump on the back of his head and that they needed an ambulance. I asked where the lump was and how big it was. James said it was on the back left side of his head and he said it would be a little bit smaller than a pop can and it stuck out two and a half inches.

I asked if there was any place in that room that he felt could have produced that bump on his head. He said there were many areas in the room and he would just be speculating if he tried to establish that. I asked James when the last time he saw Frank was in relationship to this incident and he wanted to know what time the call came in. I told him it came in at 1059 hours for the medical assist and he said it was probably 7:00 or 8:00 a.m. on this morning was the last time that he recalled seeing Frank. I asked about Nick and he said probably around the same time frame, but he had later talked to Nick on the radio. James said that there were five possible operators that worked in that area around where this incident happened, but they work in other specific areas as well. I asked James if he was aware of any argument between Frank and Nick and he said no. He said most of his involvement was just after it happened.

We next talked to Charles Fisher, date of birth 09/23/57, who is a Separator/UF Operator at the plant. Charles said that Frank came into the control room where he was working and said, "Get a hold of Jim Wilkins. Tell him that I knocked out Nick, that he's laying on the refinery room floor. I got my toolbox and I'm going home." Charles said that he was shocked that he tried to get a hold of Jim on the radio and he couldn't get a hold of him. He walked out of the control room and looked at another co-worker. They went back to the refinery room and Nick was lying on the floor. The other co-worker was identified as Jonathan Prell. Jon stayed with Nick and Charles went looking for Jim. Sharp asked Charles when he saw Nick how was he and he said, "Lying on the floor on his back by himself with no one else in the room" and he described the area where Nick was found based on cell phone photos that were taken during an inspection of the area.

I asked Charles if he saw any visible injuries on Nick and he said it looked like there was a blue mark on his face on the left side somewhere around the cheekbone area. I asked if he heard Nick say anything and he said, "You can't hear nothing down there." I asked Charles if he noticed any tools around when he walked into the room where Nick

**2**

Administrative  Agency: Fort Morgan Police Dept.     Incident #:
201600002915     Case_Nr: 201600000179

Report No.  3    Entered: 02/11/2016 16:26    By Officer: 00000298 Steve
Vosburg

was at and he said he thought that there was a hammer lying there.  He said that he
thought Nick was working on a clarifier and they were getting ready to beat off a ring to
disassemble it somewhat like a sledgehammer.  Charles said that he'd worked at the plant
for almost 21 years and had worked with both Frank and Nick for a long time.  When
asked if he was aware of any problems between the two and he said, "On a daily basis"
and he was not aware of any problems with them more than anyone else in the plant.
Charles said that he'd had problems with Nick himself.  Charles said a few years ago that
Nick got into his face and he reported it to HR at the time that he didn't think it was
appropriate for a foreman to do that.  Nothing physical, but Charles just thought Nick
tried to intimidate him.  Charles said, "You almost have to work here to understand
what's going on.  Sometimes the equipment can be very finicky and Frank gets very
frustrated because of that.  He likes his equipment to work or run and when he turns in a
work order to get something done, he likes to get it fixed and sometimes it's delayed in
getting fixed."

Sharp asked him how he knew that Frank gets frustrated, to describe what he does
that indicates that he's frustrated.  Charles said that he "drops the F-bomb a lot" and it's
kind of a joke in their department.  Charles did say that Nick has authority over Frank.
Charles said that he's an operator like Frank and Charles said that their supervisor was
off today and that Nick was filling in as the supervisor in kind of a foreman/supervisor
role and their lead supervisor was over there in the cheese department helping them with
a problem on a different radio frequency and that was Jim Wilkins.

Risa provided us with  a written statement from Charles Fisher, a written
statement from Frank Levar and a written statement from Robert Davidson.  Those
statements will become part of this case file.  We next interviewed Jonathan David Prell,
date of birth 03/30/71, who is a relief operator at the plant.  Jonathan told us that he
arrived right after Bob Davidson in the refinery room.  I asked him to tell me what he saw
when he walked in.  He said he couldn't tell whether Nick was conscious or unconscious
and he was just lying on the floor all sprawled out.  He said he didn't know whether he
had just woken up or what.  He said that his eyes were open and that Bob started talking
to him and was assisting him to sit up.  Jonathan was trying to contact people in HR and
in the meantime somebody had gotten a hold of them and they came down.  I asked if he
noticed any injuries on Nick.  He said it looked like he might have been a little bit
swollen and maybe bleeding a little bit on the left side of his face.  He said maybe
coming from his nose or his lip.  He couldn't tell.  He said where Nick had landed there
was water spraying from up above, but Nick did have some blood on his face.

3

**Administrative   Agency: Fort Morgan Police Dept.      Incident #:**
**201600002915      Case_Nr: 201600000179**

**Report No.  3    Entered: 02/11/2016 16:26    By Officer: 00000298  Steve Vosburg**

I asked if he was aware of any knots on his head and he said no, that he wasn't. I asked if there anything in close proximity to where he fell that he might have hit his head on. He said he could have hit his head on something, but it looked more to him that he might have fallen directly to the floor. He was shown photographs taken on the cell phone and indicated the approximate location of where he found Nick lying on the floor. I asked Jonathan if he noticed any tools in the room and he said he didn't know where it went because he was working with Nick when he got called back there. He said they were working on a clarifier, him and Nick, when Frank had called and Nick had a ratchet and a hammer with him at that time. He described the hammer as a dead blow mallet and he said he didn't know where that went. He said it was orange in color and a dead blow hammer, it doesn't recoil when you strike something with it. He said kind of like a rubber mallet, but plastic coated. I asked if Nick said anything in his presence and he said, "No, Bob was asking him what happened and Nick kept saying that he didn't know and you could tell that Nick was not really sure of anything at that point."

I asked if he had any trouble speaking and Jon said yes that he did. I asked him to describe that for me and he said he sounded like somebody with a really sore throat, like he was more whispering, like he was trying to talk but it was really hard for him. I asked if he noticed anything unusual about his eyes and he said no, not right away. I asked if he was aware of any problems between Nick and Frank. He said earlier in the day Frank was upset. He was in the bagging room giving the bagger a break and he heard Frank on the radio call Nick out to help him because he has to go out there to get a sample and he knew where Nick was. Frank was complaining, but not at Nick. Just complaining about the equipment, cussing and dropping the F-bomb on it and all upset. He went in about a half an hour later to see if Frank needed a break and Frank mentioned about "this place is really pissing him off." Then after that he didn't see or hear any specifics about anything and Frank didn't sound mad when he called Nick on the radio. Jonathan thought that he'd called him twice on the radio and Jon said that "Nick is our foreman" and it's common for anybody if they need help to call the foreman.

Charles had contacted Jonathan and told him that Frank had just come through the control room and advised that he had knocked Nick out and he was taking his toolbox and going home and Jon went back to the refinery room to see what was going on. We asked Jon if he was aware of any problems in the past between Nick and Frank and he said that Frank has problems with almost everybody. We asked if he had a reputation around the plant as being a hothead and he said yes. When asked to describe what that meant to him then he said, "He just gets very mad" but he's never seen him violent. He gets mad and cusses and is irate over stuff. Jon said he's actually had altercations with

4

Administrative   Agency: Fort Morgan Police Dept.    Incident #:
201600002915      Case_Nr: 201600000179

Report No. 3   Entered: 02/11/2016 16:26   By Officer: 00000298 Steve
Vosburg

---

him before where he's had to go to a supervisor and break them up because it was getting pretty heated. I asked if anyone mentioned in any detail about how Frank knocked Nick out or explained it in more detail in any fashion and he said no. All he'd heard from that was the secondhand information from Charles.

After concluding the interview with Jonathan Prell we were informed that Robert Davidson had left for the day and that we would have to set up an interview time to speak to him on the following day. After the interviews, we were informed by Risa Esterly that Jim had mentioned that there was a section in the refinery room where we took photos stating that there was a bent piece of metal in the room that wasn't previously that way. We requested from Risa to have her send a copy of a cropped photo that she took that could show the bent piece of metal. She said that after she was able to check with her corporate office, then she would try to comply with that request. Risa went on to say that when Frank came up and wrote out his statement for her that he had never mentioned the hammer or the choking or anything, but he was grabbing his hands when they were talking. She said she didn't know whether it was just a nervous thing or what, but she didn't notice any redness or anything, but Frank did state in his written statement that he had pushed Nick with his hands the first time when Nick got into his face and he demonstrated that with Julia, how close he was and he said, "Back up." Frank said that Nick went towards his chest with both hands and one of his hands slid up and mioved Franks personal glasses. Frank's glasses were bent but Risa did not see any visual marks on Frank's face. Frank said that's when he "clocked" him.

We confirmed through the picture what we were specifically talking about, what was bent in the refinery room. Risa indicated that it was the tray and Sergeant Sharp asked Risa to save that photograph in case there was any inquiry from the court and she said she was fully aware. She'd been to court multiple times. No further information at this time. End of supplemental report.

298SV/sh
Approved  02/12/16 Detective Vosburg
Approved by Sergeant Loren Sharp on 02/16/16

5

**Administrative   Agency: Fort Morgan Police Dept.     Incident #:**
**201600002915     Case_Nr: 201600000179**

**Report No. 4   Entered: 02/12/2016 08:28   By Officer: 00000298 Steve**
**Vosburg**

---

Report #4

Supplemental Statement of Detective Steve Vosburg

In the State of Colorado, County of Morgan, City of Fort Morgan on 02/10/16 at approximately 11:04 a.m., I once again went to the Leprino cheese factory at 2400 East Beaver Avenue in Fort Morgan, CO where I went to Risa Esterly's office and conducted some follow-up interviews with some additional employees at Leprino.

I started with Robert A. Davidson, date of birth 07/30/52, who is the Sanitation Supervisor for Leprino. Mr. Davidson said that he was walking through the plant in the Whey Department and saw Frank. He waved at him and he heard Frank say something, but he didn't catch what it was right away. All he heard from the comment was "Supervisor's unconscious on the floor." Then Robert asked "What," but Frank kept going so Robert took off and passed three operators just outside of the control room, Charles, Jon and Tim. They asked what was going on. He said when he entered the refinery room Nick was on the floor unconscious. Robert said as he approached him, he noticed that Nick was starting to come to. He said based on his experience as a previous EMT, he was going to try to keep Nick on the floor and it didn't work well, stating that Nick was rather resistant. He said that Nick was wet and cold when he was coming out of unconsciousness. He said that's not an uncommon event and he said Nick had definitely been unconscious. His eyes were extremely dilated and he wasn't aware of what was going on around him. To one of the guys following Robert in, Robert told him to get an ambulance and to get Jim Wilkins and get Troy Gettman who is a paramedic or EMT that also works at Leprino.

Robert said he stayed there with Nick and his wife showed up. They thought that they could keep Nick calm at that location, but he was still quite disoriented and was not aware of his surroundings. Robert stated that it was necessary to have to try to move Nick a little bit because of one of the pieces of machinery that he was next to was starting to begin the cleaning process and to expel contents on the floor. It looked like Nick had been hit with something in the fact and when Nick put his head against his wife's chest then Robert noticed a large lump on the back of his head. His tools were scattered on the floor and Robert said he just waited for people to show up. I asked if he recalled when he saw Frank if Frank had his toolbox or was carrying some tools in a box with him. He said he didn't recollect that. I asked him when he first found Nick if he was still lying down or if he was trying to get up and he said no that he was lying supine on the floor unconscious and as he was approaching, Nick started to blink.

1

LEP0228

**Administrative   Agency: Fort Morgan Police Dept.     Incident #:**
**201600002915       Case_Nr: 201600000179**

**Report No.  4   Entered:  02/12/2016 08:28   By Officer:  00000298  Steve**
**Vosburg**

I said, "According to your statement, you mentioned that Frank had no glasses on and he was very agitated" and Robert said he wears glasses. I confirmed that they were vision glasses and not safety goggles. He said Frank was in a state of high anxiety. I asked him if he saw any torn clothing, any blood or any marks on him and he said no, that he only literally saw him somewhere between three to five seconds and he kept walking away and Robert kept walking towards the refinery room. Robert said as they were waiting he kept asking Nick if he knew what was going on and Nick said no. He was having a hard time maintaining his balance sitting up. I asked him in reference to his statement where he mentioned something about Nick may have had a concussion. I asked him how he knew that and he said, "By his eyes." Based upon his experience and the type of injury that he had and his facial expressions and the fact he was lying on the floor and being unstable. I asked what he recalled about Nick's facial features. He said that there was swelling on the left side of the lip and petechia of the little vessels that pop through. I asked if he noticed any petechia in the eyes and he said no that he wasn't trying to assess him. He said it's been a long time since he held those certificates, but he knew he had to keep him calm and keep him down. I asked if he noticed any injuries around Nick's neck at all and he said no, that he did not. I asked if he complained about any injuries around his neck and he said no. I asked if he had any trouble talking or breathing and he said he didn't know whether he spoke or not. Most of the time he just moved his head.

