## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 19-CV00285-CMA-NRN


 NICOLAS DONEZ,

       Plaintiff,

v.

LEPRINO FOODS, COMPANY, a Colorado
corporation

       Defendant.

---

## SUPPLEMENTAL APPENDIX TO DEFENDANT'S REPLY TO PLAINTIFF'S RESPONSE TO MOTION FOR SUMMARY JUDGMENT

---

1          IN THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF COLORADO

3   Civil Action No. 19-CV-00285-CMA

4   _____

5   NICOLAS DONEZ,

6   Plaintiff,

7   v.

8   LEPRINO FOODS COMPANY,

9   Defendant.
    _____

10     RULE 30(B)(6) DEPOSITION OF LEPRINO FOODS COMPANY
             GIVEN BY STEVEN C. SCHMIDT
11                November 8, 2019
    _____

12

13          PURSUANT TO NOTICE and the appropriate
    rules of civil procedure, the deposition of STEVEN C.
14  SCHMIDT, as representative of Leprino Foods Company,
    called for examination by the Plaintiff, was taken on
15  Friday, November 8, 2019, commencing at 11:13 a.m. at
    Campbell Killin Brittan & Ray, LLC, 270 St. Paul
16  Street, Suite 300, Denver, Colorado, before Carmen
    Murphy, a Registered Professional Reporter and Notary
17  Public in and for the State of Colorado.

18

19

                      Dauster|Murphy
20                 www.daustermurphy.com
                      303.522.1604
21

22

23

24

25

## Page 37

1      **Q.**   Would that be a decision that Kelly Soja
2 would be involved in?
3      **A.**   **No.**
4      **Q.**   Okay.  Does Leprino Foods have written
5 policies regarding what factors should be determined
6 in deciding whether or not to promote an employee?
7      **A.**   **Not that I'm aware of.**
8      **Q.**   I want to switch topics a little bit
9 here and talk about Leprino's actual policies that
10 they had that are pertinent to this case.
11      Can you -- did Leprino have disciplinary
12 policies for its employees at the Fort Morgan plant?
13      **A.**   **The Fort Morgan Employee Guidebook has**
14 **their disciplinary policy.**
15      **Q.**   Okay.  And the Employee Guidebook, is
16 that the Employee Handbook?
17      **A.**   **Yes.**
18      **Q.**   Okay.  I'll hand you what we'll mark as
19 Exhibit 22.
20      (Exhibit 22 marked for identification.)
21      **Q.**   (BY MS. BURMA)  And I'll give you time
22 to look through it.  Let me know if you recognize
23 this document.
24      **A.**   **I do.**
25      **Q.**   Okay.  Can you tell me what it is?

## Page 38

1      **A.**   **It is the Fort Morgan Employee Handbook.**
2      **Q.**   And is this -- does the Employee
3 Handbook contain all of the disciplinary policies for
4 employees at the Fort Morgan plant, or are there
5 additional policy and procedure documents that have
6 other guidelines?
7      **A.**   **Fort Morgan disciplinary guidelines are**
8 **in this book.  They are supposed to be.  Mine stops**
9 **at page 30.**
10      MR. BRITTAN:  I'm sorry, yours --
11      THE DEPONENT:  Mine stops at page 30.
12      MR. BRITTAN:  Oh.  Here.  Let me --
13      MS. BURMA:  Oh.
14      THE DEPONENT:  Disciplinary guidelines
15 are on page 33.
16      MS. BURMA:  Take mine.  I'm sorry.
17      MR. BRITTAN:  So we need to probably
18 mark another one as an exhibit, because the one
19 that's been marked as Exhibit 22 is apparently short.
20 He can use mine.
21      MS. BURMA:  Okay.  I thought I had
22 checked all of them.
23      MR. BRITTAN:  So at a break, we can
24 re-mark this one as Exhibit 22.
25      MS. BURMA:  Here are the pages that

## Page 39

1 aren't included.
2      **Q.**   (BY MS. BURMA)  Okay.  Now, have you
3 gotten to the section of disciplinary policies?
4      **A.**   **Yes.**
5      **Q.**   Is this the disciplinary policies for
6 the employees at the Fort Morgan plant?
7      **A.**   **Yes.**
8      **Q.**   Do different plants have different
9 employee handbooks?
10      **A.**   **Yes.**
11      **Q.**   Why is that?
12      **A.**   **We -- they're different.**
13      **Q.**   Okay.  For the Fort Morgan plant, did
14 Leprino have any zero tolerance policies?
15      **A.**   **Not that I'm aware of.**
16      **Q.**   Do you know -- can you describe to me
17 what your understanding of a zero tolerance policy
18 is?
19      **A.**   **My definition of a zero tolerance policy**
20 **means that you're not going to tolerate it, and**
21 **whatever the infraction is, is going to be thoroughly**
22 **investigated, and that disciplinary action is going**
23 **to be taken up to and including termination based on**
24 **what's learned in the investigation.**
25      **Q.**   Well, how does that differ from just

## Page 40

1 conducting an investigation and -- strike that.
2      Does zero tolerance always result in
3 termination if it's determined that there was a
4 violation of the policy?
5      **A.**   **It depends.  It depends on the degree of**
6 **the violation and what was learned in the**
7 **investigation.**
8      **Q.**   Okay.  Let's take, for example, like,
9 drugs.  If an employee is determined that they had
10 drugs on them at the time that they were at work,
11 would that be something that they would be
12 immediately terminated for?
13      **A.**   **That would be on a very high scale of**
14 **severity and would lead to termination, yes.**
15      **Q.**   Is there any circumstance in which an
16 employee would have drugs on them -- illegal drugs on
17 them during the time that they are working where they
18 would not be terminated?
19      **A.**   **I can't speculate on that.**
20      **Q.**   Are you aware of any such situation?
21      **A.**   **Of?**
22      **Q.**   Of an employee who had illegal drugs on
23 them and was not terminated?
24      **A.**   **The times that I have been involved or**
25 **been over human resources --**

Page 41

1    Q.    Yes.
2    A.    -- when that has been found, there has
3    been termination.
4    Q.    Any other conduct that, in your
5    experience, has resulted in termination?
6    A.    Any other conduct?
7    Q.    Such as -- is there anything else that
8    you can think of similar to being found with illegal
9    drugs that would result in immediate termination?
10   A.    There is so -- again, everything is
11   viewed through the scale of severity.
12   Q.    Uh-huh.
13   A.    And things that reach the end of the
14   scale of severity as the most severe -- whether it's
15   harassment, whether it's workplace violence -- will
16   lead to termination.
17   Q.    Okay.
18   A.    After an investigation.
19   Q.    So in your mind, zero tolerance doesn't
20   mean, if you -- if it's determined that you violated
21   that policy, you're automatically fired?
22   A.    Correct.
23   Q.    Okay.  Did the Fort Morgan plant have a
24   progressive disciplinary policy?
25   A.    Yes.  It's in this section.

Page 42

1    Q.    And what is a progressive
2    disciplinary -- what was Leprino's progressive
3    disciplinary policy?
4    A.    Leprino's or Fort Morgan's?
5    Q.    Fort Morgan's.
6    A.    So it's outlined on this section on
7    page 33, which -- a 5-step process, with the
8    paragraph below it that says, "There are situations,
9    however, where discipline is warranted (up to and
10   including termination) without the use of
11   progressive" disciplinary -- "progressive discipline
12   or counseling.  Each situation is reviewed carefully
13   with action taken appropriate to the
14   specific...circumstances."
15   Q.    Is this policy in place in
16   February 2016?
17   A.    I believe so.
18   Q.    What was -- did Leprino have a separate
19   policy for workplace violence?
20   A.    We have a workplace security policy,
21   yes.
22   Q.    Okay.  And if you look at Exhibit 5.
23   MR. BRITTAN:  In here.
24   Q.    (BY MS. BURMA)  Can you tell me what
25   Exhibit 5 is?

Page 43

1    A.    It's the Human Resources Workplace
2    Security Policy.
3    Q.    Is that provided to employees?
4    A.    It would be available to employees.
5    Q.    Is it -- strike that.
6          Did hourly employees receive training on
7    policies and procedures at the Fort Morgan plant?
8    A.    Yes.
9    Q.    How often did that training take place?
10   A.    It depends what policy it was.
11   Q.    What about for harassment and
12   discrimination?
13   A.    Trying to recall back then whether it
14   was annual or biannual.
15   Q.    So either annually or biannually,
16   employees were provided training on harassment or
17   discrimination; is that fair?
18   A.    Yes.
19   Q.    What did that training consist of?
20   A.    Back then, I believe it was a leader-led
21   PowerPoint presentation on harassment.
22   Q.    Do you recall how long the training
23   would take for harassment/discrimination?
24   MR. BRITTAN:  Let me just object to the
25   extent that it's a compound question.  I don't know

Page 44

1    if harassment and discrimination are two different --
2          MS. BURMA:  Okay.
3          MR. BRITTAN:  But to the extent you can
4    answer, go ahead.
5    Q.    (BY MS. BURMA)  Let's clear that up,
6    then.
7          Did Leprino have a harassment policy at
8    the Fort Morgan plant?
9    A.    Yes.
10   Q.    Did Leprino have a discrimination
11   policy?
12   A.    Yes.
13   Q.    Were they the same policy?
14   A.    No.
15   Q.    Okay.  What's -- first of all, is the
16   harassment and discrimination policy in Exhibit 22?
17   A.    No.
18   Q.    Let's mark this as Exhibit 23.
19          (Exhibit 23 marked for identification.)
20          (Discussion off the record.)
21   Q.    (BY MS. BURMA)  Do you recognize
22   Exhibit 23?
23   A.    Yes.
24   Q.    Can you tell me what that document is?
25   A.    Standards of Ethical and Business

Page 57

1   their employment.
2       Q.    Okay.  And was that a group training?
3   Individual?
4       A.    Could have been both.  Could have been
5   in a meeting.  Could have been in one-on-one training
6   for a new manager or supervisor.
7       Q.    Are you aware of what actually was
8   provided, for example, to Rita Esterly?
9       A.    As part of Risa's on-boarding, she would
10  have been trained on our policies and procedures.
11  She would have been trained on -- most likely by
12  Kelly Soja on the guidebook, and she would have, as
13  she started in her job, had oversight on the
14  application of policies and procedures through Kelly.
15          MR. BRITTAN:  Amy, whenever you get to a
16  good breaking point.  I think we've been going about
17  an hour and 20.
18          MS. BURMA:  Now is fine.
19          MR. BRITTAN:  Okay.  Thank you.
20          (Recess taken from 12:32 p.m. to 12:48 p.m.)
21      Q.    (BY MS. BURMA)  Exhibit 23.
22          MR. BRITTAN:  Here.
23      Q.    (BY MS. BURMA)  Does this document
24  include anything related to workplace violence?
25      A.    I don't believe so.

Page 58

1       Q.    Okay.  To your knowledge -- and I know I
2   don't have a copy of it here -- the equal
3   employment -- the equal employment policy -- let me
4   get the -- the equal employment opportunity policy,
5   to your knowledge, does that include any information
6   relating to workplace violence?
7       A.    It does not.
8       Q.    Okay.  Exhibit 5, to your knowledge, is
9   this the only written policy provided to employees
10  about workplace violence?
11      A.    Yes.
12      Q.    Okay.  If an employee -- if -- strike
13  that.
14          When an employee -- let's go back again.
15  If an employee receives a copy of this
16  policy, is that documented?
17      A.    It would be in their initial new-hire
18  orientation.
19      Q.    So would there be something indicating
20  that they've received it, which the employee would be
21  required to sign?
22      A.    There may be.
23      Q.    Do you know if there is or not?
24      A.    I'm saying, for most plants, they will
25  have people sign off on the receipt of it.

