Lambert
11/21/2019

Page 17

1  A. With Risa Esterly?
2  Q. Yes.
3  A. Yes.
4  Q. How often?
5  A. Once a month maybe.
6  Q. Have you talked with Ms. Esterly about
7  her deposition in this case?
8  A. Yes.
9  Q. What did you talk with Ms. Esterly --
10 A. It was text.
11 Q. What did you text Ms. Esterly about?
12 A. She told me she had had hers and asked
13 me when my deposition was.
14 Q. Anything else?
15 A. She told me that it was two hours,
16 roughly, hers was, and big -- a portion of it was her
17 background.
18 Q. Would it be possible for you to provide
19 those texts to your counsel -- or to Mr. Brittan?
20 A. If they're still on my phone, yes.
21 Q. Thank you.
22    Any other time -- did you have any
23 verbal conversations with Ms. Esterly about her
24 deposition?
25 A. No.

Page 18

1  Q. Any other time that you discussed this
2  case with Ms. Esterly?
3  A. While I was employed at Leprino or after
4  I left?
5  Q. After your employment.
6  A. No.
7  Q. So when you were first hired at Leprino,
8  did you receive any training?
9  A. No.
10 Q. What about when you were promoted to the
11 HR specialist?
12 A. Supervisor.
13 Q. Supervisor.
14 A. Yes.
15 Q. What training did you receive as the HR
16 supervisor?
17 A. We had management courses -- internal
18 courses that we had to take.
19 Q. Let's first start with what were your
20 duties as the HR supervisor?
21 A. I was hiring, firing, benefits,
22 compensation, employee relations.
23 Q. So with hiring, did you actually do job
24 postings and interviews?
25 A. Correct.

Page 19

1  Q. And were you the person that had the
2  main oversight responsibility of that?
3  A. Correct.
4  Q. And with firing, I previously asked you
5  if you had the authority to fire employees. Was
6  that -- did you have authority to fire any employee
7  or were there restrictions placed on your authority
8  to terminate employees?
9  A. There were restrictions.
10 Q. What were those?
11 A. It would need to be discussed. I sat in
12 on the terminations with the managers.
13 Q. Okay. Who made the ultimate decision
14 when it came to terminations?
15 A. The HR manager, the plant manager.
16 Q. Okay. Leprino had various policies and
17 handbooks while you were there, correct?
18 A. Correct.
19 Q. Are you familiar with their handbooks
20 and policies?
21 A. Yes.
22 Q. Did you have anything to do with the
23 drafting of their handbooks or policies?
24 A. No.
25 Q. Do you know if Leprino had kind of one

Page 20

1  comprehensive set of policies for all of its plants
2  or if policies and handbooks differed from plant to
3  plant?
4  A. They differed from plant to plant.
5  Q. What's your understanding of what a
6  progressive disciplinary policy is?
7  A. What is my understanding of a
8  progressive?
9  Q. Uh-huh.
10 A. My understanding is that we have a
11 situation, you investigate the situation, and then
12 you decide what the severity is. And then from that
13 decision, then you decide whether -- what that looks
14 like as far as the discipline.
15 Q. I thought progressive discipline
16 policies were kind of like verbal warning, written
17 warning, final notice, termination, something like
18 that, where there were steps.
19 A. It depends on the severity.
20 Q. Well -- and I'm just -- I'm not asking
21 about disciplinary policies. I'm just asking about
22 progressive disciplinary policies. Is there a
23 difference between progressive disciplinary policies
24 and disciplinary policies in general?
25    MR. BRITTAN: Object to the form.

Exhibit 1