EXHIBIT 1

```
1                IN THE UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF COLORADO

3    Civil Action No. 19-CV00285-CMA
     _____
4
     VIDEO DEPOSITION OF:  NICOLAS DONEZ - August 26, 2019
5    _____

6    NICOLAS DONEZ,

7    Plaintiff,

8    v.

9    LEPRINO FOODS COMPANY,

10   Defendant.

11   _____

12             PURSUANT TO NOTICE, the video deposition
     of NICOLAS DONEZ was taken on behalf of the Defendant
13   at 1035 Pearl Street, Suite 325, Boulder, Colorado, on
     August 26, 2019, at 9:54 a.m., before Carmen Murphy,
14   Registered Professional Reporter and Notary Public
     within Colorado.
15

16

17

18

19

20

21

22

23

24

25
```

U.S. LEGAL SUPPORT, INC.
303-832-5966

**EXHIBIT 1**

Nicolas Donez   08/26/2019                                Pages 21..24
NICOLAS DONEZ v. LEPRINO FOODS COMPANY

Page 21

```
 1      A.  Yes, sir.
 2      Q.  -- charges?
 3          What documents relating to his court
 4  case did you review?
 5      A.  The documents?
 6      Q.  Yes.
 7      A.  Well, the documents that -- the actual
 8  documents that pertain to that -- to that case that
 9  the courts provided.
10      Q.  Okay.  And how many -- how many
11  different documents relating to Mr. Levar's court case
12  did you see?
13      A.  Just that one.
14      Q.  All right.  And do you know the name of
15  that document?
16      A.  No, I don't.
17      Q.  Was Heather present throughout the
18  entirety of your conversation yesterday with your
19  attorney?
20      A.  Yes.
21          MR. BRITTAN:  Counsel, I believe that
22  that waives the privilege.
23          MS. BURMA:  Heather is actually one of
24  my clients, and I have a joint representation
25  agreement with both of them, so I would say it does
```

Page 22

```
 1  not waive the privilege.
 2          MR. BRITTAN:  Okay.  Well, let's talk
 3  about this at a break.  I may circle back to this.
 4  But since we just got going, I'm going to proceed.
 5      Q.  (BY MR. BRITTAN)  What else did you do
 6  to prepare for your deposition today other than meet
 7  with your attorney and review the document relating to
 8  Mr. Levar's court case?
 9      A.  That was all.
10      Q.  There have been certain documents that
11  have been produced in this case by Leprino Foods.
12          Have you reviewed any of those
13  documents?
14      A.  The -- well, yes, sir.  My file.
15      Q.  Okay.  And when you say your file,
16  what's -- what's included in your file?
17      A.  My file history from Leprino Foods, my
18  attendance -- all of my attendance records, the
19  meeting that we had with Kerry Mobley.  And there is
20  also a meeting that they -- or a -- a report on the
21  disagreement that myself and Melvin Muth had.
22      Q.  Okay.  Is there anything else in that
23  file other than what you have just listed?
24      A.  To my recollection, that's all I can
25  remember.
```

Page 23

```
 1          MS. BURMA:  Just to clarify, are you
 2  asking anything in the file or anything that he
 3  reviewed?
 4          MR. BRITTAN:  Right now I'm just asking
 5  about his file.
 6          MS. BURMA:  Okay.
 7      Q.  (BY MR. BRITTAN)  So your file that you
 8  have -- and I take it -- is your file at home right
 9  now?
10      A.  Yes, sir.
11      Q.  You didn't bring it with you today?
12      A.  No, sir.
13      Q.  So this file, you said it's a file
14  history from Leprino Foods, which includes attendance
15  records, a meeting with Kerry Mobley, and a report on
16  a disagreement you had with Melvin --
17      A.  Muth.
18      Q.  And how do you spell Muth?
19      A.  M-u-t-h, I believe.
20      Q.  Okay.  Was -- when did you put this file
21  together?
22      A.  I did not.
23      Q.  Okay.  Who put the file together?
24      A.  That was sent to me from my attorney.
25      Q.  The meeting with Kerry Mobley that you
```