I asked if he knew anything about Frank having any history of being a hothead or any reputation or anything around the company. Robert said that Frank was very "passionate" about his work. As far as any problems would go, then Frank wanted there to be an immediate resolution to whatever problems were currently bothering him. I asked him if he was aware of any problems between Nick and Frank. He said actually looking back; he was unaware of it if there was. He never saw anything of that type of an interchange. I asked Robert how Frank was dressed as he was leaving. He said he was in uniform and he looked normal.

I next spoke to Timothy Martin, date of birth 02/03/77, who is a relief operator at the plant. I asked him what he could tell me about this incident and he said that Jon, Charles and he had been working on one of the clarifiers in the control room and he heard Frank call over the radio that he was having trouble with one of his pieces of equipment and Nick helped them for a couple more minutes and then "just disappeared" and went to help Frank. A few minutes went by and all of a sudden he saw Frank coming by the control room and he was walking in a hurry carrying his personal toolbox. He came into

**2**

**Administrative Agency: Fort Morgan Police Dept. Incident #:**
**201600002915 Case_Nr: 201600000179**

**Report No. 4 Entered: 02/12/2016 08:28 By Officer: 00000298 Steve Vosburg**

---

the control room and said something to Charles and then took off. He didn't quite hear what was said. Something about Nick was unconscious or Nick was knocked out or something like that so all three of them went over by the refinery room. Tim saw Nick lying down. Bob showed up and Tim and Jon were trying to figure out how to get a hold of somebody. After he had taken lunch, then he asked Charles what Frank had said to him. Charles said Frank told him to tell Jim that he had knocked Nick out and then took off.

Tim said he tried to do damage control on the equipment that Frank was running and shut it down. I asked Tim to describe for me how Frank was walking indicating that he was agitated and he said based on the way that he was walking, that he was almost at a slant he was walking so fast. Power walking and holding his toolbox like "don't get in my way or I'll run you over." He was "one grouchy dude." I asked if he had some sort of a reputation around the plant to that effect and he said that he did. I asked him what he knew about that and he said, "Not a lot, mainly that he was just grumpy." I asked if he knew him ever to have any arguments or disagreements with anybody out at the plant there and he said not really, that he's only been here about two years. Tim did tell me that there was a hammer lying next to Nick on the floor. I asked him to describe it and he said it was just a plastic mallet that they use.

Following the interview with Timothy Martin, I also stopped by the Colorado Plains Medical Center in Fort Morgan and took along the Authorization for Disclosure of Protected Health Information signed release form and requested a copy of Nicolas Donez Jr.'s medical records; however, I was informed by the records department that those records were incomplete at this time. He was still in the hospital in the ICU unit and those records would not be available until later. I did request that they check his chart to see if the doctor had actually signed a Serious Bodily Injury form. They went to the ICU unit and retrieved a copy of the physician's statement on a Serious Bodily Injury form where there was a check box for "a substantial risk of death" that had been checked on that box and signed by Dr. Elias Hernandez along with some notes in there to please describe the injuries and reasons for the above opinion. It states, "Fracture to the left thyroid cartilage and some other type of cartilage along the thyroid gland in the larynx and a scalp hematoma."

The complete medical record from Colorado Plains Medical Center will be obtained when they are available and they will become part of this case file. No further information at this time. End of supplemental report.

3

Administrative   Agency: Fort Morgan Police Dept.     Incident #:
201600002915       Case_Nr: 201600000179

**Report No.  4   Entered: 02/12/2016 08:28   By Officer:  00000298  Steve
Vosburg**

298SV/sh
Approved  02/12/16 Detective Vosburg
Approved by Sergeant Loren Sharp on 02/16/16

**4**

Administrative Agency: Fort Morgan Police Dept.     Incident #:
201600002915     Case_Nr: 201600000179

Report No. 5   Entered: 02/12/2016 09:10   By Officer: 00000298 Steve Vosburg

Report #5

Supplemental Statement of Detective Steve Vosburg

In the State of Colorado, County of Morgan, City of Fort Morgan on 02/10/16 at approximately 1310 hours, I went to a location of 616 West 6th Avenue in Fort Morgan, CO to contact Frank Levar. I told him that I understood that there was a little disagreement between him and a guy by the name of Nick Donez out at Leprino and he said yes. He said, "Dude, I can take somebody's mouth, but when he punched me with a hammer punch." Frank said what started it was everything started going bad on lactose and it kept diverting and he was running back and forth. Frank said he called him and Nick came in there. Frank asked if he could send Tim, or another worker, over and Nick said, "Tim's busy right now. What do you need?" Frank said, "That's alright, never mind." Frank was running back and forth trying to figure out what was going wrong with the lactose and Nick came back in there and he was standing there. Frank said, "I don't know if you went in that room or not." I told him I did and Frank said that there was a panel view right there and Frank said he was trying to figure out what was going on. He was turning them on and shutting them off. One time he had too many solids in it and Frank said he opened up his mouth and he said, "If I would have just shut my mouth none of this would have happened."

Frank said, "I don't have a problem telling people what's on my mind." Frank said he made the comment he really didn't appreciate it. Every time something's wrong with lactose over here everybody is too busy to come and help, but if there's problems up there on that end, you guys have got six guys up there working on it. Nick jumped up in my face and got in my face and he started screaming "Well it ain't gonna do any good to sit and cry about it." He was screaming at me "it ain't gonna do no good to sit and cry and whine about it." Frank said he told Nick that he better get out of my face. I know it ain't gonna do any good to whine and cry, but you better get out of my face. Nick said, "Frank why don't you make me get out of your face." He said, "The only thing I did was I reached up and placed my hand on his chest and pushed him back like that and I kind of stepped back a little bit at the same time and then Nick went like that, he doubled up and came at me. Nick went boom and he hammer chested me with both fists right in the chest and when he did that, I lost it. I popped him in the mouth and I had a right hook to the left side of his face." Frank said he was expecting a good old fight, but he'd just had enough.

1

**Administrative Agency: Fort Morgan Police Dept. Incident #: 201600002915 Case_Nr: 201600000179**

**Report No. 5 Entered: 02/12/2016 09:10 By Officer: 00000298 Steve Vosburg**

---

Frank said he knew at that point he had lost his job and Nick folded right there. He went down kind of in a circular motion, he went down and landed on the ground on his back. Frank said at first he didn't believe it and he said, "Honestly I didn't want to wake the guy up myself because he was going to come up swinging again." Frank went over the top of him and looked at him to make sure that he was breathing and it looked like he was breathing. Frank said he bent down and picked his glasses up off of the floor. They were all bent up and he got on the radio and started hollering for Jim Wilkins, but nobody would answer him. He went down into a control room. "This guy Charlie, a friend of mine, was the first one I seen" and he told Charlie, "Get on the radio and get somebody in the refinery room. I just knocked Nick's ass out in there. At that point in time I went into the lab and grabbed my toolbox and I started walking out and right there by the wall there was a sanitation supervisor named Bob Davidson and he was standing there and I said Bob you need to get somebody to the refinery room now. I just knocked Nick's ass out and Bob took off." Frank said he was expecting a lot of people to come escort him out of the building because usually that's what happens, "so I went up in the locker room and was sitting there on the bench, straightening out my glasses. I put my glasses on, cleaned out my locker and started to walk out the door" and he said, "You know what, I think I'm just going to go up and let the office know why I'm leaving. I went up in the double doors right there and Sheryl Groves was coming down from upstairs. I told Sheryl I guess you can consider this my exit interview. I'm going home." Sheryl asked what the matter was and he said, "I just knocked Nick's ass out in the refinery room." She said "Frank, I think you need to come upstairs."

He then went upstairs and laid his stuff up there. He talked to Julia Lambert and Risa Esterly. They asked him what happened and they had him fill out a statement. He just wrote out a brief statement of what happened. He started yelling and then we both started yelling, but when I told him to get out of my face, he said, "Frank out of my face" so I kind of moved him and stepped back too just to get some space in between us and when I did that, that's when all hell broke loose. It wasn't a very good day." At that point in time Frank demonstrated physically on me as to what he did. Frank said when Nick hit him in the chest, that's when one of Nick's hands slid up and hit his glasses and knocked them off. His glasses went to the ground. Frank said "If you dig deep in the records at work you'll find that Nick has a habit of getting in people's faces." Frank said he went to one of his supervisors four, five or six months ago because he got in another guy's face and that supervisor's name was Kenny Doogan.

Frank said he didn't feel like he should take the whole brunt of this whole situation. If they're going to fire people then we should both be fired. Frank said, "To

2

ND Appx., p.382

**Administrative   Agency: Fort Morgan Police Dept.    Incident #:**
**201600002915      Case_Nr: 201600000179**

**Report No. 5   Entered: 02/12/2016 09:10   By Officer: 00000298 Steve**
**Vosburg**

me, I was defending myself." He said he didn't think he should have to put up with it at work when somebody comes up and gets in your face. Frank said technically he was wrong, he realizes that because he put his hands on Nick first to get space between them and this had also happened with another foreman that no longer works there. This happened about a year ago and his name was Shane Tucker and he said we both kind of got into trouble on that deal and there happened to be a supervisor sitting right there when Frank got into that incident with Tucker and the supervisor didn't do his job and his name was Darron Weegan and he no longer works there.

I asked Frank when he hit Nick in the face if that was right handed and he said yes and his knuckle still kind of hurts. Frank then came around with another right hook and he said, "He just kind of wadded up and went down." I asked him after he had been hit two times if he, as he was falling, hit something on the way down and he said he didn't think so. It was kind of in slow motion. He said he didn't think he even hit the floor. He didn't go straight down and he rolled over and landed on his back. Frank thought maybe he was playing a trick on him, but he looked at him and he could tell that he was breathing and kind of stiffened up. His eyes were rolling around and that's when he started calling for Jim Wilkins on the radio and he grabbed his glasses off the floor. I asked if there was anything at all like a wrestling move or any contact between either one of them of any kind and he said no. I asked if there was any strangulation or choking by either one of them and he said no. When I told Frank that Nick had a bump on his head and that his throat was crushed, Frank seemed to be genuinely surprised and said "that he did not hit nothin." I asked Frank if either one of them had any weapons of any kind and he said no. Frank said he swears to me that he only hit him two times and he was pretty sure that he never hit him in the throat. It was on his side. I said he did have injuries consistent with what he had explained to me, but the only things that aren't explained are the knot on his head and the damage to his throat.

I asked Frank if he had his tools out of his toolbox and he said no, he had his tools in his toolbox except for a small crescent that he had in his back pocket and he didn't know what kind of tools that Nick had. He thought that he had a ratchet. Frank said when Nick hit him, he didn't have anything and Frank said he didn't have anything. I took a photograph of Frank's right hand, both with and without a scale and also a small mark that he had on his chest with and without a scale. I asked Frank if there were any other injuries that he wanted me to document and he said no. Frank said that the disagreement didn't even go on that long, that he was expecting to have a battle on his hands when he tagged him. I asked him to estimate for me time wise how long this entire

3

Administrative   Agency: Fort Morgan Police Dept.     Incident #:
201600002915     Case_Nr: 201600000179

Report No. 5   Entered: 02/12/2016 09:10   By Officer: 00000298 Steve
Vosburg

---

process took and he said beginning to end with the argument, probably two to two and a half minutes and the contact portion of it took between 30 and 45 seconds.

I asked Frank if he'd ever had any problems with him in the past and he said no. No further information at this time.  End of supplemental report.

298SV/sh
Approved 02/12/16 Detective Vosburg
Approved by Sergeant Loren Sharp on 02/16/16

4

**Administrative Agency: Fort Morgan Police Dept. Incident #: 201600002915 Case_Nr: 201600000179**

**Report No. 6 Entered: 02/17/2016 13:07 By Officer: 00000211 Loren Sharp**

---

Report #6

Supplemental Statement of Detective Sergeant Loren Sharp

On 02/09/16 I did assist Detective Vosburg in responding to the Leprino Foods plant in order to look at the crime scene and conduct interviews. See Detective Vosburg's report for the interviews.

When we were taken into the cheese plant I was allowed to bring a phone for the sole purpose of taking photographs. I was informed prior to taking the photographs that I was not allowed to take any photographs that may show something that would be proprietary for the company. I asked them to show me what may be proprietary as I would attempt to comply with that request.