Page 59

1       Q.    Is Leprino's policy to have employees
2   acknowledge receipt of certain policies and
3   procedures?
4          MR. BRITTAN:  Let me just object.
5   In what time frame?
6          MS. BURMA:  2016.
7       A.    Yes.
8       Q.    (BY MS. BURMA)  Is that Leprino's
9   current policy?
10      A.    On certain policies and procedures, yes.
11      Q.    Are there policies and procedures that
12  employees would receive in 2016 -- well, we'll strike
13  that.
14          Are you aware of any specific training
15  that hourly employees would receive on the workplace
16  security policy?
17          MR. BRITTAN:  And, again, time frame?
18          MS. BURMA:  In 2016.
19      A.    I'm not aware of it in 2016.
20      Q.    (BY MS. BURMA)  Are you aware of any
21  specific training that was provided to human
22  resources or managers regarding workplace --
23  regarding the workplace security policy?
24      A.    I am unaware of specific training.
25      Q.    Do you know for a fact whether or not

Page 60

1   Rita Esterly had any training on the workplace
2   security policy?
3       A.    Yes.
4       Q.    How do you know that?
5       A.    It would have been part of her
6   orientation, as well as her on-boarding, as a human
7   resources manager.
8       Q.    What did her training consist of?
9       A.    Generally speaking, her training would
10  consist of -- I mean, as her on-boarding, our Leprino
11  policies, the Fort Morgan handbook.  Thinking.  Our
12  process -- our systems, like HRIS systems, recruiting
13  systems, recruiting processes.
14      Q.    I just want to know, what did Rita
15  Esterly's training on the workplace security policy
16  consist of?
17      A.    It would have consisted in her new-hire
18  orientation training on the policy, as well as --
19  again, Kelly Soja would have done her on-boarding,
20  and this likely was something that they covered.
21      Q.    Do you know whether or not Kelly Soja
22  did cover this policy with Rita Esterly during her
23  on-board training?
24      A.    I cannot say for sure.
25      Q.    Okay.  Is there any documentation

Schmidt
11/08/2019

Page 77

1  recall from that conversation with Kelly Soja?
2      A.    No.  It was a short phone call alerting
3  me of the situation.
4      Q.    Did you -- what was your response to
5  Kelly Soja?
6      A.    "I'm about 40 minutes from Fort Morgan."
7      Q.    Did you give Ms. Soja any instructions
8  on -- regarding what action to take with respect to
9  this incident?
10     A.    I didn't need to.
11     Q.    Okay.  And why didn't you need to?
12     A.    Because she's a seasoned human resources
13  professional.
14     Q.    Did Leprino Foods conduct an
15  investigation involving the incident on February 9,
16  2016?
17     A.    Yes.
18     Q.    And I'm going mark this as 25.
19         (Exhibit 25 marked for identification.)
20     Q.    (BY MS. BURMA)  Can you tell me what
21  this document is?
22     A.    It appears to be a compilation of notes
23  and investigation reports --
24     Q.    To your knowledge, is this --
25         MR. BRITTAN:  Hold on.

Page 78

1         Did you finish your answer?
2      A.    -- and statements.
3      Q.    (BY MS. BURMA)  Oh.  I apologize.
4         Is this Leprino Foods' investigation
5  file for the February 9, 2016, incident?
6      A.    It's a portion of it.
7      Q.    What else would have been included in
8  the investigation file?
9      A.    The Fort Morgan police report.
10     Q.    Okay.  Anything other than the Fort
11  Morgan police report?
12     A.    Not that I recall.
13         There would also -- I don't know if it's
14  in here.  There would also be Nick Donez's written
15  statement that was provided.
16     Q.    I believe that is in here.
17     A.    Is that in here?
18     Q.    Yeah.  It's at the bottom, if you look
19  at LEP0147.
20     A.    Yes.
21     Q.    Is there any additional statement from
22  Nick Donez that Leprino Foods took that you are aware
23  of?
24         MR. BRITTAN:  Object to the form.
25         Go ahead and answer.

Page 79

1         THE DEPONENT:  Oh, okay.
2      A.    The additional statement I'm aware of is
3  that he confirmed with Risa over the telephone after
4  Risa received the Fort Morgan police report that --
5  Nick did confirm with her that he told the police
6  that when Frank pushed him, he pushed Frank back.
7      Q.    (BY MS. BURMA)  Okay.  And that was a
8  police statement, not a statement obtained by Leprino
9  Foods?
10         MR. BRITTAN:  Object to the form.
11         Go ahead.
12     A.    The statement was obtained by the Fort
13  Morgan police, and then, as I said, Nick confirmed
14  that with Risa over the telephone.
15     Q.    (BY MS. BURMA)  Leprino Foods conducted
16  its own separate investigation regarding the incident
17  on February 9, 2016, correct?
18     A.    We conducted an investigation, and then
19  there came a point when the Fort Morgan Police
20  Department took over.
21     Q.    So Leprino Foods conducted an
22  investigation, and the Fort Morgan police conducted
23  an investigation, correct?
24     A.    Yes.
25     Q.    And in Leprino Foods' investigation, we

Page 80

1  only have the one statement from Mr. Donez, correct?
2         MR. BRITTAN:  Object to the form.
3         Go ahead.
4      A.    There's one written statement from
5  Mr. Donez.
6      Q.    (BY MS. BURMA)  Okay.  Who was involved
7  with investigating the incident for Leprino Foods?
8      A.    Risa Esterly, Kelly Soja.  I believe
9  those were the only two that were investigating.
10     Q.    Did Leprino Foods cooperate with the
11  police during the investigation?
12     A.    Yes.
13     Q.    Were there any restrictions placed on
14  Leprino Foods' cooperation with the police?
15     A.    No.
16     Q.    Did Leprino Foods provide the police
17  with all the documents that they asked for from
18  Leprino?
19     A.    Yeah.  So the police requested
20  statements we had gathered.  We provided those to the
21  police.  We provided -- we gave them access to the
22  facility.  We gave them access to the employees they
23  wanted to speak with.
24     Q.    Do you recall if the police ever asked
25  for a copy of Mr. Levar's employment file?

Page 89

1  went to the hospital and saw him, she saw that his
2  eyes were bloodshot and he had a scratchy voice,
3  correct?
4       A.   That's what she says in her report.
5       Q.   Have you ever met Mr. Donez?
6       A.   I'm unsure.
7       Q.   Do you know how long Mr. Donez was in
8  the hospital?
9       A.   I'm unsure.
10       Q.   Heather witnessed -- was one of the
11  first people to find Mr. Donez after the incident,
12  correct?
13       A.   Could you say that again?
14       Q.   Heather Donez actually went to the room
15  where the assault happened before Nick was removed by
16  EMS, correct?
17           MR. BRITTAN:  Object to the form.
18           Go ahead.
19       A.   Yeah.  I'm unsure of when she went
20  there, but I know she was alerted.
21       Q.   (BY MS. BURMA)  Why wasn't a statement
22  taken from Heather Donez?
23       A.   I'm unsure.
24       Q.   Heather was involved with removing
25  property from the scene, correct?

Page 90

1       A.   I don't know about that.
2       Q.   Okay.  We'll mark this as 26.
3           (Exhibit 26 marked for identification.)
4       Q.   (BY MS. BURMA)  Just handed you
5  Exhibit 26.
6           Have you ever seen this document before?
7       A.   No.
8       Q.   Okay.  It's a chain of custody from the
9  police, and it has a description of property that
10  they obtained during their investigation, and it has
11  a chain of custody at the bottom.
12           And so it looks, at least based on this,
13  that Heather Donez was involved with removing some of
14  the property from the scene?
15       A.   I don't know what this is.
16       Q.   It's important for companies to do
17  thorough investigations regarding violations of its
18  policies, correct?
19       A.   Yes.
20           MR. BRITTAN:  Can you read that question
21  back, please?
22           (The last question was read back.)
23           MR. BRITTAN:  Thank you.
24       A.   I answered "yes."
25       Q.   (BY MS. BURMA)  Oh, sorry.

Page 91

1           MR. BRITTAN:  Yeah.
2       Q.   (BY MS. BURMA)  And Mr. Donez was
3  removed by the scene from EMS, correct?
4       A.   Yes.
5       Q.   He was taken to the hospital, correct?
6       A.   Yes.
7       Q.   You're unaware -- did you say you were
8  unaware of how long he was in the hospital?
9       A.   Yes.
10       Q.   Do you know if it was at least
11  overnight?
12       A.   I believe so.
13       Q.   Okay.  Who's ultimately responsible for
14  the decision to terminate Mr. Donez?
15       A.   I guess it would be me.
16       Q.   When was that decision made?
17       A.   It was a couple of weeks after.  It
18  would have to be the -- I don't have the exact date.
19  It would be the date of his termination letter, I
20  would assume.
21       Q.   Was the decision to terminate made prior
22  to the date of his termination letter?
23       A.   Can I see the termination letter?
24       Q.   Yeah.  Sure.  It's Exhibit 19.
25       A.   It would be around that time, either

Page 92

1  that day or maybe one or two days prior.
2       Q.   Is there any dispute that Frank Levar
3  was the first one to initiate physical contact in
4  this assault?
5           MR. BRITTAN:  Object to the form.
6       A.   In Frank's statement, he stated that he
7  pushed Nick --
8       Q.   (BY MS. BURMA)  Okay.
9       A.   -- after -- he pushed or moved Nick away
10  from him.
11       Q.   So in his statement, Mr. Levar
12  acknowledged pushing Nick away from him before Nick
13  engaged in any physical activity against Mr. Levar?
14       A.   Yes.
15       Q.   Stated differently, Mr. Levar was the
16  first one to initiate physical contact?
17       A.   Yes.
18       Q.   And if you go to Exhibit 18, that
19  appears to be Mr. Levar's termination letter,
20  correct?
21       A.   Yes.
22       Q.   And that was prepared by Julia Lambert,
23  who is an employee of Leprino Foods?
24       A.   Yes.
25       Q.   Is it -- oh, let's take a step back.

Page 1

1           IN THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF COLORADO

3   Civil Action No. 19-CV-00285-CMA

4   _____

5   NICOLAS DONEZ,

    Plaintiff,

6
    v.

7
    LEPRINO FOODS COMPANY,

8
    Defendant.

9   _____

10           DEPOSITION OF JULIA LAMBERT
                  November 21, 2019

11  _____

12          PURSUANT TO NOTICE and the appropriate
    rules of civil procedure, the deposition of JULIA

13  LAMBERT, called for examination by the Plaintiff, was
    taken on Thursday, November 21, 2019, commencing at

14  1:32 p.m. at the Logan County Courthouse, 110 North
    Riverview Road, Sterling, Colorado, before Jennifer

15  Bajwa Melius, a Registered Professional Reporter and
    Notary Public in and for the State of Colorado.

16

17

18                  Dauster│Murphy
                 www.daustermurphy.com

19                   303.522.1604

20

21

22

23

24

25

Lambert
11/21/2019

Page 13

1  **A.   June 19, 2019.**
2  Q.   And it's my understanding that you
3  worked there for over 20 years at Leprino?
4  **A.   Correct.**
5  Q.   That's a long time for one company.  If
6  you don't mind me asking, why were you terminated?
7  **A.   Performance.**
8  Q.   Okay.  And I'll have some more questions
9  for you on that later.
10  So do you recall when you were first
11  hired at Leprino?
12  **A.   Yes.**
13  Q.   The approximate date, if you know it.
14  **A.   November 8th.  I'm not sure of the year.**
15  Q.   It's probably, like, what?  '95, '6,
16  '8 -- sometime -- mid-'90s?
17  **A.   Correct.**
18  Q.   Mid to late '90s?
19  **A.   Correct.**
20  Q.   Okay.  What were you hired for when you
21  first got a job at Leprino?
22  **A.   The HR secretary.**
23  Q.   How long did you have that position?
24  **A.   Twelve years.**
25  Q.   And then did you have any other

Page 14

1  positions during your time at Leprino?
2  **A.   Then I was promoted.**
3  Q.   And what was your job when you were
4  promoted?
5  **A.   HR supervisor.**
6  Q.   Any other jobs?
7  **A.   No.**
8  Q.   So about 12 years after you worked
9  there -- do you recall when your promotion was to HR
10  supervisor?
11  **A.   No.  I don't recall the date.**
12  Q.   Like 2010-ish maybe?
13  **A.   I would say yes.**
14  Q.   Okay.  When you were the HR supervisor,
15  did you have any direct reports?
16  **A.   Yes.**
17  Q.   How many?
18  **A.   Three.**
19  Q.   Who were they?
20  **A.   HR assistant and two training**
21  **forepersons.**
22  Q.   Two training persons?
23  **A.   Training forepersons.**
24  Q.   Forepersons.  Okay.  Was that consistent
25  throughout the time that you were an HR supervisor?