Page 24

```
 1  mentioned, is this a -- is this a statement?  Is it a
 2  memorandum?  Or what is it exactly?
 3      A.  It was because of a disagreement that
 4  myself and a co-employee had at one time.
 5      Q.  And who is the co-employee?
 6      A.  Howie Morrill.
 7      Q.  How many pages is that document?
 8      A.  I couldn't tell you.
 9      Q.  And then there's a report on a
10  disagreement with Melvin Muth.
11          What is -- who authored that report?
12      A.  I believe it was Shane Cole at the time.
13      Q.  Mr. Cole's position was at the time --
14      A.  HR manager.
15      Q.  What was the disagreement with Mr. Muth?
16      A.  I had asked him to move -- I can't
17  remember exactly what it was.  But I had asked him to
18  do -- he was -- he is -- Melvin Muth is a forklift
19  operator in the warehouse department.
20      Q.  Okay.
21      A.  I needed for him to do something, and it
22  needed to be done immediately, and he didn't respond
23  in -- in such a manner.  So that is what sparked the
24  disagreement -- the argument.
25      Q.  Approximately when did this argument
```

Page 25

1  with Mr. Muth occur?
2       A.   I don't recollect the time.
3       Q.   Absent the report that you were
4  provided, do you have a recollection of that event?
5       A.   Vaguely.
6       Q.   Mr. Donez, you've claimed in your
7  lawsuit that you were fired from Leprino Foods in
8  February of 2016 because you had filed a workers'
9  compensation claim relating to injuries that you'd
10 suffered in the incident with Frank Levar, correct?
11      A.   Could you repeat that, please.
12      Q.   Sure.
13           Are you aware that in your complaint
14 that you have filed against Leprino Foods in this case
15 that you believe or contend that Leprino Foods fired
16 you because you filed a workers' compensation claim --
17           MS. BURMA:  I'm going to object -- oh,
18 sorry.
19           MR. BRITTAN:  That's all right.
20      Q.   (BY MR. BRITTAN)  -- a workers'
21 compensation claim relating to injuries you'd suffered
22 in the incident with Frank Levar?  Are you aware of
23 that?
24           MS. BURMA:  Objection, calls for a legal
25 conclusion.

Page 26

1            You can answer.
2       A.   Could I have you repeat that one more
3  time, please.
4       Q.   (BY MR. BRITTAN) Sure.  Sure.  Let me
5  back up, and we'll start from the beginning.
6            First of all, obviously you're aware
7  that we're here today to take your deposition because
8  you filed a lawsuit against your former employer,
9  Leprino Foods Company, correct?
10      A.   That's correct.
11      Q.   Okay.  Now, in that lawsuit that you
12 filed against Leprino Foods, you claim that you were
13 discriminated against, correct?
14      A.   That's correct.
15      Q.   Okay.  What's the basis of your claim of
16 discrimination?  What is it you believe that Leprino
17 Foods discriminated against you?  In other words, how
18 did they discriminate against you?
19      A.   How do I believe?
20      Q.   Yeah.
21      A.   Well, Frank Levar, prior to his attack
22 on me, his -- his foreman at that time, prior to that,
23 he had committed the same thing with another foreman,
24 and was just spoken to.  According to their policy,
25 they never investigated it nor did they do any

Page 27

1  corrective actions but allowed him to go right back to
2  work.
3            I place my hands on Frank Levar in
4  self-defense, and I'm fired.
5       Q.   Are you aware that in your complaint,
6  you have alleged that your termination from Leprino
7  Foods was based on your filing of a workers'
8  compensation claim?
9       A.   Based on that workman's compensation and
10 discrimination, is my understanding.
11      Q.   Okay.  So at least you -- you're
12 contending that at least partially the reason for your
13 termination from Leprino Foods was the filing of a
14 workers' compensation claim, correct?
15           MS. BURMA:  Objection, calls for a legal
16 conclusion.
17           You can answer.
18      A.   My understanding is that --
19           MS. BURMA:  And don't --
20           MR. BRITTAN:  There's no instruction of
21 the witness.
22           MS. BURMA:  I just don't want him to say
23 anything that's privileged.
24           MR. BRITTAN:  I understand.
25      Q.   (BY MR. BRITTAN)  I'm not asking for any