We then went to the area where we were told the assault occurred. I took several photographs of the little room where this happened from the angles that I was allowed. There was one machine that they stated was proprietary that I was to avoid and I did not take pictures of that machine. I later provided these photographs to Detective Vosburg for the case file. It should be noted that when we went back upstairs, it was reported to us that where the proprietary machine was there was a shelf that had been bent and that they noticed. They did take a photograph of this area and showed us the bent shelf and indicated that they would crop out the proprietary piece and provide the photograph of the shelf. She also indicated that one of the employees was already down there trying to straighten the shelf as we were speaking.

That's all the information I have at this time. End of narrative.

211LS/sh
Approved by Sergeant Loren Sharp on 02/17/16

1

**From:** "Kelly Soja"
**Sent:** Mon, 22 Feb 2016 11:57:42 PM GMT
**To:** "Julia Lambert" <jlambert@leprinofoods.com>
**Subject:** Re: Turnover number at FTM

Cheerleading thing?

>>> Julia Lambert 2/22/2016 4:57 PM >>>
true, yes I will ask her to call her contact tomorrow if she is back
she is stuck in Houston right now

Julia Lambert, PHR, SHRM-CP
Human Resources Generalist
Fort Morgan Plant
970-542-4263 Desk Phone
970-380-9638 Cell
303-209-6149 Fax

If you are offered a seat on a rocket ship, don't ask which one, you just get on! -Sheryl Sandberg

Kelly J. Soja
Production Division Human Resources Manager
Leprino Foods - Denver
1830 West 38th Avenue
Denver, Colorado 80211
ksoja@leprinofoods.com
Cell: (303) 489-1987
Denver Office: (303) 264-5339

Click here to view our Employment Opportunities: www.DairyDreamJobs.com

Julia Lambert, PHR, SHRM-CP
Human Resources Generalist
Fort Morgan Plant
970-542-4263 Desk Phone
970-380-9638 Cell
303-209-6149 Fax

If you are offered a seat on a rocket ship, don't ask which one, you just get on! -Sheryl Sandberg



EXHIBIT
27
Schmidt CM
6-11-19
SUPERVISITECO.COM

CONFIDENTIAL LEP0939



>>> Julia Lambert 2/22/2016 2:45 PM >>>
yes we do, for our next hiring frenzy (which is starting now) we will be sharing attendance policy with them as
well as a mock schedule, hopefully that helps us some

Julia Lambert, PHR, SHRM-CP
Human Resources Generalist
Fort Morgan Plant
970-542-4263 Desk Phone
970-380-9638 Cell
303-209-6149 Fax

If you are offered a seat on a rocket ship, don't ask which one, you just get on! -Sheryl Sandberg

>>> Kelly Soja 2/22/2016 2:36 PM >>>
Ok good.

Do we let people see the job before they get hired into it?

>>> Julia Lambert 2/22/2016 1:01 PM >>>
Nothing from the floor on this. Mellisa started with us and then went out with hip nerve issues. She came back and
just decided she didn't want to work here anymore. The other guy Daniel, I visited with him and he was timid,
concerned he couldn't do the job. I talked to him again, paired him with a good trainer and he just decided to leave.
I was bummed about him. He was a good kid.

Yes, I am here next Thursday.

Julia Lambert, PHR, SHRM-CP
Human Resources Generalist
Fort Morgan Plant
970-542-4263 Desk Phone
970-380-9638 Cell
303-209-6149 Fax

If you are offered a seat on a rocket ship, don't ask which one, you just get on! -Sheryl Sandberg

>>> Kelly Soja 2/22/2016 12:53 PM >>>
I am concerned about the job abandonment....any word on the floor/vibes/anything on this?

Next week on Thursday when I'm in FTM, I'd like you and I go to on the floor and spend some time in Bulk Pack.
Will you be there on Thursday next week?

>>> Julia Lambert 2/22/2016 10:28 AM >>>

CONFIDENTIAL LEP0940

okay sorry I thought we had another, we are at 30.7%
we had a gal leave Friday but it was 1 year and 2 days so she just made it

| | Hire Date | Term Date | Dept/Position | Reason |
|---|---|---|---|---|
| Ken Webb | 6/2/14 | 11/12/15 | Cheese-Clean up | Attendance |
| Loretta Pena | 12/1/14 | 11/12/15 | Proc-Gen Lab | LOA Exhausted |
| Mellisa Rodriguez | 6/22/15 | 12/09/15 | Proc-Gen Lab | No Return Job Abandonment |
| Daniel Zavala | 1/11/16 | 1/22/16 | Proc-Gen Lab | No Return Job Abandonment |

Julia Lambert, PHR, SHRM-CP
Human Resources Generalist
Fort Morgan Plant
970-542-4263 Desk Phone
970-380-9638 Cell
303-209-6149 Fax

If you are offered a seat on a rocket ship, don't ask which one, you just get on! -Sheryl Sandberg

>>> Kelly Soja 2/22/2016 10:19 AM >>>
We went up from end of FY15....

I'd like a breakdown on this as to who left, how long were they with us, what department, reason for leaving.
Yikes....

>>> Julia Lambert 2/22/2016 10:17 AM >>>
oh boy....first year we are at 38%

Julia Lambert, PHR, SHRM-CP
Human Resources Generalist
Fort Morgan Plant
970-542-4263 Desk Phone
970-380-9638 Cell
303-209-6149 Fax

If you are offered a seat on a rocket ship, don't ask which one, you just get on! -Sheryl Sandberg

>>> Kelly Soja 2/22/2016 10:08 AM >>>
I just joined it too....my exit interview with AJ ran long.

>>> Julia Lambert 2/22/2016 10:07 AM >>>
It will be a bit I'm on John's safety call

Julia Lambert, PHR, SHRM-CP
Human Resources Generalist
Fort Morgan Plant
970-542-4263 Desk Phone
970-380-9638 Cell
303-209-6149 Fax

If you are offered a seat on a rocket ship, don't ask which one, you just get on! -Sheryl Sandberg

>>> Kelly Soja 2/22/2016 10:04 AM >>>
No. I know it's higher than 3.5% and I am looking to see if FTM really needs to be a focus for future planning on the Corporate Retention Project.

It was around 30% for first year.

>>> Julia Lambert 2/22/2016 10:02 AM >>>
are you trying to be mean? let me check

Julia Lambert, PHR, SHRM-CP
Human Resources Generalist
Fort Morgan Plant
970-542-4263 Desk Phone
970-380-9638 Cell
303-209-6149 Fax

If you are offered a seat on a rocket ship, don't ask which one, you just get on! -Sheryl Sandberg

>>> Kelly Soja 2/22/2016 10:01 AM >>>
what about first year turnover?

>>> Julia Lambert 2/22/2016 9:44 AM >>>
3.5% total
1% for bulk packaging

We are doing well right now :)

Julia Lambert, PHR, SHRM-CP
Human Resources Generalist
Fort Morgan Plant
970-542-4263 Desk Phone
970-380-9638 Cell
303-209-6149 Fax

If you are offered a seat on a rocket ship, don't ask which one, you just get on! -Sheryl Sandberg

>>> Kelly Soja 2/22/2016 8:34 AM >>>
Would you be able to pull an up to date turnover number for me for FTM - plant wide and also just Bulk Packaging.

Thank you!
Kelly

CONFIDENTIAL LEP0942

**From:** "Sheryl Groves"
**Sent:** Thu, 26 Feb 2015 10:24:28 PM GMT
**To:** "Kenny Duggan" <kduggan@leprinofoods.com>
**Cc:** "Julia Lambert" <jlambert@leprinofoods.com>;"Mike Buckhout"
<mbuckhout@leprinofoods.com>
**Subject:** Re: Go the Extra Mile award (Archived)


Click here to open full message
**Message Summary:**

I have it done. I just need approvals and signatures.


Sheryl Groves
HR Assistant
Phone (970) 542-4202
Fax (303) 729-0748
>>> Kenny Duggan 2/26/2015 2:22 PM >>>
I would like to offer Nick Donez this award.
Nick is tireless in working for LFC. He was worked a lot of overtime over the years and specifically in the last 2
months since Aimee Holt left the company.
He not only works his shift, but has been picking up most of the shift vacated. Nick is always busy and is an
inspiration to others about hard work.

Kenny Duggan





# EMPLOYEE HANDBOOK



## FORT MORGAN FACILITY
### 2400 East Beaver Ave.
### Fort Morgan, Co 80701



ND Appx., p.391

# Table of Contents

PURPOSE .................................................. 4

VISION, MISSION STATEMENT & LEPRINO CORE VALUES .................................. 5

I: COMMUNICATIONS ............................................... 6-7

  A. Group Meetings .......................................... 6

  B. Written Communications ..................................... 7

  C. Open Door Philosophy ....................................... 7

II: WORK PLACE SAFETY ........................................... 8-9

  A. Personal Protective Equipment (PPE) ............................ 8

  B. Reporting Work Related Injuries & Illnesses ...................... 9

III: HOURS OF WORK/OPERATIONS ................................ 10-14

  A. Work Week ............................................. 10

  B. Schedules ............................................. 10

  C. Overtime ........................................... 10-11

  D. Meals & Rest Break Policy ................................. 12

  E. Timekeeping Policy ...................................... 12

  F. Delays in Operation ...................................... 13

  G. Exchanging Shifts ....................................... 13

  H. Mandatory Scheduled Meetings & Training ..................... 13

  I. Payday & Paychecks ...................................... 14

IV: BENEFITS ................................................. 15-19

  A. Hourly Employee Incentive Plan ............................. 15

  B. Vacations ........................................... 15-17

    Scheduling ........................................... 16

    Responsibilities ....................................... 17

  C. Holidays ............................................. 18

LEP0061

D. Paid Sick Time ..................................................................................................18

E. Leave of Absence (LOA) ..................................................................................19

F. Employee Awards ..............................................................................................19


**V: FACILITY AND LFC PROPERTY USAGE** ..........................................20-24

A. Uniforms ............................................................................................................20

B. Lockers ........................................................................................................20-21

C. Tools and Allowances ......................................................................................21

D. Parking and Speed Limits ..............................................................................21

E. Break Rooms ..............................................................................................21-22

F. Lactation Policy ................................................................................................22

G. Personnel Records ..........................................................................................22

H. Plant Security ............................................................................................22-23

Employee Badges ........................................................................................22-23

Visitors ................................................................................................................23

Inspections ........................................................................................................23

I. Lost & Found ......................................................................................................24

J. Telephone Calls ................................................................................................24

K. Cell Phones ......................................................................................................24

L. No Tobacco Policy ............................................................................................24

M. No Solicitation/Distribution Policy ..............................................................24


**VI: CAREER DEVELOPMENT & ADVANCEMENT** ..............................25-30

A. Tenure ................................................................................................................25

B. Job Posting, Applying and Interview Procedures ......................................25

Eligibility ....................................................................................................25-26

Applying ............................................................................................................26

Interviewing ......................................................................................................27

Panel Interview ................................................................................................27

Accepting the Position ..............................................................................27-28

Roles and Responsibilities ............................................................................28

LEP0062

C. Foreperson Positions ................................................................................29

D. Temporary Position................................................................................29

E. Job Elimination & Reduction in Force ....................................................29-30


**VII: WHAT IS EXPECTED OF YOU** ..................................................31-33

Required Conduct ....................................................................................31-32

Prohibited Conduct ..................................................................................32-33


**VIII: DISCIPLINARY GUIDELINES**................................................................33


**IX: ATTENDANCE POLICY**................................................................34-37

A. Introduction ..........................................................................................34

B. Definitions ..........................................................................................35-36

C. Points ..................................................................................................36

D. Responsibilities ..................................................................................36-37

E. New Hires ..............................................................................................37

F. Acknowledgement of Receipt ..................................................................38

LEP0063

# LEPRINO FOODS COMPANY

## EMPLOYEE GUIDEBOOK – FORT MORGAN (FTM) FACILITY

*Updated August 2, 2015*

## PURPOSE

Welcome to the Leprino Foods Fort Morgan (FTM) Team. This Employee Handbook is designed to give you a general understanding of plant policies, procedures, and programs. This Handbook is designed to be used in conjunction with the Leprino Foods Employee Handbook and applicable Leprino Foods policies. We want you to be an informed employee so that you can properly use and profit from the considerable investment Leprino Foods has made in these plans and programs. Your immediate Supervisor or Human Resources Representative will be happy to answer any questions not specifically covered in this Guidebook.

For detailed information about your benefit plans, please refer to the appropriate Summary Plan Descriptions (SPD). If you have any questions not answered by these materials, please contact your local Human Resource Representative.