Page 15

1  **A.   Yes.**
2  Q.   And was the HR assistant Sheryl Groves?
3  **A.   Correct.**
4  Q.   And the two training forepersons, tell
5  me about those.  Did they change?  How did that work?
6  **A.   Yes, they changed.**
7  Q.   Were they just rotated out?  How did --
8  **A.   No.  We lost -- we had one -- a couple**
9  **of them and then they moved on, so then we hired**
10  **others.**
11  Q.   Maybe I should ask what is a training
12  foreperson?
13  **A.   They go down to the floor and train new**
14  **hires, anyone promoted on the proper procedures of**
15  **the equipment.**
16  Q.   All right.  Starting backwards, who was
17  your last supervisor at Leprino?
18  **A.   My last supervisor at Leprino?**
19  Q.   Yes.
20  **A.   When I left?**
21  Q.   Yes.
22  **A.   Was Kelly Durham.**
23  Q.   Okay.  And I believe before that was
24  Rita Esterly?
25  **A.   Risa Esterly.**

Page 16

1  Q.   Risa Esterly.  And before that was Shane
2  Cole; is that correct?
3  **A.   Correct.**
4  Q.   And I don't think we need to go any
5  further back than that.
6  Did you get along with Mr. Cole?
7  **A.   Yes.**
8  Q.   What about Ms. Esterly?
9  **A.   Yes.**
10  Q.   What about Ms. Durham?
11  **A.   Yes.**
12  Q.   Have you spoken to either Ms. Esterly,
13  Ms. Durham, or Mr. Cole since your termination?
14  **A.   Yes.**
15  Q.   Who have you spoke to?
16  **A.   Risa Esterly.**
17  Q.   When did you speak -- when did you last
18  speak with her?
19  **A.   In May.**
20  Q.   What did you talk about?
21  **A.   Her daughter's graduation.**
22  Q.   Do you still stay in touch with her?
23  **A.   Yes.**
24  Q.   Do you socialize -- when you were at
25  Leprino, did you socialize outside of work?

Page 53

1   knowledge, was prohibited conduct for Leprino?
2       A.   Correct.
3       Q.   Did Leprino enforce its policies
4   consistently with its employees?
5       A.   Yes.
6       Q.   Did Leprino ever have any issues with
7   some supervisors or foremen showing favoritism?
8       A.   Yes.
9       Q.   Can you tell me about those?
10      A.   Not specifically.
11      Q.   What about in general?
12      A.   Just the perception of the employees
13  that there were -- there was favoritism.
14      Q.   Did you disagree with that perception?
15      A.   Did I disagree with that?  No.
16          MS. BURMA:  I saw you looking at your
17  watch.  Do you want to take a break or no?
18          MR. BRITTAN:  I don't have a watch.
19          MS. BURMA:  Oh, I thought you were.
20  Never mind.
21          MR. BRITTAN:  But we probably need to
22  take a break in about five minutes.
23          MS. BURMA:  Yes.  Well, now is a good
24  spot if you want to stop.
25          MR. BRITTAN:  Okay.  Let's take a break.

Page 54

1          (Recess from 2:33 p.m. to 2:47 p.m.)
2          MS. BURMA:  We're back on the record
3   after a break.
4       Q.   (BY MS. BURMA)  I asked you if you still
5   stay in contact with Risa Esterly.  Do you still stay
6   in contact with Shane Cole?
7       A.   No.
8       Q.   Were you close with him when he was your
9   supervisor?
10      A.   Yes.
11      Q.   Did you socialize together outside of
12  work?
13      A.   Yes.
14      Q.   When was the last time you talked to
15  Mr. Cole?
16      A.   I don't recall.
17      Q.   Do you have any idea as to where he's
18  working, what he's up to these days?
19      A.   Somewhere in Greeley.
20      Q.   Okay.  I'm going to hand you what we're
21  going to mark as Exhibit 46.
22          (Exhibit Number 46 was marked.)
23      Q.   (BY MS. BURMA)  And I know -- this is an
24  e-mail dated Tuesday, September 18, 2012.  It's from
25  Jenny Brown to FTM processing supervisors.  Who is

Page 55

1   FTM processing supervisors?  Is that Fort Morgan --
2       A.   Fort Morgan processing supervisors.
3       Q.   And then it cc's Shane Cole.  The last
4   sentence of that first paragraph says, "We need to
5   stay consistent and fair across the board to all
6   employees."
7          I know you're not on this e-mail.  Do
8   you recall being fair and consistent an issue in the
9   end of 2012 or during 2012?
10          MR. BRITTAN:  Object to the form and
11  foundation.
12      A.   I don't recall.
13          MS. BURMA:  Mark this as Exhibit 47.
14          (Exhibit Number 47 was marked.)
15      Q.   (BY MS. BURMA)  And, again, it's minute
16  meetings from September 13, 2012.  I know that you
17  are not present.  Have you ever seen this document
18  before?
19      A.   No.
20      Q.   If you go to the second page at the
21  bottom, it says, "General leadership roundtable
22  discussions."  I'll give you a second to review that,
23  and let me know when you're finished.
24      A.   Okay.
25      Q.   To your knowledge, is the last two

Page 56

1   paragraphs -- or the last section, "The workplace
2   violence threat and our people's reaction to the
3   issue," is that in reference to Jedidiah Camacho?
4          MR. BRITTAN:  Object to the form and
5   foundation.
6       A.   Not that I recall.
7       Q.   (BY MS. BURMA)  Do you recall a
8   workplace violence threat in September 2012 at
9   Leprino?
10      A.   Not that I recall.
11      Q.   The last paragraph says, "We also
12  reviewed the need of our department leaders to be at
13  a point where this type of behavior can be identified
14  and corrected prior to reaching this level."
15          Do you recall any steps that Leprino
16  took in September 2012 to provide any additional
17  training?
18          MR. BRITTAN:  Form and foundation.
19      A.   I don't remember.
20      Q.   (BY MS. BURMA)  As a human resources
21  employee, would you have been involved with training
22  with respect to -- would you be involved with
23  training department leaders to identify inappropriate
24  behavior?
25      A.   No.

Page 117

1      **A.**   **Correct.**
2      Q.   Do you call it personnel or employee?
3      **A.**   **Personnel file.**
4      Q.   Is there a difference between personnel
5  and employee files?
6      **A.**   **Not that I. . .**
7      Q.   Okay.  Are there any other files for
8  employees for their records that are kept at Leprino?
9      **A.**   **Lots of files, yes.**
10     Q.   I believe there's, like, medical
11 records?
12     **A.**   **Yes.  I-9s.**
13     Q.   Okay.  But some of that information such
14 as, you know, their application, their wage
15 increases, performance reviews --
16     **A.**   **Right.**
17     Q.   -- disciplinary actions --
18     **A.**   **Correct.**
19     Q.   -- that's kept in their personnel file?
20     **A.**   **Correct.**
21     Q.   Okay.  Aside from wage increases, I
22 think there's attendance information, disciplinary
23 actions, performance reviews, you know, everything
24 from offsetting cost of boots.
25     **A.**   **Correct.**

Page 118

1      Q.   What else was kept in personnel files
2  for employees at Leprino while you were there?
3      **A.**   **The policies.**
4      Q.   You mean the --
5      **A.**   **So, like, the signing off --**
6      Q.   The reaffirmation pages?
7      **A.**   **The reaffirmation?  No.  Those were**
8  **in -- they were in a binder.**
9      Q.   So what we looked at earlier, the
10 reaffirmation page, those weren't kept in an
11 employee's personnel file?
12     **A.**   **They were in a binder.**
13     Q.   And do you know why they were separate?
14     **A.**   **I don't.**
15     Q.   Do you know who was responsible for kind
16 of setting up the organizational system for personnel
17 files at the Fort Morgan plant?
18     **A.**   **Sheryl, who was the HR assistant.**
19     Q.   And that's Sheryl Groves?
20     **A.**   **Sheryl Groves.**
21     Q.   And was Ms. Groves kind of responsible
22 for maintaining the employee files?
23     **A.**   **Correct.**
24     Q.   Okay.  Investigative records.  Where
25 were they kept?

Page 119

1      **A.**   **I don't believe there was one specific**
2  **location.**
3      Q.   To your knowledge, what different
4  locations?
5      **A.**   **I believe there was a file cabinet in**
6  **the HR manager's office, and then there was a file**
7  **cabinet in the HR supervisor's office.**
8      Q.   Did Leprino have any specific policy as
9  to what records to keep and how to organize
10 investigative files?
11     **A.**   **Not to my knowledge.**
12     Q.   After -- strike that.
13     It seemed like Shane Cole liked to do
14 more kind of witness interviews and summaries of the
15 interviews, and Ms. Esterly kind of preferred witness
16 statements.  Is that a fair assessment when it comes
17 to investigating incidences at Leprino?
18     **A.**   **I believe Mr. Cole also had some**
19 **statements from employees.  I think it was a cross**
20 **between the two.**
21     Q.   Do you know if there's any difference
22 from -- and I don't have that many, so it's just --
23     **A.**   **Right.**
24     Q.   -- on what I've seen.
25     **A.**   **Not that I remember.**

Page 120

1      Q.   Do you recall any difference in their
2  style between how Mr. Cole and Ms. Esterly conducted
3  the investigation?
4      **A.**   **Not that I recall.**
5      MS. BURMA:  I think that is all I have.
6      MR. BRITTAN:  Ms. Lambert, just a couple
7  of questions.  You're going to be facing me here, so
8  keep your voice up --
9      THE DEPONENT:  Okay.
10     MR. BRITTAN:  -- so the court reporter
11 can hear you.
12     EXAMINATION
13 BY MR. BRITTAN:
14     Q.   You were asked a couple of questions
15 early on in the deposition about the issue of
16 self-defense at the plant.  At any point in time
17 while you were employed at Leprino's Fort Morgan
18 plant, was there ever an issue that you remember that
19 came up where there was an employee that claimed
20 self-defense in an altercation at the plant?
21     **A.**   **Not that I ever remember.**
22     Q.   Okay.  In fact, was there ever a
23 situation where you or anyone else, to your
24 recollection in the HR department, had to make a
25 determination about whether there should be any

## Page 121

1 discipline issue to an employee who was claiming
2 self-defense?
3     A. That never came up, so, no, not that I
4 remember.
5     Q. So with regards to the testimony that
6 you gave earlier about whether you believed
7 self-defense would have been included in a situation
8 and would have been a violation of the workplace
9 violence policy, you never had a situation where that
10 had to be implemented at the plant?
11     A. No.
12     MS. BURMA: Object. Leading.
13     A. No, I didn't.
14     Q. (BY MR. BRITTAN) Okay. And with
15 regards to your opinions you've expressed that you
16 thought that a situation where someone was acting in
17 self-defense would have been a violation, as far as
18 you know, were you ever instructed specifically on
19 that issue while you were at Leprino Foods?
20     A. No, not that I remember.
21     Q. Okay. Was it just your opinion as you
22 were sitting here today, never having come across
23 that issue before?
24     A. It was my personal opinion.
25     Q. Okay.

## Page 122

1     MR. BRITTAN: I don't think I have
2 anything further.
3     MS. BURMA: Just two quick follow-ups.
4     EXAMINATION
5 BY MS. BURMA:
6     Q. Your attorney -- or Leprino's attorney,
7 Mr. Brittan, just asked you some follow-up questions
8 regarding the self-defense issue, and you said that
9 what you testified to earlier was your personal
10 opinion.
11     Is your personal opinion based on, you
12 know, the 20 years of experience that you had working
13 at Leprino in their human resources department at the
14 Fort Morgan plant?
15     A. Partially, yes.
16     Q. So does part of your personal opinion --
17 is part of it formed by your experiences at Leprino?
18     A. I would say yes.
19     Q. And the information that you learned
20 while you were employed there with respect to their
21 policies and procedures?
22     A. I would say yes.
23     MS. BURMA: That's all I have.
24     MR. BRITTAN: Read and sign.
25     THE REPORTER: Through you?