Page 28

1  privileged information that your lawyer may have told
2  you.  I just want to know if you understand that that
3  is one of the claims you are making in this lawsuit.
4       A.   Yes, I do.
5       Q.   Okay.  So today is our opportunity to
6  ask you about facts that support your claims.  What
7  facts do you have to support the claim that you
8  believe your termination from Leprino Foods was caused
9  at least partially by your filing of a workers'
10 compensation claim?
11           MS. BURMA:  Again, objection, calls for
12 a legal conclusion.
13           You can answer.
14      A.   I'm not sure how to answer that.
15      Q.   (BY MR. BRITTAN) Okay.  Are you
16 aware -- strike that.
17           Back in 2016, you and your wife,
18 Heather, were married at that time; is that correct?
19      A.   That's correct.
20      Q.   Heather suffered an on-the-job injury
21 back in 2016, correct?
22      A.   That's correct.
23      Q.   What was that injury she suffered?
24      A.   Burn to her -- a burn to her hand.
25      Q.   How long was she off work as a result of

Page 53

1  with any physical altercation outside of the Fort
2  Morgan plant?
3       A.  No, sir.
4       Q.  Okay.  So with regards to harassment or
5  an intimidating situation outside the Fort Morgan
6  Leprino plant, what are you aware of with regards to
7  Frank Levar in that situation?
8       A.  During the court trial, it was disclosed
9  that Frank Levar had held a supervisor at gunpoint in
10 his house.
11      Q.  When did this situation occur?
12      A.  I don't remember dates.
13      Q.  Was it before -- strike that.
14          Do you know if it was before or after
15 Mr. Levar started working at Leprino Foods?
16      A.  It was before.
17      Q.  And so you heard about this, I take it,
18 at the trial of Mr. Levar?
19      A.  Yes.
20      Q.  Did you -- strike that.
21          Did you sit in on Mr. Levar's trial?
22      A.  Yes.
23      Q.  Did you sit in on the entirety of the
24 trial?
25      A.  Yes.

Page 54

1       Q.  How long did that trial last?
2       A.  Oh.  I honestly can't remember.
3       Q.  Are we talking --
4       A.  Days.  It was just -- less than -- less
5  than a week, I believe.  I'm not absolutely sure.
6       Q.  Okay.  You said he'd held a supervisor
7  at gunpoint in his home.
8           Who was the supervisor with, to the best
9  of your understanding?
10      A.  Who -- oh, okay.  That was with Cargill,
11 I believe.  And that's a meat processing plant.
12      Q.  Where is that located at?
13      A.  That's located there in Fort Morgan.
14 Morgan County.
15      Q.  Okay.  Do you have any understanding of
16 any ramifications that resulted from Mr. Levar holding
17 the supervisor at gunpoint in his home?
18      A.  That, I can't remember.
19      Q.  Now, was that the first that you had
20 heard of that situation, Mr. Levar holding a
21 supervisor at gunpoint in his home?
22      A.  Yes.
23      Q.  Do you know of anybody at Leprino Foods
24 that was also aware of that?
25      A.  I do not.

Page 55

1       Q.  Did anybody ever tell you after
2  Mr. Levar's trial -- strike that.
3           Did anybody from Leprino Foods ever
4  mention to you that they were aware of that situation?
5       A.  Not to my knowledge.
6       Q.  During the period of time -- and you
7  thought it might be eight to ten years -- that you and
8  Mr. Levar both worked in the whey department, did you
9  ever request that Mr. Levar not work with you?
10      A.  No.
11      Q.  What was Mr. Levar's position within the
12 whey department?
13      A.  He was a lactose operator.
14      Q.  And you were a foreperson in the whey
15 department.
16          Does that mean you were his foreperson?
17      A.  Yes, sir.
18      Q.  And if Mr. Levar had an issue doing his
19 job as a lactose operator, were you the first point of
20 contact for him?
21      A.  First or second.  Depending on if I was
22 busy and he couldn't contact me or get ahold of me,
23 then it would be the supervisor.
24      Q.  I understand your answer.
25          Let's assume that both you and the

Page 56

1  supervisor are available in that situation.  Would
2  you, as the foreperson, be his first point of contact?
3       A.  Yes.
4           MR. BRITTAN:  Why don't we mark this as
5  Exhibit 1, please.
6           (Exhibit 1 marked for identification.)
7       Q.  (BY MR. BRITTAN)  Sir, let me show you
8  what we have marked as Donez Exhibit Number 1.  You
9  earlier told me about the documents that you had
10 reviewed in preparation for this deposition.
11          Is this one of those documents?
12      A.  Yes, sir.
13      Q.  Okay.  And is this the situation you
14 were talking about involving yourself and Mr. Muth?
15      A.  Muth.  Yes, sir.
16      Q.  Is it Muth?
17      A.  Muth.
18      Q.  Muth.  Thank you.
19          So this is entitled an Employee Warning
20 Record.  You see the date warning issued by HR is --
21 looks like December 22, 2003.
22          Do you see that?
23      A.  Yes, sir.
24      Q.  It states on December 13, 2003, you had
25 a verbal altercation with a warehouse employee.