This Handbook is intended to provide you with general information and is not intended to create any contractual rights or obligations. Leprino Foods Company reserves the rights to modify, supplement, or rescind any policy, procedure, or guideline outlined in this Handbook at any time, without notice, as it deems appropriate.

LEP0064

**VISION:**        To be the World's Best Dairy Food and Ingredient Company.

**MISSION:**      We make every customer feel like our only customer, through
Quality, Service, Competitive Price and Ethics.

## LEPRINO CORE VALUES

At Leprino Foods we dedicate ourselves to providing outstanding value to customers through our uncompromising commitment to our Core Values. Our Core Values are the guiding principles we follow in order to continuously improve the health and longevity of our company and our customers.

**QUALITY**: We win by making better products. Ones with exceptional composition and performance that are produced with exemplary safety standards. Our products do precisely what they are supposed to do. If it's worth doing, it's worth doing right.

**SERVICE:** We treat every customer like they are our only customer. We pay special attention to small details that matter. When our customers need help, we are shockingly responsive problem solvers.

**COMPETITIVE PRICE:** We provide the best combination of performance and value. Customers get more for their money with Leprino Foods. We run efficient operations so we can always be competitively priced.

**ETHICS:** We strive to do the right thing all the time. We are principled and fair in all of our dealings. We take personal responsibility to do our very best. Promises made are promises kept.

LEP0065

## SECTION I:
## COMMUNICATIONS

At Leprino Foods we believe in open communication. An active and open two-way communications process is vital to a harmonious work environment and a successful plant.

The informal communication process is an active day-in and day-out activity. Your Supervisor will meet with you and your other team members, individually as well as in a group setting. Supervisors will also hold departmental meetings. In addition to a general exchange of information and ideas, these meetings are designed with ample opportunity for you and others in your department to make suggestions, offer constructive feedback, and ask pertinent questions.

In addition, a regular formal schedule of meetings has been established to complement the regular daily communications that routinely occur between you and your Supervisor. The purpose of these formal meetings is to freely discuss matters of concern to both you and the Company. In addition, these meetings will help keep you informed about the operation of Fort Morgan (FTM) and the Company.

You are encouraged to express your thoughts and ideas. Listed below are the types of meetings we hold on a regular basis:

**A.** <u>Group Meetings</u>

- **Pre-Shift Meetings:**

  o A brief fifteen-minute meeting held prior to the start of your shift. This meeting provides you with the opportunity to be informed of daily Plant operations. Pre-shift meetings will start at 5 minutes after the start of your scheduled shift. Prompt attendance is requested.

- **All Plant Meetings:**

  o The Plant Manager will conduct an Annual meeting to review plant metrics and standings. Plant updates and company information will be provided. To review the Plant's performance during the past year. Goals, objectives and information about the upcoming period are also covered. This meeting is mandatory for all scheduled employees. A Q&A session will occur at the end of each meeting.

LEP0066

- **Listening Meetings /Quarterly Review Meetings:**

    o These are conducted each quarter by the Plant Manager or Human Resources. These meetings are attended by employees selected from each of the various departments by the department manager. Advisory members are expected to attend the meetings and provide representative comments and suggestions. If you are interested in participating, let your Supervisor know. A Q&A session will occur at the end of each meeting.

## B.   Written Communications

- **LeprinoNET** – The Company Intranet.
- **Partners in Progress** – News from Leprino Foods on a bi-monthly basis.
- **Mailings** – Business and benefit related information mailed to your home.
- **Communication/Bulletin boards** – Communication bulletin boards are maintained in each area of our facility for job related information and electronic message boards are in break rooms to provide news of special interest to all employees. To keep "in the know" on our activities, it is a good idea to get in the habit of looking at the nearest communication bulletin board at least once a day. Management must approve all communications before being posted.

## C.   Open Door Philosophy

Open and honest communication is essential to ensuring the standards set by the Leprino Foods Vision. You are encouraged to discuss concerns, suggestions, questions, or ideas with your immediate Supervisor. However, if you feel that you cannot discuss something with your immediate Supervisor, you are encouraged to talk with the next level of the leadership team or the Human Resources Department to discuss resolutions to your concerns or to get answers to your questions.

LEP0067

Leprino Foods is committed to a safe, injury free and secure work environment. All of us at Fort Morgan are responsible for our own safety and ensuring the safety of our co-workers, visitors, and others who are doing business with the Company.

You, as well as all members of the Fort Morgan Team, are expected to:

- Wear the required personal protective equipment (PPE) and ensure your coworkers and visitors are wearing required PPE; and
- Actively participate in behavioral safety activities; and
- Continuously check your work area and other areas you visit (e.g. break rooms, hallways, parking lots, etc.) for unsafe conditions, and immediately correct any unsafe condition(s) or notify your Supervisor of the unsafe condition(s), as applicable; and
- Seek opportunities to continuously improve safety procedures, processes, behaviors; and
- Follow all Company procedures and federal/state/local safety & environmental regulations.

**A.** **Personal Protective Equipment (PPE)**

Leprino Foods supplies you with personal protective equipment (PPE), which will enable you to perform your job duties safely. Examples of these include, but are not limited to, safety glasses, safety shoes, goggles, facemask, hearing protection, dust masks, gloves and aprons. You will receive training regarding job-specific PPE and are expected to wear the appropriate PPE to protect you from potential hazards.

<u>Safety Shoes</u> - *Employees without safety shoes will not be allowed to work.*

1. All employees are eligible to receive either:
   - Rubber safety boots as their jobs require (these may be received as needed from your Supervisor; you must exchange your worn rubber safety boots for a new pair); or
   - Employees are eligible for an annual reimbursement up to $75.00 for leather safety shoes.
   - All "Shoes for Crews" shoes/boots are covered with a 60 day warranty. Employees are responsible for returning all shoes/boots to their supervisor or safety supervisor for replacements.
   - It is the responsibility of the employee to notify their supervisor of needing a new pair before a new pair is obtained.

2. All safety shoes must be purchased from selected vendors. Under special circumstances shoes can be purchased from other vendors however they must

meet the approval of the safety Supervisor and the employees' immediate Supervisor.

3. All shoes must meet ANSI #241PT91 standards and have: (i) Steel toe; (ii) ¼ inch tread; (iii) smooth toe; (iv) no suede; and (v) slip-resistance (with a co-efficient of friction of .45).

**B.** **Reporting Work Related Injuries & Illnesses**

All injuries are required to be **immediately reported** to your Supervisor or Manager. Do not withhold injury information because you do not think the injury is severe enough to warrant attention. **All injuries are to be reported**. You should not seek outside medical attention for an injury before it has been reported to management. Your Supervisor will ensure that you get prompt medical attention and that the appropriate incident reports and workers' compensation insurance forms are completed. This is a requirement to ensure that you receive the appropriate medical attention and to prevent a possible reoccurrence of a similar injury to yourself or a co-worker.

Following an injury you will be asked to participate in an injury investigation designed to address any circumstances that may have contributed to your injury; and help determine how we can prevent another similar injury from occurring in the future.

LEP0069

Fort Morgan operates **24-hours a day, 7-days a week, 365-days a year**. The nature of our business and the raw ingredients we use, dictate that we operate the facility on **weekends** and **holidays**. This aspect of our business means that your work schedule may vary, depending on the needs of your department.

A. **Work Week**
The "regular work week" begins Sunday and ends Saturday. For those employees starting work on or before 11:59 p.m. on a Saturday, all worked hours will be counted as Saturday hours.

B. **Schedules**

Employees are responsible to know their work schedule.
Every effort will be made to post work schedules for the upcoming week in the designated areas by 1:00 p.m. on Friday. Starting times are the times employees are to be at their assigned work stations (or pre-shift meeting) and ready to go to work. See your Supervisor for any specific direction on starting time and location. Employees who are not at work when the schedule is posted are responsible to get their schedule. Supervisors will not call employees to communicate a regularly posted schedule.

Schedules can change with minimal notice. Supervisors will make every effort to notify employees of any major schedule change but employees are encouraged to check the schedule every day at the end of their shift.

C. **Overtime (OT)**

Overtime will be paid as follows:
- At one (1) and one-half (1/2) times your regular hourly rate of pay for all hours worked in excess of 40 hours in the workweek.
- Additional wage and hour guidelines can be found on labor posters throughout the facility. Your Supervisor or HR can direct you to posting locations.

Overtime needs that are anticipated during upcoming weeks are normally scheduled in advance, but there are times when overtime cannot be planned in advance. Below are some options your Supervisor may use:

## Voluntary Overtime Sign-Up List Option:

If your Department utilizes a voluntary overtime sign-up list, overtime requirements for a shift vacancy will be filled as follows:

- If time permits, the most qualified employee in the department will be called in who has signed a voluntary overtime list; or

- Retain for an additional four (4) hours, the employee performing the job where the overtime is to occur and call in the next scheduled employee four hours early.

## No Voluntary OT Sign-Up List:

If your Department does not utilize a list, overtime requirements for a shift vacancy will be filled as follows:

- If time permits, call in an unscheduled qualified employee; or

- Retain for an additional four (4) hours, the employee performing the job where the overtime is to occur and call in the next scheduled employee four hours early; or

- Management has the right to mandate overtime for any employee based on business needs.

  ✓ Employees may be assessed a 1 point if they refuse the mandated overtime.

\* See your Supervisor for specific details on how unplanned OT is handled in your department.

\* No employee should be working over 16 hours within a 24 hour period.

LEP0071

### D. Meal and Rest Break Policy

Regular scheduled shifts total eight and one half hours (8½) during which employees will be provided one (1) unpaid 30-minute duty-free meal break and two (2) paid 15-minute rest breaks. All employees must remain on facility property during their 15-minute paid rest breaks. See your department Supervisor regarding break and meal break coordination. You may contact your Supervisor, Manager or Human Resources Department regarding any questions you have regarding meal break requirements. Violations of the facility's meal and rest break policy will be subject to disciplinary action in accordance with the facility's disciplinary policy.

    1. Duty-free Meal Breaks: Employees are **required** to take a 30-minute unpaid duty-free meal break prior to the end of the 5th hour of work. During a meal break, employees are relieved of all duties. Employees are responsible for accurately punching in and out for their meal break. Employees who fail to correctly punch in or out for meal breaks may be subject to disciplinary action pursuant to the facility's performance disciplinary policy.

    2. Rest Breaks: Employees will be provided with one (1) 15-minute paid rest break when they work between 3 ½ and 6 hours, and a second 15-minute paid rest break when they work between 6 and 10 hours, and a third 15-minute paid rest break when they work between 10 and 14 hours. Travel time to and from the designated break area is included in the 15-minute time allotment for rest breaks. To the extent practical, 15-minute paid rest breaks will be scheduled during the middle of each work period. While employees are free to voluntarily forego or waive rest breaks, the company does not encourage you to do so. See your Supervisor for specific department rest break guidelines.

### E. Timekeeping Policy

Time clocks are used as a means of accurately recording hours worked and calculating pay. FTM utilizes the Kronos® timekeeping system. The clocks record regular hours worked, meal breaks, overtime, absences and other time related items. Employees are prohibited from being on the production floor unless they have punched in pursuant to their scheduled shift or have prior authorization from their Supervisor to be out on the production floor during non-scheduled work hours.

Employees are responsible for punching in at the beginning and end of each shift and at the beginning and end of each meal break at their assigned time clock. When recording your time, you should not punch in more than seven minutes prior to your scheduled start time or punch out more than seven minutes after your scheduled end time without authorization from your Supervisor. You are

responsible for immediately notifying your Supervisor if there is a time punch malfunction and you are not able to punch in or out, or if you forgot to punch in or out.

Punching in after the start time of your scheduled shift, failing to punch at the start or end of your shift and punching out early without approval will all be subject to the facility's Attendance Policy. Disciplinary action up to and including termination of employment may be taken for violation of this timekeeping policy.

## F.     Delays in Operation

If a shift is cancelled due to an emergency, every reasonable effort will be made to notify the employees.

In the event of a facility shutdown, total or partial, due to an emergency such as a fire, flood, storm, utility shortage or any other cause, an employee will be paid for hours worked but in no event less than two (2) hours straight time hourly rate if he/she reports to work for their scheduled shift. When an employee is called into work or arrives for a scheduled shift that is cancelled or changed, he/she will be provided with four (4) hours of work or pay or combination thereof. In such cases, a Supervisor may ask for volunteers to go home. Any employee who refuses available work will not be paid.

## G.     Exchanging Shifts

Employees are not permitted to exchange shifts with another employee without the prior written authorization of the Supervisor and both employees. No authorizations for exchanging shifts will be granted unless the exchange can be accomplished without interference of facility operations and limiting the amount of approved department overtime.