## Page 123

1     MR. BRITTAN: Yes.
2     MS. BURMA: I'll just get the same order
3 that I have been getting.
4     MR. BRITTAN: Same order as we had with
5 Carmen.
6     * * * * * * *
7     WHEREUPON, the foregoing deposition was
8 concluded at the hour of 4:19 p.m.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 124

1     REPORTER'S CERTIFICATE
2     I, Jennifer Bajwa Melius, a Registered
3 Professional Reporter and Notary Public within and
4 for the State of Colorado, commissioned to administer
5 oaths, do hereby certify that previous to the
6 commencement of the examination, the deponent was
7 duly sworn/affirmed by me to testify the truth in
8 relation to matters in controversy between the said
9 parties.
10     I further certify that this deposition was
11 taken in stenotype by me at the time and place herein
12 set forth and thereafter reduced to a typewritten
13 form; that the foregoing constitutes a true and
14 correct transcript to the best of my ability.
15     I further certify that I am not related to,
16 employed by, nor of counsel for any of the parties or
17 attorneys herein, nor otherwise interested in the
18 result of the within action.
19     My commission expires August 31, 2023.
20
21
22     _____
23     JENNIFER BAJWA MELIUS
    Registered Professional Reporter
    and Notary Public
24
25

Page 1

1        IN THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF COLORADO

3    Civil Action No. 19-CV-00285-CMA

4    _____

5    NICOLAS DONEZ,

     Plaintiff,

6

7    v.

     LEPRINO FOODS COMPANY,

8

     Defendant.

9    _____

10          DEPOSITION OF RISA ESTERLY-WESSBECKER
                    November 6, 2019

11   _____

12          PURSUANT TO NOTICE and the appropriate
     rules of civil procedure, the deposition of RISA
13   ESTERLY-WESSBECKER, called for examination by the
     Plaintiff, was taken on Wednesday, November 6, 2019,
14   commencing at 1:00 p.m. at the Burma Law Offices,
     1035 Pearl Street, Suite 325, Boulder, Colorado,
15   before Carmen Murphy, a Registered Professional
     Reporter and Notary Public in and for the State of
16   Colorado.

17

18
                       Dauster|Murphy
19                  www.daustermurphy.com
                       303.522.1604
20

21

22

23

24

25

Page 73

1    A.   After the phone call?
2    Q.   After the phone call.
3    A.   Yes, I did.
4    Q.   When was that?
5    A.   On his termination date.
6    Q.   And where was that conversation?
7    A.   In my office.
8    Q.   How did it come -- had Mr. Donez
9  returned to work at that point?
10   A.   No, he did not.
11   Q.   Did you have any information as to when
12 Mr. Donez would be returning to work?
13   A.   Not that I recall.
14   Q.   Do you know why Mr. Donez was not at
15 work?
16   A.   Specifically?
17   Q.   Was it for any other reason aside from
18 the injuries that he received in the assault?
19   A.   No.
20   Q.   Okay.  Did I ask you do you recall when
21 you set up the meeting -- if you set up a meeting, if
22 you contacted Mr. Donez to set up a meeting?
23   A.   Do I recall when it was, no.  Did I do
24 it --
25   Q.   Okay.

Page 74

1    A.   -- yes, because he came in.
2    Q.   Do you recall anything about that
3  conversation?
4    A.   This conversation -- which conversation?
5    Q.   The conversation -- sorry.  So you had
6  the phone call.
7    A.   Yes.
8    Q.   You ended it.
9    A.   Yes.
10   Q.   And at some point there was a meeting on
11 February 29?
12   A.   Yes.
13   Q.   In between the meeting on February 29,
14 2016, and that phone call, did you have any
15 communications that you can recall with Nick Donez?
16   A.   Phone conversation and him coming in.
17 Not off the top of my head.
18   Q.   Okay.  Do you recall what happened
19 during the meeting on February 29, 2016?
20   A.   Yes.  Go on?
21   Q.   Yes.
22   A.   Nick came into my office, and I
23 presented him with the termination letter at that
24 point.  I asked him if there was anything downstairs
25 that he needed in his -- they have lockers

Page 75

1  downstairs.  And I believe he said no, and walked him
2  out.
3    Q.   Do you recall if Mr. Donez said anything
4  during that meeting?
5    A.   Not that I can think of, no.
6    Q.   Did you recommend that Mr. Donez be
7  terminated to corporate?
8    A.   Yes.
9    Q.   And was your recommendation the first
10 recommendation regarding Mr. Donez's termination?  I
11 mean, was there someone else before you, such as
12 Kelly Soja or Ron Cantwell, who recommended it prior
13 to your recommendation?
14   A.   Not that I can recall.
15   Q.   Do you recall how many conversations you
16 had with other employees at Leprino before Nick
17 Donez's termination regarding Nick Donez's
18 termination?
19   A.   Let me clarify.  How many people I spoke
20 to about Nick's --
21   Q.   Termination.
22   A.   -- termination.
23   Q.   How many conversations you had.
24   A.   No.
25   Q.   Was it more than one?

Page 76

1    A.   Probably.
2    Q.   More than five?
3    A.   I couldn't tell you.
4    Q.   After the criminal trial, did you speak
5  with anyone at Leprino about this incident, aside
6  from counsel today or in this past month?
7    A.   Okay.  So after the criminal trial, did
8  I speak with anyone else about this?
9    Q.   About this incident.
10   A.   I do not recall.
11   Q.   Do you think an employee should be
12 terminated if they are acting in self-defense?
13   A.   I think it depends upon the situation.
14   Q.   Explain.
15   A.   It's hard for me to tell you because it
16 really -- it depends upon the situation.  I mean, if
17 someone is coming after me with a knife, I'm going
18 to, you know -- I don't know.  I can't answer that.
19 I'm sorry.
20   Q.   During your time at Leprino, did you
21 conduct any other -- any investigations involving
22 workplace violence?
23   A.   Workplace violence.  Not that I can
24 recall off the top of my head.
25   Q.   Can you turn to Exhibit 14 in this

## Page 89

1 recording of the interview that they did with
2 Mr. Donez?
3    **A.**   **No.**
4    **Q.**   Did you have other audio recordings of
5 interviews that the police did with employees --
6    **A.**   **No.**
7    **Q.**   -- during the investigation?
8    **A.**   **No.**
9    **Q.**   During the interviews that you were
10 present for with the police, did you take your own
11 notes?
12    **A.**   **Yes.**
13    **Q.**   Do you recall what happened to those
14 notes?
15    **A.**   **Can I grab an exhibit?**
16    **Q.**   Uh-huh.
17    **A.**   **17?**
18    **Q.**   This isn't a test.  You can --
19    **A.**   **They are documented on Exhibit 17,**
20 **page 5 and page 6.**
21    **Q.**   Did you take -- maybe I just need to
22 find a copy of that somewhere.  Just going to steal
23 yours really quick.
24    **A.**   **I think actually that one is yours.  Is**
25 **that the one you didn't have?**

## Page 90

1    **Q.**   No.  It's got the sticker.
2    **A.**   **Oh, okay.  I thought that was the one**
3 **that had the -- oh, this one is.**
4    **Q.**   Is there any additional notes aside from
5 what you have in Exhibit 17 regarding -- that you
6 took during the investigation, during the interviews
7 with the police?
8    **A.**   **Not that I can recall, no.**
9    **Q.**   Is there anything different or unusual
10 about the way that the investigation into this
11 incident was handled as compared to other incidents
12 that you have investigated throughout your career?
13    **A.**   **No.**
14    **Q.**   About how many investigations do you
15 think you have done in your 20 years of HR?
16    **A.**   **To this level?**
17    **Q.**   Yes.
18    **A.**   **Maybe one a year.  So 20.**
19    MS. BURMA:  That's all I have.
20          EXAMINATION
21 BY MR. BRITTAN:
22    **Q.**   Let me just ask you a quick question.
23 Would you put Exhibit 19 in front of you.
24    **A.**   **Yeah.  Sorry.**
25    **Q.**   There you go.  Now, I don't want you to

## Page 91

1 look at me, because the court reporter needs to hear
2 you.
3        You were asked a question just a minute
4 ago about the language here that says, "During our
5 investigation you verbally admitted to us you pushed
6 your operator.  Leprino Foods has no tolerance for
7 workplace violence."
8        We read that earlier, correct?
9    **A.**   **Correct.**
10    **Q.**   Okay.  Now, with regards to the reasons
11 why Leprino terminated Mr. Donez's employment at
12 Leprino Foods' Fort Morgan plant, it involved his
13 pushing Frank Levar, correct?
14    **A.**   **Correct.**
15    **Q.**   Okay.  And the information that
16 demonstrated that to you was, Number 1, Mr. Donez
17 admitting to that in your conversation with him,
18 correct?
19    **A.**   **Correct.**
20    **Q.**   Mr. Levar telling you that when you
21 interviewed him and in his statement, correct?
22    **A.**   **Correct.**
23    **A.**   **As well as what you were told by the**
24 police officer and then confirmed in the police
25 reports that you ultimately received; is that

## Page 92

1 correct?
2    **A.**   **Correct.**
3    **Q.**   And those three different sources of
4 information were used in determining the -- or making
5 the determination to terminate Mr. Donez's
6 termination -- employment, correct?
7    **A.**   **That is correct.**
8    MR. BRITTAN:  Sorry.  I struggled on
9 that one.
10        All right.  I have nothing further.
11 Thank you.
12    MS. BURMA:  Yeah, no, I don't have
13 anything.  Thank you very much for your time.
14    THE DEPONENT:  Thank you.
15    MR. BRITTAN:  We'll read and sign.
16    MS. BURMA:  Oh, can I ask one more quick
17 question.
18    THE DEPONENT:  On the record?
19    MS. BURMA:  Yes.
20    THE DEPONENT:  Oh, dang, I was joking
21 when I said that.
22    MR. BRITTAN:  Deposition is over with.
23 Thank you.
24    MS. BURMA:  Really, Bill, you're not
25 going to let me ask one more follow-up?

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 19-CV00285-CMA-NRN

NICHOLAS DONEZ,

      Plaintiff,

v.

LEPRINO FOODS COMPANY

      Defendant.

---

**AFFIDAVIT OF KENSI M. MAYS**

---

      I, Kensi M. Mays, being of lawful age and being first duly sworn, upon oath, deposes and says the following:

    1.    I am over the age of eighteen, of sound mind, and have personal knowledge to testify as to the matters set forth in this Affidavit.

    2.    I am an attorney at Campbell Killin Brittan & Ray, LLC ("CKBR") representing Defendant Leprino Foods Company ("Defendant") in the above-captioned matter.

    3.    Pursuant to CKBR's request, the Fort Morgan Police Department ("Fort Morgan PD") provided a certified copy of the police report (the "Police Report"), audio recordings (the "Recordings"), and photographs (the "Photographs") relating to the incident which occurred on or around February 9, 2016 between Plaintiff Nicolas Donez and Frank Levar at Leprino Foods Company, 2400 East Beaver Avenue, Fort Morgan, Colorado (collectively, the "Records").

4.      I received and reviewed the certified hard copy of the Police Report and the certified compact disc (CD) containing the Recordings and Photographs provided by the Fort Morgan PD.

5.      Using audio editing software, I trimmed the relevant Recordings (the "Recording Snippet") identified in Defendant's Reply to Plaintiff's Response in Opposition to Motion for Summary Judgment (the "Reply").

6.      Further, I added the Recording Snippet to the same Workshare[1] folder provided in Plaintiff's Motion for Summary Judgment and prepared the universal serial bus (USB) containing the Recording Snippet which was hand delivered to this Court on January 21, 2020. A copy of the Recording Snippet is also accessible via the hyperlink listed on **Exhibit A** attached hereto and within the Reply (the "Hyperlink").

7.      I affirm the contents of the Hyperlink is an accurate snippet of the relevant Recordings received from the Fort Morgan PD and can testify thereto at trial if necessary.

FURTHER AFFIANT SAYETH NAUGHT.