**EXHIBIT 1**

Nicolas Donez    08/26/2019    Pages 57..60
NICOLAS DONEZ v. LEPRINO FOODS COMPANY

Page 57

1  And that warehouse employee was
2  Mr. Muth?
3     A.  Yes, sir.
4     Q.  I don't think his name is listed in
5  this, but I'll continue reading.  During this
6  conversation you used inappropriate language directed
7  at the other employee.
8         What inappropriate language did you use
9  at -- was -- I'm sorry -- strike that.
10        What inappropriate language did you
11 direct to Mr. Muth?
12    A.  I can't remember what words I used, but
13 they were basically cuss words.
14    Q.  How many cuss words?
15    A.  I'm not absolutely sure.
16    Q.  As a result of that situation, you
17 received this warning, right?  This employee warning
18 record, correct?
19    A.  That's correct.
20    Q.  Is your signature on here, sir?
21    A.  Yes, it is.
22    Q.  It's on the left -- lower left-hand
23 side?
24    A.  Yes, it is.
25    Q.  Okay.  Was that the first situation --

Page 58

1  employed at Leprino?  Strike that.
2         Was that the first situation while you
3  were employed at Leprino Foods where you had an
4  altercation, either verbal or otherwise, with a fellow
5  employee?
6     A.  Yes, sir.
7     Q.  Were there any others between this
8  situation with Mr. Muth in 2003 and the situation with
9  Mr. Levar in February of 2016?
10    A.  The disagreement that I had with Howie
11 Morrill.
12        MR. BRITTAN:  Let's mark this as Exhibit
13 Number 2.
14        (Exhibit 2 marked for identification.)
15    Q.  (BY MR. BRITTAN)  Sir, I've marked and
16 I'm showing you what's been marked as Donez Exhibit
17 Number 2.
18        Have you seen this document before?
19    A.  Yes, sir.
20    Q.  Was this one of the documents you
21 reviewed in preparation for your deposition?
22    A.  Yes, sir.
23    Q.  Prior to reviewing it in preparation for
24 your deposition, had you seen this document before?
25    A.  Prior to, no, I had not.

Page 59

1     Q.  This is a memo from Julia Lambert.
2         Do you know who Julia Lambert is?
3     A.  Yes, sir.
4     Q.  Who is Julia Lambert?
5     A.  She assisted in the HR department.
6     Q.  Back in 2009 -- which is the date of
7  this memo -- am I correct that you and Heather -- you
8  were not married, but you were --
9     A.  Together.
10    Q.  -- living as a couple?
11    A.  Yes, sir.
12    Q.  Okay.  And during that period of time
13 back in 2009, Heather was employed at Leprino Foods as
14 well?
15    A.  Yes, sir.
16    Q.  At the Fort Morgan plant?
17    A.  Yes, sir.
18    Q.  Which side of the plant was Heather
19 working on?
20    A.  She was working in the cheese
21 department.
22    Q.  And that's the same department that
23 Mr. Morrill worked in, correct?
24    A.  That's correct.
25    Q.  So what was the situation that led to

Page 60

1  the meeting between yourself, Ms. Lambert, Kerry
2  Mobley, and Mr. Morrill which is the subject of this
3  memo?
4     A.  My confronting Howie Morrill and asking
5  him to not harass my wife.
6     Q.  How did you confront him?
7     A.  He walked out to his -- his vehicle, and
8  I followed him out there.  And I -- once he stopped at
9  his vehicle, I asked him -- I asked to talk to him.
10    Q.  Okay.  And you confronted him in the
11 parking lot at the Leprino Foods --
12    A.  Yes, sir.
13    Q.  -- Fort Morgan plant, correct?
14    A.  Yes, sir.
15    Q.  All right.  What was said in that -- in
16 that conversation?
17    A.  I can't remember word for word.  But I
18 had asked him to -- if it was a work-related issue,
19 that I couldn't do anything about it.  But personal
20 issues, he needed to mind his own business and not
21 harass my wife.
22    Q.  Did you touch Mr. Morrill at that --
23    A.  I never touched him.
24    Q.  -- time?
25        MS. BURMA:  And just wait a second after