## H.     Mandatory Scheduled Meetings & Training

Employees scheduled for mandatory meetings or training on their days off will be paid for the time spent in the session or one (1) hour of pay, whichever is greater. Employees that *do not attend* a Mandatory Meeting or Training may be assessed one (1) attendance point.

LEP0073

I.   **Payday and Paychecks**

Hourly employees will receive a paycheck every week. Leprino Foods provides all employees the option to directly deposit paychecks into their bank account(s). This enables you to conveniently receive your pay in your bank account on payday without having to personally pick up a paycheck and then drive to your bank to cash it.

Direct deposit can be set up online at *MY LEPRINO* at home or at designated kiosks located in the facility. If you elect not to participate in direct deposit, paychecks will generally be distributed on Thursday, between the hours of 3:00 pm - 4:30 p.m. at the reception desk. After that pay checks will be available at the guard shack.

Minor errors in an employee's paycheck will be adjusted in the next payroll run. Major changes may be handled with an off cycle check. If you think there is an error in your paycheck, consult your Supervisor.

LEP0074

In addition to the Benefit Programs outlined in the Leprino Foods Employee Handbook, this section of the Handbook is designed to acquaint you with some of the specific features of the Company's benefit programs at the Fort Morgan (FTM) facility. It is important to remember that more detailed information is set forth in the official plan documents and policies that govern each of the plans. If there is any conflict between the brief summaries contained in this Handbook and the terms, conditions or limitations of the official plan documents, the provisions of the official plan documents will prevail. Employees wishing to inspect those documents, please see a Human Resources Representative.

A.     **Hourly Employee Incentive Plan**

We believe that every employee should share in the success of our Company. All employees have a common stake in seeking to facilitate the success of our Company. By everyone's collective and individual contribution, the Company will achieve its vision and goals through continuous improvement. Therefore, we currently have an Incentive Plan that was developed to reward our contributions. You are eligible to participate in the Incentive Plan beginning on your 1st day of employment and provided you meet the availability for work requirements for the payout. Incentive periods are divided into quarters: Q1 (Nov-Jan) Q2 (Feb-Apr) Q3 (May-July) Q4 (Aug-Oct).

The program is structured into three (3) principle measurement criteria: 1) Safety, 2) Quality, and 3) Financial Performance. The financial payment will be awarded to all eligible employees based on the percentage achieved according to the established goals and individual attendance. Monthly status reviews will be posted in the facility. Program overviews and award distributions are done on a quarterly basis. For more information on the Incentive Plan, please see a Human Resources Representative.

B.     **Vacations**

The Company recognizes that vacations serve an important function of providing for employees' rest and recreation. Vacations will be scheduled between you and your Supervisor. Vacation time is accrued based upon length of service and is earned at six-month intervals. Vacation time may not be taken until it has been earned. Please refer to the Leprino Foods Employee Handbook and Vacation Policy for more detailed information regarding vacation benefits.

Department workload and labor requirements control the number of vacations each department can permit, per week. Vacation scheduling may differ by department depending upon unique operation requirements. See your immediate Supervisor for details.

LEP0075

This internal plant policy is intended to clarify how vacations are scheduled and approved in the Fort Morgan facility.

Note: This internal policy is <u>not</u> intended to alter in any way, how the company awards or employees accrue vacation as stated in (HUM 3200).

## Scheduling:

- Plant tenure will have preference of vacation dates during the selection process from January 1st to January 31. Requests during this time will be approved or denied by February 15. Requests must be made on the Kronos system.

- For the period of January 1 to January 31, full weeks' vacation requests will be granted over single days/partial weeks. (Max. of 2 weeks)

- Vacation requests received after January 31 will be granted on a first come, first serve basis. These requests will be approved or denied within 7 days and the employee can view this on the Kronos system.

- The Human Resources Manager and the Plant Manager must approve vacation requests longer than two weeks.

- Each department manager will be responsible for establishing their own vacation schedule, giving consideration to departmental needs based on staffing, product schedule, milk volumes, etc.

- Employees will only be allowed to schedule one major holiday off during the January 1 to January 31 periods. Major holidays are considered by this policy are Thanksgiving, Christmas and New Year's. If a major holiday is not booked completely one-month prior, the employee can request for another vacation during a major holiday.

- Request for vacation should be submitted into the department supervisor as far in advance as possible. A request for multiple days should be turned in at least two-week's prior to the dates requested.

- Vacation requested after the schedule has been posted will need to be made before the end of the shift prior to the request and will need department manager's approval.

- Any deviations from the policy above will be reviewed on a case-by-case basis.

    *Note: Vacation can be denied at any time prior to the start of the vacation based on business needs.*

LEP0076

**Responsibilities:**

a. **Employee:**
- Ensure that you will have the time earned that you are requesting.

- From January 1-January 31 submit 1st, 2nd and 3rd choices.

- Submit Kronos request for approval to immediate supervisor preferably two weeks prior to the requested date during the 1st come 1st serve basis.

- Review preapproved leaves with manager in new department if a transfer takes place.

b. **Department Supervisor:**
- Process all non-exempt Kronos requests.

- After January 31, respond to requesting employees within 7 days, of approval or denial.

c. **Department Manager:**
- Process, review and approve all exempt ESS (employee self-service) requests through the MSS (manager self-service).

- Ensure proper reporting and scheduling of vacation time.

- Review preapproved leaves if employee is transferred to new department

d. **Human Resources:**
- Communicate vacation scheduling procedures to plant employees. Review any exceptions to the policy and provide guidance to department managers.

*Note...If employee transfers to a new department, vacation requests that have already been approved must be honored by new department manager.*

*\*Payment of vacation time in lieu of taking time off is NOT PERMITTED under any circumstances.*

**C.** **Holidays**

At the Fort Morgan Plant hourly production employees observe the following nine (9) holidays:

- New Year's Day
- Memorial Day
- Independence Day
- Labor Day
- Thanksgiving Day
- Friday after Thanksgiving
- Christmas Eve
- Christmas Day
- New Year's Eve

All employees whose department normally works a Monday through Friday schedule will observe holidays as recognized by our corporate office. This schedule also applies to clerks and other hourly positions that do not generally have to be back filled each time the employee is absent. All employees who normally do not work a Monday through Friday schedule will observe holidays as they fall on the calendar dates.

To be eligible for holiday pay, an employee must have been employed for at least 30 calendar days and work their scheduled day before the holiday, AND the holiday if they are scheduled to work AND their 1st scheduled day following the holiday.

Holiday pay for eligible employees will be calculated in the following manner:

If a holiday falls on an employee's scheduled day off, the employee will receive eight (8) hours of straight-time pay. If the holiday falls on a scheduled workday, the employee will receive eight (8) hours of straight-time pay for the holiday and 1½ times his/her straight-time rate for each hour worked during the holiday. When a holiday falls during an employees' scheduled vacation, the employee will receive holiday pay, when appropriate, in addition to the vacation pay.

**D.** **Paid Sick Time**

Paid sick time will be administered in accordance with the Company's Paid Sick Leave Policy (HUM6100). Paid sick time absences will subject an employee to points under the Fort Morgan (FTM) Attendance Policy.

E. <u>Leave of Absence (LOA)</u>

If an employee has a situation that requires an extended or intermittent leave from work, they should talk to their Supervisor or an HR Representative about options available in the Leprino Leave of Absence Policy (HUM6600). Requests for leave may be granted as outlined in the policy pursuant to proper notification, eligibility and approval.

Refer to LFC Employee Handbook and applicable policy for additional details.

F. **Employee Awards**

In addition to the Service Awards and Performance Awards mentioned in the Leprino Foods Employee Handbook, the Company recognizes achievement in many other areas. There are opportunities for awards based on both team and individual contributions toward achieving our Vision. There are awards in the safety area (both team and individual) and in the area of Leprino Quality (both team and individual). There are also performance awards for teams and individuals chosen by coworkers, Supervisors, Managers, regional, and corporate personnel. More information on the Company's Employee Recognition Awards is available through Plant postings as well as Company and newsletters. See your Human Resource Representative for additional details.

LEP0079

**A.**     Uniforms

Uniforms are to be worn by all employees to help maintain cleanliness, protect personal clothing and provide a professional appearance.

FTM provides professional services to launder employee's uniforms. You are responsible for putting your dirty uniforms in the laundry drop off area in a timely manner. Cleaned uniforms can be picked up at the designated clean uniform area. Your cooperation is needed to place hangers and dirty clothing in their proper locations. If you have a problem with uniforms, document the specific issue each time it occurs and contact a Human Resources representative if you have any questions.

No alterations to company-provided uniforms are allowed. Uniform shirts must be tucked into the pants and pants must be worn at the waist. Beanies are allowed but must be completely covered by the hairnet and bump cap. Clothes of your choice can be worn beneath your uniform as long as they are not inappropriately revealing or inappropriately graphic.

In some specific jobs, company provided coats or hoods may be worn. For example, jackets may be worn while working in the coolers and freezer suits/hoods may be worn by warehouse personnel. If you have any questions regarding acceptable additions to the company-provided uniform, please discuss them with your Supervisor.

Uniforms and footwear must be kept at the plant. You will change into and out of your uniform while on the punch; meaning that you will punch in prior to putting on your uniform at the beginning of your shift and will not punch out at the end of your shift until you have changed out of your uniform.

**B.**     Lockers

Leprino Foods provides you, based upon availability, two lockers (including locks) at the time of your employment, one for your clean uniforms, and one for your personal clothing. The lockers and locks provided to you during your employment remain the property of Leprino Foods and there should be no expectation of privacy. This means that lockers are subject to inspection by the company at any time for any reason. No other items except for clean uniforms are to be kept in the clean uniform lockers.

No use of personal locks will be allowed in the facility. All lock combinations will be kept on file in the Human Resource Department. Any locker damage must be reported to the Human Resources Department or your Supervisor immediately. Failure to do so may result in disciplinary action.

LEP0080

Personal items should not be brought into the work area, but are to be kept in your assigned locker. These items must comply with the good manufacturing practice (GMP) that prohibits glass in any production area. You are expected to keep your locker and the locker rooms clean, orderly and free of litter on the floor. All soiled uniforms must be placed in the laundry chute and not left on the floor. No food products or beverages are allowed in the locker room. You should keep all food, snacks, candy, gum and drinks in your lunch pail in the designated break room areas. Employees are expected to keep their lockers closed and locked. The Company is not responsible for lost, damaged or missing property. It is recommended that you do not keep valuables in your locker.

C.    **Tools and Allowances**

Maintenance employees are required to furnish hand (manual, not power) tools. Large, special-purpose tools and power tools will be furnished by Fort Morgan.

A tool allowance will be paid to eligible employees who are required to furnish their own hand tools. A $150.00 tool allowance will be paid after one (1) year of continuous employment and every year thereafter while working in an eligible position. A underlined receipt is required for payout. See your Supervisor for additional information.

D.    **Parking and Speed Limits**

Leprino Foods provides a parking lot for employee cars on its premises. Care should be taken when driving on the gravel to prevent damage to the area and parked vehicles. Leprino Foods reserves the right to adopt and modify parking rules and regulations governing use of Leprino Foods property. Parking lot passes must be visible at all times while vehicles are on Leprino property.

All employees are required to enter the parking lot thru the employee entrance. Swipe your employee badge so that the gate will open. Please be respectful; observe all parking spots including Handicapped and Visitor parking. Park in a single space and comply with posted speed limits.

Leprino Foods is not responsible for lost, damaged or missing property. It is recommended that you lock your car and not keep valuables in it.

E.    **Break Rooms**

Break rooms throughout the facility have been provided for your comfort and convenience. Leprino Foods takes pride in its facilities and asks that you share this pride by keeping break rooms clean. If we all do our part and clean up after ourselves, it will not place a burden on anyone else.

LEP0081

The main break room, located near the main entrance across from the locker rooms, is equipped with various vending machines, refrigerators, microwaves and a sink for your use. Additional break rooms are located in the Processing department.

**F.**  **Lactation Policy**

The company provides lactating employees with a reasonable amount of break time to express breast milk for up to 1 year after the child's birth. The Fort Morgan facility is equipped with a lactation room in the main office area.

Employees will use paid rest break time to express milk and may use their unpaid meal break time, at the employee's option. Employees will be allowed to extend their regularly scheduled paid rest breaks to 20 minutes to accommodate the expressing of breast milk. Should an employee need additional time beyond 20 minutes, then reasonable unpaid time will be provided and employees should promptly report the additional unpaid time to their Supervisor.