*Kensi M. Mays*

Kensi M. Mays

STATE OF COLORADO                    )
                                     ) ss.
CITY AND COUNTY OF DENVER            )


SUBSCRIBED AND SWORN TO before me on January 21, 2020 by Kensi M. Mays.


Witness my hand and official seal.

My Commission Expires: _Feb. 20, 2022_

TERRI L. PONTARELLI
Notary Public – State of Colorado
Notary ID 20184008027
My Commission Expires Feb 20, 2022

*Terri L. Pontarelli*

Notary Public

---

[1] Workshare is an internet-based file sharing application.

# EXHIBIT A
## Hyperlink to Audio Recording Snippet

Recording Snippet 4

```
 1                IN THE UNITED STATES DISTRICT COURT

 2                   FOR THE DISTRICT OF COLORADO

 3     Civil Action No. 19-CV00285-CMA
       _____
 4
       VIDEO DEPOSITION OF:  NICOLAS DONEZ - August 26, 2019
 5     _____

 6     NICOLAS DONEZ,

 7     Plaintiff,

 8     v.

 9     LEPRINO FOODS, INC.,

10     Defendant.

11     _____

12             PURSUANT TO NOTICE, the video deposition
       of NICOLAS DONEZ was taken on behalf of the Defendant
13     at 1035 Pearl Street, Suite 325, Boulder, Colorado, on
       August 26, 2019, at 9:54 a.m., before Carmen Murphy,
14     Registered Professional Reporter and Notary Public
       within Colorado.

15

16

17

18

19

20

21

22

23

24

25
```

**H+G**

Hunter + Geist, Inc.

303.832.5966
800.525.8490

1900 Grant Street, Suite 1025
Denver, CO 80203

■ www.huntergeist.com
■ scheduling@huntergeist.com

Your Partner in Making the Record

Court Reporting, Legal Videography, and Videoconferencing

Page 117

1    mischaracterizes the testimony and documents.
2        A.   Repeat that, please.
3        Q.   (BY MR. BRITTAN)  The statement that you
4    gave to Leprino Foods and the statements that you gave
5    to the police department were that when you were
6    pushed, you pushed back, correct?
7        A.   That's correct.
8        Q.   Okay.
9        A.   In self-defense.
10       Q.   There's nothing in the reports that
11   indicate a need for self-defense --
12           MS. BURMA:  Objection --
13       Q.   (BY MR. BRITTAN) -- is there?
14           MS. BURMA:  Mischaracterizes the
15   documents.
16       A.   Not in the reports, but --
17       Q.   (BY MR. BRITTAN)  Okay.
18       A.   -- the end results were my being
19   hospitalized with a broken trachea.  So I was right in
20   my guesstimation.
21       Q.   Sir, you understand there was a fight
22   that day?
23       A.   I consider a fight when two people are
24   involved.
25       Q.   Well, aren't you and Mr. Levar two

Page 118

1    people?
2        A.   I was not fighting him back.  I was
3    defending myself.
4        Q.   Sir, the reports that Leprino Foods had
5    was that one employee pushed an employee -- that being
6    you -- and that the other employee -- that being
7    you -- pushed Mr. Levar back, correct?
8            MS. BURMA:  Objection, asked and
9    answered.
10       A.   Yes, I've answered that.  Yes.
11       Q.   (BY MR. BRITTAN)  Okay.  If those are
12   the reports that Leprino Food had, don't you think it
13   was reasonable for them to terminate your employment
14   based on the workplace violence policy?
15       A.   No.
16       Q.   Why?
17       A.   Because I -- that day of the -- the day
18   of my termination, I specifically told Risa that --
19   that I had done that in self-defense.
20       Q.   Where did you tell Risa that?
21       A.   Where did I tell her?
22       Q.   Yeah.
23       A.   In her office when she called me in,
24   which was that -- the 29th.
25       Q.   Okay.  So you didn't tell Risa anything

Page 119

1    about self-defense before that day, correct?
2        A.   I can't remember.
3        Q.   Okay.  It's certainly not in your
4    statement that we have marked as Exhibit Number 6,
5    correct?
6        A.   That's correct.
7        Q.   And it's not in the police reports,
8    correct?
9        A.   That's correct.
10       Q.   And when you talked to the police, you
11   want to be as truthful and accurate as you can,
12   correct?
13       A.   I gave him my statement to the best of
14   my knowledge.
15       Q.   Okay.  And you gave the statement that
16   we have marked as Exhibit Number 6 to the best of your
17   knowledge, correct?
18       A.   Considering what I had been through,
19   yes, sir.
20       Q.   Okay.  And it was not until you
21   apparently met with Risa Esterly after you received
22   your termination letter that you advised her that you
23   were acting in self-defense; is that a fair statement?
24       A.   I can't say that that was the only time
25   that I told her.  I cannot clearly remember whether I

Page 120

1    had told her prior to that.  I can't remember.
2        Q.   Would it be fair to say that as you sit
3    here right now, the only -- the first time you
4    remember telling anyone in HR at Leprino Foods about
5    acting in self-defense is when you met with Risa
6    Esterly approximately February 29, 2016?
7        A.   No.  I believe that if I would -- okay.
8    Yes.  Otherwise, if I would have -- if there would
9    have been a thorough investigation, I would have told
10   her then also.
11       Q.   Okay.  Just so I'm clear, though, you
12   remember, as you sit here today, telling Risa Esterly,
13   who is the HR person at the Fort Morgan plant for
14   Leprino Foods, you remember telling her, at the time
15   that she was telling you that your employment was
16   terminated, that you had been acting in self-defense?
17       A.   Yes, sir.
18       Q.   Okay.  And that's the first time that
19   you remember actually mentioning that to anyone
20   associated with Leprino Foods, correct?
21       A.   That I can recall, yes.
22       Q.   Okay.  How did you find -- strike that.
23           How did you learn that your employment
24   at Leprino Foods was being terminated?
25       A.   I was called in to the HR

1    DISTRICT COURT, MORGAN COUNTY, COLORADO

2    Case No.   2016 CR 36

3    ───────────────────────────────────────────

4    TRANSCRIPT OF FTR PROCEEDINGS

5    ───────────────────────────────────────────

6    Plaintiff, The People of the State of Colorado

7    vs.

8    Defendant, Frank Donald Levar

9    ───────────────────────────────────────────

10   A motions hearing in this case was held on

11   August 10, 2016, in District Court before the

12   Honorable Charles M. Hobbs.

13

14   FOR THE PLAINTIFF:  Rebecca Wiard, Esq.

15   FOR THE DEFENDANT:  Paul Wiese, Esq.

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Cross-examination?

2                    CROSS-EXAMINATION

3     BY MR. WIESE:

4          Q.   Now, Mr. Tucker, going back to when you

5     were talking about this specific incident in the

6     supervisor's office, your testimony is that you

7     stepped up to Frank Levar when he had come into

8     the office and demanded to go on to break?

9          A.   Yes.

10         Q.   So, you had been sitting down?

11         A.   I had been sitting down, yes.

12         Q.   You got up and you stepped up to him?

13         A.   Yes.

14         Q.   And how far of a distance are we

15    talking?

16         A.   Maybe a foot.

17         Q.   Okay.  A foot?  And how big -- and this

18    a fairly small office?

19         A.   It is fairly small.

20         Q.   Okay.  So, you would have been fairly

21    close to him when you got up and stepped up to

22    him; correct?

23         A.   Yes.

24         Q.   Okay.  Now, you weren't happy with the

25    fact that Frank had come into the office and

1    demanded to go on to -- go on break; correct?

2         A.    Correct.

3         Q.    Because, he wasn't following proper

4    procedure?

5         A.    True.

6         Q.    And so, when you got up to confront him

7    about this, then you were a little upset with him

8    also; correct?

9         A.    Absolutely.  Yes.

10        Q.    Okay.  And so -- and where were your

11   hands at the time that you stepped up?

12        A.    In my pocket.

13        Q.    Okay.  And so, you were sitting down and

14   then you got up.  Did you use your hands to get up

15   or do you recall?

16        A.    That I don't recall.

17        Q.    Okay.  So -- but, you got up, were

18   angry, stepped up to confront him about this, but

19   you had your hands in your pocket?

20        A.    Yes.

21        Q.    Okay.  And then, you were shoved back;

22   correct?

23        A.    Yes.

24        Q.    Okay.  And at that -- after that

25   Mr. Levar left the office?

1      A.   Yes.

2      Q.   Okay.  And if I understand your

3 testimony, you stated that he went to HR to quote,

4 unquote, report the incident; correct?

5      A.   Yes.

6      Q.   And you had also testified that HR had

7 told you that, well, that was just Frank being

8 Frank; correct?

9      A.   Yes.

10     Q.   Okay.  Did HR tell you anything else?

11     A.   You know, there was conversation, but I

12 cannot re -- I cannot remember everything that was

13 said.

14     Q.   Okay.

15     A.   You know, I can remember Don Northrup

16 saying that I can't believe he did that, because

17 he would have kicked his ass.

18     Q.   Okay.  But, specifically, do you recall

19 how other persons that worked with you felt about

20 what happened?  About your involvement in what

21 happened?

22     A.   Nobody could believe it.

23     Q.   Okay.  Now, you have also been asked by

24 Ms. Wiard here just a few minutes ago about

25 whether you have talked with an investigator about

1    this case?

2          A.   Yes.

3          Q.   Okay.  So, as a matter of fact, you have

4    actually spoken to two different investigators;

5    correct?

6          A.   Yes.

7          Q.   Okay.  And do you remember speaking to

8    this gentleman who is seated to the left of me

9    about this?

10         A.   Yes.  Yes.

11         Q.   Okay.  So, you -- and then you also

12   ended up speaking to Detective Vosburg, who is

13   sitting here -- seated here at the prosecution

14   table?

15         A.   I don't know this one, but --

16         Q.   Okay.  And you spoke to another

17   investigator by phone?

18         A.   Talked to him by phone, yes.

19         Q.   Okay.  By phone?  But, the person you --

20   the investigator you spoke to by phone, that was

21   after you spoke to Mr. Evans, who is seated here

22   next to me to the left?

23         A.   Yes.

24         Q.   Okay.  And, Mr. Evans, you spoke to him

25   in person?

1      A.   Him?  No.

2      Q.   No.  No.  No.  Mr. Evans, who is seated

3   to my left?

4      A.   Oh, Mr. Evans?  Yes.

5      Q.   Right.

6      A.   Yes.  He came to my house.

7      Q.   He came out to your house and then

8   talked to you; correct?

9      A.   He came to my house.

10      Q.   Okay.  And then, the other

11   investigator --

12      A.   Was on the phone while I was at work.

13      Q.   On the phone while you were at work?

14   Okay.  And do you recall when you spoke to

15   Mr. Evans, who, again, is seated here to my left,

16   that -- do you recall telling him that after the

17   incident others felt that -- that you were to

18   blame, or believed that you were the investigator

19   by getting up from the chair and getting too close

20   to Frank?

21      A.   Yes, I do.  I do recall that now.

22      Q.   Okay.  And do you also recall telling

23   Mr. Evans specifically, quote, honestly, I

24   probably got too close and he pushed me, unquote.

25      A.   Yes, I do remember saying that.

1    Q.   Okay.  And so, these other persons that

2    felt this way, were any of those folks in human

3    resources?

4    A.   They are HR.  Yes, that was Shane Cole

5    and Don Northrup.

6    Q.   Okay.  So, it is pretty -- so, HR found

7    that you were to blame, because you got too close

8    to Frank?

9    A.   They probably said I shouldn't have got

10   up.

11   Q.   Okay.  And -- okay.

12   A.   I don't remember them saying that I was

13   to blame, but they said I shouldn't get up -- I

14   shouldn't have gotten up.

15   Q.   Okay.  But, do you recall telling

16   Mr. Evans here that -- that others felt that you

17   were to blame?

18   A.   I think so.

19   Q.   Okay.

20   A.   I think I do recall.

21   Q.   And so, those others easily could have

22   been HR?

23   A.   Yes.

24   MR. WIESE:  Can I have one second?

25   UNKNOWN PERSON:  (Inaudible)

1    investigator.  You said investigator.  It says

2    instigator.