**G.**  **Personnel Records**

All personnel records are maintained by the Human Resources Department. Because it is necessary for Leprino Foods to maintain current and accurate personnel records on each employee. Employees are required to enter any change in address or telephone number into *MyLeprino* as soon as changes occur. Documentation will be required to substantiate changes in name, marital status and dependents – see an HR representative immediately when these changes occur.

Access to employee personnel records is controlled. Therefore, if you need to review your personnel file, please contact the Human Resources Department to schedule an appointment during normal business hours, (8:00 a.m. – 5:00 p.m.), Monday through Friday.

**H.**  **Plant Security**

1. **Employee Badges:**

To ensure the safety and security of employees, visitors, and property, only authorized personnel have access to the Company's facilities. All Fort Morgan employees will be issued an identification card that allows him or her access to the Plant. Each employee is responsible for their own card and having it in their possession when they enter and leave the facility. Any card that is lost or damaged should be brought to the attention of the Human Resources

LEP0082

Department immediately. The initial card will be issued at no cost to the employee upon hire. There is a replacement cost for lost cards chargeable to the employee. Any defective card needs to be returned to the HR department for replacement. There is no charge to replace a defective card returned to HR.

You are required to use your badge to enter the plant property. If carpooling, each employee in the vehicle is required to swipe their badge. If you forget your badge you will be required to provide identification and sign in at the security gate. Excessive entrance into the plant without a badge will result in disciplinary action.

2. Visitors:

All visitors must check in with the security guard and receptionist during the day or a Supervisor during off hours. All visitors will be required to sign the company's Visitor Agreement and will be issued a visitor's pass. Frequent visitors will fill out a visitor's pass to be kept on file. Non-employee spouses, relatives, or friends are prohibited from waiting for employees in the lunchroom or in any other areas of the plant. Employees getting rides shall inform drivers of the vehicle that they are required to check-in with security and wait with their vehicle until the employee leaves the Plant.

* Management has the right to remove any visitor from company premises.

3. Inspections:

To ensure compliance with the company's Food Safety and Workplace Safety Policies, Leprino Foods reserves the right to inspect personal items such as lunch boxes, backpacks, briefcases, purses, uniform pockets or packages taken into or out of the facility. Should you need to take a package or item out of the facility, you must obtain signed authorization from a Manager and present it to security as you leave the facility. Furthermore, all lockers, toolboxes, desks and workstations are the property of the company and subject to inspection by the Company at any time, for any reason.

To monitor activity in critical areas, the Fort Morgan Facility does have video surveillance cameras set up at various locations on the property.

LEP0083

I.    **Lost and Found**

Any personal articles found on the facility's premises should be delivered to the Human Resources Department to be held in "Lost and Found". Anytime something is lost, check with HR to see if it has been turned into the "Lost and Found" inventory.

J.    **Telephone Calls**

Telephone calls to employees from outside the facility are limited to emergencies. For such emergency calls, callers should be instructed to advise the Receptionist or Security Guard of the details of the emergency. The employee's Supervisor will then be contacted to allow them to take the call. A telephone for local calls is available for employee use in the break rooms.

K.    **Cell Phones**

No cell phones are allowed on the production floor unless approved by the department manager. See your Supervisor if you have any questions.

L.    **No Tobacco Policy**

The Fort Morgan (FTM) facility is a tobacco free environment. Tobacco products of any kind are not permitted inside the facility on the production floor. A designated site is located outside, in front of the facility, where employees are allowed to smoke (commonly referred to as the "smoke shack"). Employees utilizing the designated smoking area must properly dispose of all waste.

M.    **No Solicitation/ No Distribution Policy**

Solicitation of Leprino employees by other employees or non-employees and the distribution of literature, pamphlets, or other material by same are prohibited on Leprino's premises and to Leprino employees during working time.

**A.**   **Tenure**

The Company recognizes that promotion opportunity and fairness are important to most individuals. Accordingly, an employee's plant tenure is one factor taken into consideration when administering vacations, decreases in work force and rehiring after layoff. Tenure status is measured from your initial date of hire. To determine tenure for those employees with the same hire date, the last four digits of their social security number will be used. The lower social security number translates into the lower employee number. The employee with the lower employee number will be the most senior. Tenure, as referenced in this Section VI, will refer to plant tenure, unless otherwise stated.

**Department Tenure**

Department Tenure is a factor taken into consideration when determining promotion, job position and scheduled shift within the department. When a position or scheduled shift becomes available, department tenure (not plant tenure) will be considered along with most qualified candidate.

**B.**   **Job Posting, Applying and Interview Procedures**

When a vacancy occurs as a result of facility expansion and/or employee separation, the below guidelines outline the procedures followed to fill a vacancy. Every effort will be made to fill the open position through a transfer, promotion or internal interest form within the facility. If there are no internal eligible/interested/qualified candidates after exhausting the interest procedure, the facility will utilize outside resources to fill the open position.

1.   Eligibility: Employees wanting to participate in applying for a job must meet the following criteria:

- Attendance:

     Employees with > 180 days of active employment must have less than four (4) attendance points. Employees with ≤ 180 days of active employment must have less than two (2) attendance points.

- Leave of Absence:

     Employees out on Leave of Absence are not eligible.

LEP0085

- Performance Warnings/Safety Warnings

     An employee cannot be at disciplinary action level of Written
     Warning or greater. Employee must have zero safety warnings
     and/or violations in the last twelve months (12).

- Time in Current Position**

     All employees are requested to have six (6) months (unless noted)
     experience in their current position before they may apply for an
     open position.

     **EXCEPTION: General Labor category employees who have been with
     the company < 6 months are allowed to apply on positions that do not
     receive any interest from qualified employee during the 5-day posting,
     regardless of the time they have been in their current position as long as
     they meet the eligibility requirements above.

- Vacation

     If an employee is on vacation during the entire posting period of a
     position, they may call in during the posting period and apply by
     phone; however, they must speak with an HR Representative,
     messages will not be accepted.

2. Applying:

   To apply for a position a Personnel Request Form needs to be submitted to
   Human Resources and the position will be posted. The position will be
   posted for five (5) days. Interested persons will have five days to apply for the
   position by signing the job interest form in the job posting binder at the HR
   assistant's desk or at the Guard Shack during off-hours. During this five-day
   period, employees are responsible for researching the job to ensure it is a
   position they are truly interested in. At the end of the posting period, the HR
   staff will review all requests.

   *All Employees are welcome to apply for open positions with applying
   criteria being reviewed for eligibility.

   *Management has the right to "Repost" a position with reduced criteria when
   needed.

LEP0086

3.  <u>Interviewing:</u>

    Those employees that applied for an open position will interview with the department manager or designate. The most qualified employee based on interview will be offered the position.

4.  <u>Panel Interviewing:</u>

    Panel Interviewing will be for the following positions: Foreperson, Quality, Maintenance, Starter Maker, Waste Water Treatment Technicians, Vat Operator, and CIP II/CIP III.

    To be considered a candidate for a Panel Interview the following criteria needs to be met:

    - 3 attendance points or less
    - No more than one performance warning in a 1-year time period
    - Ability to perform essential job functions
    - Knowledge, skills and abilities
    - Technical skills and aptitude, Problem solving ability, Applied and continuous learning, work standards (includes attendance, overall current job performance, recognition/awards received, and any disciplinary actions received), initiating action, quality orientation, safety awareness, and working effectively with others.

    * Management has the right to "Repost" a position with reduced criteria when needed.

5.  <u>Accepting the position:</u>

    The successful employee will have up to 10 working days to determine if they are capable of satisfactorily performing job requirements. If after ten days the employee is **NOT** at the level of proficiency required for the amount of time in the position the training period may be extended at management's discretion or the employee may be disqualified from the position.

    Once an employee accepts the position, they may **NOT** have a "change of mind" or be disqualified without recourse. Such recourse will be the forfeiture of applying rights for twelve (12) months and possible return to the general labor workforce or previous position if that position is still available (paid at that rate of the position).

    All efforts will be made to place the successful employee in their new position within three weeks of acceptance; the plant manager must approve exceptions to

LEP0087

this. If an employee is not transferred to their new position within the three week period they will start receiving the new position wage on the fourth week, unless the new position is at a lower pay grade.

An employee may only accept one job in a twelve-month period **unless** applying to a higher pay grade, and then they can apply after being in the position six months unless noted. Employee are requested be in the role 12 months to apply laterally or down.

\* The following positions: Quality, Warehouse, and Starter are only able to submit a job request for another position after twelve (12) months in position.

6. <u>Roles and Responsibilities:</u>

   a. <u>Employee:</u>

   - Sign job interest form with HR Department during regular work week. After-hours book will be with Guard Shack attendant.
   - Research job applying for to determine if it meets your needs and you can perform position requirements.
   - Sign acceptance/declination on the day position is offered.

   b. <u>Supervisors:</u>

   - Inform employees of open positions during pre-shift meetings.
   - Submit job request form for employees that are on vacation if requested.

   c. <u>Department Manager:</u>

   - Inform employees of open positions.
   - Schedule release of employees to new positions within three weeks of acceptance of new position.
   - Ensure proper paperwork is completed to transfer employee to the new department.
   - Establish criteria for positions.
   - Interview employees.

   d. <u>Human Resources:</u>

   - Ensure transfer paperwork is completed and entered into HRIS system.
   - Determine time in current position is sufficient to apply.
   - Review attendance and performance records.
   - Schedule interviews for employee.

LEP0088

C.    **Foreperson Positions**

Forepersons are important role models who have a direct impact on the behaviors of those they work with. Forepersons are selected based on several criteria including work ethic, performance and attendance. Accordingly, Forepersons are required to keep their performance and attendance to a Leadership level.

Forepersons who have more than two (2) progressive discipline warning within a rolling twelve (12) month period will be removed from their Forepersons role. Forepersons are required to keep their attendance points below five (5). In the event Forepersons accumulate five (5) attendance points, they will be removed from their Forepersons role. They may be placed in any open position.

D.    **Temporary Positions**

If needed, the Company may create temporary positions, normally lasting less than twelve (12) months. Temporary positions may be either: assigned, posted, or filled from the outside depending upon duration, training time required, etc. In many cases, general labor will be assigned to a temporary position.

E.    **Job Elimination and Reduction in Force**

Employees impacted by job elimination or reduction in force will be given advance notice, typically 45 days (or longer if required by law). During that time the following displacement procedures will take effect.

Displacement Procedures
During the days following the time of notice, employees who are eligible will be able to apply on open jobs or accept open jobs that are being recruited for from outside the Fort Morgan Facility or are at the appoint stage in the process. In addition, affected employees may displace by plant tenure into other positions where they are qualified and capable of satisfactorily performing the job duties with a minimal amount of training.

Employees will be considered qualified for any job that they have held within the past 2 years. Displacement will occur as follows:

1.    First, the affected employee displaces the least senior employee in the same classification, same shift, and same department. If no such employee exists; then

2.    The affected employee displaces least senior employee in the same classification and department and any shift. If no such employee exists; then

LEP0089

3. The affected employee displaces least senior employee in the same department, lower classification and any shift. If no such employee exists; then

4. Finally, the affected employee displaces least senior employee in any department and any shift.

If an employee refuses a job offered, at any step in the displacement process, then the employee will be treated as having voluntarily resigned his or her employment.

LEP0090

We believe it's important to clearly state the Standards of Conduct we expect of our employees. By doing so, each employee knows what the expectations and obligations are in advance. Please review the following to ensure the orderly and efficient operation of the Company and the protection of all employees. Any inappropriate conduct which may interfere with our facility and/or employees will be subject to disciplinary action up to and including termination of employment. The following standards are only representative of the types of actions that are conducive to facility efficiency and productivity. In addition, any inappropriate conduct that may not be specifically included in these Standards of Conduct will also be considered a violation and will be subject to disciplinary action up to and including termination of employment.

## Required Conduct

1. Comply with all Safety rules and procedures. Report any accident, injury, unsafe or inoperable equipment to the Supervisor on duty.

2. Perform all aspects of assigned job or tasks according to Company standards. Follow all regulatory requirements and company policies.

3. Carry out all written and/or verbal directions and instructions.

4. Report to assigned work areas at specified time.

5. Maintain proper standards of personal hygiene; follow all Sanitation requirements, comply with all Personal Protective Equipment (PPE) and Good Manufacturing Practices (GMP's).

6. Keep all company required personal information up-to-date.

7. Employees leaving work for personal reasons prior to being properly relieved of duty must have Supervisor approval.

8. Employees will stay at their work station at the end of their shift until they have passed down the necessary work information to the replacement employee on the following shift or until the shift Supervisor or the Manager has relieved them of their duties.