3        Q (MR. WIESE) And to clarify, I had asked you

4    if it was believed you were the investigator by

5    getting up, but they said that they believed --

6        A.   The instigator.

7        Q.   -- that you were to blame for being the

8    instigator for getting up?

9        A.   Yes.

10        Q.   Okay.  Thank you.  And when Frank Levar

11    went to human resources, that was, again, you said

12    to report the incident; correct?

13        A.   Yes.  I think that's -- that's exactly

14    what they told me.

15        Q.   As a matter of fact, Frank Levar did not

16    go to human resources to turn himself in; did he?

17        A.   That I don't know.

18        Q.   Okay.  But -- okay.  So, you are saying

19    it was just to report the incident?

20        A.   Yes.

21        Q.   Okay.  But, did you actually -- do you

22    recall telling anybody that Frank Levar went to

23    human resources to turn himself in for shoving you

24    or anything to (inaudible) that?

25        A.   I don't remember saying anything about



**Leprino Foods**

Employee Name:     Kyle Lara                    Department:   Processing

Date Issued:     8/17/2015

## COMPANY'S REMARKS RE: TERMINATION

Kyle,

On 8/15/2015 you had an altercation with another employee in the Processing redline room where you assaulted this employee.

This is violation of our standards of employee conduct which is cause for immediate termination. Please return all company property to your manager.

Regards,

*Julia Lambert*          8/17/2015

Julia Lambert, Human Resources Generalist      Date

CC:     Risa Esterly, HR Manager
        Mike Buckhout, Department Manager

## Julia Lambert - Statement of Kyle Lara Incident

| | |
|---|---|
| **From:** | Evan Assmus |
| **To:** | Julia Lambert; Risa Esterly |
| **Date:** | 8/17/2015 3:40 AM |
| **Subject:** | Statement of Kyle Lara Incident |
| **CC:** | Jim Hunter; Manley Frisbie; Mellisa Webb; Mike Buckhout; Ramon Mende... |

On the morning of the 15th of July at approximately 5:30 a.m.  I was concluding a walk through of line 2 and returning to processing from between the brines. As I walked to the red room to leave the department & head back to the office I passed Kyle Lara exiting the red room into processing. When I exited the red room I was approached by Chase Nicaise & he began to tell me of an altercation between himself & Mr. Lara. We stepped into the office & he began to tell me that Kyle had said he was talking "SHIT" about him & said they could handle it here right now if Chase wanted to but Chase's response was that he wasn't talking about anybody. Chase then told me Mr. Lara had struck him at the edge of his bump cap with an open hand knocking his goggles & ear protection to the ground. He added that Mr. Lara had then after the first blow added a second open hand slap to Mr Nicaise's face. I sent Mr. Nicaise to the break room to sit & relax as he was clearly shaken after the ordeal & told him to stay there until I came to retrieve him. Shane Davisson & myself were discussing the altercation when Sandie Byron came in the office & informed us that she had retrieved Mr. Nicaise's hearing protection from the boot scrubbing bucket. I immediately contacted Howard Morrill. Howie gave me his card to access the offices upstairs & I retrieved Mr. Nicaise from the break room & took him upstairs to the training room. Howie joined us shortly after & asked Mr. Nicaise what had happened & to fill out a statement as to what had happened. Howie asked me to bring Mr. Lara upstairs & place him in the first huddle room near Mike Buckhouts desk. Howie & myself entered the room & Howie asked him if he knew why he was brought to the huddle room & he replied "NO". Howie asked him if he could be honest with him at this point & asked if he knew of an issue in the red room, Mr. Lara replied "NO". Howie asked again for his complete honesty & if he knew there was a camera in the red room. Mr. Lara replied "No I didn't know there was a camera in that room". Howie asked him again if he had an altercation in the room with another employee, he then replied "YES, but that kid has been talking a lot of shit about me". Howie asked him why he had not brought the situation to the attention of the foreperson on duty & he said "It would not of made a difference". Howie asked him if he had forced physical contact with the employee & he admitted to striking the other employee in the red room at that time. Howie told him there is always another way to handle the situation & that this was not the right course of action taken. Mr. Lara explained that the employee was talking about him & other employees & he knew it to be true because the employee had said things in reference to others to himself. Howie asked him if he wanted to fill out a statement attesting to his side of what had happened & he declined. I went to check on Chases' condition & he appeared to be much calmer & he returned to work.

Sincerely,

*Evan A. Assmus*

Processing Foreman

Leprino Foods Company
2400 E Beaver Avenue
Fort Morgan, CO 80701

(970) 867-9351 Operator
(970) 542-4225 Direct Line
(303) 729-0746 Fax

CONFIDENTIALITY NOTICE: The content of this email message and any attachment thereto is confidential, non-public information intended only for the use of the recipient(s) named above. If received in error and you are NOT one of the named recipients, kindly forward it back to the sender, delete, and disregard the message. You are further notified that the copying, distribution, dissemination or forwarding [other than returning it to the sender if received in error] of this email and/or any attachment is strictly prohibited unless permission, in writing or by email, is received from the sender. Further, this email message may contain company privileged communications which privilege is NOT deemed waived by actual transmission as an email or it may contain company work product, which is privileged.

LEP1143

Page 1 of 1

## Julia Lambert - Chase Nicaise and Kyle Lara 08/15/2015

**From:**    Howard Morrill
**To:**       Lambert, Julia
**Date:**     8/15/2015 7:44 AM
**Subject:**  Chase Nicaise and Kyle Lara 08/15/2015
**CC:**       Buckhout, Kaye;  Cantwell, Ron

At 06:30 on 08/15/2015 Evan Assmus reported to me that there was another employee who got slapped by another employee.

I went upstairs and talked to chase in the training room. He was very upset. He explained that Kyle approached him in the red room and he was very aggressive verbally and ended up slapping him twice in the helmet and the side of his head.

We got Kyle Lara in the huddle room. Evan A. was a witness to the conversation. I asked Kyle to take a seat and told him to be honest with me. I asked if he knew why he was there. He said NO. I asked if he had an altercation with another employee he said no. I said there were cameras near the red room so I wanted him to think about it again and if he put his hands another employee. He did at that point say yes that he did raise his hand physically to another employee. He said that Chase was talking badly about him.

I gave Kyle a piece of paper to make a statement but I would sending him home. He said that he did NOT want to make a statement cause he knew would be fires. I did contact Mike Buckhout and I was told to walk him down. I did take his employee badge and told him Leprino would contact him. I gave him another opportunity to make a statement. He refused.

He wanted his boots that were locked up he paid for. I said he would have that opportunity later. Mike had me talk to Chase again and let him know that he was safe here and what actions we had taken at this point. Asked if he needed anything else he said he did not. He made a choice to go work back on the floor. Chase did notify his father who is a local policeman and said he was going to press charges. I put Chases statement on Julias desk. I also had Kyle, Evan make statements also. If you have any further questions for me call me at 970-370-3691

Howard Morrill

## Julia Lambert

| | |
|---|---|
| **Subject:** | Confidential File |
| **Start:** | Tue 3/1/2016 12:00 AM |
| **End:** | Wed 3/2/2016 12:00 AM |
| **Show Time As:** | Free |
| **Recurrence:** | (none) |
| **Meeting Status:** | Meeting organizer |
| **Organizer:** | Julia Lambert |

Jay brought complaint to Pete regarding Shawn Morrison. After the conversation, Jay stated he was tired of Shawn rough-housing, grabbing shoulders, pretend to choke hold, playing around. He stated he wanted it to stop. We are here to work and not play around. He ask that Shawn be talked to. We told him we would take care of it.

## Julia Lambert

| | |
|---|---|
| **Subject:** | Discussion with Shawn Morrison |
| **Location:** | Huddle Room |
| | |
| **Start:** | Thu 3/3/2016 10:00 AM |
| **End:** | Thu 3/3/2016 10:30 AM |
| | |
| **Recurrence:** | (none) |
| | |
| **Meeting Status:** | Meeting organizer |
| | |
| **Organizer:** | Julia Lambert |
| **Required Attendees:** | Julia Lambert; Jim Wilkins |

Jim and I met with Shawn Morrison. I started the conversation with Shawn explaining that I have had complaints from employees that he likes to play around with others, pretending to put others in head lock, grabbing shoulders. He said yes, I like to play around with people. I am not doing it to be mean. I told Shawn this was not appropriate for the work place and he needed to stop. He said, well I just cannot have fun around here anymore. It is getting very stale here. I said you can have fun at work but you need to remember this is a professional work environment and you need to behave professionally. I asked if he remembered harassment training and he said yes. I told him if you recall we ask that all employees conduct themselves in a professional manner, any inappropriate conduct (playing around, touching) could lead to harassment. I asked Shawn if he understood and he said yes. I told Shawn this was a coaching for him and any continued behaviors of this nature would result in further disciplinary action up and including termination. He stated again I am just playing around and don't mean anything by it. I said I understand but this behavior is not to continue. I did remind Shawn of our no retaliation policy because the fact that employees came forward with their concerns. He said I know and it doesn't matter I don't know who said it. I said true. He asked if he could go and I said yes, thanked him for coming to see us.

Julia Lambert, PHR, SHRM-CP
Human Resources Generalist
Fort Morgan Plant
970-542-4263 Desk Phone
970-380-9638 Cell
303-209-6149 Fax
If you are offered a seat on a rocket ship, don't ask which one, you just get on! -Sheryl Sandberg

## Julia Lambert - To: Confidential File - Marshall

**From:**     Julia Lambert
**Date:**     4/13/2016
**Subject:**  To: Confidential File - Marshall

To: Confidential File
From: Julia Lambert
Date: 4/13/2016, Time: 9:00 a.m.
Re: Discussion with Jay Marshall

I went out to the floor around 9:00 a.m. and I saw Jay Marshall. I apologized to Jay for not following up with him sooner, but I wanted to see how things were going since we had conversation with Shawn Morrison. Jay stated Shawn was mad at me for a couple of weeks, but he got over it. I asked has he stopped the rough housing and he stated yes, it is much better now. I told Jay I didn't tell Shawn that he was the one the had the concern. Jay stated I know you didn't, but someone did. I did tell Jay if Shawn starts up with these behaviors again to let me know immediately. Jay stated, ok I will.



**Leprino Foods**

## EMPLOYEE JOB PERFORMANCE DISCIPLINARY NOTIFICATION

Employee Name: __Shawn Morrison__     DEPT: __Cheese__

Date Warning Issued: __04/18/2016__     TYPE OF VIOLATION: __Job Performance__

COMPANY'S REMARKS RE: VIOLATION:   **Last and Final Warning**

Shawn,

On March 3, 2016 Julia Lambert, HR Generalist, had a conversation with you on some unacceptable behavior between you and another employee. The other day you were seen picking up another employee around the waist, engaging in this type of behavior is not suited for the work place. This type of unprofessional behavior in the workplace is unacceptable and will not be tolerated.

This warning serves as your last and final warning, any further performance issues within a 12-month period; you will be subject to immediate termination.

### EMPLOYEE'S REMARKS RE: VIOLATION

The absence of any statement on the part of the employee indicates his/her agreement with this report as stated, write on back of the white copy if necessary.

_As of 4-18-2016 there will be no more horse play :|||, per sun_

### ACTION TO BE TAKEN TO CORRECT VIOLATION

Managers Statement : __Shawn__ was counseled on the above issue.  Future occurrences may result in further disciplinary action up to and including suspensions and/or termination.

**I have read the "warning" and understand it.  Signing below is <u>acknowledging</u> this meeting and receipt of this document.  It does not imply agreement or guilt of the warning.**

Employee Signature: _____     Date: _4-18-2016_

Human Resources Signature: _____     Date: _4/18/16_

Supervisor/ Manager Signature: _____     Date: _4-18-2016_

REVISED: Disciplinary Action Form – Feb 2015

To: All Ft Morgan Employees

From: Jim Grahlmann

Date: December 21, 2017

Subject: Security Event

As many of you may have already heard, we had a security event last night/this morning relating to a potential threat of workplace violence. Upon receipt of this information, we took steps to alert local law enforcement and they are now investigating this matter.