9. Punch in and out on time punch as required. Punch in no earlier than 5 minutes prior to shift start and punch out no later than 5 minutes past shift end time. Any exception must be approved by Management in advance.

10. Park in designated employee spaces with appropriate parking pass. All vehicles are required to have a FTM parking permit visible while on company property;

LEP0091

other specific parking areas such as disability spots, car pool, etc. must have the appropriate permit visible **IN ADDITION TO** the FTM parking permit.

## Prohibited Conduct

11. Altercations, fighting or actions which would incite provocation while on duty and/or on Company property.

12. Possession of weapons, horseplay, disorderly conduct or engaging in disruptive or reckless behavior while on company property and/or operating equipment.

13. Smoking in unauthorized areas.

14. Dishonesty, including but not limited to theft, embezzlement, falsification of records and misrepresentation of data.

15. Possession, use, or any indication of use of alcohol, illegal substances, intoxicants, narcotics, amphetamines, drug paraphernalia or any derivative thereof while on Company property, when reporting to work and/or while on duty.

16. Insubordination or refusal to follow Supervisor's instructions; Sabotage; Gross Negligence.

17. Littering, abuse or destruction of equipment of any company property

18. Sleeping while on duty.

19. Any chargeable accident resulting in death, injury or serious property damage.

20. Carrying unauthorized passengers while operating company equipment.

21. Unnecessary delay of production or operation of equipment.

22. Interfering with others in the performance of their assigned duties.

23. Unauthorized tampering with equipment.

24. Discourteous language or actions, including but not limited to being profane, threatening and abusive. All issues are to be immediately reported to your Supervisor, Manager or HR.

25. Causing shortages, overages or damage to product.
26. Unauthorized cameras, picture taking devices or recorders on premises.

27. Permitting unauthorized person(s) in or on Company premises or vehicles.

28. Tampering with authorized posted materials; distributing unauthorized forms of literature or petitions for signature in working areas at any time.

## SECTION VIII:                                        DISCIPLINARY GUIDELINES

Our disciplinary guidelines are based on the premise that all employees are interested in contributing to the success of our business and, as individuals, want to perform well at all times. If an employee's behavior is inconsistent with Company guidelines, rules or policies or if their performance has been substandard, they may be warned, counseled, or disciplined, up to and including termination.

The typical discipline progression for performance issues is as follows:

| | |
|---|---|
| First Step: | Verbal Warning |
| Second Step: | Written Warning 1 |
| Third Step: | Written Warning 2 |
| Fourth Step: | Final Warning/Suspension. |
| Fifth Step: | Termination |

There are situations, however, where discipline is warranted (up to and including termination) without the use of progressive discipline or counseling. Each situation is reviewed carefully with action taken appropriate to the specific individual and circumstances.

Performance based warnings will remain active for a rolling twelve (12) month period, exclusive of any approved leave of absence (except for time spent on Military Leave). Discipline steps will fall off at the same level they were assessed. All warnings, regardless of age, will remain a permanent part of an employee's personnel file.

SECTION IX: ATTENDANCE POLICY

## INTRODUCTION:

The Fort Morgan Plant is a continuously running, twenty-four (24) hours per day, seven (7) days per week manufacturing operation. Your attendance is critical to the success of our plant. Good attendance helps create consistency within the plant, contributes to a better trained workforce, enables plant efficiency, and fosters a positive working environment.

Absenteeism and/or tardiness place an undue burden and hardship on your co-workers. Often, others' schedules are disrupted and workloads are increased in order to compensate for an absent co-worker. Unscheduled vacancies are usually covered with unplanned overtime, which not only decreases plant efficiency, but more importantly causes your co-workers to disrupt their personal lives.

The plant uses an attendance monitoring system to track your good attendance and also to identify unacceptable attendance trends prior to you reaching an unacceptable level of absenteeism/tardiness that may impact your continued employment.

Good attendance is a requisite for continued employment and the successful operation of the plant. It increases plant efficiency, maintains a higher standard of productivity, and promotes a better working environment.

In an effort to ensure a consistent and fair approach and minimize abuses, the following disciplinary policy for absenteeism and tardiness is has been developed:

## DISCIPLINARY ACTION:

0 to 4 points ................................................................................................NO ACTION
4 points.................................................................................................VERBAL WARNING
6 points................................................................................................ WRITTEN WARNING
7 points...................................... FINAL WARNING/3 DAY WORKING SUSPENSION
8 points ............................................................................................... TERMINATION

**\* TWO (2) Written Warning (6pts) in rolling 12 months period will result in Termination.**

Accumulation of absences will be based on a rolling twelve-month period.

LEP0094

## DEFINITIONS:

### ABSENCE:

Not being at work for any reason other than jury duty, paid funeral leave, industrial injury, vacation, preapproved sick day requests or approved written leave of absence. Each day absence will be counted as one (1) point.

 * Preapproved Sick time must have accrued amount to cover the absence.

 *Any accrued Sick pay will be used for absences.

### ABSENCE NOTIFICATION:

If you are reporting off absent, you must notify your supervisor sixty (60) minutes prior to your shift start time. You will be assessed one (1) point for each time you do not call in at least sixty (60) minutes prior to your shift start time.

*Untimely Call (1 point) plus Absence (1 point) would equal 2 point total.

### PARTIAL ABSENCE:

Failure of employee to work up to 80% of his/her scheduled shift time will be assessed one (1) point. However, if an employee is able to work over 80% of his/her scheduled shift time, but not a complete shift, he/she will only be assessed one-half (½) point.

### TARDINESS:

Reporting to work late or after the scheduled shift's starting time. Tardies will be counted as follows:

* Each tardy of 1-15 minutes will be noted on an exception report and forwarded to HR. Every two (2) tardies less than 15 minutes in a 30-day period will assess one-half (½) point.

*Each tardy exceeding fifteen (15) minutes up to two (2) hours will count as one-half (½) point.

**If you are going to be tardy more than 15 minutes, a courtesy call to your supervisor would be appreciated.

### NO CALL/ NO SHOW:

No Call No Show absence problems place an undue hardship on your fellow employees and the company's operations. Because of the hardship created by these problems, discipline of possible termination may occur on the first offense. A No Call No Show is defined as failure to notify the employer of your absence. Each unreported absence (NCNS) occurrence will be assessed four (4) points.

*Three consecutive days without notification will be considered a Voluntary Separation.

**PATTERNS/TRENDS:**

Patterns or Trends such as frequent tardiness, repeated absences adjacent to scheduled days off, repeated absences on weekends, repeated absences adjacent to vacations and repeated missed punch in's/out's will be assessed two (2) points.

**OVERTIME:**

Unfortunately due to absence notifications overtime may be requested. Supervisors will first ask for volunteer to work overtime when needed. If there are no employees that volunteer for the overtime mandatory overtime will occur. If an employee is required to work mandatory overtime and refuses they will be assessed one (1) point.

**POINTS:**

Attendance points are issued per the schedule below and accumulate and drop off on a rolling 12 months.

| Tardiness | |
|---|---|
| *Two within 30 days, < than 15 min | ½ Point |
| * > 15 min up to 2 hrs. | ½ Point |
| Absence | 1 Point |
| Partial Absence | |
| *Under 80% shift | 1 Point |
| *Over 80% shift | ½ Point |
| Overtime Refusal | 1 Point |
| Untimely Call | 1 Point |
| Untimely Call – with Absence | 2 Points |
| Patterns/Trends | 2 Points |
| No Call No Show | 4 Points |

**RESPONSIBILITIES:**

Employee:

- Reporting an unplanned or unscheduled absence related to a medical reason.
  - Call your supervisor with reason of unplanned absence.
  - Call the Guard shack at the main number 970-867-9351 to log the absence.
- Call UNUM at 877-463-2114
  - In advance of a planned medical leave
  - To care for a family member or for the birth/adoption/foster care placement of a child

## ACKNOWLEDGEMENT OF RECEIPT

I hereby acknowledge receipt of the Fort Morgan (FTM) Employment Guidebook. I understand the Guidebook is a guide, that all employment at Fort Morgan (FTM) is at-will, and that nothing in the rules and regulations constitutes a contract of employment or a promise of continued employment of any type. No one other than an officer of Leprino Foods Company has the authority to alter the at-will nature of the employment relationship, and any such agreement to do so must be in writing, signed by an officer of Leprino Foods Company. Fort Morgan (FTM) reserves the right to modify, supplement or rescind any policy or procedure outlined in this Guidebook, at any time, without notice, as it deems appropriate.

_____

Print Employee Name          ID Number

_____

Employee Signature

_____

Date

- For any intermittent hours of absence for the employee's own medical illness or an immediate family members medical illness
- Due to an injury

Supervisor:
- Communicate attendance policy to department employees
- Complete attendance reports properly via call-ins or kronos schedule or actual hours worked
- Approve time off via kronos timely
- Verify employee has sick time hours to cover absence
- Notify HR department if absence trends exist, investigation to follow

## NEW HIRES:

Employees with less than six (6) mouths with Leprino Foods will be subjected to a progressive attendance. New hires that have completed six (6) mouths of employment will have their attendance record transferred to the regular attendance policy.

## NEW HIRES DISCIPLINARY ACTION:

1 points ................................................................................................................NO ACTION
2 points ..........................................................................................................VERBAL WARNING
3 points ........................................................................................................WRITTEN WARNING
4 points ...............................................................................................................TERMINATION

LEP0097

| | |
|---|---|
| **MORGAN COUNTY COMBINED COURTS**<br>STATE OF COLORADO<br>400 WARNER STREET<br>FORT MORGAN, CO 80701<br>(970) 542-3435 | FILED IN COMBINED COURTS<br>MORGAN COUNTY, CO<br><br>OCT 0 7 2016<br><br>JEANA SPRADLIN, CLERK<br><br>▲ COURT USE ONLY ▲ |
| **PEOPLE OF THE STATE OF COLORADO**<br>Plaintiff.<br>v<br>**FRANK LEVAR,**<br>**Defendant.** | |
| | Case Number 16CR36<br><br>Division A |

DATE FILED: October 7, 2016<br>CASE NUMBER: 2016CR36

## JURY VERDICT – ASSAULT IN THE SECOND DEGREE, INTENT TO CAUSE BODILY INJURY; CAUSING SERIOUS BODILY INJURY

I.* We, the jury, find the defendant, Frank Donald Levar, NOT GUILTY of Assault in the Second Degree, Intent to Cause Bodily Injury; Causing Serious Bodily Injury, and the lesser included offense of Assault in the Third Degree.

_____
Foreperson

II.* We, the jury, find the defendant, Frank Donald Levar, GUILTY of:

[ ]    Assault in the Second Degree, Intent to Cause Bodily Injury; Causing Serious Bodily Injury

[X]    Assault in the Third Degree

_____
Foreperson

*The Foreperson should sign only one of the above (I or II).  If the verdict is NOT GUILTY, then I above should be signed.  If the verdict is GUILTY, then II above should be signed.

** If you find the defendant guilty of the crime charged or [one of] the lesser-included offense[s], the foreperson should complete only this GUILTY verdict by placing, in ink, an "X" in the appropriate square.  ONLY ONE SQUARE may be filled in, with the remainder to remain unmarked.  The foreperson should then sign only section II above.



**Leprino Foods®**
1830 West 38ᵗʰ Avenue
Denver, CO 80211-2225

Susanne E. Jennings
Senior Corporate Counsel
303.264.5305
sjennings@leprinofoods.com

VIA online submission (https://nxg.eeoc.gov/rsp/login.jsf)
U.S. Equal Employment Opportunity Commission
Attention: Ms. Holly B. Romero, Enforcement Supervisor
303 East 17ᵗʰ Avenue, Suite 410
Denver, CO 80203

August 4, 2017

Re: Charge No. 541-2017-00477; Nicolas Donez v. Leprino Foods Company

To Whom It May Concern:

This correspondence constitutes the entry of appearance of the undersigned as counsel of record for Leprino Foods Company in the above-referenced charge. This submission also constitutes an initial statement of position in response to the allegations made by Charging Party.

The information provided with this response is primarily limited to Leprino's facility in Fort Morgan, CO. This facility is located at 2400 E. Beaver Ave., Fort Morgan, CO 80701. Leprino reserves the right to supplement this response if necessary, and does not waive any affirmative defense that may be available to Leprino, including, but not limited to, timeliness of allegations.

## Background and Stance on Equal Employment Opportunity

Leprino is a privately-held corporation based in Colorado since 1962. Today, the company has grown into a leading manufacturer of cheese and dairy-related ingredients. The Fort Morgan facility is one of Leprino's manufacturing locations, and employs approximately 400 of Leprino's team members. Leprino maintains thorough policies regarding ethical behavior in the workplace. *See* Standards of Ethics and Business Practices, attached as Exhibit A. Leprino's policies promote equal employment opportunity and prohibit unlawful discrimination or harassment in the workplace based on any reason, including national origin. Moreover, the company does not tolerate retaliation against individuals who bring forth a concern, file a claim, or participate in an investigation of any kind. *See* additional policies at Exhibit B.