In response to this incident, we have banned the individual who allegedly made the threats from our premises while the investigation continues. We also have hired an additional security company to assist in our on-premise security measures. We will have armed guards patrolling the exterior of the plant for the foreseeable future. They may occasionally come inside the plant to use our break room facilities.

As you know, our company is committed to the safety and well-being of our employees. Leprino Foods believes that all employees should work in an environment without intimidation, threats or violence. Any actions that are deemed inappropriate will not be tolerated and law enforcement will be notified when warranted.

As such, I need your help in immediately reporting <u>any</u> threats of workplace violence to your supervisor, human resources or any member of management. I would also ask that you report anything that you think might be abnormal behavior or any unusual circumstance to someone in the management team.

It is also important to note that these types of events sometime cause a series of rumors around the plant, which oftentimes can include inaccuracies. I ask that if you hear something or if you have concerns or questions, please raise them with somebody on the management team.

It is our goal to help our fellow employees come to work safely and leave safely. Thank you for your cooperation.

## HR NOTES– CONFIDENTIAL

| Date Time | Employee's Involved | Discussion |
|-----------|---------------------|------------|
| 12/20/17 @ 3:30 p.m. | Howard Morrill, Kevin George | Kevin George and Howard Morrill came to my desk and stated they needed to talk with Manley and myself. Howard began my saying that he was talking with his foreperson Heather Donez, Kevin and Raul were in the office. Howard was sharing a story about Shawn Morrison sitting in his chair in the Cheese office and Howard asking him to move. And that Shawn had given him a little attitude about it. Heather stated well do you want to hear about what he said to me. She stated I didn't want to tell you because I know you will have to do something it and take it upstairs. Howard said yes, you need to tell me. Howard stated Heather told him about conversation with Shawn and Shawn stating if things didn't work out for him he was going to come shoot up the place and Heather was the first one on his list. I asked when did he tell her this and Howard stated it was around a week ago. I asked who else was present and he stated Mike Smith. Manley asked if Heather was doing a statement and Howard said yes and that he would get a hold of Mike Smith to get his statement. Mike Smith out for bereavement. I then stated we need to see Jim Grahlmann and let him know.

Howard, Kevin, Manley and myself went to see Jim and Howard relayed what he had told Manley and I to Jim. Jim then asked to talk with Heather. |
| 4:00 p.m. | Heather Donez | Manley, Jim and I met with Heather. Jim asked Heather to repeat the story about what Shawn Morrison had said to her. Heather stated she and Shawn were in the Cheese Supervisors office the last time they worked together.  She said they were discussing Shawn's personal situation about his divorce. Shawn made the comment to Heather that if things didn't work out for him and he lost his house, he was going to shoot his wife and then come to Leprino and shoot up the place. He told Heather she was his first target. Heather stated she wasn't afraid of him. He told her you would be dead. Heather again stated to him she wasn't scared of him. Jim asked Heather when did this happen? Heather stated she wasn't sure, but it was the last time she worked with him which was either Tuesday or Friday. Jim asked why she didn't report it sooner. Heather told him that she didn't want to be a nark or get him fired. She said today was the first time she had seen him since their conversation. She stated he approached her earlier that morning and Heather looked at him and stated I am not going to put up with your shit today Shawn. He then told her it was stupid that Sandie Byron had been a foreperson. Heather stated she thought that was odd and he had walked away.  Heather stated later she was in the Cheese Supervisors office with Raul. She stated that Shawn walked in and sat in a chair, facing her and just stared at her. Heather stated he didn't say a word but sat there for about 5 minutes just looking at her. Heather asked Raul if he had seen that and he said yes.  Jim asked if she thought it was an act of intimidation and she stated yes. Jim asked Heather if there were any other situations between the two where Heather had disciplined Shawn and she stated no. Jim asked if they were involved in a relationship outside of here and Heather stated no. Heather stated the only issue was the time she reported him for picking up another employee. It was a year and a half ago and he almost lost his job. Heather stated after their interactions this morning she was a little afraid of him. Jim asked Heather what time her shift ended, and she stated now. He asked when she worked again, and she stated tomorrow morning. Jim asked what time do you go to bed and she stated 8:30 p.m. Jim told Heather that we would contact her to let her know what was happening what we had done. Jim did explain we might have to involve the police. Heather stated that was fine. |

12-20-2017

I was sitting in the office. Mike Smith was present. Shawn Morrison came in and was talking about his divorce. He stated that if his wife tries to take his house that he will kill her. I told him that he should not do that. He then proceeded to tell me that if it all goes wrong he will kill her then come to Leprino and shoot the place up. He told me that I would be one of his primary targets. I told him I am not afraid of you. He patted Mike Smith on the shoulder and said you don't have anything to worry about because I like you. I won't shoot you. I once again told him that I am not afraid of him. He said to me that it doesn't matter whether I am afraid of him or not because I will be dead. I told him two more times that I wasn't afraid of him. He left the room.

That was the last time I worked with him until today. Today I was in the office with Raul, Shawn came in sat in a chair so he was facing me and just sat there for approximately 5 minutes and stared strangely at me. It was uncomfortable. He said absolutely nothing then got up and left. I asked Raul if he thought that was strange. He agreed that Shawn was acting strangely and asked me what was going on. It has been bothering me since it happened, but I was not sure how to approach it, I am also afraid of what he will do now that I have told on him, that is why I waited to say anything.

X Heather Perez

# FORT MORGAN SECURITY ALERT

A former employee, Shawn Morrison, engaged in threatening behavior recently that led to his arrest and termination of his employment. Mr. Morrison is not allowed to be <u>within 100 yards</u> of Leprino's facility, and not allowed <u>within 200 yards</u> of any Leprino personnel. This is pursuant to a Protective Order entered on January 5, 2018 in the Morgan County court. The case number is 2018C30005.



**If you see and/or encounter Mr. Morrison, or someone who you suspect may be Mr. Morrison, IMMEDIATELY CONTACT THE POLICE DEPARTMENT using the 911 emergency number.**

*Inform the 911 operator that you have an emergency at the Leprino facility at 2400 E. Beaver Ave, Fort Morgan, CO 80701. An individual (Shawn Morrison) is violating a court order that prohibits him from being near the facility.*

<u>**DO NOT HESITATE TO CONTACT 911 IF YOU HAVE ANY REASON TO BELIEVE MR. MORRISON IS VIOLATING THESE RESTRICTIONS OR THREATENING SAFETY IN ANY MANNER.**</u>

<u>*Other details that may be requested by law enforcement:*</u>

- White, 5'11", 250 lbs., Brown Hair, Brown Eyes
- Date of Birth: 12/8/77
- Address: 039 CR 16, Merino, CO 80741
- Protective Order for Leprino Foods (via representative James Grahlmann) is Case No. 2018C30005, issued 1/5/18.
- An additional Protective Order was issued in a criminal matter protecting our employee, Heather Donez. Case No. 2017M559, in Morgan County court, on 12/21/17.
- Mr. Morrison was arrested outside our facility on 12/21/17 following our report to Morgan County police that he made threats to his coworker (Ms. Donez) regarding shooting people at the facility.
- Mr. Morrison is known to own at least one firearm.
- Mr. Morrison is known to drive a white Buick.

| □Municipal Court ☒County Court □District Court □Denver Juvenile □Denver Probate<br>County Court, Morgan County, Colorado<br>Court Address: Morgan County Justice Center<br>400 Warner Street, Fort Morgan, CO 80701 | DATE FILED: January 4, 2018 3:56 PM<br>FILING ID: 87E712CCE0F5E<br>CASE NUMBER: 2018C30005 |
|---|---|
| Petitioner: Leprino Foods Company, by and through its Vice President of Production Operations, James Grahlmann<br>Address: 2400 E. Beaver Ave, Fort Morgan, CO 80701,<br><br>v.<br><br>Respondent: Shawn Lee Morrison<br>Address: 039 CR 16, Merino, CO 80741. | ▲   COURT USE ONLY   ▲<br>Case Number:<br><br>16 Character #:<br><br>Division          Courtroom |

## VERIFIED PETITION FOR CIVIL PROTECTIVE ORDER
## PURSUANT TO C.R.S. §13-14-104.5(7)(b)

Pursuant to C.R.S. § 13-14-104.5(7)(b), Plaintiffs, Leprino Foods Company ("Leprino") by and through its manager James Grahlmann, respectfully request the Court grant Temporary and Permanent Civil Protection Orders for the benefit of the Protected Persons identified below, against Defendant Shawn Morrison, on the following grounds:

1. This Motion is filed pursuant to C.R.S. § 13-14-104.5(7)(b), which expressly provides that a civil protection order may be issued in the name of a business for the protection of its employees.

2. The background of this action and this Motion, and the reasons why protection orders are necessary based on the acts and expected acts of Mr. Morrison, are described below.

3. Until December 21, 2017, Mr. Morrison was an employee of Leprino at its Fort Morgan facility located at 2400 E. Beaver Ave, Fort Morgan, CO 80701, (the "Plant"). Mr. Morrison is known to Vice President of Production Operations James Grahlmann (who verifies this Petition) as engaging in unpredictable and threatening behavior. Moreover, it is Mr. Grahlmann's understanding that Mr. Morrison owns at least one firearm.

4. On or about December 12, 2017, Plant employee Heather Donez was sitting in an office at the Plant. Plant employee Mike Smith was present as well.

5. On that date, Shawn Morrison entered the office and began talking about his divorce. He told Ms. Donez that if Mr. Morrison's wife tried to take his house he will kill his wife, then come to the Plant and "shoot the place up." Ms. Donez told Mr. Morrison that "he should not do that." In response, Mr. Morrison repeated the threat to kill his wife and "shoot the place up." Mr. Morrison then told Ms. Donez that Ms. Donez, a foreperson at the Plant, would be one of Mr. Morrison's primary targets. Ms.

Donez told Mr. Morrison "I am not afraid of you," to which Mr. Morrison responded that it did not matter whether Ms. Donez was afraid of him or not because she would be dead. During the conversation, Mr. Morrison patted Mike Smith on the shoulder and told Mr. Smith "you don't have anything to worry about because I like you. I won't shoot you." Ms. Donez then twice told Mr. Morrison that she was not afraid of him. Mr. Morrison then left the room. See Affidavit of Heather Donez attached as Exhibit A.

6. On December 20, 2017, Ms. Donez was sitting in the office when Mr. Morrison came into the office, sat in a chair so he was facing Ms. Donez, and stared at Ms. Donez for approximately five minutes in an intimidating manner. Mr. Morrison then got up and left. The December 20, 2017 incident was witnessed by Plant employee Raul Sanchez. This incident on December 20, 2017 alarmed Ms. Donez and prompted Ms. Donez to report the threats and actions of Mr. Morrison to her supervisors, including Mr. Grahlmann. See Exhibit A, Affidavit of Heather Donez.

7. On December 21, 2017 at approximately 4:00 a.m., as Mr. Morrison approached the Plant to begin his shift, he was arrested by the Fort Morgan Police. Vice President Grahlmann was present for and witnessed the arrest.

8. On December 21, 2017, while he was seated in the police vehicle, Mr. Grahlmann informed Mr. Morrison that, based upon his words and actions, his employment with Leprino was terminated, and that he was prohibited from accessing Leprino property or interfering with or being present at any company sponsored activities.

9. Mr. Morrison was charged on December 21, 2017 in Morgan County criminal case number 2017M000559 with harassment, C.R.S. § 18-9-111, and menacing, C.R.S. § 18-3-206, both class 3 misdemeanors, and driving without a driver's license. He has an arraignment date of March 12, 2018 at 8:30 a.m. He was released on bond. A Mandatory Protection Order pursuant to C.R.S. §18-1-1001 was entered against Mr. Morrison naming Heather Donez as the protected party. It is not a no contact order. Leprino is unaware of any other Protective Orders against Mr. Morrison.

10. Based upon Mr. Morrison's conduct, Ms. Donez and the employees of the Plant have expressed concern for their safety and welfare, and believe they are in imminent danger from Mr. Morrison given the statements he made on December 12, 2017 and his actions on December 20, 2017, exacerbated by his criminal charges and employment termination.

11. Following Mr. Morrison's arrest, to protect and provide peace and security for its employees, Leprino has obtained armed security protection for the Plant.