Importantly, as an employer the promotes a safe and respectful workplace for its employees, Leprino believes violence in the workplace is extremely serious. The company maintains policies and standards regarding such behavior. *See* Workplace Security Policy, attached as Exhibit C,[1] Excerpt from

---

[1] An updated version of this policy is also attached as Exhibit D.

company Handbook, attached as Exhibit E, and Fort Morgan Handbook, attached as Exhibit F. All employees are repeatedly trained regarding these standards of conduct and acknowledge their understanding.

> ➢ *This Charge Should Not Be Processed by the EEOC Because it is Time-Barred.*

As an initial matter, this charge should be dismissed because Charging Party's allegations are absolutely time-barred. The termination of his employment took place on February 29, 2016. He signed his charge on May 5, 2017, and the charge reflects receipt by the agency on May 12, 2017, far beyond the 300-day deadline. It is well-established that violating this deadline bars an individual from bringing a claim under any applicable statutes. *See* EEOC Regulation 29 C.F.R. § 1614.107(a)(2). Charging Party cannot in good faith claim any justification for his delay, especially given the fact that he has been heavily involved with Leprino throughout a workers' compensation process since the incident occurred that led to his separation. In addition, he communicated with the company questioning his separation immediately, and again as recently as December, 2016. Therefore, this charge should be dismissed by the agency.

> ➢ *There is No Merit to Charging Party's Allegations.*

Even if his charge were timely, which it is not, Charging Party's allegations have absolutely no merit. Charging Party was an "at-will" employee. He was discharged pursuant to the company's workplace violence standards after engaging in an altercation with a coworker (Mr. Frank Levar). Notably, Mr. Levar, who does not share the alleged national origin of Charging Party (Mexico), was also discharged because of this incident. *See* Separation Letter and Report, attached as Exhibit G. Therefore, similarly situated individuals outside of Charging Party's protected class were treated in exactly the same way. Notably, in the more than 17 months since his separation from Leprino, Charging Party has never alleged that he was treated differently due to his national origin.

Leprino learned of the altercation immediately after it occurred. The company promptly involved the authorities and conducted its own investigation of the incident. Charging Party immediately received the full benefit of Leprino's Workers' Compensation program. Both parties involved were fully aware of the company's standards of conduct. *See* Charging Party's Policy Acknowledgements, attached as Exhibit H, and Mr. Levar's Policy Acknowledgements, attached as Exhibit I. Unfortunately, because both parties were found to have engaged in behavior that was inappropriate and in violation of the company's standards regarding violence in the workplace, the company felt it necessary to separate Charging Party's employment. *See* Separation Letter and Report, attached as Exhibit J.[2]

## Conclusion

Given that this charge is time-barred, and that there is clear evidence that the other employee involved in the situation received the same discipline, Charging Party cannot bring a claim against Leprino for discrimination. The company feels that this information should be sufficient to dismiss this

---

[2] Notably, Charging Party received discipline previously for a verbal altercation with another employee. The Warning, attached as Exhibit K, stated the purpose "to inform and impress upon you the importance of professionally addressing others in frustrating situations."

2

charge. However, should the agency deem it necessary to investigate further into the facts underlying Charging Party's allegations, Leprino will willingly supply a supplemental position statement.

Thank you very much for your assistance with this matter. Please contact me should you have any questions or require further information.

Sincerely,

Susanne E. Jennings
Senior Corporate Counsel

3

# Exhibit A

SELECT A CITY ⌄

INDUSTRIES & TOPICS   🏠   NEWS   LISTS & LEADS   PEOPLE & COMPANIES   EVENTS   LEADERSHIP TRUST   MORE...   🔍

LIFE IN BALANCE:
**Exploring the daily quest to achieve harmony in life** ›

LIMITED TIME OFFER
Subscribe Now

YOUR ACCOUNT
akburma@yahoo.com ⌄

From the Denver Business Journal:
https://www.bizjournals.com/denver/news/2012/07/20/leprino-foods-settles-discrimination.html

# Leprino Foods settles discrimination case

Jul 20, 2012, 5:24am MDT **Updated: Jul 20, 2012, 7:54am MDT**

Cheese manufacturer Leprino Foods Inc. has signed a consent decree to settle allegations of discriminatory hiring practices leveled by the U.S. Department of Labor.



The privately held Denver company reached an agreement with Labor's Office of Federal Contract Compliance Programs, which determined Leprino Foods violated an executive order prohibiting federal contractors and subcontractors from discriminating in their hiring practices on the basis of race, color, religion, sex and national origin.

The Labor Department said Leprino Foods used a pre-employment test caled WorkKeys at its Lemoore, Calif., plant to pick who it hired for on-call laborer positions. The test discriminated against blacks, Asians and Hispanics, the government said. People who were applying for entry-level positions were tested on skills that weren't job-related, such as questions about math.

Leprino Foods will pay $550,000 in back wages, interest and benefits to 253 minority workers who weren't hired between January 2005 and October 2006 because they failed the WorkKeys test. The company also has agreed to stop using the test for that purpose and to hire at least 13 of the original group of rejected applicants.

Leprino Foods has received contracts with the U.S. Department of Agriculture that since 2005 has paid the company nearly $50 million to supply the federal government mozzarella and other dairy products.



**Leprino Foods**

Employee Name: ___Kyle Lara___          Department: __Processing__

Date Issued: ___8/17/2015___

## COMPANY'S REMARKS RE: TERMINATION

Kyle,

<mark>On 8/15/2015 you had an altercation with another employee in the Processing redline room where you assaulted this employee.</mark>

This is violation of our standards of employee conduct which is cause for immediate termination. Please return all company property to your manager.

Regards,

_Julia Lambert_          _8/17/2015_

Julia Lambert, Human Resources Generalist          Date

CC:      Risa Esterly, HR Manager
         Mike Buckhout, Department Manager


**Leprino Foods**

### EMPLOYEE JOB PERFORMANCE DISCIPLINARY NOTIFICATION

Employee Name:  Shawn Morrison          DEPT:  Cheese

Date Warning Issued:  04/18/2016          TYPE OF VIOLATION:  Job Performance

C O M P A N Y ' S   R E M A R K S   R E :   V I O L A T I O N :  **Last and Final Warning**

Shawn,

On March 3, 2016 Julia Lambert, HR Generalist, had a conversation with you on some unacceptable behavior between you and another employee. The other day you were seen picking up another employee around the waist, engaging in this type of behavior is not suited for the work place. This type of unprofessional behavior in the workplace is unacceptable and will not be tolerated.

This warning serves as your last and final warning, any further performance issues within a 12-month period; you will be subject to immediate termination.

### E M P L O Y E E ' S   R E M A R K S   R E :   V I O L A T I O N

The absence of any statement on the part of the employee indicates his/her agreement with this report as stated, write on back of the white copy if necessary.

As of 4-18-2016 there will be no more horse play!!!, per sm

### A C T I O N   T O   B E   T A K E N   T O   C O R R E C T   V I O L A T I O N

Managers Statement :  __Shawn__  was counseled on the above issue.  Future occurrences may result in further disciplinary action up to and including suspensions and/or termination.

**I have read the "warning" and understand it.  Signing below is <u>acknowledging</u> this meeting and receipt of this document.  It does not imply agreement or guilt of the warning.**

Employee Signature: _____  Date: 4-18-2016          Human Resources Signature: _____  Date: 4/18/16

Supervisor/ Manager Signature: _____  Date: 4-18-2016

EXHIBIT
**31**
Schmidt Cm
SUPPLYJUSTICE.COM

REVISED: Disciplinary Action Form – Feb 2015          CONFIDENTIAL          LEP0375

we started off with pre-shifted after pre-shifted we went to stritches and started to miss around. I started to miss around with Carlos acking like I was going to kick him in the middle of his legs. We all were making fun of him for the way he stritches because he puts his legs so far up in the air, but he was joking around with everyone and I went at him and accidentley hit him on his leg not his man parts. After I hit him I was saying that I was sorry and I was repeating it over and over. I told him that I didnt mean to hit him their, he then told me that not to do it again or he was going to go to the blue hats. I said it was ok and Carlos went off to his job position and then started talking to Martin Hernandez then I saw him pointing at me and Carlos started walking twards the office then I knew what was going to happen. After talking to him, Evan and Mandy we went on our ways to our jobs and continued the night. But I didnt hit him in his man parts. I hit him on his leg and I had said sorry multipal time and that it would never happen again. I was willing to take his spot so that he can go home but he said no that he would continue the night.

Crystal Campos

LEP1139


Leprino Foods

Employee Name: _____Crystal Campos_____    Department: __Processing_____

Date Issued: _____06/16/2017_____

## C O M P A N Y ' S   R E M A R K S   R E: TERMINATION

Crystal,

We have concluded our investigation pertaining to the incident between you and another operator that occurred on Tuesday, June 13th. During our investigation, you verbally admitted to kicking your co-worker in the groin area.  Leprino Foods Company has no tolerance for inappropriate touching in the workplace.

Your employment is terminated effective today, June 16, 2017. Due to the grounds of your termination, you are not allowed on Leprino property, nor are you allowed to attend any Leprino sponsored events.

Regards,

_Julia Lambert, Human Resources Generalist_          _6/16/17_
Julia Lambert, Human Resources Generalist          Date


CC:    Manley Frisbie, Department Manager



**Leprino Foods**
2400 East Beaver Avenue
Fort Morgan, CO 80701
970 867-9351



ND Appx., p.733

EXHIBIT
32
Schmidt Cm

# Memo

**To:**     **Personnel File**

**CC:**     **Chris Dreher**

**Date:**   **11/07/12**

**From:** **Shane Cole, Fort Morgan Human Resources Manager**

**Re:**     **Information discovered during investigation about touching other
employees.**

During a recent investigation related to possible workplace violence and bullying, it was
discovered that you (Chris Dreher) physically touch a lot of co-workers during your work time.
Even though the information we gathered indicated the touching was likely not sexual in
nature, we feel that this behavior is inappropriate for the workplace and needs to be
addressed with you.

This memo serves as formal notice to you that we are concerned with the behaviors
displayed regarding the touching of co-workers and expect that you will discontinue such
behaviors. We are serious about having a workplace free of harassing behaviors and one
that is a comfortable place for people to work. In addition to this written notice, we will have
you review the Harassment Prevention training materials and re-affirm your acknowledgment
of our Harassment Prevention policies.

1



**Leprino Foods**
2400 East Beaver Avenue
Fort Morgan, CO 80701
970 867-9351

September 17, 2012

Mr. Jedidiah Camacho
708 Walnut Street
Fort Morgan, CO 80701

Dear Jedidiah:

We have concluded our investigation pertaining to the report we received alleging you made threatening comments against the Fort Morgan Leprino Foods workplace. Leprino Foods Company takes reports of potential workplace violence seriously and investigations of such behavior are elevated to the corporate level. We have determined sufficient evidence exists that establishes you did make inappropriate comments threatening the safety and security of your fellow co-workers. Such behavior is a direct violation of the Company's workplace security policy and will not be tolerated.

Accordingly, your employment is terminated effective September 17, 2012. Due to the grounds of your termination, you are not allowed on Leprino property, nor are you allowed to attend any Leprino sponsored events.

Sincerely,

Shane E. Cole

Shane E. Cole
Human Resources Manager

SEC/slg

EXHIBIT
30
Schmidt    Cm
SUPPLYJUSTICE.COM

CONFIDENTIAL                    LEP0370

**From:** "Jenny Brown" <jbrown@leprinofoods.com>
**Sent:** Tue, 18 Sep 2012 2:32:37 AM GMT
**To:** "FTM Processing Supervisors" <FTM Processing Supervisors@leprinofoods.com>
**Cc:** "Shane Cole" <scole@leprinofoods.com>;"Manley Frisbie" <mfrisbie@leprinofoods.com>
**Subject:** Dept Items

We need to make sure that we are paying attention to rotations, schedules and ensuring that there is not any horseplay, bullying and things of that nature going on our shifts. We need to stay consistent and fair across the board to all employees.

There are rumors that certain people are being favored by forepersons and we can not allow this to happen.

Jenny Brown
Processing Supervisor
Leprino Foods-Fort Morgan
2400 E. Beaver Ave.
Fort Morgan, CO 80701
(970) 542-4225

CONFIDENTIAL LEP0834