12. Leprino is seeking this Civil Protection Order as a result of the violent threat regarding the Plant and its employees made by Mr. Morrison to Ms. Donez in the presence of Mike Smith, as well as Mr. Morrison's follow-up act of harassment and intimidation against Ms. Donez on December 20, 2017, Mr. Morrison's known ownership of firearms, his intimidating and threatening behavior, his resultant loss of his employment and pending criminal charges. Leprino believes its employees are in imminent danger from Mr. Morrison, particularly during the pendency of the criminal case and any dissolution proceedings affecting Mr. Morrison.

13. Leprino is seeking Protective Orders prohibiting Mr. Morrison from coming within 200 yards of the Plant or any function or organized activity of Leprino in or around Morgan County. This is

necessary to protect the employees of Leprino and to secure the employees' peace and security, physical and emotional well-being.

14. "[T]the court shall not deny a petitioner the relief requested because of the length of time between an act of abuse or threat of harm and filing of the petition for a protection order." C.R.S. § 13-14-104.5(7)(a).

15. Minor children and dissolution are not involved directly and are not applicable to this Motion, although, according to Mr. Morrison, the impetus for his threats against the Plant and its employees is a pending or future dissolution proceeding.

16. The Protected Persons are as follows:

| Full Name of Protected Party | Date of Birth | Address | Sex | Race |
|---|---|---|---|---|
| Grahlmann, James, as Vice President and operations leader of the Leprino Fort Morgan Plant on behalf of all Leprino employees | | 2400 E. Beaver Ave, Fort Morgan, CO 80701 | | |

WHEREFORE, Leprino requests that temporary and permanent Protection Orders be entered against Mr. Shawn Morrison as follows:

A. To refrain from attacking, beating, molesting, intimidating, and verbally harassing the Protected Persons, following them, threatening their life, or threatening them with serious bodily injury.

B. To stay at least 200 yards from the above addresses of the Protected Persons and the Leprino offices located at 2400 E. Beaver Ave, Fort Morgan, CO 80701 or from any Leprino sponsored activities or functions in or around Morgan County, Colorado.

Leprino understands that once a Civil Protection Order is issued it cannot be modified or dismissed by Leprino, the Protected Persons or Mr. Morrison without permission of the Court.

Date: January 3, 2018.

Respectfully submitted,

CAMPBELL KILLIN BRITTAN & RAY, LLC

By: *s/William C. Brittan*
     William C. Brittan, #17643

## VERIFICATION

STATE OF COLORADO      )
                       ) ss.
COUNTY OF _MORGAN_     )


I, James Grahlmann, as Vice President and operations leader of Leprino Foods Company, Fort

Morgan Plant state that I am authorized to make this Verification regarding the Verified Petition for

Civil Protective Order Pursuant to C.R.S. § 13-14-104.5(7)(b) on behalf of Leprino Foods Company and

its employees, and that the facts stated in this Petition are true and correct to the best of my knowledge.


James Grahlmann
Leprino Foods Company

Subscribed and sworn to before me this _4th_ day of January, 2018 by James Grahlmann,
Leprino Foods Company

My Commission expires:  _10/13/2018_

Witness my hand and official seal.

[SEAL]

Sheryl L Groves
Notary Public

## CERTIFICATE OF SERVICE

I hereby certify that on this 5th day of January, 2018 a true and correct copy of the foregoing **VERIFIED PETITION FOR CIVIL PROTECTIVE ORDER PURSUANT TO C.R.S. §13-14-104.5(7)(b)** was filed via the Colorado Court's Efiling System to the following:

*s/Andrea Davis*
Andrea Davis

## Risa Esterly

| | |
|---|---|
| **From:** | Manley Frisbie |
| **Sent:** | Wednesday, June 14, 2017 4:35 PM |
| **To:** | Risa Esterly |
| **Subject:** | FW: Employee Incident |

fyi

**From:** Jim Hunter
**Sent:** Wednesday, June 14, 2017 4:29 PM
**To:** Manley Frisbie <mfrisbie@leprinofoods.com>
**Subject:** FW: Employee Incident

**From:** Mandy Phillips
**Sent:** Tuesday, June 13, 2017 6:02 PM
**To:** Jim Hunter <jhunter@leprinofoods.com>; Rick Osburn <rosburn@leprinofoods.com>
**Cc:** Evan Assmus <eassmus@leprinofoods.com>
**Subject:** Employee Incident

Tuesday night before I headed out, Carlos Sibrian came into the office and said that Crystal kicked him in his testicles while he was stretching but he did not wish to write a formal complaint because he did not want to get anyone in trouble.  He stated that this was not the first time that Crystal had "pretending to try to kick him" but this was the first time that she made contact.  He has had other run ins with her.  I recommend that you talk to him about those events.

I pulled Crystal into the office and asked her what happened. She admitted to kicking him, but said it was just an accident and she was horsing around.  I told her that she would be getting at the very least a write up.  I didn't know what else to do in this situation as it was after hours and Carlos did not feel threatened and did not feel like it was necessary to do anything further at this time.

Carlos did not want to get a point for going home, but he said he was in a lot of pain.  Evan had Heather and him switch for the night to help him out.

We can discuss this tomorrow in person if you would like.  I will be in audit, but I can make some time.

**MANDY PHILLIPS**
QE SUPERVISOR
LEPRINO FOODS COMPANY
2400 E. BEAVER AVE.
FORT MORGAN, CO 80701
DIRECT: 970-542-4237
MAIN: 970-867-9351



Leprino Foods



**Leprino Foods**

2400 East Beaver Avenue
Fort Morgan, CO 80701
970 867-9351

September 17, 2012

Mr. Jedidiah Camacho
708 Walnut Street
Fort Morgan, CO 80701

Dear Jedidiah:

We have concluded our investigation pertaining to the report we received alleging you made threatening comments against the Fort Morgan Leprino Foods workplace. Leprino Foods Company takes reports of potential workplace violence seriously and investigations of such behavior are elevated to the corporate level.  We have determined sufficient evidence exists that establishes you did make inappropriate comments threatening the safety and security of your fellow co-workers.  Such behavior is a direct violation of the Company's workplace security policy and will not be tolerated.

Accordingly, your employment is terminated effective September 17, 2012.  Due to the grounds of your termination, you are not allowed on Leprino property, nor are you allowed to attend any Leprino sponsored events.

Sincerely,

*Shane E. Cole*

Shane E. Cole
Human Resources Manager

SEC/slg

# Memo

| | |
|---|---|
| To: | Kerry Mobley |
| From: | Shane Cole |
| CC: | Steve Schmidt, Julia Lambert |
| Date: | 7/31/2019 |
| Re: | Alleged Work Place Violence status report |

---

On **Monday, September 10, 2012 around 4:00 PM** Maria Urbina (QE tech) met with Julia Lambert, Coral Mendez and me to inform us of an issue her and three other employees had been discussing among themselves. She reported the issue involving Jedidiah Camacho (Line Attendant), and statements he has made and behaviors he has exhibited. Maria told us the group she was talking with informed her that Jedidiah was making blanket statements of violent behavior to them including the potential existence of a death list. She (Maria) did not hear anything first hand. The people involved in the discussion were Felix Hinojos, Maria Lechuca and Vanessa Apodaca. Chris Lee was the employee with alleged information about the death list.

On **Tuesday, September 11, 2012 at 8:30 AM** Julia Lambert and I talked to Felix. Felix confirmed Maria's information. Felix stated Jedidiah does have a temper and he has heard him talking to himself out on the floor after people piss him off. He and Mike Villarreal have a hard time getting along, Mike seems to ride him hard and not stop. Mike Hollenbeck also gets involved a little more but stop when Jedidiah reaches the edge.

We asked him (Felix) if he has ever heard Jedidiah say anything regarding a gun or killing people first hand. He confirmed and told us he heard Jedidiah say "I'm fucking bringing a machine gun in and killing everyone." Felix also stated that Jedidiah has been more agitated lately even punching his fist into his hands when he gets angry. We asked if Jedidiah knows him (Felix) is around when he did those things and Felix stated, yes because I try to joke with him and calm him down. The last question we asked Felix was about the death list and he informed us that he did not know or hear anything about that.

Felix asked us if our conversation was going to be kept confidential, we informed him as much as it can be but we could not guarantee his anonymity.

On **Tuesday September 11, 2012 around 10:30 AM** Julia and I called Steve Schmidt to inform him of our issue and let him know of our actions taken and planned for the day. He requested that we contact the local police and set in motion the ability to have double security for the plant for at least two weeks. We then involved Warren Walker to research and contact possible vendors that could provide this service if we were not able to do so internally.

On **Tuesday, September 11, 2012 around 10:45 AM** we met with Vanessa Apodaca and asked her to talk to us about Jedidiah and the concerns she had discussed with Maria and the group. She started by saying Mike Villarreal and Mike Hollenbeck have been pushing his buttons. We asked if they know they are pushing him and making him angry, she stated, yes. We asked if she has ever heard him say anything about getting a gun or violent behaviors. She stated, one day he did say he wanted to grab a

1

CONFIDENTIAL LEP0818

gun and shoot everybody. We asked when that was and she replied a couple days ago last week, on the floor. We asked if he said it to her or if he was talking to himself, she told us both. The last question we asked is his behavior getting worse; she replied yes it seems to be.

On **Tuesday, September 11, 2012 around 12:30** we met with Maria Lechuga and asked her to tell us the story instead of us asking any questions. Maria said she has noticed Jed getting very upset lately, for about a month now. She said Jed told her I wish that Mother Fucker would stay off my ass. He expects me to do everything. He is Mike Villarreal. She also told us she remembers he was doing cellulose and got so mad that he with a piece of metal. She told him not to do that because he was going to hurt himself and she tried to calm him down. Maria has also coached Jed to not take crap from Mike Villarreal and to talk back to him. Maria was asked if she has ever heard him say anything about guns or shooting anyone. She replied no but has heard him say that he wants to run his (Mike) ass over.

Maria said there was a confrontation between the two where Jed allegedly chest bumped Mike, but Mike backed down. This happened last week. She has heard Mike Villarreal say he was going to kick Jed's ass, but not here at work. She didn't know if Mike informed anyone of this confrontation but she did say he was looking for Manley that day and couldn't find him. And Mike said to Maria that he couldn't wait for Manley to get a hold of (Jed) that Mother Fucker. She also told us that Mike mentioned something to Roy Buhring (Foreperson) and that Roy then talked to Jed. Jed was very upset after that and told Maria he was going to hit Roy. Maria said when she first started that Jed was very quiet and kept to himself. Now he is more vocal and that she has even seen him punch the air in anger.

We asked what this issue was between Mike and Jedidiah, She replied Mike thinks he knows it all and likes to tell Jed what to do.  Mike gets on him and Jed won't let him know he needs to talk to the supervisor if he thinks Jed needs direction. Jed could do more, he does take off sometimes.

On **Tuesday, September 11, 2012 at 2:00 PM** we met with Chris Lee and let him know we were conducting an investigation and his name came up about knowing about a kill or death list that Jedidiah allegedly has. Chris told us he was unaware of any list but did hear that Jedidiah said his was going to punch or nail Roy to the wall, Roy Buhring. This was because Roy asked/directed him to do something. We asked if Chris has any issues with Jedidiah , he stated not really but there is an issue with his dad and my wife at the post office that involves a restraining order so I kind of stay away from him.

Chris called later and asked us to keep his name out of it because of the situation between his wife and Jedidiah's Dad.

On **Tuesday, September 11, 2012 at 2:10 PM** Julia and I met with Officer Thyne from the Fort Morgan Police Department. We informed him of the situation and what we have done to this time. We did tell him our next step was to meet with Jedidiah and get his side of the story. Then he would be suspended him until we reviewed all the information and shared it with people above us. We did let him know we were going to have double guards on after we met with Jedidiah on Wednesday and that we would do that for a period of time after we determined what our actions with Jedidiah are going to be. He seem to like what he heard

| Page 2

and that he would be off tomorrow but to call his cell phone after we met with Jedidiah to let him know how it went.

Page 3

CONFIDENTIAL LEP0820